No. 01-639C
(Judge Lettow)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

BANNUM, INC.,

Plaintiff
v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS SIX AND EIGHT OF THE SECOND AMENDED COMPLAINT**

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DEBORAH A. BYNUM
Assistant Director

DEVIN A. WOLAK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel. (202) 616-0170
Fax. (202) 514-8624

August 29, 2007

Attorneys for Defendant

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . ii

STATEMENT OF THE ISSUES . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . 2

II. Statement Of Facts . . . . . . . . . . 4

A. Count 6: Contract J200c-336 Concerning Beaumont, Texas . . . . . . . . . . 4

B. Count 8: Contract J200c-397 Concerning Montgomery, Alabama . . . . . . 7

ARGUMENT . . . . . . . . . . 10

I. Standard of Review . . . . . . . . . . 10

II. The Defendant Is Entitled To Summary Judgment Upon Count Six Because Bannum Should Not Be Compensated For Having To Respond To The Cure Notice . . . . . . . . . . 11

A. Bannum's Claim . . . . . . . . . . 11

B. Bannum Is Not Entitled To Recover The Cost Of Responding To A Cure Notice . . . . . . . . . . 12

C. The Government Did Not Withhold Superior Knowledge . . . . . . . . . . . 13

D. The Government Did Not Breach Its Duty To Cooperate . . . . . . . . . . . . 15

III. The Defendant Is Entitled To Summary Judgment Upon Count Eight Because Bannum Made More Money Under The Replacement Contract Than It Would Have Under The Options That Were Not Exercised, And Bannum Has Failed To Substantiate Its Claim For Administrative Costs Associated With Negotiating Over Its Failure To Provide Transportation To Inmates As Required Under The Contract . . . . . . . . . . 16

A. Bannum's Claim . . . . . . . . . . 16

B. The Defendant Was Not Bound To Exercise The Options . . . . . . . . . . . 17

C. The Defendant Did Not Act In Bad Faith . . . . . . . . . . . . . . . . . . . . . . . . . 18

D. Bannum Has Suffered No Lost Profits Because It Received More Money Under The Replacement Contract Than It Would Have Received Under the Option Years . . . . . . . . . . . . . . . . . . . . 20

E. Bannum Is Not Entitled To Its Costs Of Negotiating The Transportation Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## TABLE OF AUTHORITIES

**CASES**

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Cedar Lumber, Inc. v. United States,
5 Cl. Ct. 539 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Curtis v. United States,
144 Ct. Cl. 194, 168 F. Supp. 213, (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Continental Collection & Disposal Inc. v. United States,
29 Fed. Cl. 644 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

Discount Co. v. United States,
554 F.2d 435 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

GAF Corp. v. United States,
932 F.2d 947 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Granite Constr. Co. v. United States,
24 Cl. Ct. 735 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

H.H.O., Inc. v. United States,
7 Cl. Ct. 703 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Hi-Shear Technology Corp. v. United States,
53 Fed. Cl. 420 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Ho v. U.S.,
49 Fed. Cl. 96, 107 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

McCormick Constr., Co. v. United States,
18 Cl. Ct. 259 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Northrop Grumman Corp., Military Aircraft Div. v. United States,

63 Fed. Cl. 12 (2004) . . . . . . . . . . 13

Optimal Data Corp. v. United States,
17 Cl. Ct. 723 (1989) . . . . . . . . . . 17

Piasecki Aircraft Corp. Island Rd. v. United States,
229 Ct. Cl. 208 (1981) . . . . . . . . . . 13

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . . . . . . 15

Ryco Const., Inc. v. United States,
55 Fed. Cl. 184 (2002) . . . . . . . . . . 15

Seal-Flex, Inc. v. Athletic Track and Court Const.,
98 F.3d 1318 (Fed. Cir. 1996) . . . . . . . . . . 10

Southern Comfort Builders, Inc. v. United States,
67 Fed. Cl. 124 (2005) . . . . . . . . . . 18

Sweats Fashions, Inc. v. Pannill Knitting, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 10

**RULES AND REGULATIONS**

RCFC 56(c) . . . . . . . . . . 10

48 C.F.R. § 31.205 . . . . . . . . . . 12

48 C.F.R. § 52.249-8(2) . . . . . . . . . . 12

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BANNUM, INC., Plaintiff, | ) | |
| v. | ) | No. 01-639C (Judge Lettow) |
| THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**UPON COUNTS SIX AND EIGHT OF THE SECOND AMENDED COMPLAINT**

Pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court grant this motion for summary judgment because there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law. In support of this motion, we rely upon the plaintiff's second amended complaint, the defendant's Proposed Findings of Uncontroverted Fact, the following brief, and the separately filed appendix.

