**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BANNUM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-639C |
| | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RULE 56(h)(1)**
**PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the defendant respectfully submits this Proposed Findings of Uncontroverted Fact in connection with its simultaneously filed Motion For Summary Judgment Upon Counts Six and Eight Of The Second Amended Complaint.

**COUNT SIX**

1. On November 1, 1997, the BOP awarded Bannum Contract J200c-336 (the "Beaumont contract"), which generally required Bannum to operate a Community Corrections Center ("CCC") to house Federal inmates assigned to the Beaumont, Texas area in the late stages of their Federal Custody. A 1-5.

2. The Beaumont contract required Bannum to"furnish the necessary facilities" for performance of the contract, i.e., obtain a building in which to house the Federal inmates. A 10, 14-16.

3. To satisfy this requirement, Bannum leased a building at 1310 Pennsylvania Avenue, Beaumont, Texas. A 42-44.

4. The "lessor" identified on the lease is Mr. Ken Webb. A 42. However, although Mr. Webb was listed as the lessor, Mr. John McCray was the owner of the building. According

to Mr. McCray's agent, Mr. Webb's lease did not permit him to sublet the building. A 20-21.

5. Mr. McCray first learned about Bannum's sublease when Bannum's attorneys contacted Mr. McCray with a request to fix a leaky portion of the roof. A 20.

6. Mr. McCray's property manager then attempted to contact Bannum in order to fix the sublease problem and offer Bannum a new, direct lease with Mr. McCray. Bannum refused to cooperate. A 20.

7. On December 8, 2000, Mr. McCray sent Bannum an eviction notice stating that Bannum's tenancy would terminate in 30 days. A 20, 49.

8. On or about December 18, 2000, BOP employee Charles Ala became aware of the eviction notice and placed a telephone call to McCray's property manager in order to determine what had led to the eviction notice. A 20-21.

9. On December 19, 2000, the BOP informed Bannum that it had learned of the lease dispute. A 52.

10. If Bannum was evicted from the Beaumont facility, the BOP would have to immediately relocate all the Federal inmates housed at the Beaumont facility. A 21.

11. On December 19, 2000, Bannum obtained a legal opinion about the lease dispute. A 30.

12. On December 20, 2000, the BOP informed Bannum that, because the upcoming eviction threatened performance of the contract, the BOP would issue a cure notice, which would give Bannum ten days to either remedy the problem or assure the BOP that the problem will be remedied. A 53.

13. On December 21, 2000, Bannum initiated litigation with its landlord(s) by filing

an application for a temporary restraining order in Texas state court. A 33-60. In its application for a temporary restraining order, Bannum argued that it must be allowed to continue its tenancy or it would suffer great harm by losing its contract with the BOP, and this was best evidenced by the fact that the BOP had indicated its intent to issue a cure notice with respect to the lease issue -- a necessary prerequisite to terminating the contract for default. A 35-37.

14. The Texas state court granted Bannum's application for a temporary restraining order on December 21, 2000. A 59-60.

15. On December 22, 2000, the BOP issued a Cure Notice concerning the lease issue, and required a response from Bannum by January 3, 2001. A 23-24.

16. Bannum responded to the cure notice on January 3, 2000. A 25-64.

17. In its response, Bannum demanded that the BOP pay the cost of preparing the response, in the amount of $4,500. A 27. As proof of these costs, Bannum attached a chart stating that it had incurred $4,000 for "added administrative time and effort in dealing with the show cause and its response," and $500 for "added clerical, copying, etc cost." A 63.

18. The response was written upon the letterhead of, and signed by, Joseph Camardo, Esq., Bannum's attorney. A 25-29.

19. On January 28, 2001, the contracting officer issued her final decision upon Bannum's request, denying it and stating:

> Based upon the information received, the BOP did not have adequate assurances that Bannum would be able to perform the services as required by the contract and was in danger of defaulting on the contract. In accordance with Federal Acquisition Regulation 52.249-8 Default (Fixed-Price Supply and Service), the BOP is required to issue a Cure Notice prior to making a decision to terminate the contractor for default. The BOP considers the contractor's response to a Cure Notice as a part of the basic

> contract administration requirements of the contract and is not entitled to any costs associated with preparing the response.

