**BANNUM v. UNITED STATES**
**No. 01-639C**

**APPENDIX TO MOTION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT UPON**
**COUNTS SIX AND EIGHT OF THE SECOND AMENDED COMPLAINT**

**DOCUMENT** | **PAGE NUMBER**

COUNT SIX DOCUMENTS


Beaumont Contract . . . . . . . . . . A 1

Beaumont Statement of Work . . . . . . . . . . A 4

December 18, 2000 BOP memorandum re lease dispute . . . . . . . . . . A 20

December 19, 2000 BOP memorandum re lease dispute . . . . . . . . . . A 22

December 22, 2000 Cure Notice . . . . . . . . . . A 23

January 3, 2001 response to Cure Notice . . . . . . . . . . A 25

January 9, 2001 correspondence from BOP to Bannum
re lease litigation . . . . . . . . . . A 64

January 11, 2001 correspondence from Bannum to BOP
re continuation of lease litigation (including injunction) . . . . . . . . . . A 65

January 29, 2001 Contracting Officer's Final Decision . . . . . . . . . . A 68

February 20, 2001 correspondence From Bannum to BOP
re continuation of trial date in lease litigation . . . . . . . . . . A 70

February 28, 2001 correspondence from BOP to Bannum
re lease litigation and additional response to Cure Notice . . . . . . . . . . A 72

March 7, 2001 correspondence from Bannum to BOP
re additional response to Cure Notice . . . . . . . . . . A 73

March 29, 2001 correspondence re additional problems with lease . . . . . . . . . . A 74

May 14, 2001 correspondence from Bannum to BOP
re lease litigation and trial date . . . . . . . . . . A 76

May 25, 2001 correspondence from Bannum to BOP
re lease litigation and trial date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 77

June 4, 2001 correspondence from Bannum to BOP
re lease litigation trial date and new case in Federal court . . . . . . . . . . . . . . . . . . . . . A 78

June 15, 2001 correspondence from Bannum to BOP
re lease litigation and Chuck Ala . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 79

Bannum v. McCray, et al., M.D. Fla. No. 01-cs-1099-T-27-MAP
Second Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 81

Bannum v. McCray, et al., M.D. Fla. No. 01-cs-1099-T-27-MAP
Bannum's Response to Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 109

Bannum v. McCray, et al., M.D. Fla. No. 01-cs-1099-T-27-MAP
Final Order upon Motion To Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 130

COUNT EIGHT DOCUMENTS

1998 Montgomery Contract Award Document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 144

2001 Montgomery Contract Award Document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 154

1992 Montgomery Statement of Work Excerpts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 159

1996 Montgomery Statement of Work Excerpts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 166

2000 Montgomery Statement of Work Excerpts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 168

February 10, 1998 Monitoring Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 185

March 10, 1998 Notice to Bannum re competitiveness upon solicitation . . . . . . . . . . . . . . . A 191

March 18, 1998 correspondence from Bannum to BOP
re DART public transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 194

April 10, 1998 solicitation discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 195

April 16, 1998 Correspondence from Bannum to BOP
re compliance with transportation clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 198

April 24, 1998 correspondence from Bannum to BOP
re response to solicitation discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 200

May 6, 1998 correspondence from Bannum to BOP . . . . . . . . . . A 215

May 27, 1998 correspondence from BOP to Bannum
re continuation of solicitation discussion . . . . . . . . . . A 216

June 3, 1998 correspondence from BOP to Bannum
re final proposal . . . . . . . . . . A 218

June 17, 1998 correspondence from BOP to Bannum
re continuation of solicitation discussion . . . . . . . . . . A 220

June 25, 1998 correspondence from BOP to Bannum
re final proposal (second time) . . . . . . . . . . A 222

October 1, 1998 Notice To Proceed . . . . . . . . . . A 224

February 1, 1999 Monitoring Report . . . . . . . . . . A 225

February 16, 1999 correspondence from Bannum to BOP
re response to monitoring report . . . . . . . . . . A 229

March 12, 1999 correspondence from BOP to Bannum
re public transportation concerns . . . . . . . . . . A 230

June 15, 1999 correspondence from BOP to Bannum
re public transportation concerns . . . . . . . . . . A 233

June 16, 1999 Monitoring Report . . . . . . . . . . A 235

June 21, 1999 Monitoring Report (repeat) . . . . . . . . . . A 238

June 25, 1999 Interim Monitoring Report . . . . . . . . . . A 241

June 28, 1999 correspondence from BOP to Bannum
re close of monitoring period . . . . . . . . . . A 247

September 8, 1999 Bannum cost proposal re public transportation . . . . . . . . . . A 248

September 23, 1999 correspondence from BOP to Bannum
re close of monitoring period . . . . . . . . . . A 251

November 29, 1999 correspondence from Bannum to BOP
re recission of Modification No. 3 . . . . . . . . . . A 252

December 13, 1999 correspondence from BOP to Bannum
re copy of executed Modification No. 3 . . . . . . . . . . A 253

December 20, 1999 correspondence from Bannum to BOP
re recission of Modification No. 3 . . . . . . . . . . A 256

January 7, 2000 Bannum cost proposal re public transportation . . . . . . . . . . A 257

January 11, 2000 correspondence from Bannum to BOP
re negotiation of transportation issue . . . . . . . . . . A 260

February 2, 2000 Interim Monitoring Report . . . . . . . . . . A 261

February 24, 2000 correspondence from Bannum to BOP
re request to withdraw finding in February Interim Monitoring Report . . . . . . . . . . A 269

March 2, 2000 correspondence from BOP to Bannum
re Interim Monitoring Report . . . . . . . . . . A 273

March 7, 2000 correspondence from Bannum to BOP
re recission of Modification No. 3 . . . . . . . . . . A 275

March 13, 2000 correspondence from BOP to Bannum
re close of monitoring period . . . . . . . . . . A 277

March 24, 2000 correspondence from Bannum to BOP
re public transportation issue . . . . . . . . . . A 278

April 7, 2000 e-mail re private taxi cab service . . . . . . . . . . A 281

April 7, 2000 e-mail re solutions to public transportation issue . . . . . . . . . . A 282

April 11, 2000 proposed revision to Statement of Work . . . . . . . . . . A 283

May 10, 2000 correspondence from Bannum to BOP
re public transportation issue . . . . . . . . . . A 286

May 19, 2000 Interim Monitoring Report . . . . . . . . . . A 287

June 13, 2000 Bannum cost proposal re public transportation . . . . . . . . . . A 293

June 23, 2000 correspondence from BOP to Bannum
re exercising of first option year . . . . . . . . . . A 297

June 26, 2000 correspondence from BOP to Bannum
re close of monitoring period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 298

October 5, 2000 correspondence from BOP to Bannum
re no-exercise of second option year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 299

October 16, 2000 Interim Monitoring Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 300

November 2, 2000 correspondence from Bannum to BOP
re public transportation issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 305

November 13, 2000 correspondence from BOP to Bannum
re close of monitoring period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 307

January 1, 2001 BOP memorandum re transportation issue . . . . . . . . . . . . . . . . . . . . . . . . A 308

January 24, 2001 cost proposal re public transportation . . . . . . . . . . . . . . . . . . . . . . . . . . A 311

February 12, 2001 correspondence from BOP to Bannum
re January 24, 2001 cost proposal and resolicitation . . . . . . . . . . . . . . . . . . . . . . . . A 314

February 21, 2001 Interim Monitoring Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 315

March 6, 2001 Request For Equitable Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 320

August 1, 2001 Interim Monitoring Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 350

August 14, 2001 correspondence from BOP to Bannum
re close of monitoring period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 354

DCAA Audit of Count 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 355

OMB 1103-0018 Exp. 2/28

# AWARD/CONTRACT

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) ▶ RATING | PAGE 1 OF 3 PAGES

2. CONTRACT (Proc. Inst. Ident.) NO.: J200c-336

3. EFFECTIVE DATE: 11/1/97

4. REQUISITION/PURCHASE REQUEST/PROJECT NO.: 051/Engel

5. ISSUED BY CODE

U.S. Department of Justice
Federal Bureau of Prisons
320 First St., NW, CCC Contracts
Washington, D.C. 20534

6. ADMINISTERED BY (If other than Item 5) CODE

ORIGINAL

Katharina Washington
(202) 514-5438

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and ZIP Code)

Bannum, Inc.
1301 Seminole Blvd., Suite 126
Largo, Florida 33770
Attn: David Lowry, Executive Director
(813)588-2594

CODE | FACILITY CODE

8. DELIVERY: ☐ FOB ORIGIN ☒ OTHER (See below) DESTINATION

9. DISCOUNT FOR PROMPT PAYMENT: N/A

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: ▶ ITEM: See item G-3 (RFP)

