52. Subsequently, the Texas Court issued Letters Rogatory regarding to the California Superior Court for Ken and Michelle Webb, pursuant to which the California Superior Court issued a Subpoena Duces Tecum for both individuals.

53. Pursuant to said Subpoenas, Bannum took the depositions of Ken and Michelle Webb in Poway, California on May 30, 2001. During his deposition, Ken Webb admitted that he was not the true owner of the premises and that the lease between Bannum and Ken Webb, therefore, was illusory and used merely to defraud the City of Beaumont into issuing a use permit. Bannum was fraudulently induced by defendant Foxworth and Ken Webb into believing that Ken Webb was the true owner of the property. Furthermore, the defendant Foxworth and Ken Webb fraudulently induced the BOP into issuing a contract for the operation of a halfway house to Bannum.

54. During her deposition, Michelle Webb admitted, among other things, that she had boxes of documents responsive to the subpoena duces tecum which she did not produce. Upon information and belief, these documents, which include financial statements and books and records of Ken and Michelle Webb, and Delta Career Institute, will show a course of conduct and pattern of dealing over a fifteen (15) year period, from 1985 through and including 1999, between Ken and Michelle Webb and defendant John McCray, evidencing the actual or apparent agency authority of Ken and Michelle Webb to act on behalf of defendant John McCray. It was upon this apparent authority that Bannum relied in entering into the lease agreement with Ken Webb, from which defendant John McCray, and Ken and Michelle Webb, all benefited financially.

55. As a result of the information learned from the depositions of Ken and Michelle Webb, Bannum filed a motion for continuance with the Texas Court on May 31, 2001, wherein

Bannum requested that the hearing on the declaratory judgment action scheduled for the following day, June 1, 2001, be continued pending the review of the documents which Ken and Michelle have in their possession. As stated above, these documents are directly responsive to the subpoena duces tecum which was issued by the Texas and California Courts, and go directly to the heart of Bannum's claim of the agency and business relationships that existed between defendant John McCray and Ken and Michelle Webb.

56. Notwithstanding the importance of said documents, the Texas Court denied Bannum's Motion for Continuance and ordered the declaratory judgment hearing proceed as scheduled on June 1, 2001.

57. As a result of the foregoing, Bannum was forced to file a "nonsuit," or dismissal without prejudice, of its declaratory judgment action in Texas State Court on May 31, 2001, and file the instant action based upon the existence of new evidence, new causes of actions based upon federal questions, and new diverse parties.

COUNT I (DECLARATORY RELIEF)

58. Plaintiff repeats and realleges the allegations in paragraphs 1 through 57 of this Complaint as if set forth fully herein.

59. Bannum seeks a declaration by the Court that the lease between Bannum and defendant John McCray, and Ken Webb, a copy of which has been attached hereto as Exhibit "A" and incorporated fully herein by reference, is a valid, binding, and enforceable contract, which defendants are not entitled to rescind without just cause.

60. As stated more fully hereinabove, on February 5, 1999, Bannum executed the lease attached hereto as Exhibit "A" and incorporated herein fully by reference. Bannum relied upon the representations made by defendant Foxworth and Ken Webb that Ken Webb was the

true owner, co-owner, or agent thereof, of the premises at issue in this proceeding.

61. Defendants Foxworth and Ken Webb held Ken Webb out to Bannum as the sole owner of the premises with authority to lease the premises to Bannum. Defendants Foxworth and Ken Webb went so far as to fraudulently misrepresent to the City of Beaumont and Bannum that Ken Webb was an owner of the property on the application for zoning.

62. By virtue of their various business relationships over the past fifteen (15) years, Ken and Michelle Webb were vested with authority, either actual or apparent, to bind defendant John McCray.

63. The Bureau of Prisons awarded Bannum its contract based on the lease it had signed with Ken Webb.

64. Bannum paid rent on the premises at all times relevant hereto, from which defendants Delta Career Institute, John McCray, Charles Foxworth, and Ken and Michelle Webb directly benefited financially. Over the course of its lease, Bannum has paid rent directly to both defendants Delta Career Institute and John McCray. Defendant McCray accepted said lease payment from Bannum without objection, thereby ratifying the agreement with Bannum.

65. Bannum's lease runs concurrently with its federal Government contract with the Bureau of Prisons. Bannum insisted, and relied, upon this provision given its use of the property as a halfway house which is tied directly to its contract with the BOP.

66. Defendant McCray has conspired with defendant Richard Milburn to evict Bannum in an effort to obtain a longer term lease with a higher monthly rent payment. Such an arrangement is obviously more beneficial to defendant McCray which will allow him to offset some of the losses that the Delta Career Institute has suffered and money owed to him by Ken and Michelle Webb.

67. Based on the foregoing, the lease executed by Bannum is a valid and enforceable legal agreement between Bannum and defendant John McCray.

COUNT II (EQUITABLE ESTOPPEL)

68. Plaintiff repeats and realleges the allegations in paragraphs 1 through 67 of this Complaint as if set forth fully herein.

69. McCray through his various agents and/or partners leased the premises to Bannum, for the explicit purpose of allowing Bannum to operate its contract with the BOP.

70. Bannum in making its bid to procure the BOP contract it now operates, relied upon not only the representation by McCray and his agents that it would be able to use the premises for that purposes for the entire term of the contract with the BOP, but also relied upon the monthly rental payments as actual costs to be expended in formulating its bid price to the BOP.

71. Ultimately, during the bidding process, Bannum also submitted the premises to the BOP for inspection and approval as the proposed site for the community corrections center. Accordingly, the BOP relied upon the existence of the lease in making its decision whether or not to award the contract to Bannum.

72. McCray has now changed his position to the contrary, stating that Bannum and the BOP can no longer operate the center at the premises, despite their respective reliance to the contrary.

73. McCray now seeks to disavow knowledge of the lease and Bannum's existence on the premises in contravention of the actions of his agents and in contravention of knowledge imputed to him in his capacity as director of Delta Career Institute, Inc. and imputed to him by the acts and representations of his agents. In so acting, McCray has now taken the position that

the lease is only for a month-to-month term, despite, at a minimum, his acquiescence in Bannum's presence there, notwithstanding the knowledge of his agents.

74. As a direct and proximate result of McCray's change in position detrimental to Bannum, Bannum is in immediate danger of losing its contract with the BOP and suffering irreparable damage to its business goodwill.

75. Additionally, Bannum has incurred attorney's fees and costs since January, 2001 in seeking to enjoin McCray's eviction of it and the BOP from the premises.

76. WHEREFORE, based on the foregoing, defendant John McCray should be estopped from now attempting to wrongfully evicting Bannum from the premises and, for the reasons stated herein, plaintiff requests that, after trial, this Court permanently enjoin the defendants from evicting plaintiff, or otherwise violating the lease agreement. In order to prevent any further harm to the federal government, specifically the Bureau of Prisons, and to protect the future viability of Bannum, the Court must immediately restrain defendant McCray from wrongfully evicting Bannum from the premises.

COUNT III (TEMPORARY AND PERMANENT INJUNCTION)

77. Plaintiff repeats and realleges the allegations in paragraphs 1 through 76 of this Complaint as if set forth fully herein.

78. Bannum will suffer irreparable harm if defendant McCray is allowed to evict it from the premises. Specifically, if eviction occurs, Bannum's contract with the BOP will be terminated for default.

79. Bannum has no adequate remedy at law for the potential damages described herein. Bannum's property rights are unique and irreplaceable. The financial consequences of defendants' actions is so vast that there is a substantial possibility that Plaintiff would be unable

to collect the millions of dollars in damages which may be incurred. In addition to the loss of jobs and monetary impact, Bannum will be irreparably harmed in that it will suffer severe damage to its business goodwill with, not only its source of revenue, the BOP, but the Small Business Administration as well.

80. The defendants and/or their agents have informed the BOP that a notice to vacate has been sent to Bannum. As a result, a ten (10) day cure notice has been issued to Bannum by the BOP. The only method of "curing" to satisfy the BOP will be to obtain injunctive relief from this Court.

81. For the reasons stated herein, plaintiff requests that, after trial, this Court permanently enjoin the defendants from evicting plaintiff, or otherwise violating the lease agreement. In order to prevent any further harm to the federal government, specifically the Bureau of Prisons, and to protect the future viability of Bannum, the Court must immediately restrain defendant McCray from wrongfully evicting Bannum from the premises.

## COUNT IV (FRAUD)

82. Plaintiff repeats and realleges the allegations in paragraphs 1 through 81 of this Complaint as if set forth fully herein.

83. In the alternative, as stated more fully hereinabove, defendant Foxworth and Ken Webb, unbeknownst to Bannum, and with full authority of defendant John McCray, committed fraud upon Bannum, the City of Beaumont and the United States Government in submitting said zoning application and entering a lease with Bannum.

84 Bannum reasonably relied upon the representations made by defendant Foxworth and Ken Webb that Ken Webb was the owner of the property with authority to enter into said lease agreement with Bannum.

85. Bannum has made more than $114,400 in lease payments over the course of the lease, and has made approximately $90,000 in improvements to the premises. Defendants John McCray, Delta Business Institute, Foxworth, Ken and Michelle Webb have, therefore, benefited directly from the fraud perpetrated by defendants.

86. Based on the foregoing, defendant John McCray should be estopped from now attempting to wrongfully evicting Bannum from the premises.

COUNT V
(TORTIOUS INTERFERENCE WITH A
FEDERAL GOVERNMENT CONTRACT)

87. Plaintiff repeats and realleges the allegations in paragraphs 1 through 86 of this Complaint as if set forth fully herein.

