blueprints, that the Heating/Air Conditioning system has been equipped with an automatic fan shut-down switch wired into the annunciator panel to ensure there is no mechanical air movement in case of an alarm. This is a weakness.

5. All circuits in the electrical panel boxes need to be correctly labeled. This is a weakness.

6. The plug receptacle in the second floor Day Room needs to be connected to a ground wire. This is a weakness.

7. A cover needs to be installed over the opening of the electrical fuse box, located in the closet of the Visiting Room. This is a weakness.

8. Modifications must be proposed to meet the requirements of the American National Standards Institute, ANSI-A117.1-1986, Specifications for Making Buildings Accessible to, and Usable by the Physically Handicapped. Presently, the facility has no features to service the handicapped. <u>Bannum must provide a plan of action indicating what is to be done and the time frames for completion in order to accommodate the physically handicapped.</u> This is a weakness.

9. Bannum must provide documentation from a certified entity as to the presence or non-presence of Radon in the facility. This documentation must be dated after the inspection visit on March 19. This is a weakness.

10. Bannum must provide documentation from a certified entity as to the presence or non-presence of lead-based paint in the facility. This documentation must be dated after the inspection visit on March 19. This is a weakness.

11. Bannum must provide documentation from a certified entity as to the presence or non-presence of asbestos (condition) in the facility. This documentation must be dated after the inspection visit on March 19. This is a weakness.

12. Bannum must establish a written program for the storage, issuance, handling, and accountability of flammable liquids, hazardous chemicals, and toxic/corrosive materials in the facility. This is a weakness.

13. The facility lacks separate space for each activity (ie, the downstairs Day Room is used for visiting, group meetings, and television viewing). There is a large outdoor porch on the upper floor that could be enclosed, thereby eliminating the separation of space concerns. **Statement of Work (SOW), Chapter 3, Section J.** This is a weakness.

14. Because the City of Montgomery has terminated much of its bus service, some residents are required to walk great distances to work under the current contract (J200c-181). <u>This makes job</u>

searches and job-commuting an issue to be addressed under this Solicitation RFP 200-0422-SE. It is the contractor's responsibility to provide the residents with free transportation for employment or program participation activities when there is an absence of public transportation within one mile of the facility. Bannum must provide a plan of action addressing how the residents will be provided free transportation for the purposes stated above. **SOW, Chapter 3, Section A.** This is a weakness.

**CODES AND STATEMENT OF WORK:**
Americans with Disabilities Act of 1990
1991 Standard Building Code
1992 Safety Manual 1600.06
1992 Statement of Work
1993 National Plumbing Code
1994 National Fire Code/OSHA
1996 National Electric Code
1997 NFPA 101 Life Safety Code

Valid proof of all zoning and local ordinance requirements necessary for the operation of a CCC facility must be submitted by Final Proposal Revisions (formerly known as Best and Final Offers). An offeror's failure to establish and maintain proof may result in elimination from the competitive range prior to award and termination for default following award.

**Business Proposal:**

As a result of this discussion, please submit any price, technical, or other revisions to your proposal.

Please fax your Discussions #2 response to this office at (202) 307-2780 by April 24, 1998, 2:00PM Local Time.

Please submit an original and four (4) copies of your Discussions #2 response to this office at Procurement and Property Branch, Community Corrections Contracting, 320 First Street, N.W., Room 5006, Washington, D.C. 20534, by April 30, 1998, 2:00PM Local Time.

Sincerely,

Leah Wilson
Contracting Officer
Community Corrections Contracting

BAN10316

BANNUM, INC.
1301 SEMINOLE BOULEVARD
SUITE 126
LARGO, FLORIDA 33770

DAVID LOWRY
EXECUTIVE DIRECTOR

OFFICE: (813) 588-2594
FAX: (813) 588-2689

April 16, 1998

Leah Wilson
Bureau Of Prisons
320 First Street, N.W.
Washington, D. C. 20534

Re: Contract# J200c-181

Dear Ms. Wilson:

This is in response to your letter of April 9, 1998. Thank you for extending the time in which to respond. The following represents our response.

As you are aware, the Statement Of Work states: "The contractor shall arrange for transportation for indigent residents while seeking employment, at no cost to the resident." and that: "The facility shall be located in an area where the commuting time to the general area of work is ordinarily no more than one and one half hours each way via public transit." This is the extent to which the contract Statement of Work addresses transportation issues. Attached is a copy of documentation which indicates that public transportation is available from 6 AM thru 6 PM within one mile of our facility. During normal business hours residents are permitted to leave the facility to seek gainful employment. Bannum provides indigent residents with bus fare while seeking employment and for program purposes. Accordingly, Bannum is in complaince with contractual requirements and the SOW. Please also consider that Bannum's facility is located in downtown Montgomery which provides immediate access to many employment opportunities.

After receipt of your letter dated April 9, 1998, we have conducted a review of employment statistics of Bannum residents,transportation needs related thereto, and instances of residents walking to employment. Currently, of the 27 employable program participants, only two are unemployed and of those two, one was recently laid-off from a construction job with the other arriving on April 7. Such record is consistent with past experience. As you can see, we do not believe that transportation is an issue. Although some residents may choose to walk to their place of employment, such decision is not based on lack of access to public transportation. In fact, many of those who initially indicate a decision to walk subsequently make alternative transportation arrangements. These decisions are primarily

BAN04581

based on a desire to avoid paying the cost of public transportation once employed.

In the matter of Transitional Services, Bannum is advised that the Government's budget provides for the cost of transportation. That arrangement should be adressed between the Government and the Transitional Services provider. Due to the inflexibility of the current Transitional Services provider, employment positions have been lost to Bannum residents. Additionally some current employment opportunities are being jeopardized by scheduling requirements during work hours and during hours when public transportation is available. Also attached is a copy of Ms. Bellew's letter adressed to the CCM concerning other aspects of this matter.

Since we are in compliance with contract requirements, should the Government wish to amend the contract, Bannum will accomodate the additional requirements after the Governments approval of the necessary cost adjustments.

Sincerely,

David A. Lowry

**BANNUM, INC.**
1301 SEMINOLE BOULEVARD
SUITE 126
LARGO, FLORIDA 33770

DAVID LOWRY
EXECUTIVE DIRECTOR

OFFICE: (813) 588-2594
FAX: (813) 588-2689

April 24,1998

Leah Wilson
CCC Contracting
Federal Bureau of Prisons
320 First Street NW
Washington, D.C.

Re: RFP 200-0422-SE

Dear Mr. Wilson:

This letter is in response to your request for further clarification of Bannum's proposal concerning the above referenced RFP. The following represents our response.

Technical (Reports/Policy/Procedures)

1. Attached is a copy of a current Food Permit and Business License.

Technical (Facility)

1. The exit sign located by the rear exit on the second floor will be connected to a secondary power source. Emergency lights and exit signs will be illuminated in both normal and emergency modes.

2. Bannum will ensure that the water temperature is thermostatically controlled at 120 degrees Fahrenheit.

3. Documentation that the smoke detectors have been tested is being sent under separate cover.

4. Documentation that the Heating/Air Conditioning system has been equipped with an automatic fan shut-down switch wired into the enunciator panel to ensure there is no mechanical air movement in case of an alarm is being sent under separate cover.

5. All circuits in the electrical panel boxes will be correctly labeled.

6. The plug receptacle in the second floor Day Room will be connected to a ground wire.

7. A cover will be installed over the opening of the electrical fuse box, located in the closet of the Visiting Room.

BAN10338

7. A cover will be installed over the opening of the electrical fuse box, located in the closet of the Visiting Room.

8. During the current contract period, Bannum has only received one handicap referral. The referral was accommodated given the current facility layout. Should handicap referrals require more extensive accommodations, Bannum's contingency plan is, and is proposed to be utilization of home confinement for that purpose.

9. Documentation as to the presence or non-presence of Radon in the facility is being sent under separate cover.

10. Documentation as to the presence or non-presence of Lead-based paint in the facility is being sent under separate cover.

11. Documentation as to the presence or non-presence of asbestos (condition) in the facility is being sent under separate cover.

12. Attached is a written program for the storage, issuance, handling, and accountability of flammable liquids, hazardous chemicals, and toxic/corrosive materials in the facility.

13. The large outdoor porch on the upper floor will be enclosed, thereby eliminating your separation of space concern.

14. See attached letter of April 16, 1998. Should a different transportation plan be required, Bannum's manday rate would increase based on the related costs thereof.

Attached is proof of zoning and please let me know if the contents herein do not satisfactorily address your concerns.

