JUN 13 2000 10:00 FR TO 95882689 P.01/01

Acordia

America's Local Insurance Broker

June 13, 2000

David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste.126
Largo, FL 33770

RE: CONVEYANCE CONSULTING SERVICES LLC

Dear Mr.Lowry:

Following is a premium "indication" only for Excess Auto Liability Coverage. The intent of this coverage is to provide Conveyance Consulting Services LLC with protection over and above Liability Limits carried by contracted taxi companies.

$1,000,000 Excess Auto Liability

$3,500.00 - Annual Premium
211.83 - Taxes & Fees
$3,711.83 - Total Annual Premium "Indication"

$4,000,000 Excess Auto Liability - Excess of $1,000,000

$5,500.00 - Annual Premium
317.83 - Taxes & Fees
$5,817.83 - Total Annual Premium "Indication"

This "indication" is subject to company confirmation and approval of underlying information, approved drivers, and approved underlying companies. It is also understood that the taxi companies will provide certificates of insurance naming Conveyance Consulting Services LLC as Additional Insured, and that they will carry limits of coverage no less than $100,000/$300,000/$50,000.

Although we will attempt to firm up this indication today, I have been advised that it might take longer.

Sincerely,

Jacqueline Rappolt, ARM, AAI
Account Representative
727 791 - 5495 OR 800 282 - 3343

Acordia
311 Park Place Boulevard
Clearwater, Florida 33759
Voice: 727.796.6666
Fax: 727.791.1399

Mailing address:
P.O. Box 31666
Tampa, FL 33631-3666

** TOTAL PAGE.01 ** BAN04803

**U.S. Department of Justice**

Federal Bureau of Prisons

*Washington, DC 20534*
June 23, 2000

Bannum, Inc.
1301 Seminole Boulevard, Suite 126
Largo, Florida 33770
Attn: David Lowry, Executive Director

Re: Contract J200c-397

Dear Mr. Lowry:

In accordance with the terms and conditions of our Contract No. J200c-397, this letter is notification of our preliminary intent to exercise the First Option Year.

If we exercise this option year from October 1, 2000 through September 30, 2001, we project usage of an estimated 9,490 (7,300 males and 2,190 females) inmate days at $50.45 per inmate day.

If you have any questions, please contact me at 202/307-3070.

Sincerely,

Crystal D. Clayton
Contract Specialist

Montgomery

BAN10450

**U. S. Department of Justice**

Federal Bureau of Prisons

*Community Corrections Office*

*Post Office Box 230727*
*Montgomery, AL 36123-0727*

June 26, 2000

David Lowery
Executive Director
Bannum Incorporated
1301 Seminole Boulevard
Suite 126
Largo, Florida 33770

**RE: Close out of Interim Monitoring**
**conduced May 2-3, 2000**
**Bannum of Montgomery, Alabama (4XA)**
**Contract Number J200c-397**

Dear Mr. Lowry:

The purpose of this correspondence is to close out the Interim Monitoring conducted at your facility on the above referenced dates.

We are in receipt of your response to the monitoring report. Although transportation continues to remain a concern, you may consider this monitoring officially closed. We appreciate all your efforts to provide quality services and programs to the residents.

We look forward to our next visit to your facility. Should you have any questions and/or concerns, please contact us.

Sincerely,

Helen Ramsdell
Community Corrections Manager

cc: Cheryl Dennings, Community Corrections Administrator
Donna Zickefoose, Management Center Administrator
Crystal Clayton, Contracting Officer
Juliette Davis, Director
Robert P. Longshore, Chief United States Probation Officer
Community Corrections Manager Contract File

BAN10803

**U.S. Department of Justice**

Federal Bureau of Prisons

*Office of the Director*

*Washington, DC 20534*

October 5, 2000

Bannum Incorporated
Attn: David Lowry
1301 Seminole Blvd., Suite 126
Largo, Florida 3370

Re: Contract J200c-397, Montgomery, Alabama

Dear Mr. Lowry:

In accordance with the terms and conditions of the above contract, this letter is notification of the Government's intent not to exercise the remaining option years for Community Correction Center services. Therefore, effective October 1, 2001, the Bureau of Prisons will no longer receive CCC services from Bannum, Inc. under Contract J200c-397.

If you have any questions, please call me at 202-307-3070.

Sincerely,

Crystal D. Clayton
Crystal D. Clayton,
Contracting Officer

BAN04580

**U. S. Department of Justice**

Federal Bureau of Prisons

*Community Corrections Office*

*2350 Fairlane Dr. Suite 110*
*Montgomery, AL 36116*

October 16, 2000

David Lowry
Executive Director
Bannum Incorporated
1301 Seminole Boulevard
Largo, Florida 33770

Received
10-19-00

**RE: Interim Monitoring (CMY 4AX)**
**(October 5-6, 2000)**
**Montgomery, Alabama**
**Contract Number J200c-397**

Dear Mr. Lowry:

The purpose of this letter is to convey the findings of the Interim Monitoring conducted at your facility on the above referenced dates. All findings are included in the attached Monitoring Report.

As noted in the report, there is a finding which will require corrective action. Additionally, please respond to all recommendations in the report. Thank your staff for the warm hospitality and cooperation displayed throughout the monitoring.

Please forward your response to this report to me no later than 30 days from receipt of this letter. If you have any questions and/or concerns regarding the monitoring, please feel free to contact me.

Sincerely,

Larry E. Spencer
Community Corrections Manager

cc: Cheryl Dennings, Community Corrections Administrator
Donna Zickefoose, Management Center Administrator
Crystal D. Clayton, Contracting Officer, Washington, D.C.
Robert P. Longshore, Chief United States Probation Officer
Juliette Davis, Program Director
Community Corrections Manager Contract File

BAN10796

**INTERIM MONITORING REPORT FOR**
**BANNUM INCORPORATED**
**BANNUM PLACE OF MONTGOMERY**
**540 SAYRE STREET**
**MONTGOMERY, ALABAMA 36104**
**CONTRACT NUMBER J200c-397**

## SCOPE OF THE INTERIM MONITORING

An Interim Monitoring of the facility was conducted October 5-6, 2000, to determine compliance with the terms of the contract between Bannum Incorporated and the Bureau of Prisons. The following are the specific dates and times of the monitoring: October 5, 2000, from 8:50 a.m. to 5:15 p.m. and October 6, 2000, from 6:45 a.m. to 2:00 p.m. The monitoring consisted of a random review of residents' files, facility logs, staff and resident interviews, as well as a walk through of the facility.

The previous Monitoring conducted May 2-3, 2000 identified the following findings: failure to establish a comprehensive environment/pollution prevention program; failure to establish individual chronological urine logs, and failure to verify a resident's release date. **All previous issues, with the exception of providing transportation to residents for program and employment participation activities, have been corrected.**

## BACKGROUND INFORMATION

Bannum Incorporated is the sole provider of community-based services in the Montgomery, Alabama area. The facility is a multistory building consisting of a basement and two stories, which was built in the late 19th century. There is an automatic sprinkler system connected to alert the local fire department of a fire. The facility is located in a residential area of the city near downtown.

The facility serves as a pre-release center for male and female offenders. Client types include institution transfers, direct court commitments, supervised release violators, probation cases and pre-trial cases. All offenders should be assisted in securing viable employment, made aware of available community services, assisted with the establishment of personal bank accounts, and the reestablishment of family and community ties.

The CCC contract was awarded to Bannum Incorporated on July 1, 1998. Performance of the contract begin on October 1, 1998.

The quota is 26. CCC utilization over past 5 months has been 3698 regular inmate-days and 122 home confinement inmate-days. This equates to an average daily population of 25 residents in the facility with 1 assigned to the home confinement program.

On the first and last day of the monitoring, there were 30 Bureau residents in the facility and 1 on home confinement. There were 0 Pretrial residents in the facility.

**REPEAT FINDINGS AND CORRECTIVE ACTION REQUIRED**

There were no Repeat Findings noted during this monitoring.

**FINDINGS AND CORRECTIVE ACTION REQUIRED**

**FINDING #1 - PROGRAMS**
Chapter 13, Page 69, Number 8, states "The contractor shall have written policy and procedure regarding the control and dispensing of a resident's prescribed medication and over-the-counter drugs."

