| Bannun, Inc | | | | | |
|---|---|---|---|---|---|
| Contract No. J200C-181 | | | | | |
| Claim for Equitable Adjustment | | | | | |
| Contract Period | # of Days | Residents per Day | # of Inmate Residents | Lost Profit & Overhead | Lost Profit & Overhead Dollars |
| Option Year Two | 365 | 28 | $50.45 | 28.00% | $144,367.72 |
| Option Year Three | 365 | 29 | $50.45 | 28.00% | $149,523.71 |
| Subtotal | | | | | $293,891.43 |
| Estimated Added Administration Time | | | | | $19,615.00 |
| Estimated Added Phone, Travel, etc | | | | | $1,400.00 |
| Unamortized Lease Hold improvement | | | | | $22,588.24 |
| Proposal Preparation | | | | | $1,917.00 |
| Total Claim Amount | | | | | $339,411.67 |

JOSEPH A. CAMARDO, JR.
ATTORNEY AT LAW
127 GENESEE STREET
AUBURN, NEW YORK 13021
WWW.CAMARDO.COM

JOSEPH A. CAMARDO, JR.
NANCY M. CAMARDO*
*admitted to Georgia Bar only
KEVIN M. COX
ROBERT LOUIS RILEY
MARY ANNE DOHERTY

MANAGER-GOVERNMENT COST/PRICE ANALYST
JOSEPH W. NORRIS, M.B.A.

PHONE: (315) 252-3846
FAX: (315) 252-3508
E-MAIL: JCAM123@AOL.COM

**Via Federal Express**

April 9, 2001

Crystal Clayton
Contracting Officer
Federal Bureau of Prisons
CCC Contracting
320 First Street N.W.
Washington, D.C. 20534

Re: **Bannum, Inc.**
**Contract No. J200c-181**
**Claim**

Dear Ms. Clayton:

Enclosed herewith for your file please find the original Certification, signed by David Lowry of Bannum, for the Claim submitted on April 9, 2001, under Contract J200c-181, in the amount of $339,411.67. Please substitute this for the photocopied Certification provided with the original Claim.

If you have any questions, please do not hesitate to contact the undersigned.

Respectfully,

Kevin M. Cox

cc: Bannum, Inc.

**BANNUM, INC.**
**Contract No. J200C-181**
**Claim for Equitable Adjustment**

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

4-5-01
DATE:

[signature]
SIGNATURE

DAVID A. LOWRY
NAME

EXECUTIVE DIRECTOR
TITLE

**BANNUM, INC.**
**Contract No. J200C-181**
**Claim for Equitable Adjustment**

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

4-5-01
DATE:

SIGNATURE

DAVID A. LOWRY
NAME

EXECUTIVE DIRECTOR
TITLE

**U. S. Department of Justice**

Federal Bureau of Prisons

*Community Corrections Office*

*2350 Fairlane Dr. Suite 110*
*Montgomery, AL 36116*

August 1, 2001

David Lowry
Executive Director
Bannum Incorporated
1301 Seminole Boulevard
Largo, Florida 33770

**RE: Interim Monitoring (CMY 4AX)**
**(July 2-3, 2001)**
**Contract Number J200c-397**

Dear Mr. Lowry:

The purpose of this letter is to convey the findings of the Full Monitoring conducted at your facility on the above referenced dates. All findings are included in the attached Monitoring Report.

Sanitation of the facility was viewed as excellent. As noted in the report, there is one finding which will require immediate corrective action. Additionally, we request that you respond to the Recommendation and General Comment sections of the monitoring report.

Thank all your staff for the warm hospitality and cooperation displayed throughout the monitoring.

If you have any questions and/or concerns regarding the monitoring, please feel free to contact me.

Sincerely,

Larry E. Spencer
Community Corrections Manager

cc: Cheryl Dennings, Community Corrections Administrator
Jackie Taylor, Management Center Administrator
BOP-CCD/Contract Dvlp and Admin
Joseph P. Nash, Chief United States Probation Officer
Juliette Davis, Program Director
Community Corrections Manager Contract File

BAN10766

**INTERIM MONITORING REPORT FOR**
**BANNUM INCORPORATED**
**BANNUM PLACE OF MONTGOMERY**
**540 SAYRE STREET**
**MONTGOMERY, ALABAMA 36104**
**CONTRACT NUMBER J200c-397**

## SCOPE OF THE INTERIM MONITORING

An Interim Monitoring of the facility was conducted July 2-3, 2001, to determine compliance with the terms of the contract between Bannum Incorporated and the Bureau of Prisons. The following are the specific dates and times of the monitoring: July 2, 2001, from 7:00 a.m. to 3:30 p.m., and July 3, 2001, from 6:35 a.m. to 11:15 a.m. The previous Monitoring conducted February 5, 7, 8 and 9 did not identify any findings. However, the Area of Concern section of the monitoring report identified the ongoing problem with Bannum's failure to provide residents with transportation for employment and program participation activities.

## BACKGROUND INFORMATION

Bannum Incorporated is the sole provider of community-based services in the Montgomery, Alabama area. The facility is a multistory building consisting of a basement and two stories, which was built in the late 19th century. The facility has an automatic sprinkler system. The facility is located in a residential area of the city near downtown.

The facility serves as a pre-release center for male and female offenders. Client types include institution transfers, direct court commitments, supervised release violators, probation cases and pre-trial cases. All offenders should be assisted in securing viable employment, made aware of available community services, assisted with the establishment of personal bank accounts, and the reestablishment of family and community ties.

The CCC contract was awarded to Bannum Incorporated on July 1, 1998. Performance of the contract begin on October 1, 1998. The quota is 27. CCC utilization since the previous monitoring (past 5 months) has been 5031 regular inmate-days and 349 home confinement inmate-days. This equates to 34 residents per month in the facility with an additional 2 residents assigned to the home confinement program.

On the first and last day of the monitoring, there were 37 Bureau residents in the facility and 4 on home confinement. There were 0 Pretrial residents in the facility.