**STATEMENT OF THE ISSUES**

1. Whether the United States is entitled to summary judgment upon Count 6 of the second amended complaint, in which the plaintiff seeks to recover the cost of preparing a response to a Cure Notice that was issued after the Government learned that the plaintiff had been issued a notice of eviction for the premises where it was required to perform the contract.

2. Whether the United States is entitled to summary judgment upon Count 8 of the second amended complaint, where the plaintiff seeks to recover lost profits under two unexercised option periods and the costs of responding to various inquiries by the Government during performance, even though the plaintiff was awarded a new contract in place of the unexercised option periods at a substantially higher price.

## STATEMENT OF THE CASE

I. Nature Of The Case

The plaintiff, Bannum, Inc. ("Bannum"), and the United States Department of Justice, Federal Bureau of Prisons ("BOP"), entered into several contracts to operate various BOP Community Correctional Centers ("CCC" or "halfway house") throughout the nation. The CCC's are, generally speaking, facilities where Federal inmates spend the last months of their terms of incarcerations so that they can more effectively make the transition from life as an inmate to life as a member of free society. During their stay at a CCC, the inmates are given a room, are required to find gainful employment, and are also required to participate in a variety of transitional and rehabilitational activities. Under the terms of its contract to operate CCCs, Bannum was to provide services for and oversee all aspects of the inmates' custody.

This action was filed in 2001, and the original complaint contained ten separate claims for relief. Discovery is closed and, pursuant to the Court's July 13, 2007 order, the defendant has been granted leave to file a motion for summary judgment upon only two of the ten counts in the plaintiff's second amended complaint. Based upon these limitations, we request summary judgment upon counts six and eight of the second amended complaint.

Count Six arises under Bannum's Beaumont, Texas contract, and seeks the costs of preparing a response to a Cure Notice that the BOP issued when it learned that Bannum had been in a months-long lease dispute with the landlord of the Beaumont facility that led to the landlord issuing a notice of eviction to Bannum on December 8, 2000. There are no disputes of material fact with respect to this claim – the Beaumont contract required Bannum to provide suitable property for the operation of the CCC, Bannum had been served with a notice of eviction for the

Beaumont CCC, and the BOP issued a Cure Notice that basically required Bannum to provide assurances that it would be able to continue to fulfill its obligation to maintain possession of the physical building used to house the Federal inmates. The defendant is entitled to judgment as a matter of law, because neither the Beaumont contract nor any statute, regulation or other law requires the BOP to pay Bannum for costs incurred in responding to a cure notice.

Count Eight arises under Bannum's Montgomery, Alabama contract, and centers upon Bannum's failure to provide free transportation to inmates after Montgomery's public transportation system proved to be unreliable. Bannum seeks both (a) the administrative costs of negotiating with the BOP over the transportation issue, and (b) lost profits under the final two option periods of the contract, which the BOP did not exercise. The material facts are not disputed -- Bannum and the BOP disagreed upon the proper interpretation of the transportation clause, Bannum never provided free transportation to the inmates and was repeatedly found to be deficient in this area of performance, and Bannum was awarded a replacement contract for the Montgomery area that paid a substantially higher contract price than the two unexercised option periods. Additionally, during the six-year history of this case, and despite requesting and receiving a DCAA audit for this count, Bannum has not documented a any of the amount claimed. The defendant is entitled to judgment as a matter of law, because Bannum has completely failed to prove any additional costs for its additional negotiations with the BOP over the transportation issue (despite having six years to do so), and because Bannum was not entitled to have the BOP exercise the remaining option periods under the Montgomery contract, and, even if it were, Bannum received substantially more money under the replacement contract than it would have under the option periods.

## II. Statement Of Facts [1]

### A. Count 6: Contract J200c-336 Concerning Beaumont, Texas

On November 1, 1997, the BOP awarded Bannum Contract J200c-336 (the "Beaumont contract"), which generally required Bannum to operate a Community Corrections Center ("CCC") to house Federal inmates assigned to the Beaumont, Texas area in the late stages of their incarceration. A 1-5; PFUF ¶ 1. The Beaumont contract required Bannum to"furnish the necessary facilities" for performance of the contract, i.e., obtain a building in which to house the Federal inmates. A 10, 14-16; PFUF ¶ 2.

To satisfy this requirement, Bannum subleased a building at 1310 Pennsylvania Avenue, Beaumont, Texas ("Bannum Place of Beaumont") from Mr. Ken Webb. . A 42-44; PFUF ¶¶ 3,4.[2]

At some point in 2000, Bannum's attorneys contacted Mr. McCray to fix a leaky portion of the Beaumont facility's roof. A 20; PFUF ¶ 5. Shortly thereafter, Mr. McCray's property manager began attempting to contract Bannum to renegotiate a direct lease with Mr. McCray because, under the terms of Mr. Webb's lease, Mr. Webb was not permitted to sublease the Beaumont facility. A 20; PFUF ¶ 6. Bannum was not responsive to these requests and, on

---

[1] Pursuant to RCFC 56.1(h)(1), the United States is filing with this motion proposed findings of uncontroverted fact. This section provides a summary of the facts relevant to this motion. The abbreviation "A" refers to the Appendix, filed simultaneously herewith; the abbreviation "PFUF" refers to the defendants Rule 56(h)(1) Proposed Findings of Uncontroverted Fact, also filed simultaneously herewith.