A 68-69.

20. Bannum appealed this decision to this Court when it filed its complaint in this case on November 13, 2001.

21. The Texas state court entered a temporary injunction on January 11, 2001, preventing Bannum from being evicted, and set the trial date for the full merits of Bannum's claim for March 1, 2001. A 66-67.

22. Bannum's Texas state court continued the trial date several times (A 70, 71, 76, 77, 78) until, on June 4, 2001, Bannum dropped its Texas state court lawsuit and was filed a federal action in the United States District Court for the Middle District of Florida. A 78, 81. Bannum did this because it thought it was not receiving a fair trial in Texas. A 116 ("it became increasingly obvious to [Bannum] that it needed to address the unfair treatment it had been receiving in the Texas state court").

23. Bannum's Federal case was dismissed for a lack of personal jurisdiction. The district court noted that Bannum "is attempting to gain a tactical and strategic advantage over Defendants by initiating suit in its home forum, apparently unhappy with the manner in which the dispute has been address by the Texas state courts." A 131.

24. In March 2001, the BOP was informed of potential problems at the Bannum's Beaumont facility caused by the fact that a school for troubled youths had recently begun its tenancy in another portion of the building where the Beaumont facility was located. There had been two instances where Federal inmates were fraternizing with students at the school, and the director of the school was very concerned about problems that could arise from the close

proximity of the troubled youths and the Federal inmates. A 74-75.

**COUNT EIGHT**

25. On October 1, 1993, the BOP awarded Bannum contract no. J200c-181 (the "Montgomery contract"), which generally required Bannum to operate a Community Correction Center ("CCC") to house Federal inmates assigned to the Montgomery, Alabama are in the late stages of their incarceration. A 161.

26. Among other things, the Montgomery contract required that the CCC itself "be located within one mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident." A 162.

27. In a February 1998 monitoring report for the Montgomery facility, the BOP observed that "[t]ransportation has become an issue since the change in the public transportation system within the City of Montgomery. The transportation needs of the residents need to be addressed by Bannum immediately, before the problem becomes severe." A 189.

28. By letter dated March 18, 1998, Bannum responded, stating its belief that Montgomery's new Demand And Response Transit ("DART") public bus service technically met the requirements of the Montgomery contract. Bannum's response also stated that "[c]onflicts over resident transportation needs in the evening sometimes develop over late appointment schedules with CAPS, the transitional service provider," that Bannum has attempted to alleviate the problems by asking CAPS to relocate to the Bannum facility or to change their schedule to accommodate the limited DART bus service, but CAPS would not do so. A 194.

29. The DART service is a call-ahead, limited bus service. Unlike a regular bus route, the DART busses do not operate on a regular ongoing schedule. Persons wishing to use the DART system must call the dispatch center and then wait for the bus to arrive. A 209-211.

30. On April 9, 1998, the BOP wrote to Bannum and indicated that its March 18, 1998 response did not sufficiently address the transportation issue. A 329 ¶ 6.

31. On April 16, 1998, Bannum submitted a second response addressing the transportation issue, again stating that it was technically in compliance with the Montgomery contract, and argued that the high percentage of employed inmates suggested that the status quo satisfied the transportation requirement. The letter also stated that "some current employment opportunities [of inmates] are being jeopardized," but blamed that on the inflexible scheduling of the Transitional Services provider, which allegedly regularly scheduled during inmates' workdays and at times when public transportation is [un]available. A 198-199.

32. At approximately the same time as the public transportation issue was arising, Bannum's final option period on the 1993 contract was expiring, and the BOP had solicited bids for a new contract. On March 10, 1998, Bannum was notified that its bid was within the competitive range for further discussions. A 191-193.

33. After the preliminary site inspection, conducted on March 19, 1998, the BOP noted that one weakness in Bannum's bid proposal was:

> Because the City of Montgomery has terminated much of its bus service, some residents are required to walk great distances to work under the current contract (J200c-181). <u>This makes job searches and job-commuting an issue to be addressed under this Solicitation RFP 200-0422-SE.</u> It is the contractor's responsibility to provide the residents with free transportation for employment or program participation activities when there is an absence of public transportation within one mile of the facility. Bannum must

> provide a plan of action addressing how the residents will be provided free transportation for the purposes stated above. **SOW, Chapter 3, Section A.** This is a weakness.