11. SHIP TO/MARK FOR CODE

1310 Pennsylvania
Beaumont, Texas

12. PAYMENT WILL BE MADE BY CODE

Federal Bureau of Prisons
4211 Cedar Spring Rd., Ste. 100
Dallas, Texas 75219

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
☐ 10 U.S.C. 2304(c)( ) ☐ 41 U.S.C. 253(c)( )

14. ACCOUNTING AND APPROPRIATION DATA: 82-T-270-420-613-2506/Funds obligated by each delivery order

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | See Attached Continuation Pages | | | | |

BOP3806

15G. TOTAL AMOUNT OF CONTRACT ▶ $

## 16. TABLE OF CONTENTS


| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I — THE SCHEDULE | | | | PART II — CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | | X | I | CONTRACT CLAUSES | |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | | | | PART III — LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | | X | J | LIST OF ATTACHMENTS | |
| | D | PACKAGING AND MARKING | | | | PART IV — REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |


*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return Two copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number ______, including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

19A. NAME AND TITLE OF SIGNER (Type or print): DAVID A. LOWRY, EXECUTIVE DIRECTOR

20A. NAME OF CONTRACTING OFFICER: Anthony H. Bigesby, Contracting Officer

19B. NAME OF CONTRACTOR
BY [signature] (Signature of person authorized to sign)

19C. DATE SIGNED: 06/27/97

20B. UNITED STATES OF AMERICA
BY [signature] (Signature of Contracting Officer)

20C. DATE SIGNED: 7/17/97

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE

26-107

☆ U.S.G.P.O.: 1990-262-081/20013

STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>J200c-336 | PAGE<br>2 of 3 |
|---|---|---|
| NAME OF OFFEROR OR CONTRACTOR<br>Bannum, Inc. | | |

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|

1. Provide residential Community Corrections Center (CCC) services and Transitional Drug Treatment services for male and female Federal offenders in the Beaumont, Texas area (Line Item 1 and Line Item 2), in accordance with RFP 200-0366-SC and the Business, Technical and Past Performance proposals for Line Items 1 and 2 dated 2-3-97 and the following:

   a. Amendment #1, dated 12-9-96
   b. Amendment #2, dated 1-16-97
   c. Amendment #3, dated 5/14/97
   d. Clarifications and Deficiencies Response #1 dated 4/25/97
   e. Best and Final Offer # 1 received 5/27/97

2. Option Years, if exercised, will begin on November 1.

3. Performance shall begin no later than November 1, 1997.

4. Home confinement and Furlough services shall be provided at one-half (½) the rate of regular manday services.

6. Base period and Option year rates for RFP 200-0366-SC are as follows:

**Line Item One - Comprehensive Corrections Center Services (M/F)**

| Performance Dates | Mandays | Rates |
|---|---|---|
| 11-01-97<br>10-31-99 | 21,900 | $45.95 |
| 11-01-99<br>10-31-00 | 10,950 | $45.95 |
| 11-01-00<br>10-31-01 | 10,950 | $45.95 |
| 11-01-01<br>10-31-02 | 10,950 | $45.95 |

**Estimated Total Base Period: $1,006,305.00**

BOP3808

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>J200c-336 | PAGE<br>3 of 3 |
|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
Bannum, Inc.

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|

**Line Item 2: Transitional Drug Treatment Services (M/F)**

**Base Period & Each of the Three Option Years:**

a. 5 Initial Treatment Planning Conferences per year @ $60 per conferences = $300

b. 20 Assessments per year @ $45 per assessment = $900

c. Individual Counseling (24 30-minutes sessions per inmate per year)
600 30-minute sessions @ $20 per session = $12,000

d. Group Counseling (36 30-minute sessions per inmate per year)
900 30-minute sessions @ $20 per session = $18,000

e. Family/Group Counseling ( 1 30-minute session per inmate per year)
25 30-minute sessions @ $35 per session = $875.00

**Estimated Base Total: $32,075**

BOP3809

# STATEMENT OF WORK

## COMMUNITY CORRECTIONS CENTER

## WITH

## TRANSITIONAL DRUG TREATMENT SERVICES

AUGUST, 1996

# I. INTRODUCTION

## A. BACKGROUND

The Bureau of Prisons (BOP) contracts with state and local governments and private organizations to provide a variety of services to federal offenders in the community. These services are generally provided through facilities commonly known as Community Corrections Centers.

## B. OBJECTIVE

The objective of this contract is to provide a versatile community-based program for federal offenders. Services shall include programs designed to assist offenders in becoming law-abiding, self-sufficient, contributing members of the community.

1. Three programmatic components are required: **Pre-Release, Community Corrections, and Home Confinement.**

   **Pre-Release Component:** Offenders in this program component are in the center for the purpose of making a transition from the institutional setting to the community, or as a program resource while under supervision. These individuals are the responsibility of the BOP.

   **Community Corrections Component:** Offenders in this program component are in the center primarily as a punitive sanction. Conditions are more restrictive than the pre-release component. This component may consist of individuals under the responsibility of the BOP (Direct Court Commitments and Institution Transfers) and the Probation Office (Supervision Cases).

   **Home Confinement Component:** Offenders in this program component are ordinarily within thirty to sixty days of release. This is a selective status that is authorized discriminantly according to an offender's needs. This component may consist of individuals under the responsibility of the BOP and the Probation Office.

C. **EXPLANATION OF TERMS**

1. **Bureau of Prisons (BOP):** A vital component of the Department of Justice, providing high quality correctional services to confined federal offenders, through a well-managed, varied network of prison and community based-programs.

2. **Community Corrections Center (CCC):** The location in which the contractor's programs are operated; also referred to as facility, center, community treatment center (CTC), or halfway house.

3. **Community Corrections Manager (CCM):** The BOP employee responsible for all functions, programs and services related to Community Corrections in their assigned judicial district(s).

4. **Community Corrections Management Center Administrator (MCA):** The BOP employee who exercises responsibility for Community Corrections operations and programs within the geographical area assigned to the Correctional Management Center.

5. **Community Corrections Regional Administrator:** The BOP employee responsible for all Community Corrections functions, services and operations within their respective region.

6. **Contracting Officer:** A BOP employee with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer. (See Section G to identify authorized representatives of the Contracting Officer and limited authorities delegated to these representative.)

7. **Contracting Officer's Technical Representative (COTR):** A COTR is an individual (ordinarily a CCM) designated by a Contracting Officer to act as an authorized representative in monitoring and administration of a contract and acts as technical liaison between the contractor and the Contracting Officer. (See Section G for an expanded outline of these authorities and responsibilities.)

8. **Contractor:** The individual, partnership, corporation or other legal entity who has been awarded a contract by the BOP; "contractor employees", "staff", or "contractor" are used interchangeably throughout this document. Includes all staff from the CEO level to line staff.

9. **Contract Oversight Specialist (COS):** The BOP employee who, assists the CCM, in inspecting and monitoring contract compliance.

10. **Electronic Monitoring Equipment:** The telemetry technology used to monitor a program participant remains in the specified location during the required hours. Either of the two basic types of equipment described below, or other types yet to become commercially available, may be used. The two types are:

    a. **Continuously Signalling Device:** The offender wears a transmitter which emits a signal with a range of 100 to 200 feet. That signal is received by a receiver dialer, a unit installed at the monitored location, which notifies the central computer of a change in the offenders status -- when he comes within range of the unit and when he goes out of range. The central computer contains, within its memory, the offenders schedule and, when notified of a change in the offender's status, compares the time of the change with the schedule to determine if the action is a violation.

    b. **Programmed Contact Device:** A computer contacts the offender periodically to monitor location and verifies the person responding is the offender being monitored. This verification may be accomplished in a variety of ways, including, but not limited to, a device worn by the offender, voice verification, etc.

    c. **Hybrid Device:** A hybrid device functions like a continuously signalling device until it determines a violation has occurred. Then, it functions like a programmed contact device trying to clear the violation before notifying the operator.

11. **Offeror:** The individual, partnership, corporation or other legal entity who has submitted a proposal to the BOP to provide services as outlined in the solicitation.

12. **Preliminary Site Inspection:** One BOP scheduled, on-site inspection of the offeror's facility and location (place of performance) for the purpose of evaluating the proposed site.

13. **Preoccupancy Inspection:** One BOP scheduled, on-site inspection of the contractor's place of performance to ensure facility repairs or renovations have been completed and minimum programmatic requirements have been met so performance may begin.

14. **Pre-Trial Services Officer (PSO):** An officer of the Federal Courts responsible for supervising federal defendants, prior to trial or sentencing, as directed by Federal Courts.

    PSOs are more common to large metropolitan areas. USPOs function in the capacity of a Pre-Trial Services Officer in the majority of judicial districts.

    As applicable, the terms USPO and PSO may be used interchangeably throughout this document in connection with pre-trial service defendant responsibilities.

15. **Reasonable Costs:** The costs of travel (airfare, rental car, etc.) and per diem allowances for United States Government travel, as set forth in the Federal Travel Regulations.