88. Bannum currently has a mutually beneficial contract with the Bureau of Prisons.

89. Defendants, one and all have at all times material hereto possessed knowledge of the existence of the contractual relationship between Bannum and the Bureau of Prisons.

90. Defendants John McCray, Foxworth and Richard Milburn Academy, intentionally and without justification or privilege attempted to procure the breach of Bannum's contract in order to force Bannum from the subject property so that McCray could then lease the premises to Richard Milburn Academy at a higher price.

91. In so acting, said defendants have already caused the BOP to issue a "cure notice" to Bannum threatening to cancel Bannum's contract for cause, if the relief sought herein is not obtained and said defendants are not halted and permanently enjoined, Bannum will lose its contract. As a further direct and proximate result of said defendants' actions, Bannum will suffer irreparable damage to its business goodwill should it lose this contract.

92. WHEREFORE, based on the foregoing, defendants McCray, Foxworth and

Richard Milburn Academy should be estopped from further interference with Bannum's contract with the BOP, attempting to wrongfully evict Bannum from the premises and, for the reasons stated herein, plaintiff requests that, after trial, this Court permanently enjoin the defendants from evicting plaintiff, or otherwise violating the lease agreement and award damages to plaintiff.

**COUNT VI**
**(TORTIOUS INTERFERENCE WITH A FEDERAL GOVERNMENT CONTRACT)**

93. Plaintiff repeats and realleges the allegations in paragraphs 1 through 92 of this Complaint as if set forth fully herein.

94. Bannum currently has an advantageous business relationship with the Bureau of Prisons.

95. Defendants John McCray, Foxworth and Richard Milburn Academy have, at all times material hereto, possessed knowledge of the existence of said advantageous business relationship between Bannum and the Bureau of Prisons.

96. Defendant McCray, intentionally and without any justification or privilege, attempted to procure the breach of Bannum's contract in order to relieve himself from his contractual obligation to Bannum under the lease, so that he could then lease the premises to another entity, Richard Milburn Academy, at a higher price. In so acting, said defendants have intentionally interfered with Bannum's advantageous business relationship with the BOP. As such, Bannum expects and intends for the relationship to continue well in to the future as Bannum has worked diligently to cultivate it.

97. The overwhelming majority of Bannum's business is conducted with the BOP.

98. As a result of the above-mentioned acts, said defendants have already caused the BOP to issue a "Cure Notice" to Bannum threatening to cancel Bannum's contract for cause. If

the relief sought herein is not obtained, and John McCray is not halted and permanently enjoined, Bannum will lose its contract with the Federal Government. As a further direct and proximate result of Defendants' actions, Bannum will suffer irreparable damage to its business goodwill should it lose this Contract. Loss of business goodwill and damage to Bannum's reputation with the BOP will result in damages to Bannum's ability to conduct business with the BOP in the future.

99 WHEREFORE, based on the foregoing, said defendants should be estopped from further interference with Bannum's contract with the BOP, and John McCray from attempting to wrongfully evict Bannum from the premises, and for the reasons stated herein, plaintiff requests that, after trial, this Court permanently enjoin John McCray from evicting plaintiff, or otherwise violating the lease agreement, and award damages to Plaintiff in an amount to be determined at trial.

COUNT VII (CIVIL RICO ACTION)

100. Plaintiff repeats and realleges the allegations in paragraphs 1 through 99 of this Complaint as if set forth fully herein.

101. This is a civil action brought by plaintiff under the Organized Crime Control Act of 1970, Racketeer Influenced and Corrupt Organizations, 18 U.S.C. §1961 et seq.

102. Plaintiff is a "person" within the meaning of 18 U.S.C. §§1961(3) and 1964(c).

103. Defendants John McCray, Foxworth and Lee Wheeler are "persons" within the meaning of 18 U.S.C. §§1961(3) and 1962(c) and (d).

104. Defendants John McCray, Foxworth and Lee Wheeler are an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c).

105. Defendants John McCray, Foxworth and Lee Wheeler conducted or participated,

directly or indirectly, in the conduct of the enterprise's affairs, and conspired to do so, through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5), that is:

a. Mail fraud in violation of 18 U.S.C. §1341; and

b. Wire fraud in violation of 18 U.S.C. §1343.

106. Plaintiff has been injured by defendants in its business and property in an undetermined amount by reasons of violations of 18 U.S.C. §§1962(c) and (d) committed by the aforesaid defendants within the meaning of 18 U.S.C. §1964(c).

COUNT VIII (CONSTITUTIONAL TORT ("BIVENS ACTION"))

107. Plaintiff repeats and realleges the allegations in paragraphs 1 through 106 of this Complaint as if set forth fully herein.

108. Defendant Chuck Ala conspired with the other Defendants in this action to interfere with Bannum's contract with the BOP in an effort to remove Bannum from the Beaumont, Texas facility, and ultimately have its contract with the BOP terminated for default.

109. As a direct result of the actions of Defendant Chuck Ala, the BOP issued a "Cure Notice" to Bannum. The Cure Notice has been, and will continue to be, a "black mark" on Bannum's record, and has, and will, serve as an impediment to its ability to be awarded future contracts by the BOP. Furthermore, if Bannum is ultimately terminated for default by the BOP on the Beaumont, Texas contract, it may well be barred from receiving any future federal contracts with the BOP.

110. Based on the foregoing, Defendant Chuck Ala has deprived Bannum of its Constitutional rights to liberty and property without due process in violation of the Fifth Amendment to the United States Constitution.

111. As a result of the foregoing deprivation of its Constitutional rights, Bannum has

suffered irreparable financial injury and damage to its business reputation and goodwill, for which it is entitled to compensation, in an amount to be determined at trial, from Defendant Chuck Ala.

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Declare that Bannum has a valid and enforceable lease agreement with defendants John McCray and Delta Career Institute for the premises;

(2) Enter an injunction restraining defendant McCray from evicting Bannum from the premises;

(3) In the alternative, enter a judgment for Plaintiff against defendants McCray and Foxworth for fraud in the inducement of a federal Government contract in an amount to be determined at trail;

(4) Award treble damages against defendants McCray and Foxworth in accordance with 18 U.S.C. §1964(c);

(5) Award plaintiff the costs of this suit in accordance with 18 U.S.C. § 1964(c) and State law;

(6) Award plaintiff reasonable attorney's fees in accordance with 18 U.S.C. §1964(c) and State law;

(7) Award damages in an amount to be determined at trial on all of the foregoing COUNTS; and

(8) Such other relief the Court deems just and proper.

Dated: October 10, 2001

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury of all issues so triable.

John D. Rich, Esq.
Florida Bar No. 0136697
EPPERSON & ASSOCIATES
1719 West Kennedy Blvd.
Tampa, FL 33606
Tel# (813) 258-0550
Fax# (813) 258-0544

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing AMENDED COMPLAINT has been furnished to DEFENDANTS, via First Class Mail, this 11th day of October, 2001.

John Rich, Esq.
EPPERSON & ASSOCIATES
1719 West Kennedy Blvd.
Tampa, FL 33606
Tel# (813) 258 - 0550
Fax# (813) 258 - 0544
Florida Bar No. 0136697
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BANNUM, INC.,

Plaintiff,

v.

CASE NO. 8:01CV1099-T-27-MAP

JOHN McCRAY, DELTA CAREER INSTITUTE, DELTA CAREER MANAGEMENT COMPANY, INC., CHARLES FOXWORTH, FOXWORTH REAL ESTATE, JOHN DOE, JANE DOE, LEE WHEELER, RICHARD COMPTON, P.E. COMPTON, AND RICHARD MILBURN ACADEMY, CHUCK ALA, AGENT OF THE UNITED STATES GOVERNMENT ACTING THROUGH THE BUREAU OF PRISONS,

Defendants

JURY TRIAL DEMANDED

INJUNCTIVE RELIEF SOUGHT

FILED
01 DEC -5 AM 11:41
CLERK U.S. DISTRICT COURT
MIDDLE DIST OF FLORIDA
TAMPA, FLORIDA

328

**PLAINTIFF'S BRIEF IN OPPOSITION TO McCRAY/FOXWORTH DEFENDANTS' MOTION AND BRIEF TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT, OR IN THE ALTERNATIVE, TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

**I. Introduction:**

Plaintiff files this Brief in Opposition to McCray/Foxworth Defendants' Motion to Strike Plaintiff's First Amended Complaint or, In the Alternative, to Dismiss for Lack of Personal Jurisdiction. As explained more fully hereinbelow, and supported by the Affidavit of David Lowry (attached hereto as Exhibit "1" and incorporated herein by reference), the legal basis for personal jurisdiction can be found in the United States Supreme Court's ruling in Burger King Corporation v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174 (1985), which



65

involved facts and circumstances strikingly similar to the instant matter, and its progeny in the 11th Circuit.

The Defendants also argue that Plaintiff has field this suit solely for purposes of delay and harassment, and that the Complaint should be stricken by the Court. As argued hereinbelow, however, a motion to strike an entire complaint is "neither an authorized nor a proper way to procure the dismissal of all or part of the complaint." Furthermore, on November 27, 2001, Judge Milton Shuffield signed an "Order of Recusal" in the Texas State proceeding, wherein the case was transferred to a different District for consideration by a different Judge. Subsequently, on December 4, 2001, Judge Mehaffy, the new Texas Judge, ordered a sixty (60) day moratorium on any further proceedings in the case to avoid prejudice to Bannum, and indicated that he may have to conduct a *de novo* review of Judge Shuffield's summary judgment ruling. Based on the foregoing events, Plaintiff respectfully submits to this Court that Judge Shuffield's previous rulings in the Texas case are tainted, and that Defendants' attempts to portray Plaintiff in an unfavorable light to this Court are inappropriate.