Sincerely,

David A. Lowry

42498CCCcont

04-24-98 09:50 ☎ 3342622749 BANNUM PLACE 4XA 002

# Alabama Department of Public Health

# FOOD PERMIT

MONTGOMERY
COUNTY

1052 FSE
PERMIT NUMBER

ELIZABETH HARRIS MCNEIL
BUSINESS OWNER OR AUTHORIZED AGENT

IS HEREBY PERMITTED TO MAINTAIN AND OPERATE

LIZ HOME COOKING
ESTABLISHMENT

LOCATED AT

| 1677 OAK STREET | MONTGOMERY | AL | 36108 |
|---|---|---|---|
| STREET | CITY OR TOWN | | ZIP |

THIS PERMIT SIGNIFIES COMPLIANCE ON THE DATE OF ISSUE WITH THE ALABAMA DEPARTMENT OF PUBLIC HEALTH RULES FOR

FOOD SERVICE ESTABLISHMENT SANITATION

PURSUANT TO ALABAMA LAW (SECTION 22-20-5 CODE OF ALABAMA, 1975) AND IS VALID UNTIL PERMIT EXPIRES, IS SUSPENDED OR REVOKED.

Date issued 09/15/97 2

Expiration Date SEPTEMBER 30, 1998

Donald E. Williamson, M.D.
State Health Officer

James R. Reynolds
Local or District Health Official

Display for public view - not transferable

ADPH-FLP-102L/Rev. 1-95

04/24/98 12:22 TX/RX NO.3398 P.002 BAN[redacted]340

04-24-98 09:18 ☎ 3342622749 BANNUM PLACE 4XA 002

LICENSE EXPIRES DECEMBER 31, 1997

NOTICE
License issued subject to compliance with all pertinent city codes.

MONTGOMERY, ALABAMA

# 1997 BUSINESS LICENSE

CITY OF MONTGOMERY, ALA. — CRADLE OF THE CONFEDERACY — GREAT SEAL

No. 13810

LICENSE VALID ONLY AT LOCATION INDICATED. NOT TRANSFERABLE

**PENALTY FOR FAILURE TO POST IN CONSPICUOUS PLACE**

MAILING NAME AND ADDRESS
LIZ HOME COOKING
2607 LARK DR
MONTGOMERY AL 36108

LOCAL TRADE NAME AND PHYSICAL LOCATION
LIZ HOME COOKING
1677 OAK ST
MONTGOMERY AL 36108

THE FIRM, CORPORATION, ORGANIZATION, BUSINESS OR PERSON, WHOSE NAME APPEARS ABOVE HAS PAID THE REQUIRED LICENSE FEE AND IS AUTHORIZED TO ENGAGE IN BUSINESS IN MONTGOMERY, ALABAMA AS INDICATED BELOW.

| CODE | ACCOUNT NUMBER | LICENSE NUMBER | RECEIPT NUMBER | TYPE OF LICENSE |
|---|---|---|---|---|
| | 5812242 | 013810 | 13810 | |
| 5812 | CATERING/RESTAURANT | | | |

DATE ISSUED
06 05 1997
MONTGOMERY, ALABAMA

Carolyn R. Mozingo
Carolyn R. Mozingo, Revenue & License Officer

04/24/98 11:50 TX/RX NO.3391 P.002

BAN[illegible]0341

## 7. TOXIC, CAUSTIC AND FLAMMABLE MATERIALS

All employees will be trained in the proper handling and use of all toxic, caustic and flammable materials within two weeks of their initial employment or whenever a new hazard is introduced into their work area. Training will be documented in the personnel files.

The following policy will apply.

### TOXIC, CAUSTIC AND FLAMMABLE MATERIALS POLICY

Toxic, Caustic and Flammable materials are defined as those having "signal words" such as **POISON**, **DANGER** and **WARNING**. Such materials require special handling, control and accountability.

1. Materials are to be properly labeled, stored in the original container, and kept in the secure storage area of the staff restroom.

2. Toxic, caustic and flammable materials may not be stored in sleeping rooms or any area other than designated above or close proximity with stored foodstuff.

3. Concentrated materials may be used by the general population once the product has been diluted. The container is to be labeled and marked "Diluted".

4. Propane gas and other pressurized cylinders, both full and empty, are to be strapped, chained or otherwise stored in an upright position.

   a. Aerosol containers are considered to be pressurized cylinders and should be controlled/accounted for.

5. Indoor storage of Class I and II materials cannot exceed 25 gallon capacity.

   **NOTE:** Flammable liquids are classified as:

   **Class I** - Flash Point 0 - 100 Degrees Fahrenheit
   **Class II** - Flash Point 100 - 140 Degrees Fahrenheit
   **Class III** - Flash Point 140 - above Degrees Fahrenheit

6. Flammable materials such as gasoline, kerosene and paint thinner shall be stored outside of the main structure and in approved Department of Transportation safety containers.

7. In compliance with the "Right-to-Know" Law, Material Safety Data Sheets (MSDS) will be maintained on all toxic, caustic and flammable material.

NOTE: These data sheets will list the characteristics and chemistry of the product, flash point and first aid antidote in case of ingestion or exposure.

8. Inventory cards of all toxic, caustic or flammable materials will be maintained.

9. Personal protective clothing is to be furnished and utilized in accordance with the MSDS sheets.

NOTE: See attached Material Safety Data Sheet.

MATERIAL SAFETY DATA SHEET

Product: ______________________________

Inventory card #: ______________________________

Product Characteristics and Chemistry: ______________________________

______________________________

______________________________

______________________________

Flash Point: ______________________________

FIRST AID ACTION IN CASE OF INGESTION OR EXPOSURE: ______________

______________________________

______________________________

ANTIDOTE: ______________________________

______________________________

Director Signature/Date: ______________________________

BANNUM, INC.
1301 SEMINOLE BOULEVARD
SUITE 126
LARGO, FLORIDA 33770

DAVID LOWRY
EXECUTIVE DIRECTOR

OFFICE: (813) 588-2594
FAX: (813) 588-2689

April 16, 1998

Leah Wilson
Bureau Of Prisons
320 First Street, N.W.
Washington, D. C. 20534

Re: Contract# J200c-181

Dear Ms. Wilson:

This is in response to your letter of April 9, 1998. Thank you for extending the time in which to respond. The following represents our response.

As you are aware, the Statement Of Work states: "The contractor shall arrange for transportation for indigent residents while seeking employment, at no cost to the resident." and that: "The facility shall be located in an area where the commuting time to the general area of work is ordinarily no more than one and one half hours each way via public transit." This is the extent to which the contract Statement of Work addresses transportation issues. Attached is a copy of documentation which indicates that public transportation is available from 6 AM thru 6 PM within one mile of our facility. During normal business hours residents are permitted to leave the facility to seek gainful employment. Bannum provides indigent residents with bus fare while seeking employment and for program purposes. Accordingly, Bannum is in complaince with contractual requirements and the SOW. Please also consider that Bannum's facility is located in downtown Montgomery which provides immediate access to many employment opportunities.

After receipt of your letter dated April 9, 1998, we have conducted a review of employment statistics of Bannum residents,transportation needs related thereto, and instances of residents walking to employment. Currently, of the 27 employable program participants, only two are unemployed and of those two, one was recently laid-off from a construction job with the other arriving on April 7. Such record is consistent with past experience. As you can see, we do not believe that transportation is an issue. Although some residents may choose to walk to their place of employment, such decision is not based on lack of access to public transportation. In fact, many of those who initially indicate a decision to walk subsequently make alternative transportation arrangements. These decisions are primarily

BAN10345

based on a desire to avoid paying the cost of public transportation once employed.

In the matter of Transitional Services, Bannum is advised that the Government's budget provides for the cost of transportation. That arrangement should be adressed between the Government and the Transitional Services provider. Due to the inflexibility of the current Transitional Services provider, employment positions have been lost to Bannum residents. Additionally some current employment opportunities are being jeopardized by scheduling requirements during work hours and during hours when public transportation is available. Also attached is a copy of Ms. Bellew's letter adressed to the CCM concerning other aspects of this matter.

Since we are in compliance with contract requirements, should the Government wish to amend the contract, Bannum will accomodate the additional requirements after the Governments approval of the necessary cost adjustments.