The contractor has established a policy on the control and dispensing of residents' prescribed medication and over-the-counter drugs. However, a review of Betty Knight's medication log revealed that she was required to take one Risperdal table per day. On July 11, 2000 she had a balance of 6 tables. On July 12, 2000, her medication log revealed she had a balance of 3 tables. There was no explanation of what happened to the other 2 tables.

**Corrective Action:**

**Effective immediately, as discussed during the monitoring**, staff shall keep an accurate count of residents prescribed medications and over-the-counter drugs. The number of tables issued should always agree with the remaining balance. Example: Beginning balance is 5. Staff issued 2 tables to the resident. The remain balance should reflect 3. Any discrepancies should be immediately reported to the center director.

Additionally, the CCM and COS recommend that all resident medication logs be audited by the center director on a frequent basis.

BAN10798

**RECOMMENDATIONS**

**RECOMMENDATION #1**
Ensure the Counselor's Aide have access to all areas of the facility in the event of an emergency.

**RECOMMENDATION #2**
To prevent puncture of car tires and damage to staff and residents' vehicles, consider leveling the lot used to park vehicles.

**RECOMMENDATION #3**
Amend the resident medication log to reflect a column to document the number of tables issued to residents. This will assist in carrying over the remaining balance. Also, review the current policy to ensure it is up-to-date.

**AREA OF CONCERN**

This issue is currently being negotiated by the contractor with Central Office Contracting. Therefore, it is not considered a finding but remains a concern.

Residents continue to suffer due to the unreliable public transportation system in the Montgomery, Alabama area. They are forced to get family members to transport them back and forth to work, or they must walk during periods of rain, cold and excessive heat.

One of the primary source of work for residents in the CCC program was construction of the federal building, which is located one block from the facility. This job opportunity is no longer available. Some residents are unable to obtain viable jobs because the job requires transportation to get there. Additionally, residents are still having to walk 4 to 12 miles to obtain their drivers license, birth certificate and social security card.

**COMMENDATIONS**

1) Excellent documentation is maintained on residents' employment assessments, with documented follow-up.

2) Resident files were extremely organized.

3) Resident Case notes were well written and contained substance that clearly described the resident's progress in the program or lack thereof.

4) Excellent documentation on residents' accountability checks is maintained.

5) Staff morale and dedication was viewed as high.

6) The director recently purchased benches for use in the facility.

---

I certify that this inspection has been performed in accordance with Bureau of Prisons policy and that all information is true and correct to the best of my knowledge.

Ray Toston Date: 10-16-00

RAY TOSTON
Contract Oversight Specialist

Reviewed by:

Larry E. Spencer Date: 10-16-00

LARRY E. SPENCER
Community Corrections Manager

**BANNUM, INC.**
1301 SEMINOLE BOULEVARD
SUITE 126
LARGO, FLORIDA 33770

DAVID LOWRY
EXECUTIVE DIRECTOR

OFFICE: (727) 588-2594
FAX: (727) 588-2689

November 2, 2000

Larry Spencer
Federal Bureau of Prisons
U. S. Courthouse
15 Lee Street
Montgomery, AL 36104-4096

Dear Mr. Spencer:

This letter is in response to the monitoring report dated October 16, 2000 which was received in our office on October 19, 2000 regarding Bannum Place of Montgomery. Attached is a response to that monitoring from Juliette Davis, Director, however, I would like to comment as well.

Area of Concern

The transportation concern which you addressed was first expressed by the BOP as a "recommendation" as a result of a monitoring on 2/10/98. Bannum addressed the concern, first with the Montgomery CCM office and then with the Contracting Officer. Without any further discussions, and seven months later, a new contract (the current one) was awarded. Obviously, Bannum had satisfied the BOP's concern about transportation prior to award of the new contract.

Then, as a result of a monitoring on 2/1/99, (four months after award of the new contract) the BOP issues a finding for transportation. Over the next ten months the BOP and Bannum negotiated the transportation issue and then in November 1999, the Contracting Officer initiated the contract modification process specifically for transportation. Obviously, a contract modification absolutely exonerates Bannum for any liability associated with transportation since a modification is an admission that the transportation issue is outside contract terms.

In any event, we have reviewed the employment rates for the Montgomery program for the previous ten month period and find that Bannum Place of Montgomery has maintained a 97% rate of resident employment. Obviously, the BOP concerns expressed about public transportation is not affecting our residents' ability to obtain employment. Those who don't obtain employment within the specified time are clearly recalcitrant and, unless specified circumstances exist, are

program failed. Additionally, the employment rate at our Montgomery program is consistent with other Bannum programs.

Please let me know if I can be of any further assistance.

Sincerely,

David A. Lowry

BAN10751

**U. S. Department of Justice**

Federal Bureau of Prisons

*Community Corrections Office*

*2350 Fairlane Dr. Suite 110*
*Montgomery, AL 36116*

November 13, 2000

David Lowery
Executive Director
Bannum Incorporated
1301 Seminole Boulevard
Suite 126
Largo, Florida 33770

**RE: Close out of Interim Monitoring**
**conduced October 5-6, 2000**
**Bannum of Montgomery, Alabama (4XA)**
**Contract Number J200c-397**

Dear Mr. Lowry:

The purpose of this correspondence is to close out the Interim Monitoring conducted at your facility on the above referenced dates.

We are in receipt of your response to the monitoring report. Although transportation continues to remain a concern, you may consider this monitoring officially closed. We appreciate all your efforts to provide quality services and programs to the residents.

We look forward to our next visit to your facility. Should you have any questions and/or concerns, please contact us.

Sincerely,

Larry E. Spencer

Larry E. Spencer
Community Corrections Manager

cc: Cheryl Dennings, Community Corrections Administrator
Donna Zickefoose, Management Center Administrator
Crystal Clayton, Contracting Officer
Juliette Davis, Director
Robert P. Longshore, Chief United States Probation Officer
Community Corrections Manager Contract File

BAN10758

UNITED STATES GOVERNMENT

# MEMORANDUM

COMMUNITY CORRECTIONS OFFICE
MONTGOMERY, ALABAMA

*DATE:* January 5, 2001

*REPLY TO ATTN OF:* Larry Spencer
Community Corrections Manager

*SUBJECT:* **Proposal for Transportation at Bannum of Montgomery Contract Number J200c-397, CMY 4XA**

*TO:* Crystal Clayton
Contracting Officer, Central Office

*THRU:* Donna Zickefoose
Management Center Administrator, Atlanta

Bannum's current contract with the Bureau of Prisons requires the facility to be located within one mile of public transportation, or Bannum shall provide for transportation of residents for employment or program participation activities, at no cost to the resident. The facility is to be located in an area where the commuting time to the general area of work is ordinarily no more than one-half hours each way via public transit. Regardless of the aforementioned, the contract requires Bannum to arrange for transportation for indigent residents while seeking employment, at no cost to the resident.

During the life of this contract, the area of transportation has continually been cited as an area of concern. The lack of transportation severely limits the residents' ability to seek employment outside walking distance of the facility, as well as limits the hours and days they may be employed. Additionally, residents that unable to afford transportation must walk in all types of weather, and at all times of the day and night, for purposes of employment and program

participation regardless of the residents' age, health, and/or disabilities.

Although the city has occasionally offered public transportation (bus) during the life of this contract, it was inadequate to meet the needs of the residents. The residents also attempted to utilize the DART (demand and response) system, but this too proved to be inadequate. Although a public transportation system is currently operating in the Montgomery, Alabama area, it is deemed inadequate, ineffective and unreliable for the residents to seek employment opportunities, to get to and from work after securing employment, and to get to and from program participation activities. The United States Probation Office has, on occasion, been required to respond to local judges regarding the lack of transportation provided by the CCC, and the U.S. Probation Officers have had to leave their duties to personally transport USPO inmates residing at the CCC to appointments.

Despite a good faith attempt at negotiations by both parties, we have been unable to reach an acceptable agreement which is flexible enough to meet the ever changing population of the CCC. Our proposal for the Bannum of Montgomery facility is as follows: Bannum shall provide transportation for residents to seek employment opportunities, to get to and from work after securing employment, and to get to and from all program participation activities, at no cost to the residents. Several examples: employment interviews, employment (to and from work), to obtain personal identification, medical, dental and mental health appointments/treatment, substance abuse treatment programs as well as any other program that is geared toward meeting the individual needs of the residents.