BAN10767

## REPEAT FINDINGS AND CORRECTIVE ACTION REQUIRED

There were no Repeat Findings noted during this monitoring.

## FINDINGS AND CORRECTIVE ACTION REQUIRED

The Statement of Work, Chapter 10, page 43 states in part "procedures for locating and verifying the whereabouts of residents at all times shall be maintained."

A random review of residents' sign in/out log sheets revealed the following discrepancies: Staff are not consistently completing the log sheets in its entirety, i.e., the residents' phase, arrival date, release date, the employer information, the residents' home address and contact person. Staff are not consistently noting the reason why residents return early or late to the facility. Additionally, during the monitoring, the COS overheard staff asking residents the time they are expected to return to the facility.

**Corrective Action:**

**Effective immediately,** staff shall complete all residents' sign in/out log sheets in its entirety. Under no circumstances shall staff allow residents to inform them of the time they are due to return to the facility. All estimated time of arrivals (ETA) shall be given to the residents by staff. Additionally, the COS and CCM recommend that the sign in/out log sheets of residents be audited each day by a staff member. All discrepancies should be relayed to the center director or counselor for corrective action.

## RECOMMENDATIONS

1) Home confinement is underutilized at this particular facility. The contractor should refer all eligible and appropriate cases for home confinement. This is an excellent tool to use to manage the in-house resident population.

2) Install a paper towel dispenser in the bathrooms. To eliminate waste, it is recommended that a dispenser be purchased that would automatically cut the paper towel when pulled from the dispenser.

## GENERAL COMMENTS

1) Under no circumstance shall the occupancy load of the facility be exceeded. The director shall consult with the CCM when necessary.

## AREA OF CONCERN

The following issue is currently being handled by the Contracting Officer and Bannum Incorporated. Therefore, it is not considered a finding but remains a concern.

Since the inception of the contract, residents continue to suffer due to Bannum's failure to provide them with transportation for employment and program participation activities. Resident interviews, as well as observation, continue to reveal residents get to and from work and other program activities the best way they can.

## COMMENDATIONS

2) Staff turnover continues to be minimal.

3) Staff strives to provide the best services possible, with the resources available to them.

---

I certify that this inspection has been performed in accordance with Bureau of Prisons policy and that all information is true and correct to the best of my knowledge.

Ray Toston

Date: 08-01-01

RAY TOSTON
Contract Oversight Specialist

Reviewed by:

Larry E. Spencer

Date: 08-01-01

LARRY E. SPENCER
Community Corrections Manager



BAN10769

**U. S. Department of Justice**

Federal Bureau of Prisons

*Community Corrections Office*

*2350 Fairlane Dr. Suite 110*
*Montgomery, AL 36116*

August 14, 2001

David Lowery
Executive Director
Bannum Incorporated
1301 Seminole Boulevard
Suite 126
Largo, Florida 33770

**RE: Close out of Interim Monitoring conducted July 2-3, 2001 Bannum of Montgomery, Alabama (4XA) Contract Number J200c-397**

Dear Mr. Lowry:

The purpose of this correspondence is to close out the Interim Monitoring conducted at your facility on the above referenced dates.

We are in receipt of your response to the monitoring report. The comment regarding transportation for the resident population was mentioned in the report because it continues to remain a concern. Nevertheless, you may consider this monitoring officially closed. We appreciate all your efforts to provide quality services and programs to the residents.

We look forward to our next visit to your facility. Should you have any questions and/or concerns, please contact us.

Sincerely,

Larry E. Spencer
Community Corrections Manager

cc: Cheryl Dennings, Community Corrections Administrator
Jackie Taylor, Management Center Administrator
Sheila Thompson, Contracting Officer
Juliette Davis, Director
Joseph P. Nash, Chief United States Probation Officer
Community Corrections Manager Contract File

BAN10759

# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT NO. 1271-2004D17200004

August 6, 2004

**PREPARED FOR:** Federal Bureau of Prisons (BoP)
ATTN: Mr. William Robinson, Assistant General Counsel
Office of General Counsel
Commercial Law Bureau
320 First Street, N.W. Ninth Floor
Washington, DC 20534

**PREPARED BY:** DCAA Tampa Bay Branch Office
14450 46th Street North, Suite 106
Clearwater, FL 33762-2921

| | |
|---|---|
| Telephone No. | (727) 533-2120 |
| FAX No. | (727) 535-9966 |
| E-mail Address | dcaa-fao1271@dcaa.mil |

**SUBJECT:** Report on Audit of Price Adjustment Claim

**REFERENCES:** Contract No: J200C-397
Claim No: 01-639c, Count 8
Relevant Dates: See Page 10
DCAA Chron No: 4-4051

**CONTRACTOR:** Bannum, Inc.
8726 Old County Road 54, Suite E
New Port Richey, FL 34653-6464

**REPORT RELEASE RESTRICTIONS:** See Page 11

**CONTENTS:**


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 1 |
| Results of Audit | 2 |
| Contractor Organization and Systems | 9 |
| DCAA Personnel and Report Authorization | 10 |
| Audit Report Distribution and Restrictions | 11 |
| Appendix – Chronology of Significant Events | 12 |


**FOR OFFICIAL USE ONLY**

## SUBJECT OF AUDIT

As you requested on March 19, 2004, we performed an examination of the Bannum, Inc.'s (BI) $339,412 price adjustment claim (Claim No. 01-639c; Count 8) for alleged damages suffered as a result of the Government's dealing with the Montgomery transportation issue and the alleged improper non-exercise of options to determine if the claimed costs are acceptable as a basis for settlement. The claim was submitted pursuant to the Contract Disputes Act of 1978, 41 U.S. C. 601-613. BI submitted the claim, dated September 12, 2002, under Contract No. J200C-397 for community correction center services. During the course of our audit, Bannum, Inc. provided a revised claim totaling $371,918. We audited the revised claim.

The price adjustment claim and related cost or pricing data are the responsibility of the contractor. Our responsibility is to express on opinion on the claim based on our examination.