[2] A controversy about the validity of this sublease between the property owner and Bannum led to the landlord issuing an eviction notice to Bannum, which the BOP learned of independently. When the BOP issued a Cure Notice with respect to the eviction notice, Bannum responded by filing the claim that eventually evolved into count six of the second amended complaint.

December 8, 2000, Mr. McCray, through his property manager, sent Bannum an eviction notice stating that Bannum's tenancy would terminate in 30 days. A 20, 49; PFUF ¶¶ 6, 7.

On or about December 18, 2000, BOP employee Charles Ala became aware of the eviction notice and placed a telephone call to Mr. McCray's property manager in order to determine what had led to the eviction notice. Mr. Ala confirmed that Mr. McCray intended to evict Bannum. A 20-21; PFUF ¶ 8.

On December 19, 2000, the BOP informed Bannum that it had learned of the lease dispute. A 52; PFUF ¶ 9. On that same day, Bannum obtained a legal opinion about its rights under the sublease. A 30; PFUF ¶ 11. On December 20, 2000, the BOP informed Mr. Lowry that because the upcoming eviction threatened performance of the contract, the BOP would issue a cure notice, which would give Bannum ten days to either remedy the problem or assure the BOP that the problem will be remedied. A 53; PFUF ¶ 12.

Bannum initiated litigation in Texas state court over the lease dispute on December 21, 2000, when it filed an application for a temporary restraining order that would prevent Mr. McCray from evicting Bannum from the Beaumont facility. A 33-60; PFUF ¶ 13. In its application for a temporary restraining order, Bannum argued that it must be allowed to continue its tenancy or it would suffer great harm by losing its contract with the BOP, and this was best evidenced by the fact that the BOP had indicated its intent to issue a cure notice with respect to the lease issue -- a necessary prerequisite to terminating the contract for default. A 35-37; PFUF ¶ 13. The Texas court granted Bannum's application on December 21, 2000. A 59-60, PFUF ¶ 14.

Bannum responded to the cure notice on January 3, 2000. A 25-64; PFUF ¶ 16. In its

response, Bannum asserted (1) that the lease between Bannum and Mr. Webb was enforceable upon its face, and the BOP would have realized this had it simply taken the time to read the document; (2) the December 19, 2000, legal opinion of Bannum's real-estate attorney, allegedly provided to the BOP, clearly established that the eviction notice was frivolous; (3) "immediately upon its receipt" of the eviction notice, Bannum filed its application for a temporary restraining order to prevent the eviction, the TRO was granted, and therefore Bannum would prevail upon the merits of its claim; (4) the final hearing upon Bannum's claim had been postponed until January 3, 2001; (5) Bannum requested that a BOP represenative attend the hearing upon its claim in order to support its claim; (6) Bannum and its attorneys are personally very confident in their ability to prevail in their state court litigation; (7) Bannum's actions to correct this issue have been immediate and swift, so there should be no problem with continuing performance; and (8) there is no breach, so there is nothing to cure. Id.

The response further stated that Bannum "takes strong exception to the manner in which the BOP has chosen to deal with this matter," admitted that it had received a copy of the eviction notice on December 15, 2000, and complained that the BOP's actions in this instance somehow constituted a breach of the duty to cooperate and the withholding of superior knowledge. Id. As damages for these alleged breaches, Bannum demanded that the BOP reimburse it for its costs in preparing its REA/Response to the cure notice. Id.; PFUF ¶ 17. As proof of these costs, Bannum attached a chart stating that it had incurred $4,000 for "added administrative time and effort in dealing with the show cause and its response," and $500 for "added clerical, copying, etc cost." A 63; PFUF ¶ 17.

The response was written upon the letterhead of, and signed by, Joseph Camardo, Esq.,

Bannum's attorney of record in this case. A 25-29; PFUF ¶ 18. Bannum did not then, and has not since, provided any receipts, ledgers, or any other proof of these costs.

On January 28, 2001, the contracting officer issued her final decision upon Bannum's claim, denying the request and stating:

> Based upon the information received, the BOP did not have adequate assurances that Bannum would be able to perform the services as required by the contract and was in danger of defaulting on the contract. In accordance with Federal Acquisition Regulation 52.249-8 Default (Fixed-Price Supply and Service), the BOP is required to issue a Cure Notice prior to making a decision to terminate the contractor for default. The BOP considers the contractor's response to a Cure Notice as a part of the basic contract administration requirements of the contract and is not entitled to any costs associated with preparing the response.