A 196-197.

34. Bannum responded on April 24, 1998, by sending the BOP a copy of its April 16, 1998 correspondence that explained Bannum's position that it believed that the Montgomery DART bus service satisfied the requirements of the contract solicitation. A 200-201.

35. On June 3, 1998, the BOP informed Bannum that its discussions had concluded and that Bannum could submit its Final Proposal Revision. A 218-219.

36. Bannum's discussion period was briefly reopened to address another issue with Bannum's proposal (the BOP could not accept a handicapped-accessibility contingency plan of simply assigning handicapped inmates to home confinement so that Bannum could avoid making its facility Title II compliant). On June 25, 1998, the BOP again informed Bannum that its discussions had concluded and that Bannum could submit its Final Proposal Revision. A 222-223.

37. Bannum was awarded the 1998 Montgomery contract and the notice to proceed was issued on October 1, 1998. A 144, 224.

38. On February 1, 1999, BOP transmitted the results of a January 1999 monitoring report to Bannum. In that monitoring report, Finding #2 stated:

> The City of Montgomery's public transportation system, Demand And Response Transit (DART) has proven to [be] an unreliable and ineffective means of transportation for the residents at the center. The system operates only from 6:00 a.m. to 6:00 p.m. in limited areas. This creates problems for residents by restricting their employment opportunities and participation in off site program related activities.
>
> <u>Corrective Action</u>: It is the contractor's responsibility to

> provide the residents free transportation for employment or program participation when there is an absence of public transportation within one mile of the facility (SOW, Chapter 3, Section A). Corrective action shall be implemented immediately and a written response provided within 10 days of receipt of this report.

A 227.

39. Bannum responded on February 16, 1999, stating:

> Bannum has re-verified that Demand and Response Transit (DART) provides public transportation for Bannum Place of Montgomery residents. Residents only need to make application for transportation pick-up and a DART driver will begin transporting the residents from Bannum to his/her local work area. The Statement of Work requirement is being met in that public transportation is within one mile of our facility and Bannum does npay for transportation for indigent residents while seeking employment at no cost to the resident should the resident request transportation assistance. Once a resident becomes employed the responsibility of transportation means and costs is that of the residents. With twenty-six (26) residents at the facility and only one (1) unemployed (a new arrival) there seems to be no lack of transportation for residents to and from their jobs.

A 229.

40. The BOP responded to Bannum's assessment of the transportation issue on March 12, 1999:

> [T]here is strong evidence that the situation with the local bus service is not in accordance with the provisions of the Statement of Work. We do not believe the bus service is consistently available for the inmates of the Bannum of Montgomery facility, as you have advised us. Please advise us of your intentions with respect to the transportation of inmates at this facility, as the bus service does not appear to be a satisfactory solution. Please see the attached articles from the Montgomery Advertiser.

A 230.

41. The newspaper articles attached to the March 12, 1999 letter generally describe

the ineffective nature of the City of Montgomery's public transportation service, including reports of unreliable bus service. A 231-232.

42. According to Mr. David Lowry, president of Bannum, Bannum's response to the BOP was:

> On March 24, 1999, I telephoned Ms. Perry, CCCOS (of the Montgomery office), and discussed the matter of bus service. Ms. Perry suggested that I discuss the matter with the Contracting Officer, Leah Wilson. On March 25, 1999, I discussed the matter with Ms. Wilson. Ms. Wilson said she would review the matter.

A 332 ¶ 18.

43. On June 15, 1999, the BOP wrote to Bannum again to notify it that transportation at the Montgomery center was a continuing problem and it must be resolved. The BOP relayed the complaints of the Chemical Addictions Program, which had observed that residents of the Montgomery facility were having attendance problems directly attributable to a lack of readily available public transportation, and the management of the Montgomery facility was not otherwise providing free transportation to the inmates. A 233-234.