16. **Routine Monitoring:** The BOP's scheduled and unscheduled, on-site inspection visits to the contractor's facility to evaluate performance. For program facilities having an average daily population of federal offenders totaling ten or more over the past 90 days, this is ordinarily four times per every twelve months of performance; and for program facilities having an average daily population of federal offenders totaling nine or less over the past 90 days, two times per every twelve months of performance.

17. **Types Of Offenders:**

a. **Transfers from Federal Institutions:** These BOP offenders have served a portion of their sentence in a federal institution and are completing the confinement portion in a CCC.

b. **Direct Court Commitments:** These BOP offenders have been designated to serve their entire terms of confinement in a CCC.

c. **Supervision Cases:** These offenders are referred to the BOP for placement in a CCC by a USPO or PSO due to conditional release supervision requirements. The supervision requirements may be by order of a Federal Court, the U. S. Parole Commission, or Federal Pre-Trial Services. The BOP may pay for room and board (except for Pre-Trial cases) during the period of time spent in a CCC on conditional release. Some of these cases may also be referred to as "Community Confinement Cases" as described in the Sentencing Reform Act Guidelines.

(1) **Probationers:** Offenders that are required to reside in and adhere to program requirements of a CCC as a condition of probation for the time specified by the Court.

(2) **Supervised Releasees:** Offenders that are required to reside in and adhere to program requirements of a CCC as a condition of supervised release for the time specified by the Court.

(3) **Parolees, Mandatory Releasees:** Offenders that have been paroled or mandatorily released from a federal institution. The offenders must reside in, and adhere to program requirements of a CCC as a condition of their parole or mandatory release.

(4) **Pre-Trial Services:** An individual required by the Court to reside in and adhere to program requirements of a CCC as a condition of pre-trial release. The duration of residence will be specified by the pre-trial

services official referring the case for placement. Pre-trial status offenders are the sole responsibility of Pre-trial Services/U.S. Courts.

18. **U. S. Probation Officer (USPO):** An officer of the Federal Courts responsible for supervising federal offenders placed on probation or under supervised release by Federal Courts. Probation Officers also supervise mandatory releasees and those released on parole by the United States Parole Commission (USPC).

D. **SCOPE OF WORK**

The contractor shall furnish the necessary facilities, equipment, and personnel to provide for the safekeeping, care, and program needs of persons residing in centers as defined in this contract.

The contractor has affirmative responsibility to ensure proper management oversight of their program. Absentee ownership does not mitigate program integrity, responsiveness or responsibility.

The contractor shall develop operational policies and procedures that adhere to the requirements contained in this SOW and to generally accepted correctional practice as defined by the COTR.

Except as otherwise provided for in this SOW, all offenders shall receive the same treatment and services.

All instances of unusual and/or non-routine happenings concerning the facility or inmate management must be telephonically communicated to the CCM immediately, and in writing within three (3) working days.

The contractor shall comply with all requirements outlined in this SOW. The requirements of the SOW are minimum requirements and take precedence over the contractors proposal in the event of any conflict or ambiguity.

The BOP reserves the right to enter into negotiations with the contractor to modify conditions or procedures within this statement of work and contract, so long as those negotiations do not result in a significant change.

II. REQUIREMENTS

## CHAPTER 1 - ADMINISTRATION AND ORGANIZATION

A. The contractor shall maintain documentation (meeting minutes, copies of reports, checklists, etc.) as evidence that requirements in this SOW are being met. The contractor has the affirmative responsibility to demonstrate they are in compliance with the requirements. Any variations from the contractor's proposal must be submitted for approval through the CCM to the Contracting Officer.

B. The contractor shall provide documentation indicating their standing as a legal entity, or part of a legal entity and shall provide documentation indicating legal measures have been taken to provide continuity of service in the event of incapacitation, retirement, or death.

C. The contractor shall provide a written description and organizational chart outlining the structure of authority, responsibility, and accountability within the contractor's facility and parent agency.

D. The Center Director shall hold meetings at least monthly with facility staff to foster communication, establish policy, discuss problems, ensure compliance with requirements, and implement programs. Written documentation of all staff meetings shall be maintained as evidence of compliance.

E. The contractor shall maintain a current written operations manual which is available to and reviewed, at least annually, by staff. The manual must contain operational procedures of an instructional nature for staff working in the facility. The offeror's proposal may not be used as the operations manual. The manual shall describe the purpose, philosophy, programs, services, policies and procedures of the facility for all elements of work contained herein. The contractor must operate according to this manual. On an as-needed basis, but not less than annually, the contractor shall update the manual to reflect current policy.

The contractor shall have a written system for disseminating new or revised policy and procedure to staff, volunteers, and if appropriate, to residents.

F. The contractor shall conduct an internal audit of the program on at least an annual basis. The SOW will be used as the guideline for the audit. Written findings and planned corrective actions shall be forwarded to the CCM.

G. A key staff member from each contract facility shall attend and participate in a regional meeting/training session scheduled by BOP staff every eighteen months, and a local CCM session every six months, in order to maximize contract performance. Additionally, the contractor shall conduct at least 20 hours of annual refresher training for all staff.

H. The contractor shall have a written policy to prevent conflict of interest which specifically states that no employee may use his or her official position to secure privileges or advantages.

I. The contractor shall provide documentation of its tax exempt status, if applicable.

J. The contractor shall operate according to an annual written budget of anticipated revenues and expenditures.

K. The contractor shall have written policy and procedures for receipt, safeguarding, disbursement, and recording of funds that comply with generally accepted accounting practices.

L. The contractor shall have liability and property insurance for the facility and equipment, with documentation available for review.

M. The contractor shall have written policy specifying equal employment opportunities exist for all positions.

N. Under no circumstances shall a resident be in a position of control or authority over other residents.

O. Safety of residents and staff shall be given highest priority. The use of physical force shall be resorted to only in instances of justifiable self-defense for the prevention of loss or damage to property, and to prevent a resident from self-inflicted harm.

Only the degree of force necessary to control the situation is allowed; excessive force is prohibited. Any instance where use of physical force is required shall be telephonically reported immediately to the CCM. The contractor shall furnish a written report to the CCM within 24 hours of the incident.

The use or possession of lethal weapons in the contract facility shall be prohibited.

P. The contractor shall conduct searches of the facility and personal belongings of residents as needed, but at a minimum of once per month. In instances where staff believe a resident is attempting to introduce contraband into the facility, they may conduct a pat search of the resident. For the same reasons, a strip search may be conducted with approval of the Center Director. Any strip search shall be conducted by a member of the same sex and may be done only when at least two staff are present. The basis for and results of the strip search shall be documented and maintained in a log for tracking purposes.

Q. At least 75% of the services required in this contract shall be provided by the contractor's staff.

R. If accredited, the contractor shall submit documentation of this status. If not accredited, the contractor shall address what plans, if any, exist to achieve this status.

S. Any deviation from the provisions of the SOW shall be reported by the contractor to the Contracting Officer through the CCM.

T. The contractor shall provide for the translation of facility rules, emergency diagrams, and other related documents into a foreign language as required by the composition of the resident population.

U. The contractor shall ensure residents are not used for medical, pharmaceutical, or cosmetic experiments.

V. The contractor shall post in a conspicuous location, a listing of the name, address, and telephone number of the responsible CCRA, MCA, CCM, Regional Director, CUSPO, and other relevant persons as deemed appropriate by the contractor.

## CHAPTER 3 - FACILITY

A. The facility shall be located within one mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident.

B. The contractor shall ensure the facility is not located in an area where public concern or opposition would have an adverse effect on the community or the residents. The contractor shall provide copies of documentation indicating the community where the facility is located has been advised of the program and purpose. This documentation may include, but is not limited to, letters or petitions signed by the elected or appointed officials in the facility's geopolitical subdivision, letters from the adjacent property owners and other residents, and other material supporting the community has been made aware of the contractor's intent to locate and operate the CCC program at the contractor's specified address. Letters from adjacent property owners and other residents shall include name, address, and their respective location to the proposed facility.

The facility shall not be a part of an operating hotel/motel.

C. The facility shall be located in an area where the commuting time to the general area of work is ordinarily no more than one and one-half hours each way via public transit. The contractor shall arrange for transportation for indigent residents while seeking employment, at no cost to the resident.

D. The facility's sleeping quarters shall have adequate ventilation of outside or recirculated filtered air. The BOP authority having jurisdiction determines if adequate natural or mechanical ventilation is present.

E. All resident personal living/sleeping areas in the facility shall have lighting of at least twenty (20) foot candles. Lighting in washroom and resident grooming areas shall have lighting of at least thirty (30) foot candles. Illumination for walk-in refrigerator, freezer, closet and/or storage areas shall be at least ten (10) foot candles.

F. A minimum of six square meters (sixty (60) square feet) of sleeping space shall be provided each resident of which no more than .4 square meters (four square feet) is closet space. Common areas such as dayrooms, bathrooms, TV rooms, dining rooms, halls, etc. shall not be considered as living space.