## II. <u>Legal Argument</u>

### a. <u>Motion to Strike</u>:

Preliminarily, it should be noted that the Defendants have improperly brought a motion to strike by directing it at Plaintiff's entire complaint. Rule 12(f) of the Federal Rules of Civil Procedure ("F.R.C.P.") provides that upon the motion by a party, "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, "[i]t is settled that a motion to strike is neither

an authorized nor a proper way to procure the dismissal of all or part of the complaint." Egan v. Pan American World Airways, Inc., 62 F.R.D. 710, 712 (1974); see also, South v. United States, 40 F.R.D. 374, 376 (N.D.Miss.1966). "Where a motion to strike is incorrectly denominated, however, it may be treated as a motion to dismiss for failure to state a claim." Egan, 62 F.R.D. AT 712.

That being said, the McCray/Foxworth Defendants argue that Plaintiff's Second Amended Complaint is merely a "sham pleading designed for delay and harassment," and that the Court should strike it in its entirety. In support of this position, the McCray/Foxworth Defendants point to a previous Texas State court proceeding, herein Plaintiff was granted three (3) continuances by the Court, had a fourth motion for continuance denied, and then non-suited, or dismissed without prejudice, the declaratory and injunctive relief action "on the day before the claims were to be heard by the Texas Court." Finally, the McCray/Foxworth Defendants argue that Plaintiff's filing of its Complaint in the instant proceeding was just a continuation of the alleged pattern of delay. However, as explained fully hereinbelow, this is a specious argument which overlooks the true and actual history of the Texas litigation.

As the McCray/Foxworth Defendants indicate in their brief, Plaintiff filed a lawsuit in Texas on December 22, 2000, seeking, inter alia, declaratory and injunctive relief against the McCray/Foxworth Defendants, and Ken and Michelle Webb, two of the key individuals in the lawsuit. On or about February 16, 2001, Ken and Michelle Webb filed for Chapter 7 Bankruptcy in the United States Bankruptcy Court, Southern District of California. As a result of the Webbs' bankruptcy filing, the Webbs were severed from the Texas lawsuit on

May 30, 2001 (see Severance Order at Exhibit "2"). As a result, Plaintiff was put at a tremendous disadvantage in obtaining discovery and developing evidence for the Texas litigation since the Webbs had the protection of the California Bankruptcy Court. In fact, Plaintiff was forced to file a non-dischargeable adversary proceeding against the Webbs in California Bankruptcy Court (see attached Complaint at Exhibit "3"). Obtaining discovery and developing evidence was made even more difficult by the McCray/Foxworth Defendants refusal to turn over relevant documents, resulting in the filing of three (3) motions to compel against the Defendants (see Motions to Compel attached hereto as Exhibits "4" and "5"). After a hearing on the matter, the Texas Court granted Plaintiff a continuance (see attached Motion to Compel, Motion for Sanctions and Motion for Continuance at Exhibit "6") to travel to California and take the depositions of Ken and Michelle Webb. Furthermore, the Texas Court even signed Letters Rogatory (Exhibit "7") for the service of subpoenas duces tecum on Ken and Michelle Webb (Exhibit "8"). In accordance with said subpoenas duces tecum, Ken and Michelle Webb had been ordered to produce at their depositions all documents in their possession which related to their business dealings with John McCray, the Delta Career Institute, and Bannum.

Pursuant to the aforementioned subpoenas, Plaintiff traveled to Poway, California on May 30, 2001 to take the depositions of Ken and Michelle Webb. However, Ken and Michelle violated the subpoenas by failing to bring with them responsive documents requested therein, which they admitted to possessing during their depositions. Despite the Webbs' failure to honor the subpoenas by producing the documents requested, the Texas Court insisted upon proceeding with a trial on the declaratory and injunctive action two (2)

days later in Texas, when it denied Plaintiff's Motion for a Continuance, wherein it sought to continue the trial until the Webbs had produced the documents requested in the subpoenas (see Motion for Continuance at Exhibit "6"). As a direct result of the Court's refusal to await the Webbs' document production before trial, Plaintiff was left with no choice but to "nonsuit," or dismiss without prejudice, the declaratory and injunctive action in Texas (Exhibit "9"), and file a new lawsuit in this Court on June 8, 2001. It is important to note that Bannum has a right under the Texas Rules of Civil Procedure and should have no adverse inference or prejudice should be suffered by Plaintiff for exercising this right.[1]

It is important for this Court to understand that on June 8, 2001, when Plaintiff filed its Complaint in this matter, there was no action for declaratory and injunctive relief pending in the Texas Court. As stated above, Plaintiff had non-suited, or dismissed without prejudice, its action for declaratory and injunctive relief in Texas on June 1, 2001. Notwithstanding this fact, and in disregard for the jurisdiction and authority of this Court, on June 29, 2001, and August 6, 2001, respectively, Defendants Foxworth and McCray filed actions for declaratory and injunctive relief in Texas State Court (see Exhibits "10" and "11", respectively). Notably, attorney for Defendant McCray in the Texas proceeding, Chris Coco, stated in his affidavit in this proceeding that he "is seeking a trial date for the purpose of attempting to recover attorneys' fees and costs incurred on behalf of John McCray" (see Exhibit "1" of Motion of Defendants John McCray and Delta Career Management Company, Inc. to Dismiss the Complaint of Bannum, Inc. Due to Lack of Personal Jurisdiction). This is clearly improper since, under Texas law, a party may not file a declaratory judgment action

[1] Texas Rule of Civil Procedure 162 states, in pertinent part, that "[a]t any time before the plaintiff has

solely to recover attorneys' fees (see Hartford Cas. Ins. v. Budget Rent-A-Car, 796 S.W.2d 763, 772 (Tex.App.—Dallas 1990, writ denied), a fact which has been brought to the Texas Court's attention by Plaintiff on a number of occasions. Interestingly, attorney Coco's affidavit is conspicuously silent as to the date on which he filed a declaratory judgment action on behalf of Defendant McCray in Texas, or when co-counsel Crutchfield filed his declaratory judgment action in Texas on behalf of his client Defendant Foxworth. It seems obvious to Plaintiff that the reason Mr. Coco's affidavit is silent on this point is because he does not want this Court's to focus its attention on the fact that the Defendants' declaratory judgment actions in Texas were not filed until well after this honorable Court obtained jurisdiction over the matter.

In response to the improperly-filed declaratory judgment actions of McCray and Foxworth in Texas, Plaintiff filed a Motion for Abatement and supporting legal memorandum (see Exhibits "12" and "13" respectively), wherein it informed the Court in Texas that this Court already had jurisdiction over the action by virtue of Plaintiff's June 8, 2001 Complaint. However, the Texas Court stated that it would only abate the subsequently-filed declaratory judgment actions of McCray and Foxworth if Plaintiff agreed to pay them their attorneys' fees if they prevailed in Florida (see August 17, 2001 Order, attached hereto as Exhibit "14"). Plaintiff did not agree to the Texas Court's conditional abatement and therefore filed a Writ of Mandamus with the Ninth Circuit Court of Appeals of Texas on October 19, 2001, seeking to compel the Texas State Court to honor the abatement and not to interfere with the jurisdiction of this Court. Immediately after serving a copy of the

---

introduced all of his evidence other than rebuttal evidence, the plaintiff may dismiss a case, or take a non-suit,

Mandamus on Judge Shuffield, Plaintiff's New York's counsel received a telephone call from co-counsel in Texas, wherein he stated "Bannum is f***ed now!" Plaintiff's Texas counsel reached this conclusion based upon a message he had received from Judge Shuffield on his voicemail, the exact contents of which have not been disclosed to Plaintiff (see Affidavit of Joseph A. Camardo, Jr. attached hereto as Exhibit "22"). Then, immediately after the Court of Appeals' denial of the Mandamus, the Texas State Court granted summary judgment in favor of the Defendants and agreed to award them all of their attorneys' fees (see Decision dated October 26, 2001, attached hereto as Exhibit "16"), before the Court even had the time or opportunity to consider the nine (9) bankers boxes of documents produced by the Webbs in California on October 5, 2001 (see Affidavit of James D. Crosby, Esq. attached hereto as Exhibit "15").

As stated in Mr. Crosby's Affidavit, the Webbs produced nine (9) bankers' boxes full of documentation in California pursuant to the aforementioned subpoenas duces tecum, which included "corporate records for Delta Career Institute of Beaumont, Texas, Inc. ("Delta Career"), for years through the 1990's; documents relating to a variety of transactions by and between Delta Career, Kenneth and Michelle Webb, and John McCray, including transactions directly relating to the leased premises in Beaumont, Texas; documents relating to litigation between John McCray and Kenneth and Michelle Webb concerning the leased premises in Beaumont, Texas; documents relating to negotiation, execution and performance of the Bannum sublease [sic]; operational and financial records for Delta Career; and communications by and between the Webbs and John McCray, by and through their counsel,

---

which shall be entered in the minutes."

relating to the Bannum sublease." This newly-discovered evidence supports the allegations made by Plaintiff in its Complaint(s) in the instant action. The Court had previously given Plaintiff until October 26, 2001, to supplement its summary judgment response with the Webb documentation. As such, Plaintiff filed a Motion for Reconsideration and a Third Supplemental Response to the summary judgment motions, which were summarily denied by the Texas Court on November 19, 2001 (Exhibit "17"), wherein the Court asked Defendants "to provide this Court with a final judgment awarding attorneys' fees consistent with the summary judgment proof."