Sincerely,

David A. Lowry



BAN10346

DART
a new direction

# Questions & Answers about DART your new City Bus Service

## Why was the bus service changed?

There were several reasons. First, the old system of routes was not working. Ridership had fallen by 66% in the last eight years. Of course, revenue had fallen with it. Another major factor was the loss of federal operating funds. In 1989, the city was matching about one-half million dollars in operating funds. This year there will be only about $70,000 in federal operating assistance and the city will be paying almost all of the transit operating bill. DART is the way to give the best service to the most people with the equipment and money available.

## How does DART operate?

DART buses will run anywhere in the city limits of Montgomery based upon demand and the availability of resources. We will not run "door-to-door" but will stop at intersections as near trip origins and destinations as possible.

## How do I get a ride on a DART bus?

Call 262-7321 between 6:00 AM and 6:00 PM to request a trip. Give the dispatcher your name, your telephone number, your home address, the intersection or corner where you want to be picked up (for instance Fairview Avenue and Mobile Road), the intersection or corner where you want to go, and the time you need to be there.

## Will I have to call in every day?

No. Standing orders for a trip or trips you make regularly on the same day or days each week will be scheduled on a first-come, first-served basis. After you are notified that your request has been approved, you do not have to call in for that service again! If you have a standing order on DART, we do ask that you call us when you are not going to be riding, so that we can make that space available to someone else.

BAN10347

## What if I need to go shopping or make a medical trip or go somewhere else just once in a while?

If you need a one-time ride or an occasional ride, call us as far in advance as possible. If the dispatchers can possibly work you into a trip, they will do so, even if you call on the day you need a ride.

## Where will I catch the DART bus?

When your reservation is confirmed, you will be called and told when and where the DART bus will pick you up. We'll do our very best to get you where you want to go on time.

## How will I know my bus?

There will be an alphabet sign on the right front windshield of the bus and another one on the right side of the bus near the door. You will be given the letter designation for your bus, such as "A" or "Z", by the dispatcher who confirms your trip. If a bus is at your pickup spot and your are not sure if it's your bus, JUST ASK THE DRIVER AND HE OR SHE WILL HELP YOU.

## I've heard talk about new, smaller buses. When will they start running?

We are buying twenty new Goshen buses and they will go into service as soon as we get them. Each will be lift-equipped and have sixteen seats, plus two wheel chair tie-downs. The buses will be equipped with cellular telephones and radios for easy bus-to-bus, dispatcher-to bus, or bus-to-dispatcher communications. The new buses will be equipped with surveillance cameras for the safety of riders and drivers. Until the new buses are received, the regular MATS buses that are in service today will be used for the new DART service.

## What if I'm late getting to the bus?

Since other riders will be depending on the same bus for service, we cannot wait for those who are not on time.

## What about school rides and fares?

Reservations for school trips will also be made on a first-come, first-served basis. The fare will be $1.50 for each trip. There are no longer any discounted fares for school students.

## What will the fare be on DART?

The fare will be $1.50 per trip for everyone. There will be no discounts and no transfer charges, if a transfer is needed.

## I've heard that the new fare boxes will take dollar bills. Is that true?

Yes, they will take UNFOLDED one dollar bills, but only on the new, smaller buses when they come into service. DRIVERS DO NOT CARRY CHANGE.

## Is DART going to work?

Yes! Months of hard work and careful planning have gone into this project. Obviously, the further along we are, the better the service will be. Most of the citizens of Montgomery did not have access to a city bus under the old route system. DART will make it possible for you and many, many more people to have access to public transit.

## How can I help?

Be patient. Remember, we are learning too! Give us a chance. Judge us by how well we serve you, not by what you may read or hear others say. Our employees are doing everything in their power to make this the best public transit system possible. *It is very important that DART be successful. We all have a stake in this.*

## I have other questions. Where do I get answers?

Call 262-7321 Monday through Friday from between 6:00 AM and 6:00 PM.

RECEIVED MAR 2 3 1998

Bannum, Inc.
5904 MacCorkle Avenue, SW
St. Albans, WV 25177

Cathy Bellew
Operations Manager
Office: (304) 768-6625
Fax: (304) 768-4012

March 18, 1998

Mr. Larry E. Spencer,
Community Corrections Manager
U.S. Department of Justice
Federal Bureau of Prisons
P.O. BOX 171
U.S Courthouse Room B-18
15 Lee Street
Montgomery, AL 36101

Mr. Spencer:

As per your request I am relating the results of my recent communications with the Public Bus System, DART, for our Bannum Place of Montgomery facility.

I spoke with DART administrator, Sue Pari, regarding Bannum's need for bus service. Ms. Pari has supplied the attached DART operations manual . According to the attached DART operations manual, DART currently offers public transportation for Bannum residents which adhere to SOW requirements.

Conflicts over resident transportation needs in the evening sometime develop over late appointment schedules with CAPS, the transitional service provider. Bannum has offered to provide CAPS with free, private counseling space at our Montgomery facility to alleviate resident transportation problems, but Bannum's offer was declined. Bannum has also attempted to schedule residents in transitional services during times which do not conflict with bus and work schedules, but CAPS has declined to work around resident bus and work schedules.

Residents who rely on public transportation to work, should schedule ahead with DART to make sure transportation is available.

Should you have questions regarding the above response, please contact me.

Sincerely,

Cathy Bellew, Operations Manger

BAN10350

# APPEAL TO THE BOARD OF ADJUSTMENT

## CITY OF MONTGOMERY, ALABAMA

Plat Sheet: 13671
Receipt No:
Amount:
Date: 4-20-93

File No: 93-[illegible] 101
Bldg. Pmt. No:
Date:

APPLICANT: Barnum Inc — Address: 530 Sayre St
OWNER: Charles C Spears — Address: 262-0227 Juliette Dr

This Appeal should properly come before the **Board of Adjustment** on the 6 day of May 19 93, at 2:00 PM, Council Chambers, City Hall. **The petitioner or a representative must be present to present the item to avoid delay.**

The following is an appeal to the **Board of Adjustment** for an **Administrative Review. Special Exception or variance** which shall be determined by the Board within the scope of the Zoning Ordinance as ought to be.

REMARKS: request approval of group home (half-way house) (employees - 32 bed facility non-violent parolees white collar crime) parking at rear of building lot next door grass can be used for parking

☐ **Flood Hazard District**
☐ **Development Plan Required**

**Certified Elevation** ______

**Hold Harmless Letter** Req. ☐ Sub. ☐

Rear Lot Line ( )

two doors down from 526 Sayre -532

*

Side Lot Line ( )

Front Lot Line ( )

Property Location: 540-542 Sayre St
(St., Number, Lot, Block or Legal Description)
Lot R[illegible]

In an area zoned R-60-a

Plat Restrictions (if any)

I further state that if this request is granted, I will proceed with construction in accordance with plans submitted and under the conditions as stated by the Board of Adjustment.

Juliette Owens
(Signature of Applicant)

DECISION OF **BOARD OF ADJUSTMENT**

☒ Approved ☐ Denied ☐ Delayed
☐ Confirmation

STIPULATIONS:

[signature] 
(Secretary, Board of Adjustment)

Date 5/6/93

BAN10351

04-24-98 09:50 ☎ 3342622749 BANNUM PLACE 4XA 003

THIS LICENSE EXPIRES DECEMBER 31, 1998

NOTICE
License issued subject to compliance with all pertinent city codes.

# CITY OF MONTGOMERY
MONTGOMERY, ALABAMA

# 1998

CITY OF MONTGOMERY, ALA. GREAT SEAL

## BUSINESS LICENSE

No. 10502

LICENSE VALID ONLY AT LOCATION INDICATED. NOT TRANSFERABLE

MAILING NAME AND ADDRESS
BANNUM PLACE OF MONTGOMERY
1301 SEMINOLE BLVD
SUITE 126
LARGO FL 34640

LOCAL TRADE NAME AND PHYSICAL LOCATION
BANNUM PLACE OF MONTGOMERY
540 SAYRE ST
MONTGOMERY AL 36104

THE FIRM, CORPORATION, ORGANIZATION, BUSINESS OR PERSON, WHOSE NAME APPEARS ABOVE HAS PAID THE REQUIRED LICENSE FEE AND IS AUTHORIZED TO ENGAGE IN BUSINESS IN MONTGOMERY, ALABAMA AS INDICATED BELOW.

| CODE | ACCOUNT NUMBER | LICENSE NUMBER | RECEIPT NUMBER | TYPE OF LICENSE |
|---|---|---|---|---|
| | 7391187 | 010502 | 10502 | |
| 7399 | REHABILITATION SERVICES | | | |

DATE ISSUED
02 11 1998
MONTGOMERY, ALABAMA

**MUST BE POSTED IN AREA ACCESSIBLE TO PUBLIC**

Carolyn R. Mozingo
Carolyn R. Mozingo, Revenue & License Officer

04/24/98 12:22 TX/RX NO.3398 P.003

BAN10352

**BANNUM, INC.**
1301 SEMINOLE BOULEVARD
SUITE 126
LARGO, FLORIDA 33770

DAVID LOWRY
EXECUTIVE DIRECTOR

OFFICE: (813) 588-2594
FAX: (813) 588-2689

May 6, 1998

Leah Wilson
U.S. Department of Justice
Federal Bureau of Prisons
320 First Street, NW
Washington, DC 20534

Re: RFP 200-0422-SE

Dear Ms. Wilson,

This letter is in response to your addendum concerning the above referenced RFP. The following represents our response:

1. A one-hour enclosure around the water heaters will be installed.
2. The facility will have exit signs.
3. The facility will have evacuation diagrams.
4. The facility will have emergency illumination.
5. Clear access at the exit discharge will be maintained at all times.