The BOP cannot tell the contractor how to meet the SOW. This contractor has the same SOW to interpret as other contractors, yet they wish the BOP to be more specific or provide them with more direction. Again, we cannot tell the contractor how to provide transportation for the residents; however, any proposal must be flexible enough to allow residents to work evening/midnight and/or weekend shifts, and to get to and from required programming. There is no need to accept an agreement which limits the hours an inmate may seek or hold employment (that's what we have now). Additionally, the inmate population changes on a daily basis. This week the CCC may have two new inmates that require transportation assistance, next week they may seven or none.

In order to provide transportation and provide CCC staff with the flexibility to accommodate their ever changing population, it is recommended that Bannum purchase or lease a (15 to 20) passenger van. CCC staff could use the van to transport the residents to and from their destinations. The hours of operation of the van should remain flexible, in order to meet the individual needs of the resident population. As the population changes, the needs of the resident will change. Bannum would also need to provide proper insurance for such a vehicle.

Residents may **elect** to provide their own transportation, i.e., have a family member, employer, or friend transport them. They may drive a personal vehicle after being cleared by the CCM.

Do not hesitate to contact me if additional information is needed.

BANNUM, INC.
1301 SEMINOLE BOULEVARD
SUITE 126
LARGO, FLORIDA 33770

VID LOWRY
.ECUTIVE DIRECTOR

OFFICE: (727) 588-2594
FAX: (727) 588-2689

January 24, 2001

Crystal Clayton
Federal Bureau of Prisons
CCC Contracting
320 First Street N. W.
Washington, DC 20534

By Overnight Mail

Re: Contract #J200c-0397
Montgomery, Alabama

Dear Ms. Clayton:

This letter is in response to our telephone conversation of January 11, 2001 and the telephone conversations held between Mike Lewis, Assistant General Counsel for the Federal Bureau of Prisons ("BOP") and my attorney, Joseph Summerill of Piliero, Mazza & Pargament with regard to your request for a proposal for additional transportation services at Bannum Place of Montgomery. In our conversation, you stated that the Montgomery BOP office was demanding that Bannum provide transportation services from 6 a.m. to 9 p.m.

First, I would like to reiterate that both Mr. Summerill and I strongly believe that Bannum meets or exceeds all the requirements of Contract #J200c-0397, including the provisions that deal with public transportation. However, in our continuing effort to try and accommodate the BOP, Bannum has agreed to submit this cost proposal. In fact, Bannum previously provided the BOP with four such proposals during the past sixteen months. To date, the BOP has chosen not to exercise such proposals, and I can only imagine that this decision was based upon the fact that 97% of our residents at Bannum Place of Montgomery are employed. You should note that this high rate of employment is consistent with other Bannum programs. Further, as of November 30, 2000, 54% of our Montgomery residents were approved to drive and could transport themselves. Apparently, the current concerns of the Montgomery BOP office are not representative of our resident's ability to obtain employment. Clearly, those residents who have not obtained employment within the specified time are recalcitrant and not a reflection on Bannum's inability to perform the contract.

Nevertheless, Bannum has revised the proposal which was originally submitted on June 13, 2000. Please note that we have proposed an on-call period which you stated was acceptable. Also note that we have removed the language regarding "continuation of service" but suggest inserting language contained in the attached "Fixed-Price Contracts

with Economic Price Adjustment." We have also renegotiated the proposal from New Deal Cab Company. Finally, as discussed between Mr. Lewis and Mr. Summerill, Bannum requests that the BOP indemnify and hold it harmless for any liability associated with the transportation of the residents.

PROPOSAL

New Deal Cab Company of Montgomery will provide transportation to residents between the hours of 6:00 a.m. and 9:00 a.m. and 4 p.m. and 7:00 p.m. on as needed basis, Monday through Friday. Transportation will be limited to those residents who have no other means of viable transportation, to include the use of personal vehicles, and will not be provided within one linear mile of the facility as is discussed in the SOW. In addition, New Deal Cab Company will be on call to serve the needs of our residents between the hours of 9 a.m. and 4:00 p.m. and from 7:00 p.m. to 9:00 p.m., and New Deal Cab Company has agreed to a minimum response time during those hours of 30 minutes. Of course, should a problem arise with the provider of services, then Bannum will use its best efforts to resolve the problem, change providers or take other appropriate action which the BOP deems necessary. Further, Bannum staff will transport residents by private vehicles, if necessary, in unusual situations as they currently do. In cases of medical emergencies, residents will be transported by ambulance. Residents will be required to schedule known program activities and other necessities in advance and to accommodate the fixed or on-call transportation service hours and response time.

In our continuing effort to provide the most cost efficient service in accordance with the BOP's demands, we have again revised the arrangement with the New Deal Cab Company. They have now agreed to a $25.00 per hour rate. Based on the $25.00 per hour rate for 6 hours per day, 5 days a week, 52 weeks per year, the total cost is $39,000. CCS is projecting a fixed cost for three hours per day, 5 days per week for on-call services between the hours of 9:00 a.m. and 4:00 p.m. and 7.00 p.m. to 9:00 p.m. at a cost of $19,500. The umbrella insurance policy cost to CCS is $9,535. Administrative and overhead costs are anticipated to equal or exceed $10,000. As I remember, you previously indicated that the administrative overhead was excessive. Please consider that the proposed $10,000 annually amounts to only $833 per month for administrative and overhead costs to include management, oversight with the taxi companies including drivers' information and records, vehicle maintenance records, periodic insurance verifications, coordination of insurance coverage between that of New Deal Cab Company and CCS, verification of transportation schedules and costs thereof, billing, collection, accounts payable, check writing, clerical, telephone, copying, etc. In addition, a reasonable profit of approximately $9,000 per year provides a total cost to the government of $87,035 annually. Based on the actual billing invoice population for the year 2000, Bannum proposes an increase in the existing per manday rate of $10.00.

Finally, Bannum requests that any modification to Contract #J200c-0397, involving transportation, include a provision in which the BOP agrees to completely and entirely indemnify Bannum against any and all liability associated with the transportation of the Montgomery residents, and specifically indemnifies Bannum against any and all negligence on the part of New Deal Cab Company and Bannum regarding such transportation. As

discussed between Mr. Lewis and Mr. Summerill, Bannum is extremely concerned with the liability associated with the BOP's demand that Bannum now provide its residents with transportation services from 6:00 a.m. to 9:00 p.m. Both attorneys agreed that there is considerable liability on the part of both the BOP and Bannum, and that it is unfair to require Bannum to shoulder such risk. In fact, in light of this liability, the continued high employment rates enjoyed by our Montgomery residents and the availability of public transportation to such residents, the BOP may decide that this modification is unwise. It is the opinion of Bannum and its attorneys, that the risk associated with this transportation modification overwhelmingly outweighs the benefits identified with providing, what amounts to a small group of residents, additional transportation options.

As always, Bannum appreciates the opportunity to provide the BOP with the high quality and service that it has become accustomed to, and looks forward to a long, continuous relationship. Please let me know if I can be of further assistance on this issue.

Sincerely.

David A. Lowry

cc: Joseph J. Summerill IV, Esq.

U.S. Department of Justice

Federal Bureau of Prisons

Washington, DC 20534

February 12, 2001

Mr. David Lowry, Executive Director
Bannum Inc.
1301 Seminole Boulevard, Suite 126
Largo, Florida 33770

RE: Contract J200c-397
Montgomery, Alabama

Dear Mr. Lowry,

The Bureau of Prisons (BOP) is in receipt of your January 24, 2001 proposal for additional transportation services located at Bannum Place of Montgomery. However, after careful review and discussion the BOP cannot accept this proposal.

It is the BOP's intention to move forward with the current solicitation (RFP 200-0637-SE) which clearly states the transportation needs of the BOP. This solicitation closes on March 5, 2001 and we encourage you to submit a proposal.

Thank you for your continued interest in the BOP. If I may be of further assistance, please do not hesitate to contact me.