## EXECUTIVE SUMMARY

Our examination of the $371,918 revised claim disclosed $371,918 of questioned costs, including the following significant element of cost.

| | |
|---|---|
| Lost Overhead & Profit | $293,892 |

The revised claim is acceptable for negotiation of a fair and reasonable price. However, the significant issues described below should be considered in the negotiation process.

SIGNIFICANT ISSUES:

We questioned the total Lost Overhead & Profit amount of $293,892 because BI's Montgomery Contract No. J200c-397 was replaced with a new Contract No. J200c-562 and there was no interruption of BI's revenues for this facility and no loss of revenues. Additionally, the BoP was under no obligation to exercise any options under the original contract.

## SCOPE OF AUDIT

We conducted our examination in accordance with generally accepted Government auditing standards. Those standards require that we plan and perform the examination to obtain reasonable assurance that the price adjustment claim is free of material misstatement. An examination includes:

- evaluating the contractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on the control risk assessment;
- examining, on a test basis, evidence supporting the amounts and disclosures in the price adjustment claim;
- assessing the accounting principles used and significant estimates made by the contractor;

- evaluating the overall price adjustment claim presentation; and
- determining the need for technical specialist assistance.

We evaluated the claimed costs using the applicable requirements contained in the:

- Federal Acquisition Regulation (FAR)
- Justice Acquisition Regulation (JAR)
- Bureau of Prisons Acquisition Policy (BPAP)

The contractor claims exemption under 48 CFR 9903.201-1(b)(3) from the practices required by the Cost Accounting Board rules and regulations because it considers itself a small business concern.

The contractor is a small business with limited resources to be applied to compliance procedures and testing. We have not reviewed Bannum's accounting system and its related internal controls. The scope of our examination reflects this assessment of control risk and includes those tests of compliance with applicable laws and regulations that we believe provide a reasonable basis for our opinion.

Entitlement is a legal matter; therefore, we did not consider entitlement issues in our audit of the contractor's price adjustment proposal. A legal review is required to determine whether the contractor has been impaired by government action or inaction and therefore has a right to a monetary adjustment. Our audit was limited to review of the amount of the proposed monetary adjustment in the event that the allegation of entitlement is proven.

## RESULTS OF AUDIT

In our opinion, the cost or pricing data submitted by the offeror are inadequate in part (see comments in the Explanatory Notes). However, the inadequacies described are considered to have a limited impact on the subject proposal. Because the inadequacies are considered relatively insignificant, we believe the proposal is an acceptable basis for negotiation of a fair and reasonable price.

We have questioned the revised claimed amount of $371,918 in its entirety. The detailed conclusions and recommendations resulting from our examination are presented below.

| Element of Claim | Contractor's Claim 9/12/2002 Complaint | Contractor's Claim 6/21/2004 Revision (Note 1) | Results of Audit Quest. Revised Claim | Note |
|---|---|---|---|---|
| Lost Overhead & Profit | $293,892 | $293,892 | $293,892 | 2 |
| Estimated administrative effort | 19,615 | | | |
| Estimated clerical labor, etc | 1,400 | | | |
| Bannum Labor Costs: | | | | |
| Facility Staff | | 211 | 211 | 3 |
| Mid-Mgmt (G&A) | | 9,615 | 9,615 | 3 |
| Clerical (G&A) | | 736 | 736 | 3 |
| Exec Mgmt D. Lowry (G&A) | | 8,800 | 8,800 | 3 |
| Exec Mgmt A. Rich (G&A) | | 4,800 | 4,800 | 3 |
| Telephone, mail, copies, etc | | 798 | 798 | 4 |
| Unamortized Leasehold Improvement | 22,588 | 22,588 | 22,588 | 5 |
| Legal Fees-Camardo | 1,917 | 20,096 | 20,096 | 6 |
| Legal Fees-Piliero | - | 8,426 | 8,426 | 7 |
| Travel | - | 1,956 | 1,956 | 8 |
| Total Claimed | $339,412 | $371,918 | $371,918 | |

Explanatory Notes

1. Contractor's Revised Claim

During the course of our audit, Bannum, Inc. (BI) provided a revised claim. We audited the revised claim.

2. Lost Overhead & Profit

a. Summary of Conclusions:

We questioned the total claimed amount of $293,892 because BI's Montgomery Contract No. J200c-397 was replaced with a new Contract No. J200c-562 and there was no interruption of BI's revenues for this facility and no loss of revenues. Additionally, the BoP was under no obligation to exercise any options under the original contract. We also consider the contractor's claimed lost overhead and profit to be a contingency, which would be unallowable under FAR 31.205-7.

b. Basis of Contractor's Cost:

According to BI, the BoP withheld the exercise of Option Years 2 and 3 of the Montgomery Contract No. J200c-397 because the BoP improperly and wrongfully alleged that BI was not meeting the transportation needs of the program participants.

BI computed the claimed amount as follows:

| | |
|---|---|
| Option Yr 2 & 3 Lost Revenue | $1,049,612 |
| Lost Profit and Overhead @ 28% | $ 293,892 |

The contractor did not provide any verifiable actual cost data to support the claimed estimated 28 percent profit and overhead rate.

c. Audit Evaluation:

The unexercised option years were for GFY 2002 and 2003 with a total of 20,805 estimated man-days @ $50.45 per man-day. We noted that this contract was replaced by Contract No. J200c-562 with a base period of GFY 2002 through 2003, with 21,900 estimated man-days at $60.45 per man-day. Thus, BI did not have a loss of revenue. In fact, it appears the replacement contract provided for more revenue than would have been realized if the option years were exercised. In addition, the BoP was under no obligation to exercise any options under the original contract. We also consider the contractor's claimed lost overhead and profit to be a contingency which would be unallowable under FAR 31.205-7.

According to BI's representative, Mr. David Lowry, there was no interruption of revenues for the Montgomery facility.