A 68-69; PFUF ¶ 19.

Bannum appealed this decision to this Court when it filed its complaint in this case on November 13, 2001. PFUF ¶ 20.

Bannum's Texas state court litigation continued until June 4, 2000, when Bannum voluntarily withdrew its complaint and filed a new case in the United States District Court for the Middle District of Florida. A 70-81; PFUF ¶ 22. Bannum did this because it thought it was not receiving a fair trial in Texas. A 116; PFUF ¶ 22. The Federal case was eventually dismissed for a lack of personal jurisdiction, with the court noting that Bannum "is attempting to gain a tactical and strategic advantage over Defendants by initiating suit in its home forum, apparently unhappy with the manner in which the dispute has been addressed by the Texas state courts." A 131; PFUF ¶ 23.

B. <u>Count 8: Contract J200c-397 Concerning Montgomery, Alabama</u>

On October 1, 1993, the BOP awarded Bannum contract no. J200c-181 (the

"Montgomery contract"), which generally required Bannum to operate a Community Correction Center ("CCC") to house Federal inmates assigned to the Montgomery, Alabama area in the late stages of their incarceration. A 161; PFUF ¶ 25. Among other things, the Montgomery contract required that the CCC itself "be located within one mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident." A 162; PFUF ¶ 26.

In early 1998, the BOP observed that Montgomery's public transportation system had become inadequate to meet the needs of the Montgomery CCC. Beginning in February 1998, and continuing until Bannum was awarded a replacement contract with a new transportation clause in October 2001, the BOP consistently and repeatedly cited Bannum for failing to provide its inmates with free transportation, as the Montgomery contract required, when Montgomery's public service had proven inadequate. See PFUF ¶¶ 27-28, 30-31, 33-34, 38-47, 49, 55-61, 64, 67, 69, 70-72, 76-77. Each time Bannum was cited for this performance deficiency, it responded by insisting that, despite the evidence to the contrary, Montgomery's public transportation system worked as advertised, and any transportation problems were caused by other contractors or the inmates themselves -- and were therefore not Bannum's responsibility. Id. During this time, Bannum never provided the free transportation that was required under the contract. Id.

Beginning in September 1999, Bannum and the BOP began negotiating a resolution to the transportation issue. Bannum submitted four cost proposals between September 1999 and February 2001, all of them being slight variations upon a general plan to hire a taxi cab company to provide service to some (but not all) of the inmates during limited hours of the day. See PFUF ¶¶ 48, 54, 62-63, 65, 73, 74. None of the proposals promised to provide transportation to all

inmates when they needed it, as required under the Montgomery contract, and therefore they were all unacceptable to the BOP. PFUF ¶¶ 72, 74. .

In October 2000, when it was clear that the transportation issue was getting worse and that Bannum was not going to honor its contractual obligations or even negotiate a reasonable modification to address the issue, the BOP notified Bannum that it was not going to exercise any more option periods under the 1998 Montgomery contract and, instead, it would resolicit the contract with a new transportation clause. A 299, 314; PFUF ¶¶ 68, 74. The revised transportation clause stated:

> The facility will be located within one mile of public transportation, or the contractor will provide transportation for offenders to seek employment, work, and participate in program activities and necessary medical treatment i.e. physicals, at no cost to the offender. The contractor will ensure the proper insurance policy is in effect to cover the transportation, if applicable. If at anytime during the cont[r]act the CCM determines the public transportation system to be inadequate or ineffective, the contractor will provide offenders with transportation for work, program participation activities and necessary medical appointments at no cost to the offender. Additionally, staff will not use their personal automobiles to transport offenders unless it is an emergency.

A 175; PFUF ¶ 75.

Bannum was awarded the replacement contract on October 1, 2001. A 154; PFUF ¶ 78. Under the option periods for the 1998 contract, Bannum would have been paid $50.45 for an estimated 10,220 man-days in 2001, and $50.45 for an estimated 10,585 man-days in 2002. A 144. Thus, under the option periods for the 1998 contract, Bannum would have received an estimated gross income of $1,049,612.25. Under the 2001 replacement contract, the two-year base period paid $60.45 for an estimated 21,900 man-days, thus giving Bannum an estimated

gross income of $1,323,855.00. A 155, 158; PFUF ¶ 79. Thus, by losing the option years under the 1998 Montgomery contract and gaining the new replacement contract, Bannum grossed an estimated $274,242.75 more.