44. On June 16, 1999, the BOP notified Bannum of the results of the March 1999 monitoring report. The monitoring report contained a repeat finding regarding the transportation issue:

> The City of Montgomery's public transportation system, Demand and Response Transit (DART) has proven to be an unreliable and ineffective means of transportation for the residents at the center (see attached news article). The system operates only from 6:00 a.m. to 6:00 p.m. in limited areas. This creates problems for residents by restricting their employment opportunities and participation in off site program related activities.
>
> Correction Action: It is the contractor's responsibility to provide the residents free transportation for employment or program participation when there is an absence of public

> transportation within one mile of the facility (SOW, Chapter 3, Section A). Corrective action shall be implemented immediately and a written response provided within 10 days of receipt of this report.

A 237, 240.

45. Bannum responded on June 21, 1999, and again insisted that it was complying with the Montgomery contract. A 332, ¶¶ 21, 22.

46. The BOP issued an interim monitoring report on June 25, 1999, which stated that, since the last monitoring report, "the only deficiency . . . not resolved was the transportation issue. This is currently being discussed with the Central Office Contracting Officer and the Contractor." A 242.

47. On June 28, 1999, the BOP notified Bannum that the March 1999 monitoring was closed, but noted that "the transportation issue has not been resolved," and that, if it "is not resolved, it will be re-addressed in the future." A 247.

48. On September 8, 1999, Bannum submitted a cost proposal for providing inmate transportation as required under the Montgomery contract, and characterized its proposal as being "in excess of our contract terms at our . . . Montgomery program[]." In it proposal, Bannum would hire a taxi cab service for 6 hours per day, limited to "transporting employed residents to and from their work site, residents seeking employment to specific interviews and residents participating in Transitional Service Counseling and for no other purpose." Bannum also stated that "[s]hould a problem arise with the provider of services, Bannum will use its best efforts to resolve the problem, change providers or take other appropriate action the BOP deems necessary. However, Bannum can not be held responsible for lapses in service, quality of service, or other matters beyond its control." A 248-249.

49. On September 23, 1999, the BOP informed Bannum that the June 1999 monitoring was officially closed, but the transportation issue remained unresolved and was to be negotiated with the Contracting Officer. A 251.

50. In late November 1999, the contracting officer sent Bannum contract Modification No. 3, which increased the compensation under the Montgomery by $45,000 per year so that Bannum could correct the ongoing transportation issue. A 254-255.

51. Bannum executed the modification on November 24, 1999, and the BOP executed it on November 26, 1999. A 254-255.

52. On November 29, 1999, Bannum sent the BOP a letter stating that it had learned that its September 8, 1999 cost proposal had not been forwarded to the contracting officer, and therefore Bannum rescinded its agreement to modification no. 3. Bannum also requested further negotiations on the transportation issue. A 252.

53. After receiving the fully executed modification on December 17, 1999, Bannum wrote to the BOP again, reiterating its intent to rescind its agreement to the modification and promised to discuss the matter further on the telephone. A 256.

54. On January 7, 2000, Bannum submitted a cost proposal for providing inmate transportation as required under the Montgomery contract, and characterized its proposal as being "in excess of our contract terms at our . . . Montgomery program[]." In it proposal, Bannum would hire a taxi cab service for 6 hours per day, Monday through Friday, and was limited to "those residents who have no other means of viable transportation, to include the use of personal vehicles or the use of the existing public transportation system, and will not be provided beyond the city limits." The proposal further stated that "transportation will be

provided for transporting employed residents to and from their work site, residents seeking employment to specific interviews and residents participating in Transitional Service Counseling and for no other purpose." " Bannum also stated that, in the event the taxi-cab company decided to discontinue its service, Bannum would also discontinue its transportation service to the inmates. Bannum also stated that "[s]hould a problem arise with the provider of services, Bannum will use its best efforts to resolve the problem, change providers or take other appropriate action the BOP deems necessary. However, Bannum can not be held responsible for lapses in service, quality of service, or other matters beyond its control." A 257-259.

55. In January 2000, BOP contract specialist Totson complained to Bannum about the transportation issue. A 334 ¶ 32.

56. Bannum responded by informing Mr. Totson that it was currently negotiating the issue with the contracting officer. A 260.