Each resident shall be provided equal closet/metal locker space in their sleeping area for the storage of personal items.

G. The contractor shall ensure residents are afforded a reasonable degree of privacy. Co-correctional facilities shall provide for separate sleeping, bathing, and toilet facilities by gender.

H. The contractor's facility shall be accessible to the physically handicapped, or the contractor shall develop contingency plans to provide services to these residents by subcontracting or arranging for services through an acceptable alternative. When the resident is housed by someone other than the contractor, the contractor maintains responsibility for the resident.

Contingency plans to house the physically handicapped in other than the contractor's facility require the advance approval of the CCM.

I. Private counseling space shall be provided in the facility.

J. Space and furnishings for activities such as group meetings, visits, and recreation shall be provided in the facility.

K. At a minimum, the facility shall have one operable toilet for every ten residents, one shower (or bathing area) for every eight residents, and one wash basin for every six residents.

Showers and wash basins shall have hot and cold water. Hot water temperatures shall be thermostatically controlled at 120 degrees fahrenheit.

L. Laundry facilities shall be available to all residents. One operable washer and dryer for every sixteen residents shall be provided in-house or through a community establishment within one mile of the facility. The costs of laundering

all indigent resident's belongings shall be the financial responsibility of the contractor.

M. Adequate telephone facilities which are accessible to residents shall be provided on the facility's premises. The use of pay telephones is acceptable.

N. The facility room temperature shall be consistently maintained which is appropriate for the season. Ordinarily, 20 degrees C (68 degrees F) during seasonably cold months and 25.6 degrees C (78 degrees F) during seasonably warm months, shall be maintained.

However, cooling energy shall not be used to achieve the temperatures specified for heating and heating energy shall not be utilized to achieve the temperatures specified for cooling.

O. The contractor is required to identify the exact areas of their proposed facility to be utilized for resident sleeping areas, counseling, dining, kitchen, etc. This information is required in the form of a diagrammed facility floor plan, to include exact room dimensions. The contractor is required to notify the CCM, in writing, of any proposed changes to this plan. The CCM will have final approval authority of any deviation from this plan before any federal residents are moved.

## CHAPTER 20 - INSPECTIONS

The contractor shall be responsible to ensure performance is in accordance with this SOW. The COS and/or CCM monitors compliance with the SOW on a systematic and routine basis by various means, including on-site inspections. The results of these inspections shall be brought to the attention of the contractor through consultations and narrative reports, commonly referred to as monitoring reports.

Monitoring reports contain all findings of the inspection and shall express deviations from the SOW in the following terms:

A. **Findings:**

Findings result when evidence indicates the conditions of this SOW are not being met, as determined by the CCM.

B. **Corrective Action:**

The tasks, or group of tasks, necessary to resolve a finding.

C. **Recommendations/Comments:**

Suggestions to the contractor of ways to modify procedures or practices that improve facility operations. Areas that are in need of improvement but do not meet the criteria of a finding.

Upon receipt of the report the contractor shall be responsible for drafting a response to the CCM within 30 days, unless directed otherwise by the CCM. The response shall note corrective what action was taken and when it was taken. In the event constraints are identified the contractor shall establish a realistic timeframe for corrective action being completed.

Failure to respond to the monitoring report or to take corrective action to the findings may result in adverse action up to and including the termination of the contract.

## CHAPTER 21 - COST REIMBURSEMENTS

Background:

The BOP has incurred significant expenses in: providing excessive oversight due to marginal performance by some contractors; performing repetitive (two or more) preliminary site inspections when an offeror changes facility site locations; and, performing repetitive (two or more) preoccupancy inspections when a contractor fails to have their facility ready to accept federal offenders. As a result of this poor planning and/or failure to provide adequate management oversight, BOP representatives may have to frequently and repeatedly travel to these locations. The BOP cannot continue to perform these unreasonable and costly practices which results from an offeror's poor planning, and/or contractors mismanagement.

Repeated site changes by an offeror during the negotiation process results in expensive travel and staff costs in order to inspect the offeror's new site. These same costs are incurred when some contractors fail to timely prepare their program and/or facility for performance. Even after performance begins, some contractors fail to satisfactorily manage their programs resulting in unnecessary, frequent monitoring visits by BOP personnel.

Requirements:

A. In the event an offeror changes their proposed site during the negotiation process after the BOP has inspected the facility, the offeror shall be required to reimburse the BOP for all reasonable costs associated with the re-inspection of the new proposed site(s) due to the offeror's change in proposed facility. Failure to reimburse the BOP within ten (10) calendar days of written notification shall result in elimination from consideration for award of the contract.

B. When a contractor fails to respond to monitoring reports or repeatedly fails to correct documented deficiencies, the BOP will have to increase the number of its inspections, and thus charge the contractor for the reasonable costs associated with these visits. If the BOP must repeatedly visit the facility above and beyond the routinely scheduled

activity of monitoring and training, the contractor shall be required to reimburse the BOP for <u>all</u> reasonable costs

associated with providing technical assistance, training and oversight required to improve contractor performance to a satisfactory level. These costs shall be deducted from the monthly billing to the government.

C. The BOP will schedule a Preoccupancy inspection following award, but prior to performance. Unless specified otherwise, this inspection is ordinarily not less than thirty nor more than forty-five days from date of contract award. If the BOP must repeatedly inspect the place of performance (facility and location) due to the contractor's failure to complete necessary facility repairs or renovations, or fails to meet minimum programmatic requirements so that performance may begin, the contractor shall be required to reimburse the BOP for <u>all</u> reasonable costs associated with a <u>second</u> (or subsequent) preoccupancy inspection. These costs shall be deducted from the monthly billing to the government.

D. Ordinarily, at least two BOP staff will require from one to three working days to perform an inspection or monitoring. However, the BOP reserves the right to determine the resources (i.e., number and type of staff, number of working days, etc.) necessary to perform all inspections and monitorings as defined in this chapter.

E. The requirements of this chapter do not modify nor waive the rights of the BOP to terminate a contract for default under the terms and conditions of the contract.

U.S. Department of Justice
Federal Bureau of Prisons
Community Corrections Office
515 Rusk Avenue, Room 12024
Houston, Texas 77002

December 18, 2000

MEMORANDUM FOR KATHY CAMPBELL, ASSISTANT COMMUNITY CORRECTIONS ADMINISTRATOR

THRU: ANDREA JOHNSON, ASSISTANT COMMUNITY CORRECTIONS ADMINISTRATOR

FROM: CHARLES W. ALA, CONTRACT OVERSIGHT SPECIALIST

SUBJECT: BANNUM BEAUMONT, J200C-336, 6ZL

This memo is in regards to a conversation I had with the owner of the building that is occupied by Bannum Incorporated at 1310 Pennsylvania Avenue, Beaumont, Texas. The owners name is John McCray. Mr. McCray informed me that Bannum has never had a lease to occupy the building.

Mr. McCray leased the building to Mr. Ken Webb. Mr. Webb sub-leased the building to Bannum on February 5, 1997. Mr. McCray stipulated in his lease with Mr. Webb, that Mr. Webb could not sub-lease the property. According to the copy of Bannum's lease in our contract file, David Lowry was aware that he was sub-leasing the property. Mr. McCray did not know the building was sub-leased until he got a letter from Lawyers representing Bannum regarding a leaking roof.

I spoke with Lee Wheeler from Foxworth Reality, Beaumont, Texas. Mr. Wheeler is the property manager for Mr. McCray. Mr. Wheeler explained to me that he has tried to deal with David Lowry for the past six months. He has offered a new lease to Mr. Lowry but Mr. Lowry refuses to sign another lease.

On December 11, 2000, a registered eviction letter was issued to Bannum Inc.

Bannum has thirty (30) days to vacate the premises. I have secured a copy of the letter and will fax it if needed.

Mr. John McCray
P.O. Box 1528
Alexandria, La. 71309
318-793-5641

Mr. Lee Wheeler
Foxworth Reality
Beaumont, Texas
409-892-7245

I will forward information as it comes available.

As an aside, should it become necessary, Cornell Corrections, Houston, Texas. can accommodate all Bannum Beaumont's population and can accommodate for all their programming needs, including home confinement in the Beaumont area.

Federal Bureau of Prisons

Community Corrections Office

*515 Rusk Avenue, Room 12024*
*Houston, Texas 77002*
*(713) 718-4781 Fax: (713) 718-4780*

December 19, 2000

**MEMORANDUM FOR KATHRINA WASHINGTON, COMMUNITY CORRECTIONS CONTRACTING OFFICER, CENTRAL OFFICE**

THRU: David J. Wollner, Community Corrections Administrator
Central Office

THRU: Gina Lane Mustain, Community Corrections Regional Administrator
South Central Regional Office

THRU: Andrea Johnson, Assistant Community Corrections Administrator

FROM: Benjamin R. Tousley /s/ Benjamin R. Tousley
Community Corrections Manager

SUBJECT: Cure Notice Bannum Place Beaumont
Contract #J200c-336(6ZL)

I am recommending a Cure Notice be issued to Bannum Incorporated for contract J200c-336, due to a conversation with the building owner of 1310 Pennsylvania Avenue, Beaumont, Texas, John McCray. Bannum Beaumont has occupied the building since the award date of the contract.