In light of the above, and after the hearing before this Court on November 20, 2001, it became increasingly obvious to Plaintiff that it needed to address the unfair treatment it had been receiving in the Texas State Court. As such, Plaintiff had no choice but to file a Motion for Recusal of Judge Shuffield in the Texas State Court on November 23, 2001 (see Exhibits "18", "19", and "20"). Plaintiff's Motion for Recusal was based, inter alia, on the Judge's insistence on awarding attorneys' fees to the Defendants in violation of Texas law, as well as some comments made by the Judge outside of Court about Plaintiff evidencing a clear bias or prejudice against Bannum. As argued by Plaintiff in its Motion for Recusal, a judge "shall recuse himself in any proceeding in which his impartiality might be reasonably questioned," or "has a personal bias or prejudice concerning the subject matter or party..."

Notably, on November 27, 2001, Judge Milton Shuffield signed an "Order of Recusal" in the Texas State proceeding, wherein the case was transferred to a different District (58th) in Texas for consideration by a different Judge (Honorable James Mehaffy) (see Exhibit "21"). On December 4, 2001, Judge Mehaffy ordered a sixty (60) day

moratorium on any further proceedings in the case to avoid prejudice to Bannum (see Camardo Affidavit at Exhibit "22"). Furthermore, Judge Mehaffy indicated that he may have to conduct a *de novo* review of Judge Shuffield's summary judgment ruling (see Camardo Affidavit at Exhibit "22"). Based on Judge Suffield's recusal, and Judge Mehaffy's December 4, 2001 Order, Plaintiff intends to file a motion for a new trial in Texas, if necessary, on Defendants' Motions for Summary Judgment on their declaratory judgment actions, and to renew its aforementioned Plea In Abatement (see Camardo Affidavit at Exhibit "22"). Based on the foregoing events, Plaintiff respectfully submits to this Court that Judge Shuffield's previous rulings in the Texas case are tainted, and that Defendants' attempts to portray Plaintiff in an unfavorable light to this Court are inappropriate.

Finally, the McCray/Foxworth Defendants have argued that Plaintiff is somehow delaying the instant, and the Texas, proceeding "[i]n an effort to further delay Plaintiff's inevitable eviction from the Premises located in Texas..." However, the McCray/Foxworth Defendants have had every opportunity to evict Plaintiff since it nonsuited its declaratory action in Texas in June, 2001. Rather than evict Plaintiff, however, the McCray/Foxworth Defendants have elected instead to file their own declaratory judgment actions in Texas in an effort to recover attorneys' fees. As stated hereinabove, this was done in violation of Texas law and over Plaintiff's objection. The McCray/Foxworth Defendants continue to argue that Plaintiff is delaying the "inevitable," however they continue to allow Plaintiff to remain in the building, and Defendant McCray continues to accept monthly rent from Bannum.

**b. <u>Personal Jurisdiction Exists in Florida Under *Burger King* Decision and Its Progeny in 11th Circuit:</u>**

As more fully explained in the Complaint, the Florida Courts have personal jurisdiction over the McCray/Foxworth Defendants by virtue of their entering into a subcontract to a Federal Government contract with Bannum, a corporation with a national headquarters and nerve center in Largo, Florida. With the motive of securing a commission, Defendant Foxworth, real estate agent for Defendant John McCray, fraudulently held Kenneth Webb out to Bannum as the owner of the property. Defendant, by virtue of his agency relationship worth Kenneth Webb, and the fact that he personally accepted rent directly from Bannum, and indirectly through Delta Career Institute to which some of Bannum's rent checks were written and of which Defendant John McCray was a director, was at all times relevant hereto fully aware of the lease. The McCray/Foxworth Defendants defrauded Bannum into entering into the lease agreement with full knowledge that the property was to be used as a "halfway house" pursuant to a Federal contract with the United States Department of Justice, Federal Bureau of Prisons ("BOP"). In negotiating the lease, the McCray/Foxworth Defendants were also fully aware that Bannum's corporate headquarters or "nerve center" was located in Largo, Florida, and that Bannum operated several such facilities throughout the United States in nine states from its corporate headquarters or "nerve center" in Largo, Florida. As such, at all times relevant hereto the McCray/Foxworth Defendants purposefully availed themselves of the laws of the State of Florida and were fully aware that their actions would harm Bannum in Florida.

The McCray/Foxworth Defendants would now like this Court to ignore the foregoing facts and find that there is no personal jurisdiction. However, this Court has personal jurisdiction over the defendants by virtue of the subcontract/lease they entered into with

Bannum, and the fraudulent and tortious conduct of the defendants associated with said subcontract/lease. The basis for personal jurisdiction can be found in the United States Supreme Court's ruling in Burger King Corporation v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174 (1985), which involved facts and circumstances strikingly similar to the instant matter, and its progeny in the 11th Circuit.

In evaluating the personal jurisdiction argument, the Court must accept the facts asserted in the plaintiff's complaint as true, to the extent they are not controverted by Defendants' affidavits. Kelly v. Kelly, 901 F.Supp. 1567, 1569 (M.D.Fla.1995). If defendants sufficiently challenge plaintiff's assertions regarding personal jurisdiction, then plaintiff must support his allegations and cannot rely only on the factual allegations published in the complaint. Prentice v. Prentice Colour, Inc., 779 F.Supp.578, 586 (M.D.Fla.1991). Where the affidavits conflict, the Court must construe all reasonable differences in favor of the plaintiff. Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir.1988).

The determination of personal jurisdiction over a nonresident defendant requires the Court to engage in a two-part analysis. Black v. Bryant, 905 F.Supp. 1046, 1051 (M.D.Fla.1995); see also Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 855 (11th Cir.1990). In a federal diversity action such as this, a district court first considers the presence or absence of personal jurisdiction according to the law of the state in which the court is situated. Black v. Bryant, 905 F.Supp. at 1051; see also Pizzabiocche v. Vinelli, 772 F.Supp. 1245 (M.D.Fla.1991). In the instant case, plaintiff has alleged that the Court has jurisdiction pursuant to the Florida Long-Arm Statute. §48.193

*Fla. Stat.* Specifically, Section 48.193 of the Florida Long-Arm Statute states, *inter alia*, the following:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>
> . . .
>
> (b) Committing a tortious act within this state.
>
> . . .

§48.193 *Fla. Stat.* The Courts of the 11th Circuit have held that "It is well established that the commission of a tort for purpose of establishing long-arm jurisdiction does not require physical entry into the state, **but merely requires that the place of the *injury* be within Florida**" (emphasis added). Future Tech International, Inc. v. Tae Il Media, Ltd., 944 F.Supp 1538, 1558 (S.D.Fla.1996), citing International Harvester v. Mann, 460 So.2d 580, 581 (Fla.1stDist.Ct.App.1984)).

In its Second Amended Complaint, Plaintiff has asserted causes of action for, among other things, fraud, tortious interference with a government contract and tortious interference with a business relationship against the McCray/Foxworth Defendants. As stated in the Complaint, the injury to Bannum as a result of the actions of the Defendants has occurred, and will occur, in Florida where Bannum is headquartered. Bannum has been damaged by the fraud of Defendants which took place by mail and facsimile over state lines with Bannum's headquarters in Largo, Florida. Bannum has been further damaged by Defendants' repudiation of the lease agreement and threatened eviction. As a direct result thereof, the BOP issued a "Cure Notice" to Bannum on December 26, 2000, wherein it

directed Bannum that it was considering terminating its contract for default based on the aforementioned notice of eviction received from defendant Foxworth. As such, Defendants have put Bannum into a position where it is faced with a possible termination for default by the BOP if it is wrongfully evicted from its facility in Beaumont, Texas. If a termination for default occurs, Bannum's entire operation, which is headquartered in Florida, will suffer irreparable harm, including damage to its business reputation and goodwill, as it will be effectively barred from any future Government contract awards.

Once the Court has made the determination that Florida has personal jurisdiction over the defendants under its Long-Arm Statute, it must next consider whether the exercise of personal jurisdiction comports with the requirements of due process. M.G.J. Industries, Inc. v. Greyhound Financial Corporation, 801 F.Supp. 614 (M.D.Fla.1992); Davis v. Pyrofax Gas Corp., 492 So.2d 1044 (Fla.1986); Pesaplastic, C.A. v. Cincinnati Milacron Co., 750 F.2d 1516, 1521 (11th Cir.1985). Federal due process requires that a non-resident have sufficient "minimum contacts" with the forum state such that "maintenance of the suit does not offend traditional notions of fair play and justice." M.G.J. Industries, Inc. v. Greyhound Financial Corporation, 801 F.Supp. at 616, citing International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

In the Burger King case, the plaintiff was a national corporation with its principal place of business located in Miami, Florida. From its home office in Miami, plaintiff operated several franchise operations throughout the country. Plaintiff administered and oversaw all of its national franchise operations from its home office in Miami, Florida. The Burger King litigation arose out of the termination by plaintiff of one of its franchisees, and

plaintiff sued in Federal Court in Miami, Florida in a diversity action pursuant to *28 U.S.C. §1332(a)*. Defendants responded to the suit by arguing that the Florida Federal Court lacked personal jurisdiction over them because they were Michigan residents. However, The District Court denied the motions of defendants and held that, pursuant to Florida's long-arm statute, a non-resident franchisee is subject to the personal jurisdiction of the Federal Courts in Florida in actions arising out of its franchise agreements.