Please let me know if the concerns herein do not satisfactorily address your concerns.

Sincerely,

David Lowry

BAN10365

RECEIVED MAY - 9 1998

**U.S. Department of Justice**

Federal Bureau of Prisons

*Washington, DC 20534*

May 27, 1998

Mr. David A. Lowry, Executive Director
Bannum, Inc.
1301 Seminole Boulevard, Suite 126
Largo, Florida 33770

**Re: Discussions #3**
**Request For Proposals (RFP) 200-0422-SE, Montgomery, AL area**

Dear Mr. Lowry:

This letter acknowledges receipt of your response to Discussions #2 for RFP 200-0422-SE, for residential Community Corrections Center (CCC) services in the Montgomery, Alabama area.

A review of your response has been completed and the following issue is in need of further discussion.

**Technical (Facility):**

1. Provide Bannum's plan addressing all 39 lead paint "actionable" areas (cited in the May 19, Environmental Materials Consultants' survey) identified in the facility above the abatement level of 1.0MG/CM. This is a weakness.

**REMINDER:**

Valid proof of all zoning and local ordinance requirements necessary for the operation of a CCC facility must be submitted by Final Proposal Revisions (formerly known as Best and Final Offers). An offeror's failure to establish and maintain proof may result in elimination from the competitive range prior to award and termination for default following award.

**Business Proposal:**

As a result of this discussion, please submit any price, technical, or other revisions to your proposal.

Please fax your Discussions #3 response to this office at (202) 307-2780 by May 28, 1998, 2:00PM Local Time.

BAN10321

Please submit an original and four (4) copies of your Discussions #3 response to this office at Procurement and Property Branch, Community Corrections Contracting, 320 First Street, N.W., Room 5006, Washington, D.C. 20534, by June 4, 1998, 2:00PM Local Time.

Sincerely,

Leah Wilson
Contracting Officer
Community Corrections Contracting

**U.S. Department of Justice**

Federal Bureau of Prisons

*Washington, DC 20534*

June 3, 1998

Mr. David A. Lowry, Executive Director
Bannum, Inc.
1301 Seminole Boulevard, Suite 126
Largo, Florida 33770

**Re: Final Proposal Revision**
**Request For Proposals (RFP) 200-0422-SE, Montgomery, AL area**

Dear Mr. Lowry:

This letter acknowledges receipt of Bannum's response to Discussions #3 for RFP 200-0422-SE, for residential Community Corrections Center (CCC) services in the Montgomery, Alabama area.

In accordance with Federal Acquisition Regulation (FAR) Part 15.307, you are hereby notified that discussions are now concluded. You now have the opportunity to submit your Final Proposal Revision.

In addition, you are notified that we intend to conduct a background investigation of your proposed Facility Director, Vice-President, and Executive Director. Please include the full legal name, date of birth, social security number, race, and gender of your proposed Facility Director, Vice-President, and Executive Director in your Final Proposal Revision.

**In accordance with Section L of the RFP, by the submission date of Final Proposal Revisions, offerors shall provide to the Contracting Officer valid proof of all zoning and local ordinance requirements necessary for the operation of a CCC. An offeror's failure to establish and maintain proof may result in elimination from the competitive range prior to award and termination for default following award.**

**Bannum will need to submit more detailed zoning documentation in addition to the Appeal to the Board of Adjustment, dated April 20, 1993 which Bannum submitted with its proposal. This signed Appeal does not definitively state that it serves as approval for zoning. Submit any and all additional supporting**

**zoning documentation which Bannum received from the City of Montgomery (ie, Certificate of Zoning, Certificate of Building Occupancy, Building Permit/License to operate the CCC, etc.).**

Your Final Proposal Revision must indicate that it is valid for 180 days from the date it is signed.

Following evaluation of Final Proposal Revisions and background investigations, we will select the contractor whose offer is most advantageous to the Government.

**Please fax your Final Proposal Revision to this office at (202) 307-2780 by June 5, 1998, 2:00PM Local Time.**

Then submit the original and four (4) copies of your Final Proposal Revision to this office at Procurement and Property Branch, Community Corrections Contracting, 320 First Street, N.W., Room 5006, Washington, DC 20534, by June 12, 1998, 2:00PM Local Time.

After receipt of your Final Proposal Revision on June 5, negotiations will be concluded. Please be advised that if any modification to your offer is submitted, it must be received by June 5, 2:00PM Local Time, and is subject to FAR Part 15.208, Submission, Modification, Revision, and Withdrawal of Proposals.

If you have any questions, please call me at (202) 307-3069.

Sincerely,

Leah Wilson
Contracting Officer
Community Corrections Contracting

BAN10380

U.S. Department of Justice

Federal Bureau of Prisons

*Washington, DC 20534*

June 17, 1998

RECEIVED ... 2 1998

Mr. David A. Lowry, Executive Director
Bannum, Inc.
1301 Seminole Boulevard, Suite 126
Largo, Florida 33770

Re: Request For Proposals (RFP) 200-0422-SE, Montgomery, AL area

Dear Mr. Lowry:

Discussion is required on a remaining issue. Therefore, it has been determined to be in the best interest of the Government to reopen discussions for the following issue.

Technical (Facility):

1. Based on the Preliminary Site Inspection conducted on March 19, 1998, the proposed facility lacks provisions to meet the American National Standards Institute, ANSI-A117.1-1986, Specifications for Making Buildings Accessible to, and Usable by, the Physically Handicapped. At present, the facility has no features to service the handicapped. Modifications and a plan of action must be proposed indicating what Bannum will do to achieve this and the time-frames for completion.

   Bannum's contingency plan of placing physically handicapped inmates on home confinement is not acceptable.

Please fax your response to this office at (202) 307-2780 by June 18, 1998, 2:00PM Local Time.

Then submit the original and four (4) copies of your response to this office at Procurement and Property Branch, Community Corrections Contracting, 320 First Street, NW, Room 5006, Washington, DC 20534, by June 25, 1998, 2:00PM Local Time.

If you have any questions, please call me at (202) 307-3069.

BAN10326

Sincerely,

Leah Wilson
Contracting Officer
Community Corrections Contracting

**U.S. Department of Justice**

Federal Bureau of Prisons

*Washington, DC 20534*

June 25, 1998

Mr. David A. Lowry, Executive Director
Bannum, Inc.
1301 Seminole Boulevard, Suite 126
Largo, Florida 33770

**Re: Final Proposal Revision**
**Request For Proposals (RFP) 200-0422-SE, Montgomery, AL area**

Dear Mr. Lowry:

This letter acknowledges receipt of Bannum's responses to the reopened Discussions regarding the facility's handicapped accessibility for RFP 200-0422-SE, for residential Community Corrections Center (CCC) services in the Montgomery, Alabama area.

In accordance with Federal Acquisition Regulation (FAR) Part 15.307, you are hereby notified that discussions are now concluded. You now have the opportunity to submit your Final Proposal Revision.

Because Bannum has already submitted its background investigation information for its Facility Director, Vice-President, and Executive Director, Bannum will not be required to submit this again.

Your Final Proposal Revision must indicate that it is valid for 180 days from the date it is signed.

Following evaluation of Final Proposal Revisions and background investigations, we will select the contractor whose offer is most advantageous to the Government.

**Please fax your Final Proposal Revision to this office at (202) 307-2780 by June 26, 1998, 2:00PM Local Time.**

Then submit the original and four (4) copies of your Final Proposal Revision to this office at Procurement and Property Branch, Community Corrections Contracting, 320 First Street, N.W., Room 5006, Washington, DC 20534, by June 29, 1998, 2:00PM Local Time.