Sincerely,

Crystal D. Clayton

Crystal D. Clayton
Contracting Officer

BAN04562

**U. S. Department of Justice**

Federal Bureau of Prisons

*Community Corrections Office*

*2350 Fairlane Dr. Suite 110*
*Montgomery, AL 36116*

February 21, 2001

Received
2-23-01

David Lowry
Executive Director
Bannum Incorporated
1301 Seminole Boulevard
Largo, Florida 33770

**RE: Full Monitoring (CMY 4AX)**
**(February 5, 7, 8, 9 2001)**
**Contract Number J200c-397**

Dear Mr. Lowry:

The purpose of this letter is to convey the findings of the Full Monitoring conducted at your facility on the above referenced dates. There were no findings identified during the monitoring. Therefore, no response is required and you may consider this monitoring officially closed.

We personally congratulate the staff for a job well done. Special recognition is given to three staff members for their obvious dedication and hard work.

Thank all your staff for the warm hospitality and cooperation displayed throughout the monitoring.

If you have any questions and/or concerns regarding the monitoring, please feel free to contact me.

Sincerely,

Larry E. Spencer
Larry E. Spencer
Community Corrections Manager

cc: Cheryl Dennings, Community Corrections Administrator
Jackie Taylor, Acting, Management Center Administrator
BOP-CCD/Contract Dvlp and Admin
Robert P. Longshore, Chief United States Probation Officer
Juliette Davis, Program Director
Community Corrections Manager Contract File

BAN10776

**FULL MONITORING REPORT FOR**
**BANNUM INCORPORATED**
**BANNUM PLACE OF MONTGOMERY**
**540 SAYRE STREET**
**MONTGOMERY, ALABAMA 36104**
**CONTRACT NUMBER J200c-397**

**SCOPE OF THE FULL MONITORING**

A Full Monitoring of the facility was conducted February 5, 7, 8 and 9, 2001, to determine compliance with the terms of the contract between Bannum Incorporated and the Bureau of Prisons. The following are the specific dates and times of the monitoring: February 5, 2001, from 11:52 a.m. to 3:30 p.m.; February 7, 2001, from 7:00 a.m. to 6:00 p.m.; February 8, 2001, from 8:00 a.m. to 3:55 p.m., and February 9, 2001, from 7:30 a.m. to 11:25 a.m. The previous Interim Monitoring conducted October 5-6, 2001 identified the following finding: Failure to properly maintain accountability of a resident's prescribed medication. The finding was corrected. The Area of Concern section of the monitoring identified the ongoing problem with Bannum's failure to provide residents with transportation for employment and program participation activities. This issue continues to be an area of concern.

**During the monitoring, a two and half hour staff training session was conducted on Integrity, Accountability, Life Safety and Inmate Discipline. A review of the evaluation forms revealed the training was well received by staff.**

**BACKGROUND INFORMATION**

Bannum Incorporated is the sole provider of community-based services in the Montgomery, Alabama area. The facility is a multistory building consisting of a basement and two stories, which was built in the late 19th century. There is an automatic sprinkler system connected to alert the local fire department of a fire. The facility is located in a residential area of the city near downtown.

The facility serves as a pre-release center for male and female offenders. Client types include institution transfers, direct court commitments, supervised release violators, probation cases and pre-trial cases. All offenders should be assisted in securing viable employment, made aware of available community services, assisted with the establishment of personal bank accounts, and the reestablishment of family and community ties.

The CCC contract was awarded to Bannum Incorporated on July 1, 1998. Performance of the contract begin on October 1, 1998. The quota is 27. CCC utilization since the previous monitoring (past 4 months) has been 3,541 regular inmate-days and 198 home confinement inmate-days. This equates to 30 residents per month in the facility with an additional 2 residents assigned to the home confinement program.

On the first day of the monitoring, there were 35 Bureau residents in the facility and 1 on home confinement. On the last day of the monitoring, there were 36 Bureau residents in the facility and 1 assigned to the home confinement program. There were 0 Pretrial residents in the facility.

**REPEAT FINDINGS AND CORRECTIVE ACTION REQUIRED**

There were no Repeat Findings noted during this monitoring.

**FINDINGS AND CORRECTIVE ACTION REQUIRED**

There were no Findings noted during the monitoring.

**GENERAL COMMENT**

The contractor should seek accreditation or submit their plans for accreditation to the CCM. Additionally, it is recommended that surveillance cameras be installed to enhance supervision of the resident population.

**AREA OF CONCERN**

The following issue is currently being handled by the Contracting Officer and Bannum Incorporated. Therefore, it is not considered a finding but remains a concern.

Since the inception of the contract, residents continue to suffer due to Bannum's failure to provide them with transportation for employment and program participation activities. Resident interviews, as well as observation, continue to reveal the residents get to and from work and other program activities the best way they can. Often, this put the residents' safety at risk, since they are forced to walk. An example of this is residents who are required to attend the Bureau of Prisons Drug Transitional Service program have to walk approximately 7 miles to and from the class.

The buses stop running at 7:00 p.m., however, the drug class ends at 8:30 p.m. Residents who are not approved to drive their own vehicles, or have someone transport them are forced to walk in the dark and through unsafe neighbors of the city. Furthermore, the good paying jobs are all located a great distance away from the CCC facility. Many residents are forced to walk to and from their destination, have a family member, friend, co-worker, or boss to transport them. Some residents even pay taxi fare to be transported. Residents are forced to get to and from their destination using any means possible.

**COMMENDATIONS**

1) The contractor has painted the entire basement of the facility, which enhances the overall appearance.

2) New exercise equipment and table games have been purchased for use by the resident population.

3) New carpet has been installed in the Counselor's Aide Office and the foyer. This greatly enhanced the overall appearance of the facility.

4) Sanitation continues to be maintained at an extremely high level.

5) Organization of the resident files was impressive. All required documents were in the files. The information was legible and complete.

6) Job readiness counseling is being completed on each new commitment.

7) The Resident handbook was complete and thorough.

8) The fire drill was conducted by staff in an impressive manner. The building was evacuated in about two minutes. It was obvious that staff and residents were thoroughly familiar with proper procedures.

9) Staff presented a professional appearance in their uniform shirts.

Although the entire staff at the CCC facility is to be commended on the fine job they are doing, we want to particularly recognize Ms. Juliette Davis, Director, Ms. Jacquelyn Bell, Employment Specialist, and Mr. Clifford Coleman, Counselor.

Ms. Davis is recognized for her dedication, strong leadership and efforts to provide quality services to the resident population and the Bureau of Prisons. She is well respected by her staff as well as the resident population. She can be relied upon to do whatever is necessary to accomplish the mission. She meets challenges head on, and lets nothing get in the way of her dedication and responsibilities.

Ms. Bell is hereby recognized for the development of forms to ensure residents are given the tools they need to obtain viable employment. She personally conducts an employment interview with every resident to assess their knowledge skills and abilities. Her employment notes are thorough and concise. She provides every resident with employment leads and equips them with the necessary skills to obtain the best job possible.

Mr. Coleman is recognized for his continued hard work as the senior Counselor for the resident population. His case notes are thorough and complete. He consistently identifies the need of every resident, and does whatever is necessary to assist them with their problems. His dedication and hard well are evident, by the organization of the resident case files and resident interviews.

---

I certify that this inspection has been performed in accordance with Bureau of Prisons policy and that all information is true and correct to the best of my knowledge.

Ray Toston

RAY TOSTON
Contract Oversight Specialist

Date: 02-21-01

Reviewed by:

Larry E. Spencer

LARRY E. SPENCER
Community Corrections Manager

Date: 02-21-01

BAN10780

JOSEPH A. CAMARDO, JR.
ATTORNEY AT LAW
127 GENESEE STREET
AUBURN, NEW YORK 13021
WWW.CAMARDO.COM

..PH A. CAMARDO, JR.
NANCY M. CAMARDO*
*admitted to Georgia Bar only
KEVIN M. COX
KEVIN P. RYAN
ROBERT LOUIS RILEY

MANAGER-GOVERNMENT COST/PRICE ANALYST
JOSEPH W. NORRIS, M.B.A.

PHONE: (315) 252-3846
FAX: (315) 252-3506
E-MAIL: JCAM123@AOL.COM

**Via Federal Express**

March 6, 2001

Crystal Clayton
Contracting Officer
Federal Bureau of Prisons
CCC Contracting
320 First Street N.W.
Washington, D.C. 20534

**Re: Bannum, Inc.**
**Contract No. J200c-181**
**Request for Equitable Adjustment**

Dear Ms. Washington:

Enclosed herewith for your review please find Bannum's Request for Equitable Adjustment to the above-referenced Contract.