3. Bannum Labor Costs

a. Summary of Conclusions:

We questioned the total revised claim amounts because:

- BI did not have any verifiable data, including timesheets or time logs that identify the claimed effort, to support the claimed hours.
- According to Mr. Lowry, Executive Director, none of Bannum's payroll costs were increased as a result of any alleged effort regarding the claim. All employees were paid the same annual salaries or wages, regardless of whether the employee was doing any work associated with the claim or other work. Thus BI did not have any increased labor costs and we questioned the claimed amount.
- The claimed hours include an indeterminable number of estimated hours to support the claim, which are unallowable per FAR 31.205-47(f)(1).

b. Basis of Contractor's Claim:

| | Claimed | | |
|---|---|---|---|
| Bannum Labor | Hours | Rate | Total |
| Facility Staff | 10 | $ 21.07 | $ 211 |
| G&A Labor: | | | |
| Mid-Management | 405 | 23.74 | 9,615 |
| Clerical | 40 | 18.41 | 736 |
| D. Lowry, Exec. Dir. | 80 | 110.00 | 8,800 |
| A. Rich, Chairman | 40 | 120.00 | 4,800 |
| Total Bannum Labor | 575 | | $24,162 |

According to BI, the BoP withheld the exercise of Option Years 2 and 3 of the Montgomery Contract No. J200c-397 because the BoP improperly and wrongfully alleged that BI was not meeting the transportation needs of the program participants and is claiming estimated labor costs for the alleged added/abnormal contractual work effort.

The claimed hours are based solely on estimates.

The claimed labor rates for facility staff, mid-management, and clerical labor are based on the actual base labor rates, plus an approximate estimated 49 percent loading factor (for payroll and unemployment taxes, Workman's Compensation, medical insurance, and vacation, holiday, and sick pay) and an estimated 28 percent rate for G&A/Profit.

The claimed labor rates for D. Lowry and A. Rich are estimated rates. According to BI, "Considering that the Office of Federal Procurement Policy allows compensation for senior executives under Government contracts to be $186.00 per hour, Lowry and Rich's rates of $110.00 and $120.00, respectively, are extremely reasonable."

c. Audit Evaluation:

BI did not have any verifiable data, including identification of the dates the alleged labor was incurred and timesheets or time logs that identify the claimed effort, to support the claimed hours. In addition, according to Mr. Lowry, Executive Director, none of Bannum's payroll costs were increased as a result of any effort regarding the claim. All employees were paid the same annual salaries or wages, regardless of whether the employee was doing any work associated with the claim or other work. Thus BI did not have any increased labor costs and we questioned the claimed amount.

We also noted that BI's revised claimed labor costs were substantially higher than in the September 12, 2002 amended complaint. We asked the contractor's representative, Mr. David Lowry, Executive Director, why there was an increase. Mr. Lowry's written response was "In the REA's and claims which Bannum filed, we estimated, based on the best information available at the time, the number of hours which executive and middle management spent on each count, to include central office clerical support and support of staff at the facility level. Obviously, the extra work effort involved in each count did not stop at the time of filing the REA

or claim. In fact, several of the claims involved extra contract work several years after the REA and claims were filed. In preparing for the DCAA audit, Bannum staff reviewed all the REA's and claims and voluminous correspondence, documents and costs associated therewith. Accordingly, we determined that more hours were expended by middle and executive management and central office clerical staff and facility staff than were originally estimated in the majority of cases. Therefore, Bannum has now provided what we believe to be a more accurate estimate of hours". The indeterminable estimated hours that Bannum included for supporting the claim are unallowable per FAR 31.205-47(f)(1).

We found that the estimated 49 percent loading factor is based on inflated estimates. In addition, the claimed G&A labor costs (excluding G&A/Profit) are duplicated in BI's G&A expenses, which are included in the claimed 28 percent G&A/Profit rate. BI did not provide any actual cost data to support the claimed 28 percent rate, including separate identification of the G&A and profit rates. Also, BI did not provide an appropriate G&A rate which excludes the G&A expenses claimed as direct costs including labor costs, travel, and legal expenses.

Should the BoP determine there is entitlement to claimed labor hours, we computed recommended average labor rates, shown below, based on:

- Actual hourly base labor rates.
- A 23.3 percent fringe rate based on BI's recorded costs for salaries, payroll and unemployment taxes, workman's compensation, and medical from CY 1998 to CY 2000.
- A 10 percent G&A rate based on BI's recorded allocation bases (operating expenses) and G&A expenses (adjusted for unallowable interest expense, G&A labor costs claimed as direct costs, and the total legal expenses which are either claimed as a direct cost or have no causal/beneficial relationship to the subject claim) from CY 1998 to CY 2000.

- Facility Staff $12.08
- G&A Mid-Mgmt $15.52
- G&A Clerical $13.10
- D. Lowry $33.91
- A. Rich $81.14

4. Telephone, Mail, Copies etc.

a. Summary of Conclusions:

We questioned the $798 claim because we could not determine from the documentation provided that the costs were incurred for this claim.

b. Basis of Contractor's Claim:

The $798 claim purportedly represents telephone, shipping, and copy costs related to the door replacement issue.

c. Audit Evaluation:

BI's support consisted of a list of charges for $698. BI did not provide any support for the remaining $100 of the claim. We could not determine that the costs were incurred for this claim from the documentation provided.

5. Unamortized Leasehold Improvement

a. Summary of Conclusions:

Since there was no loss of revenue, there were no unamortized leasehold improvement costs. Therefore, we questioned the total claimed amount of $22,588.

b. Basis of Contractor's Cost:

According to BI, since the two option years were not exercised, BI's leasehold improvement costs were not amortized for the two year period and estimated $22,588 for the claimed unamortized leasehold improvement costs.

BI did not provide any verifiable cost data to support the claimed amount.

c. Audit Evaluation:

Since there was no interruption in BI's revenues from this facility (See Note 2 above), it had no unamortized leasehold costs and we questioned the entire claimed amount.