## ARGUMENT

I. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party bears the initial burden of establishing the absence of any disputes of material fact. Seal-Flex, Inc. v. Athletic Track and Court Const., 98 F.3d 1318, 1321 (Fed. Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When the movant has met its initial burden, the non-movant must respond with sufficient evidence to show that there is a material factual dispute and that, on the non-movant's evidence, the movant is not entitled to judgment as a matter of law." Id. Alternatively, if the moving party can show that there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. Celotex, 477 U.S. at 325. The Supreme Court has emphasized that the "[s]ummary judgment procedure is not properly regarded as a disfavored procedural shortcut but, rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action. . . .'" Celotex, 477 U.S. at 327 (citations omitted); accord Sweats Fashions, Inc. v. Pannill Knitting, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987).

"The focus in determining whether summary judgment is appropriate is the lack of disputed material facts. A material fact has been defined as a fact that will make a difference in

the outcome of a case." Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959). Put differently, only disputes over facts that would affect the outcome of a claim or defense will properly prevent summary judgment. See Anderson, 477 U.S. at 248.

As we demonstrate below, there are no disputes of material fact under these two claims and the defendant is entitled to judgment as a matter of law. Bannum is not entitled to be compensated for the cost of responding to a cure notice where it was clear that Bannum had entered into an allegedly disallowed sublease and was in danger of being evicted from the facility where it was housing Federal inmates. Bannum is also not entitled to recover lost profits for option periods of a contract that the Government had the unfettered discretion to exercise (or not), and it is especially not entitled to lost profits under those options periods where the option periods were replaced with a substantially more lucrative contract for the same services. Finally, Bannum has failed to prove that it incurred any additional compensable costs in connection with its efforts to resolve its noncompliance with one of its contractual duties. As such, the defendant is entitled to judgment as a matter of law upon counts six and eight of the second amended complaint.

## II. The Defendant Is Entitled To Summary Judgment Upon Count Six Because Bannum Should Not Be Compensated For Having To Respond To The Cure Notice

### A. Bannum's Claim

In count six of its second amended complaint, Bannum seeks to recover the alleged $4,500 cost of responding to the Cure Notice issued by the BOP when it discovered that Bannum had received an eviction notice for its Beaumont facility. Bannum does not assert that its right to recover this cost arises from the contract or because the law recognizes this as a normally

compensable contract administration cost; rather, Bannum contends that the BOP violated two components of the implied covenant of good faith and fair dealing in its handling of this issue after it learned about the lease dispute directly from the landlord rather than from Bannum. Specifically, Bannum claims that "the BOP's direct communication with the owner of the property, their failure to verify the accuracy of the information received, their failure to notify Bannum of their receipt of the communication and their failure to identify the person(s) and the nature of the communications conducted, constituted an improper and prejudicial withholding of Superior Knowledge and further constituted a breach of the BOP's contractual duty to cooperate with Bannum." 2AC ¶ 58.

B. Bannum Is Not Entitled To Recover The Cost Of Responding To A Cure Notice

Bannum's claim under count six claim is wholly without merit. First, there is no authority supporting the proposition that the cost of responding to a cure notice is a recoverable contract expense. See, e.g., 48 C.F.R. § 31.205 (listing certain contract administration costs and stating whether they are compensable; the cost of responding to a cure notice is not included as a compensable cost). The Government is not required to reimburse contractors for the cost of performing this basic contract administration task. This is especially true in this case, where Bannum's actions (or inactions) had brought Bannum to the brink of default (it is impossible to perform a contract to house Federal inmates without access to a physical house). Additionally, had Bannum defaulted, the BOP would have borne the significant burden and expense of suddenly relocating all the inmates, because the BOP is not free to release the inmates because the contractor is evicted from the correctional center. The cure notice was not improper; it was necessary. See 48 C.F.R. § 52.249-8(2) (requiring the Government to issue a 10-day cure notice

prior to termination); see also Discount Co. v. United States, 554 F.2d 435, 438-39 (Ct. Cl. 1977) (where the Government has reasonable grounds to believe that the contractor may not be able to perform the contract, it may issue a cure notice).

C. The Government Did Not Withhold Superior Knowledge

The Government also did not withhold superior knowledge. The Government may only be liable for non-disclosure of superior knowledge when: (1) the contractor began performance without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information. Northrop Grumman Corp., Military Aircraft Div. v. United States, 63 Fed. Cl. 12, 15-16 (2004) (citing GAF Corp. v. United States, 932 F.2d at 949 (Fed. Cir. 1991). However, "[a] mere governmental failure to disclose each and every bit of information it has clearly is not, in and of itself, enough to serve as a basis for contractor recovery." Piasecki Aircraft Corp. Island Rd. v. United States, 229 Ct. Cl. 208 (1981). "The government will not be held liable for nondisclosure of information which the contractor could or should have known." Northrop Grumman, 63 Fed.Cl. at 16 n.1. The United States Court of Appeals for the Federal Circuit has held that information specific to the contractor's industry is knowledge that the contractor could or should know. See GAF Corp. v. United States, 932 F.2d at 949 (asbestos industry); Granite Constr. Co. v. United States, 24 Cl.Ct. 735, 753 (1991) (concrete drilling industry). The Government is also not liable under the superior-knowledge theory where the information allegedly withheld may reasonably be obtained from other sources. See McCormick Constr., Co. v. United States, 18 Cl. Ct. 259, 266

(1989) (the plaintiff would have the allegedly secret difficult drilling conditions if it had taken samples of logs the Government made available to plaintiff and performed a site visit).