57. On February 2, 2000, the BOP forwarded to Bannum the results of its January 2000 monitoring. The report stated made a "significant finding," which stated:

> The Statement of Work, Chapter 3, Page 16-C, states in part "The contractor shall arrange for transportation for indigent residents while seeking employment, at no cost to the resident."
>
> Since the inception of the contract, Bannum has not provided residents seeking employment with any type of transportation. All transportation costs have been at the residents' own expense.
>
> Corrective Action: Upon receipt of the monitoring report, the contractor shall provide all residents seeking employment with free transportation. This could be accomplished by purchasing bus passes from Dart, and issuing them to residents until they become employed. After they become employed, residents should be responsible for the cost of their transportation.

The report also made finding no. 2:

> Chapter 3, Page 16-A, of the Statement of Work, states "The facility shall be located within one mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident."
>
> The facility is not located within one mile of public transportation. Residents have to call a public transportation system known as "Dart," and make an appointment to be picked up from the nearest Dart pick-up location. Sometimes, even after arrangements have been made by the residents for pick-up, Dart fails to arrive to transport the residents to their designation. Furthermore, an agreement with Bannum and the contractor was reached on November 26, 1999, for Bannum to start providing transportation to the resident population. However, to date, Bannum has not provided the service. The CCM office received a letter from Executive Director David Lowry, stating that the transportation issue had been referred back to the Contracting Officer for negotiation. Upon checking with the Contracting Officer, it was learned that Bannum should currently be providing residents with transportation in accordance with the recent agreement.
>
> Corrective Action: By February 20, 2000, provide residents with transportation in accordance with the recent negotiated agreement. This should include transportation to and from work, as well as to program participation activities. With the submission of the response to this monitoring report, please provide a written summary of the type of transportation you plan to provide to the residents, i.e., purchase a van, pay taxi fares. Also, indicated the hours of operation in which the transportation will be provided.

A 263-265.

58. Bannum responded to the monitoring report on February 24, 2000, stating that an agreement with the contracting officer had not, in fact, been reached, and requested that finding no. 2 be withdrawn. A 269-272.

59. The BOP responded on March 2, 2000, reiterating its finding that Bannum was not providing what was required under the Montgomery contract and/or the November 1999 agreement, and asked that Bannum provide assurances that it would begin providing the

transportation. A 273-274.

60. Bannum responded on March 7, 2000, stating that it understood that finding no. 2 would be rescinded because Bannum had requested its recission, and that negotiations over the transportation issue continued. A 275-276.

61. The BOP responded on March 13, 2000, stating that, based upon Bannum's response on March 7, the monitoring was closed. A 277.

62. On March 24, 2000, Bannum submitted its third cost proposal to resolve the transportation issue . Again, Bannum characterized its proposal as being "in excess of our contract terms at our . . . Montgomery program[]." In it proposal, Bannum would hire a taxi cab service for 5 hours per day, Monday through Friday, and was limited to "those residents who have no other means of viable transportation, to include the use of personal vehicles or the use of the existing public transportation system, and will not be provided beyond the city limits." The proposal further stated that "transportation will be provided for transporting employed residents to and from their work site, residents seeking employment to specific interviews and residents participating in Transitional Service Counseling and for no other purpose." Bannum also stated that, in the event the taxi-cab company decided to discontinue its service, Bannum would also discontinue its transportation service to the inmates. A 278-280.

63. On May 10, 2000, Bannum wrote to the BOP to assure it that Bannum was working to revise its cost proposal regarding the transportation issue. A 286.

64. On May 19, 2000, the BOP transmitted the results of its May 2000 interim monitoring report to Bannum. In the interim monitoring report, the BOP noted that the transportation problem was still an issue, and gave several concrete examples of how the service

advertised by the City of Montgomery differed from the actual service provided. The lack of public transportation, and Bannum's failure to provide a back-up service, as required in the contract, was causing residents to miss employment opportunities and to break their curfews. A 287-292.