The owner stated that the building was erroneously sub-leased to Bannum Incorporated and that Bannum Incorporated has never had a valid lease agreement to occupy this building. The building was leased to Mr. Ken Webb with the provision that this building not be sub-leased. On February 5, 1997, David Lowry signed a lease sub-letting a portion of this building which is now occupied by Bannum Beaumont.

Upon learning of the sub-lease, Mr. McCray evicted all tenants except Bannum Beaumont. Approximately six months ago, Mr. McCray instructed his property manager, Lee Wheeler of Foxworth Reality, to offer Bannum a new lease. David Lowry refused to accept this new lease.

On December 11, 2000, Lee Wheeler sent a certified letter to David Lowry giving Bannum Incorporated thirty (30) days to vacate the premises.

Attached are the copies of the certified letter, the lease agreement signed by David Lowry, and a memo to Kathy Campbell dated December 18, 2000.

**U.S. Department of Justice**

Federal Bureau of Prisons

*Washington, DC 20534*

December 22, 2000

Mr. David Lowry, Executive Director
Bannum, Incorporated
1301 Seminole Boulevard, Suite 126
Largo, Florida 33770

RE: Contract J200c-336 (CURE NOTICE)
Beaumont, Texas area

Dear Mr. Lowry:

Bannum, Incorporated (Bannum) was awarded Contract J200c-336 for Community Corrections Center (CCC) Services and Transitional Drug Treatment Services in the Beaumont, Texas area on July 17, 1997. By signing the Standard Form (SF) 26 Award Document on June 27, 1997, Bannum agreed to perform the contract in accordance with the Statement of Work (SOW) and comply with all terms and conditions of the contract which began November 7, 1997.

In accordance with Request for Proposal (RFP) 200-0366-SC, for the Beaumont, Texas area, when submitting an offer, prospective offerors must comply with Section L.7(g), which states: "All proposals must provide evidence supporting the offeror's right to use the proposed facility. Acceptable evidence of right to use is limited to deeds, leases, bills of sale, options to lease, options to buy, contingency leases or contingency deeds. ......"

However, the Federal Bureau of Prisons (BOP) received a copy of a letter to Bannum from Mr. Lee Wheeler, Property Manager of Foxworth Real Estate Corporation. The letter states that the owner has elected to execute his option to terminate Bannum's tenancy and for Bannum to consider the letter as its 30-day notice.

Bannum is required to provide a written plan of action and a copy of a valid lease for the duration of the contract. This will ensure that Bannum will have a valid place of performance to continue providing services.

Should Bannum desire to provide a substitute place of performance, the documentation for the new place of performance should be provided to BOP in accordance with RFP 200-0366-SC, Section H.2.

Bannum is notified that the BOP considers the above a condition that is endangering performance of the contract. Unless Bannum can cure the above apparent loss of right to use the facility or provide an acceptable plan of action to the Contracting Officer at the Federal Bureau of Prisons, Procurement and Property Branch, Attn: CCC Contracting, 320 First Street, N.W. (5006), Washington, D.C. 20534, within ten (10) calendar days after receipt of this notice, it is requested that the response be received in this office no later than January 3, 2001, the Government may terminate the referenced contract for default under the authority of the Federal Acquisition Regulations Clause 52.249-8, Default (Fixed-Price Supply and Service).

Should Bannum fail to respond to this notice in a manner that will ensure full contract compliance to the BOP by Bannum, the BOP shall exercise its full right and obligation to obtain the satisfactory completion of performance by other means.

If you have any questions, please let me know.

Sincerely,

Katharina Washington

Katharina Washington
Contracting Officer

JOSEPH A. CAMARDO, JR.
ATTORNEY AT LAW
127 GENESEE STREET
AUBURN, NEW YORK 13021
WWW.CAMARDO.COM

OSEPH A. CAMARDO, JR.
NCY M. CAMARDO*
*admitted to Georgia Bar only
_VIN M. COX
KEVIN P. RYAN
ROBERT B. RIBAROVSKI

MANAGER-GOVERNMENT COST/PRICE ANALYST
JOSEPH W. NORRIS, M.B.A.

PHONE: (315) 252-384
FAX: (315) 252-350
E-MAIL: JCAM123@AOL.COM

**Via Fax (202) 307- 2780 (Without Exhibits)**
**& Federal Express (With Exhibits)**

January 3, 2001

Katharina Washington
Contract Officer
Federal Bureau of Prisons
CCC Contracting
320 First Street N.W.
Washington, DC 20534

**RE: CONTRACT J200c-336**
**BANNUM, INC.**

Dear Ms. Washington:

**RESPONSE TO CURE NOTICE /**
**<u>CLAIM FOR EQUITABLE ADJUSTMENT</u>**

Reference is hereby made to the Cure Notice, dated December 22, 2000, issued in regard to the above-referenced contract. This Cure Notice was issued based upon the receipt by BOP of a blind copy of a letter sent to Bannum from the Property Manager of Foxworth Real Estate Corporation, stating that the owner of the property, where the Bannum facility is presently located, has elected to execute his option to terminate Bannum's tenancy and for Bannum to consider the letter as its 30-day notice to vacate. As a result of this letter, the BOP is requiring Bannum "to provide a written plan of action and a copy of a valid lease for the duration of the contract", as required by Section L.7(g) of the Solicitation. BOP further stated that it considered this condition is endangering contract performance and that if Bannum failed to respond within 10 days, the Government may terminate the contract for default.

Therefore, in response to this Cure Notice, please be advised of the following:

1. As required by the Solicitation, Bannum supplied to BOP, as part of its

Proposal, a copy of the required lease. Upon the most cursory reading of said lease, it is obvious that Bannum had, and continues to have, a valid right of use of the facility for the full term delineated therein. If BOP had taken the time to read the lease, prior to the issuance of this Cure Notice, BOP would have realized that Bannum's right to use continues to be valid.

2. Attached is a copy of a letter, dated December 19, 2000 from Bannum's attorney in Beaumont, which discusses the validity of the lease agreement and the actions to be taken (Attachment A). Bannum had previously supplied a copy of this letter to BOP prior to the issuance of the Cure Notice. Therefore, the BOP had full knowledge of the frivolousness of the notice to vacate and the actions Bannum intended to take in response, prior to the issuance of the Cure Notice.

3. Immediately upon its receipt of the alleged 30-day notice, Bannum filed a Petition for Temporary Restraining Order, Injunction and Declaratory Judgment in the District Court in Jefferson County, Texas (Attachment B, which includes Petition Exhibits A-E). A Temporary Restraining Order (TRO) was issued by the Court on December 22, 2000 (Attachment C). Please note that a TRO is not normally issued by a Court unless it has been determined that the moving party is most likely to prevail upon the merits of the case, upon a full hearing. Therefore, it is evident that the Court will make a final determination that the lease is valid and will continue.

4. A Hearing on the matter was scheduled for January 3, 2001. However, the TRO was extended until January 11, 2001 (Attachment D), at which time a hearing will be held on this mater.

5. On numerous occasions, high-ranking BOP officials have stressed the need for partnering and mutual cooperation between Bannum and the BOP. In this spirit of partnering and mutual cooperation, Bannum respectfully requests that BOP send a representative to this January 11th hearing to aid us in maintaining this contract, which is to our mutual benefit. Specifically, BOP is needed to help show irreparable harm that will occur if a permanent injunction is not granted and Bannum's contract is terminated for default.

6. Bannum, as well as its attorneys, are confident that, based upon the facts, the law controlling this case, and the Court's issuance of the TRO, the Court will issue a decision that upholds Bannum's continuing right of use under the presently existing valid lease.

7. As a result of Bannum taking immediate action to resolve this matter and its

confidence that it will prevail against this frivolous action, it contends that its continuing performance of this contract is, in no way, endangered by this illegal and factually unsupported vacate notice.

8. Therefore, based upon the foregoing, it is clear that Bannum, in no way, has failed or will fail to meet the requirements of the contract. There is no breach of the contract terms and therefore, there is nothing to cure, as represented in your Cure Notice.

In addition to the facts presented above, Bannum takes strong exception to the manner in which the BOP has chosen to deal with this matter, which Bannum feels is but another example of BOP's continuing breach of its duty of cooperation and fair dealing. The alleged notice was dated December 8, 2000, but was not received by Bannum until December 15th. In communications with Bannum, the BOP represented that it received a copy of the notice to vacate sometime between December 8th and the 19th, 2000. Despite Bannum's request, the BOP refused to tell Bannum when and from whom they received the copy of the 30-day notice. The BOP also indicated that they had telephone communications with persons representing the property owner. Despite Bannum's request, the BOP refused to identify said persons, and the nature and context of said communications. This is a deliberate and prejudicial withholding of superior knowledge and further constitutes a breach of BOP's duty of cooperation and fair dealing.