In ruling on the case, the United States Supreme Court made it clear that the Florida Federal Court had personal jurisdiction over the out-of–state defendants in accordance with the Florida long-arm statute and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. As the Court stated, "[w]here a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S.Ct.1473, 1478, 79 L.Ed.2d 790 (1984), and the litigation results from alleged injuries that 'arise out of or relate to' those activities, Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984)." Burger King Corporation, 471 U.S. at 473, 105 S.Ct. at 2182. Furthermore, the Court stated that "with respect to interstate contractual obligations, we have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State' for the consequences of their activities with citizens of another state." Burger King Corporation, 471 U.S. at 473, 105 S.Ct. at 2182. In this regard, the Court reasoned that "[a] State generally has a 'manifest interest' in providing

its residents with a convenient forum for redressing injuries inflicted by out-of-state actors," and "where individuals 'purposefully derive benefit' from their interstate activities, Kulko v. California Superior Court, 436 U.S. 84, 96, 98 S.Ct. 1690, 1699, 56 L.Ed.2d 132 (1978), it may well be unfair to allow them to escape having to account in other states for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." Burger King Corporation, 471 U.S. at 473-474, 105 S.Ct. at 2182-2183.

With the foregoing in mind, the Court in Burger King acknowledged that "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." Burger King Corporation, 471 U.S. at 474, 105 S.Ct. at 2183, citing International Shoe Co. v. Washington, 326 U.S. at 316, 66 S.Ct. at 158. "[T]he foreseeability that is critical to due process analysis...is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." Burger King Corporation, 471 U.S. at 474, 105 S.Ct. at 2183. Notably, the Court stated that personal jurisdiction over a defendant does not require physical presence within a state:

> Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the

> reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another state, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

Burger King Corporation, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184 (1985), citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774-775, 104 S.Ct. 1473, 1478 (1984); see also Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482 (1984); McGee v. International Life Insurance Co., 355 U.S. 220, 222-223, 78 S.Ct. 199, 200-201 (1957); Hooperston Canning Co. v. Cullen, 318 U.S. 313, 317, 63 S.Ct. 602, 605, (1943).

Finally, "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum state, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice'." Burger King Corporation, 471 U.S. at 476, 105 S.Ct. at 2184, citing International Shoe Co v. Washington, 326 U.S. at 320, 66 S.Ct. at 160. These factors include the burden on the defendant(s), the forum State's interest in adjudicating the dispute, and the plaintiff's interest in obtaining convenient and effective relief. Burger King Corporation, 471 U.S. at 477, 105 S.Ct. at 2184. "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." Burger King Corporation, 471 U.S. at 477, 105 S.Ct. at 2185.

Based on the foregoing analysis, this Court clearly has personal jurisdiction over the Defendants in this case. Bannum is corporation whose principal place of business in Largo,

Florida. Bannum operates approximately twenty (20) community corrections centers, or "halfway houses," throughout the United States pursuant to contracts with the United States Department of Justice, Federal Bureau of Prisons ("BOP") located in Washington, D.C. Bannum has halfway houses located in several states throughout the country, including but not limited to Florida, North Carolina, South Carolina, West Virginia, Alabama, Mississippi, Georgia, Nevada, and Texas. Bannum administers all of its federal contracts with the BOP from its headquarters in Largo, Florida, the "nerve center" of Bannum's national operation. The operation of all of Bannum's halfway houses is overseen from its offices in Largo, Florida. Bannum does this primarily by the use of telephone and facsimile communication, as well as through the United States mail and private courier.

The facts and circumstances which form the basis of this action arose out of Bannum's contract with the BOP for the operation of a halfway house in Beaumont, Texas (see Exhibit "23"). The Contract was issued to Bannum by the BOP at its corporate headquarters in Largo, Florida, and specifically states that the name and address of contractor is "Bannum, Inc., 1301 Seminole Blvd., Largo, Florida, 33770." In furtherance of its Contract with the BOP, Bannum entered into a lease agreement with an agent of Defendant John McCray for the rental of a building in Beaumont in which to operate its halfway house. The lease agreement was facilitated by Defendant McCray's real estate agent in Texas, Charles Foxworth, also a Defendant in this case. All of Bannum's negotiations for the lease agreement between Bannum's headquarters in Largo, Florida and the Defendants took place by interstate negotiations by telephone, facsimile, United States mail, and private courier. At the time the lease was entered into, the Defendants were fully aware that the facility was

needed for the operation of a halfway house, pursuant to a contract between the BOP and Bannum. In fact, as stated therein, the parties agreed that Bannum's lease would run concurrently with Bannum's contract with the BOP, including all option periods. Furthermore, the Defendants also completed and filed a zoning change application with the City of Beaumont so that the facility could be used as a halfway house pursuant to Bannum's contract with the BOP. As a direct result of said zoning application, the City of Beaumont issued a use permit to Bannum for use of the premises as a "halfway house" pursuant to its contract with the BOP.

Following award of the BOP contract to Bannum, Bannum made monthly rent payments to the Defendants, in Texas, Louisiana, and California, from its headquarters in Largo, Florida. Bannum has been damaged by the fraud of Defendants, which took place by mail and facsimile over state lines with Bannum's headquarters in Largo, Florida. Furthermore, Bannum has been further damaged by Defendants' repudiation of the lease agreement and threatened eviction. As a direct result thereof, the BOP issued a "Cure Notice" to Bannum on December 26, 2000, wherein it directed Bannum that it was considering terminating its contract for default based on the aforementioned notice of eviction received from defendant Foxworth. As such, Defendants have put Bannum into a position where it is faced with a possible termination for default by the BOP if it is wrongfully evicted from its facility in Beaumont, Texas. If a termination for default occurs, Bannum's entire operation, which is headquartered in Florida, will suffer irreparable harm, including damage to its business reputation and goodwill, as it will be effectively barred from any future Government contract awards.

As evidenced by the foregoing, this Court has personal jurisdiction over the Defendants by virtue of the fact that at the time they entered into the lease agreement made in furtherance of Plaintiff's federal Government contract. Defendants were fully aware that the lease was signed in furtherance of a federal Government contract between the BOP and Bannum, a business headquartered in the State of Florida. In so doing, the Defendants not only accepted the financial benefits of the lease agreement, but also availed themselves of the jurisdiction of the Florida Courts. The lease agreement was contingent upon the BOP's award of a contract to Bannum for the operation of a halfway house. If Bannum had not been awarded the BOP contract, then there never would have been a lease agreement for the facility in Texas. The lease agreement is the equivalent of a subcontract of Bannum for its Government contract with the BOP. As such, the Defendants had more than fair warning that any breach of the lease agreement, or fraud associated therewith, would subject them to the jurisdiction of the Florida Courts. The Defendants purposefully directed the lease of the facility to Bannum, a business headquartered in the State of Florida. The instant litigation and all of Bannum's injuries arise out of and relate directly to the wrongful actions of Defendants related to the lease agreement. The State of Florida has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors, especially those who purposefully derive benefit from their interstate activities, such as the Defendants in this case.

## III. Conclusion

In light of the recent recusal and subsequent moratorium placed on the proceedings in Texas, Plaintiff feels a more accurate picture of the history of this case is emerging. Contrary

to what the Defendants have argued, Plaintiff has filed this action in good faith, not in an attempt to delay further proceedings. Furthermore, as explained hereinabove, the Defendants have been free to evict Plaintiff for some time now, but have elected instead not to do so and to continue to accept monthly rent checks from Plaintiff.

As argued above, this Court has personal jurisdiction over the McCray/Foxworth Defendants pursuant to the Florida Long-Arm Statute. In accordance with the United States Supreme Court's decision in Burger King, and its progeny in the 11th Circuit, this Court's exercise of long-arm jurisdiction comports with due process requirements. The Defendants' conduct toward Plaintiff have injured, and will continue to injure, Plaintiff in the State of Florida. As such, Plaintiff respectfully requests the Court deny in its entirety Defendants' Motion to Strike Plaintiff's First Amended Complaint or, in the Alternative, to Dismiss for Lack of Jurisdiction.

Dated: December 4, 2001

Joseph A. Camardo
Admitted Pro Hac Vice
Law Firm of Joseph A. Camardo, Jr.
1719 West Kennedy Blvd.
Tampa, FL 33606
Tel# (813) 258 - 0550
Fax# (813) 258 - 0544

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by United States Mail, first class, postage paid, to all counsel of record, at their last known addresses, on this 5th day of December, 2001.

John D. Rich, Esq.

FILED

02 MAR 28 PM 4:24

FLORIDA
FLORIDA

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**BANNUM, INC.,**

**Plaintiff(s),**

**vs.** **Case No. 8:01-CV-1099-T-27MAP**

**JOHN McCRAY, DELTA CAREER INSTITUTE, DELTA CAREER MANAGEMENT COMPANY, INC., CHARLES FOXWORTH, FOXWORTH REAL ESTATE, JOHN DOE, JANE DOE, LEE WHEELER, RICHARD COMPTON, P.E. COMPTON AND RICHARD MILBURN ACADEMY,**

**Defendant(s).**

______________________________________/

## ORDER

**THIS CAUSE** came on to be considered on Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. 29). The Court having heard argument on February 22, 2002, having reviewed the pleadings and being otherwise fully advised, finds that Plaintiff has not alleged or proffered prima facie facts establishing that Defendants are amenable to suit under Florida's Long-Arm Statute or that Defendants have sufficient "minimum contacts" with Florida to satisfy due process concerns.