Please be advised that if any revision to your offer is submitted, it must be received by June 26, 2:00PM Local Time, and is subject to FAR Part 52.215-1(c), Instructions to Offerors-Competitive Acquisition.

If you have any questions, please call me at (202) 307-3069.

Sincerely,

Leah Wilson
Contracting Officer
Community Corrections Contracting

09/3( /9) WED 16:12 FAX 202 307 2780 Comm. Corr. Contracting 001

OPTIONAL FORM 99 (7-90)

**FAX TRANSMITTAL** # of pages ▶ 1

| | |
|---|---|
| To David A. Lowry | From A.H. Bigesby |
| Dept./Agency Bannum, Inc. | Phone # 202/307-0093 |
| Fax # 313/588-2689 | Fax # 202/307-2780 |

NSN 7540-01-317-7368 5099-101 GENERAL SERVICES ADMINISTRATION

**U.S. Department of Justice**

Federal Bureau of Prisons

*Washington, DC 20534*

**NOTICE TO PROCEED**

**CONTRACTOR:** Bannum, Inc.
1301 Seminole Blvd., Suite 126
Largo, Florida 33770

**CONTRACT NUMBER:** J200c-397

**LOCATIONS:** 540 Sayre Street
Montgomery, Alabama 36104

**EFFECTIVE PERFORMANCE DATE:** October 1, 1998

**DESCRIPTION OF SERVICES:** Provide Residential Community Corrections Center (CCC) services for male and female Federal offenders held under authority of various United States statutes in the area of Montgomery, Alabama. Services are to be provided in accordance with the "Community Corrections Center" Statement of Work, dated December 1992 (latest revision, July 1997), and all subsequent revisions in effect at time of award, and the Contractor's written proposal as identified in Contract Number J200c-397.

Please consider this to be your formal Notice to Proceed. Acknowledge receipt by signing below and returning to:

Leah Wilson, Contracting Officer
United States Department of Justice
Federal Bureau of Prisons
500 First Street, N.W., Room 600
Washington, DC 20534
Attn: CCC Contracting

Contractor — 9-30-98 Date

Contracting Officer — 09/30/98 Date

BAN10774

**U.S. Department of Justice**

Federal Bureau of Prisons

*Community Corrections Office*

*P.O. Box 171*
*U.S. Courthouse Room B-18*
*15 Lee Street*
*Montgomery, AL 36101*

February 1, 1999

Mr. David Lowry, Executive Director
Bannum, Incorporated
1301 Seminole Boulevard, Suite 126
Largo, FL 33770

RE: Full Monitoring--Bannum of Montgomery, Contract #J200c397

Dear Mr. Lowry:

The purpose of this letter is to notify of the results of the full monitoring conducted at your Bannum Place of Montgomery, Alabama, facility in January 1999.

I have attached a copy of the full monitoring report for your review and corrective actions.

In closing, please relay to Director Davis and her staff my appreciation for their assistance and cooperation during the monitoring. Please respond to this report within 10 days of receipt of this correspondence. Should you have any questions, please contact me.

Sincerely,

Larry E. Spencer

Larry E. Spencer
Community Corrections Manager

cc: Ms. Juliette Davis, Director, Bannum Place of Montgomery, AL
Cheryl Dennings, CCRA, SERO, Atlanta, GA
Donna Zickefoose, MCA, Atlanta, GA
Contracting Officer via Community Corrections Branch

BAN10818

# FULL MONITORING REPORT

# FOR

# BANNUM PLACE OF MONTGOMERY

## JANUARY 1999

## SCOPE OF THE MONITORING

This full monitoring was conducted to determine the level of compliance with the terms of contract number J200c-397, Bannum Place of Montgomery, Alabama, Community Corrections Center.

The monitoring was performed by Larry Spencer, Community Corrections Manager on the following dates and times:

January 6, 1999 - 11:40 a.m. to 3:05 p.m.
January 7, 1999 - 12:50 p.m. to 3:47 p.m.
January 8, 1999 - 9:55 a.m. to 5:15 p.m.
January 11, 1999 -10:28 a.m. to 2:50 p.m.

This was the initial full monitoring of this contract and was a comprehensive review of all areas of the center's operations. The monitoring also served as the preliminary occupancy inspection for this contract.

## BACKGROUND INFORMATION

Contract J200c-397 was awarded to Bannum, Inc., on June 30, 1998, with an effective date of October 1, 1998. This contract is due to expire on September 30, 2003.

## FINDINGS

All discrepancies observed during the preliminary site inspection had been corrected. During the monitoring, some areas of concern were noted and are cited as the following findings:

**Finding #1 - Life Safety**

The emergency lights for the stairway leading to the front entrance and in the hallway of the second floor failed to illuminate in the battery back-up mode.

Corrective Action: Repair or replace the emergency lighting. Immediate corrective action is required. Also, please provide a written response within 10 days receipt of this report.

**Finding #2 - Facility (Transportation)**

The City of Montgomery's public transportation system, Demand And Response Transit (DART) has proven to an unreliable and ineffective means of transportation for the residents at the center. The system operates only from 6:00 a.m to 6:00 p.m. in limited areas. This creates problems for residents by restricting their employment opportunities and participation in off site program related activities..

Corrective Action: It is the contractor's responsibility to provide the residents free transportation for employment or program participation when there is an absence of public transportation within one mile of the facility (SOW, Chapter 3, Section A). Corrective action shall be implemented immediately and a written response provided within 10 days of receipt of this report.

**COMMENTS**

On the first day of the monitoring, the total count at the center was 26. Of these, 25 residents were in the custody of the Bureau of Prisons and one was under the supervision of the United States Probation Office. Two residents were participating in the Home Confinement Program.

Sanitation at the facility was considered good. The residents' living quarters and common areas were clean and well organized. The exterior grounds of the facility were well maintained. However, a general observation was that the facility's interior walls were dirty and marked. Also, in several areas the paint was peeling from the walls. The contractor must address these concerns soon, before they are cited as compliance issues.

The center's fire alarm/smoke detection system was last inspected on September 28, 1998. The facility was last inspected by the City of Montgomery's Fire Marshals Office on December 16, 1998. Staff are conducting mock emergency fire evacuation drills monthly, with the last being conducted at 5:45 p.m., on December 29, 1998.

The residents' case files were well organized and contained the required information. These files are kept in a locked fireproof cabinet in the director's office. Access to the files is limited to authorized personnel only. Program plans and reviews were well written and comprehensive.

The center provides for residents meals through Liz Home Cooking, a local caterer. The meals were prepared according to the posted menu and appeared nutritious. The caterer has a valid license issued by the City of Montgomery, Alabama. The caterer was last inspected by the Alabama Department of Public Health on December 8, 1998, obtaining a satisfactory rating.

One resident was not employed. This resident had recently arrived at the center and was actively seeking employment.

## COMMENDATIONS

Director Davis and her staff continue to have an excellent relationship with the United States Probation Office. USPO Sandra Woods relayed the center provides a valuable resource to her agency.

This contractor does an excellent job of obtaining community support through the use of local volunteers, student interns and community activists in many of their programs.

This contractor is fortunate to have highly skilled staff in the field of corrections. Key staff have advanced degrees in the fields of juvenile and adult corrections. This contractor is also fortunate in that the staff retention for key positions is very stable. This stability of leadership is the major contributing factor to the consistent high standards displayed at this center.

The contractor does an exceptional job of submitting accurate bills and collecting subsistence.

I appreciate the level of cooperation and hospitality extended to me during the monitoring process and await your response to the findings referenced above within **10 days of receipt** of this correspondence.

Prepared by:
Larry E. Spencer

Larry E. Spencer
CCM
Date: 2-3-99

BANNUM, INC.
5904 MacCorkle Ave. SW
St. Albans, WV 25177
Phone 304- 768-6625
Fax 304- 768-6467

Cathy Bellew, Operations Director

February 16, 1999

Mr. Larry Spencer
Community Correction Manager
Federal Bureau of Prisons
PO Box 171
15 Lee Street
Montgomery, AL 36101

Re: Full Monitoring
Bannum Place of Montgomery

Dear Mr. Spencer:

A full monitoring report dated February 1, 1999, for Bannum Place of gives the following response to issues addressed in this report.

Finding #1- The emergency lights for the stairway leading to the front entrance and in the hallway of the second floor have been repaired.