Thank you for your attention to this matter. If you have any questions or comments, please do not hesitate to contact the undersigned.

Respectfully,

Kevin M. Cox

cc: Bannum, Inc.

# REQUEST FOR EQUITABLE ADJUSTMENT UNDER CONTRACT J200c-397 BANNUM, INC.

On or about July 1, 1998, Bannum, Inc. (hereinafter, "Bannum") was awarded Contract No. J200c-397 ("Contract") by the U.S. Department of Justice, Federal Bureau of Prisons, Community Corrections Contracting (hereinafter "BOP" or "Government"). This Contract was awarded based upon Bannum's Proposal submitted in response to Solicitation No. RFP 200-0422-SE.

The contract called for Bannum to provide Community Correction Center Services for Federal offenders in the Montgomery, Alabama area. Pursuant to the terms of the Contract, Bannum was to commence performance on October 1, 1998 for a base period of two years, ending September 30, 2000. The Contract also contained three (3) one (1) year Option periods, the first of which was exercised on October 1, 2000, thereby extending the contract to September 30, 2001.

Throughout Bannum's performance of the subject Contract, and its preceding Contract for the same services (No. J200c-181), the BOP raised an issue regarding Bannum's compliance with the transportation requirements under the Contract. Essentially, the only transportation requirement contained in the Contract is that public transportation be available within one (1) mile of the facility. The main purpose for this requirement is so that resident's of Bannum's facility are able to travel to and from their places of employment or potential employment. During negotiation of the Solicitation 200-0637-SE, the BOP initiated eight (8) discussion letters. Bannum addressed the BOP's alleged concerns with transportation in response to the second of those eight (8) discussion letters. Te BOP did not express concern about the transportation issue in any of the remaining six (6) discussion letters, and then proceeded to award Contract No. J20-c-397 to Bannum. After award

of the Contract, however, the BOP began a pattern of harassment toward Bannum alleging non-compliance with respect to the aforementioned transportation requirements. The BOP's conduct is most egregious when it is considered that at all times during its performance of the present and past contracts, Bannum has been in full compliance with the transportation requirements of the Contracts. Bannum's compliance is best evidenced by the extremely high employment rate of the facility residents, which averaged approximately 97% throughout the subject Contract.

Despite the fact that Bannum has always been, and remains, in full compliance with the transportation requirements of the Contract, the BOP has raised a concern as to the adequacy of the public transportation in Montgomery, which has resulted in numerous communications between Bannum and the BOP during the last three (3) years. The entire chronology of these communications is described in detail in the Affidavit of David Lowry which is attached hereto and incorporated herein fully by reference. As explained in Mr. Lowry's Affidavit, the BOP has continuously failed to act in good faith in its dealings with Bannum with respect to the transportation issue. The following is a brief outline of the history of said dealings, all of which is more fully explained in Mr. Lowry's Affidavit:

1. Bannum has always been in complete compliance with the transportation requirements of the Contract;
2. The BOP has failed repeatedly to definitize the changes to the transportation requirements that it was anticipating;
3. The BOP, despite claiming that Bannum was failing to comply with the Contract requirements, failed to state specifically how it was failing to comply, resorting instead to general, vague allegations of non-compliance, which were impossible to

address with any specificity;

4. The BOP has required Bannum to provide several (five) cost proposals for the undefinitized changes;

5. The BOP has failed to conduct any meaningful negotiations with Bannum with respect to any of the aforementioned cost proposals;

6. The BOP has, in bad faith, held the Contract Option periods hostage, stating that the Options would not be exercised unless the transportation issue were resolved. The BOP did so even though the change in the requirements had not been definitized and the BOP had failed to conduct any meaningful negotiations;

amendment

7. The BOP issued Solicitation No. 200-0637-SE, requesting proposals for a follow-up contract to the subject Contract. Notably, despite the fact that the BOP had threatened Bannum with not exercising the Option periods on the grounds that their undefinitized transportation requirements were not being met, the new Solicitation as originally issued, failed to substantially revise the transportation requirements.

8. As evidenced by the above, changes in the transportation requirements of the Contract are not needed. Bannum has submitted detailed documentary proof that the public transportation offered to the residents is more than adequate, and as is further evidenced by the 97% employment rate for residents at the facility;

9. Any changes to the transportation requirements would clearly constitute a waste of taxpayer money, and an improper privilege to felons, one to which even law-abiding citizens in free society are not entitled.

Based upon the foregoing, it is Bannum's belief that the BOP has raised its alleged concerns

with the transportation issue merely as a pretext for not exercising the remaining Option periods under the Contract, in a blatant and obvious attempt to eliminate Bannum as a contractor in the area. The BOP's bad faith motive in this regard is further evidenced by the improper and unsupported Performance Evaluation issued by the BOP on October 11, 2000. As clearly shown in the attached Affidavit of David Lowry, the BOP's ranking of "fair/poor" was completely contradictory to the facts of this case, was determined utilizing a method contrary to that established and represented by BOP hierarchy, and was in contradiction to all prior evaluations performed by the BOP. The alleged transportation problem was the only concern raised by the BOP, but for reasons unexplained the BOP greatly reduced Bannum's scores in several other areas as well.

Bannum further alleges that the BOP's bad faith in dealing with this matter is merely another example of the BOP's systematic harassment of Bannum on all of its Contracts, whether in the same geographical procurement area or elsewhere in the country. These improper actions by the BOP have resulted in the following: meritless investigations by the BOP at Bannum's facilities; constructive changes to its Contracts; improper deductions from its Contracts; unsupported demands for the termination of certain employees; and numerous unresolved or unaddressed REA's. The foregoing has disrupted Bannum in its performance of its Contracts, and forced it to expend significant amounts of time, effort and cost in addressing these matters. The following is a chart of REA's and Claims filed by Bannum on its various contracts which have been affected by the BOP's improper actions:

| CONTRACT NO. | ISSUE | AMOUNT ($) | REA/CLAIM |
|---|---|---|---|
| J200-c-325 | Wrongful deduction | 17,446.00 | REA filed on 10/22/99, and denied by the Contracting officer on 3/24/00.<br><br>Converted to Claim on 3/1/01. |
| J200-c-361 | Wrongful deduction | 1,126.40 | REA filed on 10/26/99, and denied by the Contracting Officer on 2/4/00.<br><br>Converted to Claim on 3/1/01. |
| J200-c-361 | Wrongful deduction | 950.00 | REA filed on 10/28/99, and denied by the Contracting officer on 2/4/00.<br><br>Converted to Claim on 3/1/01. |
| J200-c-336 | Wrongful deduction | 700.00 | REA filed on 10/27/99, and denied by the Contracting Officer on 2/4/00.<br><br>Converted to Claim on 1/3/01. |
| J200-c-361 | Wrongful deduction | 1,120.00 | REA filed on 2/22/00, and denied by the Contracting officer on 3/24/00.<br><br>Converted to Claim on 3/1/01. |
| J200-c-336 | Wrongful deduction | 4,050.00 | REA filed on 2/23/00, and denied by Contracting Officer on 3/24/00.<br><br>Converted to Claim on 1/3/01. |

| | | | |
|---|---|---|---|
| J200-c-375 | Wrongful deduction | 740.00 | REA filed on 3/16/00, and denied by the Contracting Officer on 3/24/00.<br><br>Converted to Claim on 3/1/01. |
| J200-c-375 & 433 | Wrongful deductions | 2,060.00 | REA filed on 4/10/00, and denied by the Contracting officer on 4/13/00.<br><br>Converted to Claim on 3/1/01. |
| J200-c-306 & 325 | Extra work associated with change to door requirement on Contracts. | 16,620.86 | REA filed on 6/14/00, and deemed denied by the Contracting Officer's failure to respond.<br><br>Converted to Claim on 1/18/01. |
| J200-c-336, 361 & 375 | Wrongful diversions | 480,201.40 | Claim filed on 7/12/00.<br><br>Contracting Officer issued Final Decision on 11/15/01, wherein she denied all of the Claim costs under Contracts 361 and 375, and "offered" $50,000 to settle the Claim for Contract 336. |
| J200-c-336 | Wrongful termination of Pam Simpson | 4,293.45 | REA filed on 7/17/00, and denied by the Contracting Officer on 11/15/00.<br><br>Converted to Claim on 1/3/01. |
| J200-c-336 | Standards of conduct Modification | 41,200.00 (to date) | REA filed on 1/02/01. |
| J200-c-336 | Improper Cure Notice | 4,500.00 | Claim filed on 1/3/01, and denied by the Contracting Officer on 1/29/01. |

| | | | |
|---|---|---|---|
| J200-c-375 | Wage Increase (Double Interest) | 5,038.38 | REA filed on 2/27/01. |

## CONCLUSION

Based upon the foregoing, Bannum alleges that the BOP's failure to exercise the Option period was in bad faith, a clear abuse of discretion, and a breach of the subject Contract. As such, Bannum is entitled to compensation from the BOP for all damages resulting from said breach, including but not limited to, all profits Bannum would have earned if the BOP had exercised the Option, as well as all proposal preparation costs.