6. Legal Fees-Camardo

a. Summary of Conclusions:

We questioned $18,171 of the $20,096 claim for legal fees for protests of Federal Government solicitations which are unallowable per FAR 31.205-47(f)(8). Since all of the other claimed elements were questioned for the reasons stated in the above notes, we consider the remaining $1,925 claimed attorney's fees unreasonable and questioned the claimed amount.

b. Basis of Contractor's Cost:

The claimed amount represents paid attorney invoices associated with the transportation issue.

c. Audit Evaluation:

The claim was submitted April 9, 2001. We found that the claimed costs include $18,171 for protesting the Montgomery re-solicitation. $10,916 of the $18,171 claimed amount was for fees subsequent to filing of the claim. All of the re-solicitation protest fees are unallowable per FAR 31.205-47(f)(8). We verified the $1,925 pre-claim fees to the attorney invoices. However, since all of the other claimed elements were questioned for the reasons stated in the above notes, we consider the remaining $1,925 claimed attorney's fees unreasonable and questioned the claimed amount. We also noted that there was no mention of claimed costs for the re-solicitation protest fees in the complaint.

7. <u>Legal Fees-Piliero</u>

a. Summary of Conclusions:

Since all of the claimed elements were questioned for the reasons stated in the above notes, we consider the $8,426 claimed attorney's fees unreasonable and questioned the claimed amount. In addition, we could not determine what the services were for from the documentation provided. FAR 31.205.33 states that, to be allowable, fees for services rendered must be supported by evidence of the nature and scope of the service furnished.

b. Basis of Contractor's Cost:

The claimed amount represents paid attorney invoices allegedly associated with the transportation issue.

c. Audit Evaluation:

We reviewed BI's supporting documentation and could not determine what the services were for. FAR 31.205.33 states that, to be allowable, fees for services rendered must be supported by evidence of the nature and scope of the service furnished. Since all of the claimed elements were questioned for the reasons stated in the above notes, we also consider the $8,426 claimed attorney's fees unreasonable. It is also noted that there was no mention or claimed costs for this effort in the complaint. To date, only $2,000 was paid on this subject $8,426 invoice.

8. Travel

a. Summary of Conclusions:

We questioned the entire $1,956 because it is not supported by documentation describing the purpose of the claimed trips which is required by FAR 31.205-46(a)(7).

b. Basis of Contractor's Claim:

The claimed costs represent alleged travel incurred by Mr. Dave Lowry in connection with this claim.

c. Audit Evaluation:

We reviewed the contractor's supporting documentation which consisted solely of travel receipts. The claimed costs for the executive director, Mr. Lowry were not supported by documentation describing the purpose of the trips which is required by FAR 31.205-46(a)(7) and is therefore unallowable.

We discussed the results of our examination with Mr. David Lowry, Executive Director and Mr. John Rich, Corporate Counsel, during an exit conference held on August 4, 2004. At the request of Tom Dinackus, DoJ Attorney, a copy of our draft report was not provided to Bannum. We did, however, discuss with Bannum, our summary audit findings by cost element claimed. Bannum was informed that our report addressed their final revised claimed costs. Bannum was advised that a copy of our report could be requested through the DoJ. The contractor reserved comment pending receipt and review of the final DCAA audit report.

## CONTRACTOR ORGANIZATION AND SYSTEMS

1. Organization

Bannum, Inc. provides Community Correction/Comprehensive Sanction Center services for the Federal Bureau of Prisons. Bannum, Inc. currently has 137 employees. Bannum, Inc. currently has 12 Community Correction/Comprehensive Sanction Centers at various locations in the United States. Bannum, Inc.'s calendar year 2003 revenues were approximately $8,000,000 all of which were for BoP contracts.

2. Accounting & Estimating Systems

Bannum's accounting period is from January 1 to December 31. We have not performed any reviews of the contractor's systems.

## DCAA PERSONNEL

| | Telephone No. |
|---|---|
| Primary contacts regarding this audit: | |
| Walter A. Schminky, Supervisory Auditor | (727) 533-2133 |
| Joseph Schillace, Technical Specialist | (727) 533-2121 |
| Other contact regarding this audit report: | |
| Gary R. Ricketts, Branch Manager | (727) 533-2120 |
| | FAX No. |
| | (727) 535-9966 |
| | E-mail Address |
| | dcaa-fao1271@dcaa.mil |

General information on audit matters is available at http://www.dcaa.mil/.

## RELEVANT DATES

Request for audit dated March 19, 2004 and received March 22, 2004.

**AUDIT REPORT AUTHORIZED BY:**

/signed/

Gary R. Ricketts
Branch Manager
DCAA Tampa Bay Branch Office

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

DISTRIBUTION

| | E-mail Address |
|---|---|
| Federal Bureau of Prisons<br>ATTN: Mr. William Robinson, Assistant General Counsel<br>Office of General Counsel<br>Commercial Law Bureau<br>320 First Street, N.W. Ninth Floor<br>Washington, DC 20534 | wdrobinson@bop.gov |
| United States Department of Justice<br>ATTN: Mr. Paul Wellons, Commercial Litigation Attorney<br>1100 L Street , N.W. Room 11018<br>Washington, DC 20005 | paul.wellons@usdoj.gov |
| Defense Contract Audit Agency<br>ATTN: OAL – Sr. Non-DoD FLA (P. Stephens)<br>8725 John J. Kingman Road, Suite 2135<br>Ft. Belvoir, VA 22060-6219 | dcaa-srfla-nondod@dcaa.mil<br><br><u>Telephone No.</u><br>(202) 287-1540 |
| Bannum, Inc.<br>8726 Old County Road 54, Suite E<br>New Port Richey, FL 34653-6464 | (Copy furnished thru the DoJ) |

RESTRICTIONS

1. Information contained in this audit report may be proprietary. It is not practical to identify during the conduct of the audit those elements of the data which are proprietary. Make proprietary determinations in the event of an external request for access. Consider the restrictions of 18 U.S.C. 1905 before releasing this information to the public.