Of the four allegedly improper acts by the BOP, only two can possibly relate to the superior knowledge claim: (1) allegedly failing to notify Bannum of the BOP's receipt of the eviction notice; and (2) allegedly failing to notify Bannum of the identity of the persons with whom the the BOP communicated and the nature of those communications. With respect to the first allegedly deficient act, the BOP did notify Bannum that it received a copy of the eviction notice. That happened on December 19, 2000, immediately after the BOP learned about it, and, critically, before Bannum informed the BOP that its ability to remain in the facility -- and thus perform the contract -- was in immediate jeopardy.[3] The lease dispute was not a surprise to Bannum. The Government does not withhold superior knowledge when it immediately informs a contractor that the contractor has been caught engaging in disputes with third parties that directly threaten the contractor's its ability to continue performance upon the contract.

The Government also did not withhold superior knowledge by not informing Bannum of the person who told it about the eviction notice or precisely what that person said. This information is simply not"vital" within the superior-knowledge rubric. To the extent any portion of those communications would be vital, it would be the fact that Bannum's landlord had issued an eviction notice, which meant that Bannum was in jeopardy of being physically removed from the Beaumont CCC on January 7, 2001. The BOP informed Bannum of this, and it did so right away. Moreover, Bannum already knew this information, and was apparently withholding it

[3] The affidavit of David Lowry, submitted in connection with Bannum's claim, states that Bannum received the eviction notice on December 15, 2000. A 52. During these four days, Bannum apparently did absolutely nothing with the eviction notice.

from the BOP. The Government did not withhold superior information in this instance; if either party can be accused of keeping secrets here, it is Bannum.

D. The Government Did Not Breach Its Duty To Cooperate

The Government also did not breach its duty to cooperate with Bannum. The duty to cooperate is only implicated where the Government actively and unjustifiably interferes with the contractor's performance. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 58-59 (2001); Ryco Const., Inc. v. United States, 55 Fed. Cl. 184, 192 (2002). Furthermore, to recover for a breach of the implied duty to cooperate, the plaintiff must show that the Government was at fault and that the allegedly uncooperative actions caused the contractor material damage. Cedar Lumber, Inc. v. United States, 5 Cl. Ct. 539, 550 (1984).

The two acts that fall under this category are (1) the BOP's direct communication with the property owner (rather than Bannum) when it learned of the eviction notice, and (2) the BOP's alleged failure to verify the accuracy of the information it received. Neither of these actions support a finding of a breach under this theory. First, when the BOP received a notice of eviction from the property owner and contacted the property owner to inquire about the veracity and status of the notice, the BOP did not interfere with Bannum's ability to keep its lease. If anything, the BOP helped, because Bannum -- despite being generally aware of the lease dispute for months and sitting on the eviction notice for four days before the BOP contacted them about it -- did nothing to protect its rights and ability to continue performance under the Beaumont contract. Additionally, contacting Bannum first would not have been helpful. The only information Bannum could have provided was that it had been disputing the validity of the lease with its landlord for months, it had refused to sign a new lease with the landlord, and it had

received the eviction notice on December 15 but had not done anything about it -- including failing to inform the BOP that it might have to relocate the entire population of the Beaumont facility because it had been evicted. None of this information would have verified that the property owner was attempting to exercise his eviction rights. The BOP did not breach its duty to cooperate by communicating directly with the property owner when it received the eviction notice.

The BOP also did not fail to verify the accuracy of the information it had received. On December 18, 2000, the BOP received information that Bannum's landlord was preparing to evict Bannum from its Beaumont facility. The BOP contacted the landlord to determine if this was, in fact, what was happening. The landlord's agent not only confirmed this fact, but also sent the BOP a copy of the eviction notice. The BOP did verify the facts it had received.

Bannum is not entitled to recover the cost of responding to the BOP's inquiry about why Bannum has placed itself upon the brink of default. There are no genuine disputes of material fact with respect to count six of the second amended complaint, and the defendant is entitled to judgment as a matter of law.