65. On June 13, 2000, Bannum submitted a fourth cost proposal to resolve the transportation issue. In it proposal, Bannum would hire a taxi cab service for 8.5 hours per day, Monday through Friday, and was limited to "those residents who have no other means of viable transportation, to include the use of personal vehicles, and will not be provided within one linear mile of the facility as is discussed in the SOW." The taxi-cab company also agreed to be "on-call," from 10:00 a.m. through 4:00 p.m., Monday-Friday. Additionally, facility employees would be available to use their personal vehicles to transport inmates. Bannum also stated that, in the event the taxi-cab company decided to discontinue its service, Bannum would also discontinue its transportation service to the inmates. A 293-295.

66. On June 23, 2000, the BOP notified Bannum of its intent to exercise the first option year under the Montgomery contract, thus extending the contract from October 1, 2000 through September 30, 2001. A 297.

67. On June 26, 2000, the BOP notified Bannum that its May 2000 monitoring was officially closed, but also that the transportation issue remained a concern. A 298.

68. On October 5, 2000, the BOP notified Bannum of its intent not to exercise the second option year under the Montgomery contract, thus concluding the contract on September 30, 2001. A 299.

69. On October 16, 2000, the BOP notified Bannum of the results of its October 2000

monitoring. The report noted that the transportation issue had still not been resolved, and that the lack of transportation was requiring some residents to walk 4 to 12 miles to perform activities such as obtaining their drivers' licenses, social security cards and birth certificates. A 300-304.

70. Bannum responded on November 2, 2000, stating its belief that it was technically complying with the Montgomery contract, that the proposed modification no. 3 was an admission by the BOP that Bannum did not have to provide transportation, that the Montgomery center's employment rate of 97 percent proved that there was no problem with a lack of transportation, and stating that the 3 percent unemployed inmate population could not find employment because they were "clearly . . . recalcitrant." A 305-306.

71. On November 13, 2000, the BOP informed Bannum that the interim monitoring period had been closed, but that the transportation issue remained a concern. A 307.

72. On January 5, 2001, the BOP circulated a memorandum summarizing the transportation negotiations with Bannum, stating the reasons why Bannum's proposals were not acceptable to the BOP, and recommending that Bannum purchase a transportation van to provide the required transportation when the public transit system is not adequate. A 308-310.

73. On January 24, 2001, Bannum provided the BOP with another cost proposal to address the transportation issue. Bannum noted that its four previous proposals had not been accepted by the BOP because of the 97 percent inmate employment rate, and Bannum repeated its belief that unemployed individuals were "recalcitrant." This new proposal was a revision to the previous proposals, and essentially offered to purchase taxi-cab service during limited hours as a back-up to the public transportation, and only for certain Federal inmates. A 311-313.

74. On February 12, 2001, the BOP informed Bannum that it could not accept

Bannum's transportation proposal, and that the would move forward with a new solicitation of the Montgomery contract that contained a revised public-transportation clause in the Statement of Work. A 314.

75. The revised transportation clause stated:

> The facility will be located within one mile of public transportation, or the contractor will provide transportation for offenders to seek employment, work, and participate in program activities and necessary medical treatment i.e. physicals, at no cost to the offender. The contractor will ensure the proper insurance policy is in effect to cover the transportation, if applicable. If at anytime during the cont[r]act the CCM determines the public transportation system to be inadequate or ineffective, the contractor will provide offenders with transportation for work, program participation activities and necessary medical appointments at no cost to the offender. Additionally, staff will not use their personal automobiles to transport offenders unless it is an emergency.

A 175.

76. On February 21, 2001, the BOP notified Bannum of the results of its February 2001 monitoring report. The report indicated that Bannum's failure to comply with the transportation clause remained a concern. A 315-319.

77. The transportation issue remained a concern throughout the remainder of Bannum's performance. A 350-354.

78. Bannum bid upon and won the replacement Montgomery contract. A 154.

79. Under the 2001 Montgomery contract, Bannum was paid $60.45 per man-day, with an estimated amount of annual man-days of 10,950. A 155, 158.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

/s/ Devin A. Wolak
DEVIN A. WOLAK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel. (202) 616-0170
Fax. (202) 514-8624

August 29, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on August 29, 2007, a copy of the foregoing "DEFENDANT'S RULE 56(h)(1) PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Devin A. Wolak
DEVIN A. WOLAK