Bannum further alleges that BOP's handling of this matter, after it received the blind copy of the alleged 30-day vacate notice, also constitutes a breach of its duty of cooperation. The BOP chose to take the notice at face value, without: making any attempt to verify its validity; reviewing the lease previously submitted; or conducting any meaningful discussions with Bannum as to its position on the matter or the course of action it intended to take. Instead, the BOP chose to take the extreme and uncalled for measure of issuing the Cure Notice, inherent in which is the threat of a Termination for Default. Inherent in the BOP's duty of cooperation and fair dealing is the obligation that BOP will properly and fully review a situation, prior to resorting to such an extreme measure as issuing a Cure Notice and threatening a Termination for Default.

Therefore, as a result of the BOP's improper handling of the lease matter, which constitutes a breach of the duties of cooperation and good faith and fair dealing, this letter further constitutes a submission of a Claim for Equitable Adjustment in the amount of $4,500.00, which constitutes all costs entailed in responding to this improperly issued Cure Notice (Attachment E). Therefore, pursuant to the terms of the Contract Disputes Act of 1978 and the Disputes Clause of the Contract, demand is hereby made for compensation in the amount of $4,500.00, and for a Contracting Officer's Final Decision.

In addition, the BOP's resorting to the issuance of a Cure Notice and a threatened

Termination for Default, is made even more egregious by the fact that Bannum previously filed, or is presently filing five REA/Claims on the above-referenced contract, none of which has reached final resolution. Specifically:

1. On October 27, 1999, Bannum submitted an REA for wrongful deductions, in the amount of $700.00. Said REA was rejected by the Contracting Officer by letter dated February 4, 2000. In this regard, please find enclosed a letter, which converts this REA into a Claim pursuant to the Disputes Clause of the contract and the Contract Disputes Act (Attachment F). In addition, on February 23, 2000, Bannum filed an additional and independent REA for wrongful deductions in the amount of $4,050.00. To date, no response has been issued by the Contracting Officer in regard to this REA. Due to this failure to issue a response in a timely manner, please find enclosed a letter, which converts this REA into a Claim pursuant to the Disputes Clause of the contract and the Contract Disputes Act (Attachment G).

2. On July 12, 2000, Bannum filed a Claim for a breach of contract, resulting from the wrongful diversion of incoming inmates to other facilities, under several of Bannum's ongoing contracts. The Claim was in the amount of $428,201.40, the majority of which related to the Beaumont contract. In a Final Decision, dated November 15, 2000, the BOP offered Bannum $50,000 for the Beaumont portion of the Claim. Bannum intends to file an appeal from this Final Decision in the Federal Claims Court. In the interim, due to your apparent willingness to negotiate this matter, please find enclosed a letter requesting ADR on this issue (Attachment H).

3. On July 17, 2000, Bannum filed an REA in regard to the alleged improper directed termination of P. Simpson as an employee at the Beaumont facility. The REA, in the amount of $4,293.45, represented the costs entailed in finding a replacement and compiling the REA. The BOP responded by letter dated November 15, 2000, which denied the REA in its entirety. In this regard, please find attached a letter converting this REA into a Claim pursuant to the Disputes Clause of the contract and the Contract Disputes Act (Attachment I).

4. By Modification No. 10, dated September 19, 2000, the BOP's Standards of Conduct were incorporated into Bannum's contract. By letter dated September 19, 2000, Bannum notified the BOP of its intent to file an REA for all costs attributable to the incorporation of these Standards. In this regard, please find enclosed the subject REA (Attachment J).

It has long been established that a Contracting Officer has the obligation to consider

all outstanding REAs/Claims prior to issuing a notice of a potential Termination for Default. It is obvious that you have failed to consider these outstanding matters prior to the issuance of the Cure Notice, which constitutes a further breach of the duties of cooperation and good faith and fair dealing.

If you have any questions, or require any further information, please feel free to contact the undersigned. Your prompt attention and timely response to these matters will be greatly appreciated.

Very truly yours,

Joseph A. Camardo, Jr.

cc: Bannum

SUSAN J. OLIVER
ATTORNEY AT LAW
505 MILAM, SUITE 600
BEAUMONT, TEXAS 77701-4400
TELEPHONE 409-835-6000
FACSIMILE 409-835-1140
E-MAIL: SUSANJOLIVER@aol.com

December 19, 2000

*Via Facsimile 727-588-3689*
Mr. David Lowry
Executive Director
Bannum, Inc.
1301 Seminole Blvd., Suite 126
Largo, FL 33770

Re: Lease Agreement at 1310 Pennsylvania Avenue, Beaumont, Texas

Dear David:

At your request I have reviewed the lease agreement executed on or about February 5, 1997, between Bannum, Inc. and the owner of the building at 1310 Pennsylvania. Mr. Ken Webb was identified as an owner along with Mr. John McCrey by Mr. McCrey's agent signing the Application for Amendment of the Zoning Ordinance. Mr. McCrey and Mr. Webb are apparently currently involved in litigation proceedings and Mr. McCrey has recently taken the position that he is not bound by the acts of Mr. Webb or his agent and has attempted to terminate the lease agreement which clearly runs for the full term of Bannum's government contract as a result of RFP-200-0366-SC, along with any renewals and extensions thereof.

Mr. McCrey further ratified this contract by accepting payments by and through Ken Webb and then directly from Bannum, Inc. Additionally, Charles Foxworth, the owner's authorized agent pursued the zoning change and included Ken Webb's name as "owner" on the Application for Amendment of the Zoning Ordinance in Beaumont on or about February 24, 1997. A copy of this document is attached.

We are preparing a Petition for Declaratory Judgment requesting that the court finalize this issue by determining that the lease may not be terminated by the McCrey/Webb/Foxworth group. In the meantime, we are requesting a restraining order preventing any further action on behalf of these owners which would violate the lease agreement. Bannum will not be evicted by the actions of Mr. McCrey or his agents.

In addition, we may pursue our claim against McCrey, Webb and Foxworth for interference with contractual relationships with the Bureau of Prisons.

December 19, 2000
Page 2

I feel confident that we will be successful in these endeavors, and will get these petitions filed expeditiously. Please call if you have further questions or concerns at this time.

Sincerely,

Susan J. Oliver

SJO/jcl
Enclosure

cc: *Via Facsimile 813-258-0544*
Mr. John D. Rich
Epperson & Associates, P.A.
1719 West Kennedy Blvd.
Tampa, FL 33606

Dec. 13. 2000 12:11PM 4098351140 No. 2396 P. 5/5
8135082683 BANNUM PAGE 02
Received Jan-25-98 11:20pm Jan-25-98 11:24pm from 14098328894 → 8135082683 page 2/2

# APPLICATION FOR AMENDMENT OF THE ZONING ORDINANCE BEAUMONT, TEXAS (Chapter 30, City Codes)

[redacted] 3582
873-[redacted]
Ken Webb
Delta Institute

TO: THE PLANNING COMMISSION AND CITY COUNCIL, CITY OF BEAUMONT, TEXAS

APPLICANT'S NAME AND ADDRESS: David Lowry & Bannum, Inc., 1301 Seminole Blvd., Largo, FL 33770

APPLICANT'S PHONE #: 813/558-3594 FAX #: ______

NAME OF OWNER: John Mccrey Ken Webb

ADDRESS OF OWNER: 1310 Pennsylvania, Beaumont, TX 77701

LOCATION OF PROPERTY: ______

LEGAL DESCRIPTION OF PROPERTY:

LOT NO. 737, 738, 739, 740 and/or Lots 1,2,3,4 Bryan Addn TRACT: D, E, F, G

BLOCK NO. 74 PLAT: E

ADDITION: Beaumont SURVEY: Noah Tevis

NUMBER OF ACRES: ______ NUMBER OF ACRES: ______

For properties not in a recorded subdivision, submit a copy of a current survey or plat showing the properties proposed to be changed, and a complete legal field note description.

CURRENT ZONING DISTRICT: CM

ZONING DISTRICT REQUESTED: CBD

HAS THE REQUEST BEEN MADE BEFORE? No IF SO, DATE: ______

ACTION: ______

SUBMIT A LETTER STATING REASONS FOR REQUEST.

ATTACH THE APPROPRIATE APPLICATION FEE:

LESS THAN 1/2 ACRE ______ $300.00
1/2 ACRE OR MORE AND LESS THAN 5 ACRES ______ $400.00
5 ACRES OR MORE ______ $500.00

I HEREBY ACKNOWLEDGE THAT THIS APPLICATION IS MADE FOR THE REQUESTED DISTRICT OR A MORE RESTRICTIVE DISTRICT.