Plaintiff has filed a Second Amended Complaint for Declaratory and Injunctive Relief, attempting to allege eight separate causes of action against twelve Defendants. The case involves allegations of fraud and tortious interference with contractual and business relationships. It involves a dispute concerning Plaintiff's lease of real property in Beaumont, Texas on which Plaintiff operates a halfway house pursuant to its contract with the United States Bureau of Prisons. Importantly, none of the predicate acts relied on by Plaintiff in support of its purported causes of



73

action took place within the state of Florida. Moreover, this dispute was previously the subject of litigation in Texas which remains pending, in part. It is apparent to the Court, as evidenced by the findings contained herein, that Plaintiff is attempting to gain a tactical and strategic advantage over Defendants by initiating suit in its home forum, apparently unhappy with the manner in which the dispute has been addressed by the Texas state courts. For this reason alone, apart from the issues of personal jurisdiction raised by the Defendants, the Court has concluded that in the interest of comity, these disputes should be resolved in the District Court of Jefferson County, Texas, 136th Judicial Circuit or the appropriate United States District Court in Texas.

A. Personal Jurisdiction

Plaintiff bears the burden of establishing jurisdiction. Francosteel Corp. v. M/V Charm, 19 F.3d 624, 626 (11th Cir. 1994). Florida's long arm statute is strictly construed and the person invoking jurisdiction under it has the burden of proving facts which clearly justify the use of this method of service. Oriental Imports and Exports, Inc. v. Maduro & Curiel's Bank, N.V., 701 F.2d 889, 890-91. Where, as here, an evidentiary hearing is not held on a motion to dismiss for lack of personal jurisdiction, a Plaintiff must establish a prima facie case of jurisdiction to survive the motion to dismiss. Id. Plaintiff may establish a prima facie case by presenting sufficient evidence to withstand a motion for directed verdict.[1] This Court has concluded, consistent with the Eleventh

[1] The Eleventh Circuit has a well established standard governing motions for judgment as a matter of law or directed verdict:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury . . . [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences and to determine the credibility of witnesses. Lipphardt v. Durango Steak House of Brandon, 267 F.3d 1183 (11th Cir. 2001).

Circuit's well established standard governing motions for judgment as a matter of law or directed verdict, that the facts and inferences point so strongly and overwhelmingly in favor of Defendants on the issue of personal jurisdiction that reasonable men could not arrive at a contrary verdict.

The standard by which to decide the issue of personal jurisdiction is clear:

> [T]he plaintiff must establish a prima facie case of personal jurisdiction over a nonresident defendant. A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict. The district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. Finally, where the plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff.

Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 255 (11th Cir. 1996), *quoting*, Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990)(citations omitted).

A two-part analysis is utilized in determining whether the Court has personal jurisdiction over a nonresident defendant. Pesaplastic, C.A. v. Cincinnati Milacron Co., 750 F.2d 1516, 1521 (11th Cir. 1985). The Court must consider (1) jurisdiction under Florida's long-arm statute and (2) due process considerations under the Fourteenth Amendment. Venetian Salami Co. v. Parthenais, 554 So.2d 499, 502 (Fla. 1989); see also Future Technology Today, Inc. v. OSF Healthcare Systems, 218 F.3d 1247, 1249 (11th Cir. 2000). The mere proof that a nonresident appears to fall within the Florida long arm statute does not automatically satisfy the due process requirements of minimum contacts with the forum state. Venetian Salami Co., 554 So.2d at 502. "A defendant wishing to contest the allegations of the complaint concerning jurisdiction or to raise a contention of minimum contacts must file affidavits in support of his position." Id. at 502-03. If a defendant sustains this burden, plaintiff must then support its jurisdictional assertions by affidavits and cannot merely rely on factual allegations in the complaint. Id.

*1. Florida's Long Arm Statute*

A Federal court in a diversity action may exercise jurisdiction over a nonresident defendant only to the extent permitted by the long arm statute of the forum state. Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 627 (11th Cir. 1996). In determining whether long arm jurisdiction is appropriate, Florida courts inquire as to whether the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of the Florida long arm statute, § 48.193, Fla. Stat. (1993). Venetian Salami Co. v. Parthenais, supra.

In its opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, Plaintiff relies solely on Fla. Stat. § 48.193(1)(b). (See Plaintiff's Memorandum in Opposition at p. 12, Dkt. 65).

Florida's long arm statute, Fla. Stat. § 48.193(1)(b), provides in pertinent part:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>
> * * * * *
>
> (b) Committing a tortious act within this state.[2]

Under this statute, as opposed to a general personal jurisdiction statute, a defendant may be subject to specific personal jurisdiction for an isolated tortious act committed in Florida. [3]

---

[2] "It is well established that the commission of a tort for purpose of establishing long-arm jurisdiction does not require physical entry into the state, but merely requires that the place of the injury be within Florida." Future Tech Int'l, Inc. V. Tae Il Media, Ltd., 944 F.Supp. 1538, 1558 (S.D.Fla. 1996), *citing* International Harvester v. Mann, 460 So.2d 580, 581 (Fla.1st DCA 1984).

[3] "Specific personal jurisdiction is exercised when the suit arises out of or is related to a party's single or isolated contacts with [Florida]." Prentice v. Prentice Colour, Inc., 779 F.Supp. 578, 582 (M.D. Fla. 1991). Conversely, general personal jurisdiction is grounded on a defendant's substantial or "continuous and systematic contacts" with Florida, regardless of whether those contacts are related to the cause of action. Id.

Plaintiff is a Kentucky corporation with its principle place of business in Pinellas County, Florida. Plaintiff has filed an eight count Amended Complaint against twelve defendants seeking declaratory judgment, damages and injunctive relief arising out of conduct occurring entirely within the state of Texas involving a lease of real property in Texas. Defendants Charles Foxworth and Lee Wheeler are citizens and residents of the state of Texas (Foxworth Declaration, ¶ 2, Second Amended Complaint, ¶ 7). Defendant Foxworth Real Estate Corporation is a Texas corporation with its principle place of business in Texas (Second Amended Complaint, ¶ 5). Defendant John McCray is the owner of the real property leased by Plaintiff and at the center of this dispute. The property is located in Beaumont, Texas. John McCray is a citizen of the state of Louisiana (Second Amended Complaint, ¶ 2). Defendant Delta Career Management Company, Inc. is a Louisiana corporation with its principle place of business in Louisiana (Second Amended Complaint, ¶ 4).[4]

The real property in Texas which is the subject of this dispute was leased by the Plaintiff for use as a halfway house pursuant to Plaintiff's contract with the United States Bureau of Prisons. The lease was negotiated in Texas and executed in Texas.[5] Plaintiff was represented by a realtor (Prewitt) in Texas who negotiated the lease on behalf of Plaintiff with Wheeler. (Second Amended Complaint, ¶ 22). After assuming occupancy of the premises, Plaintiff mailed rent checks to the Defendants in Texas, Louisiana and California from its headquarters in Largo, Florida. (Dkt. 62, Second Amended Complaint, ¶¶ 16, 18, 19, 27).

---

[4] Defendants Richard Compton, P.E. Compton and Chuck Ala have not appeared in this action. Richard Milburn Academy is a Virginia corporation which did business in Beaumont, Texas but has been dismissed as a party by the Plaintiff. (Dkt. 65)

[5] Although there is no express allegation or affidavit confirming that the lease was executed in Texas, at oral argument the attorneys did not dispute this.

Defendants Foxworth, McCray and Wheeler do not reside in Florida or transact business in Florida. (Foxworth Declaration, ¶¶ 2, 5; Wheeler Declaration, ¶¶ 2, 6; McCray Declaration, ¶¶ 2, 5). Foxworth Real Estate Corporation does not now and has never had any offices, employees, facilities or agents in Florida and has never been registered to transact business in Florida. (Foxworth Declaration, ¶¶ 9, 10). Foxworth Real Estate Corporation is a Texas corporation and has never transacted business in the state of Florida. (Id., ¶¶7-11). None of the Foxworth defendants ever traveled to Florida in conjunction with the lease agreement which forms the basis of Plaintiff's Complaint. (Id., ¶¶ 4-5, 10; Wheeler Declaration, ¶¶5-6). Delta Career Management Company, Inc. does not now and has never had any offices, employees, facilities or agents in Florida and has never been registered to transact business in Florida. (Id., ¶¶ 9-10). It is a Louisiana corporation and has never transacted business in Florida. (Id., ¶¶ 6-11). None of the McCray defendants ever traveled to Florida in negotiating the lease agreement which forms the basis of Plaintiff's Complaint. (Id., ¶¶ 3-5, 11).

The basis for Plaintiff's contention that this Court has long arm jurisdiction over Defendants is that Plaintiff claims it has been damaged by alleged tortious conduct of the individual Defendants which took place by mail and facsimile. (Second Amended Complaint, ¶¶ 16-19). These allegations are insufficient on their face to establish prima facie jurisdiction over any of the Defendants. First, the only connection to Florida with respect to any Defendant is that they have engaged in a one time contractual relationship with Plaintiff, a corporation whose principle place of business is in Florida, utilizing the mail, facsimile and telephone. Although Plaintiff alleges that there was telephonic communication on the part of Defendants with Plaintiff from Texas to Florida, Plaintiff never alleges or proffers evidence of any act on the part of any Defendant which actually occurred within Florida. Rather, Plaintiff relies solely on the commission of a tort (fraud or tortious interference)

which allegedly caused economic injury to Plaintiff in Florida. See Fla. Stat. § 48.193(1)(b) "committing a tortious act within this state".[6]

The facts alleged by Plaintiff in the Second Amended Complaint are devoid of any evidence which could possibly confer specific personal jurisdiction over any of the Defendants. Neither Foxworth, Wheeler, Foxworth Real Estate Corporation, McCray or Delta Career Management Company, Inc. ever traveled to Florida concerning the lease agreement. Rather, as the Defendants' affidavits establish, the lease agreement was negotiated (and executed) in Texas, between Foxworth and Plaintiff's Texas real estate agent. In negotiating the terms of the lease, Foxworth and Foxworth Real Estate Corporation never spoke to any agent of Plaintiff located in Florida or to any other person in Florida. (Foxworth Declaration ¶ 4-10).