Finding #2- Bannum has re-verified that Demand and Response Transit (DART) provides public transportation for Bannum Place of Montgomery residents. Residents only need to make application for transportation pick-up and a DART driver will begin transporting the residents from Bannum to his/her local work area. The Statement of Work requirement is being met in that public transportation is within one mile of our facility and Bannum does pay for transportation for indigent residents while seeking employment at no cost to the resident should the resident request transportation assistance. Once a resident becomes employed the responsibility of transportation means and cost is that of the residents. With twenty-six (26) residents at this facility and only one (1) unemployed (a new arrival) there seems to be no lack of transportation for residents to and from their jobs.

Should you have further questions regarding Bannum's response to this report, please contact me.

Sincerely,

Cathy Bellew

Cathy Bellew, Operations Director

cc: Bannum Place of Montgomery
cc: Bannum, Inc.
cc: File

**U.S. Department of Justice**

Federal Bureau of Prisons

*Community Corrections Office*

*P.O. Box 171*
*U.S. Courthouse Room B-18*
*15 Lee Street*
*Montgomery, AL 36101*

March 12, 1999

Mr. David Lowry, Executive Director
Bannum, Incorporated
1301 Seminole Boulevard, Suite 126
Largo, FL 33770

Received 3-15-99

Re: Bannum Place of Montgomery
Contract No. J200c397

Dear Mr. Lowry:

Please be advised we have received your response to the full monitoring conducted at the above referenced facility January 6-11, 1999.

Since the corrective action noted in your correspondence is considered to satisfactorily resolve the Finding which was identified related to the emergency lighting, we can close that particular finding. However, there is strong evidence that the situation with the local bus service is not in accordance with the provisions of the Statement of Work. We do not believe the bus service is consistently available for the inmates in the Bannum of Montgomery facility, as you have advised us. Please advise us of your intentions with respect to the transportation of inmates at this facility, as the bus service does not appear to be a satisfactory solution. Please see the attached articles from the Montgomery Advertiser.

We request you respond to this issue within 15 days of the receipt of this letter. Let us take this opportunity to thank you for your continued cooperation and assistance.

Sincerely,

Larry E. Spencer

Larry E. Spencer
Community Corrections Manager

cc: Cheryl Dennings, CCRA, SERO
Donna Zickefoose, MCA, Atlanta, GA
Community Corrections & Detention Div., Washington, DC
Contracting Officer, Washington, DC

BAN10863

# City must be more receptive to new bus service ideas

daily 1/99 By Jon Broadway



Alabama **Voices**

Montgomery's public bus ystem is a failure. This was iot always the case.

In 1993, ridership peaked at ,500 persons per day, moving rom all sectors of our city hrough the center to jobs, iospitals and shopping. That ear, Montgomery's system was rated the most efficient n the United States by a naionwide study conducted by he University of North Caroina at Charlotte.

What happened between then and now? In April 1994, when the primary bus transfer station was relocated from the center of the downtown area to a newly constructed transfer station on Fairview Avenue, ridership began to nose-dive. This decline was further accelerated as fixed-route buses were eliminated in September 1997 following a decision from the city — with little citizen input — to establish a dial-a-ride system called Demand and Response Transit (DART).

Riders, confronting a host of problems that the new system presented, stayed away in droves and ridership plunged to a paltry 200 persons per day in December 1997. The most recent reported estimate of utilization has rebounded somewhat, but to only 800 riders per day. Therefore, present ridership is barely 25 percent of 1993 ridership.

Most of us have easy access to private cars and cannot see the problem from our position of comfort. Most of us cannot see transportation needs through the eyes of a young mother awaking with a child who needs to get to the doctor, calling for a ride only to be told that maybe in a few days or a week a bus will become available. The stress and frustration of such a situation is far outside the range of most of our imaginations.

Furthermore, the victims of these difficulties are not those we typically listen to. Most are poor, many are old, and all are forgotten; they represent the excess baggage of a society in an air-conditioned sport utility vehicle headed in another, opposite direction.

We must learn from our experiences and especially those of other successful transportation systems. We should learn from cities that have successfully woven public transportation systems into the center fabric of city life, not trimmed it as unnecessary residue.

We need city leadership that recognizes that, next to good public education, adequate public transportation is of keen interest to industries that can fuel our economic growth. We should all recognize that when despondent young men and women are isolated in public housing and cannot get to work, and when children miss the enrichment of the zoo or the Shakespeare Festival, the whole city suffers from the crime, the despair and the loss of tax revenue.

Montgomery should follow the leadership of Birmingham by taking the necessary step of establishing a citywide board for transportation policy. This board should be composed of community leaders who recognize the essential role of public transportation; representatives from job training programs, reading programs, hospitals, state employees and city planners should be included.

Our three-person transportation committee, appointed by the City Council in January 1997, has held only one public meeting — in March 1997 — has made no recommendations and has set no policy for our city. As a result, the hoped-for success of this committee as expressed editorially by the *Montgomery Advertiser* early in 1997 has never been realized.

The Montgomery Transportation Coalition Inc. requested in a letter Dec. 15, 1998, that the city consider a plan to leverage community financial support for a limited fixed-route system in the areas of greatest need in our city. Aggressive public relations information to make known the $65 per employee tax benefit that is available now to both employers and employees could move Montgomery toward a system similar to that successfully used in the Robertsdale area and in other states such as North Carolina.

To date, we heard every excuse imaginable to avoid even meeting to discuss our proposal. A proud Capital City must reach out to greatness and beyond the politics of division and exclusion. As we move into the new millennium, let's welcome the challenges before our citizens and work together as never before.

*Jon Broadway is secretary-treasurer of the Montgomery Transportation Coalition Inc.*

BAN10864

Montgomery Advertiser

SINCE 1829

SUNDAY
Feb. 7, 1999
awker edition
$1.50

# City's bus system isn't serving the ones who need

By Barbara Harris

Alabama Voices

When will our city officials realize that the current public transportation system is not working for the masses? In 1993, Montgomery's system was rated the most efficient in the United States by a nationwide study conducted by University of North Carolina at Charlotte when approximately 3,500 persons were riding the buses each day.

In 1998 approximately 750 persons used the system each day. The population has not decreased. What has happened?

There are many individuals who need the bus service for various reasons. The main reason is a means of getting to and from work each day at an affordable cost.

What will it take to make our city officials decide to do something about Montgomery's woefully inadequate public transportation service? What we have is embarrassing and sad. The individuals who need the services the most are the most neglected. Many of the citizens are required to use this mode of transportation to get to and from work and other necessary destinations, but what is now available is not working.

Most of us have easy access to private cars and cannot see the problem from our position of comfort. There are many citizens who want to work and have no access to a private car or taxi fare to go to their jobs, yet they can't depend on the public transportation for numerous reasons.

Many of our elderly residents no longer are able to drive but they, too, can't afford taxi fares. They would like to go to the malls, shopping centers, etc., however, to do this, they would have to make reservations in advance, and even then, they would have no guarantee that the bus would return to pick them up.

If I woke up one morning ill and needed to see my doctor that day, what would I do? I would call my doctor that morning and make an appointment for the same day. At the appropriate time I would either get in my car and drive to the doctor or have someone drive me there.

This is not the case with many of our residents. If you call DART for same-day service, you are not likely to get it. Yet, no one knows in advance of every illness or other emergency that will require transportation right then or the same day.

What happens when your child is ill and you can't wait until the next day to get bus service to the doctor and you don't have the money for a taxi? There are many who don't have private transportation and can't afford taxi fare. DART simply does not adequately meet the transportation needs of such people.

The leadership of Montgomery needs to take a long, hard look at methods to improve the bus transportation service. Why not ask the citizens to make suggestions through an organized system/committee?

We don't need a committee just on paper, nor just a committee. We need a committee that is interested in assisting the citizens who need bus service, one that will sit down with people who ride the bus and hear what their problems are. The problems are numerous anr and disgusting th problems are not addressed by thos tion to deal with t transportation ne working people ai who can no longe would like to be i simply are not bei

Surely in a city Montgomery, with resources, human there are enough are smart enough, ing, to form a tean a more efficient pu portation system t serve the needs of zens than what we

*Barbara Harris gomery is retired fro. University. She reve as a community repr on the Advertiser's board.*

JUN-16-99 08:35 AM BARNUM... P. 01/02
JUN-16-99 WED 08:03 AM

***UNITED STATES GOVERNMENT***
MEMORANDUM
***BUREAU OF PRISONS***
***SOUTHEAST REGIONAL OFFICE***
***ATLANTA, GEORGIA***

DATE: June 15, 1999

REPLY TO ATTN OF: Hector Ledezma
Regional Transitional Drug Abuse Treatment Manager, and

D. Zickefoose
Donna Zickefoose, MCA
Atlanta, GA.

SUBJECT: Transportation issues and Clinical notes

TO: Ms. Juliette Davis, CCC Director
Barnum Place - Montgomery

I first want to thank you and your staff for scheduling time to meet with Ms. Karen Bredesen during her monitoring of the Chemical Addictions Program this past week.