STATE OF FLORIDA }
}
COUNTY OF PINELLAS } ss:

## AFFIDAVIT OF DAVID LOWRY

I, DAVID LOWRY, being duly sworn, deposes and says:

1. I am presently, and have been since 1984, the Executive Director of Bannum, Inc. (hereinafter "Bannum"), located at 1301 Seminole Boulevard, Suite 126, Largo, Florida 33770.

2. Bannum began providing community correction center services to the BOP in Montgomery, Alabama in January of 1986. Then, on or before October 1, 1993, Contract No. J200c-181 was awarded to Bannum to again provide Community Correction Center Services for Federal offenders in the Montgomery, Alabama area. The contract included a base year running from October 1, 1993 to September 30, 1995, with three additional option years, all of which were subsequently exercised. Bannum's facility was located in the downtown area of Montgomery, Alabama.

3. Bannum's facility was located within one mile of public transportation in accordance with the terms of the Contract.

4. Despite meeting the requirements of the Contract, on February 10, 1998 the CCM of the Montgomery BOP office (Mr. Spencer) stated the following in a Monitoring Report:

> Recommendation #3 - Transportation has become an issue since the change in the public transportation system within the City of Montgomery. The transportation needs of the residents need to be addressed by Bannum immediately, before the problem becomes severe.

5. On March 18, 1998, Bannum's Operations Director responded to the Monitoring Report, stating that even with the changes in the public transportation system, Bannum was still providing transportation, as required by the Contract.

6. In a letter dated April 9, 1998, the Contracting Officer stated that Bannum's letter of March 18, 1998 was not an adequate response, and that a corrective plan of action was required to be submitted by April 16th, 1998, wherein Bannum was to indicate how it would fully accommodate the transportation requirements of Chapter 3, Section A of the Specifications.

7. Bannum responded to the Contracting Officer's direction, by letter dated April 16, 1998, wherein it reiterated its allegations that Bannum was in full compliance with the Contract requirements, and that if the BOP wished to amend the Contract, Bannum would accommodate the additional requirements after the Government's approval of the necessary cost adjustment.

8. On October 31, 1997, RFP 200-0422-SE was issued by the BOP, which was to result in a follow-up contract to Contract No. J200c-181 presently held by Bannum.

9. Despite having full knowledge of the changes in the Montgomery public transportation system, little substantive modification was made to the Statement of Work, in regard to the transportation requirements.

10. In response to the RFP, Bannum submitted a proposal wherein it sought to use the facility currently being used under Contract No. J200c-181, and which reflected the costs entailed in performing the contract pursuant to the specified Statement of Work.

11. After submission of the aforementioned proposal, the following discussions and negotiations

were conducted between Bannum and the BOP:

a. March 10, 1998: In a clarification and discussion letter ("C&D") No. 1, no mention was made of the transportation issue;

b. April 10, 1998: In C&D letter No. 2, the Contracting Officer stated the following:

> 14. Because the City of Montgomery has terminated much of its bus service, some residents are required to walk great distances to work under the current contract (J200c-18). This makes job searches and job commuting an issue to be addressed under this Solicitation RFP 200-0422-SE. It is the contractor's responsibility to provide the residents with free transportation for employment or program participation activities when there is an absence of public transportation within one mile of the facility. Bannum must provide a plan of action addressing how the residents will be provided free transportation for the purposes stated above. SOW, Chapter 3, Section A. This is a weakness.

c. Bannum responded with another letter on April 24, 1998, to which was attached its April 16, 1998 letter, wherein it stated that if a different transportation plan was required by the BOP, Bannum's manday rates would increase based on related costs.

d. May 6, 1998: In an addendum to C&D letter No. 2, no mention was made of transportation issue.

e. May 27, 1998: In C&D letter No. 3, no mention was made of transportation issue.

f. June 3, 1998: BOP requested Final Proposal Revisions. No mention was made of transportation issue.

g. June 17, 1998: Negotiations were reopened. No mention was made of transportation issue.

h. June 19, 1998: Negotiations were reopened. No mention was made of

transportation issue.

i. June 25, 1998: BOP requested Final Proposal Revisions. No mention was made of transportation issue.

12. On July 1, 1998, Bannum received the Notification of Contract Award for Contract No. J200c-397. As such, Bannum reasonably believed that the transportation issue had been negotiated to the satisfaction of all pertinent BOP procurement personnel, and that Bannum's proposal met all the requirements of the Solicitation.

13. Bannum commenced performance of the Contract on October 1, 1998 pursuant to terms of the Solicitation/Contract, its accepted proposal, and all previous negotiations.

14. On February 1, 1999, CCM Spencer issued a finding in a Monitoring Report, stating as follows:

Finding #2 – Facility (transportation)

The City of Montgomery's public transportation system, Demand and Response Transit (DART) has proven to be an unreliable and ineffective means of transportation for the residents at the center.

15. On February 16, 1999, Bannum's Operations Director responds to the aforementioned Monitoring Report, stating that public transportation is being provided and that Bannum meets all contractual requirements.

16. On March 12, 1999, CCM Spencer stated in a letter:

However, there is strong evidence that the situation with the local bus service is not in accordance with the provisions of the Statement of Work.

17. Upon information and belief, no changes had been made to the City of Montgomery local bus service from the time of the issuance of the Solicitation to the date of the above-referenced

letter from Spencer.

18. On March 26, 1999, I responded to Spencer's letter, stating the following:

On March 24, 1999, I telephoned Ms. Perry, CCCOS (of the Montgomery office), and discussed the matter of bus service. Ms. Perry suggested I discuss the matter with the Contracting Officer, Leah Wilson. On March 25, 1999, I discussed the matter with Ms. Wilson. Ms. Wilson said she would review the matter.

19. In a letter dated June 15, 1999, BOP Regional Transitional Drug Abuse Treatment Manager stated the following:

Upon conferring with the management Center Administrator, Donna Zickefoose, the issue of transportation falls upon your agency based on the Statement of Work in which your agency agreed to provide transportation for the residents.

20. On June 16, 1999, CCM Spencer issued a repeat finding in a Monitoring Report:

Finding #2 – Facility – REPEAT FINDING

The City of Montgomery's public transportation system, Demand and Response Transit (DART) had proven to be an unreliable and ineffective means of transportation for the residents at the center (see attached news article).

21. On June 21, 1999, Bannum's Operations Director responded, in part, to the Regional Transitional Drug Abuse manager's letter, stating:

Bannum is in compliance with the Statement of Work due to public transportation being within one mile of the facility for the purpose of employment or program participation.

22. On June 21, 1999 Bannum's Operations Director appealed the June 16, 1999 "repeat finding."

23. On June 25, 1999, MCA Zickefoose stated the following in a Monitoring Report:

The only deficiency from the last monitoring not resolved was the transportation issue. This is currently being discussed with the Central Office Contracting Officer and the Contractor.

24. In a subsequent letter to Bannum, dated June 28, 1999, MCA Zickefoose stated:

> Although the transportation issue has not been resolved, the problems regarding resident transportation are currently being discussed by the contractor, Montgomery CCM office, and the Central Office Contracting Office.
>
> As a resolution is expected in the near future, I accept MS. Bellew's response to the findings. Please consider the march 1999 monitoring closed. If the transportation issue is not resolved it will be re-addressed in the future.

2. 25. Prior to September 8, 1999, the CCRA, Cheryl Dennings, requested that Bannum submit a proposal for the provision of transportation services in excess of contract terms. This request for a proposal constituted an admission, by the BOP, that Bannum was in full compliance with the transportation requirements of the Contract, and that any additional transportation arrangements that may be directed by BOP would constitute a change to the Contract.