2. Under the provisions of Title 32, Code of Federal Regulations, Part 290.7(b), DCAA will refer any Freedom of Information Act requests for audit reports received to the cognizant contracting agency for determination as to releasability and a direct response to the requestor.

3. Do not use the information contained in this audit report for purposes other than action on the subject of this audit without first discussing its applicability with the auditor.

**CHRONOLOGY OF SIGNIFICANT EVENTS**
**FOR CLAIM No. 01-639C-Count 8**

Filed under Disputes clause

J200c-336 (Beaumont, Texas); J200c-361 (Corpus Christi, Texas); J200c-375 (Laredo, Texas)

United States Court of Federal Claims Case No. 01-639c

Contractor Name: Bannum, Inc. Telephone: 727-588-2594

Trial Attorney Name: Joseph Camardo, Jr. Telephone: 315-252-3846

Dates of Contracts Awarded:
J200c-336 (Beaumont, Texas) 7/17/97
J200c-361 (Corpus Christi, Texas) 10/15/97
J200c-375 (Laredo, Texas) 11/19/97

Performance dates per contract and Modifications:
BEAUMONT (J200C-336)
Base Period: 11/1/97 - 10/31/99
Option 1: 11/1/99 - 10/31/00
Option 2: 11/1/00 - 10/31/01
Option 3: 11/1/01 - 10/31/02
Extension Modification #19 11/1/02 - 4/30/03

CORPUS CHRISTI (J200C-361)
Base Period: 2/1/98 - 1/31/00
Option 1: 2/1/00 - 1/31/01
Option 2: 2/1/01 - 1/31/02
Option 3: 2/1/01 - 1/31/03
Extension Modification #15 2/1/03 - 4/30/03
Extension Modification #16 5/1/03 - 5/31/03

LAREDO (J200C-375) (Male)
Base Period: 1/1/98 - 12/31/99
Option 1: 1/1/00 - 12/31/00
Option 2: 1/1/01 - 12/31/01
Option 3: 1/1/02 - 12/31/02
Extension Modification 20 1/1/03 - 6/30/03
Purchase Order 3R130031: 7/1/03 - 7/31/03.

Description: Bannum alleged that it had lost profits and overhead and other costs as a result of the Government's dealing with the Montgomery transportation issue and the alleged improper non-exercise of options.

Dates contracting officer decisions rendered:

* There are two sets of lawsuit "Count" numbers, the primary set being from Bannum's Second Amended Complaint, the secondary being from the CART files that BOP sent DCAA on March 19, 2004. For ease of reference, both are used throughout this document.

Count 8 (CART # 15): Deemed Denial

Date claims (certified, if over $100,000) filed:

Count 8(CART # 15): April 9, 2001

Date audit request received: March 22, 2004

<u>Pertinent Government or Contractor Actions:</u>

<u>Count Eight: "Extra-contractual" changes to Transportation Requirements/Failure to Exercise Option (two Montgomery, Alabama contracts)</u>
(CART # 15)

On March 6, 2001, Bannum submitted an REA, requesting compensation for all costs expended as a result of the transportation issue and for lost profits resulting from BoP not exercising the option because of the transportation issue. On April 9, 2001, Bannum converted its REA into a Claim, demanding $339,411.67. The Contracting Officer did not issue a Final Decision, and from the deemed denial, Bannum appealed. This count deals with BoP requirements about public transportation, including that it be available within one mile of the facility. It is important to note, especially vis-à-vis the lost profits portion of this claim, that after failing to exercise the option, BoP awarded Bannum the subsequent contract.

# PART II - CONTRACT CLAUSES

## SECTION I - CONTRACT CLAUSES

I.1 52.252-2 CLAUSES INCORPORATED BY REFERENCE (JUN 1988)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

| NUMBER | TITLE | DATE |
|---|---|---|
| 52.202-1 | DEFINITIONS | OCT 1995 |
| 52.203-3 | GRATUITIES | APR 1984 |
| 52.203-5 | COVENANT AGAINST CONTINGENT FEES | APR 1984 |
| 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT | JUL 1995 |
| 52.203-7 | ANTI-KICKBACK PROCEDURES | JUL 1995 |
| 52.203-8 | CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY | JAN 1997 |
| 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY | JAN 1997 |
| 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS | JUN 1997 |
| 52.204-4 | PRINTING/COPYING DOUBLE-SIDED ON RECYCLED PAPER | JUN 1996 |
| 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT | JUL 1995 |
| 52.215-2 | AUDIT AND RECORDS--NEGOTIATION | AUG 1996 |
| 52.215-8 | ORDER OF PRECEDENCE--UNIFORM CONTRACT FORMAT | OCT 1997 |
| 52.215-10 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA | OCT 1997 |
| 52.215-12 | SUBCONTRACTOR COST OR PRICING DATA | OCT 1997 |
| 52.215-15 | TERMINATION OF DEFINED BENEFIT PENSION PLANS | OCT 1997 |
| 52.215-18 | REVERSION OR ADJUSTMENT OF PLANS FOR POSTRETIREMENT BENEFITS (PRB) OTHER THAN PENSIONS | OCT 1997 |
| 52.215-19 | NOTIFICATION OF OWNERSHIP CHANGES | OCT 1997 |
| 52.217-2 | CANCELLATION UNDER MULTIYEAR CONTRACTS | OCT 1997 |