## III. The Defendant Is Entitled To Summary Judgment Upon Count Eight Because Bannum Made More Money Under The Replacement Contract Than It Would Have Under The Options That Were Not Exercised, And Bannum Has Failed To Substantiate Its Claim For Administrative Costs Associated With Negotiating Over Its Failure To Provide Transportation To Inmates As Required Under The Contract

### A. Bannum's Claim

In count 8 of the second amended complaint, Bannum seeks (1) profits allegedly lost because of the BOP's failure to exercise the final option period on the 1998 Montgomery contract, and (2) "compensation for all costs expended as a result of [the Montgomery public

transportation] issue." AC ¶ 80. The second amended complaint fails to allege that, instead of the final two option periods on the 1998 Montgomery contract, Bannum was awarded a replacement contract that paid Bannum substantially more money than it would have received under the options.

B. The Defendant Was Not Bound To Exercise The Options

"An option contract generally binds the option giver, not the option holder." Hi-Shear Technology Corp. v. United States, 53 Fed. Cl. 420, 435 (2002).

> The government's failure to exercise an option in a contract does not ordinarily give rise to a breach of contract action. A standard option provision in a government contract obliges the contractor to perform the additional contract work if the government chooses to exercise the option, but it does not create a legal obligation on the part of the government to exercise the option and require the work.

Id. at 436, quoting Optimal Data Corp. v. United States, 17 Cl. Ct. 723, 731 (1989), aff'd, 904 F.2d 45 (Fed. Cir. 1990) (table) (additional citations omitted). Thus, Bannum is not entitled to the option periods under the Montgomery contract, and, absent a showing of bad faith by the Government, Bannum is not entitled to recover any damages for any amounts it would have earned under the unexercised option period. See Ho v. U.S., 49 Fed. Cl. 96, 107 (2001). aff'd, 30 Fed. Appx. 964 (Fed. Cir. 2002) (not finding bad faith and collecting cases addressing the bad-faith exception to the option rule).

The plain language of the Montgomery contract grants the BOP unfettered discretion in its decision to exercise the option periods. Section F.3(e) of the Montgomery contract states, "[i]n accordance with FAR 52.217-9(a), entitled 'Option to Extend the Term of the Contract,' the Government *may* exercise the option year provided notice shall be given to the Contractor by the first day of the ensuing option year." (emphasis added). In Continental Collection & Disposal

Inc. v. United States, 29 Fed. Cl. 644, 650 (1989), where option clause in the contract at issue stated, "[t]he Government may extend the term of this contract," this Court held that the government was not obligated to exercise the option because the plain meaning of the contract language provided the government discretion whether to exercise the option. 29 Fed. Cl. 650 (the contract "clearly and unambiguously indicate[d]" that the government had the discretion to extend the contract, and was "simply a right of the [government] under the explicit terms of the contract"). Bannum is not entitled to any of the option periods under the Montgomery contract.

C. The Defendant Did Not Act In Bad Faith

The BOP did not act in bad faith such that Bannum would be entitled to damages for the BOP's decision to refrain from exercising the final two option years under the Montgomery contract.[4] Bannum has not carried and cannot carry its high burden of producing "well-nigh irrefragable" proof of the BOP's bad faith, by clear and convincing evidence that "produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is highly

[4] Bannum's second amended complaint does not specifically allege that the Government engaged in any bad faith in failing to exercise the option years. See Southern Comfort Builders, Inc. v. United States, 67 Fed. Cl. 124, 153 (2005) ("The United States Court of Appeals for the Federal Circuit has stated on numerous occasions that a plaintiff's failure to raise a claim or argument in its complaint may be deemed as a waiver of that argument by the plaintiff.") (citations omitted). The only mention of "bad faith" in the second amended complaint appears at paragraph 79, where Bannum alleges that the BOP's issuance of a certain performance evaluation in the wake of the Montgomery transportation issue was done in bad faith, and has allegedly caused "a long-range effect on Bannum's ability to be awarded other contracts." AC ¶ 79. However, this accusation is purely gratuitous, as Bannum does not seek damages for this alleged bad-faith rating. AC ¶ 80. It is just as well; such damages are to speculative to recover as a matter of law. See H.H.O., Inc. v. United States, 7 Cl. Ct. 703, 708 (1985) (plaintiff could not recover damages due to allegedly hindered ability to obtain future contracts because it was too speculative as a matter of law). Thus, any aspect of Count 8 requiring an allegation (and proof) of bad faith could be dismissed pursuant to RCFC 12(b)(6).

probable." Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (internal quotation marks omitted). The parties' conduct over the Montgomery transportation issue is well-documented, and it clearly demonstrates that: (a) the Montgomery public transportation system was ineffective and unreliable; (b) Bannum consistently failed to provide the free transportation to the inmates as required under the contract; (c) the BOP consistently cited Bannum for this failure; (d) despite Bannum's nonperformance, the BOP reached out to Bannum in an effort to devise a solution to the transportation problem; and (e) after months of negotiations the parties could not find a mutually agreeable solution. During this time, the inmates housed in the Montgomery CCC were having to take unreasonable or expensive measures to get to and from their jobs every day. This is not bad faith on the part of the Government. This is an attempt by the Government to make sure the inmates who rely upon the contractor receive the services they need. Bannum was unrepentant in its nonperformance, and that nonperformance was causing inmates to be late for work and miss required programs like drug rehabilitation. Rather than default Bannum and scramble to find a replacement contractor in time to minimize the disruption upon the inmates' lives, the BOP made a good faith effort to appease Bannum and entertain its demands for more money. In the end, the efforts failed and the BOP elected to do what it had every right to do -- refrain from exercising the options under the 1998 Montgomery contract and resolicit it. Bannum was not entitled to have the final two option years exercised under the 1998 Montgomery contract.