SIGNATURE OF APPLICANT: [signature] DATE: 3-24-97

SIGNATURE OF OWNER (IF NOT APPLICANT): ______

PLEASE TYPE OR PRINT AND SUBMIT TO: PLANNING DIVISION, ROOM 220, CITY HALL, 801 MAIN STREET, BEAUMONT, TX 77701, P.O. BOX 3827 77704, (409)880-3764

FILE NUMBER: 1363-Z
DATE RECEIVED: ______ 97
RECEIPT NUMBER: ______

Sec 5.E. 4-6

CAUSE NO. ____________

| | | |
|---|---|---|
| BANNUM, INC. | § | IN THE DISTRICT COURT |
| VS. | § | |
| | § | JEFFERSON COUNTY, TEXAS |
| KEN WEBB AND JOHN McCREY | § | |
| CHARLES FOXWORTH | § | |
| | § | _____ JUDICIAL DISTRICT |

# PLAINTIFF'S ORIGINAL PETITION FOR TEMPORARY RESTRAINING ORDER, INJUNCTION AND DECLARATORY JUDGMENT

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW, BANNUM, INC. and files this its Original Petition for Temporary Restraining Order, Injunction and Declaratory Judgment against KEN WEBB, JOHN McCREY and CHARLES FOXWORTH, jointly and severally, and shows the following:

I.

Pursuant to Rule 190.1 of the Texas Rules of Civil Procedure Plaintiff, BANNUM, INC., alleges that the discovery in this case is intended to be conducted under Discovery Control Plan Level 2.

II.

This court has jurisdiction of this cause and the amount in controversy exceeds the minimum jurisdictional limits of the court. Venue is proper in Jefferson County, Texas, in that Plaintiff's cause of action arose in this county.

III.

BANNUM, INC. is a Kentucky corporation with its principal office in Florida and is licensed to conduct business in the State of Texas.

Defendant, KEN WEBB, is an individual believed to be residing at 12106 Travertine Ct., Poway, CA 92064.

Plaintiff requests that citation for service on Defendant, KEN WEBB, be prepared and *returned to the undersigned attorney of record for Plaintiff, Susan J. Oliver, for forwarding to the appropriate officer for service.*

Defendant, JOHN McCREY, is an individual residing at P. O. Box 1528, Alexandria, Louisiana 71309.

Plaintiff requests that citation for service on Defendant, JOHN McCREY, be prepared and *returned to the undersigned attorney of record for Plaintiff, Susan J. Oliver, for forwarding to the appropriate officer for service.*

Defendant, CHARLES FOXWORTH, is an individual working as a real estate agent and may be served with citation at 2530 North Eleventh Street, Beaumont, Texas.

Plaintiff requests that citation for service on Defendant, CHARLES FOXWORTH, be prepared and *returned to the undersigned attorney of record for Plaintiff, Susan J. Oliver, for forwarding to the appropriate officer for service*

IV.

## DECLARATORY JUDGMENT ACTION

Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, BANNUM, INC. requests the construction of a lease between BANNUM, INC. and the owner of the premises located at 1310 Pennsylvania Avenue, Beaumont, Texas. This lease is attached hereto as Exhibit "A" and incorporated herein by reference.

reference. Foxworth inserted the name "Ken Webb" in the blank area on the form by "name of owner" so that this document reflects that the owners of the property at issue are both JOHN McCREY and KEN WEBB.

IX.

For approximately 24 months, BANNUM, INC. paid rent directly to KEN WEBB. On or about February 10, 1999, BANNUM, INC. was told by Michelle Webb to make monthly rental payments directly to JOHN McCREY. A copy of this communication is attached hereto as Exhibit "C" and incorporated herein by reference. Payments from that point forward were made pursuant to the lease terms by direct payment to JOHN McCREY.

X.

At no time during the pendency of this contract, did McCrey, Webb or Foxworth attempt to rescind or invalidate this lease agreement. All Defendants had actual or apparent authority to act on behalf of the true owner of the property. Based upon the actions of Defendants herein, Defendants are estopped from asserting lack of authority to act on each other's behalf.

XI.

On or about December 8, 2000, representatives of the owner of the premises sent a letter to BANNUM, INC. attempting to terminate the tenancy. A copy of this letter is attached hereto as Exhibit "D", and incorporated herein by reference.

XII.

BANNUM, INC. operates community corrections centers pursuant to government contracts with the United States Department of Justice, Bureau of Prisons.

The lease agreement provides that the term of the agreement runs concurrently with BANNUM, INC.'s government contract as a result of RFP2000-0366-SC, and any renewals or extensions thereof. It was this assurance in the lease that prompted Bannum to execute it, and to pay $2,600.00 per month, beginning February 5, 1997.. This provision was material to this contract, the importance of which was explained in detail to one or more of the Defendants or their agents prior to the execution of the lease. BANNUM, INC. relied upon the language of the lease agreement in conjunction with securing this important government contract.

XIII.

The Federal Acquisition Regulation (FAR) governs, *inter alia*, the manner in which the Federal Government interacts with private contractors. FAR Section 31,254.70, paragraph 49.402-1 state that:

> "... the government has the right, subject to the notice requirements of [the default clause at ¶ 52.249-8] to terminate the contract completely or partially for default if the contractor fails to (a) make delivery of the supplies or perform services within the time specified in the contract, (b) perform any other provision of the contract, or (c) make progress that endangers performance of the contract."

FAR Section 31,254.70, paragraph 49.402-3(d) addresses the procedures for termination of a contract by the Government. When a default occurs the [government] contracting officer shall give the contractor written notice specifying the failure and providing a period of 10 days in which to cure the failure. This notice is commonly known as a "cure notice".

The contractor's failure to cure the deficiencies will result in the Federal Government's termination of the contract.

Pursuant to FAR Section 31,254.70, paragraph 49.402-3(e)(4), if a contractor is a small business firm, the contracting officer shall immediately provide a copy of the "Cure Notice" to the Small Business Administration (SBA) Regional Office.

BANNUM, INC.'s failure to provide an acceptable facility or cessation of the use of the existing facility will result in the issuance of a "Cure Notice" from the Government, as this is a material default of Bannum's contract therewith. The government contract referenced in the lease is for multi-millions of dollars. The eviction of BANNUM, INC. would ensure the loss of this government contract. This loss would affect the employment of dozens of persons in Jefferson County, Texas, and will be financially devastating to BANNUM, INC.

XIV.

BANNUM, INC. has held telephone conversations with the Deputy Community Corrections Regional Administrator for the U. S. Department of Justice, Bureau of Prisons, who has informed BANNUM, INC. that a cure notice will be issued the week of December 25, 2000. See the affidavit of David Lowry, attached hereto as Exhibit "E" and incorporated herein by reference.

XV.

Due to the actions of KEN WEBB, JOHN McCREY and CHARLES FOXWORTH, BANNUM, INC. has necessarily obtained the services of Susan J. Oliver and John D. Rich to pursue this declaratory judgment action pursuant to Sec. 37.009 and Sec. 38.001 of the Texas Civil Practices and Remedies Code, BANNUM, INC. requests that it recover reasonable and necessary attorney's fees as a result of this lawsuit.

XVI.

BREACH OF CONTRACT

On or about February 5, 1997, a contract was executed between BANNUM, INC. and the owner of the property at issue (Exhibit "A"). JOHN McCREY has threatened to unilaterally terminate the contract, which assertion is a repudiation and breach of the contract. This violation will result in loss in excess of one million dollars in consequential damages to BANNUM, INC. for which it will seek recovery from KEN WEBB, JOHN McCREY and CHARLES FOXWORTH, Defendants, jointly and severally.

XVII.

TEMPORARY AND PERMANENT INJUNCTION

Plaintiff believes, based upon Exhibit "B", that it is Defendants' intention to attempt to evict Plaintiff, in which case irreparable harm will occur, and BANNUM, INC. will lose the government contract with the United States Justice Department Bureau of Prisons. Loss of this contract will result in the loss of jobs of dozens of employees of BANNUM, INC. who work and reside in Jefferson County.

XVIII.

The Plaintiff has no adequate remedy at law for the potential damages described herein. The property and rights involved are unique and irreplaceable. The financial consequences of Defendants' actions is so vast that there is a substantial possibility that Plaintiff would be unable to collect the multi-millions of dollars in damages which may be incurred. In addition to the monetary impact, BANNUM, INC. will be irreparably harmed in that it will suffer severe damage to its business goodwill with, not only its source of revenue, the Federal Government, but the Small

Business Administration as well. The 11th and 5th Circuits have held that loss of customers and goodwill is irreparable harm, noting that causing customers to be discouraged from patronizing a certain business significantly harms the goodwill of the effected business establishment. See, Ferrero v. Associated Materials, Inc., 923 F.2d 1441, 1449 (11th Cir. 1991); accord, Speigel v. City of Houston, 636 F. 2d 997; 1000-1001 (5th Cir. 1981).