Plaintiff argues that the Defendants are subject to personal jurisdiction in Florida because it has been damaged by the fraud of Defendants, which allegedly took place by mail and facsimile over state lines. (Dkt. 62, Complaint, ¶ 19). Plaintiff argues that two Defendants tortiously interfered with Plaintiff's contract with the United States Bureau of Prisons, subjecting those Defendants to personal jurisdiction pursuant to Fla. Stat. § 48.193(1)(b) in that ". . . the injury to Bannum as a result of the actions of Defendants has occurred, and will occur, in Florida where Bannum is headquartered." This argument unconvincing.[7]

---

[6] Plaintiff does not contend that the general personal jurisdiction long arm statute (Fla. Stat. §48.193(2)) confers personal jurisdiction on any of the Defendants. Rather, Plaintiff relies solely on the specific personal jurisdiction statute (Fla. Stat. § 48.193(1)) whereby "specific personal jurisdiction is exercised when the suit arises out of or is related to a party's single or isolated contact through [Florida]". Prentice v. Prentice Colour, Inc., 779 F.Supp 578 (M.D. Fla. 1991).

[7] Plaintiff devotes much of its argument and numerous allegations in the Second Amended Complaint to its contractual relationship with the United States Bureau of Prisons and its known intended purpose to utilize the leased premises in Texas as a halfway house pursuant to that contract. Plaintiff apparently believes that these facts in some way buttress its claim of personal jurisdiction over Defendants. They do not. These facts are incidental to a determination of long arm jurisdiction and consideration of Defendants' due process rights, given that the entire dispute involves leased real estate in Texas.

While Plaintiff alleges that personal jurisdiction exists, the allegations in the Second Amended Complaint are conclusory and do not state a cause of action for tortious acts committed in Florida, within the meaning of § 48.193(1)(b). Specifically, the record does not reflect that Defendants, Delta Career Management Company ("DCMC") and Foxworth Real Estate ("FRE"), participated in any tortious conduct in Florida. Further, the allegations of the Second Amended Complaint do not establish a prima facie case that Defendant McCray committed a tortious act in Florida: "Bannum had not spoken directly with Defendant McCray, but rather communicated with him through various agents." (Complaint, ¶ 40). To the extent that the Second Amended Complaint purports to allege fraud in Count IV, the theory of which is not apparent to the Court from the allegations in the Second Amended Complaint, the fact that Ken Webb was held out as the owner of the Beaumont, Texas property, instead of Defendant McCray, is not established as a material misrepresentation under a fraud theory, given the numerous inconsistent allegations that Webb acted with the authority of McCray.[8]

Additionally, neither Defendant Foxworth or Defendant Wheeler are subject to personal jurisdiction in Florida. The lease agreement was negotiated in Texas between Foxworth and Plaintiff's Texas real estate agent, Milt Prewitt.[9] In negotiating the terms of the lease, Foxworth

---

[8] (See ¶¶ 23 "Upon information and belief, Ken Webb had authority from the owner, Defendant John McCray, to lease the entire premises or any portion thereof". ¶ 31; "Ken and Michelle managed the entire premises and all tenants leasing space therein for absentee owner Defendant John McCray."... "Upon information and belief, Ken and Michelle Webb leased the premises to other parties several times previously with the knowledge and ratification of Defendant McCray.") Moreover, Plaintiff's allegations that Defendants perpetrated a fraud on the United States Government and/or the City of Beaumont, Texas have no apparent relevance to its purported causes of action against these Defendants.

[9]To the extent that the affidavit of Lowry, ¶¶ 8-9, avers that all negotiations occurred between Plaintiff in Florida and individuals in Texas via telephone, facsimile, United States mail and private courier, the undisputed facts remain that (1) Plaintiff initiated contact with Foxworth in Texas (Lowry Affidavit, ¶ 7); (2) Plaintiff utilized a real estate broker in Texas and "the lease agreement was facilitated by Defendant McCray's real estate agent in Texas . . ." (¶¶ 16-22); (3) Bannum's representatives initiated contact with Defendants in January 1997 by traveling to Texas in search of property to lease (¶ 21); and (4) the leased premises were located in Texas. That Plaintiff was physically located in Florida during the negotiations and throughout the contractual relationship with the Foxworth/McCray defendants is incidental, given these undisputed facts.

never spoke to any agent of Plaintiff located in Florida, or any other person located in Florida. (Foxworth Declaration, ¶¶ 4-10). Defendant Wheeler only spoke on the telephone with Plaintiff's representative in Florida and mailed an eviction notice to Plaintiff in Florida from Texas. (Wheeler Declaration, ¶ 4).

With respect to the tortious interference theories, the Court cannot rely upon unidentified "secret communications" Plaintiff alleges took place between Foxworth and or its agent(s) and the Bureau of Prisons or between McCray and the Bureau of Prisons. These communications, alleged in a conclusory fashion, are not alleged to have occurred in Florida and Plaintiff has proffered no evidence and made no factual allegations that any such conversations are a basis for the alleged tortious interference.

Accordingly, Plaintiff fails to meet its burden of demonstrating specific facts which justifies the exercise of specific personal jurisdiction over any of the Defendants pursuant to Florida's Long Arm Statute, § 48.193(1).[10]

2. *Due Process*

Even if the Defendants alleged to have committed torts could arguably be subject to long arm jurisdiction pursuant to § 48.193(1)(b), the Court concludes that Plaintiff has not presented a prima facie case establishing that these Defendants have sufficient minimum contacts with the State of

[10] Although Plaintiff does not rely on Florida's long arm statute invoking general personal jurisdiction (§ 48.193(2)), the Declarations of Foxworth, Wheeler and McCray, establish that neither Foxworth, Wheeler, Foxworth Real Estate Corporation, McCray nor Delta Career Management have the necessary "substantial" or "continuous and systematic" contacts with Florida to confer general personal jurisdiction. As previously discussed, the Foxworth Defendants are residents of Texas and the McCray defendants are residents of Louisiana. None of the parties have ever entered Florida for the purpose of transacting or conducting business in Florida, traveled to Florida for the purpose of transacting business, been authorized by the Florida Department of State to transact business within Florida or maintained any offices, employees, property, mailing addresses, telephone numbers, agents or sales in Florida. (Dkt. 29, p. 13; Foxworth Declaration, ¶¶ 2, 4-10; Wheeler Declaration ¶¶ 2, 5-6; McCray Declaration ¶¶ 4-11). Plaintiff therefore cannot establish general jurisdiction over Defendants.

Florida, for due process purposes. Further, the Court concludes that exercising jurisdiction over these Defendants in Florida would offend traditional notions of fair play and substantial justice. In that regard, due process requires that a nonresident defendant have "fair warning" that a particular activity may subject it to the jurisdiction of a foreign sovereign. Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985).

The fact that the Foxworth defendants had interactions with a Florida corporation is insufficient, in and of itself, to subject any of the Foxworth defendants to jurisdiction in Florida. Burger King, 471 U.S. at 478-79 (even a contract with an out of state party, by itself, does not establish minimal contacts in that other party's home forum). Due process requires (1) that Defendant have sufficient "minimum contacts" with the State of Florida; and (2) that exercise of jurisdiction over Defendant would not offend "traditional notions of fair play and substantial justice." Robinson, 74 F.3d at 258.

The minimum contacts analysis requires consideration of three factors: (1) whether there was purposeful availment of the forum state; (2) whether the alleged contacts give rise to the alleged cause of action; and (3) whether the defendant should reasonably anticipate being haled into court in the forum state. Burger King v. Rudzewicz, 471 U.S. 462, 474-75 (1985). Isolated or fortuitous circumstances do not satisfy the "minimum contacts" requirement. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295 (1980); Francosteel Corp. v. M/V Charm, supra.

In this case, Plaintiff has not established that Defendants purposely availed themselves of the privilege of conducting activities within the state of Florida. To the contrary, Plaintiff initiated contact with Defendants in Texas by sending representatives to Texas to look for property to lease, utilizing a real estate broker in Texas to facilitate the lease and eventually leasing the premises in Texas. No reasonable person, in the exercise of impartial judgment, would conclude any differently.

Secondly, what contacts these Defendants did have with the state of Florida consist merely of interstate telecommunications by telephone and facsimile and use of the United States mail. Plaintiff has not contended or established that any of the Defendants ever physically came to Florida for purposes related to the lease or the disputes arising therefrom. The only arguable contact with Florida are conclusory allegations in the Second Amended Complaint that the Defendants in some undefined manner perpetrated a fraud and tortiously interfered with Plaintiff's contract with the Bureau of Prisons through use of interstate telecommunications and mail and that Plaintiff, in Florida, was damaged thereby. Yet, the only allegation which comes close to a physical contact with Florida is Wheeler speaking on the telephone from Texas with David Lowry in Florida on three occasions and Wheeler having mailed an eviction notice to Plaintiff in Florida. (See Dkt. 20, Declaration of Wheeler). Plaintiff simply has not established that any of these marginal contacts have given rise to any of the purported causes of action set forth in the Second Amended Complaint. Lastly, even to the extent that there may be conflicts in the affidavits, and construing all reasonable inferences in favor of Plaintiff, none of these Defendants could reasonably have anticipated being haled into Florida's courts over disputes arising from the Texas lease.