There are two issues that surfaced during her monitoring that I want to resolve with you. The first issue is of transportation, which we have discussed in the past. Upon conferring with the Management Center Administrator, Donna Zickefoose, the issue of transportation falls upon your agency based on the Statement of Work in which your agency agreed to provide transportation for the residents. Thus, the residents should not be experiencing transportation problems getting to and from sessions.

Second, Chemical Addictions Program has been forwarding you a copy of the inmates monthly treatment progress report. This information is confidential and we are not allowed to share this information unless there is a need to know (i.e. suicidal/homicidal, problematic behaviors, other mental health issues, etc.). Therefore, Karen has instructed Chemical Addictions Program to continue to forward you a copy of the sign in/out

BAN10901

sheet for accountability purposes and to not send any clinical information forthwith.

If you should have any questions, please feel free to contact me at 404-635-5677. Thank you for your assistance in this matter

cc: Larry Spencer, CCM
Gerald White, Director, Chemical Addictions Program

**U.S. Department of Justice**

Federal Bureau of Prisons

*Community Corrections Management Center*

*715 McDonough Boulevard S.E.*
*Atlanta, Georgia 30315*

June 16, 1999

Mr. David Lowry, Executive Director
Bannum Incorporated
1301 Seminole Boulevard
Suite 126
Largo, Florida 33770

received
6-18-99

RE: Interim Monitoring
Bannum Place of Montgomery
Contract #J200c-397

Dear Mr. Lowry:

The purpose of this letter is to notify you of the results of the interim monitoring conducted in March 1999, at the Community Corrections Center, located in Montgomery, Alabama.

This is a reconstructed interim monitoring report. I did not personally observe the information contained in this report. I have attached a copy of the interim monitoring report for your review and corrective actions.

Sincerely,

for D. Zickefoose

Larry E. Spencer
Community Corrections Specialist

cc: Ms. Juliette Davis, Director, Bannum Place of Montgomery
Cheryl Dennings, CCRA, SERO
Donna Zickefoose, MCA-Atlanta
Contracting Office, Community Corrections Branch

BAN10842

INTERIM MONITORING REPORT

FOR

BANNUM PLACE OF MONTGOMERY

MARCH 1999

SCOPE OF THE MONITORING

This interim monitoring was conducted to determine the level of compliance with the terms of contract number J200c397, Bannum Place of Montgomery, Alabama, Community Corrections Center.

The monitoring was performed by Deborah Perry, former Contract Oversight Specialist on March 30-31, 1999.

The monitoring included an inspection of the physical plant following a full monitoring conducted in January 1999.

BACKGROUND INFORMATION

There have been no structural changes to the facility since the last monitoring which was conducted in January 1999. The facility's population at the time of the monitoring was 23 in-house residents and 2 individuals on home confinement. Of the 23 residents in-house residents, five community confinement/supervision case; one was pre-trial with the remaining 17 individuals being institutional transfers.

FINDINGS

There were two findings identified as a result of this interim monitoring. Supporting evidence for all concerns are contained in the working papers which are maintained in the CCM office and have been addressed with Juliette Davis, Director, Bannum Place of Montgomery.

Finding #1 - Programming

Unable to provide gainful employment opportunties for the residents due to limited number of jobs available in walking distance of facility. (Chapter 10, Section E, SOW)

Corrective Action: It is the contractor's responsibility to provide the residents free transporation for employment or program participation when there is an absence of public transportation within one mile of the facility (SOW, Chapter 3, Section A). Inaddition, the contractor should develop meaningful resident employment opportunties. Meaningful employment means the matching of jobs to resident needs, aptitudes, desires, and capabilities (SOW, Chapter 10, Section E-1).

Finding #2 - Facility - REPEAT FINDING

The City of Montgomery's public transportation system, Demand And Response Transit (DART) has proven to be an unreliable and ineffective means of transportation for the residents at the center (see attached news article). The system operates only from 6:00 a.m. to 6:00 p.m. in limited areas. This creates problems for residents by restricting their employment employment opportunties and participation in off site program related activities.

Correction Action: It is the contractor's responsibilty to provide the residents free transportation for employment or program participation when there is an absence of public transportation within one mile of the facility (SOW, Chapter 3, Section A). Corrective action shall be implemented immediatley and a written response provided within 10 days of receipt of this report.

I appreciate the level of cooperation and hospitality extended to me during the monitoring process and await your response to the findings referenced above within 10 days of receipt of this correspondence.

Prepared by:

Larry E. Spencer
CCS
Date:

**U. S. Department of Justice**

Federal Bureau of Prisons

*Southeast Regional Office*

*Building 2000*
*3800 Camp Creek Parkway, S.W.*
*Atlanta, Georgia 30331-6226*

June 21, 1999

Received
6-24-99

Mr. David Lowry, Executive Director
Bannum Incorporated
1301 Seminole Boulevard, Suite 126
Largo, Florida 33770

RE: Interim Monitoring
Bannum Place of Montgomery
Contract #J200c-397

Dear Mr. Lowry:

The purpose of this letter is to notify you of the results of the interim monitoring conducted in March 1999, at the Community Corrections Center, located in Montgomery, Alabama.

This is a reconstructed interim monitoring report. I did not personally observe the information contained in this report. I have attached a copy of the interim monitoring report for your review and correction action.

Sincerely,

Larry E. Spencer, Community Corrections Manager
Montgomery Community Corrections Office

cc: Ms. Juliette Davis, Director, Bannum Place of Montgomery
Cheryl R. Dennings, CCRA
Donna Zickefoose, MCA, Atlanta
Contracting Office, Community Corrections Branch, Central Office

BAN10845

Interim Monitoring Report

For

**Bannum Place Of Montgomery**

March 1999

## Scope of the Monitoring

This interim monitoring report was conducted to determine the level of compliance with the terms of contract number J200c-397, Bannum Place of Montgomery, Alabama, Community Corrections Center.

The monitoring was performed by Deborah Perry, former Contract Oversight Specialist on March 30-31, 1999.

The monitoring included an inspection of the physical plant following a full monitoring conducted in January 1999.

## Background Information

There have been no structural changes to the facility since the last monitoring which was conducted in January 1999. The facility's population at the time of the monitoring was 23 in-house residents and 2 individuals on home confinement. Of the 23 in-house residents, 5 were community confinement/supervision cases, 1 was pretrial and the 17 remaining individuals were institutional transfers.

## Findings

There were two findings identified as a result of this interim monitoring. Supporting evidence for all concerns are contained in the working papers which are maintained in the Montgomery Community Corrections Office and have been addressed with Juliette Davis, Director, Bannum Place of Montgomery.

### Finding # 1 - Programming

Unable to provide gainful employment opportunities for the residents due to a limited number of jobs available within walking distance of the facility. (Chapter 10, Section E, SOW)

Corrective Action: It is contractor's responsibility to provide the residents free transportation for employment or program participation when there is an absence of public transportation within one mile of the facility. (Chapter 3, Section A, SOW) In addition, the contractor should develop meaningful resident employment opportunities. Meaningful employment means the matching of jobs to residents needs, aptitudes, desires and capabilities. (Chapter 10, Section E-1, SOW)

**Finding # 2 - Facility (Repeat Finding)**

The City of Montgomery's public transportation system, Demand and Response Transit (DART) has proven to be an unreliable and ineffective means of transporation for the residents at the center. (See attached news article) The system operates only from 6:00 a.m. to 6:00 p.m. in limited areas. This creates problems for residents by restricting their employment opportunities and participation in off-site program related activities.

Corrective Action: It is the contractor's responsibility to provide the residents free transportation for employment or program participation when there is an absence of public transportation within one mile of the facility. (Chapter 3, Section A, SOW)

Corrective action shall be implemented immediately and a written response provided within 10 days of receipt of this report. I appreciate the level of cooperation and hospitality extended to me during the monitoring process and await your response to the findings referenced above.