26. In response to BOP's request, on September 8, 1999, Bannum submitted a draft cost proposal to the CCRA which discussed price, terms and other conditions regarding the provision of transportation services in excess of the contract terms.

27. In a letter dated September 23, 1999, CCM Spencer stated:

> After numerous discussions regarding the transportation issue, we have decided to have the Contracting Officer negotiate this concern with you. For this reason, you may consider this monitoring officially closed. We appreciate all your efforts to provide quality services and programs to the residents.

28. On November 24,1999, the Contracting Officer sent Modification No. 3 for transportation services to Bannum for its signature. Bannum signed Modification No. 3, reasonably believing that its draft proposal submitted to the CCRA on September 8, 1999 had been accepted.

29. On November 29, 1999, the CCRA informed Bannum that its draft proposal was not

forwarded to the Contracting Officer. As a result, Bannum rescinded its agreement to Modification No. 3.

30. On December 17, 1999, Bannum received Modification No. 3 signed by the Contracting Officer. On December 20, 1999, Bannum issued a letter to the Contracting Officer reminding the Contracting officer that it had rescinded its execution of Modification No. 3.

31. On January 4, 2000, the Supervising Contracting Officer acknowledged the recission of Modification No. 3, and requested a cost proposal for the provision of transportation services in excess of contract requirements. Additionally, the Supervising Contracting Officer stated that the BOP Montgomery office may decide to not exercise the option period, if Bannum did not satisfy their alleged transportation concerns. Bannum considers the Contracting Officer's statement regarding the option an improper attempt by BOP to extort extra-contractual performance from Bannum, in exchange for BOP exercising the subsequent options under the contract. In response to BOP's direction, Bannum submitted a formal cost proposal for the change in the transportation requirements on January 7, 2000.

32. In January, 2000, CCCOS Toston of the Montgomery BOP office raised an alleged concern regarding the transportation issue. In response, on January 11, 2000, Bannum's Executive Director responded, stating that the matter was presently being negotiated with the BOP.

33. Despite the BOP acknowledging that it was revising the transportation requirements of the Contract, as evidenced by the ongoing cost negotiations and its issuance of a draft modification to the Contract, on February 2, 2000, CCM Ramsdell of the Montgomery BOP office issued a finding in a Monitoring Report, stating that "[t]he facility is not located within one mile of public transportation," and that Bannum was required to comply with the

agreement reached on November 26, 1999.

34. Despite the BOP's protestations to the contrary, Bannum's facility was indeed located within one mile of the facility, and this had been the case throughout Bannum's performance of both contracts discussed hereinabove, and, in fact, all contracts since 1986. In addition, no agreement had been reached between BOP and Bannum, in regard to the changed transportation requirements, as evidenced by Bannum's recission of the execution of Modification NO. 3 and the BOP's acceptance of such recission and the continuing negotiations. Therefore, since no formal modification or direction had been made to the Contract, Bannum was under no responsibility to presently meet the anticipated changes.

35. Bannum's Executive Director responded to the Ramsdell finding of February 23, 2000, stating that an agreement in this regard had not yet been met, and it was requested that this finding be withdrawn.

36. On March 2, 2000, CCM Ramsdell stated in a letter:

> This finding resulted from the contractor's noncompliance with the Statement of Work by not providing transportation to residents for employment or program participation activities at no cost to the resident, due to the facility not being located within one mile of public transportation. In our monitor report dated February 2, 2000, we requested that you comply with the recent negotiated agreement between you and the Contracting Officer.

37. As was previously stated, the comments in the aforementioned letter were incorrect and were not reflective of the actual, present Contract requirements, nor the events that had occurred in the past with respect to this issue.

38. Bannum's Executive Director again responded by letter dated March 7, 2000, stating:

> It is my understanding that, in response to my request, the CCRA was to have this finding rescinded. Further, Bannum is currently negotiating a contract modification

with Mr. Melvin Gardener, of the Contracting Branch. In fact, Mr. Gardener requested that Bannum provide additional information relating to the modification costs.

39. In a letter dated March 13, 2000, CCM Ramsdell wrote:

> We are in receipt of your response to our clarification letter. Based on your responses, you may consider this monitoring officially closed.

By the issuance of this letter, BOP was again acknowledging that Bannum was in full compliance with the Contract requirements.

40. During negotiations and in response to a request from the Contracting Officer to lower Bannum's cost, Bannum submitted a second cost proposal on March 24, 2000.

41. On April 25, 2000, Bannum management personnel meet in Atlanta with BOP Regional personnel to discuss, among other things, the transportation issue. In particular, the BOP stated that Bannum must provide transportation throughout the day and strongly encouraged that a van be purchased for that purpose.

42. On June 13, 2000, Bannum submitted a third cost proposal to the supervising Contracting Officer.

43. No further negotiations were conducted between Bannum and BOP with respect to Bannum's submitted third cost proposal.

44. In a subsequent Monitoring Report dated October 16, 2000, BOP again raised the transportation issue, stating that due to the alleged inadequacy of the public transportation, the resident's employment rate has been affected.

45. Bannum's Executive Director responded to the transportation issue again on November 2, 2000, stating the following:

a. It was obvious, that based upon discussions conducted with BOP in 1998, when the transportation issue was first raised, BOP was satisfied with Bannum's response, as evidenced by the award of the follow-on contract;

b. The issue was again raised in a Monitoring Report issued four months after the award of the new Contract. This resulted in ten months of negotiation being conducted, during which the Contracting Officer initiated the Contract modification process, stating that "[o]bviously, a contract modification absolutely exonerates Bannum for any liability associated with transportation since a modification is an admission that the transportation issue is outside contract terms."

c. Upon review of the Montgomery program files, it has been determined that Bannum has maintained a 97% rate of resident employment, which obviously indicates that the alleged transportation concerns are not affecting the residents' ability to obtain employment. The residents who did not obtain employment within the specified time are clearly recalcitrant.

46. On October 11, 2000, BOP issued its "Performance Evaluation" for Bannum's Montgomery program, which ranked Bannum, "fair" in the contract compliance and business relations categories, and "poor" in the customer satisfaction category. Specifically, BOP made the determination that Bannum's Director, Juliette Davis, lacked the leadership skills, professionalism and ability to maintain adequate staff, contract compliance and an appropriate business relationship with the BOP.

47. On November 16, 2000, I issued a response to the "Performance Evaluation," which in pertinent part, stated the following:

a. Bannum believes that its assessment of the adequacy of Ms. Davis' job performance and skills is correct, and that the information supplied herein will succeed in removing this terminal career deficiency from her record.

b. Bannum had been advised by high-ranking BOP officials that contractor evaluations are based primarily upon the monitoring reports issued during the evaluation period. Any other consideration would allow the author of the evaluation to insert personal bias, emotional prejudices, and negative attitudes. Bannum had previously expressed its serious concern regarding the bias and prejudice and generally inappropriate approach of the CCM and CCCOS in the Montgomery CCM office. It is these persons who are responsible for the evaluation reports.

c. During the two year base period covered by this evaluation, there has been two full monitorings and three interim monitorings. In each report the BOP discussed their concern with the decline in the public transportation system in Montgomery, as a finding or concern. Despite the satisfactory negotiation of this issue, the CCM and CCCOS continued to malign Bannum's contract performance.

d. It is obvious that the transportation issue was a significant factor in lowering the evaluation score. However, the BOP has acknowledged that their concern is not the fault of Bannum, and therefore, Bannum's score should be raised significantly.

e. Given that the BOP hierarchy has represented that the evaluation should be based solely on the monitoring reports, the evaluation should be reviewed, using that standard and the following comments:

i. <u>Contract Compliance</u>:

Staffing: With the exception of one minor finding in one monitoring report, which was based on misunderstanding by the CCCOS, all comments have been highly favorable.

Life Safety: In three reports reflected minor life safety issues of a routine nature, and which were immediately corrected. Compliance was 100%.

Financial Responsibility: Since Bannum's financial responsibility is beyond reproach, and has been verified by the SBA and the Inspector General's Office, Bannum assumed that financial responsibility relates to program residents. In regard to employment, with the exception of the transportation issue and one minor finding in a monitoring report, which was based upon a misunderstanding by the CCCOS, Bannum has achieved an excellent record of employment. In regard to Subsistence and Resident Bank Accounts, no findings were issued and Bannum's compliance in both, are excellent.