I.1 (Continued)

| NUMBER | TITLE | DATE |
|---|---|---|
| 52.219-8 | UTILIZATION OF SMALL, SMALL DISADVANTAGED AND WOMEN-OWNED SMALL BUSINESS CONCERNS | JUN 1997 |
| 52.219-9 | SMALL, SMALL DISADVANTAGED AND WOMEN-OWNED SMALL BUSINESS SUBCONTRACTING PLAN | AUG 1996 |
| 52.219-16 | LIQUIDATED DAMAGES--SUBCONTRACTING PLAN | OCT 1995 |
| 52.222-3 | CONVICT LABOR | AUG 1996 |
| 52.222-4 | CONTRACT WORK HOURS AND SAFETY STANDARDS ACT - OVERTIME COMPENSATION | JUL 1995 |
| 52.222-26 | EQUAL OPPORTUNITY | APR 1984 |
| 52.222-28 | EQUAL OPPORTUNITY PREAWARD CLEARANCE OF SUBCONTRACTS | APR 1984 |
| 52.222-36 | AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS | APR 1984 |
| 52.222-37 | EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA | JAN 1988 |
| 52.222-41 | SERVICE CONTRACT ACT OF 1965, AS AMENDED | MAY 1989 |
| 52.222-43 | FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT ACT--PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) | MAY 1989 |
| 52.223-2 | CLEAN AIR AND WATER | APR 1984 |
| 52.223-6 | DRUG-FREE WORKPLACE | JAN 1997 |
| 52.223-14 | TOXIC CHEMICAL RELEASING REPORTING | OCT 1996 |
| 52.224-1 | PRIVACY ACT NOTIFICATION | APR 1984 |
| 52.224-2 | PRIVACY ACT | APR 1984 |
| 52.225-11 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES | OCT 1996 |
| 52.227-1 | AUTHORIZATION AND CONSENT | JUL 1995 |
| 52.227-2 | NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT | AUG 1996 |
| 52.229-3 | FEDERAL, STATE, AND LOCAL TAXES | JAN 1991 |
| 52.229-5 | TAXES - CONTRACTS PERFORMED IN U.S. POSSESSIONS OR PUERTO RICO | APR 1984 |
| 52.232-1 | PAYMENTS | APR 1984 |
| 52.232-8 | DISCOUNTS FOR PROMPT PAYMENT | MAY 1997 |
| 52.232-11 | EXTRAS | APR 1984 |
| 52.232-17 | INTEREST | JUN 1996 |
| 52.232-18 | AVAILABILITY OF FUNDS | APR 1984 |
| 52.232-23 | ASSIGNMENT OF CLAIMS | JAN 1986 |
| 52.232-25 | PROMPT PAYMENT | JUN 1997 |
| 52.232-33 | MANDATORY INFORMATION FOR ELECTRONIC FUNDS TRANSFER | AUG 1996 |

**I.1 (Continued)**

| NUMBER | TITLE | DATE |
|---|---|---|
| | PAYMENT | |
| 52.233-1 | DISPUTES | OCT 1995 |
| | Alternate I (DEC 1991) | |
| 52.233-3 | PROTEST AFTER AWARD | AUG 1996 |
| 52.242-13 | BANKRUPTCY | JUL 1995 |
| 52.243-1 | CHANGES - FIXED-PRICE | AUG 1987 |
| | Alternate I (APR 1984) | |
| 52.244-1 | SUBCONTRACTS (FIXED-PRICE CONTRACTS) | OCT 1997 |
| 52.246-25 | LIMITATION OF LIABILITY - SERVICES | FEB 1997 |
| 52.248-1 | VALUE ENGINEERING | MAR 1989 |
| 52.249-2 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) | SEP 1996 |
| 52.249-8 | DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) | APR 1984 |
| 52.253-1 | COMPUTER GENERATED FORMS | JAN 1991 |

**I.2 52.204-1 APPROVAL OF CONTRACT (DEC 1989)**

This contract is subject to the written approval of the Department of Justice, Federal Bureau of Prisons, Supervisory Contracting Officer, Community Corrections Contracting and shall not be binding until so approved.

**I.3 52.216-18 ORDERING (OCT 1995)**

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from the date established by the notice to proceed through a period not to exceed the last day of the base period as set forth in Sections B and F, or the last day of an option period, if exercised, as set forth in Sections B and F.

(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

(c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

**I.4 52.216-19 ORDER LIMITATIONS (OCT 1995)**

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than , the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

(b) Maximum order. The Contractor is not obligated to honor--

(1) Any order for a single item in excess of ;

(2) Any order for a combination of items in excess of ; or

(3) A series of orders from the same ordering office within days that together call for quantities exceeding the limitation in subparagraph (1) or (2) above.

(c) If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) above.

(d) Notwithstanding paragraphs (b) and (c) above, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.

**I.5 52.216-21 REQUIREMENTS (OCT 1995)**

(a) This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. Subject to any limitations in the Order Limitations clause or elsewhere in this contract, the Contractor shall furnish to the Government all supplies or services specified in the Schedule and called for by orders issued in accordance with the Ordering clause. The Government may issue orders

**I.5 (Continued)**

requiring delivery to multiple destinations or performance at multiple locations.

(c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

(d) The Government is not required to purchase from the Contractor requirements in excess of any limit on total orders under this contract.

(e) If the Government urgently requires delivery of any quantity of an item before the earliest date that delivery may be specified under this contract, and if the Contractor will not accept an order providing for the accelerated delivery, the Government may acquire the urgently required goods or services from another source.

(f) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after the last day of the base period or the last day of any additional option period should the Government exercise the option clause as specified in the schedule.

**I.6 52.217-8 OPTION TO EXTEND SERVICES (AUG 1989)**

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within the period specified in the Schedule.

**I.7 52.217-9 OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 1989)**

(a) The Government may extend the term of this contract by written notice to the Contractor within the time specified in the schedule; provided, that the Government shall give the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The

**I.7 (Continued)**

preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option provision.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

**I.8 52.222-35 AFFIRMATIVE ACTION FOR SPECIAL DISABLED AND VIETNAM ERA VETERANS (APR 1984) (DEVIATION)**

(a) Definitions.

"Appropriate office of the State employment service system," as used in this clause, means the local office of the Federal-State national system of public employment offices with assigned responsibility for serving the area where the employment opening is to be filled, including the District of Columbia, Guam, Commonwealth of Puerto Rico, and the Virgin Islands.

"Positions that will be filled from within the Contractor's organizations", as used in this clause, means employment openings for which no consideration will be given to persons outside the Contractor's organization (including any affiliates, subsidiaries, and the parent companies) and includes any openings that the Contractor proposes to fill from regularly established "recall" lists.