D. Bannum Has Suffered No Lost Profits Because It Received More Money Under The Replacement Contract Than It Would Have Received Under the Option Years

The Court need not decide the issue of bad faith, because Bannum's lost-profits claim is

resolvable by observing two indisputable facts: (1) Bannum was awarded the replacement contract for the Montgomery CCC, and (2) Bannum received a substantially higher contract price under the new contract than it would have had it performed under the option periods. There are no damages here. Not only did Bannum not lose any profits, it actually made more money than it would have under the old contract.

Under the option periods for the 1998 Montgomery contract, Bannum would have been paid $50.45 for an estimated 10,220 man-days in 2001, and $50.45 for an estimated 10,585 man-days in 2002. Thus, under the option periods for the 1998 Montgomery contract, Bannum would have received an estimated gross income of $1,049,612.25. Under the 2001 replacement contract, the two-year base period paid $60.45 for an estimated 21,900 man-days, thus giving Bannum an estimated gross income of $1,323,855.00. Thus, by losing the option years under the 1998 Montgomery contract and gaining the new replacement contract, Bannum grossed an estimated $274,242.75 in addition to the profits it claims to have lost.

E. Bannum Is Not Entitled To Its Costs Of Negotiating The Transportation Issue

The second portion of count eight is Bannum's request for ""compensation for all costs expended as a result of [the Montgomery public transportation] issue." AC ¶ 80. In its request for an equitable adjustment, Bannum claims that it incurred $45,520.24 for "Estimated Added Administration Time" ($19,615), "Estimated Added Phone, Travel, etc." ($1,400), "Unamortized Lease Hold Improvement" ($22,588.24), and "Proposal Preparation" ($1,917).

As an initial matter, Bannum requested, and the defendant provided, a DCAA audit of this claim. See A 355-368. The auditors concluded, after independently interviewing Bannum and requesting documentation to support the claim, that Bannum could not support its claim.

Bannum has had six years to produce proof that it incurred these expenses, and it has utterly failed to do so. On that basis alone, this aspect of count eight should be dismissed.

Moreover, Bannum does not even pretend that these are compensable costs. The first two categories are "estimated." In light of Bannum's failure to produce any documentation to support these estimates, it appears that Bannum fabricated some numbers in an attempt to get more money from the Government. Bannum has not incurred these damages, and the defendant is entitled to judgment as a matter of law.

The amortization of a leasehold improvement is the spreading of the cost of an improvement to leased real property (here, the facility). The amortization schedule typically lasts either the life of the improvement or the life of the lease. Because Bannum never explained this cost, and it is charging it to the defendant in connection with a claim for the wrongful withholding of two option years, we assume that Bannum was amortizing its improvements to the Montgomery facility over the life of the lease. First, the contract provides that all expenses associated with outfitting and preparing the facility are to be borne by the contractor. Thus, Bannum is not entitled to recover these costs; they were (or should have been) incurred at the inception of the contract, and Bannum contracted to pay for them out of its profits. Furthermore, to the extent Bannum spread the cost, for accounting and tax purposes, over a number of years, it was still in the facility under the replacement contract for the allegedly denied option years. Bannum was free to continue depreciating whatever leasehold improvements it added to the facility during those years.

Finally, Bannum's $1,917 claim for "proposal preparation" presumably refers to the four nearly identical taxi-cab cost proposals it sent to the BOP between September 1999 and February

2001. Ultimately, this hard negotiating led to Bannum obtaining a contract that paid nearly $300,000 more than Bannum would have received under the option periods. Now, after six years, Bannum has failed to provide any proof of this cost, even when asked for documentation by the auditor. As such, the defendant is entitled to summary judgment.

## CONCLUSION

For these reasons, we respectfully request the Court to grant the defendant summary judgment upon counts six and eight of the plaintiff's second amended complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

/s/ Devin A. Wolak
DEVIN A. WOLAK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel. (202) 616-0170
Fax. (202) 514-8624

August 29, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on August 29, 2007, a copy of the foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS SIX AND EIGHT OF THE SECOND AMENDED COMPLAINT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Devin A. Wolak
DEVIN A. WOLAK