We have knowledge that the Defendants or their representatives have made contact with the Bureau of Prisons and informed them that a notice to vacate has been sent. We have knowledge that a 10-day cure notice, per FAR 31,254.70 will be forthcoming. The only method of "curing" to satisfy the United States Department of Justice, Bureau of Prisons, will be to obtain injunctive relief from this Honorable Court.

XIX.

For the reasons stated herein, Plaintiff requests that, after trial, this Court permanently enjoin the Defendants from evicting Plaintiff, or otherwise violating the lease agreement.

XX.

It is essential that the Court immediately restrain the Defendants from evicting Plaintiff.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendants each be cited to appear and answer, and that the Plaintiff have and recover:

1) a temporary restraining order be issued without notice to the Defendants prohibiting Defendants from proceeding with a forcible entry and detainer to attempt to evict Plaintiff;

2) that the Defendants be cited to appear and show cause, and that upon such hearing the temporary injunction be issued, enjoining the Defendants, their agents, servants and/or employees, directly or indirectly from attempting to evict Plaintiff;

3) a declaration that the lease attached hereto as Exhibit "A" is fully enforceable with respect to the true owner of the facility located at 1310 Pennsylvania Avenue, Beaumont, Texas 77701;

4) in the alternative, that Plaintiff have judgment against Defendants, KEN WEBB, JOHN McCREY and CHARLES FOXWORTH, jointly and severally, for damages resulting in wrongful eviction;

5) that Defendants, KEN WEBB, JOHN McCREY and CHARLES FOXWORTH, be required to reimburse Plaintiff, jointly and severally, for reasonable and necessary attorney's fees;

6) that BANNUM, INC. recover its costs; and

7) all other relief to which BANNUM, INC. is justly entitled.

Respectfully submitted,

Susan J. Oliver
Attorney for BANNUM, INC.
Texas Bar No. 15262920
505 Milam, Suite 600
Beaumont, Texas 77701-4400
Telephone: (409) 835-4000
Telecopier: (409) 835-1140

# EXHIBIT

# "A"

AGREEMENT

THIS AGREEMENT is made and executed on the 5 day of February, 1997, by and between Ken Webb (hereinafter referred to as "Lessor"), and Bannum, Inc., a corporation organized under the laws of the Commonwealth of Kentucky, having its principal office at 1301 Seminole Boulevard, Suite 126, Largo, Florida 33770 (hereinafter referred to as "Bannum").

The subject property is:

5200 sq. ft. building at

1314 Pennsylvania $2600 per month

(hereinafter referred to as "Property").

In consideration of $1.00 cash in hand paid, mutual promises, and other valuable consideration, receipt of which is hereby acknowledged, and the parties do hereby agree as follows:

SECTION 1

Lessor rents to Bannum, and Bannum hires from Lessor for the purpose of subleasing the property described above to persons subject to authority of the United States Statutes, those certain premises situated in the City of Beaumont, State of Texas, including appurtenances thereto as more particularly described as written in the Statement of Inventory (see Section 5). As used herein, the term "premises" refers to the real Property above described and to any improvements located therein from time to time during the Term hereof.

SECTION 2

The Term of the Agreement shall run concurrently with Bannum's Government contract as a result of RFP 200-0366-SC, and any renewals or extensions thereof. In the event Bannum is not awarded a Government contract for CCC services to be located at this property (or) Bannum cannot begin performance of a contract, if awarded, for any reason, then this Agreement is null and void. It is anticipated that a decision of contract award will be made by the Government on or about September 1, 1997. In the event a decision is not rendered on or about September 1, 1997, then Bannum has the option to extend this Agreement for an additional 60-day period.

SECTION 3

Bannum shall pay Lessor during the term of Government contract as a result of RFP 200-0366-SC as follows:

The first monthly payment of rent shall be due and payable on or before 1st of the Month and on the same day of each succeeding month for as long as this Agreement shall continue. In the event Bannum fails to pay any amount as indicated, Lessor is relieved of the obligation to provide the property.

SECTION 4

Lessor agrees to maintain continuous liability insurance coverage throughout the Term of Agreement.

SECTION 5

(A) Lessor and Bannum, at the time Bannum takes possession of the subject property, shall itemize all equipment and fixtures within the subject property on a Statement of Inventory. This Statement of Inventory will be attached to this Agreement and made a part thereof.

(B) Lessor assumes and agrees to maintain the electric, gas, water and sewer lines external to the building so as to provide continuous services to the building, and Bannum agrees to pay the monthly service charge for same. Lessor further assumes and agrees to provide maintenance and upkeep of the premises as necessary to insure continuous compliance with all State or local fire, health and sanitation, building and zoning ordinances, laws and/or codes.

SECTION 6

(A) Lessor certifies that the property, fixtures, and appurtenances, excluding fixtures and appurtenances installed by Bannum, conform to all applicable laws, ordinances, regulations, and requirements of Governmental authorities, any board of underwriters, rating bureau, or similar organization, and the insurer of the Property, Lessor, will, at its sole cost, comply with all such laws, ordinances, regulations, and requirements.

(B) Lessor assumes and agrees to repair and maintain in good working order the Property and all common areas of the Property and the services (including, but not limited to, the heating and cooling systems, plumbing, electrical wiring, roof, walls, and structural integrity) provided to the premises and at the Property at the time Bannum takes possession of the premises hereunder. After occupancy by Bannum, Lessor will maintain the roof, exterior walls and foundation of the property. Lessee will make repairs, if necessary, excluding the roof, exterior walls and foundation; however, Lessee is only required to pay up to $500.00 per repair. Lessor will pay any amounts exceeding $500.00 per repair.

SECTION 7

Bannum shall not be responsible for any taxes not discussed herein or other similar expenses required to be paid by the [illegible]

[illegible] above-described a bona fide offer to purchase or lease the property. In that event, Lessor will given Bannum first right to purchase or lease the property at the same terms as contained within the bona fide offer. If Bannum refuses to purchase or lease the property at those terms, this this agreement is null and void

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day, month, and year first above written.

Lessor

BY ____________________

____________________
Witness

BANNUM, INC.

BY ____________________

____________________
Witness

* This agreement is contingent on a zoning classification change from CM to CBD in order to accomodate residential social service. Any cost associated with this zoning change request will be at Bannum's expense.

12/22/2000 12:12 8135882689 BANNUM PAGE 15
Dec.21. 2000 5:17PM 4098351140 No.2484 P. 18/31
Jan-25-98 11:24pm from 14098323994 → 8135882689
Received Jan-25-98 11:28pm from 14098323994 → 83239947 page 2/2

# APPLICATION FOR AMENDMENT OF THE ZONING ORDINANCE BEAUMONT, TEXAS (Chapter 30, City Codes)

833-3582
Ken Webb
Delta Institute

TO: THE PLANNING COMMISSION AND CITY COUNCIL, CITY OF BEAUMONT, TEXAS

APPLICANT'S NAME AND ADDRESS: David Lowry & Bannum, Inc., 1301 Seminole Blvd., Largo, FL 33770

APPLICANT'S PHONE #: 813/538-2594 FAX #:

NAME OF OWNER: John McCrey Ken Webb

ADDRESS OF OWNER: 1310 Pennsylvania, Beaumont, TX 77701

LOCATION OF PROPERTY:

LEGAL DESCRIPTION OF PROPERTY:

LOT NO. 735, 738, 739, 740 and Lot 1,2,3,4 Bryan Add. TRACT D, E, F, G

BLOCK NO. 74 PLAT S

ADDITION Beaumont SURVEY Noah Tevis

NUMBER OF ACRES NUMBER OF ACRES

For properties not in a recorded subdivision, submit a copy of a current survey or plat showing the properties proposed to be changed, and a complete legal field note description.

CURRENT ZONING DISTRICT: GC

ZONING DISTRICT REQUESTED: CBD

HAS THE REQUEST BEEN MADE BEFORE? No IF SO, DATE:

ACTION:

SUBMIT A LETTER STATING REASONS FOR REQUEST.

ATTACH THE APPROPRIATE APPLICATION FEE:

LESS THAN 1/2 ACRE $200.00
1/2 ACRE OR MORE AND LESS THAN 5 ACRES $250.00
5 ACRES OR MORE $500.00

I HEREBY ACKNOWLEDGE THAT THE APPLICATION IS MADE FOR THE REQUESTED DISTRICT OR A MORE RESTRICTIVE DISTRICT.

SIGNATURE OF APPLICANT: [signature] DATE: 2-24-97

SIGNATURE OF OWNER (IF NOT APPLICANT):

PLEASE TYPE OR PRINT AND SUBMIT TO:

PLANNING DIVISION, ROOM 210
CITY HALL, 801 MAIN STREET
BEAUMONT, TX 77701
P.O. BOX 3827 77704
(409)880-3764

FILE NUMBER: 1363-Z
DATE RECEIVED: 2-24-97
RECEIPT NUMBER:

GC S.E.
4-6