The Court must now determine whether the exercise of personal jurisdiction over Defendants comports with "fair play and substantial justice". Sculptchair, 94 F.3d at 631. Relevant factors include "the burden on the Defendant, the interest of the forum . . . and the Plaintiff's interest in obtaining relief". Asahi Metal Indus. Co., Ltd. v. Superior Court of California, 480 U.S. 102 (1987). The Court concludes that Plaintiff has initiated this action in Florida in an apparent strategic attempt to avoid perceived unfavorable prospects in the Texas state courts and to burden these Defendants

by requiring them to defend these disputes in Florida.[11] Under these circumstances, Florida has minimal, if any, interest in these disputes, given that the dispute centers on the lease of real property in Texas. To the extent Plaintiff has an interest in obtaining relief, it can seek relief in the courts of Texas as effectively as it can in Florida. For these reasons, exercising personal jurisdiction over these Defendant would be the antithesis of "fair play and substantial justice". Accordingly, the Court finds that the facts and inferences point overwhelmingly against this Court exercising personal jurisdiction over these Defendants and that reasonable people could not arrive at a contrary conclusion.

In conclusion, the evidence of record demonstrates that Defendants do not have sufficient minimum contacts with Florida to satisfy due process considerations. That Defendants had interactions with a Florida corporation is insufficient, under these circumstances, to subject any of the Defendants to jurisdiction in Florida. Burger King, 471 U.S. at 478-79 (even a contract with an out-of-state party, by itself, does not establish sufficient minimum contacts in that other party's home forum). Principles of due process mandate that the very limited and isolated contacts between Defendants and Florida are simply not sufficient to subject Defendants to jurisdiction here.

As appropriately stated by the Supreme Court in Burger King, 471 U.S. at 475:

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with a forum state. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the Defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

[11] Although the parties have expounded at length in the record on what did or didn't occur in Texas state court, suffice it to say that none of that has any bearing on this decision, other than the Court's recognition that in the interest of comity and due process, Texas is where these parties should be litigating.

As the Supreme Court noted, this "purposeful availment" requirement insures that a defendant will not be haled into a jurisdiction solely as a result of "random", "fortuitous", or "attenuated" contacts, . . . or of the "unilateral activity of another party . . .". In keeping with these observations by the Supreme Court, the Court concludes that this Court does not have personal jurisdiction over these Defendants under Florida's long arm statute and subjecting these Defendants to jurisdiction in Florida would offend traditional notions of fair play and substantial justice.

B. Comity

Defendants persuasively argue that in addition to Florida lacking personal jurisdiction over these Defendants, principles of comity mandate that the District Court of Jefferson County, Texas, 136th Judicial Circuit, should resolve this dispute as it was the first court to obtain jurisdiction over these parties and issues. "In the absence of compelling circumstances, the court who initially sees the controversy should be the one to decide the case." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 675 F.2d 1169, 1174 (11th Cir. 1982); see also Structural Panels, Inc. v. Texas Aluminum Ind., Inc., 814 F.Supp 1058,1067 (M.D. Fla. 1993).

As the record establishes, this case involves a dispute concerning a lease agreement executed in Texas for real property located in Texas and involving Defendants who are citizens of the states of Texas and Louisiana. Plaintiff initially chose to file suit in Jefferson County, Texas where the property at issue is located and where all events giving rise to the instant case occurred. Plaintiff has claims pending against the McCray and Foxworth defendants in Jefferson County District Court and the Defendants have counterclaims pending against Plaintiff in that court. Without question, Jefferson County, Texas is the appropriate forum for resolution of the issues presented in the Plaintiff's Complaint.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1. Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. 29) is **GRANTED**.

2. Defendants' Motion to Strike the Second Amended Complaint is **DENIED**.

3. The Clerk is directed to close this case.

**DONE AND ORDERED** in chambers this 28th day of March, 2002.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record
Law Clerk

OMB 1103-0018 exp. 02/28/2001

# AWARD/CONTRACT

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | RATING | PAGE 1 OF 10 PAGES

2. CONTRACT (Proc. Inst. Ident.) NO.: J200c-397

3. EFFECTIVE DATE: October 1, 1998

4. REQUISITION/PURCHASE REQUEST/PROJECT NO.: Dennings/247

5. ISSUED BY: CODE
U.S. Department of Justice
Federal Bureau of Prisons
Attn: CCC Contracting
320 First Street, NW
Washington, DC 20534

ORIGINAL

6. ADMINISTERED BY (If other than Item 5) CODE
Leah Wilson
Contracting Officer
(202) 307-3069

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and ZIP Code)
Bannum, Inc.
1301 Seminole Boulevard, Suite 126
Largo, Florida 33770
Attn: Mr. David A. Lowry, Executive Director
(813) 588-2594

8. DELIVERY: DESTINATION
☐ FOB ORIGIN ☒ OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT: Net 30 Days

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: ITEM Part I Section G.3

CODE | FACILITY CODE

11. SHIP TO/MARK FOR CODE
540 Sayre Street
Montgomery, Alabama 36101

12. PAYMENT WILL BE MADE BY CODE
Federal Bureau of Prisons
523 McDonough Blvd., SE
Atlanta, Georgia 30315 Attn: Comptroller

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
☐ 10 U.S.C. 2304(c)( ) ☐ 41 U.S.C. 253(c)( )

14. ACCOUNTING AND APPROPRIATION DATA
FP-03-00-09-T1-414-2506-N-08-0397 FUNDS WILL BE OBLIGATED BY EACH DELIVERY ORDER

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| 1. | Provide residential Community Corrections Center (CCC) services for male and female Federal offenders in the Montgomery, Alabama area in accordance with RFP 200-0422-SE | 18,980 Inmate (IDY) | Days | $53.45 | $1,014,481.00 |
| | | W/Gov't unilateral right to exercise three one-year options at: | | | |
| | | 9,855 | IDY | $50.45 | Option Year 1 |
| | | 10,220 | IDY | $50.45 | Option Year 2 |
| | (CONTINUED) | 10,585 | IDY | $50.45 | Option Year 3 |

ESTIMATED TOTAL BASE PERIOD AMOUNT — 15G. TOTAL AMOUNT OF CONTRACT ▶ $1,014,481.00

## 16. TABLE OF CONTENTS

| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I — THE SCHEDULE | | | | PART II — CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | | X | I | CONTRACT CLAUSES | |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | | | | PART III — LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | | X | J | LIST OF ATTACHMENTS | |
| | D | PACKAGING AND MARKING | | | | PART IV — REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return 2 copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number ________ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

19A. NAME AND TITLE OF SIGNER (Type or print)
David A. Lowry
Executive Director

20A. NAME OF CONTRACTING OFFICER
Donald M. Comer
Contracting Officer

BOP7483

19B. NAME OF CONTRACTOR
BY [signature] (Signature of person authorized to sign)

19C. DATE SIGNED: 6-30-98

20B. UNITED STATES OF AMERICA
BY [signature] (Signature of Contracting Officer)

20C. DATE SIGNED: 7/1/98

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE

26-107

*U.S. Government Printing Office: 1995 — 387-722/10087

STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE |
|---|---|---|
| | Contract J200c-397 | 2 of 10 |

NAME OF OFFEROR OR CONTRACTOR
Bannum, Inc., Montgomery, Alabama area

AWARD/CONTRACT CONTINUED --

2. Provide residential Community Corrections Center (CCC) services for male and female Federal offenders in the Montgomery, Alabama area in accordance with RFP 200-0422-SE and the Business, Technical, and Past Performance proposals signed by the Executive Director, Bannum, Inc., on December 31, 1997, and the following:

   (a) Discussions #1 Response, dated March 12, 1998
   (b) Discussions #2 Response, dated April 24, 1998
   (c) Correspondence (Documentation on Facility Inspections), dated April 30, 1998
   (d) Addendum to Discussions #2 Response, dated May 6, 1998
   (e) Correspondence (Update on Facility Inspections), dated May 13, 1998
   (f) Correspondence (Facility Inspection Results), dated May 19, 1998
   (g) Discussions #3 Response, dated May 29, 1998
   (h) Final Proposal Revision, dated June 5, 1998
   (i) Reopened Discussions Response, dated June 18, 1998
   (j) Reopened Discussions Response, dated June 24, 1998
   (k) Amendment No. One, dated June 25, 1998
   (l) Final Proposal Revision, dated June 25, 1998

3. Performance shall begin no later than October 1, 1998, and upon Government's issuance of Notice to Proceed.

4. Home Confinement and Furlough services shall be provided at one-half (1/2) the rate of regular inmate day services.

5. Option Years, if exercised, will begin on October 1.

6. "The Government intends to refer all eligible CCC requirements under this solicitation to the successful Contractor."

7. Base Period and Option Year dates are as follows:

| | | | |
|---|---|---|---|
| Base Period: | 10/01/1998 | - | 09/30/2000 |
| Option Year One: | 10/01/2000 | - | 09/30/2001 |
| Option Year Two: | 10/01/2001 | - | 09/30/2002 |
| Option Year Three: | 10/01/2002 | - | 09/30/2003 |

8. See the attached revised **Section F - Deliveries or Performance.**

BOP7484