Prepared by:

Larry E. Spencer
Community Corrections Manager
Date:

**U.S. Department of Justice**

Federal Bureau of Prisons

*Community Corrections Management Center*

*715 McDonough Boulevard S.E.*
*Atlanta, Georgia 30315*

June 25, 1999

Received
7-1-99

Mr. David Lowry, Executive Director
Bannum Incorporated
1301 Seminole Boulevard
Suite 126
Largo, Florida 33770

RE: Interim Monitoring/Bannum of Montgomery
Contract # J200c-397

Dear Mr. Lowry:

The purpose of this correspondence is to notify you of the results of the interim monitoring conducted at the Bannum Place, located in Montgomery, Alabama. The monitoring was conducted June 22-23, 1999.

I have attached a copy of the monitoring report for your review. There were four findings which will require corrective action and a written response. The written response should be submitted to this office no later than 30 days from the receipt of this correspondence.

In closing, please relay to Mrs. Davis and her staff my appreciation for their cooperation and assistance during the monitoring. The staff should be commended for their professionalism and willingness to work as a team. Should you have questions or concerns regarding the report, please contact me at (404)635-5680.

Sincerely,

D. Zickefoose

Donna Zickefoose
Management Center Administrator

cc: Cheryl Dennings, CCRA/SERO
Contracting Officer, Community Corrections Branch/CO
Contract File, Montgomery CCO
Ms. Juliette Davis, Director, Bannum Place Montgomery

## INTERIM MONITORING REPORT

**Bannum place of Montgomery**
**540 Sayre Street**
**Montgomery, Alabama 36104**

**Contract Number: J200c-397**

## BACKGROUND INFORMATION

This monitoring was conducted under the terms of contract J200c-397 for performance to begin on June 30, 1998, to the incumbent contractor, Bannum Incorporated. The monitoring was conducted to determine the level of compliance with the terms of the 1992 Bureau of Prisons Statement of Work (SOW) and the technical proposal from Bannum Incorporated.

The facility is located in a residential section of Montgomery and is comprised of three floors. The contract is for 26 beds (male & female). At the time of the monitoring, the facility's population consisted of 33 in-house residents and 1 home confinement case. The in-house population breakdown was as follows: 26 Institution Transfers, 3 Direct Court Commitments, and 4 Supervision cases.

## SCOPE OF THE MONITORING

The monitoring was conducted by Donna Zickefoose, Management Center Administrator (MCA), and Helen Ramsdell, Community Corrections Trainee, on the following dates and times: Monday, June 21, 1999, from 1:20 PM - 6:00 PM and Tuesday, June 22, 1999, from10:20 AM - 4:20 PM.

The monitoring consisted of fingerprinting all necessary staff, a walk through inspection of the physical facility, resident interviews, review of case files and select operational and program documents. A fire drill was conducted and previous monitoring reports were reviewed to ensure corrective action with regard to previously identified deficiencies. The only deficiency from the last monitoring not resolved was the transportation issue. The is currently being discussed with the Central Office Contracting Officer and the Contractor.

## REPEAT FINDINGS

There were no repeat findings. There is one issue which is currently being resolved with Central Office and the Contractor (transportation).

## OTHER FINDINGS AND CORRECTIVE ACTION REQUIRED

**Finding #1 - Facility/Life Safety**

**Chapters 4 & 5 of the 1992 SOW identify life safety and sanitation requirements. Specifically, the facility shall comply with all local, state, and national health, safety, environmental, and building codes. Portable fire extinguishers shall be inspected at least quarterly by a trained person. Electric and battery powered emergency light units shall be provided in all buildings to provide continuous lighting. The contractor shall ensure the facility and surrounding area is kept clean and in good repair at all times.**

The following areas are in need of corrective action:

1. Warning signs/notices at front entrance are cracked and torn. They need to be replaced.

2. The inside of the entrance doors need to be painted.

3. Entrance floor day room - The lower corner of the paneling on the telephone wall is damaged and needs to be replaced/repaired.

4. The paint in the bathroom, off room 540G, is cracking and peeling. It needs to be scraped and painted.

5. Female bathroom/shower area - Several ceiling tiles have sustained water damaged and need to be replaced. The non-functioning shower needs to be repaired, and the shower head of the functioning shower needs to be stabilized.

6. The light in the storage closet which contains the cleaning supplies requires a cover.

7. The threshold of the doorway, leading to the storage area off the laundry room, needs to be stabilized.

8. The light in the hot water heater room requires a cover.

9. There are ceiling tiles missing in the sprinkler system room which need to be replaced.

10. Front stairwell, second floor entrance area - The emergency light did not function in the back-up power mode and the door does not properly close. Both items are in need of repair or replacement.

11. The cracked and water damaged ceiling in the female dorm needs to be repaired.

12. Two fire extinguishers did not have the quarterly (April 1999) inspection documented on the inspection cards. The vendor will need to document the inspections. The fire extinguishers are

located in the second floor entrance area, of the front stairwell, and room 540A.

13. The window which was taken out/sealed off in Ms. Means' office needs to be re-caulked.

14. Room 540D - The water damaged ceiling needs to be repaired and the loose molding near the ceiling needs to be re-tacked.

15. Room 540C - The water damaged ceiling needs to be repaired.

16. Room 540B - The door frame, of the door leading to the sealed off bathroom, needs to be scraped and painted.

17. Area surrounding electrical box "D" in upstairs hallway, must be repaired and sealed.

18. All holes around the sprinkler system pipes, air duct work, and any holes in the ceilings or walls inside the facility need to be sealed/filled.

19. The roof currently leaks during rainy weather causing water damage to various rooms in the facility. The roof needs to be repaired to prevent further damage.

20. The gutters lining the roof are full of cracks and holes. As a result, the gutters fail to hold and properly drain the water. The wood trim around the roof line has visibly rotted. The paint on the trim and gutters is peeling. The vents located in the trim "over hang" on the left side of the building are torn. The gutters, rotten wood, and vents should be replaced/repaired and painted.

21. The first gutter running up/down on the right side of the house no longer extends to the extension gutter. This needs to be repaired.

22. The electrical box located on the back, left side of the facility is missing it's cover. The exposed wires must be covered.

23. New gas lines were "ran" into the facility. However, the old gas pipes were still present and hanging out of the lower vent on the left side of the house. The old pipes should be discarded and the vent where the gas line enters the facility needs to replaced or repaired.

**Corrective Action:** The above items need to be repaired, replaced, or a documented "time line" of when the repairs will be completed should be submitted to this office within 30 days of receiving this report.

**Finding # 2 - Toxic, Caustic, and Flammable Materials**

**Chapter 7, page 26, states the contractor must establish a written program for the storage, issuance, handling, and accountability of flammable liquids, hazardous chemicals, toxic, and caustic materials used within the facility. Inventory cards or an approved method of accountability must be maintained on all toxic, caustic, and flammable materials.**

No inventory cards or method of accountability was currently in use for the facility's chemicals (i.e. Clorox, Pinesol, etc.).

**Corrective Action:** The facility will need to obtain or create inventory sheets/cards for all toxic, caustic and flammable material in use at the facility and ensure staff add new supplies and deduct used supplies from the inventory forms. This process should be implemented within 30 days of receiving this report.

**Finding # 3 - File Records**

**Chapter 14, page 69, of the SOW states the contractor shall perform an audit of case records on at least a quarterly basis.**

Although staff indicated monthly audits were previously being conducted by center staff, there was no documentation to indicate that monthly or quarterly file audits are currently being conducted.

**Corrective Action:** A program should immediately be implemented to ensure that quarterly file audits are being conducted.

**Finding # 4 - Medical/Physical Exams**

**Chapter 13, page 68, of the SOW states that all offenders admitted directly to the center (excluding those from federal institutions) will have a routine physical examination completed within 5 working days of arrival at the facility.**

During the review of resident files, one direct court commitment file and one supervision file were reviewed. One contained no documentation that a physical had been conducted and the other reflected the examination did not occur within 5 working days of his arrival at the facility.

**Corrective Action:** Staff need to ensure that physicals are being scheduled for direct commits within 5 working days of the residents arrival. If the doctor can not see the inmate within 5 working days of his/her arrival, file notations should indicate when staff attempted to make the appointment and the reason for the delay. After the physical is conducted, staff must ensure appropriate documentation is placed in the inmate's file.

## RECOMMENDATIONS

**Recommendation # 1** - Staff need to ensure that all intake forms are signed by the Facility Director and resident, and that all Pass Request and Approval forms are signed by the Facility Director.

**Recommendation # 2** - Keep one original set of fingerprints in the CCC file instead of a paper copy. Additionally, staff taking fingerprints must be sure to sign the back of the fingerprint cards