Discipline: No findings were made, and Bannum's rating should be excellent

Food Service: One minor issue, which never should have been considered as a finding, was immediately corrected. Other reports contained commendations as to food service. Therefore, Bannum's rating should be excellent.

Accountability: No findings were made in this area. Therefore, Bannum's rating should be excellent.

Completeness and Accuracy of Reports: No findings were made in this area, and commendations were made. Therefore, Bannum's rating should be

excellent.

Therefore, based upon the foregoing, Bannum's rating for Contract Compliance should be excellent.

ii. Customer Satisfaction: In the areas of overall quality of programs, and overall approach to correctional management, no findings were made in the monitoring reports, at any level. In the area of correctional management, no report findings were ever issued at any level, and several strong commendations were made. Bannum has been performing these services at Montgomery since 1986, and they have been and will remain committed to quality programs and management and absolute compliance with all BOP requirements. Accordingly, Bannum believes that a rating of excellent is appropriate.

iii. Business Relations:

Flexibility: Relating to the issue of transportation, Bannum has considered every viable alternative, including changing insurance carrier to accommodate the changed transportation activities and the submission of three proposals. In regard to the implementation of corrective measures in response to BOP findings or recommendations, Bannum has always complied or initiated immediate meetings with appropriate BOP personnel to discuss any matters in dispute.

Proactiveness: Bannum established, with BOP approval, an Employment Specialist position that has provided the excellent resident employment

record. In other areas relating to proactiveness, Bannum has received commendations.

Professionalism: In several discussions and communications, BOP has expressed nothing but the highest regard for the staff, in general, and Ms. Davis, specifically. In one communication, the BOP stated that "...Director, Mrs. Juliette Davis, is considered a master in the field of community corrections. She has put together a group of individuals who work well together. We are very pleased to have her in charge of this facility." Staff were very knowledgeable about their duties, security and programs. The staff were professional, helpful, and displayed a team spirit attitude."

Cooperation with the BOP, USPO, U.S. Marshall, local law enforcement and the community: The transportation issue can be in no way, be considered the fault of Ms. Davis, or her staff. When the transportation issue is eliminated from the evaluation, Ms. Davis and her staff's cooperation cannot be questioned and has received a commendation in this regard.

Therefore, based upon the foregoing, a rating of excellent is appropriate for Business Relations.

f. Given the above information, Bannum cannot see how a rating of poor can be assigned to any of the categories of the evaluation. It is Bannum's belief that the transportation issue has resulted in personal bias, emotional prejudices, negative attitudes and other subjective elements in this evaluation. The injection of these subjective elements violates the standards adopted by the higher echelon of BOP.

48. As is clearly evidenced by the information supplied in my response to the Evaluation Report, BOP personnel was unjustly and improperly prejudiced against Bannum, despite its exemplary record of performance on the Montgomery project. Based upon information and belief, this unfair prejudice arose solely as a result of the transportation issue, which, despite the best efforts of Bannum, BOP has failed to negotiate in good faith. BOP, on numerous occasions, has acknowledged that the additional transportation requirements constitute a change to the contract, and despite such admission, this issue has been continually and improperly raised in monitoring and evaluation reports, which has resulted in skewed, incorrect and highly prejudicial ratings.

49. Bannum has continually attempted to negotiate this matter in good faith, as evidenced by its submission of three different cost proposals, which contained alternative methods to achieve BOP's desires for increased transportation. Each proposal has been met with contradictory statements that either the proposals were inadequate, or were too expensive. It is important to note that BOP never supplied Bannum with specifics as to what exactly what the new transportation requirements would be, thereby forcing Bannum to supply proposals in a "shotgun" approach, hoping that one of its alternatives would somehow meet BOP's yet undefinitized changed requirements.

50. Upon information and belief, it is Bannum's contention that BOP realized that the general, non-specific transportation requirement, contained in all BOP's contracts may not be sufficiently detailed to meet their needs at all facility locations. As a result, the BOP is attempting to place the blame for its Specification defect on Bannum, even to the extent of attempting to force Bannum to determine the proper "corrective action" and threatening to

withhold the contract option until Bannum corrects its SOW in a manner BOP determines is adequate and "cheap."

51. On October 15, 2000, despite the absence of any discussion concerning Bannum's third cost proposal, and despite having been supplied with incontrovertible proof of the inaccuracies contained in the monitoring and evaluation reports, the BOP notified Bannum of its intent not to exercise the remaining option periods.

52. Upon information and belief, I believe that the sole reason for the failure of the BOP to exercise the remaining options is that the BOP, in a blatant show of bad faith, is attempting to punish Bannum for its alleged failure to negotiate the undefinitized change in the transportation requirements.

53. As further evidence of BOP's continuing bad faith, and their attempt to extort extra-contractual performance from Bannum, on or about November 29, 2000, Bannum received a copy of Solicitation 200-0637-SE, which was a Request for Proposals for a follow-up contract in Montgomery. When I inquired of BOP as to the reason for the Solicitation, BOP stated that unless the transportation issue was resolved, the procurement was going back "out on the street." The BOP further represented that the Contracting Officer would contact Bannum to further discuss the transportation issue.

54. It is important to note, that despite BOP having full knowledge of the alleged transportation problems in Montgomery, the SOW in the Solicitation was not modified substantially to reflect these concerns.

55. Despite BOP's representations, I was not contacted by the Contracting Officer for further negotiations of the transportation issue. As a result, on or about January 11, 2001, I

contacted Bonnie Sinsel, Chief Contracting Officer, as to the status of the new Solicitation. Ms. Sinsel referred me to the Contracting Officer, Crystal Clayton, who informed me that unless we successfully negotiate the transportation issue, a contract would be awarded under the new Solicitation.

56. However, despite the BOP's insistence that the transportation issue be resolved, prior to the exercise of the option, they have made no attempt to specifically definitize its actual transportation requirements or to comment and/or negotiate Bannum's submitted cost proposals. It is impossible to resolve this outstanding matter, when the BOP fails to conduct good faith communications and negotiations with Bannum.

David Lowry

Sworn to me this 5th
day of March, 2001

Sandra Allen
My Commission CC853336
Expires July 11, 2003

Sandra Allen
Notary Public

JOSEPH A. CAMARDO, JR.
ATTORNEY AT LAW
127 GENESEE STREET
AUBURN, NEW YORK 13021
WWW.CAMARDO.COM

PHONE: (315) 252-3846
FAX: (315) 252-3508
E-MAIL: JCAM123@AOL.COM

JOSEPH A. CAMARDO, JR.
NANCY M. CAMARDO*
*admitted to Georgia Bar only
KEVIN M. COX
ROBERT LOUIS RILEY
MARY ANNE DOHERTY

MANAGER-GOVERNMENT COST/PRICE ANALYST
JOSEPH W. NORRIS, M.B.A.

**Via Federal Express**

April 9, 2001

Crystal Clayton
Contracting Officer
Federal Bureau of Prisons
CCC Contracting
320 First Street N.W.
Washington, D.C. 20534

**Re: Bannum, Inc.**
**Contract No. J200c-181**
**Claim**

Dear Ms. Clayton:

On March 6, 2001, Bannum, Inc. forwarded for your consideration Request for Equitable Adjustment ("REA") to the above-referenced Contract. As you know, Bannum's REA sought compensation from the BOP for lost profits and proposal preparation costs as a result of the BOP's bad faith refusal to exercise the Option on Bannum's Contract in Montgomery. As of this day, you have not responded in any way to Bannum's REA.

Based on your refusal to adjust Bannum's Contract in accordance with its aforementioned REA, this matter is in dispute. As such, pursuant to the Contract Disputes Act of 1978 and the Disputes Clause in Bannum's Contract, please be advised that Bannum hereby converts its aforementioned REA into a Claim, and demands a Contracting Officer's Final Decision and payment in the amount of $339,411.67. A summary of the Claim costs are attached hereto and incorporated into the Claim fully by reference.

Thank you for your attention to this matter. As stated previously, Bannum remains committed to the use of Alternative Dispute Resolution for the subject Claim, and hereby requests the same. As you are aware, if you deny Bannum's request for ADR, you must provide a detailed explanation for said denial.

Respectfully,

Kevin M. Cox

cc: Bannum, Inc.