"Employment openings", as used in this clause, includes full-time employment, temporary employment of over 3 days, and part-time employment, but does not include (1) executive and top management positions, (2) positions that will be filled from within the Contractor's organization or under a customary and traditional employer-union hiring arrangement, or (3) openings in an educational institution that are restricted to students of that institution.

(b) General. (1) Regarding any position for which the employee or applicant for employment is qualified, the Contractor shall not discriminate against the individual because the individual is a special disabled or Vietnam Era veteran. The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified special disabled and Vietnam Era veterans without discrimination based upon their disability or veterans' status in all employment practices such as-

(i) Employment;

**I.8 (Continued)**

(ii) Upgrading

(iii) Demotion or transfer;

(iv) Recruitment;

(v) Advertising;

(vi) Layoff or termination;

(vii) Rates of pay or other forms of compensation; and

(viii) Selection for training, including apprenticeship

(2) The Contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor (Secretary) issued under the Vietnam Era Veterans' Readjustment Assistance Act of 1972 (the Act), as amended.

(c) Listing openings. (1) The Contractor agrees to list all employment openings existing at contract award or occurring during contract performance, at the appropriate office of the State employment service system in the locality where the opening occurs. These openings including those occurring at any Contractor facility, including one not connected with performing this contract. An independent corporate affiliate is exempt from this requirement.

(2) State and local government agencies holding Federal contracts of $10,000 or more shall also list all their openings with the appropriate office of the State employment service.

(3) The listing of employment openings with the State employment service system is required at least concurrently with using any other recruitment source or effort and involves the obligations of placing a bona fide job order, including accepting referrals of veterans and nonveterans. This listing does not require hiring any particular job applicant or hiring from any particular group of job applicants and is not intended to relieve the Contractor from any requirements of Executive orders or regulations concerning nondiscrimination in employment.

(4) Whenever the Contractor becomes contractually bound to the listing terms of this clause, it shall advise the State employment service system, in each State where it has establishments, of the name and location of each

hiring location in the State. As long as the Contractor is contractually bound to these terms and has so advised the State system, it need not advise the State system of subsequent contracts. The Contractor may advise the State system when it is no longer bound by this contract clause.

(5) Under the most compelling circumstances, an employment opening may not be suitable for listing, including situations when (i) the Government's needs cannot reasonably be supplied, (ii) listing would be contrary to national security, or (iii) the requirement of listing would not be in the Government's interest.

(d) Applicability. (1) This clause does not apply to the listing of employment openings which occur and are filled outside the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands.

(2) The terms of paragraph (c) above of this clause do not apply to openings that the Contractor proposes to fill from within its own organization or under a customary and traditional employer-union hiring arrangement. This exclusion does not apply to a particular opening once an employer decides to consider applicants outside of its own organization or employer-union arrangement for that opening.

(e) Postings. (1) The Contractor agrees to post employment notices stating (i) the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified special disabled veterans and veterans of the Vietnam era, and (ii) the rights of applicants and employees.

(2) These notices shall be posted in conspicuous places that are available to employees and applicants for employment. They shall be in a form prescribed by the Director, Office of Federal Contract Compliance Programs, Department of Labor (Director), and provided by or through the Contracting Officer.

(3) The Contractor shall notify each labor union or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound by the terms of the Act, and is committed to take affirmative action to employ, and advance in employment, qualified special disabled and Vietnam Era veterans.

(f) Noncompliance. If the Contractor does not comply with the requirements of this clause, appropriate actions may be taken

**I.8 (Continued)**

under the rules, regulations, and relevant orders of the Secretary issued pursuant to the Act.

(g) Subcontracts. The Contractor shall include the terms of this clause in every subcontract or purchase order of $10,000 or more unless exempted by rules, regulations, or orders of the Secretary. The Contractor shall act as specified by the Director to enforce the terms, including action for noncompliance.

**I.9 52.222-42 STATEMENT OF EQUIVALENT RATES FOR FEDERAL HIRES (MAY 1989)**

In compliance with the Service Contract Act of 1965, as amended, and the regulations of the Secretary of Labor (29 CFR Part 4), this clause identifies the classes of service employees expected to be employed under the contract and states the wages and fringe benefits payable to each if they were employed by the contracting agency subject to the provisions of 5 U.S.C. 5341 or 5332.

THIS STATEMENT IS FOR INFORMATION ONLY: IT IS NOT A WAGE DETERMINATION.

**I.10**

| CLASSES OF SERVICE EMPLOYEES | NUMBER OF EMPLOYEES | WAGE RATE |
|---|---|---|
| 27101 Guard I | 2-3 | GS 4,5,6 |
| 01011 Accounting Clerk I | 1 | GS 4,5 |
| 01012 Accounting Clerk II | 1 | GS 5,6 |
| 07041 Cook I | 1-2 | WG 7,8 |
| 07042 Cook II | 1-2 | WG 8 |
| 07010 Baker | 1 | WS 7 |
| 07070 Dishwasher | 1-2 | WG 3,4 |
| 07100 Food Service Worker | 1-2 | WG 3,4 |
| 01040 Desk Clerk | 2-3 | GS 3,4 |
| 01102 File Clerk | 1-2 | GS 3,4 |
| 10311 Secretary | 1 | GS 5,6 |
| 11150 Janitor, Porter, Cleaner | 1 | WG 3,4 |
| 23370 General Maintenance Worker | 1 | WG 6,7 |

**I.11 52.232-19 AVAILABILITY OF FUNDS FOR THE NEXT FISCAL YEAR (APR 1984)**

Funds are not presently available for performance under this contract beyond September 30, 1998. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. No legal liability on the part of the Government for any payment may arise for performance under this contract beyond September 30, 1998, until funds are made available to the Contracting Officer for performance and until the

**I.11 (Continued)**

Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

**I.12 52.252-6 AUTHORIZED DEVIATIONS IN CLAUSES (APR 1984)**

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation or contract of any Department of Justice clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.