No. 01-639
(Judge Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

BANNUM, INC.

Plaintiff,

v.

UNITED STATES,

Defendant.

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

---

Dated: October 12, 2007

Respectfully submitted,

Joseph A. Camardo, Jr.
Camardo Law Firm, P.C.
*Attorneys for Plaintiff*
127 Genesee Street
Auburn, New York 10321
Tel: (315) 252-3846
Fax: (315) 252-3508

# TABLE OF CONTENTS


Table of Authorities……………………………………………………………………....ii

Summary….…………………………………………………………………………………1

I. ARGUMENT………………………………………………………………………..1

A. Summary Judgment Standard………………………………………………..1

B. Count 6: Contract J200c-336 - Beaumont, Texas...…………………………….....2

1. Statement of Facts Relevant to Count 6…………………………………..2

2. Legal Argument – Count 6………………………………………………..6

(i) The Government Withheld Superior Knowledge…………………7

(ii) The BOP Breached its Duty of Cooperation & Fair Dealing……11

(iii) Bannum is Entitled to Recover Costs for its Response to BOP's Cure Notice and for All Costs Attributable to its Litigation Regarding the Lease…………………………………..13

C. Count 8: Contract J200c-397 – Montgomery, Alabama…………………………14

1. Statement of Facts Relevant to Count 8………………………………….15

2. Legal Argument – Count 8……………………………………………....21

(i) Bannum is Entitled to All Costs in Dealing with Transportation Issue……………………………………………..21

(ii) The BOP Acted in Bad Faith in Not Exercising the Option to Contract J200c-397……………………………………25

PLAINTIFF'S CROSS-MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT…………………………………………………….28

Conclusion………………………………………………………………………………30

# Table of Authorities

## Federal Cases

Abcon Assoc. v, United States,
49 Fed.Cl. 678 (2001) 13

American Shipbuilding Co. v. United States,
654 F.2d 75, 79, 228 Ct.Cl. 220 (1981) 10

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) 2

Bill Strong Enterprises, Inc. v. Shannon,
49 F.3d 1541, 1550 (Fed. Cir. 1995) 23

C. Sanchez & Son, Inc. v. United States,
6 F.3d 1539 (Fed.Cir 1993) 13

Celotex Corp. v. Catrett,
477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) 2

Centex Corp. v. United States,
395 F.3d 1283, 1304 (Fed.Cir. 2005) 13

Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,
145 F.3d 1303, 1307 (Fed.Cir.1998) 2

Citizens Federal Bank, FSB v. U.S.,
52 Fed.Cl. 561, 562-563 (2002) 2

Gasser Chair Co. v. Infanti Chair Mfg. Corp.,
60 F.3d 770, 773 (Fed.Cir.1995) 2

Helene Curtis Indus., Inc. v. United States,
160 Ct. Cl. 437, 312 F.2d 774 (1963) 9, 10

Helene Curtis Indus., Inc. v. United States,
169 Ct. Cl. 437, 444, 312 F.2d 774 (1963) 11

Hi-Shear Technology Corp. v. United States,
53 Fed.Cl. 420 (2002) 27

Info. Tech. & Applications Corp. v. United States,
316 F.3d 1312 (Fed.Cir.2003) 27

Jay v. Secretary, DHHS,
998 F.2d 979 (Fed.Cir.1993) 2

Kalvar Corp. v. United States,
211 Ct.Cl. 192, 543 F2d. 1298, 1302 (1976) 27

Lewis-Nicholson, Inc. v. United States,
213 Ct.Cl. 192, 550 F.2d 26, 32 (1977) 13

Libertatia Associates, Inc. v. United States,
46 Fed.Cl. 702 (Fed.Cl.2000) 27

Librach v. United States,
147 Ct.Cl. 605, 614 (1959) 27

Northrop Grumman Corp., Military Aircraft Div. v. United States,
63 Fed.Cl. 12, 15-16 (2004) 10

Orlosky Inc. v. United States,
68 Fed.Cl. 296 (2005) 13

Peter Kiewet Sons' Co. v. United States,
138 Ct.Cl. 668 (1957) 13

Petrochem Service, Inc. v. United States,
837 F.2d 1076, 1079 (1988) 10

Reflectone, Inc. v. Dalton,
60 F.3d 1572, 1579 (Fed. Cir. 1991) (en banc) 23


**Federal Regulations**


FAR 31.202 13, 24

FAR 31.205-33 23

FAR 31.205-33(a)(b) 23


**Other Authorities**


Agrinautics,
ASBCA Nos. 21512, 21608, 21609, 1979 WL 41983 14, 25

Allied Material & Equip. Co.,
ASBCA 17318, 75-1 BCA ¶ 11,150 22

C. H. Hyperbarics, Inc.,
ASBCA No. 49375, 04-1 BCA ¶32,568 24

Electronics Corporation of America,
ASBCA No. 4770, 61-2 BCA ¶ 3134 14, 24

George Hyman Construction Company,
ENGBCA 4541, 85-1 BCA ¶17,847 25

Gladwynne Construction Co.,
ASBCA No. 47076, 95-1 BCA ¶27,297 24

Grumman Aerospace Corp.,
ASBCA No. 50090, 01-1 BCA ¶ 31,316, aff'd, 34 Fed. Appx. 710 (Fed. Cir. 2003) 23

Lear Siegler, Inc.,
ASBCA 22235, 81-2 BCA ¶ 15,372 10

Peter Kiewit Sons' Company,
ENGBCA No. 4742, 85-1 BCA ¶ 17,911 at 100,248 14, 24

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BANNUM, INCORPORATED,

Plaintiff, No.01-639C

v. Judge Lettow

UNITED STATES,

Defendant.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR LEAVE TO AMEND COMPLAINT**

Summary

In accordance with the Court's Order issued following the July 13, 2007 status conference, defendant filed its motion for partial summary judgment on Counts 6 and 8 of the Second Amended Complaint. Pursuant to its Order, the Court limited defendant to a motion for summary judgment on only two counts in the second amended complaint. Plaintiff has incurred a tremendous amount of time and effort in wading through the documentation submitted by defendant in support of its motion, as well as in reviewing the mountains of documentation produced by the BOP during discovery, to ensure a full and complete record is before the Court. Unfortunately, in its motion, defendants have failed to provide the Court with key documentation generated by the BOP relating to each of the Counts. As argued herein, this information, along with the affidavits of David Lowry being filed herewith, clearly establishes issues of material fact which preclude summary judgment.

## I. ARGUMENT:

### A. Summary Judgment Standard:

Summary judgment is appropriate when there are no genuine issues of material fact and

the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Jay v. Secretary, DHHS, 998 F.2d 979 (Fed.Cir.1993). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Citizens Federal Bank, FSB v. U.S., 52 Fed.Cl. 561, 562-563 (2002). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, where that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must resolve any doubts about factual issues in favor of the non-moving party, Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1307 (Fed.Cir.1998), and draw all reasonable inferences in its favor. See Gasser Chair Co. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 773 (Fed.Cir.1995).

**B. Count 6: Contract J200c-336, Beaumont Texas:**

Defendant has moved for partial summary judgment on Count 6 on the grounds that: (1) Bannum is not entitled to recover the cost of responding to a cure notice; (2) the Government did not withhold superior knowledge; and (3) the Government did not breach its duty to cooperate. In response, plaintiff alleges that partial summary judgment is not appropriate because, as presented below, defendant has failed to include pertinent documentation that raises material issues of fact.

**1. Statement of Facts Relevant to Count 6**

On July 17, 1997, Bannum entered into contract J200c-336 with the BOP to provide a community corrections center services in accordance with the stated specification. (PFUF 90). At the time of the award of the contract, Bannum had several contracts with the BOP for community correction centers, a number of which were located in the South Central Region.

(PFUF 80). Simultaneously, Bannum was experiencing a multitude of contract disputes, many of which centered around the actions and inactions of Charles Ala (BOP Community Corrections Manager). (PFUF 81)

In order to provide the necessary facility needed to perform the contract, Bannum negotiated and entered into a sublease agreement for a building located at 1310 Pennsylvania Avenue, Beaumont, Texas on or about February 5, 1997. The lessor on the lease was listed as Ken Webb, who was listed as an owner of the property. (PFUFs 82, 83, 86). John McCray, who was a business partner of Mr. Webb, (PFUF 84), was identified as an owner of the property, as specified on the application for amendment of the zoning ordinance. (PFUF 88). At all times during the leasehold, Bannum made rental payments as specified (PFUF 91), including payments made directly to Mr. McCray directed by a letter dated February 10, 1999. (PFUF 92).

On November 7, 2000, Mr. Ala advised Ms. Mustain that, during the monitoring of Bannum, it was discovered that the City Council in Beaumont had approved a Catholic school for troubled youths, and that the school would be in the section of the building occupied by Bannum. Mr. Ala also represented that the City Council stated that it was agreed upon that Bannum would vacate the premises prior to the beginning of the school year 2001. Mr. Ala further stated that as of the date of the memorandum, Bannum had not notified the BOP of any future move. No mention is made of any attempts by the BOP to communicate this information to Bannum. (PFUF 93). The BOP never disclosed this information to Bannum (PFUF 94).

On December 15, 2000, Bannum received a notice dated December 8, 2000, stating that "the owner has elected to execute his option to terminate your tenancy. (PFUF 95), despite the fact that no such option existed in the lease. (Response to PFUF 7).

On December 18, 2000 Mr. Ala sent a memorandum to the BOP's Assistant Community Corrections Administrator recounting a conversation he had with Mr. McCray and his allegations that the property was improperly subleased to Bannum and therefore no lease existed. Mr. Ala further stated that he had contacted Cornell Corrections, who stated that they could accommodate Bannum's Beaumont residents if it became necessary. The December 18, 2000, memorandum also contained a handwritten note stating: **"County Commissioner says unwritten agreement that if the schools goes in Bannum will have to vacate."** (emphasis added) No mention was made of any attempts by the BOP to communicate with Bannum. (PFUFs 97-98). On December 19, 2000, the BOP Regional Administrator called Bannum and inquired about the purported eviction letter. At no time during the conversation did Ms. Mustain raise the issue of the school agreement. (PFUF100).

On December 19, 2000, Benjamin Tousley, Community Corrections Manager issued a memorandum to the Contracting Officer recommending that a Cure Notice be issued to Bannum. No mention was made in the memo regarding the agreement that had been made to displace Bannum from the property to make room for the Milburn Academy. (PPUF 101). On December 19, 2000 Bannum's lease was reviewed by attorney Susan Oliver, who stated that the lease was valid, and that she would seek a restraining order. (PFUF 102). Bannum supplied a copy of Ms. Oliver's letter to the BOP. (PFUF 104). On December 20, 1999 David Lowry of Bannum had a telephone conversation with Andrea Johnson (Deputy Community Corrections Regional Administrator for BOP), during which Ms. Johnson stated that since Bannum was being evicted from the contract location, a Cure Notice would be issued the following week by the Contracting Office. At no time during the telephone conversation did Ms. Johnson impart any information to Bannum regarding the school agreement. (PFUF 103).

On December 22, 2000, a Cure Notice was issued to Bannum by the BOP, citing to the eviction notice. No mention is made to the secret school agreement. (PFUF 105). On January 3, 2001, Bannum filed a response to the Cure Notice and a claim for equitable adjustment. The claim stated that Bannum had a valid lease and that the BOP improperly handled the lease matter by, failing to verify the validity of the eviction notice, failing to review the terms of the lease previously submitted, or failing to conduct meaningful discussions with Bannum before issuing the Cure Notice, which Bannum felt constituted a breach of the duties of cooperation and good faith and fair dealing. (PFUF 107).

On January 12, 2001, the Contracting Officer sent a note to Ms. Mustain stating that Bannum has an injunction for the Beaumont facility, which was good until March 1, 2001. Therefore, there was nothing to cure at this time (PFUF 110). However, at no time did the BOP retract or rescind the Cure Notice. (PFUF 118).

On January 29, 2001, the BOP denied Bannum's claim stating that it did not have adequate assurances that Bannum would be able to perform the contract services, and was in danger of defaulting on its contract. No mention was made with respect to the communications regarding the secret school agreement or that Bannum was advised accordingly. (PFUF 111).

On March 29, 2001 Mr. Ala wrote a memorandum recounting a telecon he had with the Director of the Richard Milburn Academy, who stated that he thought Bannum was to be moved out of the facility prior to them occupying the building. At no time did the BOP impart to Bannum any information regarding the secret school agreement. (PFUF 113).

Bannum expended significant cost and effort aggressively pursuing litigation to protect its rights under the lease through state and federal courts, including, but not limited to, being granted a restraining order and injunctions, which were extended a number of times. (PFUF

106, PFUF108, PFUF109, PFUF 112, PFUF 115). At no time during these proceedings did Mr. McCray initiate any eviction proceedings. (PFUF 96). As a result of this litigation, Bannum was able to complete its contract and follow-on contracts with the BOP utilizing the same premises pursuant to a new lease agreement with Mr. McCray. (PFUF 116). At no time prior to the issuance of eviction notice or during the subsequent litigation, where Bannum incurred substantial litigation expenses, did the BOP notify Bannum of the secret school agreement. (PFUF 117). Bannum has incurred approximately, $115,836.64 as a result of the ongoing litigation resulting from the lease. (PFUF 120)

The Defense Contract Audit Agency (DCAA) was requested by the DOJ to do an Audit of Bannum's Claims, but was directed not to audit Count 6. (PFUF 119). Even though the Auditor did not audit Count 6, he reviewed some of the legal bills that Bannum incurred, which described the nature of the legal costs expended. (PFUF 121, PFUF 122).

**2. Legal Argument – Count 6**

In Count Six of its amended complaint Bannum seeks to recover the alleged $4,500 in cost incurred in responding to the Cure Notice issued by BOP on the basis that the BOP violated the implied covenant of good faith and fair dealing in its handling with the lease issue after it had learned of the dispute directly from the Landlord instead of the Bannum. Specifically Bannum claimed that the "BOP's direct communication with the owner of the property, their failure to verify the accuracy of the information received, their failure to notify Bannum of their receipt of the communication and their failure to identify the person(s) and the nature of the communications conducted, constituted an improper and prejudicial withholding of Superior Knowledge and further constituted an breach of the BOP's contractual duty to cooperate with Bannum."

**(i) The Government Withheld Superior Knowledge:**

` Bannum alleges that the BOP withheld pertinent and prejudicial information which constituted a breach of the BOP's contractual duty to cooperate with Bannum. Specifically, Bannum alleges that the BOP had conducted private conversations with the landlord and their agent, who imparted information that was improperly withheld from Bannum. As early as November 7, 2000, over one month before the eviction notice was given, the BOP had knowledge that the City of Beaumont had approved the institution of a school for troubled youths on the condition that Bannum would vacate the premises prior to the beginning of the school year 2001. (PFUF 93) Also, Mr. Ala in the November 7th memorandum, stated that Bannum had not notified the BOP of any future move. Therefore, having this information, Mr. Ala should have reasonably made the following conclusions:

- If the school was to be in place by the beginning of the year, 2001, and if it was represented that Bannum would be out of the facility by that date some sort of eviction process would have to be commenced.
- Given the fact that Bannum is an experienced contractor who knows the long term effort it takes to find a new location and bring it up to specifications, and given the fact that Bannum had not notified BOP of a possible move, the BOP should have known that Bannum had no knowledge of this agreement.
- Since this information went directly to Bannum's ability to continue performance of the contract, it was material and prejudicial and the BOP had the obligation, at the bare minimum, to make inquiries of Bannum as to whether they knew this information and what plans had been made to

continue performance.

However, despite having this important and material information in its possession, the BOP improperly and intentionally failed to supply the information to Bannum. This withholding of pertinent and material information continued even after the issuance of the eviction notice. The BOP acknowledged that they had a copy of the eviction notice as early as December 18, 2000 and therefore had knowledge that the notice contained no reference to the agreement made regarding the school. In the Memorandum dated December 18, 2000, a handwritten note at the end of the memorandum, again refers to unwritten agreement with the County Commissioner that if the school goes in, Bannum will have to vacate. (PFUF 98). It was especially necessary for the BOP to impart this knowledge to Bannum at this juncture because it became obvious that the real reason for the eviction was not the lack of a proper sublease, but that the owners were attempting to fraudulently end the lease to accommodate the school. On December 19, 2000, Bannum was contacted by the BOP Regional Administrator, regarding the eviction notice, and again no mention was made of the school agreement despite the fact that Ms. Mustain had knowledge of it as early as November 7, 2000.

Instead of imparting this vital information, the BOP issued a Cure Notice on December 22, 2000, demanding that Bannum provide a written plan of action and a copy of a valid lease. Again no mention was made of the school agreement. This failure to impart the information regarding the school agreement was in addition to the BOP's failure to give Bannum information regarding the identification and nature of the improper communications the BOP had with the property owner/agents, despite Bannum's numerous requests. It is important to note that the BOP owed no duty to either the property owner/agent to keep the communications confidential. However, the BOP had a contractual duty to disclose to Bannum all information that may have a

material effect on its ability to perform.

On January 3, 2001, Bannum filed a response to the Cure Notice, which included an REA for the costs in responding to the Cure Notice because of the Government's improper actions and lack of cooperation. At the time of its response, Bannum still had no knowledge of the school agreement.

Immediately upon the receipt of the eviction notice, Bannum initiated lengthy and costly litigation in order to protect its leasehold rights, based upon the facts that they knew at the time, of which the BOP was kept apprised. Despite being supplied with a copy Bannum's initial pleadings, which do not mention the school agreement, the BOP failed to impart the information, despite its pertinence. The failure of the BOP to impart the material information regarding the school agreement to Bannum, deprived Bannum of knowledge of the actual, fraudulent reason behind the eviction, which would have resulted in Bannum presenting a measurably stronger case.

Therefore, the BOP's failure to impart the important and material information was clearly prejudicial and constituted an interference of its performance and further constituted a breach of the BOP's duty to cooperate. Had the BOP at least made inquiries of Bannum regarding the school agreement when it initially discovered the information in November, 2000, Bannum could have been proactive in protecting its leasehold rights before the eviction was issued, and at the least, would have conceivably shortened, if not eliminated the need for the lengthy and costly litigation.

It has long been established by the Courts that pursuant to its implied duty of good faith and fair dealing, the Government must disclose its superior knowledge to the contractor. In Helene Curtis Indus., Inc. v. United States, 160 Ct. Cl. 437, 312 F.2d 774 (1963), the Court held

that the Government had a duty to share vital information with the contractor which it is aware the contractor does not have, and to not allow the contractor to flounder on its own without such information. "Although it is not a fiduciary toward its contractors, the Government – where the balance of knowledge is so clearly on its side – can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word." Helene Curtis Indus., Inc. v. United States, 169 Ct. Cl. 437, 444, 312 F.2d 774 (1963).

The disclosure of superior knowledge doctrine applies in situations where: (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and (4) the government failed to provide the relevant information. Northrop Grumman Corp., Military Aircraft Div. v. United States, 63 Fed.Cl. 12, 15-16 (2004), Petrochem Service, Inc. v. United States, 837 F.2d 1076, 1079 (1988), citing American Shipbuilding Co. v. United States, 654 F.2d 75, 79, 228 Ct.Cl. 220 (1981).

As to whether the Government should have been aware of the contractor's ignorance, if the information is specific and the contractor likely would not be able to obtain the information, the Government will be assumed to have reason to know of the contractor's ignorance. Lear Siegler, Inc., ASBCA 22235, 81-2 BCA ¶ 15,372, *recons. denied*, 82-2 BCA ¶ 15,832.

The Defendant in its Motion, alleges that the BOP did not withheld any information that was vital to Bannum's performance and that whatever information was imparted by the property owner or agent was already within Bannum's knowledge. This allegation is a clear misrepresentation of the facts. As shown in the previously presented facts, as early as November 7, 2000, BOP personnel had knowledge of the actual reason why the property owners were

attempting to evict Bannum, namely that they had made representations to the Beaumont City Council that Bannum would be out of the facility before the beginning of 2001, so that a school could be established on the same premises. Despite having this vital information regarding this fraud the owners intended on perpetrating on Bannum, the BOP kept silent, which deprived Bannum of asserting a fraud defense, which would have limited or eliminated the need for the cost and time-consuming litigation. It was also obvious that the BOP knew Bannum had no knowledge of the school agreement as evidenced by the fact that Mr. Ala stated that Bannum had not given any notice that it intended on relocating the facility.

In conclusion, Bannum alleges that the BOP failed to disclose vital information that was material to Bannum's continued performance and further resulted in it being forced to expend a significant amount of effort and cost, for which it is entitled to be compensated.

**(ii) <u>The BOP Breached its Duty of Cooperation and Fair Dealing</u>:**

Bannum alleges that the BOP breached its duty of fair dealing and cooperation and not to impede performance continuously from over a month before Bannum was issued the eviction notice through Bannum's lengthy and costly litigation it was forced to conduct to protest its leasehold rights. Specifically:

a. The BOP failed to make any inquiries of the property owner/agent regarding the school agreement, despite its numerous communications.

b. The BOP failed to discuss the school agreement with Bannum, despite indications that Bannum had no knowledge of the agreement.

c. The BOP failed to make any inquiries of the property owner/agent regarding the specifics of the eviction notice despite knowing that the lease contained no language which allowed the owner to terminate the

lease at its option, especially since the BOP knew that the real and fraudulent reason for the eviction was the school agreement.

d. The BOP improperly issued the Cure Notice to Bannum despite knowing that there was no language in the lease which would allow the owner to terminate the tenancy and the real and fraudulent reason for the termination.

e. The BOP failed to conduct any meaningful discussions with Bannum regarding its position on the issues or its intended action to preserve the leasehold.

f. The BOP improperly failed to rescind the Cure Notice after the Bannum was granted an injunction, despite the BOP's acknowledgment that there was nothing to cure once the injunction was granted.

g. Despite being requested by Bannum, the BOP failed to send personnel to Bannum's court hearing to testify as to the irreparable harm that would occur if the lease was terminated.

As a result of the BOP's continual lack of cooperation and fair dealing and its withholding of vital superior knowledge, Bannum was forced to expend a significant amount of needless cost and effort fighting both the BOP to protect its contract and the property owners to protect its lease. This cost and effort could have been significantly reduced or eliminated if the BOP had met its contractual obligations to: cooperate with Bannum; afford it fair treatment; not to impede performance and disclose vital and material superior knowledge. Therefore, since the costs incurred by Bannum can be directly attributed to the BOP's breach of its contractual duties, they are fully compensable.

Implied in every contract is the covenant of good faith and fair dealing. Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed.Cir. 2005). This covenant includes the duty to cooperate and not hinder the contractor's performance. C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539 (Fed.Cir 1993). "Not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform." Lewis-Nicholson, Inc. v. United States, 213 Ct.Cl. 192, 550 F.2d 26, 32 (1977). A contractor is not required to prove bad faith on the part of the Government to show the breach of these duties, Abcon Assoc. v, United States, 49 Fed.Cl. 678 (2001), but only needs to show willful or negligent interference. Peter Kiewet Sons' Co. v. United States, 138 Ct.Cl. 668; Orlosky Inc. v. United States, 68 Fed.Cl. 296.

The BOP did not enable Bannum to perform, or else it would have come to its aid, or at least be forthright about information it possessed. Instead, the BOP attempted to disable Bannum's performance of the contract.

**(iii) Bannum is Entitled to Recover Costs for its Response to BOP's Cure Notice and for all Costs Attributable to its Litigation Regarding the Lease:**

The previous sections have clearly evidenced the BOP's withholding of superior knowledge and its continuous breach of its implied duty of cooperation and fair dealing. As a result, Bannum is entitled to have its contract equitably adjusted to cover all extra-contractual costs expended that resulted from the BOP's improper actions.

First, Bannum alleged that the issuance of the Cure Notice was improper and was therefore entitled to be compensated for the costs in issuing its response. These costs went beyond normal contract administration, and constituted abnormal work effort beyond the scope of the contract. The FAR regulations allow for the direct charging of indirect costs to arrive at an equitable result. FAR 31.202 defines a "direct cost" as any cost that can be identified

specifically with a particular final cost objective. Dave Lowry and other Bannum Personnel worked directly on the response to the Cure Notice, which constituted administrative work effort beyond the normal scope of work for the Beaumont contract. Bannum is not charging direct routine administrative or clerical activities that were part of his bid. Electronics Corporation of America, ASBCA No. 4770, 61-2 BCA ¶ 3134. There is nothing objectionable about charging a cost directly, provided it is properly allocable to the contract, and other costs of the same character are excluded from indirect pools charged to the contract in order to avoid 'double screening,' or duplicate charging. Peter Kiewit Sons' Company, ENGBCA No. 4742, 85-1 BCA ¶ 17,911 at 100,248. In addition, when it is necessary to arrive at an equitable result re-classification from indirect-to-direct expenses may be appropriate. Agrinautics, ASBCA Nos. 21512, 21608, 21609, 79-2, BCA & 14,149.

Secondly, after the claim was filed, and in order to protect its contract, Bannum was forced to incur a tremendous amount of additional administrative and legal costs which were directly related to the BOP's actions and inactions. At this time, Bannum is seeking to amend its complaint to include these additional costs in its cross-motion for leave to amend (see below).

**C. Count 8: Contract J200c-397- Montgomery, Alabama:**

Defendant has moved for partial summary judgment on Count 8 on the following grounds: (1) defendant was not bound to exercise the option; (2) defendant did not act in bad faith; (3) Bannum has suffered no lost profits because it received more money under the replacement contract than it would have received under the option years; and (4) Bannum is not entitled to its costs of negotiating the transportation issue. In response, plaintiff states that the issuance of a partial summary judgment is not appropriate because, as presented below, Defendant failed to include pertinent documentation that raises material issues of fact.

### 1. Statement of Facts Relevant to Count 8

Bannum was awarded Contract No. J200c-181 on or about October 1, 1993 which called for Bannum to provide Community Corrections Center ("CCC") services for Federal offenders in the Montgomery, Alabama area. Pursuant to the terms of the contract, Bannum was to commence performance on October 1, 1993 for a base period of two years ending September 30, 1995. The contract also contained three one year options, all of which were exercised by the BOP. (PFUF 123). Then, or about July 1, 1998, Bannum was awarded follow-on contract No. J200c-397 by the BOP. This Contract was awarded after several rounds of discussion during which there were no questions raised regarding the transportation requirement, except for BOP's C&D letter dated April 10, 1998, which Bannum responded to by attaching its April 16, 1998 letter addressing the same issue raised under the present contract. (PFUF 124).

The Statement of Work required that "the facility shall be located within 1 mile of public transportation, or the contractors shall provide transportation for residents for employment or program participation activities at no cost to the residents." Bannum's facility was located in compliance with the contract requirement. (PFUF 125).

Intermittently during Bannum's performance of both contracts, BOP raised an issue regarding Bannum's compliance of the transportation requirements under the contract. The BOP issued numerous monitoring reports and letters insisting that Bannum had to come up with a solution for the transportation needs of the inmates. (PFUF 126). Bannum spent considerable extra-contractual time, effort and cost responding to BOP's allegations, demonstrating that it met the transportation requirements of the contract. (PFUF 127).

Despite the fact that the BOP admitted internally that Bannum met the contract requirements regarding transportation, it issued written reports against Bannum alleging

deficiencies in this area. (PFUFs 128, 129, 130).

After realizing that Bannum met the contract transportation requirements, the BOP required Bannum to submit a proposal in excess of the contract terms, which was submitted on September 8, 1999, and which requested a price increase of 5,000.00 per month. (PFUF 131). During approximately October of 1999, the BOP issued a "Request for Contract Action" citing a need for a modification on Bannum's contract for additional transportation services, and which further provided a cost estimate of $90,000, which was then slashed by 50% to $45,000 per year. (PFUF 130).

The contracting officer sent Modification No. 3 to Bannum, which included compensation for the additional transportation services in the amount of $45,000 per year, which was the BOP's estimate included in its Request for Contract Action. (PFUF 132). However, on November 29, 1999, Bannum found out that the CCRA had never forwarded its September 8, 1999 pricing proposal to the contracting officer. Bannum then notified the contracting officer that there had been a mistake with Bannum believing that its proposal had been accepted and incorporated into the contract. Bannum then rescinded its agreement to the Modification. (PFUF 133).

On January 4, 2000 the supervising contracting officer acknowledged the rescission of Modification 3 and requested another cost proposal from Bannum for additional transportation services. Additionally the supervising contracting officer stated that the BOP Montgomery office may decide not to exercise the option if Bannum did not satisfy its alleged transportation concerns. Bannum considered the contracting officer's statement an attempt to extort extra contractual performance from Bannum in exchange for the BOP exercising subsequent options under the contract. (PFUF 134). In response, Bannum submitted another formal cost proposal

for the change in transportation requirement on January 7, 2000. (PFUF 1351).

In January 2000, even though the BOP had directed Bannum to submit a proposal for additional transportation services, BOP personnel in the field office continued to raise the alleged concerns regarding the transportation issue and Bannum responded that the matter was presently being negotiated with the BOP. (PFUF 136). Despite this fact, the BOP continued to make findings against Bannum in monitoring reports. This forced Bannum to expend additional time and effort responding to the groundless allegations. (PFUF 137).

Pursuant to further requests from the BOP, on March 24, 2000 Bannum submitted another cost proposal in the amount of $55,200 per year. During a meeting with the BOP regarding this cost proposal, the BOP advised Bannum that it had to provide transportation throughout the day, and strongly encouraged Bannum to purchased a van for that purpose. (PFUF 139). Bannum then contacted the BOP and sought further clarification as to whether or not it should provide for taxicab services or to provide vans. The BOP advised Bannum to submit its best offer, and would not provide Bannum with any additional information. (PFUF 139).

On June 13, 2000, Bannum submitted a detailed proposal for use of a taxicab service, and private cars in unusual situations. The total cost proposed was $100,477 per year. Based upon an estimated inmate population of thirty, as used in the Government's subsequent estimate, Bannum's proposal equated to a revised manday rate of $59.63 ($50.45/day contract amount + $9.18/day proposed change) for the remaining option years. (PFUF 140). No further negotiations were conducted between Bannum and the BOP with respect to the June cost proposal. (PFUF 141).

On or about September 5, 2000, the BOP prepared a request for contract action ("RCA")

and stated that Bannum and the BOP were unable to reach a mutual agreement to resolve the ongoing transportation issue and, therefore Option year 2 would not be exercised. Included in the RCA was an estimate of what the BOP expected a new contract to cost ($60 per manday), based upon a inmate population of 30 inmates for the base 2-year period, $61.80 per manday for Option Year 1, $63.65 per manday for Option Year 2, and $65.56 per manday for Option Year 3. However, the record is devoid of any comparison between the alleged mandate rate for the new contract and Bannum's transportation proposal, as evidenced by the fact that Bannum's June 13, 2000 cost proposal equates to a significantly lower price than the BOP's estimate. (PFUF 143). The BOP eventually awarded Bannum a contract for $60.45 per man day for the base period and all option years. This price was significantly less than the BOP's estimate. (PFUF 144).

On October 11, 2000, the BOP issued its Performance Rating for Bannum's Montgomery program ("CEF"), which ranked Bannum "fair" in the contract compliance and business relations category and "poor" in the customer satisfaction category. (PFUF 145). Bannum had to spend a significant amount of time responding to this performance evaluation. On November 16, 2000, Bannum submitted a detailed rebuttal to what it considered to be the erroneous CEF. (PFUF 146).

On November 29, 2000, Bannum received a copy of solicitation 200-0637-SE which was a request for proposals for a follow-on contract in Montgomery. When Bannum inquired as to the reason for this solicitation the BOP responded that unless the transportation issue was resolved, procurement was going back out on the street and that the BOP would further contact Bannum to discuss the transportation issue. (PFUF 147). On or about January 11, 2001 Bannum contacted the chief contracting officer and was advised again that unless it negotiated

the transportation issue, a new contract would be issued. (PFUF 148).

On January 24, 2001, Bannum submitted yet another cost proposal pursuant to a telephone conversation between Bannum representatives and BOP personnel and significantly reduced its cost proposal. The total proposed price was $87,035 per year. Based upon an estimated inmate population of 30, as used in the Government's estimate, Bannum's proposal would equate to a revised manday rate of $58.40 ($50.45/day contract amount + $7.95/day proposed change) for the remaining option years. (PFUF 149)

On February 9, 2001 the Piliero Law Firm spent a great deal of time and expense contesting the CEF on Bannum's behalf, and appealed the February 21, 2001 full monitoring report. (PFUF 150). On or about March 2, 2001, Bannum filed a Protest of Solicitation No. 200-0637-SE. (PFUF 151).

The BOP eventually awarded Bannum a contract for $60.45 per man day for the base period and all option years (PFUF 144). This price was significantly less than the BOP estimate.

On March 6, 2001 Bannum file a detailed Request for Equitable Adjustment ("REA"). The basis behind the REA was to contest the wrongful refusal by the BOP to exercise the option, and to recover all the time and expense in dealing with the transportation issue including the cost proposals requested by the BOP. (PFUF 152) The BOP did not negotiate the REA and, on April 9, 2001, the REA was converted into a certified claim for equitable adjustment in the amount of $339,411.57. (PFUF 153) The claim was revised during the audit from $339,412 to $371,918. This was a revision to ongoing costs. The claim amount included the lost overhead and profits for the wrongful refusal to exercise the option, proposal preparation expenses which included Bannum labor costs for the BOP requested proposals, associated expenses and fees, and travel expenses. (PFUF 154).

While the DCAA auditor questioned the lost overhead and profits since Bannum would have replaced the income or revenue that it would have derived from the exercise of the options with the replacement contract, Bannum alleges that it was still wrongfully deprived of two years of performance. As indicated above, the BOP exercised all the option years on the replacement contract and Bannum was not successful in obtaining a follow-on contract. (PFUF 155)

The auditor also reviewed Bannum's labor costs, but did not disclose the basis behind Bannum's request or the support that Bannum provided for these costs. The auditor discounted these costs on the basis that Bannum did not have timesheets. However, the auditor's working papers included a detailed affidavit from David Lowry explaining and detailing the basis behind Bannum's request, citing to the work effort expended by specific Bannum personnel and a detailed estimate of their time and the labor rates. (PFUF 156).

The auditor then reviewed the expenses incurred by Bannum associated with the extra work discounting these expenses claiming that he could not tie them in to the Montgomery claim. However, the bills were provided to the auditor, all of which showed that the recipient was the BOP along with the date and time of the bill which could be matched to Bannum's correspondence. (PFUF 157).

The auditor then looked at the Camardo and the Piliero Law Firm bills. The auditor alleged that these bills were for the Montgomery protest. However the vast majority of the Camardo bills were for the time and effort incurred in the protest of the defective transportation language and the detailed REA. The Piliero bills were for the time and effort incurred contesting the improper CEF's. (PFUF 158).

The auditor then reviewed the travel cost and alleged that Bannum did not support these charges by tying them into the Montgomery matter. However, in David Lowry's affidavit, he

states that he traveled to meet with the BOP officials on several occasions to deal with the transportation issue. The government would have a record of these meetings which would support the claimed costs. (PFUF 159)

**2. Legal Argument – Count 8**

**(i) Bannum is Entitled to All Costs Expended in Dealing with Transportation Issue:**

Bannum has performed under three contracts to provide CCC services in the Montgomery, Alabama area since 1993. At issue in this proceeding is the 1998 Contract (No. J200c-397), which required that Bannum's facility to be within one mile of public transportation. At all times during performance, Bannum met this requirement. However, during performance of the contract, the BOP began to issue adverse findings in monitoring reports alleging that Bannum was not meeting the contract requirements regarding the transportation services, and that Bannum was required to come up with a solution for the alleged deficiencies. These findings were made despite the fact that the BOP in several internal communications acknowledged that Bannum did, in fact, meet the contract requirements. Forcing Bannum to expend the time and effort to respond to allegations of non-conformance, even though the BOP internally acknowledged that Bannum was, in fact, in compliance, strongly evidences BOP's breach of the duty to cooperate. More importantly, the BOP's actions evidence bad faith with an attempt to harm Bannum, or at the least, with a fraudulent attempt to extort additional services from Bannum at no charge to the BOP. However, once the BOP determined that Bannum was not going to be intimidated into performing additional services for free, and given that the BOP had acknowledged that Bannum was in compliance with the contract requirements, it began a process of negotiating with Bannum and directed it to submit cost proposals to provide additional transportation services in excess of the contract requirements. Additionally, Bannum was forced

to expend time and expense attempting to reverse the improper negative score in the CEF, which, upon information and belief, was based on the transportation issue.

In its REA, Bannum initially requested compensation for the extra-contractual costs expended by Bannum in dealing with all aspects of the transportation issues. In its motion for partial summary judgment, defendant does not question Bannum's *entitlement* to these costs, but merely alleges that Bannum could not support the claimed costs.

Bannum is entitled to its costs of negotiating the transportation issue, since the BOP was admittedly responsible for these costs, and directed Bannum to submit cost proposals because of it. Furthermore, the BOP through its actions in an attempt to force Bannum to provide transportation at no cost continuously wrote Bannum up in its various monitoring reports and CEFs, causing Bannum to spend extra time and effort rebutting the falsehoods. As such, Bannum is entitled to its costs incurred in seeking its equitable adjustment because of the BOP's actions, including estimated added administrative time, estimated added phone, travel, etc., and leasehold improvement and proposal preparation costs. Furthermore, Bannum is entitled to proposal preparation expenses. Bannum spent a considerable amount of time and effort in preparing the transportation proposals as requested by the BOP. This also included the time and effort in traveling and meeting with BOP officials. These costs were properly charged as direct costs because to treat the expenses as indirect costs would unfairly and inequitably burden other contracts. Allied Material & Equip. Co., ASBCA 17318, 75-1 BCA ¶ 11,150; See also, *Interpretation No. A to Cost Accounting Standard 401*, 41 Fed Reg. 24691 (1976) (recognizes costs of preparing proposal specifically required by a provision of an existing contract may be charged directly even though other proposal costs are charged indirect).

Furthermore, after the costs proposals were submitted, Bannum filed a REA (PFUF 152). The costs of compiling the REA, including professional costs, is also an allowable cost. Pursuant to FAR 31.205-33(a)(b), the cost of "Professional Services" are allowable when they are acquired to "…obtain information, advice, opinions, alternatives, conclusions, recommendations, training, or direct assistance, such as studies, analyses, evaluation, liaison with Government officials, or other forms of representation." In Bill Strong Enterprises, Inc. v. Shannon, 49 F.3d 1541, 1550 (Fed. Cir. 1995), the Federal Circuit provided the following guidance regarding recovery of legal fees incurred in the preparation of an REA:

> In classifying a particular cost as either a contract administration cost or a cost incidental to the prosecution of a claim, contracting officers, the Board, and courts should examine the objective reason why the contractor incurred the cost. If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract administration cost allowable under FAR 31.205-33, even if negotiation eventually fails and a CDA claim is later submitted. On the other hand, if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable under FAR 31.205-33.

Bill Strong Enterprises, Inc. v. Shannon, 49 F.3d 1541, 1550 (Fed. Cir. 1995), *overruled in part on other grounds,* Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1579 (Fed. Cir. 1991) (*en banc*); See also, Grumman Aerospace Corp., ASBCA No. 50090, 01-1 BCA ¶ 31,316, aff'd, 34 Fed. Appx. 710 (Fed. Cir. 2003).

Despite the auditor's and BOP's representations that Bannum did not support these costs, the record establishes otherwise. For example, David Lowry supplied a detailed affidavit to the auditor which laid out all of the extra costs incurred and a detailed explanation as to why the costs were incurred (See Exhibit 17, pgs. DCAA001741-001744). In addition, Bannum provided the following support to the auditor:

- Voluminous documents as listed in the auditor's working papers (se Exhibit 18, pg. DCAA001240);
- Invoices (Exhibit 18, pgs. DCAA001250-001279);
- Travel Costs (Exhibit 18, pgs. DCAA 001241, 001243, 001326-001331, 001338-001339); and
- Invoices for proposal preparation costs (Exhibit 18, pgs. DCAA001319-001325).

Despite the BOP's representations, Bannum is allowed to estimate its costs as part of a request for equitable adjustment. See C. H. Hyperbarics, Inc., ASBCA No. 49375 et al., 04-1 BCA ¶ 32,568 (2003) (Board held where estimates have reasonable basis in fact, they constitute sufficient evidence to make a fair and reasonable approximation of the damages). Bannum is also entitled to its extra administrative expenses, even though they were originally classified as indirect expenses. The DCAA auditor is wrong as a matter of law. FAR 31.202 defines a "direct cost" as any cost that can be identified specifically with a particular final cost objective. Dave Lowry, John Rich, and other administrative personnel from Bannum worked directly on the Government-caused problems, i.e. transportation issue, and the Government reaped the benefits of this work effort. Bannum personnel are not charging for routine administrative or clerical activities that were part of its bid. Electronics Corporation of America, ASBCA No. 4770, 61-2 BCA & 3,134; see also Gladwynne Construction Co., ASBCA No. 47076, 95-1 BCA & 27,297 (testimony that a president spent one-half of his time in a contract delay was allowed as a direct charge). There is nothing objectionable about charging a cost directly, provided it is properly allocable to the contract, and other costs of the same character are excluded from indirect pools charged to the contract in order to avoid 'double screening,' or duplicate charging. Peter Kiewit

Sons' Company, ENGBCA No. 4742, 85-1 BCA & 17,911 at 100,248. In addition, when it is necessary to arrive at an equitable result re-classification from indirect-to-direct expenses may be appropriate. Agrinautics, ASBCA Nos. 21512, 21608, 21609, 79-2, BCA & 14,149; See also The George Hyman Construction Company, ENGBCA 4541, 85-1 BCA & 17,847. The intent is to make an *equitable* adjustment to the contractor.

Defendant's gratuitous comments in its brief that Bannum is somehow committing fraud, in light of the above, especially in light of Bannum's ongoing contracts with the BOP, are outrageous, uncivil, if not downright unethical. As explained above, Bannum provided the auditor and the BOP with detailed support for all of its costs.

**(ii) The BOP Acted in Bad Faith in Not Exercising the Option to Contract J200c-397**:

On or about July 1, 1998, the BOP awarded follow-on Contract No. J200c-397 to Bannum, which was for a base period of two years, with an additional three 1-year options (PFUF 123). The Statement of Work required that the Bannum facility was to be located within one mile of public transportation, which was fully complied with at all times during the contract. (PFUF 125). During the performance of this contract, as well as the preceding contract, the BOP, on numerous occasions issued monitoring reports alleging that Bannum had failed to meet the contract's transportation requirements (PFUF 126), despite internally acknowledging that Bannum was in compliance (PFUFs 128, 129, 130). The BOP clearly acted in bad faith by forcing Bannum to respond to allegations that it internally admitted were not true for the purpose of extorting additional services at no cost.

Subsequently, when it recognized that it was not going to extort added work out of Bannum, the BOP began to request cost proposals to supply additional, extra-contractual transportation services. (PFUFs 131, 134, 138, 140). Bannum dutifully submitted four proposals

which offered various services at varying costs. (PFUFs 131, 135, 138, 140). The BOP failed to negotiate the proposals, culminating in the BOP threatening that if Bannum did not satisfy the BOP's transportation concerns, or if they were unable to reach a mutual agreement, Option Year 2 would not be exercised.

On or about September 5, 2000, the BOP prepared a Request for Contract Action ("RCA") stating that since an agreement could not be reached with Bannum, and that they considered Bannum's proposals to be unreasonable, Option Year 2 would not be exercised. The RCA included a Government estimate of the cost to provide the added transportation services under a new procurement. (PFUF 143). However, the BOP estimate was significantly higher than Bannum's previously supplied proposal of June 13, 2000 (PFUF 140), and even higher than Bannum's subsequently supplied proposal of January 24, 2001. (PFUF 149). Eventually, Bannum was awarded the follow-on contract at a price significantly lower than the BOP's estimate. (PFUF 144). Therefore, the BOP's justification for not exercising Bannum's option years on the grounds that its proposals were unreasonable, is clearly an intentional misrepresentation of the facts.

Bannum alleges that, based upon the BOP: (a) forcing Bannum to expend effort and cost responding to allegations of non-compliance, when it internally admitted that there was no non-compliance, (b) attempting to extort extra-contractual performance from Bannum at no cost, and (c) threatening Bannum that it would not exercise the option years unless Bannum lowered its proposal costs, the BOP exhibited continuous bad faith in its dealings with Bannum. Further, Bannum alleges that this continuous bad faith culminated in its improper refusal to exercise the option years, on the alleged false justification that Bannum's proposals were unreasonable, when in fact, the BOP's estimate was significantly higher. Therefore, Bannum alleges that the reason

behind BOP's improper and bad faith failure to exercise the option years was the intent to harm Bannum for its refusal to "tow the line" and agree to provide extra-contractual services at no cost.

While it has been held that that contract options bind the option giver and not the option holder, Hi-Shear Technology Corp. v. United States, 53 Fed.Cl. 420 (2002), a breach of contract action for the failure of the Government to exercise an option may be asserted upon the showing of bad faith.

It is well established that government officials are presumed to act conscientiously and in good faith in the discharge of their duties. To overcome this presumption, a plaintiff must prove, by clear and strong evidence, specific acts of bad faith on the part of the Government, which must raise to the level of well nigh irrefragable proof. Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312 (Fed.Cir.2003). However, in Libertatia Associates, Inc. v. United States, 46 Fed.Cl. 702 (Fed.Cl.2000), refused to adhere to this level of proof, stating:

> …Applying the standard of 'irrefragable proof' meaning 'impossible to refute' would appear to insulate the government action from *any* review by courts – no matter how egregious. Such an absolute standard would not serve the interests of justice between the government and its citizens. The courts are certainly not called on to allow government actors to treat contractors with bad faith or a specific intent to injure in any case where the bad faith is not, in effect, admitted by the government. The court therefore considers whether the plaintiff in this case has shown 'evidence of some specific intent to injure' plaintiff by the government or whether the government 'was actuated by animus toward the plaintiff.'

Libertatia, at 707, quoting Kalvar Corp. v. United States, 211 Ct.Cl. 192, 543 F2d. 1298, 1302 (1976) and Librach v. United States, 147 Ct.Cl. 605, 614 (1959).

Bannum was awarded the 1993 contract and all options were exercised. Bannum was and then was awarded the follow-on contract (No. J200c-397), under which the BOP shorted it

two years solely because of the transportation issue. Bannum was then awarded a 2001 follow-on contract with all options being exercised. This contract has recently expired, and Bannum was unsuccessful at getting another follow-on contract. Once the Bannum facility was established, all of the options were exercised with the exception of the two years relating to the transportation issue. As such, despite the BOP's arguments, Bannum was still shorted two years of contract revenues because of the BOP's bad faith.

Bannum supported its damages during the DCAA audit, as recognized in the DCAA working papers (see Exhibit 17, pg. DCAA 001741; see also Exhibit 18, pg. DCAA 001240) Specifically, Bannum provided the government with the rationale of the 28% overhead and profit factor used by Bannum in the calculation. Thus Bannum did lose two years of contract performance and therefore had two years of lost profit.

## PLAINTIFF'S CROSS-MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT

Plaintiff by and through undersigned counsel, pursuant to Rule 15 of the Rules of the United States Court of Federal Claims, respectfully moves the Court for leave to file its Third Amended Complaint and states as follows:

1. On or about September 12, 2002, Plaintiff filed its Second Amended Complaint in the instant action.

2. Pending now before the Court is a Defendant's Motion for Summary Judgment seeking dismissal of Counts 6 ("Beaumont") & Count 8 ("Montgomery"), contending that it should have judgment as a matter of law.

3. Pursuant to Count 6, Bannum seeks its costs, time, and effort in dealing with a false and misleading cure notice. Pursuant to Count 8, Bannum is seeking its time and effort in dealing with the BOP's attempts to leverage Bannum to correct the BOP caused transportation

issue with threats of not exercising the options and then creating false justification to support the non-exercise of the options.

4. When the Second Amended Complaint was filed, the Beaumont and Montgomery contracts had not been completed and the BOP's action and inaction were on-going. In addition, discovery has identified certain documentation divulging facts such as the "School Agreement" on Count 6. On Count 8, the BOP created documentation that the transportation issue was not Bannum's fault and then created false justification with respect to the non-exercise of the options. The additional documents augment and supplement the claim. Therefore, Bannum is requesting that it be allowed to amend its complaint based on these ongoing events as well as to revise the damage amounts.

5. There is no prejudice to the BOP with respect to the Beaumont claim because of the BOP's secret internal documentation that was not divulged to Bannum. Bannum increased the amount requested with respect to Count 8 during the Audit. An Audit Report was issued showing the increased dollar amount.

6. In addition, since the filing of the Second Amended Complaint, the BOP consented to a judgment with respect to Count 7. As such Bannum has reserved its rights to Equal Access to Justice Expenses ("EAJA"). Therefore, language has been added updating this portion of the Complaint.

7. This is not a major rewrite of the complaint, but a few paragraphs have been added and the dollar amounts of the claims have been revised accordingly. The changes have been highlighted on the attached complaint (see Exhibit 19).

8. Leave to amend should be freely granted. Only minor revisions are being made to the complaint. The BOP has had the information all along.

WHEREFORE, Bannum prays that this Court allows Bannum amend its complaint pursuant to the above.

**CONCLUSION**

It is clear that Count 6 and Count 8 are rife with material factual disputes. The fact that the BOP did not disclose the secret school agreement is grounds, in and of itself, for this Court to deny defendant's motion with respect Count 6. With respect to Count 8, the BOP internally admitted that it was responsible for the transportation problem, but yet attempted to leverage Bannum by continuously blaming Bannum for this problem. The BOP then threatened Bannum that unless the transportation issues were resolved, it would not exercise the options. The BOP then created false justification supporting its non-exercise of the options. Even though Bannum was successful in obtaining a follow-on contract, it was still shorted two years of contract revenues. The BOP's own internal documentation is conflicting, and on this basis, defendant's motion with respect to Count 8 should be denied.

Additionally, leave should be freely given where no prejudice will result. As such, plaintiff respectfully requests that the Court grant its cross-motion for leave to amend its complaint to reflect its increased costs.

Dated: October 12, 2007

Respectfully submitted,

/s/ Joseph A. Camardo, Jr.

Joseph A. Camardo, Jr.
Camardo Law Firm, P. C.
127 Genesee Street
Auburn, NY 13021
Tel: (315) 252-3846
Fax: (315) 252-3508

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of October, 2007, a copy of Plaintiff's Response to Defendant's Motion for Partial Summary Judgment and Cross-Motion for Leave to Amend Complaint was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Joseph A. Camardo, Jr.
Joseph A. Camardo, Jr.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BANNUM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01-639C |
| v. | ) | (Judge Lettow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF DAVID LOWRY (Count 6)**

STATE OF FLORIDA )
)
PINELLAS COUNTY ) ss.

I, DAVID A. LOWRY, being of the age of majority and otherwise competent to make this affidavit, being duly sworn, deposes and says:

1. I am a resident of Pinellas County, State of Florida and I have personal knowledge of the facts contained in this affidavit. From 1984 until 2006, I was the Executive Director of Bannum, Inc. (hereinafter, "Bannum"), located at 8726 Old C.R. 54, Suite E, New Port Richey, Florida 34653. Bannum is a corporation with a principal place of business in New Port Richey. At the time of the filing of the Complaint in this action, Bannum operated approximately 16 Community Correction Centers, or halfway houses, throughout the United States, pursuant to contracts with the United States Department of Justice, Federal Bureau of Prisons (BOP). I was responsible for managing the day to day activities of Bannum and its contracts.

2. Several of these contracts were with the South Central Region of the BOP. During that time, Bannum was having significant difficulties with various BOP actions and inactions leading

to a multitude of contract disputes with this specific region. The Community Corrections Regional Administrator for this region was Gina Lane Mustain and the Community Corrections Contract Oversight Specialist ("CCCOS") was Charles W. Ala, who was the source and cause of a number of these contract disputes.

3. The Disputes in the South Central Region centered on the BOP's improper deductions, diversions of referrals, interference with personnel, refusal to pay for Contract mandated wage determinations, improper investigations, improper cure notice, improper home confinement issues, etc.

4. On or about December, 1996, the BOP issued Request for Proposal 200-0366-SC for a Community Correction Center in Beaumont, Texas. As a result, on or about January, 1997, a Bannum representative, Arnold R. Rich of Bannum then traveled to Beaumont, Texas, to search for property for a lease in connection with the proposal it intended to make in response to the RFP.

5. On or about February 5, 1997, a lease agreement was executed for the property located at 1310 Pennsylvania Avenue, Beaumont. (A42-44).

6. Pursuant to the RFP, the BOP required appropriate zoning and a use permit by the City of Beaumont. (A23).

7. Charles Foxworth, as an agent for both John McCray and Mr. Ken Webb who signed the lease, submitted an application to the City of Beaumont for amendment of the zoning ordinance. The names of the owners were listed as John McCray and Ken Webb. (A32).

8. The lease was submitted to the BOP by Bannum as part of its Proposal.

9. In part, based upon the lease, the BOP on July 17, 1997, entered into a contract with Bannum to provide a Community Corrections Center at 1310 Pennsylvania Avenue, Beaumont. (A1).

10. On February 10, 1999, Mrs. Webb sent a letter to Bannum directing it to forward all future rental payments directly to John McCray (A30).

11. I have reviewed the documentation produced by the BOP in response to Bannum's discovery request. I was surprised to find several memorandums that completely contradict the BOP's request for Summary Judgment. In a Memorandum dated November 7, 2000, Mr. Ala advised Ms. Mustain that during the monitoring of Bannum, it was discovered that the City Council in Beaumont had approved a Catholic school for troubled youths, and that the school would be placed in the building currently occupied by Bannum. Mr. Ala also represented that the City Council stated that it was agreed upon that Bannum would vacate the premises prior to the beginning of the school year 2001. Mr. Ala further stated that as of the date of the memorandum, Bannum had not notified the BOP of any future move. (Exhibit 1). No mention is made of any attempts by the BOP to communicate this information to Bannum. At that time Bannum had no knowledge of any discussion about Bannum vacating the building. **Nor was there any discussion about the previous zoning approval and use permit that had already been issued to Bannum. Bannum still remains at the leased facility under contract with the BOP.**

12. To the best of my knowledge, the BOP never disclosed this information to Bannum.

13. On December 15, 2000, Bannum received a letter dated December 8, 2000, from Foxworth Real Estate stating that "The Owner has elected to execute his option to terminate your tenancy". (A49 & A52). However, the owner had no option to terminate Bannum's tenancy

under the lease agreement and did not begin any kind of legal eviction proceeding. **Bannum still remains at the leased facility under contract with the BOP.**

14. It is important to note that Mr. McCray did not file any eviction proceeding in Court to legally effectuate an eviction proceeding.

15. In a memorandum dated December 18, 2000, from Mr. Ala to Kathy Campbell, the Assistant Community Corrections Administrator in the BOP central office, Mr. Ala advised that he had a conversation with Mr. McCray, the owner of the building, who stated that Bannum never had a lease to occupy the building. Mr. Ala further represented that Mr. McCray leased the building to Mr. Webb and that Mr. Webb subleased the building to Bannum, and that Mr. Lowry was aware that he was subleasing the property. Purportedly Mr. McCray did not know that the building was being subleased until he received a letter from Bannum about a leaking roof. Mr. Ala further represented: "As an aside, should it become necessary, Cornell Corrections, Houston, Texas, can accommodate all Bannum Beaumont's population and can accommodate for all their programming needs, including home confinement in the Beaumont area." No mention is made of any attempts by the BOP to communicate these issues to Bannum. (Exhibit 2).

16. What is troubling is that on the bottom of the December 18, 2000 communication is a handwritten note stating **"County Commissioner says unwritten agreement that if the schools goes in Bannum will have to vacate."** (emphasis added) (Exhibit 2)

17. Bannum had no knowledge of any agreement with the County Commissioner regarding the institution of the school at the same premises as Bannum's facility and further Bannum was not aware that it would have to purportedly vacate the building because of the purported school agreement. Additionally, absolutely no attempt was made by the BOP to contact Bannum to

discuss this agreement regarding the school.

18. On December 19, 2000, I received a phone call from Ms. Mustain, who inquired of the purported eviction and represented that she already had in her possession a copy of the letter to vacate. As a matter of fact Mr. Ala had been in communication with Foxworth and Mr. McCray and had discussed the purported letter to vacate. (BOP26452). Ms. Mustain did not offer me any information about the "secret school" agreement.

19. On December 20, 1999 I had a telephone conversation with Andrea Johnson (Deputy Community Corrections Regional Administrator for BOP), during which Ms. Johnson stated that since Bannum was being evicted from the contract location, a Cure Notice would be issued the following week by the Contracting Office. At no time during the telephone conversation did Ms. Johnson impart any information to Bannum regarding the school agreement.

20. On December 19, 2000, Bannum had the lease agreement reviewed by an attorney Susan Oliver in Beaumont Texas, who indicated that the lease was valid. Ms. Oliver stated that the Zoning information showed both Mr. Webb and Mr. McCray were the owners of the property, and that Mr. McCray accepted Bannum's rent payments. Ms. Oliver further indicated that she would seek a restraining order. (A30-31). I then supplied a copy of Ms. Oliver's letter to the BOP. (A26).

21. On December 22, 2000, a Cure Notice was issued to Bannum demanding that Bannum provide a written plan of action and a copy of a valid lease for the duration of the contract. The Cure Notice did not advise Bannum of the existence of the secret unwritten agreement regarding the school. (A23).

22. On December 22, 2000, Bannum obtained a restraining order against any attempted legal eviction. (A59).

23. On January 3, 2001, Bannum filed a response to the Cure Notice and a claim for equitable adjustment. The claim stated that Bannum had a valid lease and Bannum alleged that the BOP improperly handled the lease matter by; failing to verify the validity of the letter to vacate, failing to review the terms of the lease previously submitted, or; failing to conduct meaningful discussions with Bannum before issuing the Cure Notice, which Bannum felt constituted a breach of the duties of cooperation and good faith and fair dealing. The response further alleged that the BOP's threat of default was especially egregious given the fact that Bannum had previously submitted numerous REAs under the subject contract, none of which had reached final resolution. At the time of the filing of the claim, Bannum was not aware of the BOP's "secret" memos about the purported removal of Bannum as a result of the school that was going into the facility. (A25-29).

24. Bannum obtained an extension of the restraining order on January 2, 2001 (A61) and a temporary injunction on January 11, 2001, which was extended a number of times (A66, A71, A76). **Bannum still remains at the leased facility under contract with the BOP.**

25. Bannum aggressively pursued litigation to preserve the lease (A33-62, A66-67, A71, A81-107).

26. On January 29, 2001, the BOP denied Bannum's claim stating that it did not have adequate assurances that Bannum would be able to perform the services required by the contract and was in danger of defaulting on its contract. No mention was made with respect to the communications regarding the secret agreement made regarding the placement of the Milburn Academy or that Bannum was advised accordingly. (A68).

27. Several months passed and the Court issued stay remained in effect. (A61, A66, A71, A76).

28. On March 29, 2001, Charles Ala wrote another memorandum to the contracting officer that he had yet another conversation with Mr. Lee Wheeler of Foxworth Realty. Mr. Wheeler advised Mr. Ala of the status of the litigation and notified him that the Richard Milburn Academy, a school for troubled youths, was now occupying the back portion of the building as of January 31, 2001. Mr. Ala further stated that he phoned Herbert Johns, the director of the Academy and questioned whether or not he was experiencing any problem with the staff or inmates at Bannum's facility. Mr. Johns told Mr. Ala that there had been one occasion of fraternization between a student and a Bannum inmate. According to Mr. Ala, Mr. Johns also stated that he thought that Bannum was to be moved out of the facility prior to them occupying the building and that he had great concerns about adult federal inmates being housed in proximity to the school. (A74). At no time did Mr. Ala or the BOP communicate with Bannum regarding these concerns or the fact that there was a presumption that Bannum would be out of the facility prior to the school moving in. (A74-75). **Bannum still remains at the leased facility under contract with the BOP.**

29. Bannum continued to take aggressive legal steps to avoid any interference or interruption with its lease. In fact, Bannum pursued Mr. and Mrs. Webb in Bankruptcy Court in California, took depositions in California, and attempted to obtain all of the Webb's records pertaining to its operation of the property at 1310 Pennsylvania Avenue. When Bannum's motion for continuance in the Texas Court was denied, it pulled its action in the Texas Court and then proceeded to pursue both Mr. McCray and Mr. Webb, and all other parties in Federal Court. (A81& A87).

30. As a matter of fact on June 4, 2001, Bannum advised the Contracting Officer that it withdrew its complaint in the Texas State Court and proceeded in Federal Court.

31. Bannum incurred substantial litigation expenses while the BOP remained silent with critical information that could have exposed the reason why Bannum was being asked to leave. As a matter of fact, in my opinion, the BOP actually consorted with and encouraged Mr. McCray by openly communicating with him.

32. At no time did the BOP retract or rescind its Cure Notice. **Bannum still remains at the leased facility under contract with the BOP.**

33. However, as a result of this litigation, Bannum was able to complete its contract. Bannum then bid on the follow-on contract with the BOP utilizing the same premises pursuant to a new lease agreement with Mr. McCray. **Bannum still remains at the leased facility under contract with the BOP.**

34. I was contacted by the Defense Contract Audit Agency (DCAA) and told that it had been requested by the DOJ to do an Audit of Bannum's Claims. However the Auditor advised me that he was not directed to Audit Count 6.

35. I have reviewed Bannum's time and effort including all the legal bills incurred by Bannum as a result of the defective Cure Notice. Bannum has incurred approximately, $115,836.64 as a result of the ongoing litigation resulting from the lease. The BOP and Bannum were under contract and pursuant to partnering agreements; both parties were to act in good faith with each other. If the BOP had disclosed the real reason behind the alleged eviction notice, Bannum could have confronted the City, the BOP, and Mr. McCray, and gotten to the bottom of this madness. The BOP knew about the school agreement approximately one month before the letter to vacate, but yet stood silent and then forced Bannum to incur tremendous legal costs to preserve the contract.

36. Even though the Auditor did not audit Count 6, he reviewed some of the legal bills that

Bannum incurred. (Exhibit 6)

37. Bannum has been supplied by the DOJ with the Audit working papers that the Auditor utilized to prepare his Audit Report that included some of the legal bills incurred in the McCray litigation.

- Bannum had to chase down the Webb's, who were located in San Diego, to obtain documents to show the real estate connection between Mr. Webb and Mr. McCray.
- When the Webb's refused to produce documents at a deposition, and the Texas Court insisted on proceeding with the case, Bannum was forced to non-suit its Texas case and proceed in Federal Court to further protect the lease, incurring additional legal cost.
- Subsequently, because the Federal Court dismissed the case on jurisdictional grounds only, Bannum had to continue with the Texas State Court action, which included additional discovery.
- Bannum finally obtained discovery from the Webb's, which included boxes of files that had to be reviewed.

(Exhibit 6).

38. <u>**Bannum still remains at the leased facility under contract with the BOP.**</u>

Sworn to before this
11th day of October, 2007

David Lowry

Sandra Allen
Notary Public

Notary Public State of Florida
Sandra Allen
My Commission DD671757
Expires 07/11/2011

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BANNUM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01-639C |
| v. | ) | (Judge Lettow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF DAVID LOWRY (Count 8)**

| | | |
|---|---|---|
| STATE OF FLORIDA | } | |
| | } | |
| COUNTY OF PINELLAS | } | ss: |

I, DAVID A. LOWRY, being of the age of majority and otherwise competent to make this affidavit, being duly sworn, deposes and says:

1. I am a resident of Pinellas County, State of Florida and I have personal knowledge of the facts contained in this affidavit. From 1984 until 2006, I was the Executive Director of Bannum, Inc. (hereinafter, "Bannum"), located at 8726 Old C.R. 54, Suite E, New Port Richey, Florida 34653. Bannum is a corporation with a principal place of business in New Port Richey. At the time of the filing of the Complaint in this action, Bannum operated approximately 16 Community Correction Centers, or halfway houses, throughout the United States, pursuant to contracts with the United States Department of Justice, Federal Bureau of Prisons (BOP). I was responsible for managing the day to day activities of Bannum and its contracts.

2. I have reviewed the summary judgment motion filed by the government along with all the attachments, which attempt to represent to this Court that the government is not responsible for refusing to exercise the options and for refusing to pay for all of the time and effort that Bannum incurred in responding to the BOP's alleged transportation requirement. I have reviewed internal documents produced during discovery and as will be shown on March 26, 1999, the contracting officer acknowledged that Bannum was in compliance with the transportation requirement of the contract.

3. By letter dated March 6, 2001, Bannum filed with the Contracting Officer a detailed Request for Equitable Adjustment ("REA"). The basis of the REA was for all of the time and work effort expended by Bannum in attempting to accommodate the BOP alleged requirement for transportation in Montgomery, Alabama and responding to the BOP's demand for pricing proposals. The BOP has admitted that it was responsible for causing the transportation mistake. Despite the BOP's admissions, it systematically harassed and blamed Bannum in an attempt to force Bannum to provide extra contractual transportation services. The BOP went as far as to threaten Bannum that it would not exercise two option years on contract J200c-397 unless and until Bannum provided the transportation that it was mistakenly being forced to provide, no cost. **Attached to the REA was a detailed affidavit that I prepared detailing Bannum's position on this matter. A copy of the REA and my affidavit are attached to the government's motion for summary judgment (A320-A346).**

4. On or about August 6, 2004, The BOP audited Bannum's claim on the transportation issue and issued an audit report (A355-368). Bannum during discovery also obtained a copy of the Auditors working papers that were used to prepare the audit report. (Exhibit 18). Pursuant to

the requests of the auditor, **I prepared a detailed affidavit dated May 14, 2004 supporting the cost relating to the transportation issue that Bannum incurred at the behest and direction of the BOP. (Exhibit 17)**

5. Bannum was first awarded a contract for Montgomery in January, 1986. Then it was awarded a follow-on Contract No. J200c-181 on or about October 1, 1993. The contract called for Bannum to provide Community Corrections Center services for Federal offenders in the Montgomery, Alabama area. Pursuant to the terms of the contract, Bannum was to commence performance on October 1, 1993 for a base period of two years ending September 30, 1995. The contract also contained three 1-year options, all of which were exercised by the BOP. (A328)

6. Then, on or about July 1, 1998, Bannum was awarded a follow-on contract No. J200c-397 by the BOP. (A144-153) This Contract was awarded after several rounds of discussion during which the alleged transportation issue was raised only once in a C&D letter dated April 10, 1998, despite the BOP's alleged previous concerns. Bannum responded to that concern by attaching its April 16, 1998 letter which addressed the issue that was raised under its current contract. Bannum further stated that if a different transportation plan was required, Bannum's manday rates would increase based on related costs. (A330). The issue was not raised again during the six subsequent C&D negotiations and requests for Final Proposal Revisions. (A330).

7. The Statement of Work for Contract for J200c-397 required that "the facility shall be located within 1 mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost the resident". (A14) Bannum's facility was located in compliance with the contract requirement. (A328, ¶3).

8. Intermittently during Bannum's performance of the subject contract and the preceding

contract (No. J200c-181), BOP raised an issue regarding Bannum's compliance of the transportation requirements under the contract, which BOP claimed was deficient. The BOP issued numerous monitoring reports and letters insisting that Bannum had to come up with a solution for the BOP's mistaken transportation needs of the inmates. (A189, A334 ¶6, A196-197, A227, A230, A233-234, A237, A240, A242, A251, A334 ¶32, A263-265, A273-274, A287-292, A298, A300-304, A307, A308-310, A315-319, A350-354)

9. Bannum spent considerable extra-contractual time, effort and cost responding to BOP's allegations, continuously claiming that it met the transportation requirements of the contract. Discovery material shows that the BOP knew full well that Bannum had met, and was continuing to meet at all times, the contract transportation requirements. (A194, A198-199, A200-201, A229, A332 ¶s 21,22, A261-272, A275-276, A305-306).

10. The BOP then, after realizing that Bannum met the contract transportation requirements, directed Bannum to submit a proposal in excess of the contract terms and Bannum submitted, in response thereto, a proposal to the CCRA Cheryl Dennings on September 8, 1999 which discussed price, terms and other conditions. The price proposed by Bannum was $5,000.00 per month (A248-249)

11. Despite the submission of Bannum's proposal, the contracting officer sent to Bannum Modification No. 3, which included compensation for the additional transportation services in the amount of $45,000 per year, which was one-half of the BOP's estimate included in its Request for Contract Action. (A254-255)

12. However, on November 29, 1999 Bannum discovered that the CCRA had never forwarded its September 8, 1999 pricing proposal to the contracting officer. Bannum then

notified the contracting officer that it had mistakenly signed Modification No. 3, believing that its proposal to the CCRA of September 8, 1999 had been accepted and incorporated into the contract. Bannum therefore rescinded its agreement to the Modification. (A252)

13. On January 4, 2000 the supervising contracting officer acknowledged the rescission of modification three and requested yet another cost proposal for the provision of transportation services in excess of contract requirements. Additionally, the supervising contracting officer stated that the BOP Montgomery office (COTR) may decide to not exercise the option years, if Bannum did not satisfy their alleged transportation concerns. Bannum considered the contracting officer's statement an attempt to extort extra contractual performance from Bannum in exchange for the BOP exercising subsequent options under the contract. (A334)

14. In response to the BOP direction, Bannum submitted yet another formal cost proposal for the change in transportation requirement on January 7, 2000. (A257-259).

15. In January 2000, again, even though the BOP had directed Bannum to submit numerous cost proposals for extra-contractual transportation services, BOP personnel in the field office (COTR) continued to raise the alleged concerns regarding the transportation issue and Bannum rightly responded that the matter was presently being negotiated with the BOP central office. (A334 ¶32, A200).

16. Despite this fact, the BOP continued to issue findings against Bannum's contract in monitoring reports, including a "REPEAT" deficient finding. (A263-265) This forced Bannum to expend time and effort again in responding. (A269-276).

17. Pursuant to further requests from the BOP, Bannum submitted another cost proposal on March 24, 2000, in the amount of $55,200.00 per year. (A278-280) During a meeting with the

BOP regarding this cost proposal, the BOP stated that Bannum must provide transportation throughout the day and strongly encouraged Bannum to purchase a van for that purpose. (A-336).

18. Bannum then contacted the BOP seeking further clarification as to whether or not it should provide for taxicab services or to provide vans. The BOP responded that Bannum should just submit its best offer and did not provide Bannum with anymore direction or guidance. (Exhibit 11).

19. On June 13, 2000, Bannum submitted a detailed proposal for use of a taxicab service, and private vehicles in unusual situations. (A293-296).

20. No further negotiations were conducted between Bannum and the BOP with respect to the June cost proposal. (A336).

21. The BOP continued to blame Bannum in monitoring reports regarding the transportation issue forcing Bannum to incur additional costs. (A336).

22. On October 11, 2000, the BOP issued its performance evaluations (CEF) for the Montgomery program which ranked Bannum "fair" in the contract compliance and business relations category and "poor" in the customer satisfaction category. (Exhibit 12).

23. Bannum had to spend a significant amount of time responding to this blatantly false performance evaluation. On November 16, 2000 Bannum submitted a detailed rebuttal to what it considered to be the erroneous CEF (Exhibit 13)

24. On November 29, 2000, Bannum received a copy of solicitation 200-0637-SE which was a request for proposals for a follow-on contract in Montgomery. When Bannum inquired as to the reason for this solicitation, the BOP responded that unless the transportation issue was

resolved, the procurement was going back out on the street and that the BOP would further contact Bannum to discuss the transportation issue. (A343)

25. On or about January 11, 2001 Bannum contacted the chief contracting officer and was advised again that unless it negotiated the transportation issue, the option years would not be exercised and a new contract would be awarded under the new solicitation (A343-344)

26. On January 24, 2001, Bannum submitted yet another cost proposal pursuant to a telephone conversation between Bannum representatives and BOP personnel and significantly reduced its cost proposal. (A311-313)

27. On February 9, 2001 the Piliero law firm, at a great deal of time and expense, contested the erroneous CEF. (Exhibit 14) and further appealed the February 21, 2001 full monitoring report wherein again the transportation issue was raised. (Exhibit 15).

28. As I indicated above, on March 6, 2001 Bannum file a detailed REA. The basis of the REA was to contest the wrongful refusal by the BOP to exercise the option and for all the time and expenses in dealing with the transportation issue with the BOP and the requested cost proposals.

29. Bannum was awarded the follow-on contract J200c-562 on September 25, 2001 for the base period of 2 years and 3 one-year options which were all exercised by the government. (A154-157). It is important to note that the government exercised all of the options years and the contract recently expired. Bannum was unsuccessful in obtaining the follow on contract after having been in Montgomery since 1986.

30. The BOP did not negotiate the REA and on April 9, 2001 the REA was converted into a certified claim for equitable adjustment in the amount of $339,411.57. (A347)

31. As I indicated above, the BOP then, through the Defense Contract Audit Agency ("DCAA"), performed an audit. I was Bannum's representative during the audit. (A355-368)

32. The claim was revised during the audit from $339,412 to $371,918 (A358).

33. The claim amount included the lost overhead and profits for the wrongful refusal to exercise the option, proposal preparation expenses which included Bannum labor costs for the BOP requested proposals, associated expenses such as UPS and overnight charges, fees associated with compiling the REA, legal cost and travel expenses. (A358)

34. The auditor questioned certain costs during the audit, based on certain opinions, which Bannum submits are in the error. (A358)

35. The auditor questioned the lost overhead and profits in its entirety based on the premise that Bannum would have replaced the income or revenue that it would have derived from the exercise of the options with the 2001 contract. (A356)

36. Bannum was still shorted two years. As indicated above the BOP exercised all the option years of the 1993 contract, did not exercise option years 2 & 3 on the 1998 contract, and exercised all of the option years on the 2001 follow-on contract. The auditor erred in not taking this issue into account.

37. The auditor then reviewed Bannum's labor costs. (A360-361). This labor was incurred in responding to the BOP's wrongful attempts to continuously blame Bannum for the transportation nightmare and then to the BOP's request for numerous pricing proposals.

38. The auditor questioned all of Bannum's labor cost because Bannum did not have time sheets and further that the work was performed by Bannum salary personnel. (A359)

39. However, buried in the auditor's working papers was my affidavit explaining and

detailing the basis behind Bannum's request. (Exhibit 17). My affidavit is very detailed, citing to the work effort expended by specific Bannum personnel and a detailed estimate of their time and also identifies the labor rates. My affidavit is hereby incorporated herein.

40. The auditor then reviewed the expenses incurred by Bannum associated with the extra work. He questioned the cost claiming that he could not tie them in to the Montgomery claim. (A361-362) However, I did provide the auditor with invoices and receipt of certain mailing and postage expenses which show the date and time of the bill that can be matched to Bannum's correspondence. (Exhibit 18)

41. The auditor then looked at the Camardo and the Piliero legal bills. The auditor incorrectly explains that these bills were for the Montgomery protest. (A362-363). However the vast majority of the Camardo billing was for the time and effort incurred in the protest of the defective transportation language and the detailed REA. (Exhibit 6). The Piliero bills were for the time and effort incurred contesting the improper and erroneous CEF's that also included contesting the transportation issue (Exhibit 6).

42. The auditor then reviewed the travel cost. (A363-364) The auditor claimed that Bannum did not support these charges by tying them into the Montgomery matter. However, pursuant to my May 14, 2004 affidavit, on page 3, I identified that I traveled to meet with the BOP officials on several occasions to deal with the transportation issue (Exhibit 17).

Sworn to before this
11th day of October, 2007

David Lowry

Sandra Allen
Notary Public

Notary Public State of Florida
Sandra Allen
My Commission DD671757
Expires 07/11/2011

# 1

U.S. Department of Justice

Federal Bureau of Prisons

Community Corrections Office

*515 Rusk Avenue, Room 12024*
*Houston, Texas 77002*
*(713) 718-4781 Fax: (713) 718-4780*

DATE: November 7, 2000

TO: Gina Lane Mustain
Community Corrections Regional Administrator

THRU: Andrea Johnson, Assistant CCRA
THRU: Christopher M. Zepher, MCA

FROM: Charles W. Ala, Acting CCM

SUBJECT: Bannum Beaumont - 6ZL

During the Interim Monitoring at Bannum Beaumont, it was discovered the City Council in Beaumont approved a Catholic school for troubled youths. The school will be in the unoccupied section of the building now occupied by Bannum Place Beaumont. The Beaumont City Council approved the school to begin operation at the beginning of the school year(September) 2001. The City Council stated that it was agreed upon that Bannum Place Beaumont would vacate the premises prior to the beginning of the school year 2001. As of the writing of this memo Bannum Incorporated has not notified this office of any future move. This information was provided by Fire Chief Jack Maddox, Beaumont Fire Department.

I received a phone call from inmate Burris #04599-043, at Bannum Beaumont. He stated he was approached by a private detective by the name of Zach Shelton. Mr. Shelton stated he was working for Federal Judge Hartfield doing an investigation into Bannum Beaumont, Director Charles Hurley and Assistant Director Lynn Klausen(terminated). Burris also stated Mr. Shelton interviewed inmate Hall #61308-080(moved to 6ze Houston) and inmate Linscomb #24624-077. Burris stated he wasn't sure but he thinks Mr. Shelton interviewed Ms. Willmeretta Lowe, a counselor that was terminated.

Inmate Burris wouldn't give the specifics of the interview due to the fact he was told it was a confidential interview and he couldn't reveal the nature of the interview.

# 2

[redacted]

U.S. Department of Justice
Federal Bureau of Prisons
Community Corrections Office
515 Rusk Avenue, Room 12024
Houston, Texas 77002

December 18, 2000

MEMORANDUM FOR KATHY CAMPBELL, ASSISTANT COMMUNITY CORRECTIONS ADMINISTRATOR

THRU: ANDREA JOHNSON, ASSISTANT COMMUNITY CORRECTIONS ADMINISTRATOR

FROM: CHARLES W. ALA, CONTRACT OVERSIGHT SPECIALIST

SUBJECT: BANNUM BEAUMONT, J200C-336, 6ZL

This memo is in regards to a conversation I had with the owner of the building that is occupied by Bannum Incorporated at 1310 Pennsylvania Avenue, Beaumont, Texas. The owners name is John McCray. Mr. McCray informed me that Bannum has never had a lease to occupy the building.

Mr. McCray leased the building to Mr. Ken Webb. Mr. Webb sub-leased the building to Bannum on February 5, 1997. Mr. McCray stipulated in his lease with Mr. Webb, that Mr. Webb could not sub-lease the property. According to the copy of Bannum's lease in our contract file, David Lowry was aware that he was sub-leasing the property. Mr. McCray did not know the building was sub-leased until he got a letter from Lawyers representing Bannum regarding a leaking roof.

I spoke with Lee Wheeler from Foxworth Realty, Beaumont, Texas. Mr. Wheeler is the property manager for Mr. McCray. Mr. Wheeler explained to me that he has tried to deal with David Lowry for the past six months. He has offered a new lease to Mr. Lowry but Mr. Lowry refuses to sign another lease.

On December 11, 2000, a registered eviction letter was issued to Bannum Inc.

Bannum has thirty (30) days to vacate the premises. I have secured a copy of the letter and will fax it if needed.

Mr. John McCray
P.O. Box 1528
Alexandria, La. 71309
318-793-5641

Mr. Lee Wheeler
Foxworth Realty
Beaumont, Texas
409-892-7245

I will forward information as it comes available.

As an aside, should it become necessary, Cornell Corrections, Houston, Texas, can accommodate all Bannum Beaumont's population and can accommodate for all their programming needs, including home confinement in the Beaumont area.

County Commissioner says unwritten agreement that if the school goes in Bannum will have to vacate.

3

U.S. Department of Justice

Federal Bureau of Prisons

Community Corrections Office

*515 Rusk Avenue, Room 12024*
*Houston, Texas 77002*
*(713) 718-4781 Fax: (713) 718-4780*

December 19, 2000

MEMORANDUM FOR KATHRINA WASHINGTON, COMMUNITY CORRECTIONS CONTRACTING OFFICER, CENTRAL OFFICE

THRU: David J. Wollner, Community Corrections Administrator
Central Office

THRU: Gina Lane Mustain, Community Corrections Regional Administrator
South Central Regional Office

THRU: Andrea Johnson, Assistant Community Corrections Administrator

FROM: Benjamin R. Tousley /s/ Benjamin B. Tousley
Community Corrections Manager

SUBJECT: Cure Notice Bannum Place Beaumont
Contract #J200c-336(6ZL)

I am recommending a Cure Notice be issued to Bannum Incorporated for contract J200c-336, based on a conversation with the owner of the building located at 1310 Pennsylvania Avenue, Beaumont, Texas, John McCray. Bannum Beaumont has occupied this building location since the award date of the contract, November 1, 1997.

Mr. McCray stated that the building was erroneously sub-leased to Bannum Incorporated and that Bannum Incorporated has never had a valid lease agreement to occupy this building. The building was leased to Mr. Ken Webb with the provision that the building not be sub-leased. On February 5, 1997, David Lowry signed a lease sub-letting a portion of this building which is now occupied by Bannum Beaumont.

Upon learning of the sub-lease, Mr. McCray evicted all tenants except Bannum Beaumont. Approximately six months ago, Mr. McCray instructed his property manager, Lee Wheeler of Foxworth Reality, to offer Bannum a new lease. David Lowry refused to accept this new lease.

On December 11, 2000, Lee Wheeler sent a certified letter to David Lowry advising Bannum Incorporated they had thirty (30) days to vacate the premises.

A Cure Notice is warranted as Bannum Incorporated will not have a viable place of performance to provide the Statement of Work requirements in Beaumont, Texas, as outlined in contract J200c-336 between the BOP and Bannum Incorporated.

Attached are the copies of the certified letter, the lease agreement signed by David Lowry, and a memo to Kathleen A. Campbell, Community Corrections Assistant Administrator, dated December 18, 2000.

File - BJ 12-21-00

4

1/12/01

Attn: Gina Mustain

From: Katharina Washington

Re: Beaumont

Please note Bannum, Inc. has an Injunction for the facility in Beaumont which is good until 3/1/01. Therefore, there is nothing to cure at this time.

5

**RESERVED**

6

JOSEPH A. CAMARDO, JR.
ATTORNEY AT LAW
127 GENESEE STREET
AUBURN, NEW YORK 13021
WWW.CAMARDO.COM

…PH A. CAMARDO, JR.
NANCY M. CAMARDO*
*admitted to Georgia Bar only
KEVIN M. COX
BRIAN J. SMITH
KEVIN P. RYAN

MANAGER-GOVERNMENT COST/PRICE ANALYST
JOSEPH W. NORRIS, M.B.A.

PHONE: (315) 252-3846
FAX: (315) 252-3508
E-MAIL: JCAM123@AOL.COM

**Via UPS**

June 12, 2004

Dave Lowry
Bannum, Inc.
8726 Old CR 54
Suite E
New Port Richey, FL 34653

Re: **Bannum, Inc.,**
**Audit of Claims for Equitable Adjustment**

**<u>FOR SETTLEMENT PURPOSES ONLY</u>**

Dear Dave:

Enclosed herewith with regards to the above reference matter is a spreadsheet along with bills in an additional attempt to isolate the fees to the various counts. We previously provided you with the bills for fees which were part of the REA(s)/Claims associated with Counts 2, 3, 5, 8, 9 along with the BOP billing code fees broken down to the various counts through November 15,2001. This spreadsheet further breaks down the allocation of fees to various counts by including related activity to each of the counts.

You should be able to follow the updated spreadsheet with the attached billing. If you have any problems, please let us know as soon as possible.

Sincerely,

Joseph A. Camardo, Jr.

Enclosure

2004D17200004

D-8

Additional charges:

| | | Amount |
|---|---|---|
| | **Faxes** | |
| [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 0.00] |
| | **Shipping** | |
| 12/6/99 | Shipping<br>S. Oltz: Certified mail to R. Benavides | 3.42 |
| | SUBTOTAL: | [ 3.42] |
| | Total costs | $3.42 |
| | [redacted] | [redacted] |
| | [redacted] | [redacted] |

STANDARD Conduct
Cont 5

Additional charges:

| | | Amount |
|---|---|---|
| | **EXPENSES** | |
| 1/20/00 | Shipping<br>S. Oltz: Certified mail<br>EXPENSES | 6.62 |
| | $2.98 – count 5 | |
| [redacted] | [redacted] D. [redacted] | NO CHARGE |
| | [redacted] | [ [redacted] |
| | [redacted] | [redacted] |
| | [redacted] | [redacted] |
| | [redacted] | [redacted] |
| | [redacted] | [redacted] |

David Lowry



| | Hrs/Rate | Amount |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| SUBTOTAL: | [redacted] | [redacted] |
| [redacted] | | |

Additional charges:

| | | |
|---|---|---|
| 2/16/00 | Faxes<br>S. Oltz: 2/17 - 2 pgage fax to D. Lowry, 2/18 - 10 pg fax to J. Leslie, 2 pg. fax to D. Lowry, 2/23 - 2 pg. fax to D. Lowry, 2 pg. fax to E. Nagy, 2 pg. fax to D. Lowry, 2/29 - 4 pg. fax to J. Malcolm Becker | NO CHARGE |
| [redacted] | | |
| 2/21/00 | Shipping<br>S. Oltz: FedEx shipping fees, delivered 1/24/00 | 12.50 |

David Lowry



| | | Amount |
|---|---|---|
| 2/21/00 | Shipping<br>S. Oltz: FedEx shipping fees, package delivered on 1/24/00. | 12.50 |
| | Shipping<br>S. Oltz: FedEx shipping fees, delivered 1/24/00 | 24.00 |
| | Shipping<br>S. Oltz: FedEx shipping fees, delivered 1/24/00 | 13.75 |
| | Shipping<br>S. Oltz: FedEx shipping fees, delivere 1/25/00 | 23.90 |
| | Shipping<br>S. Oltz: FedEx shipping fees: delivered 2/1400 | 14.16 |
| | Total costs | $100.81 |
| | [redacted] | [redacted] |
| | [redacted] | [redacted] |
| | [redacted] | [redacted] |

COUNT 5
STD Conduct

David Lowry 

| | Hrs/Rate | Amount |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| SUBTOTAL: | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

Additional charges:

EXPENSES

| | | |
|---|---|---|
| 3/2/00 | Travel<br>J. Camardo: Travel to Bannum, 3/2/00<br>airfare, food, misc. $781.50<br>EXPENSES | 781.50 |

Count 5

STD- conduct.

David Lowry

Page 4

| | | Amount |
|---|---|---|
| 3/1/00 | Faxes<br>[redacted] x to D.<br>[redacted] pg.<br>[redacted] y.<br>[redacted] | [redacted] |
| | [redacted] | [ [redacted] |
| | [redacted] | [redacted] |
| | [redacted] ill | [redacted] |
| | [redacted] | [redacted] |
| 3/ [redacted] | | [redacted] |
| | B [redacted] | [redacted] |

David Lowry — Page

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | [redacted] | | |
| 11[redacted] | N. Camardo: Draft letter [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 0.17 | 21.25] |
| | Montgomery COUNT 8 | | |
| 11/20/00 | General<br>N. Camardo: Review of file, legal research, telecon with D. Lowry<br>Montgomery | 1.00<br>125.00/hr | 125.00 |
| 11/22/00 | General<br>N. Camardo: Review of file, discussion with J. Camardo, legal research regarding non-exercise of option<br>Montgomery | 1.50<br>125.00/hr | 187.50 |
| 11/24/00 | General<br>J. Camardo: Review additional cases<br>Montgomery | 0.50<br>125.00/hr | 62.50 |
| | General<br>N. Camardo: Document review, legal research regarding non-exercise of option<br>Montgomery | 1.50<br>125.00/hr | 187.50 |
| 11/25/00 | General<br>N. Camardo: Legal research regarding non-exercise of option<br>Montgomery | 2.00<br>125.00/hr | 250.00 |
| 11/27/00 | General<br>J. Camardo: Legal research<br>Montgomery | 0.50<br>125.00/hr | 62.50 |
| | General<br>N. Camardo: Conference with J. Camardo, drafting memo to D. Lowry, legal research<br>Montgomery | 3.00<br>125.00/hr | 375.00 |
| 11/28/00 | General<br>N. Camardo: Finish memo to D. Lowry, conference with J. Camardo, telecon with D. Lowry, legal research, begin drafting Lowry affidavit<br>Montgomery | 2.57<br>125.00/hr | 321.25 |
| | SUBTOTAL: | [ 12.57 | 1,571.25] |

| | Hrs/Rate | Amount |
|---|---|---|
| [redacted] N. Camardo: [redacted] | [redacted] | [redacted] |
| SUBTOTAL: | [ 0.50 | 62.50] |
| **Montgomery** count 8 | | |
| 12/5/00 General<br>N. Camardo: Review of file, draft REA/affidavit<br>Montgomery | 2.25<br>125.00/hr | 281.25 |
| 12/6/00 General<br>N. Camardo: Review of file, draft REA/affidavit<br>Montgomery | 1.50<br>125.00/hr | 187.50 |
| 12/7/00 General<br>N. Camardo: Review of file, draft REA/affidavit<br>Montgomery | 2.50<br>125.00/hr | 312.50 |
| 12/8/00 General<br>N. Camardo: Review of file, draft affidavit/REA<br>Montgomery | 2.00<br>125.00/hr | 250.00 |
| General<br>N. Camardo: Review of file, draft affidavit/REA<br>Montgomery | 2.00<br>125.00/hr | NO CHAR' |
| SUBTOTAL: | [ 10.25 | 1,031.25] |
| [redacted] | [redacted] | [redacted] |

Cont 8

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | Montgomery | | |
| 1/8/01 | General<br>N. Camardo: Conference with J. Camardo, telecon with D. Lowry, finish draft of Lowry affidavit<br>Montgomery | 2.83<br>125.00/hr | 353.75 |
| 1/11/01 | General<br>J. Camardo: Review of file<br>Montgomery | 0.50<br>125.00/hr | 62.50 |
| 1/12/01 | General<br>J. Camardo: Review of file<br>Montgomery | 0.25<br>125.00/hr | 31.25 |
| | General<br>N. Camardo: Review of file, begin drafting protest, conference with J. Camardo, telecon with D. Lowry<br>Montgomery | 1.75<br>125.00/hr | 218.75 |
| | SUBTOTAL: | [ 5.33 | 666.25] |

[redacted]

David Lowry



| | | Hrs/Rate | Amount |
|---|---|---|---|
| | Montgomery (Cont 8) | | |
| 1/16/01 | General<br>J. Camardo: Review of cost proposal to determine what language can be added<br>Montgomery | 0.50<br>125.00/hr | 62.50 |
| | SUBTOTAL: | [ 0.50 | 62.50] |

[redacted]

EXPENSES

[redacted]

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | [redacted] | | |
| | [redacted] | [redacted] | |
| | [redacted] | [redacted] | |
| | SUBTOTAL: | [ [redacted] | |
| | Beaumont Cont 9 | | |
| 1/26/01 | General<br>J. Norris: Discussion with J. Camardo and K. Cox<br>Beaumont | 0.25<br>100.00/hr | 25.00 |
| | General<br>K. Cox: Review correspondence, discussion with J. Camardo, telecon with D. Lowry, review Beaumont claim<br>Beaumont | 1.17<br>100.00/hr | 117.00 |
| | General<br>J. Camardo: Telecon, review of letter<br>Beaumont | 0.17<br>125.00/hr | 21.25 |
| 1/29/01 | General<br>K. Cox: Discussion with N. Camardo and J. Camardo, review correspondence, telecon with D. Lowry<br>Beaumont | 0.25<br>100.00/hr | 25.00 |
| 1/30/01 | General<br>J. Norris: Work on response to Government letter of January 25, 2001, discuss call to D. Lowry, review fax from Lowry<br>Beaumont | 6.07<br>100.00/hr | 607.00 |
| | General<br>J. Camardo: Work on documentation that the CO needs, review cost<br>Beaumont | 0.75<br>125.00/hr | 93.75 |
| 1/31/01 | General<br>J. Norris: Work on response to Government letter, discussion with K. Cox, call to D. Lowry<br>Beaumont | 1.77<br>100.00/hr | 177.00 |
| | SUBTOTAL: | [ 10.43 | 1,066.00] |

David Lowry



| | | Hrs/Rate | Amount |
|---|---|---|---|
| | SUBTOTAL: | [ 1.87 | 212.00] |
| | Beaumont ~~Count 9~~ | | |
| 2/1/01 | General<br>J. Norris: Response to BOP on REA<br>Beaumont | 1.38<br>100.00/hr | 138.00 |
| | General<br>N. Camardo: Review and edit of REA letter to CO, telecon<br>Beaumont | 0.83<br>125.00/hr | 103.75 |
| | SUBTOTAL: | [ 2.21 | 241.75] V |
| | Montgomery Count 8 | | |
| 2/14/01 | General<br>N. Camardo: Legal research, review of filed protest, review and revising affidavit<br>Montgomery | 3.00<br>125.00/hr | 375.00 |
| | SUBTOTAL: | [ 3.00 | 375.00] V |
| | Tupelo/Jackson | | |
| [redacted] | General [redacted] | [redacted] | |
| | SUBTOTAL: | [ [redacted] | |
| | [redacted]ndered | [redacted] | |
| | [redacted]: | | |
| | [redacted] | | |
| 2[redacted] | [redacted] | | [redacted] |
| | [redacted] | | [ [redacted] |
| | T[redacted]bill | | |
| | [redacted] | | |

DCAA001357

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | SUBTOTAL: | [ 1.33 | 0.00] |
| | [redacted] | | |
| | General<br>[redacted] | [redacted] | |
| | [redacted] | [redacted] | |
| | SUBTOTAL: | [ [redacted] | [redacted] |

Montgomery COUNT 8

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 2/16/01 | General<br>K. Cox: Discussion with N. Camardo, review of file<br>Montgomery | 1.50<br>100.00/hr | 150.00 |
| 2/17/01 | General<br>K. Cox: Review of file and REA<br>Montgomery | 1.50<br>100.00/hr | 150.00 |
| 2/19/01 | General<br>K. Cox: Telecon with client, discussion with J. Norris, review correspondence from client<br>Montgomery | 1.75<br>100.00/hr | 175.00 |
| 2/20/01 | General<br>K. Cox: Review new documents received from client<br>Montgomery | 2.50<br>100.00/hr | 250.00 |
| 2/21/01 | General<br>K. Cox: Review of file<br>Montgomery | 1.25<br>100.00/hr | 125.00 |

All Fees Part of
Count 8

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 2/26/01 | General<br>J. Camardo: Review faxes, telecon with client<br>Montgomery | 1.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Discussion with J. Camardo and N. Camardo, telecon with D. Lowry, review of file<br>Montgomery | 1.25<br>100.00/hr | 125.00 |
| | General<br>N. Camardo: Conference with J. Camardo and K. Cox, telecon with D. Lowry, review of file, legal research<br>Montgomery | 2.25<br>125.00/hr | 281.25 |
| 2/27/01 | General<br>N. Camardo: Conference with J. Camardo and K. Cox, review of file, legal research, draft protest to court<br>Montgomery | 4.75<br>125.00/hr | 593.75 |
| | General<br>K. Cox: Review and edit REA<br>Montgomery | 0.17<br>100.00/hr | 17.00 |
| 2/28/01 | General<br>K. Cox: Review and edit REA<br>Montgomery | 1.08<br>100.00/hr | 108.00 |
| | General<br>N. Camardo: Conference with K. Cox and J. Camardo, legal research, drafting and editing protest<br>Montgomery | 2.50<br>125.00/hr | 312.50 |
| | SUBTOTAL: | [ 21.50 | 2,287.50] |

[redacted]

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ [redacted] | |
| | [redacted] | | |
| [redacted] | [redacted]ral [redacted] Ferguson | 10[redacted] | [redacted] |
| | SUBTOTAL: | [ 1.15 | 0.00] |
| | Montgomery | | |
| 3/1/01 | General<br>K. Cox: Edit and draft REA, review complaint, discussion with N. Camardo<br>Montgomery | 2.42<br>100.00/hr | 242.00 |
| | General<br>N. Camardo: Draft protest to claim court, conference with K. Cox, legal research, telecon with D. Lowry<br>Montgomery | 3.25<br>125.00/hr | 406.25 |
| 3/2/01 | General<br>K. Cox: Review complaint, discussion with N. Camardo, review and edit REA<br>Montgomery | 3.00<br>100.00/hr | 300.00 |
| | General<br>N. Camardo: Finalize and edit protest, prepare for filing, discussion with K. Cox<br>Montgomery | 2.00<br>125.00/hr | 250.00 |
| 3/5/01 | General<br>K. Cox: Telecon with D. Lowry, edit and revise REA<br>Montgomery | 0.75<br>100.00/hr | 75.00 |
| 3/6/01 | General<br>J. Camardo: Preparation for Court of Claims conference, conference with Court, telecon with client<br>Montgomery | 2.00<br>125.00/hr | 250.00 |

COUNT 8

Portion of Fees Previously billed as part of REA

DCAA001360

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 3/6/01 | General<br>K. Cox: Revise complaint, prepare for telecon with Judge, discussion with J. Camardo, telecon with D. Lowry, draft motion to seal<br>Montgomery | 5.17<br>100.00/hr | 517.00 |
| | General<br>N. Camardo: Conference with K. Cox and J. Camardo in preparation for conference call, conference with call with court of claims and DOJ attorney, preparation of amended complaint and redacted complaint and preparation for submission<br>Montgomery | 3.25<br>125.00/hr | 406.25 |
| 3/15/01 | General<br>K. Cox: Review administrator record, discussion with J. Camardo<br>Montgomery | 0.50<br>100.00/hr | 50.00 |
| | General<br>N. Camardo: Review of Government exhibit<br>Montgomery | 0.25<br>125.00/hr | 31.25 |
| | SUBTOTAL: | [ 22.59 | 2,527.75] |

Nevada (Reno)

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| | | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [redacted] | |
| | Montgomery Count 8 | | |
| 3/27/01 | General<br>J. Norris: Discussion with K. Cox, review of file<br>Montgomery | 0.28<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Preparation for conference call<br>Montgomery | 1.25<br>125.00/hr | 156.25 |
| | General<br>K. Cox: Review of file, prepare for telecon with Judge, telecon with Judge, discussion with J. Camardo and N. Camardo, telecon with D. Lowry, letter to C. Clayton regarding claim<br>Montgomery | 2.25<br>100.00/hr | 225.00 |
| | General<br>N. Camardo: Conference with J. Camardo and K. Cox, telecon with Court of Claim, telecon with Lowry<br>Montgomery | 1.33<br>125.00/hr | NO CHARGE |
| 3/28/01 | General<br>J. Norris: Work on REA/Claim, edit letter, faxes to Bannum<br>Montgomery | 1.70<br>100.00/hr | 170.00 |
| 3/30/01 | General<br>J. Camardo: Telecon on items to add to the claim<br>Montgomery | 0.08<br>125.00/hr | NO CHARGE |
| | General<br>J. Norris: Call with D. Lowry, discussion with J. Camardo, review of file and fax from Lowry<br>Montgomery | 1.07<br>100.00/hr | 107.00 |
| | All Count 8 | | |
| | SUBTOTAL: | [ 7.96 | 658.25] |
| [redacted] | [redacted] | | [redacted] |

Portion of Fees Previously Provided

As part of REA

| | | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | | | |
| SUBTOTAL: | | [redacted] | [redacted] |

Montgomery — *Count 8*

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 4/5/01 | General<br>J. Norris: Review of fax from Lowry, edits to REA costing<br>Montgomery | 1.42<br>100.00/hr | NO CHARGE |
| 4/10/01 | General<br>J. Norris: Review of costs for claim, discussion with K. Cox<br>Montgomery | 0.25<br>100.00/hr | 25.00 |
| | SUBTOTAL: | [ 1.67 | 25.00] |

[redacted]

EXPENSES

[redacted]

To[redacted]

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [redacted] | [redacted] |

Montgomery COUNT 8

| | | | |
|---|---|---|---|
| 5/7/01 | General<br>N. Camardo: Reviewing Government's motion, legal research<br>Montgomery | 1.00<br>125.00/hr | 125.00 |
| 5/8/01 | General<br>N. Camardo: Review of Government motion, legal research<br>Montgomery | 2.50<br>125.00/hr | 312.50 |
| 5/9/01 | General<br>N. Camardo: Review of file, review of Govt. motion., legal research<br>Montgomery | 0.75<br>125.00/hr | 93.75 |
| 5/10/01 | General<br>J. Camardo: Review motion for summary judgement telecon with client over response<br>Montgomery | 1.00<br>125.00/hr | NO CHARGE |
| | General<br>N. Camardo; Conference with J. Camardo, telecon with D. Lowry regarding response to motion, begin drafting findings and counter findings of fact, review of file<br>Montgomery | 2.75<br>125.00/hr | 343.75 |
| 5/11/01 | General<br>J. Camardo: Go over response to summary judgment and what discovery needs to be done, call Court of Federal Claims on procedure that needs to be used, go over letter with N. Camardo to DOJ attorney<br>Montgomery | 1.00<br>125.00/hr | NO CHARGE |

David Lowry



| | | Hrs/Rate | Amount |
|---|---|---|---|
| 5/11/01 | General<br>N. Camardo: Conference with J. Camardo and K. Cox, telephone conference with Court clerk, legal research, drafting discovery request to A. Page, drafting interrogatories<br>Montgomery | 5.00<br>125.00/hr | 625.00 |
| 5/14/01 | General<br>N. Camardo: Review of file, legal research<br>Montgomery | 1.50<br>125.00/hr | 187.50 |
| 5/15/01 | General<br>N. Camardo: Review of file, conference with J. Camardo and J. Norris, telephone conference with A. Page, prepare and submit motion for discovery and affidavit<br>Montgomery | 5.00<br>125.00/hr | 625.00 |
| | SUBTOTAL: | [ 20.50 | 2,312.50] |

Wage determination

[redacted]

SUBTOTAL: [ [redacted]

For [redacted]

97[redacted]50

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

June 06, 2001

Invoice # 32868

Professional Services

Beaumont COUNT 6

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 5/18/01 | General<br>K. Cox: Review reply to bid protest, motion for discovery, discussion with J. Camardo and N. Camardo<br>Beaumont | 2.42<br>100.00/hr | 242.00 |
| | General<br>J. Camardo: Review documents for trial, work on complaint for bankruptcy<br>Beaumont | 8.00<br>125.00/hr | 1,000.00 |
| | General<br>Robert Riley: Conference with J. Camardo, D. Lowry, J. Crosby, K. Cox, telephone conference with Selbach regarding advice on adversary proceedings and filing objections to discharge<br>Beaumont | 3.00<br>100.00/hr | NO CHARGE |
| 5/21/01 | General<br>K. Cox: Edit and draft motion to compel for sanctions, meeting with J. Camardo, research Texas law, telecon with with J. Rich, J. Crosby, and D. Lowry<br>Beaumont | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Edit and draft motion to compel for sanctions, meeting with J. Camardo, research Texas law, telecons with with J. Rich, J. Crosby, and D. Lowry<br>Beaumont | 0.57<br>100.00/hr | NO CHARGE |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 5/21/01 | General<br>J. Camardo: Telecons with client, work on motion to compel, review bankruptcy files, look at getting into Federal Court<br>Beaumont | 8.00<br>125.00/hr | 1,000.00 |
| | General<br>Robert Riley: Conference with J. Camardo and K. Cox regarding State vs. Federal Court, declaratory judgment action, unavailability of witnesses, removal to Federal Court, necessary parties<br>Beaumont | 1.00<br>100.00/hr | 100.00 |
| 5/22/01 | General<br>Robert Riley: Conference with J. Camardo and K. Cox, telecons.<br>Beaumont | 1.00<br>100.00/hr | NO CHARGE |
| | General<br>Robert Riley: Research Texas law regarding non-suit, research federal cases regarding BOP suit<br>Beaumont | 8.00<br>100.00/hr | 800.00 |
| | General<br>Robert Riley: Research Texas law regarding non-suit, research federal cases regarding BOP suit<br>Beaumont | 3.83<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecons with clients, J. Rich, S. Oliver, J. Crosby about case and what should be done, preparation for trial<br>Beaumont | 8.00<br>125.00/hr | 1,000.00 |
| 5/23/01 | General<br>K. Cox: Meeting with J. Camardo, research bankruptcy procedure, review depos of the Webb's, telecons with D. Lowry, J. Rich, J. Crosby, S. Oliver and Snider<br>Beaumont | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Meeting with J. Camardo, research bankruptcy procedure, review depos of the Webb's, telecons with D. Lowry, J. Rich, J. Crosby, S. Oliver and Snider<br>Beaumont | 2.92<br>100.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo, K. Cox, J. rich, D. Lowery, S. Oliver, J. Crosby regarding case status and issues pertaining to Texas state court action and bankruptcy court proceeding, research removal and standing of creditor and trustee to remove<br>Beaumont | 2.50<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecon with clients, J. Rich, S. Oliver, J. Crosby about case and what should be done, preparation for trial<br>Beaumont | 8.00<br>125.00/hr | 1,000.00 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 5/24/01 | General<br>J. Norris: Discussion with J. Camardo and K. Cox on case<br>Beaumont | 0.17<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecons with clients, J. Rich, S. Oliver, J. Crosby about case and what should be done, telephone hearing, attempt to get a stay, attempt to get the Webb's to testify<br>Beaumont | 8.00<br>125.00/hr | 1,000.00 |
| | General<br>K. Cox: Prepare with J. Camardo for hearing, hearing by telephone, discussion with J. Camardo, telecon with Crutchfield, Oliver, Gorrill, discussion with J. Camardo, review of fax<br>Beaumont | 5.00<br>100.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo, J. Rich regarding strategy and bankruptcy proceedings, discussion with pending Texas litigation<br>Beaumont | 1.00<br>100.00/hr | NO CHARGE |
| 5/25/01 | General<br>J. Norris: Receipt of faxes from Bannum<br>Beaumont | 0.17<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Discussion with J. Camardo, telecon with D. Lowry, research recusal<br>Beaumont | 3.50<br>100.00/hr | 350.00 |
| 5/29/01 | General<br>J. Camardo: Telecons with clients, telecons with J. Crosby, preparation for depositions of the Webb's<br>Beaumont | 8.00<br>125.00/hr | 1,000.00 |
| | General<br>K. Cox: Fax to J. Rich, fax to S. Oliver, discussion with J. Camardo, review fax from J. Crosby, meeting with J. Camardo, telecon with D. Lowry, telecon with J. Rich, research Rule 18a, research, fax to D. Lowry<br>Beaumont | 4.42<br>100.00/hr | 442.00 |
| 5/31/01 | General<br>J. Camardo: Review of file, work on Federal Court complaint, travel back to Syracuse<br>Beaumont | 8.00<br>125.00/hr | 1,000.00 |
| | General<br>K. Cox: Travel to Syracuse, discussion with J. Camardo, outine and draft Federal Complaint<br>Beaumont | 8.00<br>100.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 119.50 | 10,534.00] |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | Lease Count 6 | | |
| 5/17/01 | General<br>J. Norris: In with J. Camardo on calls with D. Lowry, discussion with J. Camardo<br>Lease | 1.00<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecons with client over status of lease matter<br>Lease | 1.00<br>125.00/hr | 125.00 |
| 5/29/01 | General<br>J. Norris: Discussion with J. Camardo and K. Cox<br>Lease | 0.23<br>100.00/hr | NO CHARGE |
| 5/30/01 | General<br>J. Camardo: Travel to California, preparation for depositions, deposition of the Webb's<br>Lease | 8.00<br>125.00/hr | 1,000.00 |
| | General<br>K. Cox: Travel to San Diego, meeting with J. Crosby, hearing, depositions of K. & M. Webb, copy documents, meeting with J. Camardo and J. Crosby, telecon with D. Lowry<br>Lease | 8.00<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Travel to San Diego, meeting with J. Crosby, hearing, depositions of K. & M. Webb, copy documents, meeting with J. Camardo and J. Crosby, telecon with D. Lowry<br>Lease | 9.00<br>100.00/hr | NO CHARGE |
| 5/31/01 | General<br>K. Cox: Travel to Syracuse, discussion with J. Camardo, outine and draft Federal Complaint<br>Lease | 3.00<br>100.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 30.23 | 1,125.00] ✓ |
| | Montgomery Count 8 | | |
| 5/18/01 | General<br>N. Camardo: Review of defendant opposition to discovery motion, conference with J. Camardo<br>Montgomery | 0.33<br>125.00/hr | 41.25 |
| 5/21/01 | General<br>N. Camardo: Review of defendant's opposition to motion, review of file, legal research<br>Montgomery | 3.50<br>125.00/hr | 437.50 |
| 5/22/01 | General<br>N. Camardo: Review of file, legal research<br>Montgomery | 5.00<br>125.00/hr | 625.00 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 5/23/01 | General<br>N. Camardo: Review of file, legal research, begin drafting response to defendant's opposition to motion<br>Montgomery | 5.00<br>125.00/hr | 625.00 |
| | General<br>K. Cox: Meet with N. Camardo, review Government motion for summary judgment<br>Montgomery | 0.50<br>100.00/hr | 50.00 |
| 5/24/01 | General<br>N. Camardo: Drafting and editing response to defendant's opposition to motion, legal research, finalizing package for filing with court<br>Montgomery | 4.00<br>125.00/hr | 500.00 |
| | General<br>K. Cox: Review N. Camardo brief for bid protest<br>Montgomery | 0.50<br>100.00/hr | 50.00 |
| 5/25/01 | General<br>J. Camardo: Telecon with client, telecon with J. Rich, Jim Crosby, S. Oliver, attempt to get a stay<br>Montgomery | 8.00<br>125.00/hr | 1,000.00 |
| | SUBTOTAL: | [ 26.83 | 3,328.75] |
| | For professional services rendered | 176.56 | $14,987.75 |

Additional Charges :

EXPENSES

| | | | Amount |
|---|---|---|---|
| 5/17/01 | Faxes<br>S. Oltz: 5/17 - 4 pg fax to D. Lowry, 5/18 - 3 pg fax to S. Oliver, 5/21 - 3 pg fax to Sandy, 3 pg fax to J. Crosby, 3 pg fax to D. Lowry, 5/24 - 2 pg fax to S. Oliver, 2 pg fax to D. Lowry, 3 pg fax to. D. Lowry, 3 pg fax to J. Crosby, 5/31 - 2 pg fax to J. Rich, 2 pg fax to S. Oliver<br>EXPENSES | | NO CHARGE |
| | Photocopies<br>S. Oltz: 5/21 - 10 copies, 5/23 - 55, 5/25 - 48 copies, 5/29 - 54 copies<br>EXPENSES | | NO CHARGE |
| 5/21/01 | Misc.<br>S. Oltz: Bannum (Webb depositions) transcripts from Barron Barber Court Reporting, transcript fro M. Webb $1,040.60, transcript for K. Webb $956.40<br>EXPENSES | Count 6 | 1,997.00 |
| 5/23/01 | Misc.<br>S. Oltz: Retainer to J. Crosby for Bannum Beaumont<br>EXPENSES | Count 6 | 2,000.00 |
| 5/28/01 | Shipping<br>S. [redacted] | | |

[redacted]

Amount

[redacted]

5/30/01 Travel 1,478.68
J. Camardo: Travel for J. Camardo to San Diego, CA for depositions of the Webb's, transportation total $1,249.65, lodging and meals $238.03
EXPENSES

Count 6

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

June 20, 2001

Invoice # 32928

Professional Services

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| | [redacted] General<br>[redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 2.50 | 0.00] |
| | Ardoin Count 5 | | |
| 6/6/01 | General<br>K Cox: Discussion with J. Camardo and Robert Riley, review complaint, research Fed. statutes, telecon with J. Rich<br>Ardoin | 1.25<br>100.00/hr | 125.00 |
| | General<br>J. Camardo: Review of Ardion matter<br>Ardoin | 1.00<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo and K. Cox regarding case status, causes of action, trial prop, review and outline complaint, research law regarding causes of action conference with J. Camardo and telecon with J. Rich<br>Ardoin | 3.00<br>100.00/hr | NO CHARGE |
| 6/7/01 | General<br>J. Camardo: Review status of this matter, telecons with client<br>Ardoin | 1.00<br>125.00/hr | 125.00 |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 6/7/01 | General<br>Robert Riley: Conference with J. Camardo, K. Cox discuss causes of action, legal research<br>Ardoin | 2.00<br>100.00/hr | NO CHARGE |
| 6/8/01 | General<br>K. Cox: Review of file, discussion with Robert Riley and J. Camardo<br>Ardoin | 1.75<br>100.00/hr | 175.00 |
| | General<br>Robert Riley: Review transcripts and pleadings, conference with J. Camardo, K. Cox and D. Lowry<br>Ardoin | 7.00<br>100.00/hr | NO CHARGE |
| 6/9/01 | General<br>J. Camardo: Legal research for motion to dismiss<br>Ardoin | 2.00<br>125.00/hr | 250.00 |
| 6/11/01 | General<br>K. Cox: Meeting with J. Camardo, discussion with Robert Riley, telecons with D. Lowry, S. Oliver, J. Rich, T. Morrison, C. Hurley, D. Green and P. Simpson, research, draft motion to compel, research removal<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Meeting with J. Camardo, discussion with Robert Riley, telecons with D. Lowry, S. Oliver, J. Rich, T. Morriison, C. Hurley, D. Green and P. Simpson, research, draft motion to compel, research removal<br>Ardoin | 4.42<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecons. with S. Oliver, J. Rich, D. Lowry, legal research on removal<br>Ardoin | 8.00<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Review EBT transcripts, review of file, telecons. with S. Oliver, J. Rich, D. Lowry, K. Cox<br>Ardoin | 8.00<br>100.00/hr | NO CHARGE |
| 6/12/01 | General<br>J. Camardo: Draft list of subpoena's, documents, pro hac vice, telecons. with S. Oliver, J. Rich, D. Lowry, legal research on removal, review and edit motions for continuance, review files that came in<br>Ardoin | 8.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Meeting with J. Camardo, research removal, telecon with J. Rich, D. Lowry, S. Oliver, review motion for continuance, draft motion to compel and continuance<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Meeting with J. Camardo, research removal, telecon with J. Rich, D. Lowry, S. Oliver, review motion for continuance, draft motion to compel | 1.00<br>100.00/hr | NO CHARGE |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| | and continuance<br>Ardoin | | |
| 6/12/01 | General<br>Robert Riley: Review documents, conference with J. Camardo, D. Lowry, K. Cox, edit correspondence to S. Oliver, telecons. with S. Oliver, research causes of action, review transcript<br>Ardoin | 8.00<br>100.00/hr | NO CHARGE |
| 6/13/01 | General<br>K. Cox: Meeting with J. Camardo, discussion with J. Camardo, review of file, draft notice of removal, research, draft answer<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>J. Norris: Discussion with J. Camardo, review complaint<br>Ardoin | 0.52<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Work on removal motion, legal research, telecon with clients<br>Ardoin | 5.00<br>125.00/hr | 625.00 |
| | General<br>Robert Riley: Review Ardoin affidavit, review Ardoin letters, review law regarding elements quitam on wrongful discharge cases, trial preparation, discussed removal continuance motions<br>Ardoin | 6.00<br>100.00/hr | NO CHARGE |
| 6/14/01 | General<br>K. Cox: Meeting with J. Camardo, review and edit motion of removal, telecons with D. Lowry and J. Rich, draft amended answer<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Meeting with J. Camardo, review and edit motion of removal, telecons with D. Lowry and J. Rich, draft amended answer<br>Ardoin | 0.67<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecons. with client, J. Rich, S. Oliver, legal research on removal, review and edit removal<br>Ardoin | 5.00<br>125.00/hr | 625.00 |
| | General<br>Robert Riley: Conference with J. Camardo and K. Cox, reviewed pro hac vice papers<br>Ardoin | 1.00<br>100.00/hr | NO CHARGE |
| 6/15/01 | General<br>J. Camardo: Telecons with D. Lowry, J. Rich, draft correspondence to S. Oliver, review removal statutes, make sure that motion has been removed<br>Ardoin | 3.00<br>125.00/hr | 375.00 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 6/15/01 | General<br>J. Norris: Discussion with J. Camardo and K. Cox<br>Ardoin | 0.17<br>100.00/hr | 17.00 |
| | [redacted]TAL: | [ 109.78 | 5,517.00] |
| | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 1.23 | 0.00] |

Lease Cant 6

| | | | |
|---|---|---|---|
| 6/1/01 | General<br>K. Cox: Review of file, draft Federal Complaint, discussion with J. Camardo, edit complaint<br>Lease | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Review of file, draft Federal Complaint, discussion with J. Camardo, edit complaint<br>Lease | 3.50<br>100.00/hr | NO CHARGE |
| | General<br>J. Norris: Discussion with J. Camardo and K. Cox<br>Lease | 0.70<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Review of deposition transcripts, work on complaint, telecons. with client<br>Lease | 5.00<br>125.00/hr | 625.00 |
| 6/2/01 | General<br>K. Cox: Review and edit complaint, discussion with J. Camardo, research corporate liability<br>Lease | 4.00<br>100.00/hr | 400.00 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 6/4/01 | General<br>K. Cox: Review fax from Lowry, edit complaint, discussion with J. Camardo, research extortion, review co, research fraud<br>Lease | 7.67<br>100.00/hr | 767.00 |
| | General<br>J. Camardo: Legal research on fraud in the procurement of a contract, telecons. with clients, telecon. with Crutchfield, fax to Crutchfield, research on injunction damages<br>Lease | 2.00<br>125.00/hr | 250.00 |
| | General<br>J. Norris: Discussion with J. Camardo and K. Cox<br>Lease | 0.17<br>100.00/hr | 17.00 |
| 6/5/01 | General<br>K. Cox: Review and edit complaint, discussion with J. Camardo, telecon with D. Lowry, telecons with J. Rich, research RICO<br>Lease | 4.58<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Draft motion for enlargement, go to Airborne Express in Syracuse<br>Lease | 3.17<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Review complaint for Federal Court action, review motion on action for fees<br>Lease | 4.00<br>100.00/hr | 400.00 |
| 6/6/01 | General<br>K. Cox: Edit and draft Federal Complaint, discussion with J. Camardo, telecon with J. Rich, review motion regarding declaratory judgment, telecons with S. Oliver<br>Lease | 7.58<br>100.00/hr | 758.00 |
| 6/7/01 | General<br>K. Cox: Edit and draft Federal Complaint, telecon with J. Camardo, telecon with J. Rich, telecon with D. Lowry, draft response to motion for dissolution, research atty. fees in Texas<br>Lease | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Edit and draft Federal Compaint, telecon with J. Camardo, telecon with J. Rich, telecon with D. Lowry, draft resposne to motion for dissolution, research atty. fees in Texas<br>Lease | 5.42<br>100.00/hr | NO CHARGE |
| 6/8/01 | General<br>J. Camardo: Review of brief to be submitted to Court, dig out cases cited in Crutchfield's brief, telecon with client, Court hearings, telecons with Crosby, telecons with S. Oliver, telecons with C. Coco<br>Lease | 7.00<br>125.00/hr | 875.00 |
| | General<br>K. Cox: Edit and draft response to motion on bond, discussion with J. Camardo, telecons with J. Rich, telecons with S. Oliver, telecons with D. | 7.25<br>100.00/hr | 725.00 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | Lowry, preparation for hearing, discussion with J. Camardo, hearing on motion, discussion with J. Camardo<br>Lease | | |
| 6/9/01 | General<br>J. Norris: Discussion with J. Camardo<br>Lease | 0.33<br>100.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 78.37 | 6,417.00] ✓ |
| | Montgomery Cont 8 | | |
| 6/5/01 | General<br>N. Camardo: Legal research<br>Montgomery | 2.50<br>125.00/hr | 312.50 |
| | General<br>J. Camardo: Work on answer to brief, draft letter for extension<br>Montgomery | 2.00<br>125.00/hr | NO CHARGE |
| 6/11/01 | General<br>N. Camardo: Review Goverment motion<br>Montgomery | 0.50<br>125.00/hr | 62.50 |
| 6/12/01 | General<br>N. Camardo: Legal research<br>Montgomery | 2.75<br>125.00/hr | 343.75 |
| 6/13/01 | General<br>N. Camardo: Legal research, draft motion, opposition to motion<br>Montgomery | 6.00<br>125.00/hr | 750.00 |
| 6/14/01 | General<br>N. Camardo: Legal research, draft motion and opposition to motion, review of file<br>Montgomery | 5.00<br>125.00/hr | 625.00 |
| 6/15/01 | General<br>J. Camardo: Review of answer to motion and review of summary judgment motion<br>Montgomery | 1.00<br>125.00/hr | NO CHARGE |
| | General<br>N. Camardo: Finalize and submit to court, opposition to motion, motion for summary judgment, statement of facts<br>Montgomery | 6.50<br>125.00/hr | 812.50 |
| | SUBTOTAL: | [ 26.25 | 2,906.25] |

F[redacted] [redacted]

[redacted]

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

June 30, 2001

Invoice # 32991

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | | | |
| | SUBTOTAL: | [ 1.33 | 0.00] |
| | Ardoin Count 5 | | |
| 6/16/01 | General<br>K. Cox: Review deposition transcripts, discussion with J. Camardo<br>Ardoin | 2.50<br>100.00/hr | 250.00 |
| 6/19/01 | General<br>K. Cox: Draft Pro Hac Vice order, research federal court rules<br>Ardoin | 1.28<br>100.00/hr | 128.00 |
| 6/20/01 | General<br>K. Cox: Discussion with J. Camardo, review of file, draft amended notice of removal, draft 2nd amended pleadings, discussion with J. Camardo, telecons with J. Rich, telecons with S. Oliver<br>Ardoin | 5.00<br>100.00/hr | 500.00 |
| | General<br>J. Camardo: Legal research, telecons with J. Rich, review deposition transcripts, telecon with Judge, review deposition transcripts<br>Ardoin | 4.00<br>125.00/hr | NO CHARGE |

David Lowry



| | | Hrs/Rate | Amount |
|---|---|---|---|
| 6/21/01 | General<br>J. Camardo: Telecons with client, review and edit notice of removal<br>Ardoin | 1.25<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Draft amended pleadings and notice of removal, discussion with J. Camardo, telecon with D. Lowry, edit amended papers<br>Ardoin | 4.00<br>100.00/hr | NO CHARGE |
| 6/22/01 | General<br>Robert Riley: Conference with J. Camardo and K. Cox regarding summary judgment motion to dismiss<br>Ardoin | 0.50<br>100.00/hr | NO CHARGE |
| 6/25/01 | General<br>J. Camardo: Review of motion for sanctions and legal research over what can be done<br>Ardoin | 1.33<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo, K. Cox and N. Camardo, Plaintiff's motion for remand, draft summary judgment papers to state court action, future litigation<br>Ardoin | 0.50<br>100.00/hr | NO CHARGE |
| 6/26/01 | General<br>K. Cox: Review and organize file, discussion with J. Camardo and Robert Riley, discuss and outline response to remand, research federal rules<br>Ardoin | 5.08<br>100.00/hr | 508.00 |
| | General<br>J. Camardo: Review of motion papers, review case law to determine what can be done, telecons. with client<br>Ardoin | 3.00<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo and K. Cox regarding distribution of work effort, trial preparation discovery, review record amended petition and outline causes of action<br>Ardoin | 2.00<br>100.00/hr | NO CHARGE |
| 6/27/01 | General<br>K. Cox: Discussion with J. Camardo, research reward, removal and preemption<br>Ardoin | 6.83<br>100.00/hr | 683.00 |
| | General<br>Robert Riley: Conference with J. Camardo, removal to Federal Court, conference with K. Cox, J. Camardo and John Rich<br>Ardoin | 1.00<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Continue review of case law, telecon with J. Rich, telecon with S. Oliver, telecon with J. Rich over what the next steps should be in the | 1.50<br>125.00/hr | 187.50 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | cases<br>Ardoin | | |
| 6/28/01 | General<br>Robert Riley: Conference with J. Camardo and K. Cox regarding summary judgement motion and status litigation<br>Ardoin | 0.50<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Research removal, review of file, draft letter to Fed Court regarding defective service<br>Ardoin | 5.42<br>100.00/hr | NO CHARGE |
| 6/29/01 | General<br>K. Cox: Research removal law<br>Ardoin | 3.42<br>100.00/hr | 342.00 |
| | SUBTOTAL: | [ 49.11 | 2,598.50] |

BOP

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | Lease | | |
| 6/18/01 | General<br>K. Cox: Review of file, discussion with J. Camardo, draft reply brief regarding bond issue<br>Lease | 1.83<br>100.00/hr | 183.00 |
| | General<br>J. Camardo: Check out notice of eviction from fax from D. Lowry<br>Lease | 1.00<br>125.00/hr | NO CHARGE |
| 6/19/01 | General<br>K. Cox: Review of file, draft reply brief on bond issue<br>Lease | 5.38<br>100.00/hr | 538.00 |
| | SUBTOTAL: | [ 8.21 | 721.00] |
| | Wage determination | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [redacted] | [redacted] |
| | For professional services rendered | [redacted] | [redacted] |
| | Additional Charges : | | |
| | EXPENSES | | |
| 6/21/01 | Faxes<br>[redacted] | | NO CHARGE |
| | SUBTOTAL: | | [ [redacted] |
| | Total costs | | [redacted] |
| | Total amount of this bill | | [redacted] |
| | Previous balance | | [redacted] |

| | | Amount |
|---|---|---|
| 6/28/01 | Payment - thank you, CK# 55912 | ($14,840.25) |
| | Total payments and adjustments | ($14,840.25) |
| | Balance due | $4,816.00 |

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

July 15, 2001

Invoice # 33055

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 0.25 | 0.00] |
| | Ardoin Cont 5 | | |
| 7/2/01 | General<br>K. Cox: Review of file, draft response to motion for remand, research removal and remand<br>Ardoin | 8.67<br>100.00/hr | 867.00 |
| 7/3/01 | General<br>K. Cox: Draft response to motion to remand, legal research<br>Ardoin | 6.00<br>100.00/hr | 600.00 |
| 7/5/01 | General<br>K. Cox: Draft response to motion to remand, legal research, edit response to motion to remand<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Draft response to motion to remand, legal research, edit response to motion to remand<br>Ardoin | 2.50<br>100.00/hr | NO CHARGE |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 7/6/01 | General<br>K. Cox: Draft response to motion to remand, edit response papers, discussion with J. Camardo<br>Ardoin | 6.33<br>100.00/hr | 633.00 |
| 7/7/01 | General<br>K. Cox: Edit response to motion for remand, assemble exhibits for research papers<br>Ardoin | 3.25<br>100.00/hr | 325.00 |
| 7/9/01 | General<br>K. Cox: Review of file regarding sanctionable conduct of J. Morgan, discussion with J. Camardo, edit response to motion to remand, assemble exhibits<br>Ardoin | 2.75<br>100.00/hr | 275.00 |
| | General<br>J. Camardo: Review the detailed response to the motion to remand<br>Ardoin | 0.50<br>125.00/hr | NO CHARGE |
| 7/11/01 | General<br>K. Cox: Review responses to motion to remand, discussion with J. Camardo<br>Ardoin | 0.50<br>100.00/hr | 50.00 |
| | SUBTOTAL: | [ 38.50 | 3,550.00] √ |
| | BOP | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [redacted] | [redacted] |
| | Beaumont Count 6 | | |
| 7/6/01 | General<br>K. Cox: Review amended pleadings, review of file<br>Beaumont | 1.17<br>100.00/hr | 117.00 √ |
| | SUBTOTAL: | [ 1.17 | 117.00] |
| | [redacted] | | |
| 7/[redacted] | K[redacted] | [redacted] | [redacted] √ |
| | S[redacted] | [redacted] | |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | Montgomery Count 8 | | |
| 7/5/01 | General<br>J. Camardo: Review of reply<br>Montgomery | 1.00<br>125.00/hr | NO CHARGE |
| 7/6/01 | General<br>N. Camardo: Review of file, review of defendant's opposition, telecon with D. Lowry, begin drafting response<br>Montgomery | 2.00<br>125.00/hr | 250.00 |
| 7/7/01 | General<br>J. Camardo: Review indemnification and research of cases<br>Montgomery | 2.00<br>125.00/hr | 250.00 |
| 7/9/01 | General<br>K Cox: Review cases, motion for summary judgment<br>Montgomery | 1.08<br>100.00/hr | NO CHARGE |
| | General<br>N. Camardo: Review of defendant's opposition, begin drafting response<br>Montgomery | 1.25<br>125.00/hr | 156.25 |
| 7/10/01 | General<br>K Cox: Discussion with J. Camardo and N. Camardo, telecon with D. Lowry, review reply from Government to summary judgement and Bannum's oppositions and cross motions for summary judgement<br>Montgomery | 3.17<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecon with client about status of case and advise that reply was going to be submitted, further legal research on indemnification<br>Montgomery | 1.50<br>125.00/hr | NO CHARGE |
| | General<br>N. Camardo: Telecon with D. Lowry, conference with J. Camardo and K. Cox, drafting reply to defendant's opposition<br>Montgomery | 2.50<br>125.00/hr | 312.50 |
| 7/11/01 | General<br>N. Camardo: Completing and filing of Plaintiff's response to defendant's motion, conference with K. Cox, legal research, draft statement regarding indemnification agreement<br>Montgomery | 3.25<br>125.00/hr | 406.25 |
| | General<br>K Cox; Review motions for summary judgement, discussion with N. Camardo, discussion with J. Camardo, telecon with D. Lowry<br>Montgomery | 1.92<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Review motions for summary judgement, telecon with D. Lowry, discussion with K. Cox<br>Montgomery | 0.50<br>125.00/hr | NO CHARGE |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 7/13/01 | General<br>J. Camardo: Telecon about hearing and status of case with Court, telecon with client<br>Montgomery | 0.50<br>125.00/hr | 62.50 |
| | General<br>K. Cox: Discussion with J. Camardo and N. Camardo, telecon with client<br>Montgomery | 0.50<br>100.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 21.17 | 1,437.50] |
| | [redacted] | [redacted] | [redacted] |

[redacted]s:

EXPENSES

[redacted]

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

July 31, 2001

Invoice # 33130

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | Ardoin Count 5 | | |
| 7/17/01 | General<br>J. Norris: Receipt of fax from S. Oliver, review of file<br>Ardoin | 0.08<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Telecon with client, discussion with J. Camardo, review of file, research Rule 11 sanctions<br>Ardoin | 2.67<br>100.00/hr | 267.00 |
| 7/18/01 | General<br>K. Cox: Research Texas law, review of file<br>Ardoin | 1.33<br>100.00/hr | 133.00 |
| 7/19/01 | General<br>K. Cox: Discussion with J. Camardo and Robert Riley, review of file and pleadings, discussion with J. Camardo<br>Ardoin | 2.55<br>100.00/hr | 255.00 |
| | General<br>J. Camardo: Review lawsuit, work on depositions<br>Ardoin | 1.00<br>125.00/hr | 125.00 |
| | General<br>Robert Riley: Telephone conference with J. Camardo and K. Cox regarding upcoming trial<br>Ardoin | 0.30<br>100.00/hr | NO CHARGE |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 7/20/01 | General<br>K. Cox: Review of file, meeting with J. Camardo, preparation for trial and motions for summary judgment<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Review of file, meeting with J. Camardo, preparation for trial and motions for summary judgment<br>Ardoin | 2.08<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Preparation for Bannum trial<br>Ardoin | 6.00<br>125.00/hr | NO CHARGE |
| 7/21/01 | General<br>J. Camardo: Preparation for Bannum trial<br>Ardoin | 5.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Meeting with J. Camardo, review of file, research, preparation for trial, outline summary judgment motions, telecon with D. Lowry<br>Ardoin | 6.50<br>100.00/hr | 650.00 |
| 7/22/01 | General<br>K. Cox: Research, preparation for motions for summary judgment<br>Ardoin | 5.50<br>100.00/hr | 550.00 |
| 7/23/01 | General<br>K. Cox: Review of file, research, draft motion for summary judgment, meeting with J. Camardo and Robert Riley, telecons. with client<br>Ardoin | 8.00<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Review of file, research, draft motion for summary judgment, meeting with J. Camardo and Robert Riley, telecons. with client<br>Ardoin | 2.67<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecons with J. Rich, Dave Lowry and M.C. Karrington, review of file, preparation for trial, telecon with Board, telecon with expert<br>Ardoin | 8.00<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference call with J. Camardo regarding trial preparation, conference with J. Camardo, K. Cox, J. Rich, D. Lowry, review of file documents, prepare witness list, research evidence issues<br>Ardoin | 8.00<br>100.00/hr | NO CHARGE |
| 7/24/01 | General<br>Robert Riley: Conference call with J. Camardo, K. Cox, D. Lowry, J. Rich, review medical reports, conference call with Walker and Allen, Texas Worker's compensation insurance fund, conference call with K. Haden at legal, draft correspondence to MC Karrington, prepare witness list, draft subpoena and subpoena duces tecem, research evidentiary issue | 8.00<br>100.00/hr | NO CHARGE |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | regarding foundation for introduction of documentary<br>Ardoin | | |
| 7/24/01 | General<br>J. Camardo: Telecon with J. Rich, D. Lowry, M.C. Karrington, review of all workers compensation files, preparation for trial<br>Ardoin | 8.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Research, review of file, draft motion for summary judgement, discussion with J. Camardo and Robert Riley, telecon with D. Lowry, J. Rich and Texas attorneys<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Research, review of file, draft motion for summary judgement, discussion with J. Camardo and Robert Riley, telecon with D. Lowry, J. Rich and Texas attorneys<br>Ardoin | 2.92<br>100.00/hr | NO CHARGE |
| 7/25/01 | General<br>K. Cox: Review of file, legal research, draft summary judgment motion<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>Robert Riley: Conference with J. Camardo regarding correspondence and subpoena, fax to Karrington, Lowry, Rich, revise subpoenas, conference with K. Cox, J. Camardo, D. Lowry, Arney, J. Rich, B. Boyd and MC Karrington, fax 2nd amended petition to K. Haden at Texas Worker's Compensation Insurance Fund, conference call with K. Haden, conference call with Arney, D. Lowry, J. Rich<br>Ardoin | 6.00<br>100.00/hr | NO CHARGE |
| 7/26/01 | General<br>K. Cox: Research, review of file, draft summary judgment, telecon with J. Rich, telecon with clients, discussion with J. Camardo<br>Ardoin | 7.17<br>100.00/hr | 717.00 |
| | General<br>J. Camardo: Check on the un-availability exception, review cases, draft memo's to local counsel on what has to be done with the case and the hearing, review of case for sanction motions, telecons. with client<br>Ardoin | 5.00<br>125.00/hr | 625.00 |
| 7/27/01 | General<br>K. Cox: Review of file, draft motion for summary judgment<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Review of file, draft motion for summary judgment<br>Ardoin | 0.08<br>100.00/hr | NO CHARGE |
| 7/28/01 | General<br>K. Cox: Review of file, research, draft summary judgment motion<br>Ardoin | 5.00<br>100.00/hr | 500.00 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 7/30/01 | General<br>J. Camardo: Telecons with D. Lowry<br>Ardoin | 0.50<br>125.00/hr | 62.50 |
| | General<br>Robert Riley: Telephone conference with adjuster J. Morales, Reliance Insurance Company will have answer regarding coverage within the next week, telephone conference with K. Haden, telecon with D. Lowry, discussion with J. Camardo<br>Ardoin | 0.50<br>100.00/hr | NO CHARGE |
| 7/31/01 | General<br>K. Cox: Research, review of file, draft motion for summary judgment<br>Ardoin | 4.17<br>100.00/hr | 417.00 |
| | General<br>Robert Riley: Conference with J. Camardo regarding Ardoin status of case, discussed research needed to be completed regarding subpoena of Govt. witnesses and summary judgment motion.<br>Ardoin | 0.50<br>100.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 139.52 | 7,501.50] |

Gomez

| | | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 6.34 | 634.00] |

Lease Count 6.

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 7/[illegible]1/01 | General<br>K. Cox: Review counterclaim, research Texas procedure on reply, telecon with S. Oliver's office<br>Lease | 1.50<br>100.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 1.50 | 0.00] |

Montgomery Count 8

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 7/16/01 | General<br>J. Camardo: Telecon with client, review of file, research case law, preparation for hearing<br>Montgomery | 8.00<br>125.00/hr | NO CHARGE |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 7/16/01 | General<br>J. Camardo: Telecon with client, review of file, research case law, preparation for hearing<br>Montgomery | 0.17<br>125.00/hr | NO CHARGE |
| | General<br>N. Camardo: Conference with J. Camardo, legal research, telecon with D. Lowry, prepare for hearing<br>Montgomery | 4.50<br>125.00/hr | 562.50 |
| 7/17/01 | General<br>N. Camardo: Telecon with D. Lowry, conference with J. Camardo, telecon with Claims Court, review of motion to withdraw<br>Montgomery | 2.75<br>125.00/hr | 343.75 |
| | General<br>J. Camardo: Preparation for hearing, telecon with client, telecons with DOJ, telecons with Court, draft motion for dismissal without prejudice<br>Montgomery | 5.00<br>125.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 20.42 | 906.25] |

Wage determination

[redacted]

SUBTOTAL: [redacted]

[redacted]

EXPENSES

[redacted] NO CHARGE

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

August 15, 2001

Invoice # 33144

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | | | |
| SUBTOTAL: | | [ 5.75 | 650.00] ✓ |

Ardoin — Cont 5

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 8/1/01 | General<br>K. Cox: Telecon with D. Lowry, review of file, research, draft summary judgment, edit summary judgment<br>Ardoin | 3.25<br>100.00/hr | NO CHARGE |
| | General<br>Robert Riley: Received call from K. Haden, Texas workers compensation fund regarding status of litigation, conference with J. Camardo<br>Ardoin | 0.25<br>100.00/hr | 25.00 |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 8/2/01 | General<br>K. Cox: Review of file, draft summary judgment<br>Ardoin | 7.00<br>100.00/hr | 700.00 |
| | General<br>Robert Riley: Received call from D. Lowry regarding status of worker's compensation insurance fund, review of file<br>Ardoin | 0.08<br>100.00/hr | NO CHARGE |
| 8/3/01 | General<br>K. Cox: Review of file, draft motion for summary judgment<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Review of file, draft motion for summary judgment<br>Ardoin | 2.00<br>100.00/hr | NO CHARGE |
| | General<br>Robert Riley: Telephone conference with K. Haden regarding workers compensation fund, advised regarding correspondence to content, conference with J. Camardo, draft fax summary of conversation<br>Ardoin | 0.50<br>100.00/hr | 50.00 |
| 8/6/01 | General<br>K. Cox: Proofread motion for summary judgment, meeting with J. Camardo, telecon with client regarding summary judgment, edit summary judgment motion<br>Ardoin | 6.58<br>100.00/hr | 658.00 |
| | General<br>J. Norris: Discussion with K. Cox and J. Camardo<br>Ardoin | 0.17<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Review of recent papers<br>Ardoin | 1.00<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Received fax regarding scheduling of hearing, conference with J. Camardo<br>Ardoin | 0.08<br>100.00/hr | 8.00 |
| 8/7/01 | General<br>J. Camardo: Call to J. Rich and D. Lowry, telecons with S. Oliver, new attorney, review latest papers, legal research on abatement of action<br>Ardoin | 8.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Review and edit summary judgment, review exhibits, telecon with D. Lowry, research effect of summary judgment on discovery<br>Ardoin | 1.50<br>100.00/hr | 150.00 |
| 8/8/01 | General<br>K. Cox: Telecon with J. Camardo<br>Ardoin | 0.67<br>100.00/hr | 67.00 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 8/8/01 | General<br>Robert Riley: Conference with J. Camardo, and J. Rich regarding subpoena and insurance company involvement<br>Ardoin | 0.50<br>100.00/hr | 50.00 |
| 8/13/01 | General<br>Robert Riley: Conference with J. Camardo, and D. Lowry regarding response for Texas worker's compensation fund, discussed insurance company notification requirements<br>Ardoin | 0.50<br>100.00/hr | 50.00 |
| 8/14/01 | General<br>J. Camardo: Review of letter from MC about deposition and responded back to that letter, telecons with client, additional response to MC about deposition of Cathy Bellew and J. Camardo, legal research on deposition of attorney<br>Ardoin | 2.00<br>125.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 42.08 | 2,558.00] |

V

[redacted]

8/14/01 [redacted]

8/15/01 [redacted]

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | SUBTOTAL: | [redacted] | |
| | Gomez | | |
| [redacted] | | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] |
| | SUBTOTAL: | [ 0.75 | 75.00] |
| | Lease *Count 6* | | |
| 8/1/01 | General<br>K. Cox: Review fax from S. Oliver, review of file<br>Lease | 0.42<br>100.00/hr | NO CHARGE |
| 8/6/01 | General<br>K. Cox: Discussion with J. Camardo, telecon with client and J. Rich<br>Lease | 0.42<br>100.00/hr | NO CHARGE |
| 8/7/01 | General<br>K. Cox: Research abatement of State Court action, discussion with J. Camardo, telecon with client<br>Lease | 8.00<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Research abatement of State Court action, discussion with J. Camardo, telecon with client<br>Lease | 0.42<br>100.00/hr | NO CHARGE |
| 8/8/01 | General<br>K. Cox: Research abatement of proceedings, discussion with J. Camardo, telecon with M.C. Carrington, telecon with client, telecon with J. Rich<br>Lease | 6.67<br>100.00/hr | 667.00 |
| | General<br>J. Camardo: Telecon with D. Lowry, J. Rich, M.C. Carrington, C. Coco, S. Crutchfield, draft letters on items that need to be done, discovery<br>Lease | 7.00<br>125.00/hr | 875.00 |
| 8/9/01 | General<br>J. Camardo: Continue with letter to MC Carrington, bring him up to speed on what has to be done on the case, discovery documents on recent counterclaims, telecon with clients<br>Lease | 5.00<br>125.00/hr | NO CHARGE |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 8/10/01 | General<br>K. Cox: Draft plea of abatement and motion to discuss<br>Lease | 3.17<br>100.00/hr | 317.00 |
| | General<br>J. Camardo: Review recent motions<br>Lease | 2.00<br>125.00/hr | 250.00 |
| 8/11/01 | General<br>J. Camardo: Draft interrogatories, review of file, review Webb's deposition<br>Lease | 2.00<br>125.00/hr | 250.00 |
| | General<br>K. Cox: Review of file, research, draft motion to discuss and memo of law<br>Lease | 4.25<br>100.00/hr | 425.00 |
| 8/12/01 | General<br>J. Camardo: Review of file<br>Lease | 2.00<br>125.00/hr | 250.00 |
| 8/15/01 | General<br>J. Camardo: Draft interrogatories, telecons with client, telecon with J. Rich, telecon with MC, telecon with J. Crosby, sent letters to MC on items that need to be done, work on interrogatories<br>Lease | 3.00<br>125.00/hr | 375.00 |
| | SUBTOTAL: | [ 44.35 | 3,409.00] ✓ |

[redacted]

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

August 31, 2001

Invoice # 33346

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | [redacted] | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [redacted] | |
| | Alden | | |
| [redacted] | [redacted] | [redacted] | |
| | SUBTOTAL: | [redacted] | |
| | Ardoin | | |
| 8/21/01 | General<br>J. Norris: Discussion with K. Cox, J. Camardo and fax to D. Lowry<br>Ardoin | 0.42<br>100.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo regarding work to be completed<br>Ardoin | 0.17<br>100.00/hr | NO CHARGE |

Cont 5

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 8/22/01 | General<br>K. Cox: Review of file, draft correspondence to MC Carrington<br>Ardoin | 0.33<br>100.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo regarding status and work to be completed, discussion with underlying merits<br>Ardoin | 1.00<br>100.00/hr | 100.00 |
| | SUBTOTAL: | [ 1.92 | 100.00] |

V

BOP

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| | | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 30.99 | 2,002.50] |
| | [redacted] | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 0.33 | 0.00] |
| | [redacted] | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 0.03 | 0.00] |
| | Lease Count 6 | | |
| 8/16/01 | General<br>J. Camardo: Telecons, review Coco's letter, draft letters to MC, work on discovery<br>Lease | 2.00<br>125.00/hr | 250.00 |
| 8/17/01 | General<br>J. Norris: Discussion with J. Camardo, K. Cox, Judge, discussions<br>Lease | 0.33<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecon with client, telecons with Butch Boyd, work on discovery<br>Lease | 2.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Discussion with J. Camardo, telecon with B. Boyd, review Judge Shuffield's order on abatement<br>Lease | 0.67<br>100.00/hr | 67.00 |
| 8/20/01 | General<br>K. Cox: Review papers received from M.C. Carrington, discussion with J. Camardo, research Texas Law on mandamus abatement, discussion with J. Camardo<br>Lease | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Review papers received from M.C. Carrington, discussion with J. Camardo, research Texas Law on mandamus abatement, discussion with | 1.42<br>100.00/hr | NO CHARGE |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| | J. Camardo<br>Lease | | |
| 8/20/01 | General<br>J. Camardo: Review of Judge's order<br>Lease | 5.00<br>125.00/hr | NO CHARGE |
| 8/21/01 | General<br>K. Cox: Review of file, research mandamus, discussion with J. Camardo, telecon with client, telecon with B. Boyd and M.C. Carrington<br>Lease | 4.75<br>100.00/hr | NO CHARGE |
| 8/22/01 | General<br>K. Cox: Review of file, letter to Crosby regarding depos, letter to Coco regarding settlement, review of file, fax to Lowry regarding option issue, telecon with J. Camardo, draft correspondence to B. Boyd and Carrington regarding releasing and/or mandamus, draft correspondence to J. Rich<br>Lease | 4.50<br>100.00/hr | 450.00 |
| 8/23/01 | General<br>J. Camardo: Telecon with D. Lowry, telecons with B. Boyd, preparation for hearing, what documents need to be used, legal research on case for ratification, draft correspondence to Coco, Crutchfield on deposition of Webb's review letter from Boyd, review letter from Crosby, telecons with Crosby<br>Lease | 6.33<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo regarding legal arguments, review correspondence, review J. Camardo research, conference with J. Camardo, telephone conference with Lowry, telephone conference with Crosby<br>Lease | 2.00<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Discussion with J. Camardo, telecon with client, edit letter to C. Coco, review of file, discussion with J. Camardo, telecon with client<br>Lease | 4.42<br>100.00/hr | NO CHARGE |
| 8/24/01 | General<br>K. Cox: Telecon with B. Boyd, telecon with D. Lowry, telecon with J. Camardo, telecon with J. Crosby, telecon with C. Coco, telecon with D. Lowry, telecon with J. Camardo, telecon with Court<br>Lease | 2.75<br>100.00/hr | 275.00 |
| | General<br>J. Camardo: Review Coco's letter, draft response, telecons with K. Cox, D. Lowry, Arnie and J. Rich<br>Lease | 0.83<br>125.00/hr | NO CHARGE |
| 8/25/01 | General<br>J. Camardo: Research on declaratory action and attorney fees and what Coco and Crutchfield can claim<br>Lease | 2.00<br>125.00/hr | NO CHARGE |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 8/25/01 | General<br>K. Cox: Review motion to dismiss, review of file<br>Lease | 2.00<br>100.00/hr | 200.00 |
| 8/26/01 | General<br>K. Cox: Research personal jurisdiction in Florida, review motion to dismiss<br>Lease | 2.50<br>100.00/hr | 250.00 |
| 8/27/01 | General<br>J. Camardo: Letter to Coco, client, attempt to reach local counsel, dig out pleadings to draft stipulation, legal research on declaratory action and attorney fees.<br>Lease | 7.00<br>125.00/hr | 875.00 |
| | General<br>Robert Riley: Conference with J. Camardo regarding case law, procedural differences Federal, State, no counter claim for declaratory judgments, right to non-suit, discuss strategy<br>Lease | 1.00<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Discussion with J. Camardo on case, telecons. with client<br>Lease | 3.33<br>100.00/hr | 333.00 |
| 8/28/01 | General<br>K. Cox: Discussion with J. Camardo, research, telecon with C. Coco, telecon with client, letter to C. Coco<br>Lease | 6.58<br>100.00/hr | 658.00 |
| | General<br>Robert Riley: Conference with J. Camardo regarding discussions with John Rich, review, research, discussion with J. Camardo<br>Lease | 0.50<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecons with Coco, telecon with client, letter to Coco, legal research on motion to discuss, pull all apparent pleadings out of the file<br>Lease | 6.00<br>125.00/hr | NO CHARGE |
| 8/29/01 | General<br>J. Camardo: Telecons with C. Coco, telecons with J. Rich and D. Lowry, further legal research, draft motion to dismiss<br>Lease | 8.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Research JP Court procedure, discussion with J. Camardo, telecons with C. Coco, telecons with D. Lowry, research abatement<br>Lease | 2.33<br>100.00/hr | NO CHARGE |
| 8/30/01 | General<br>K. Cox: Research abatement, discussion with J. Camardo, review of file, review motion to dismiss, review A. Rich memo, draft amended complaint, drive to Fed Ex in Syracuse<br>Lease | 8.00<br>100.00/hr | 800.00 |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 8/30/01 | General<br>K. Cox: Research abatement, discussion with J. Camardo, review of file, review motion to dismiss, review A. Rich memo, draft amended complaint, drive to Fed Ex in Syracuse<br>Lease | 2.33<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Telecon with C. Coco, continue to work on motion to dismiss, telecons with D. Lowry<br>Lease | 8.00<br>125.00/hr | NO CHARGE |
| 8/31/01 | General<br>J. Camardo: Finalize the motion for summary judgment, final edits, draft cover letter, fax to local counsel for filing<br>Lease | 2.00<br>125.00/hr | 250.00 |
| | General<br>K. Cox: Discussion with J. Camardo, review motion for summary judgment<br>Lease | 0.25<br>100.00/hr | 25.00 |
| | SUBTOTAL: | [ 106.82 | 5,233.00] |

[redacted]

SUBTOTAL: [ [redacted]

[redacted]

| | | | Amount |
|---|---|---|---|
| [redacted] | | | |
| 8/23/01 | Shipping [redacted] | S. Oltz: Fed Ex to S. Oliver 15.79; Fed Ex to S. Oliver 15.79, Fed Ex to MC Carrington 15.79; Fed Ex to Clerk of the Court 16.03; Fed Ex to MC Carrington 29.14; Fed Ex to MC Carrington 15.79; Fed Ex to MC Carrington 23.46; ; Fed Ex to MC Carrington 23.46; Fed Ex to J. Rich 23.46; Fed Ex to D. Lowry 23.46; Fed Ex to Y. Gomez 16.03 EXPENSES | 218.20 |
| 8/28/01 | Shipping | J. Camardo: Fed Ex to S. Oliver, 15.79; Fed Ex to S. Oliver 15.79, Fed Ex to D. Malano 15.79; Fed Ex to S. Oliver 26.43 EXPENSES | 73.80 |
| [redacted] | | | [ 292.00] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | ($10,691.75) |
| [redacted] | | | ($10,691.75) |
| [redacted] | | | $9,967.00 |

not appl

COUNT 6

Joseph A. Camardo, Jr.
Attorney-at-Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

September 15, 2001

Invoice # 33361

Professional Services

Ardoin Count 5

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 9/5/01 | General<br>J. Camardo: Deal with discovery problem, telecon with K. Bellew and D. Lowry on deposition<br>Ardoin | 1.00<br>125.00/hr | 125.00 |
| | General<br>K. Cox: Telecon with K. Bellew, discussion with J. Camardo, telecon with MC Carrington's office, telecon with Court, telecon with client, discussion with J. Camardo<br>Ardoin | 1.82<br>100.00/hr | 182.00 |
| | General<br>Robert Riley: Conference with J. Camardo regarding Ardoin, conference regarding correspondence to Lowry<br>Ardoin | 0.25<br>100.00/hr | NO CHARGE |
| 9/6/01 | General<br>K. Cox: Meeting with J. Camardo, meeting with K. Bellew, deposition of K. Bellew, telecon with D. Lowry, discussion with J. Camardo<br>Ardoin | 6.33<br>100.00/hr | 633.00 |
| | General<br>J. Camardo: Meeting with K. Bellew, deposition of K. Bellew, telecon with D. Lowry, review letters from Morgan, draft response letter back to Morgan<br>Ardoin | 6.00<br>125.00/hr | NO CHARGE |

David Lowry



| | | Hrs/Rate | Amount |
|---|---|---|---|
| 9/7/01 | General<br>K. Cox: Letter to B. Boyd regarding summary judgment hearing, review TRCP, telecon with Karen at MC Carrington's office<br>Ardoin | 1.07<br>100.00/hr | 107.00 |
| 9/10/01 | General<br>K. Cox: Review letter from J. Morgan, discussion with J. Norris, telecon with B. Boyd, letter to B. Boyd<br>Ardoin | 1.42<br>100.00/hr | 142.00 |
| | SUBTOTAL: | [ 17.89 | 1,189.00] |

[redacted]

David Lowry



| | Hrs/Rate | Amount |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| General [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ [redacted] | [redacted] |

[redacted]

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ [redacted] | [redacted] |

Lease Cont 6

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 9/5/01 | General<br>K. Cox: Discussion with J. Camardo, review summary judgment motion, telecon with D. Lowry, research TRCP/TRAP<br>Lease | 2.05<br>100.00/hr | NO CHARGE |
| 9/6/01 | General<br>K. Cox: Telecon with B. Boyd, discussion with J. Camardo<br>Lease | 0.58<br>100.00/hr | 58.00 |
| 9/12/01 | General<br>J. Norris: Discussion with J. Camardo, call to B. Boyd, MC Carrington, schedule conference call, office discussions<br>Lease | 0.92<br>100.00/hr | 92.00 |

David Lowry



| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 9/12/01 | General<br>J. Camardo: Telephone conference with client, telephone conference with MC Carrington, work on motion<br>Lease | 2.00<br>125.00/hr | 250.00 |
| 9/13/01 | General<br>J. Camardo: Draft letter, draft response to summary judgment motion, legal research<br>Lease | 4.00<br>125.00/hr | 500.00 |
| | General<br>K. Cox: Discussion with J. Camardo, review of file<br>Lease | 1.58<br>100.00/hr | 158.00 |
| 9/14/01 | General<br>J. Camardo: Work on motion for summary judgment, telecons with client<br>Lease | 4.00<br>125.00/hr | 500.00 |
| | General<br>K. Cox: Discussion with J. Camardo, review of file, telecons with J. Crosby<br>Lease | 0.33<br>100.00/hr | 33.00 |
| | SUBTOTAL: | [ 15.46 | 1,591.00] |

[redacted]

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 0.33 | 33.00] |

[redacted]

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| 9/5/01 | General<br>[redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ [redacted] | [redacted] |

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

September 30, 2001

Invoice # 33472

Professional Services

Ardoin Count 5

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 9/17/01 | General<br>K. Cox: Review transcript of K. Bellew's deposition<br>Ardoin | 1.33<br>100.00/hr | NO CHARGE |
| 9/18/01 | General<br>J. Norris: Discussion with J. Camardo and K. Cox<br>Ardoin | 0.33<br>100.00/hr | NO CHARGE |
| 9/24/01 | General<br>J. Camardo: Work on sanction motion, telecon with J. Morgan, telecon with D. Lowry<br>Ardoin | 3.50<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo regarding conversation with Morgan<br>Ardoin | 0.25<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Discussion with J. Camardo, draft letter to Court, telecon with D. Lowry, telecon with MC Carrington, discussion with J. Camardo, telecon with J. Morgan, telecon with D. Lowry<br>Ardoin | 5.17<br>100.00/hr | 517.00 |
| 9/25/01 | General<br>J. Norris: Receipt of fax from J. Morgan of letter to MC Carrington<br>Ardoin | 0.17<br>100.00/hr | NO CHARGE |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 9/26/01 | General<br>J. Camardo: Discussion with K. Cox on what to put into letter rebutting Morgan, and motion for sanction<br>Ardoin | 2.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Draft letter to MC Carrington and B. Boyd regarding conduct of Morgan, review of file draft motion for sanctions against Morgan<br>Ardoin | 4.00<br>100.00/hr | 400.00 |
| | General<br>K. Cox: Research Texas rules, draft letter to MC Carrington and B. Boyd regarding conduct of Morgan, review of file draft motion for sanctions against Morgan<br>Ardoin | 1.17<br>100.00/hr | NO CHARGE |
| 9/27/01 | General<br>J. Camardo: Review of mandamus and review response<br>Ardoin | 0.50<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Edit and review motions for sanctions, assemble exhibits, letter to MC Carrington<br>Ardoin | 2.33<br>100.00/hr | 233.00 |
| 9/28/01 | General<br>J. Camardo: Preparation for trip, review pleadings<br>Ardoin | 2.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Discussion with J. Camardo, telecon with J. Crosby, telecon with D. Lowry<br>Ardoin | 0.67<br>100.00/hr | 67.00 |
| 9/29/01 | General<br>K. Cox: Pull cases and documents for summary judgment hearing, discussion with J. Camardo<br>Ardoin | 4.00<br>100.00/hr | 400.00 |
| 9/30/01 | General<br>J. Camardo: Preparation for trip, review motion<br>Ardoin | 2.00<br>125.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 29.42 | 1,617.00] |
| | BOP | | |
| [redacted] | [redacted] | [redacted] | [redacted] |

DCAA001410

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 9/26/01 | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ [redacted] | [redacted] |

Laredo/Corpus Count 10

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 9/24/01 | General<br>J. Norris: Review and work on laredo interest claim<br>Laredo/Corpus | 0.83<br>100.00/hr | 83.00 |
| 9/25/01 | General<br>J. Norris: Work on double interest claim<br>Laredo/Corpus | 1.23<br>100.00/hr | 123.00 |
| 9/29/01 | General<br>J. Norris: Edits to interest claim<br>Laredo/Corpus | 0.18<br>100.00/hr | 18.00 |
| | SUBTOTAL: | [ 2.24 | 224.00] |

Cont 6

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | Lease | | |
| 9/17/01 | General<br>K. Cox: Meeting with J. Camardo, review fax from J. Rich, meeting with J. Camardo, telecon with client, telecon with B. Boyd<br>Lease | 2.50<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Work on summary judgment motion, legal research, telecon with client<br>Lease | 6.00<br>125.00/hr | NO CHARGE |
| 9/18/01 | General<br>J. Camardo: Continue working on summary judgment motion, on ratification, telecons with client and Butch Boyd over what has to be done<br>Lease | 8.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Review of file, research Texas procedure, draft mandamus<br>Lease | 8.00<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Review of file, research Texas procedure, draft mandamus<br>Lease | 1.33<br>100.00/hr | NO CHARGE |
| 9/19/01 | General<br>J. Camardo: Telecon with client on draft of motion, finalize motion with exhibits, telecons with C. Coco and D. Lowry<br>Lease | 4.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Meeting with J. Camardo, review of file, telecon with client, draft mandamus and motion to stay, research case law and procedure for mandamus<br>Lease | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Meeting with J. Camardo, review of file, telecon with client, draft mandamus and motion to stay, research case law and procedure for mandamus<br>Lease | 4.50<br>100.00/hr | NO CHARGE |
| 9/20/01 | General<br>J. Norris: Discussion with K. Cox and J. Camardo<br>Lease | 0.42<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Review mandamus, telecon with client, MC Carrington, Coco, draft letter to Carrington, preparation for trial<br>Lease | 1.17<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Review and edit mandamus, telecon with MC Carrington, discussion with J. Camardo<br>Lease | 4.08<br>100.00/hr | 408.00 |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 9/21/01 | General<br>K. Cox: Discussion with J. Camardo, telecon with MC Carrington and B. Boyd, telecon with D. Lowry<br>Lease | 0.75<br>100.00/hr | 75.00 |
| 9/24/01 | General<br>J. Camardo: Review latest motion for summary judgment<br>Lease | 2.00<br>125.00/hr | 250.00 |
| | General<br>Robert Riley: Review fax received from C. Coco<br>Lease | 0.17<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Discussion with J. Camardo, telecon with D. Lowry, review of file<br>Lease | 1.00<br>100.00/hr | 100.00 |
| 9/25/01 | General<br>K. Cox: Discussion with J. Camardo, telecon with Dave Lowry, review of file, copy documents for hearing, letter to MC, review of file, research TRCP, draft answer, telecon with Dave Lowry, discussion with J. Camardo<br>Lease | 7.83<br>100.00/hr | 783.00 |
| | General<br>J. Camardo: Review motion and send<br>Lease | 2.00<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo and K. Cox regarding litigation strategy<br>Lease | 1.50<br>100.00/hr | 150.00 |
| 9/26/01 | General<br>K. Cox: Review of file, draft answer to Foxworth's counterclaims, meeting with J. Camardo, research Texas rules<br>Lease | 4.00<br>100.00/hr | 400.00 |
| | General<br>K. Cox: Review of file, draft answer to Foxworth's counterclaims, meeting with J. Camardo<br>Lease | 1.17<br>100.00/hr | NO CHARGE |
| 9/27/01 | General<br>K. Cox: Discussion with J. Camardo, telecon with B. Boyd, discussion with J. Camardo, review of file, telecon with B. Boyd, telecon with P. Alvarex, draft pro hac vice, letter to MC and Butch, edit mandamus<br>Lease | 7.50<br>100.00/hr | 750.00 |
| 9/28/01 | General<br>K. Cox: Discussion with J. Camardo, assemble mandamus exhibits, review Fed Ex from P. Alvarez<br>Lease | 2.50<br>100.00/hr | 250.00 |
| | SUBTOTAL: | [ 78.42 | 3,966.00] |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | **Summerill** | | |
| 9/28/01 | General<br>K. Cox: Review of file, draft letter to collection agent<br>Summerill | 0.25<br>100.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 0.25 | 0.00] |
| | **cherbonniez** | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [redacted] | [redacted] |
| | [redacted] | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [ [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |

Additional Charges :

**EXPENSES**

| | | | Amount |
|---|---|---|---|
| 9/24/01 | Shipping<br>J. Camardo: Bannum certified letter to J. Morgan; $3.94<br>EXPENSES | | 3.94 |
| | [redacted] | | NO CHARGE |
| [redacted] | [redacted] | | 7.88 |

Bannum Count 6

Count 6

Count 6 = other than Gardner

| | | | Amount |
|---|---|---|---|
| 9/30/01 | Shipping<br>S. Oltz: Fed Ex to S. Allen $34.58; Fed Ex to S. Allen $34.58; Fed Ex to J. Rich $15.79; Fed Ex to Butch Boyd $15.79fe M. Gardner $34.83; Fed Ex to M. Gardner $34.83; Fed Ex to J. Rich $15.79<br>EXPENSES | | 186.19 |
| | SUBTOTAL: | | [ 198.01] |
| | Total costs | | $198.01 |
| | Total amount of this bill | | $11,973.26 |
| | Previous balance | | $21,032.25 |
| 9/21/01 | Payment - thank you, CK# 57524 | | ($9,967.00) |
| 9/25/01 | Payment - thank you, CK# 57778 | | ($11,065.25) |
| | Total payments and adjustments | | ($21,032.25) |
| | Balance due | | $11,973.26 |

Count 7

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

October 15, 2001

Invoice # 33479

Professional Services

Ardoin Count 5

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 10/1/01 | General<br>K. Cox: Meeting with J. Camardo, prepare for summary judgment hearing, telecon J. Camardo, telecon with MC's office, letter to MC Carrington<br>Ardoin | 1.75<br>100.00/hr | NO CHARGE |
| | General<br>J. Norris: Receipt of fax from MC Carrington, fax to J. Camardo and Dave Lowry<br>Ardoin | 0.43<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Travel to hearing, preparation for hearing<br>Ardoin | 8.00<br>125.00/hr | NO CHARGE |
| 10/2/01 | General<br>K. Cox: Review Morgan's response papers, telecon with J. Camardo, outline reply to response papers, telecon with J. Camardo<br>Ardoin | 4.50<br>100.00/hr | 450.00 |
| | General<br>J. Camardo: Hearing and conference with MC Carrington<br>Ardoin | 4.00<br>125.00/hr | 500.00 |
| 10/3/01 | General<br>J. Norris: Discussion with K. Cox, J. Camardo and Robert Riley<br>Ardoin | 0.25<br>100.00/hr | NO CHARGE |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 10/3/01 | General<br>J. Camardo: Travel back to Syracuse<br>Ardoin | 4.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Letters to MC Carrington, review of file, discussion with J. Camardo<br>Ardoin | 4.25<br>100.00/hr | NO CHARGE |
| 10/5/01 | General<br>K. Cox: Review of file, review Morgan's response to summary judgment, outline reply to response to summary judgment<br>Ardoin | 1.50<br>100.00/hr | 150.00 |
| | General<br>Robert Riley: Conference with K. Cox and J. Camardo regarding summary judgment motion<br>Ardoin | 0.50<br>100.00/hr | 50.00 |
| 10/6/01 | General<br>K. Cox: Discussion with J. Camardo, review of file, research, draft reply to response to summary judgment<br>Ardoin | 3.50<br>100.00/hr | 350.00 |
| 10/7/01 | General<br>K. Cox: Review of file, draft reply papers<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Review of file, draft reply papers<br>Ardoin | 0.50<br>100.00/hr | NO CHARGE |
| 10/8/01 | General<br>K. Cox: Draft reply to response to motions for summary judgment<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Draft reply to response to motions for summary judgment<br>Ardoin | 7.33<br>100.00/hr | NO CHARGE |
| 10/9/01 | General<br>J. Camardo: Review of motion<br>Ardoin | 0.50<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Review of file, legal research, discussion with J. Camardo, draft reply brief, telecon with MC, telecon with Dave Lowry<br>Ardoin | 8.00<br>100.00/hr | 800.00 |
| | General<br>K. Cox: Review of file, legal research, discussion with J. Camardo, draft reply brief, telecon with MC, telecon with Dave Lowry<br>Ardoin | 1.67<br>100.00/hr | NO CHARGE |

David Lowry Page 3

| | Hrs/Rate | Amount |
|---|---|---|
| SUBTOTAL: | [ 66.68 | 3,900.00] |

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| | Hrs/Rate | Amount |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| SUBTOTAL: | [ [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| SUBTOTAL: | [ [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| SUBTOTAL: | [ 0.27 | 0.00] |

Lease Count 6

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 10/2/01 | General<br>K. Cox: Review amended summary judgment motion, draft response to summary judgment motions, review of file, research lease law<br>Lease | 8.00<br>100.00/hr | 800.00 |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 10/2/01 | General<br>K. Cox: Review amended summary judgment motion, draft response to summary judgment motions, review of file, research lease law<br>Lease | 0.83<br>100.00/hr | NO CHARGE |
| | General<br>J. Norris: Review fax from Coco and discussion with J. Camardo<br>Lease | 0.17<br>100.00/hr | 17.00 |
| 10/3/01 | General<br>K. Cox: Review of file, draft response for summary judgment, draft letter to MC Carrington, telecon with J. Camardo, draft motion for continuance, draft abatement rehearing<br>Lease | 4.92<br>100.00/hr | NO CHARGE |
| 10/4/01 | General<br>J. Norris: Discussion with J. Camardo, review of correspondence<br>Lease | 0.52<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Review and respond to letters from Coco and Carrington, work on Coco's summary judgment motion<br>Lease | 3.00<br>125.00/hr | NO CHARGE |
| | General<br>K. Cox: Discussion with J. Camardo, telecon with B. Boyd, review response to summary judgment, draft response to summary judgment<br>Lease | 8.00<br>100.00/hr | NO CHARGE |
| | General<br>K. Cox: Discussion with J. Camardo, telecon with B. Boyd, review response to summary judgment, draft response to summary judgment<br>Lease | 2.50<br>100.00/hr | NO CHARGE |
| 10/5/01 | General<br>K. Cox: Review of file, draft and edit response to summary judgment, discussion with J. Camardo, telecon with Dave Lowry, telecon with J. Crosby, telecon with B. Boyd's office<br>Lease | 8.00<br>100.00/hr | 800.00 |
| | General<br>J. Camardo: Work on response to summary judgment motion<br>Lease | 1.00<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo regarding Boyd, Carrington, litigation status, mandamus,<br>Lease | 0.50<br>100.00/hr | NO CHARGE |
| 10/8/01 | General<br>J. Norris: Discussion with J. Camardo and K. Cox<br>Lease | 0.17<br>100.00/hr | 17.00 |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 10/9/01 | General<br>J. Camardo: Review of file, discussion with Dave Lowry<br>Lease | 1.00<br>125.00/hr | NO CHARGE |
| 10/10/01 | General<br>K. Cox: Review of file, draft amended complaint, draft motion to compel<br>Lease | 3.42<br>100.00/hr | 342.00 |
| | General<br>J. Camardo: Telecon with Dave Lowry, pull out relevant documents, draft and edit motion to compel and sanctions<br>Lease | 3.00<br>125.00/hr | 375.00 |
| | General<br>N. Camardo: Conference with J. Camardo, draft and finalize motion<br>Lease | 1.50<br>125.00/hr | 187.50 |
| 10/11/01 | General<br>J. Camardo: Telecon with client, telecon with Crosby, telecon with MC and Boyd over what is happening with case<br>Lease | 1.00<br>125.00/hr | 125.00 |
| | General<br>K. Cox: Review pleadings, preparation for hearing, discussion with J. Camardo, telecon with Dave Lowry, telecon with MC<br>Lease | 3.33<br>100.00/hr | 333.00 |
| 10/12/01 | General<br>J. Camardo: Draft papers to get documentation<br>Lease | 1.00<br>125.00/hr | 125.00 |
| 10/14/01 | General<br>J. Norris: Continue to work on affidavit and papers for Court<br>Lease | 1.50<br>100.00/hr | 150.00 |
| | SUBTOTAL: Count 6 | [ 53.36 | 3,271.50] ✓ |
| | Oliver Count 6 | | |
| 10/15/01 | General<br>K. Cox: Review of files from client<br>Oliver | 1.50<br>100.00/hr | 150.00 |
| | SUBTOTAL: | [ 1.50 | 150.00] |

[redacted]

| | Hrs/Rate | Amount |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

SUBTOTAL: [ [redacted]

[redacted]

Additional Charges :

EXPENSES

10/4/01 Travel 342.39
J. Camardo: Travel to Texas for hearing and meeting with client, transportation $32.45, lodging/meals $307.53, other 1.41
EXPENSES

count 5

[redacted] NO CHARGE

[redacted]

SUBTOTAL: [ 342.39]

Total costs $342.39

[redacted]

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

November 05, 2001

Invoice # 33602

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | **Albequerque** | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | ~~SUBTOTAL:~~ | ~~[ 3.25~~ | ~~250.00]~~ |
| | **Ardoin** Count 5 | | |
| 10/18/01 | General<br>J. Norris: Discussion with J. Camardo and K. Cox, pull information, discussion with J. Camardo<br>Ardoin | 0.33<br>100.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo, K. Cox, regarding case status and trial date and local counsel actions<br>Ardoin | 0.50<br>100.00/hr | NO CHARGE |
| 10/19/01 | General<br>J. Norris: Discussion with J. Camardo and K. Cox, go over list from Dave Lowry<br>Ardoin | 0.85<br>100.00/hr | NO CHARGE |

| Date | Description | Hrs/Rate | Amount |
|---|---|---|---|
| 10/19/01 | General<br>Robert Riley: Conference with J. Camardo, review of file, discussed subpoenas issues, discussed subpoena duces tecum Texas work force commission<br>Ardoin | 0.50<br>100.00/hr | NO CHARGE |
| 10/20/01 | General<br>J. Norris: Review of list from Lowry and cases<br>Ardoin | 0.17<br>100.00/hr | NO CHARGE |
| 10/21/01 | General<br>J. Camardo: Legal research on staying trial based on failure to exhaust administrative remedies, legal research on workman's comp. retaliation<br>Ardoin | 2.00<br>125.00/hr | NO CHARGE |
| 10/22/01 | General<br>Brian Smith: Document review, meeting with J. Camardo on continuance<br>Ardoin | 1.92<br>100.00/hr | 192.00 |
| | General<br>Robert Riley: Conference with J. Camardo regarding case status and upcoming trial, discussed damages and liability issues, worker's comp. claim, over lapping injuries/damages, argument election of remedies<br>Ardoin | 0.33<br>100.00/hr | NO CHARGE |
| 10/23/01 | General<br>J. Camardo: Telecon with J. Rich, MC, Dave Lowry, pull out all key documents needed for trial, motion to compel for sanctions<br>Ardoin | 5.00<br>125.00/hr | 625.00 |
| | General<br>Robert Riley: Conference with J. Camardo regarding subpoenas, discussed liability issues remaining causes of action, damage issues in worker's compensation case regarding dementia, depression and over lapping damages<br>Ardoin | 1.50<br>100.00/hr | 150.00 |
| 10/24/01 | General<br>J. Norris: Discussion with J. Camardo and Robert Riley<br>Ardoin | 0.50<br>100.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo, contact Texas worker's comp. insurance fund, conference with K. Haden, conference with J. Camardo regarding liability issues and overlapping damages, claims exclusivity,<br>Ardoin | 1.50<br>100.00/hr | NO CHARGE |
| 10/25/01 | General<br>J. Camardo: Work on plea in abatement<br>Ardoin | 1.00<br>125.00/hr | 125.00 |
| 10/28/01 | General<br>J. Camardo: Pull out all recent cases on wrongful discharge because of workers compensation<br>Ardoin | 1.50<br>125.00/hr | 187.50 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 10/29/01 | General<br>J. Camardo: Continue to work on preparation for case, pull out all pleadings, telecon with client<br>Ardoin | 5.00<br>125.00/hr | 625.00 |
| | General<br>Robert Riley: Conference with J. Camardo regarding trial preparation and situation with local counsel<br>Ardoin | 1.00<br>100.00/hr | NO CHARGE |
| 10/30/01 | General<br>Brian Smith: Draft letter to Shuffield, draft notice of hearing, telephone conference with Clerk for continuance<br>Ardoin | 1.33<br>100.00/hr | 133.00 |
| | General<br>J. Camardo: Continue to work on case preparation for trial, review of all pleadings etc.<br>Ardoin | 8.00<br>125.00/hr | 1,000.00 |
| 10/31/01 | General<br>Brian Smith: Preparation of motion for continuance<br>Ardoin | 3.25<br>100.00/hr | 325.00 |
| | General<br>J. Camardo: Telecon with J. Rich, preparation for trial, review motion for continuance<br>Ardoin | 5.00<br>125.00/hr | 625.00 |
| | SUBTOTAL: | [ 41.18 | 3,987.50] ✓ |

[redacted]

| | | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | | [redacted] |
| | Lease Count 6 | | |
| 10/17/01 | General<br>K. Cox: Review fax from J. Crosby, letter to MC regarding documents<br>Lease | 0.75<br>100.00/hr | NO CHARGE |
| 10/19/01 | General<br>J. Camardo: Telecon with Arnie and Dave Lowry, telecon with Crosby, telecon with MC, J. Rich, draft letters to Bannum, draft cover letter and get mandamus papers organized and send out<br>Lease | 1.00<br>125.00/hr | 125.00 |
| 10/20/01 | General<br>J. Camardo: Review boxes that were shipped to me by Crosby<br>Lease | 2.00<br>125.00/hr | 250.00 |
| 10/21/01 | General<br>J. Camardo: Review boxes shipped from Crosby<br>Lease | 4.00<br>125.00/hr | 500.00 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 10/22/01 | General<br>J. Camardo: Continue to go through boxes and pull out the key documentation, telecon with Dave Lowry, J. Rich and Arnie<br>Lease | 8.00<br>125.00/hr | NO CHARGE |
| | General<br>Robert Riley: Conference with J. Camardo regarding document production, review documents received from the Webb's<br>Lease | 0.33<br>100.00/hr | NO CHARGE |
| 10/23/01 | General<br>Brian Smith: Document review, legal research, drafting of agreement<br>Lease | 4.50<br>100.00/hr | 450.00 |
| | General<br>J. Camardo: Summarize important documents and outline response<br>Lease | 2.00<br>125.00/hr | NO CHARGE |
| 10/24/01 | General<br>Brian Smith: Preparation of third supplemental response and review of documents<br>Lease | 6.25<br>100.00/hr | NO CHARGE |
| | General<br>Robert Riley: Discussed necessity for settlement<br>Lease | 0.33<br>100.00/hr | NO CHARGE |
| 10/25/01 | General<br>J. Norris: Review of file<br>Lease | 0.07<br>100.00/hr | NO CHARGE |
| | General<br>Brian Smith: Review of discovery materials, draft of supplemental papers<br>Lease | 1.50<br>100.00/hr | 150.00 |
| 10/26/01 | General<br>Brian Smith: Drafting/editing of supplemental papers, transmittals and faxes<br>Lease | 8.00<br>100.00/hr | NO CHARGE |
| | General<br>Brian Smith: Drafting/editing of supplemental papers, transmittals and faxes<br>Lease | 1.50<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Edit and finalize submission to the Court, telecon with client, telecon with MC's office, calls to Court to ensure that papers are filed<br>Lease | 8.00<br>125.00/hr | 1,000.00 |
| 10/27/01 | General<br>J. Camardo: Review motion for sanctions, review complaint<br>Lease | 1.50<br>125.00/hr | NO CHARGE |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 10/29/01 | General<br>Brian Smith: Organize papers, fax to client, legal research, draft of response<br>Lease | 5.83<br>100.00/hr | 583.00 |
| | General<br>J. Camardo: Research and work on response to Coco's latest filing<br>Lease | 1.00<br>125.00/hr | 125.00 |
| 10/30/01 | General<br>Brian Smith: Legal research, draft reply papers, revise and edit transmittals of same<br>Lease | 8.00<br>100.00/hr | 800.00 |
| | General<br>Brian Smith: Legal research, draft reply papers, revise and edit transmittals of same<br>Lease | 0.33<br>100.00/hr | NO CHARGE |
| | SUBTOTAL: | [ 64.89 | 3,983.00] √ |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ 1.83 | 228.75] √ |

Oliver Count 6

| | | | |
|---|---|---|---|
| 10/17/01 | General<br>K. Cox: Research removal and malpractice, draft removal and answer, discussion with J. Camardo<br>Oliver | 6.17<br>100.00/hr | 617.00 |
| 10/18/01 | General<br>K. Cox: Research malpractice, draft removal and answer<br>Oliver | 3.42<br>100.00/hr | 342.00 |
| 10/19/01 | General<br>K. Cox: Review of file, draft removal and answer<br>Oliver | 1.50<br>100.00/hr | 150.00 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 10/20/01 | General<br>K. Cox: Draft removal and answer<br>Oliver | 3.42<br>100.00/hr | 342.00 |
| 10/22/01 | General<br>Brian Smith: Review of documents, assemble documents, editing, telephone conference, email, draft transmittal<br>Oliver | 2.67<br>100.00/hr | NO CHARGE |
| 10/23/01 | General<br>Brian Smith: Review of Alvarez email, reformat documents, telephone conference with Alvarez, misc. telephone calls<br>Oliver | 2.25<br>100.00/hr | NO CHARGE |
| 10/29/01 | General<br>Brian Smith: Correspondence to Court Clerk, memo to N. Camardo<br>Oliver | 0.33<br>100.00/hr | NO CHARGE |
| | SUBTOTAL: Count 6 | [ 19.76 | 1,451.00] |

general

| | | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| 10/23/01 | General<br>[redacted] | [redacted] | [redacted] |
| 10/24/01 | General<br>[redacted] | [redacted] | [redacted] |
| 10/25/01 | General<br>[redacted] | [redacted] | [redacted] |
| | SUBTOTAL: | [ [redacted] | [redacted] |
| | [redacted] | [redacted] | [redacted] |

Additional Charges :

| | Amount |
|---|---|
| EXPENSES | |
| [redacted] | 7.88 |
| [redacted] | NO CHARGE |
| Photocopies [redacted] | [redacted] |
| 10/24/01 Misc.<br>J. Elleman: Charge for copying, scanning documents for Bannum<br>EXPENSES | 204.26 |
| [redacted] | [redacted] |
| Shipping [redacted] | [redacted] |
| [redacted] | [redacted] |

Count 6 Beaumont

Joseph A. Camardo, Jr.
Attorney at Law
127 Genesee Street
Auburn, , NY 13021
jcam123@aol.com

Invoice submitted to:
David Lowry
Bannum, Inc.
1301 Seminole Blvd., Ste. 126
Largo FL 33770

November 15, 2001

Invoice # 33625

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| | **Ardoin** | | |
| 11/7/01 | General<br>K. Cox: Telecon with MC Carrington, discussion with J. Camardo, telecon with J. Rich<br>Ardoin | 0.58<br>100.00/hr | 58.00 |
| | General<br>J. Camardo: Telecon with MC Carrington and J. Rich<br>Ardoin | 0.17<br>125.00/hr | NO CHARGE |
| 11/9/01 | General<br>J. Norris: Receipt of fax, discussion with K. Cox and J. Camardo<br>Ardoin | 0.20<br>100.00/hr | NO CHARGE |
| 11/14/01 | General<br>K. Cox: Review of file, research Texas procedures, draft summary judgment order<br>Ardoin | 1.67<br>100.00/hr | 167.00 |
| | SUBTOTAL: COUNT 5 | [ 2.62 | 225.00] |
| | **BOP** | | |
| 1[redacted] | [redacted] | [redacted] | |

[redacted]

54304

**BANNUM, INC.**
1301 SEMINOLE BLVD. SUITE 126
LARGO, FL 33770
(727) 588-2594

BANK OF AMERICA

63-27/631

CHECK 54304

PAY ** Two Thousand and 00/100 Dollars **

| DATE | AMOUNT |
|---|---|
| 03/07/2001 | *******$2,000.00 |

TO THE ORDER OF

Piliero, Mazza & Pargament
Farragut Square
888 17th Street, N.W.
Suite 1100
Washington, DC 20006

NON-NEGOTIABLE

AUTHORIZED SIGNATURE

⑈054304⑈ ⑆063100277⑆ 001263252422⑈

**BANNUM, INC.**

CHECK 54304

54304

| Invoice # | Type | Date | Description | Total Amount | Discount |
|---|---|---|---|---|---|
| 1 svc | Inv | 02/28/2001 | Invoice | $2,000.00 | $0.00 |

Remittance for:
Piliero, Mazza & Pargament

Totals: $2,000.00 $0.00

Date: 03/07/2001 Check Amount: $2,000.00

D-6

DCAA001339

PILIERO, MAZZA & PARGAMENT, PLLC
ATTORNEYS AT LAW

FARRAGUT SQUARE
888 17TH STREET, N.W., SUITE 1100
WASHINGTON, D.C. 20006

(202) 857-1000
FAX (202) 857-0200

DANIEL J. PILIERO II (1942-1990)
PAMELA J. MAZZA
JEFFREY J. PARGAMENT
ANDREW P. HALLOWELL

ANTONIO R. FRANCO
PHILIP M. DEARBORN III
FRANK C. GULIN
STEPHEN C. DWYER
JUDITH M. BARGER
JOSEPH J. SUMMERILL, IV

NEW YORK OFFICE
292 MADISON AVENUE
NEW YORK, NY 10017
(212) 213-8200

Date Rec'd 3/7 Due Date 3/7
Inv Jan Service Ven 199
Acct # 6700.008
Approval [initials] Entered [initials]

January 31, 2001

Bannum, Inc.
Mr. David Lowry, Executive Director
1301 Seminole Boulevard
Suite 126
Largo FL 33770

Pay only
$ 2,000

FOR LEGAL SERVICES RENDERED during the month of January 2001 to include:

***General***

- Review of BOP Community Corrections Manual; review of Bannum's performance evaluation; discussion with BOP officials regarding community corrections division and appeal of past performance.
- Strategy conference.
- Telephone conference Ms. Zickefoose regarding Bannum's report card.
- Strategy conference.
- Review documents; telephone conference with Ms. Sinsel.
- Telephone conference with Ms. Zickefoose regarding Bannum's report card; telephone conference with Mr. Lowry regarding same.
- Telephone conference with Ms. Zickefoose and Mr. Hurwitz regarding Bannun's report card.
- Conference regarding liability of prime contractor for subcontractor's negligence and impact on pending federal contract.
- Telephone conference with Ms. Zickefoose and Mr. Taylor; telephone conference with Mr. Lowry; telephone conferences with Mr. Ropelewski regarding BOP liability on contract issue; strategy conference regarding same.
- Telephone conferences with Ms. Zickefoose, Mr. Spenser, Mr. Lewis and Ms. Dennings regarding CEF for Bannum Place Montgomery; telephone conferences with Mr. Lowry regarding same; draft letter to Mr. Lewis regarding same; strategy conference regarding same.
- Telephone conference with Mr. Lowry regarding cost proposal to BOP; review cost proposal from Bannum to BOP.

PILIERO, MAZZA & PARGAMENT, PLLC

Bannum, Inc.



- Telephone conference with Mr. Lowry regarding cost proposal to BOP; draft revision of Bannum cost proposal to BOP; fax cost proposal to Mr. Lowry.
- Telephone conferences with Mr. Lowry regarding cost proposal to BOP.
- Strategy conference regarding possible follow-up protest of ambiguity in solicitation.
- Strategy conference regarding issues relating to protest; research GAO caselaw on defective solicitation and ambiguous unclear solicitation requirements.
- Research regarding protest; telephone conferences with Mr. Lowry regarding same; strategy conferences regarding same.
- Conference regarding protest.
- Review and revise protest to GAO; conference regarding changes to protest.
- Review of bid protest cases.
- Draft and file protest; telephone conferences with Mr. Lowry regarding same; strategy conferences regarding same.
- Telephone conferences with Mr. Lowry regarding appeal of Montgomery report card; begin drafting appeal to Ms. Clayton regarding same.
- Review of protest; conference regarding access to materials under protective order and status of appeal of performance report card.
- Strategy conference regarding protest.
- Telephone conferences with Ms. Clayton, Mr. Lewis and Mr. Robinson regarding protest and Montgomery report card; draft letter to Mr. Lewis and Mr. Robinson regarding same.
- Telephone conference with Mr. Lowry regarding Tupelo Mississippi; review documents regarding same.

| | Amount |
|---|---|
| SUBTOTAL: | 8,160.00 |
| LEGAL FEES: | $8,160.00 |
| EXPENSES AND DISBURSEMENTS: | |
| Copies | 33.00 |
| Local Counsel | 40.00 |
| Telecopy/Phone | 29.52 |
| TOTAL EXPENSES AND DISBURSEMENT: | $102.52 |
| Research Fee | $163.20 |
| TOTAL CHARGES FOR THIS BILL: | $8,425.72 |
| TOTAL AMOUNT DUE: | $8,425.72 |

PILIERO, MAZZA & PARGAMENT, PLLC

Bannum, Inc. Page 3

Lawyer summary

| Lawyer | Hours | Rate | Amount |
|---|---|---|---|
| Partner | 1.00 | 270.00 | $270.00 |
| Partner | 2.20 | 250.00 | $550.00 |
| Associate | 2.40 | 225.00 | $540.00 |
| Associate | 30.00 | 225.00 | $6,750.00 |
| Law Clerk | 0.40 | 125.00 | $50.00 |

We request your prompt processing of our statement. In accordance with our normal policy, a service charge of 1 1/4% per month on any unpaid balance will be added to any amount not paid within 30 days in order to reflect our expense for carrying the unpaid balance beyond 30 days.

FEDERAL I.D. #52-1731636

BANNUM, INC.
2180 SUNNYDALE BLVD • SUITE C
CLEARWATER, FL 33765-1212

BANK OF AMERICA

63039

DATE: 10/18/02
CHECK NO.: 63039

PAY ** Seven Thousand and 00/100 Dollars **

AMOUNT: ******$7,000.00

BANNUM INC.

TO THE ORDER OF
Piliero, Mazza & Pargament
Farragut Square
888 17th Street, N.W.
Suite 1100
Washington, DC 20006

AUTHORIZED SIGNATURE

⑈063039⑈ ⑆063100277⑆ 001263256 2⑈ ⑈0000700000⑈

SECURITY FEATURES INCLUDED. DETAILS ON BACK.

PAY TO THE ORDER OF
FIRST UNION NATIONAL BANK
FOR DEPOSIT ONLY
PILIERO, MAZZA & PARGAMENT

22757

Jun. 13 2004 04:22PM P1 FAX NO. : FROM :

7

Noted 3/29/99 B.

From: Leah T. Wilson
To: BOPDOM7.BOPCCM.CMY0001, BOPDOM7.BOPCCM.CMY0002
Date: Fri, Mar 26, 1999 5:46 AM
Subject: CONTRACT J200C-397, MONTGOMERY AL (BANNUM)

RE: PUBLIC TRANSPORTATION FINDING CITED IN MONITORING REPORT (MONITORING INSPECTION JAN 06-11, 1999)

David Lowry called me to ask what he should do about the finding. He says Bannum meets the SOW requirements for providing transportation to the inmates for employment purposes.

How are the inmates affected by the City's transportation? Is there any inmate who's not able to get to/from work because of the City's transportation system? If so, is this occurring regularly? Are any of the inmates complaining about the transportation?

We need to determine if the City's transportation system is a significant issue, impairing the inmates' ability to get to/from work on a regular basis. If it is, we'll have to work out a solution with Bannum, and that solution could possibly mean we'd have to pay Bannum something additional since there is in fact "transportation" provided by the City, within a mile of the facility - regardless of how regular/consistent it is.

I just want to make sure we look at how the inmates are affected. If the inmates are not regularly burdened with finding alternate ways to/from work, we may want to consider removing the finding.

Please let me know what you think. Also please indicate how/how may/how regularly the inmates are being adversely affected by the City's transportation.

# 8

U. S. Department of Justice

Federal Bureau of Prisons

*Community Corrections Office*

*P.O. Box 171*
*U.S. Courthouse, Room B-18*
*15 Lee Street*
*Montgomery, AL 36101*

September 24, 1999

Charles Cox
Section Chief - Privatization Branch
Community Corrections and Detention Division
Federal Bureau of Prisons
320 First Street, NW
Washington, D.C. 20534

**RE: Transportation, Contract #J200c-397 (4XA), Montgomery, Alabama**

Dear Mr. Cox:

Enclosed is a Request for Contract Action for the above referenced facility. The reason for the request is for the Bureau of Prisons to consider paying additional funds to the contractor, for the purpose of providing transportation to the residents at the Community Corrections Center in Montgomery, Alabama.

The Statement of Work, Chapter 3, Page 16-A, states in its entirety "The facility shall be located within one mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident."

Additionally, the Statement of Work, Chapter 3, Page 16-C states in part "The facility shall be located in an area where the commuting time to the general area of work is ordinarily no more than one and one-half hours each way via public transit.

The contractor is presently meeting both requirements set forth in the Statement of Work. Public transportation (bus system) is provided by the city of Montgomery, Alabama. Buses run from 6:00 a.m. to 6:00 p.m. However, CCM staff in Montgomery, Alabama, as well as Atlanta, Georgia, have determined that the city's transportation system is inadequate. The transportation system impairs residents' ability to get to, and/or from work, as well as required program activities. This problem occurs on a regular and consistent basis, and limits inmates' ability to obtain employment. It should be noted that numerous attempts by CCM staff to resolve this issues have met with negative results.

The Bannum Incorporated facility in Montgomery, Alabama, is presently operating under the December 1992 Statement of Work, with all subsequent revisions, for Community Corrections Center Services. The latest revision was completed July of 1997. The contract was awarded October July 1, 1998. Performance begin on October 1, 1998 and will expire on September 30, 2003.

If we may be of further assistance, please contact us at (334) 223-7480.

Sincerely,

Larry E. Spencer
Community Corrections Manager

# 9

Melvin Anthony

ORIGINAL

PS 7300.09
3/12/98
Attachment 4-1, Page 1

RECEIVED
OCT 8 1999
CONTRACT DEVELOPMENT AND ADMINISTRATION

# REQUEST FOR CONTRACT ACTION (RCA)

(CO Use Only: ________________) RCA NO: 104 RSP NO:
JM 10/22/99

1. Type of Action Requested (Check One):

a. New ( ) b. Replacement ( ) c. Contract Modification (X)

If New or Replacement is checked, identify the following:
Type of Services:
Location - City: Montgomery State: Alabama

County (s):
Statement of Work (SOW): Community Corrections Center, dated December 1992 with all subsequent revisions (Latest Revision July 1997)

SOW page changes attached: yes ( ) no (X)

If Modification is checked, complete the following:
Contractor Name: Bannum Incorporated
Contract Number: J200c-397
Location Code: 4XA

2. Justification and Explanation for this request: Public transportation (bus system) is provided by the city of Montgomery, Alabama. Buses run from 6:00 a.m. to 6:00 p.m. The CCM, COS and MCA have determined that the city's transportation system is inadequate. The transportation system impairs residents' ability to get to, and/or from work, as well as required program activities. This problem occurs on a regular and consistent basis, and limits residents' ability to obtain employment. Numerous attempts by CCM staff to resolve this issue have met with negative results. It should be noted that the contractor is presently meeting the requirements set forth in the Statement of Work regarding this concern.

3. Period services will be required: Present through 09-30-2003

4. Fiscal Data

a. Accounting Code: FP-03-00-09-T1-414-2506-N-08-0397

b. Estimated Inmate-days and Expenditures:

| Contract Periods (s) | | Inmate-days/Beds | Cost Estimate Per Capita (Inmate-day) | Cost Estimate Per Period (Total) |
|---|---|---|---|---|
| Base Period __-__-__ __-__-__ | through | M: / <br> F: __/__ | M: $ <br> F: $ | $ <br> $______ |
| | | Total: / | Total: | $ |

| Contract Period(s) | | Inmate-days/Beds | Cost Estimate Per Capita (Inmate-day) | Cost Estimate Per Period (Total) |
|---|---|---|---|---|
| Option Year #1 __-__-__ __-__-__ | through | M: / <br> F: ____/__ | M: $ <br> F: $ | $ <br> $______ |
| | | Total: / | Total: | $ |
| Option Year #2 __-__-__ __-__-__ | through | M: / <br> F: / | M: $ <br> F: $ | $ <br> $ |
| | | Total: | Total: | $ |
| Option Year #3 __-__-__ __-__-__ | through | M: / <br> F: / | M: $ <br> F: $ | $ <br> $ |
| | | Total: | Total: | $ |

5. Suggested Sources: Include complete address, contact person and telephone number for each source provided. NOTE: If this is a replacement requirement, asterisk the incumbent provider and include their Contract Number, Location, Per Diem rate and Expiration Date.

N/A

6. List all existing Bureau of Prisons contracts providing similar services within 50 miles of the location identified for this request. Include the contractor name, contract number, location code, per diem rate and expiration date for each contract listed:

N/A

7. For billing purposes, provide the Community Corrections Manager's name, mailing address and telephone number below:

Larry E. Spencer
Federal Bureau of Prisons
P.O. Box 171
Montgomery, Alabama 36101
(334) 223-7464

8. Requested, Reviewed, and Approved by:

| | Signature | Date: |
|---|---|---|
| CCCOS: | [signature] | 09-24-99 |
| CCM: | Larry E. Spencer | 9-24-99 |
| MCA: | D. Zinkefoose | 10/4/99 |
| CCRA: | for D. Zinkefoose | 10/4/99 |
| CCAA: | [signature] | 10/18/99 |
| Received by CC Contracting Section | | |

## TRANSPORTATION ESTIMATE

MONTGOMERY - The Average Daily Population (ADP) from March 1999 through August 1999, (a 6 month period) was 29. On average, approximately 5 inmates assigned to the CCC have driving privileges. The remaining 24 inmates incur transportation problems getting to and from work, drug treatment, medical appointments, obtaining drivers licence, etc. Basically, they must ride with other inmates, seek work within walking distance, pay for a taxi, or get family members to shuttle them around.

Paying 15 cents a mile, and using 35 miles as the average one way trip, the cost was calculated as follows:

35 Miles<br>
x .15 cents<br>
$5.25<br>
x 2 trips daily<br>
$10.50<br>
x 24 inmates<br>
$252.00 per inmate, per day<br>
x 30 days a month<br>
$7,560.00 a month<br>
x 12 months<br>
$90,720.00

However, not every inmate would require an individual round trip. It is assumed that many inmates would be going to the same area or in the same general direction. Thus, several inmates would most likely be serviced on one trip by making deviations or side trips off the main route. Therefore, it is recommended the total figure be cut at least by 50%. This would provide a high end estimate of approximately $45,000.00.

# 10

2000 SEP 14 PM 3:18

PS 7300.09
3/12/98
Attachment 4-1, Page 1

**REQUEST FOR CONTRACT ACTION (RCA)**

(CO Use Only: RCA NO: 281 REP NO: 200-0637-SE )

1. Type of Action Requested (Check One):

a. New ( ) b. Replacement (X) c. Contract Modification ( )

If New or Replacement is checked, identify the following:
Type of Services: **CCC Adult Services**

Location - City: **Montgomery** State: **Alabama**
County (s): **Montgomery, Houston, Pike, Dale, Coffee & Geneva**

Statement of Work (SOW): **Community Corrections Center (CCC) 2000, as modified**

SOW page changes attached: **yes (X )** no ( )
**Modified copy of SOW provided on disk**

If Modification is checked, complete the following:
Contractor Name: **N/A**
Contract Number:
Location Code:

2. Justification and Explanation for this request: Numerous attempts by the Bureau of Prisons (BOP) and Bannum Incorporated to resolve the ongoing transportation issue have failed. The BOP was willing to pay an additional cost for Bannum to provide the transportation, but Bannum's proposal was considered unreasonable. Therefore, the Bureau of Prisons has decided that it would be in the best interest of the government not to exercise Option Year Number Two of the existing contract, and solicit for a replacement contract for the Montgomery, Alabama area. Option Year number two is not scheduled to begin until October 1, 2001.

Specifically, although there is a public transportation system in the Montgomery, Alabama area, it is deemed by the Montgomery CCM office to be inadequate, ineffective and unreliable, to provide transportation for offenders to seek employment, work, and participate in other required program activities. Since the inception of the contract which began on October 1, 1998, many offenders in the program have suffered due to the unreliable public transportation system.

They have missed out on viable job opportunities, been stranded at work, forced to work in the vicinity of the CCC facility and have walked to work during periods of inclement weather.

Residents have missed medical, dental and other appointments due to the unreliable public transportation system. They have had to return to the CCC facility using any means possible.

3. Period services will be required: 10/01/2001 thru 09/30/2006

Fiscal Data

a. Accounting Code: FP-03-00-T1-414-2506-N-08 YREGDOC# 2T110016

b. Estimated Inmate-days Expenditures:

| Contract Periods (s) | Inmate-days/Beds | Cost Estimate Per Capita (Inmate-day) | Per Period (Total) |
|---|---|---|---|
| Base Period | | | |
| 10-01-2001 through | M: 18250 / 25 | M: $60.00 | $1,095,000.00 |
| 09-30-2003 | F: 3650 / 5 | F: $60.00 | $219,000.00 |
| Total: | 21900/ 30 | Total: | $1,314,000.00 |

| Contract Period(s) | Inmate-days/Beds | Cost Estimate Per Capita (Inmate-day) | Per Period (Total) |
|---|---|---|---|
| Option Year #1 | | | |
| 10-01-2003 through | M: 9125 / 25 | M: $61.80 | $563,925.00 |
| 09-30-2004 | F: 1825 / 5 | F: $61.80 | $112,785.00 |
| Total: | 10950 / 30 | Total: | $676,710.00 |
| Option Year #2 | | | |
| 10-01-2004 through | M: 9125 / 25 | M: $63.65 | $ 580,806.25 |
| 09-30-2005 | F: 1825 / 5 | F: $63.65 | $ 116,161.25 |
| Total: | 10950 / 30 | Total: | $ 696,967.50 |
| Option Year #3 | | | |
| 10-01-2005 through | M: 9125 / 25 | M: $65.56 | $ 598,235.00 |
| 09-30-2006 | F: 1825 / 5 | F: $65.56 | $ 119,647.00 |
| Total: | 10950 / 30 | Total: | $ 717,882.00 |

3,405,559.50

5. Suggested Sources: Include complete address, contact person and telephone number for each source provided. NOTE: If this is a replacement requirement, asterisk the incumbent provider and include their Contract Number, Location, Per Diem rate and Expiration Date.

*Bannum Incorporated
1301 Seminole Blvd., Suite 126
Largo, Florida 33770
David Lowry
(727) 588-2594

Keeton Corrections Incorporated
804 8th Street Circle
P.O. Box 1317
Lynn Haven, Florida 32444
(850) 271-1092

Dismas Charities, Incorporated
425 W. Lee Street
Louisville, Kentucky 40208
Raymond Weis
(502) 636-2033

Cornell Companies
1700 West Loop South, Suite 500
Houston, Texas 77027
Tom Rathjen
(713) 235-9314

6. List all existing Bureau of Prisons contracts providing similar services within 50 miles of the location identified for this request. Include the contractor name, contract number, location code, per diem rate and expiration date for each contract listed:

None

PS 7300.09
3/12/98
Attachment 4-1, Page 4

7. For billing purposes, provide the Community Corrections Manager's name, mailing address and telephone number below:

**Helen Ramsdell, CCM**
**2350 Fairlane Drive, Suite 110**
**Montgomery, Alabama 36116**
**(334) 223-7478**

8. Requested, Reviewed, and Approved by: Date:

| | | |
|---|---|---|
| CCCOS: | [signature] | 09-03-00 |
| CCM: | [signature] | 9-5-00 |
| MCA: | [signature] | 9/6/00 |
| CCRA: | [signature] | 9/7/00 |
| CCAA: | [signature] | 9-16-00 |

Received by CC Contracting Section [signature]

INMATE-DAYS USED DURING FY 2000
UNDER CURRENT CONTRACT FOR
CCC IN MONTGOMERY, ALABAMA

| REGULAR INMATE-DAYS | | HOME CONFINEMENT INMATE-DAYS | |
|---|---|---|---|
| October 1999 - | 774 | October 1999 - | 67 |
| November 1999 - | 758 | November 1999 - | 64 |
| December 1999 - | 803 | December 2000 - | 39 |
| January 2000 - | 680 | January 2000 - | 94 |
| February 2000 - | 545 | February 2000 - | 118 |
| March 2000 - | 574 | March 2000 - | 132 |
| April 2000 - | 618 | April 2000 - | 56 |
| May 2000 - | 632 | May 2000 - | 2 |
| June 2000 - | 762 | June 2000 - | 34 |
| July 2000 - | 713 | July 2000 - | 40 |
| August 2000 - | 810 | August 2000 - | 34 |
| September 2000 - | 680 (projected) | September 2000 - | 40 |
| TOTAL = 8349 | | TOTAL = 720 | |
| DAILY AVERAGE = 23.19 | | DAILY AVERAGE = 2.00 | |

REGULAR BEDS DAILY AVERAGE = 23 residents
8349 divided by 12, divided by 30)

HOME CONFINEMENT BEDS DAILY AVERAGE = 2 residents
720 divided by 12, divided by 30)

APPENDIX A
INDIVIDUAL ACQUISIT: ?OR
PROCUREMENTS IN EXCI 5,000.
BUT LESS THAN $500,'

017-93 (4110)
January 14, 1993
Attachment 1, Page 1

**THIS FORM MUS: ... .TACHED TO REQUEST FOR PURCHASE**

INSTITUTION: CCO, Montgomery, AL DEPARTMENT: Community Corr.

COST CENTER MANAGER
SIGNATURE: [signature]
HELEN RAMSDELL, CCM

PROGRAM PLANNING COORDINATOR
SIGNATURE: [signature]
CHERYL DENNINGS, CCRA

DESCRIPTION OF REQUIREMENT AND ITS PURPOSE: To provide adult Community Corrections Center services for male and female offenders who are from the Montgomery, Alabama and surrounding communities. Services will be provided under the 2000 Statement of Work as modified.

PERIOD THE SERVICES OR SUPPLIES WILL BE REQUESTED:

TOTAL CONTRACT LIFE: FROM: 10-01-2001 To: 09-30-2006

DISTRIBUTION OF ESTIMATED DOLLARS: (BASE AND FOUR OPTION YEARS (TOTAL OF 60 MONTHS) ARE MAXIMUM FOR ALL CONTRACTS EXCEPT UTILITIES)

FY 2002 $657,000.00 ;
FY 2003 $657,000.00 ;
FY 2004 $676,710.00 ;
FY 2005 $696,967.50 ;
FY 2006 $717,882.00 ; TOTAL AGGREGATE AMOUNT (EST) $3,405,559.50

ACTION TYPE: NEW CONTRACT ___ RENEWAL (OPTION) XXX MOD___

TYPE OF CONTRACT: FIXED QUANTITY___ ESTIMATED (REQUIREMENTS) XXX

MINIMUM/MAXIMUM (INDEFINITE QUANTITY)___________

SPECIFICATIONS: DETAILED SPECIFICATIONS ___ STATEMENT OF WORK XX

GENERIC ___ BRAND NAME OR EQUAL ___ SOLE SOURCE ___

TYPE: FUNCTIONAL/PERFORMANCE XX OR DESIGN ___

DATE COMPLETED REQUISITION PACKAGE DUE IN PROCUREMENT:___________

(SEE PARAGRAPH FIVE OF THIS OM TO DETERMINE REQUIRED DUE DATE)

# 3661.041 Individual Acquisition Planning CDFRM

MAR 99 **FEDERAL BUREAU OF PRISONS**

Name of Institution (or location): Department: DOJ/BOP/CCDD

(1) Description of Requirement and its Purpose (i.e., justification): Commercial ____ Non-Commercial XX
Community Corrections

(2) Distribution of Estimated Dollars

| | | |
|---|---|---|
| Base Period: | FY 01-03 | $ 1,314,000 |
| Option Period 1: | FY 03-04 | $ 676,710 |
| 2: | FY 04-05 | $ 696,967.50 |
| 3: | FY 05-06 | $ 717,882 |
| 4: | FY ____ | $ ____ |
| Total Estimated value of Contract: | | $ 3,405,557.50 |

(3) Estimated Contract Term:

This action: Fr: 10/1/01 To: 9/30/0[illegible]
Total Contract Life: Fr: 10/1/01 To: 9/30/0[illegible]

(4) Setasides:
Small Business: ____ Total ____ Partial
____ 8(a) ____ Other

(5) Action Type: XX Contract ____ Letter Contract ____ Letter Contract Definitization
____ Change Order & Supplemental Agreement ____ Other Bilateral Modification ____ Negotiated Task/Delivery ord

(6) Extent of Competition: XX Full and Open Competition
____ Other than Full and Open Competition: FAR ____________ Rationale: ____________

(7) Method/Type: ____ RFQ ____ Sealed Bid XX Competitive RFP ____ Noncompetitive RFP ____ Unsolicited Propos
____ Fixed Price ____ Cost ____ Time/Material or Labor/Hour ____ Indefinite Quantity ____ Requirements ____ B

(8) Specification: ____ Mission Need ____ Functional ____ Performance Incentives ____ Design ____ Compatibilit
____ Brand name or Equal ____ Specific make and model description XX Work statement

(9) Advance Information Data: Information required:
____ Justification for Other than Full and Open Competition ____ Market Research Data
XX Written Advance Procurement Plan (see BP-S662.041) ____ Advance Copy of Specification
____ Automated Information Systems (AIS) Pre-Acquisition Approval ____ Other

(10) Content of a Complete Requisition Package: XX Requisition XX Specification/work statement
____ Statement of Need XX Evaluation Factors ____ Justification for Other than Full and Open Competition
____ Approvals (See (12) below) ____ Other ____________

(11) Date Complete Requisition is Due in the Contracting Office: ____________

(12) Required Approvals (To be secured by the program office prior to submission of requisition to the Contracting Office)

| TYPE OF APPROVAL | AUTHORITY (FAR, DOJ Order, etc.) | APPROVAL ORGANIZATION |
|---|---|---|
| National Approval | Program Statement 7300.09 | BOP/CCDD/Community Corrections Administrator: Conrad Lopez, Acting |

(13) Required Preaward Leadtimes (Including any Complexity Factors) (To be specified by the Contracting Office and included with this form)

Signature of Chief of Contracting Office delegated Contracting Officer: Crystal D. Clayton Date: 11/19/02

Typed or Printed Name: Crystal D. Clayton Title: Contract Specialist

(This form may be replicated via WP) Previous Editions Obsolete

RCA
2000 STATEMENT OF WORK MODIFICATION SHEET
CCC MONTGOMERY, ALABAMA

1) Chapter 3 (Facility), Page 24, line 21, revised to read: The facility will be located within one mile of public transportation, or the contractor will provide transportation for offenders to seek employment, work, and participate in program activities and necessary medical treatment i.e. physicals, at no cost to the offender. The contractor will ensure the proper insurance policy is in effect to cover the transportation, if applicable. If at anytime during the contract the CCM determines the public transpcrtation system to be inadequate or ineffective, the contractor will provide offenders with transportation for work, program participation activities and necessary medical appointments at no cost to the offender. Additionally, staff will not use their personal automobile to transport offenders unless it is in an emergency.

INMATE-DAYS USED DURING FY 2000
UNDER CURRENT CONTRACT FOR
CCC IN MONTGOMERY, ALABAMA

| REGULAR INMATE-DAYS | HOME CONFINEMENT INMATE-DAYS |
|---|---|
| October 1999 - 774 | October 1999 - 67 |
| November 1999 - 758 | November 1999 - 64 |
| December 1999 - 803 | December 2000 - 39 |
| January 2000 - 680 | January 2000 - 94 |
| February 2000 - 545 | February 2000 - 118 |
| March 2000 - 574 | March 2000 - 132 |
| April 2000 - 618 | April 2000 - 56 |
| May 2000 - 632 | May 2000 - 2 |
| June 2000 - 762 | June 2000 - 34 |
| July 2000 - 713 | July 2000 - 40 |
| August 2000 - 810 | August 2000 - 34 |
| September 2000 - 680 (projected) | September 2000 - 40 |
| TOTAL = 8349 | TOTAL = 720 |
| DAILY AVERAGE = 23.19 | DAILY AVERAGE = 2.00 |

REGULAR BEDS DAILY AVERAGE = 23 residents
8349 divided by 12, divided by 30)

HOME CONFINEMENT BEDS DAILY AVERAGE = 2 residents
720 divided by 12, divided by 30)

# 11

From: Melvin Gardner
To: BOPDOM7.BOPCCM(CMY0007)
Date: Fri, May 5, 2000 10:34 AM Montgomery, AL
Subject: Transportation Issues at CCCs in ~~Jackson, MS~~ & Tupelo, MS -Reply

Hi Ray:

Sorry I didn't let you know, but Bannum called last week and indicated that he didn't know if he should provide a proposal for the taxicab services or provide vans. Mr. Lowery stated that he felt the taxicab services in conjunction with other transportation options would meet these facilities needs, but he didn't know if the BOP would accept this proposal. Mr. Lowery said that he felt the BOP wanted vans, but he was reluctant to provide this service because it is very expensive.

I told Cheryl Denning that Mr. Lowery was uncertain of what type of transportation service he wanted to offer, and she told me to instruct Bannum to just give us his best offer and not to suggest a service preference for the BOP. I telephoned Mr. Lowery and did just that,
but I did not establish a deadline for his proposal.

I did however follow-up with Mr. Lowery yesterday, and he stated that he was still working on his proposal and he estimated that he would have an offer to us by the end of next week.

As soon as I receive his proposal, I will fax a copy to you for your review.

Melvin

# 12

BP-S684.073 **CONTRACTOR EVALUATION** CDFRM
Feb 2000
**U.S. DEPARTMENT OF JUSTICE** **FEDERAL BUREAU OF PRISONS**

| CONTRACTOR INTERIM/FINAL PERFORMANCE REPORT | REPORTING PERIOD: | FROM: October 1, 1998 | TO: September 30, 2000 |
|---|---|---|---|

| 1. CONTRACT NAME AND ADDRESS: Bannum Incorporated 1301 Seminole Boulevard, Suite 126 Largo, Florida 33770 | | | 2. DATE OF FORM: October 11, 2000 |
|---|---|---|---|
| 3. CONTRACT NUMBER: J200c-397 | 4. SENTRY CODE: DMY 4XA | 5. CONTRACT AWARD DATE: July 1, 1998 | 6. CONTRACTOR'S NAME: Bannum Incorporated 540 Sayre Street Montgomery, Alabama 36104 |
| 7. CCM/T-DATC RATING The CEF (print name): Helen Ramsdell, CCM | | 8. Signature and Date: [signature] 10-11-00 | |

9. Consider both positive and negative attributes in three areas: contract compliance; customer satisfaction; and business relationship. Assign one of the following scores: (1) VERY DISSATISFIED; (2) DISSATISFIED; (3) SATISFIED; (4) VERY SATISFIED; OR (5) EXTREMELY SATISFIED to each area.

| CONTRACT COMPLIANCE | CUSTOMER SATISFACTION | BUSINESS RELATIONS |
|---|---|---|
| Rate compliance in areas such as staffing patterns, life safety, financial responsibility, discipline, food service and accountability. Consider the completeness and accuracy of the reports submitted by the contractor such as invoices, urinalysis reports, incident reports, and volunteer participation reports. | Rate the overall quality of the programs that provide accountability, work, and other self-improvement opportunities for offenders. Consider the contractor's overall approach to communication and correctional management, and determine if it is consistent with the mission of the BOP. | Rate the flexibility, pro-activeness, professionalism, and cooperation as seen in the contractor's relationship with the BOP, U.S. Probation Office, U.S. Marshals Service, local law enforcement and community. |
| ASSESSMENT SCORE: 3 | ASSESSMENT SCORE: 2 | ASSESSMENT SCORE: 3 |

| To calculate the adjectival rating, total the three assessment scores. Subtract (one time) three points for any withholding(s) taken during the rating period. If performance is over and above the minimum requirements of the SOW, add either one, two or three points. The number of points added is discretionary and must not exceed three. Divide by three. The result is the overall score (enter into block 10.) and will fall within the numeric range associated with the adjectival rating below. The appropriate adjectival rating is then entered in block 11. | 10. OVERALL SCORE: 2.67 |
|---|---|

11. ADJECTIVAL RATING: Fair

| | |
|---|---|
| **EXCELLENT** (4.33 & above) | During the rating period the contractor has performed without problems and has operated within the terms and conditions of the contract. The contractor has been extremely responsive to Bureau inquiries. Improvements are not needed. |
| **GOOD** (3.66 - 4.3) | There are few, if any, problems with the contractor's performance. The contractor is generally operating within the terms and conditions of the contract. Only minor improvements are needed. |
| **FAIR** (2.55 - 3.6) | There are problems with the contractor's compliance with the requirements of the contract. However, the contractor is responsive to the Bureau and applies corrective measures within specified time frames. Several improvements are ongoing. |
| **POOR** (.1 - 2.5) | There is/are major problem(s) with the contractor's performance. The contractor must be notified in writing as to the problem areas and given a specific time frame in which to remedy the situation. The contractor is marginally responsive. The contractor is struggling to provide a safe and secure environment for offenders. |
| **UNSATISFACTORY** (0) | There is/are major problem(s) with the contractor's performance which the contractor has not remedied, cannot remedy, or refuses to remedy. The contractor fails to provide a safe and secure environment for offenders. The contractor is not performing in accordance with the terms and conditions of the contract. The contract should not continue. |

RECEIVED NOV 20 2000 MCA Atlanta, GA

(Contractor acknowledges the receipt of the Adjectival Rating by completing block No. 12 and returns the form to the BOP. The Contractor may provide comments regarding the rating and attach those comments to the returning form.)

12. CONTRACTOR'S SIGNATURE & DATE: DAVID A. LCWRY [signature] 11-16-00
(print and sign)

(The MCA is responsible for the CEF program and must ensure that CCMs and T-DATCs complete CEF on time and accurately. The MCA must review any comments submitted by the contractor and may adjust the adjectival rating up or down based on the contractor's comments. The MCA then signs the CEF, certifying that it represents the contractor's performance.)

13. MCA'S SIGNATURE & DATE: DONNA ZICKEFOOSE D. Zickefoose 10/4/00
(print and sign)

Original: Contract File
CC: Privatization and Special Projects

# 13

BANNUM, INC.
1301 SEMINOLE BOULEVARD
SUITE 126
LARGO, FLORIDA 33770

DAVID LOWRY
EXECUTIVE DIRECTOR

OFFICE: (727) 588-2594
FAX: (727) 588-2689

November 16, 2000

RECEIVED
NOV 20 2000
MCA, Atlanta, GA

Donna Zickefoose
U. S. Department of Justice
Federal Bureau of Prisons
Community Corrections Office
715 McDonough Boulevard S. E.
Atlanta, GA 30315

Re: Performance Evaluation
Contract #J200c-397
Bannum Place of Montgomery

Dear Ms. Zickefoose:

This is in response to the "Performance Evaluation" for Bannum Place of Montgomery dated October 11, 2000 which was received in our office on October 16, 2000. Based on the evaluation as forwarded to me, the BOP has, in absolute terms, determined that Director Juliette Davis lacks the leadership skills, professionalism and ability to maintain adequate staff; contract compliance; and an appropriate business relationship with the BOP. Using such a determination in Ms. Davis's job performance review would by itself dictate that Bannum must identify her replacement and seek her resignation. We do not believe that such an environment exists in Montgomery, and we continue to trust that our assessment of her abilities, skills and leadership are correct and that the information herein will succeed in removing this terminal career deficiency from her record. As such, the following represents Bannum's comments.

In previous discussions concerning contractor evaluations, we have been advised by high ranking BOP officials (including the CCRA and the MCA of the Southeast Region) that the evaluations are based primarily on monitoring reports <u>for the evaluation period</u>. Any consideration, other than the monitoring reports, is subjective as stated by the contract; therefore, the author of such evaluation reports can easily insert personal bias, emotional prejudices, negative attitudes and other subjective elements into the report.

Bannum has previously expressed its deep concerns about the bias, emotional prejudice, negative attitude and generally inappropriate approach of the CCM and CCCOS in the Montgomery CCM office. Such persons are responsible for the drafting and compilation of evaluation reports.

We have approached this response from the standpoint of the monitoring reports. Given the information hereinabove we do not see how a rating of poor in any of the three major categories can be substantiated. Therefore, it is our belief that the transportation issue has resulted in personal bias, emotional prejudices, negative attitudes and other subjective elements in this evaluation. Having included such elements in the evaluation violates the standard adopted and conveyed by the Assistant Administrator, Privatization and Special Projects Branch, and several other high ranking BOP officials.

We believe that such elements, by their very nature, have been leveled at Bannum, Inc. Executive and middle management to the exclusion of (by your own admission) the Director and staff of Bannum Place of Montgomery. If this belief is inaccurate, we are bewildered as to why the BOP has not removed or withdrawn approval for Ms. Davis to work with Federal offenders.

In addition to our request to revise the rating upward in each area discussed above, we are also requesting that you add three points to the total score. According to the evaluation form, up to three points can be added if performance is "over minimum requirements of the SOW" or "above minimum requirements of the SOW." Clearly, and considering the number of communications cited herein above, our performance has been exceptional.

Your review of this request is appreciated and if I can be of any further assistance, please let me know.

Sincerely,

David A. Lowry

During the two year base period for which this evaluation applies, there have been two full monitorings and three interim monitorings. In every monitoring report the BOP discusses their concern with the decline of the public transportation system in Montgomery, AL as a finding or concern.

With the implementation of the current contract and, in spite of the satisfactory negotiation of the transportation issue, the above referenced CCM and CCCOS continued their campaign maligning Bannum's contract compliance. Subsequently, a CCCOS (about whom Bannum has also stated grievous concerns) new to the region, but with the same prejudicial bent as his predecessors has become involved in the issue and in the drafting and compilation of the evaluation reports.

Obviously, this transportation issue was a significant factor in lowering the evaluation score. However, the BOP has now acknowledged that their concern with public transportation in Montgomery is not the fault of Bannum as more fully discussed in the attached Exhibit I below and therefore, Bannum's evaluation score should be raised significantly.

As stated above, we have been advised that monitoring reports are the basis for contractor evaluations. That standard was most recently confirmed and verified by the Assistant Administrator, Privatization and Special Projects Branch, a BOP official in Washington, DC. At the Western Regional Conference the Assistant Administrator assured all contractors present that all contractor evaluations are based solely on monitoring reports [emphasis added]. In applying that standard, we offer the following comments.

The evaluation areas are as follows:

I. Contract Compliance

A. Staffing – During the evaluation period, the monitoring reports contain only one finding concerning staff. That finding resulted from CCCOS Toston's misunderstanding of the Employment Specialist's performance of her duties in recognition of her job title and job description. This never should have been a finding and we asked that it be withdrawn.

The monitoring report reflects as follows:

1/6/99 Full monitoring – CCM states:

"This contractor is fortunate to have highly skilled staff in the field of corrections. Key staff have advanced degrees in the fields of juvenile and ad ult corrections. This contractor is also fortunate in that the staff retention for key positions is very stable.This stability of leadership is the major factor to the consistent high standards displayed at this center."

3/30/99 Interim monitoring – CCRA signed on behalf of CCM.

Due to the upheaval in the CCM and CCCOS positions. A "reconstructed" monitoring report was submitted, and it contained no comments, discussions or commendations for staff.

6/22/99 Interim monitoring – CCM states:

"3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit."

1/3/00 Full monitoring

Except as noted in I.A. above, the CCCOS has no discussion comments or commendations for staff.

5/2/00 Interim monitoring

CCCOS Toston provided no comments, commendations or discussion about staff except to acknowledge:

"Mr. Coleman, Counselor, is acknowledged for his hard work and dedication in keeping up with the resident case load after the departure of a fellow counselor."

With the exception of one erroneous finding which we requested to be withdrawn, the only comments concerning staff reflected skill, education, professionalism and stability. Therefore, we believe this rates an evaluation of Excellent.

c. Life Safety

Three monitoring reports reflected minor life safety issues, all of which are of a relatively routine nature, i.e. normal wear and tear. However, in all instances, Bannum took appropriate corrective measures. After consideration of the minor issues involved we believe our compliance is 100% with a rating good/excellent.

C. Financial Responsibility

The financial responsibility of Bannum, Inc. is beyond question. Our financial responsibility has been reviewed by the Small Business Administration and Office of the Inspector General and found to be above reproach. Therefore, we assume that financial responsibility relates to that of the residents of the program and our discussion relates thereto.

1. Employment (see Exhibit II) – Except for findings related to transportation, only one finding dealt with the issue of employment.

That issue involved CCCOS Toston's erroneous finding which we requested be withdrawn because it was based on his misunderstanding of the Employment Specialist's performance of her duties in recognition of her job title and job description. In fact, Bannum has achieved an excellent record of employment for the residents as evidenced by the information contained on the attached Exhibit II. Rating Excellent.

2. Subsistence – no findings related to this area. Bannum ensures that all residents pay the required subsistence, and we make the appropriate withholdings from the monthly billings. We believe our compliance rating to be Excellent.

3. Bank Accounts – Bannum encourages financial responsibility of residents by requiring or encouraging, as appropriate, the opening and maintenance of checking, savings accounts, etc. Financial counseling is provided when needed. We believe our rating is Excellent.

D. Discipline – No findings related to this area, therefore, we believe our rating is Excellent.

E. Food Service – One finding in this area which stated:

"During the monitoring, it was discovered that the approved food menu does not specify the K-CAL per day for males and females."

This is such a minor issue, with which we subsequently complied, that it should never have been considered a finding. In other monitoring reports the following comments were made:

"COMMENDATIONS

1. The food service operation was found to be in compliance with contract requirements. The meals followed the posted menu and appeared to provide ample portions."

and

2. "The center provides meals through Liz Home Cooking, a local caterer. The meals were prepared according to the posted menu and appeared nutritious. The caterer has a valid license issued by the City of Montgomery, Alabama. The caterer was last inspected by the Alabama Department of Health on December 8, 1998, obtaining a satisfactory rating."

We believe a rating of Excellent is appropriate.

F. Accountability – no findings in this area therefore, we believe our rating is Excellent.

G. Completeness and accuracy of reports - no findings related to submission of reports.

1. Invoices – no findings related to this area. The BOP states: "The contractor does an exceptional job of submitting accurate bills and collecting subsistence."

2. Urinalysis reports – one finding mentions urinalysis logs but our monthly urinalysis reports have not been questioned.

3. Incident reports – no findings related to this area.

4. Volunteer Participation Reports – no finding is this area.

In the area of completeness and accuracy of reports as discussed in 1. through 4. hereinabove, we believe our rating should be Excellent.

II. Customer Satisfaction

A. Overall quality of programs that provide:

1. Accountability – see discussion under Contract Compliance above – no findings. We believe our rating should be Excellent.

2. Work - see discussion under Contract Compliance above and incorporate Exhibit II herein. We believe our rating should be Excellent.

3. Other self improvement opportunities for offenders. The monitoring reports reflect no findings in this area. Also, see discussion under contract compliance hereinabove. We believe our rating should be Excellent.

B. Overall approach to communication and correctional management. Bannum has operated a program in Montgomery, AL for the Federal Bureau of Prisons since 1986.

1. Communication – no findings in the monitoring reports indicate any failure in the areas of communication either at the center staff level or at the middle and executive management levels. See discussion under Business Relations A. Flexibility.

2. Correctional management – no findings in the monitoring reports indicate any failure in the areas of correctional management either at the center staff level or at the middle or executive management levels. In fact, at the center staff level commendations include:

"We were pleased with the results of the monitoring and believe Bannum operates a very efficient program in Montgomery. The staff at the center work as a team and this is apparent after one spends only a short time in the facility. Key staff have excellent skills in their specific duties. Director, Mrs. Juliette Davis, is considered a master in the field of community corrections. She has put together a group of individuals who work well together. We are pleased to have her in charge of the facility."

and

"This contractor is fortunate to have highly skilled staff in the field of corrections. Key staff have advanced degrees in the field of juvenile and adult corrections. This contractor is also fortunate in that the staff retention for key positions is very stable. This stability of leadership is the major contributing factor to the consistent high standards displayed at this center."

and

"3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit attitude."

As to correctional management at Bannum's Executive and middle management levels, Bannum has been performing these services since early 1985 and in Montgomery since early 1986. I have had 25 years experience of correctional management experience, Mr. Rich has 16 years experience in this area, Ms. Bellew has 15 plus years and Mr. Stough has 5 plus years. We remain committed to excellence of service in correctional management, provision of quality programs and absolute compliance, all of which is consistent with the mission of the BOP. Accordingly, we believe we rate Excellent in this area.

III. Business Relations:

A. Flexibility - As relates to the issue of transportation which obviously has skewed this evaluation, Bannum has considered every viable alternative to meeting BOP demands. When our insurance carrier advised us that they would not provide coverage for the proposed service. We contacted other agencies with access to all carriers and were able to obtain coverage for the transportation activities desired by the BOP. We have submitted three proposals regarding transportation in an effort to accommodate the BOP.

Additionally, there is not one finding or recommendation that we did not implement or attempt to implement. As an example, if we are told to revise a form, we revised the form and so on.

Prior to initiating action concerning potentially disputable matters, Bannum consistently initiates face to face or telephonic communication for in-depth discussions of the issues involved in an attempt to resolve these issues without controversy. In that regard, Bannum's Executive Director and middle management personnel have traveled to Atlanta on four occasions for such purpose.

B. Proactiveness – During contract negotiation, Bannum proposed and BOP accepted, creation of an Employment Specialist position and promotion of a senior staff member. Although this action was misunderstood by CCCOS Toston, that action has provided the excellent resident employment record as indicated by Exhibit II hereto, in spite of the BOP's transportation concerns.

Understanding the BOP comments about the age of the building, we continually try to locate an alternative site for the program, subject of course to BOP approval.

The BOP confirms proactiveness when it states:

"<u>COMMENDATIONS</u>

1) Staff are in the process of attempting to implement a program that gives employers a tax break for hiring ex-felons."

and

"This contractor does an excellent job of obtaining community support through the use of local volunteers, student interns and community activists in many of their programs."

C. Professionalism – you will recall discussions which we have had in which you and the CCRA expressed the utmost respect for the professionalism, integrity and skills of Director Juliette Davis and her staff. Of course such

professionalism involves the areas of flexibility and proactiveness as discussed herein above, as well as the area of cooperation which will be discussed herein below. With these considerations, it is absolutely impossible to rate Bannum Place of Montgomery's business relations as anything but excellent. The BOP confirms this when it states:

"We believe Bannum operates a very efficient program in Montgomery. Staff of the center work as a team and this is apparent after one spends only a short time in the facility. Key staff have excellent skills in their specific duties. Director, Mrs. Juliette Davis, is considered a master in the field of community corrections. She has put together a group of individuals who work well together. We are very pleased to have her in charge of this facility."

and

"3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit attitude."

D. Cooperation with the BOP, USPO, U. S. Marshall, local law enforcement and the community.

The transportation issue as discussed throughout this missive can in no way be considered a fault of Director Juliette Davis and her staff. Such personnel continue to cooperate in developing and providing information related to that area in an effort to understand and resolve the issues. When one eliminates the transportation issue from the evaluation, Bannum's cooperation and especially that of Ms. Juliette Davis and her staff, is not subject to even a minimal question.

The BOP confirms that when it states:

"COMMENDATIONS

Director Davis and her staff continue to have an excellent relationship with the United States Probation Office. USPO Sandra Woods relayed the center provides a valuable resource to her agency.
This contractor does an excellent job of obtaining community support through the use of local volunteers, student interns and community activists in many of their programs."

We believe a rating of Excellent is appropriate in Business Relations.

CONCLUSION:

# Exhibit I

2/10/98 CCM Spencer (of the Montgomery BOP office) writes in a monitoring report:

> 'Recommendation #3 – Transportation has become an issue since the change in the public transportation system within the City of Montgomery. The transportation needs of the residents need to be addressed by Bannum immediately, before the problem becomes severe."

3/18/98 Bannum's Operations Director responds

4/9/98 The Contracting Officer writes:

> "Bannum has not provided the BOP with an acceptable response. Bannum must present a corrective plan of action to the Contracting Officer by 2:00 PM on April 16, indicating how it will fully accommodate the transportation of federal residents, in accordance with the Statement of Work, Chapter 3, Section A."

4/16/98 Bannum's Executive Director responds to the Contracting Officer, Leah Wilson, in part:

> "Since we are in compliance with contract requirements, should the Government wish to amend the contract, Bannum will accommodate the additional requirements after the Government's approval of the necessary cost adjustment."

CONTRACT NEGOTIATIONS FOR THE EXISTING CONTRACT INCLUDED:

3/10/98 Clarification and Discussion #1 – no mention of transportation issue

4/10/00 Clarification and Discussion #2 – The contracting officer states:

> "14. Because the City of Montgomery has terminated much of its bus service, some residents are required to walk great distances to work under the current contract (J200c-181). <u>This makes job searches and job-commuting an issue to be addressed under this Solicitation RFP 200-0422-SE.</u> It is the contractor's responsibility to provide the residents with free transportation for employment or program participation activities when there is an absence of public transportation within one mile of the facility. Bannum must provide a plan of action addressing how the residents will be provided free

transportation for the purposes stated above. SOW, Chapter 3, Section A. This is a weakness."

4/24/98 Bannum responds:

"14. See attached letter of April 16, 1998. Should a different transportation plan be required, Bannum's manday rates would increase based on the related costs thereof."

5/6/98 Addendum to Clarification and Discussion #2 – No mention of transportation issue

5/27/98 Clarification and Discussion #3 – no mention of transportation issue

6/3/98 Request for Final Proposal Revision – no mention of transportation issue

6/17/98 Negotiations reopened – no mention of transportation issue

6/19/98 Negotiations reopened – no mention of transportation issue

6/25/98 Request for Final Proposal Revision – no mention of transportation issue

7/01/98 Notification of contract award - Obviously the transportation issue was negotiated to the satisfaction of the Contracting Officer, the evaluation committee and all other BOP officials involved in the procurement process.

10/1/98 <u>New contract begins</u> #J200c-397

2/1/99 CCM Spencer issues a finding in a monitoring report:

"Finding #2 – Facility (Transportation)

The City of Montgomery's public transportation system, Demand and Response Transit (DART) has proven to be an unreliable and ineffective means of transportation for the residents at the center."

2/16/99 Bannum's Operations Director responds

3/12/99 CCM Spencer states in a letter:

"However, there is strong evidence that the situation with the local bus service is not in accordance with the provisions of the Statement of Work."

3/26/99 Bannum's Executive Director responds:

"On March 24, 1999, I telephoned Ms. Perry, CCCOS (of the Montgomery office), and discussed the matter of bus service. Ms. Perry suggested I discuss the matter with the Contracting Officer, Leah Wilson. On March 25, 1999, I discussed the matter with Ms. Wilson. Ms. Wilson said she would review the matter."

6/15/99 BOP Regional Transitional Drug Abuse Treatment Manager states in a letter:

"Upon conferring with the Management Center Administrator, Donna Zickefoose, the issue of transportation falls upon your agency based on the Statement of Work in which your agency agreed to provide transportation for the residents."

6/16/99 CCM Spencer issues a repeat finding in a monitoring report:

"Finding #2 – Facility – REPEAT FINDING

The City of Montgomery's public transportation system, Demand and Response Transit (DART) had proven to be an unreliable and ineffective means of transportation for the residents at the center (see attached news article)."

6/21/99 Bannum's Operations Director responds in part to Regional Transitional Drug Abuse Manager's letter:
"Bannum is in compliance with the Statement of Work due to public transportation being within one mile of the facility for the purpose of employment or program participation."

6/21/99 Bannum's Operations Director responds to the 6/16/99 repeat finding and appeals its issuance

6/25/99 MCA Zickefoose states in a monitoring report:

"The only deficiency from the last monitoring not resolved was the transportation issue. This is currently being discussed with the Central Office Contracting Officer and the Contractor."

6/28/99 MCA Zickefoose states in a letter:

> "Although the transportation issue has not been resolved, the problems regarding resident transportation are currently being discussed by the Contractor, Montgomery CCM Office, and the Central Office Contracting Office.
>
> As a resolution is expected in the near future, I accept Ms. Bellew's response to the findings. Please consider the March 1999 monitoring closed. If the transportation issue is not resolved it will be re-addressed in the future."

Prior to 9/8/99 – CCRA Dennings requests that Bannum submit to her a proposal for the provision of transportation services in excess of contract terms.

9/8/00 Bannum submits a <u>draft</u> cost proposal to the CCRA which discusses price, terms and other conditions.

9/23/99 CCM Spencer states in a letter:

> "After numerous discussions regarding the transportation issue, we have decided to have the Contracting Officer negotiate this concern with you. For this reason, you may consider this monitoring officially closed. We appreciate all your efforts to provide quality services and programs to the residents."

11/24/99 Contracting Officer sends Modification #3 for transportation services to Bannum for signature. Bannum signs modification believing that its <u>draft</u> proposal submitted to the CCRA on September 8, 1999 had been accepted.

11/29/99 The CCRA informs Bannum that its <u>draft</u> proposal was not forwarded to the Contracting Officer; therefore, Bannum rescinds its agreement to Modification #3.

12/17/99 Bannum receives Modification #3 signed by the Contracting Officer

12/20/99 Bannum writes and reminds the Contracting Officer that it rescinded its agreement to Modification #3.

1/4/00 The Supervising Contracting Officer aknowledges the recision of Modification #3 and requests a cost proposal for the provision of transportation services in excess of contract requirements. Additionally, the Supervising Contracting Officer states that the BOP

Montgomery office may decide to not exercise the option period (THREAT) if Bannum does not satisfy their transportation concerns.

1/7/00 Bannum submits a formal cost proposal.

1/11/00 At the request of CCCOS Toston (new personnel in the Montgomery BOP office) Bannum's Executive Director responds to his concern about transportation as follows:

> "Please be advised that Bannum, Inc. is currently negotiating with the contracting office for the provision of transportation services at our program in Tupelo, MS and Montgomery, AL."

2/2/00 CCM Ramsdell (new personnel in the Montgomery BOP office) issues a finding in a monitoring report:

> "The facility is not located within one mile of public transportation."

2/23/00 Bannum's Executive Director responds:

> "Finding #2
>
> In your letter you stated that 'an agreement with Bannum and the Contracting Officer was reached on November 26, 1999 . . ..' Attached is the documentation which shows that an agreement has not been reached. Therefore, we request that this finding be withdrawn."

3/2/00 CCM Ramsdell states in a letter:

> "This finding resulted from the contractor's noncompliance with the Statement of Work by not providing transportation to residents for employment or program participation activities at no cost to the resident, due to the facility not being located within one mile of public transportation. In our monitoring report dated February 2, 2000, we requested that you comply with the recent negotiated agreement between you and the Contracting Officer."

3/7/00 Bannum's Executive Director writes:

> "It is my understanding that, in response to my request, the CCRA was to have this finding rescinded. Further, Bannum is currently negotiating a contract modification with Mr. Melvin Gardener, of the

Contracting Branch. In fact, Mr. Gardener requested that Bannum provide additional information relating to the modification costs."

3/13/00 CCM Ramsdell writes in a letter:

"We are in receipt of your response to our clarification letter. Based on your responses, you may consider this monitoring officially closed."

3/24/00 In response to a request from the Contracting Officer to lower Bannum's cost, Bannum submits a second cost proposal.

4/25/00 Bannum management personnel meet in Atlanta with BOP Regional personnel to discuss the transportation issue, among other things.

6/13/00 Bannum submits a third cost proposal to the Supervising Contracting Officer.

10/5/00 In the absence of any discussion concerning Bannum's third cost proposal, the BOP notifies Bannum of its intent not to exercise the remaining option periods.

# Exhibit II

After reviewing the BOP billings for the first nine months of 2000 and discussions with our Montgomery staff, the following employment information (excluding those residents who have received a waiver from BOP) is provided:

<u>2000</u>

January — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 29, therefore, the employment rate was 93%.

1. Resident (HIV positive which <u>inhibits</u> employability) arrived 12/6/99; employed 2/24/00

2. Resident arrived 1/7/00; employed 1/26/00 (19 days instead of 15 days)

February — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 33, therefore, the employment rate was 94%.

1. Resident arrived 2/9/00; employed 3/18/00

2. Resident arrived 1/25/00; released without job 3/16/00

March — One resident did not obtain employment within 15 days of arrival. The average population for the month was 30, therefore, the employment rate was 97%.

1. Resident arrived 3/14/00; illiterate which <u>severely</u> <u>limits</u> employability and could not find a job; released 4/25/00

2. Resident arrived 3/16/00; employed 5/25/00; BOP allowed Community Service and Mental Health and Rehabilitation training (not counted in the above figures)

April — 100% employment rate

May — 100 % employment rate

1. Resident arrived 5/9/00; previous warrants issued against him were not cleared up; locked up by Bureau of Prisons on 5/15/00 (not counted in the above figures)

2. Resident arrived 5/2/00; sent to assessment center; OIC training (paid stipend)-- 19 years old -- 10th grade education (not counted in the above figures)

June Two residents did not obtain employment within 15 days of arrival. The average population for the month was 31, therefore, the employment rate was 94%.

1. Resident arrived 6/6/00; employed 7/11/00

2. Resident arrived 6/5/00; worked one day for Workforce; disabled/nerve cord damage/drug addiction; employed 7/10/00; terminated for drug use on 7/24/00

July 100% employment rate

August 100% employment rate

September One resident did not obtain employment within 15 days of arrival. The average population for the month was 35, therefore, the employment rate was 97%.

1. Resident (HIV positive) arrived 6/12/00; worked several temporary jobs; walked off the job and was locked up by BOP on 10/13/00 for violations of Community Program; leaving job; accountability; disrespect to staff, etc.

As one can clearly see, Bannum Place of Montgomery has maintained a 97% rate of resident employment. Obviously, the BOP concerns expressed about public transportation is not affecting our residents' ability to obtain employment. Those who don't obtain employment within the specified time are clearly recalcitrant and, unless specified circumstances exist, are program failed. Additionally, the employment rate at our Montgomery program is consistent with other Bannum programs.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## PROBATION OFFICE

ROBERT P. LONGSHORE
CHIEF PROBATION OFFICER

JUDITH CROSBY
DEPUTY CHIEF PROBATION OFFICER

136 Catoma St.
P.O. Box 39
Montgomery, AL 36101-0039

LESLIE P. CRAFT
SUPERVISING PROBATION OFFICER
INVESTIGATIVE UNIT

SCOTT WRIGHT
SUPERVISING PROBATION OFFICER
SUPERVISION UNIT

Voice 334/223-7301
FAX 334/223-7473

March 3, 2000

Mr. Stan Robinson
Federal Bureau of Prisons
Community Corrections Office
P.O. Box 230727
Montgomery, AL 36123-0727

Re: **Transportation Problems at Bannum**

Dear Mr. Robinson:

This letter is in regards to the transportation problems occurring at Bannum and our conversation with your staff in regards to this issue. The purpose of this letter is to advise the problems the U. S. Probation Office is having with indigent offenders that are placed in Bannum Place of Montgomery.

Within the last two months, our officers have had to provide transportation for residents of Bannum Place. These have included an immediate response to pick up an offender and take him to mental health to see a psychiatrist, transport offender to a doctor in regards to his chronic and life threatening illness, and picking up medication for the offenders.

These instances have removed our officers from their assigned duties, increased paperwork, and communication with our federal judges.

Our office has had a long and satisfactory relationship with Bannum Place and their staff, so if we could in any way assist in alleviating this problem, we will do so. In addition, would you provide our office with a contract and conditions of the duties of Bannum Place of Montgomery.

REC... ... 2000
CCM, Montgomery, AL

Sincerely,

Robert P. Longshore
Chief U. S. Probation Officer

RPL/djk

# 14

PILIERO, MAZZA & PARGAMENT, PLLC
ATTORNEYS AT LAW

FARRAGUT SQUARE
888 17TH STREET, N.W., SUITE 1100
WASHINGTON, D.C. 20006

(202) 857-1000
FAX (202) 857-0200

writer's e-mail address:
jsummerill@pmplawfirm.com

DANIEL J. PILIERO II
(1942-1990)
PAMELA J. MAZZA
JEFFREY J. PARGAMENT
ANDREW P. HALLOWELL

ANTONIO R. FRANCO
PHILIP M. DEARBORN III
FRANK C. GULIN
STEPHEN C. DWYER
JUDITH M. BARGER
JOSEPH J. SUMMERILL, IV

NEW YORK OFFICE
292 MADISON AVENUE
NEW YORK, NY 10017

(212) 213-8200

February 9, 2001

**VIA FACSIMILE & U.S. MAIL**

Crystal D. Clayton
Contracting Officer
Federal Bureau of Prisons
Community Corrections Contracting
320 First Street, NW (5006)
Washington, DC 20534

Re: Contractor Evaluation Form ("CEF") Appeals
Bannum Place of Montgomery
Contract Number J200c-397 (4XA)

Dear Ms. Clayton:

On behalf of Bannum, Inc. ("Bannum"), 1301 Seminole Boulevard, Suite 126, Largo, Florida 33770, telephone (727) 588-2594, facsimile (727) 588-2689, this constitutes an appeal of the December 4, 2000 letter issued by Donna Zickefoose, Federal Bureau of Prisons ("BOP" or "Agency") Management Center Administrator with regard to the above referenced CEF. Kindly direct all communications concerning this issue to the undersigned.

During discussions with both Ms. Zickefoose and BOP officials concerning Helen Ramsdell's, Community Corrections Manager, October 11, 2000 CEF of Bannum Place of Montgomery, I was advised that the CEF was based on monitoring reports for the evaluation period. Therefore, I have painstakingly analyzed the past monitoring reports for the two year base period for which this evaluation applies, to determine whether such reports support Ms. Ramsdell's initial evaluation and Ms. Zickefoose's follow up evaluation. Needless to say, I am troubled by the inconsistency between the rating received by Bannum during these monitoring reports and Ms. Ramsdell's and Ms. Zickefoose's evaluation under the CEF.

During the two base year periods, there have been two full monitoring reports and three interim monitoring reports. The evaluation areas addressed in these reports are as follows:

I. Contract Compliance

A. Staffing - During the evaluation period, the monitoring reports contain only one finding concerning staff. That finding resulted from CCCOS Toston's misunderstanding of the Employment Specialist's performance of her duties in recognition of her job title and job description. This misunderstanding should never should have been a "finding" and clearly does not justify the score of "satisfied" given to Bannum on the CEF.

The monitoring report reflects as follows:

1/6/99 Full monitoring - CCM states:

"This contractor is fortunate to have highly skilled staff in the field of corrections. Key staff have advanced degrees in the fields of juvenile and adult corrections. This contractor is also fortunate in that the staff retention for key positions is very stable. This stability of leadership is the major factor to the consistent high standards displayed at this center."

3/30/99 Interim monitoring - CCRA signed on behalf of CCM.

Due to the upheaval in the CCM and CCCOS positions. A "reconstructed" monitoring report was submitted, and it contained no comments, discussions or commendations for staff.

6/22/99 Interim monitoring - CCM states:

"3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit."

1/3/00 Full monitoring -

Except as noted in I.A above, the CCCOS has no discussion comments or commendations for staff.

5/2/00 Interim monitoring - CCCOS Tosten provided no comments, commendations or discussion about staff except to acknowledge:

"Mr. Coleman, Counselor, is acknowledged for his hard work and dedication in keeping up with the resident case load after the departure of a fellow counselor."

I am sure that you would agree with me that these monitoring reports suggest that BOP was "extremely satisfied" with the staffing provided at Bannum Place of Montgomery. Clearly, Ms.

Ramsdell's score of "satisfied" is unjustified. Therefore, Bannum respectfully requests that you rectify the CEF score to reflect "extremely satisfied."

B. Life Safety

Three monitoring reports reflected minor life safety issues, all of which are of a relatively routine nature, i.e. normal wear and tear. However, in all instances, Bannum took immediate and appropriate corrective measures to the satisfaction of the BOP. Again, these efforts on the part of Bannum justify a score of "extremely satisfied," instead of the score of "satisfied" given by Ms. Ramsdell.

C. Financial Responsibility

The financial responsibility of Bannum, Inc. is beyond reproach. Our financial responsibility has been reviewed by the Small Business Administration and Office of the Inspector General and found to be excellent. With regard to the financial responsibility of the Bannum Place of Montgomery, again the monitoring reports speak for themselves:

1. Employment - During the two year period for which the CEF covers, there has only been one "finding" which dealt with the issue of employment. As discussed above, that issue involved CCCOS Toston's <u>erroneous</u> finding which was based on his misunderstanding of the Employment Specialist's performance of her duties in recognition of her job title and job description. In fact, Bannum has achieved an excellent record of employment for the residents:

<u>2000</u>

January — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 29, therefore, the employment rate was 93%.

1. Resident (HIV positive which <u>inhibits</u> employability), arrived 12/6/99; employed 2/24/00

2. Resident arrived 1/7/00; employed 1/26/00 (19 days instead of 15 days)

February — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 33, therefore, the employment rate was 94%

1. Resident arrived 2/9/00; employed 3.18/00

2. Resident arrived 1/25/00; released without job 3/16/00

March — One resident did not obtain employment within 15 days of arrival. The average population for the month was 30, therefore, the employment rate was 97%.

1. Resident arrived 3/14/00; illiterate which severely limits employability and could not find a job; released 4/25/00

2. Resident arrived 3/16/00; employed 5/25/00; BOP allowed Community Service and Mental Health and Rehabilitation training (not counted in the above figures)

April — 100% employment rate

May — 100% employment rate

1. Resident arrived 5/9/00; previous warrants issued against him were not cleared up; locked up by Bureau of Prisons on 5/15/00 (not counted in the above figures)

2. Resident arrived 5/2/00; sent to assessment center; OIC training (paid stipend) - 19 years old -10th grade education (not counted in the above figures)

June — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 31, therefore, the employment rate was 94%.

1. Resident arrived 6/6/00; employed 7/11/00

2. Resident arrived 6/5/00; worked one day for Workforce; disabled/nerve cord damage/drug addiction; employed 7/10/00; terminated for drug use on 7/24/00

July — 100% employment rate

August — 100% employment rate

September — One resident did not obtain employment within 15 days of arrival. The average population for the month was 35, therefore, the employment rate was 97%.

1. Resident (HIV positive) arrived 6/12/00; worked several temporary jobs; walked off the job and was locked up by BOP on 10/13/00 for violations of Community Program; leaving job; accountability; disrespect to staff, etc.

As one can clearly see, Bannum Place of Montgomery has maintained a 97% rate of resident employment. Those who don't obtain employment within the specified time are clearly

recalcitrant and, unless specified circumstances exist, are program failed. Additionally, the employment rate at our Montgomery program is consistent with other Bannum programs. Again, I am sure that you would agree that such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

2. Subsistence - During the performance period covered by the CEF, there were no "findings" related to this area. Bannum ensures that all residents pay the required subsistence, and we make the appropriate withholdings from the monthly billings. Again, I am sure that you would agree that such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

3. Bank Accounts - The record reflects that Bannum encourages financial responsibility of residents by requiring or encouraging, as appropriate, the opening and maintenance of checking, savings accounts, etc. Financial counseling is provided when needed.

Again, I am sure that you would agree that such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

D. Discipline - During the performance period covered by the CEF, there were no "findings" related to this area. Again, I am sure that you would agree that such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

E. Food Service - During the performance period covered by the CEF, there was one minor "finding" in this area which stated:

> "During the monitoring, it was discovered that the approved food menu does not specify the K-CAL per day for males and females."

As soon as this finding was brought to the attention of Bannum, we immediately sought compliance with the contract requirements. Obviously, the minuteness of this should never have resulted in a "finding," and should not now result in Bannum being deprived of an "extremely satisfied" score with regard to contract compliance under the CEF. In fact, the monitoring reports for the period covered reflect Bannum's continued efforts in this area. Bannum Place of Montgomery has received "commendations" because:

1. The food service operation was found to be in compliance with contract requirements. The meals followed the posted menu and appeared to provide ample portions.

and

2. The center provides meals through Liz Home Cooking, a local caterer. The

meals were prepared according to the posted menu and appeared nutritious. The caterer has a valid license issued by the City of Montgomery, Alabama. The caterer was last inspected by the Department of Health on December 8, 1998, obtaining a satisfactory rating."

Again, such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

F. Accountability - During the performance period covered by the CEF, there were no "findings" related to this area. I am sure that you would agree that such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

G. Completeness and accuracy of reports -

1. Invoices - During the performance period covered by the CEF, there were no "findings" related to this area. In fact, the BOP stated that " The contractor does an exceptional job of submitting accurate bills and collecting subsistence."

2. Urinalysis reports - While there was one minor finding mentioning uranalysis logs, our monthly urinalysis reports have not been questioned.

3. Incident reports - During the performance period covered by the CEF, there were no "findings" related to this area.

4. Volunteer Participation Reports - During the performance period covered by the CEF, there were no "findings" related to this area.

I think that you would be hard pressed to find that such an outstanding record deserves the rating of "satisfied" given by Ms. Ramsdell. Instead, Bannum's efforts in this area deserve an "extremely satisfied."

II. Customer Satisfaction

As you can imagine, we were most disappointed with Ms. Ramsdell's rating of Bannum Place of Montgomery's Customer Satisfaction rating. Not only was Ms. Ramsdell's rating of "dissatisfied" unfair, but as our following review demonstrates, it was unjustified.

A. Overall quality of programs that provide:

1. Accountability - As our discussion under Contract Compliance above details, during the CEF monitoring period, there were no "findings" related to this area. Logic would suggest that the result would be a score of "extremely satisfied."

2. Work - As our discussion under Contract Compliance above details, the monitoring reports strongly favor a CEF score of "extremely satisfied."

3. Other self improvement opportunities for offenders - The monitoring reports reflect no findings in this area. Again, as our discussion under Contract Compliance above details, the monitoring reports strongly favor a CEF score of "extremely satisfied."

B. Overall approach to communication and correctional management. Bannum has operated a program in Montgomery, AL for the BOP since 1986. The following suggests that Bannum deserves a CEF score of "extremely satisfied."

1. Communication - <u>no findings</u> in the monitoring reports indicate any failure in the areas of communication either at the center staff level or at the middle and executive management levels.

2. Correctional management - <u>no findings</u> in the monitoring reports indicate any failure in the areas of correctional management either at the center staff level or at the middle or executive management levels. In fact, the center staff level commendations include:

> "We were pleased with the results of the monitoring and believe Bannum operates a very efficient program in Montgomery. The staff at the center work as a team and this is apparent after one spends only a short time in the facility. Key staff have excellent skills in their specific duties. Director, Mrs. Juliette Davis, is considered a master in the field of community corrections. She has put together a group of individuals who work well together. We are pleased to have her in charge of the facility."

and

> "This contractor is fortunate to have highly skilled staff in the field of corrections. Key staff have advanced degrees in the field of juvenile and adult corrections. This contractor is also fortunate in that the staff retention for key positions is very stable. This stability of leadership is the major contributing factor to the consistent high standards displayed at this center."

and

> "3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit attitude."

As to correctional management at Bannum's executive and middle management levels, Bannum has been performing these services since early 1985 and in Montgomery since early 1986.

Mr. Lowry has had 25 years experience of correctional management experience, Mr. Rich has 16 years. Together, they remain committed to excellence of service in correctional management, provision of quality programs and absolute compliance, all of which is consistent with the mission of the BOP. As a result, a score of anything less than "extremely satisfied" is unjustified.

III. Business Relations:

Finally, with regard to "Business Relations," I believe that the record demonstrates an impeccable effort on the part of Bannum and contradicts the score of "satisfied" given by Ms. Ramsdell on the CEF.

A. Flexibility - The record demonstrates that Bannum continuously implemented or attempted to implement every request made by the BOP. As an example, if Bannum was told to revise a form, it revised the form and so on. Prior to initiating action concerning potentially disputable matters, Bannum consistently initiates face to face or telephonic communication for in-depth discussions of the issues involved in an attempt to resolve these issues without controversy. In that regard, Bannum's Executive Director and middle management personnel have traveled to Atlanta on at least four occasions to meet with the BOP for the purpose of resolving an issue.

B. Proactiveness - During contract negotiation, Bannum proposed and BOP accepted, creation of an Employment Specialist position and promotion of a senior staff member. Although this action was misunderstood by CCCOS Toston, that action has provided the excellent resident employment record as indicated above. In addition, understanding the BOP's comments about the age of the building, we continually try to locate an alternative site for the program, subject of course to BOP approval. The BOP even confirmed Bannum's proactiveness in numerous commendations:

"1) Staff are in the process of attempting to implement a program that gives employers a tax break for hiring ex-felons."

and

"This contractor does an excellent job of obtaining community support through the use of local volunteers student interns and community activists in many of their programs."

C. Professionalism - On numerous occasions, Ms. Zickefoose and the CCRA expressed the utmost respect for the professionalism, integrity and skills of Bannum Place of Montgomery Director Juliette Davis and her staff. Such professionalism involved the areas of flexibility and proactiveness as discussed above, as well as the area of cooperation which will be discussed below. With such praise, it is difficult to understand why Ms. Ramsdell only rated Bannum as "satisfactory," while the record suggests that BOP was "extremely satisfied" with Bannum in the area "business relations." The BOP even admits this when it states:

> "We believe Bannum operates a very efficient program in Montgomery. Staff of the center work as a team and this is apparent after one spends only a short time in the facility. Key staff have excellent skills in their specific duties. Director, Mrs. Juliette Davis, is considered a master in the field of community corrections. She has put together a group of individuals who work well together. We are very pleased to have her in charge of this facility."

and

> "3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit attitude."

D. Cooperation with the BOP, USPO, U.S. Marshall, local law enforcement and the community.

Again, it is inconceivable that Bannum would receive nothing less that "extremely satisfied" in this area, especially when you take into consideration the commendations bestowed upon Bannum by the BOP.

> "Director Davis and her staff continue to have an excellent relationship with the United States Probation Office. USPO Sandra Woods relayed the center provides a valuable resource to her agency. This contractor does an excellent job of obtaining community support through the use of local volunteers, student interns and community activists in many of their programs."

Therefore, when Bannum's performance is approached from the standpoint of the monitoring reports, the evidence overwhelmingly suggests an error on the part of both Ms. Ramsdell and Ms. Zickefoose with regard to the October 11, 2000 CEF. In fact, many of the above arguments were made to Ms. Zickefoose in Bannum's November 16, 2000 response to Ms. Ramsdell's October 11, 2000 evaluation. To my surprise, however, Ms. Zickefoose failed to address any of these points in her December 4, 2000 response to Bannum. This amazed me, because from my experience with the Bureau, it is usually responsive to contractor's concerns. However, Ms. Zickefoose seemed to ignore the factors listed on the CEF, and instead, focused on a unlisted factor -- transportation. This unreasonable and arbitrary decision, on the part of

Ms. Zickefoose, not only violates the terms of Contract Number J200c-397, but may border on the level of "bad faith."

Before addressing Ms. Zickefoose's actions, I believe that it is necessary to first address the issue of transportation. In every monitoring report the BOP lists the decline of the public transportation system in Montgomery, AL as a "finding" or "concern:"

2/10/98 CCM Spencer (or the Montgomery BOP office) writes in a monitoring report:

> "Recommendation #3 - Transportation has become an issue since the change in the public transportation system within the City of Montgomery. The transportation needs of the residents need to be addressed by Bannum immediately, before the problem becomes severe."

3/18/98 Bannum's Operations Director responds

4/9/98 The Contracting Officer writes:

> "Bannum has not provided the BOP with an acceptable response. Bannum must present a corrective plan of action to the Contracting Officer by 2:00 PM on April 16, indicating how it will fully accommodate the transportation of federal residents, in accordance with the Statement of Work, Chapter 3, Section A.

4/16/98 Bannum's Executive Director responds to the Contracting Officer, Leah Wilson, in part:

> "Since we are in compliance with contract requirements, should the Government wish to amend the contract, Bannum will accommodate the additional requirements after the Government's approval of the necessary cost adjustment."

However, the failure of the Montgomery public transportation system is more a reflection of the BOP's failure to draft a RFP and contract terms which meet the needs of the government. I do not have to remind you, that it is the responsibility of the government to draft an RFP which describes the minimum needs of the procuring activity accurately. Hero, Inc., B-213225, December 14, 1983, 83-2 CPD ¶ 687 at 3.

In fact, Chapter 3 (A) of Contract Number J200c-397 specifically requires that:

The facility shall be located within one mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident. (Emphasis Added)

In full compliance with the terms of this contract, Bannum Place of Montgomery is within one mile of public transportation. This fact is indisputable. Further, the BOP has not amended this portion of the contract:

3/10/98 Clarification and Discussion #1 - no mention of transportation issue

4/10/00 Clarification and Discussion #2 - The contracting officer states:

"14. Because the City of Montgomery has terminated much of its bus service, some residents are required to walk great distances to work under the current contract (J200c-181). This makes job searches and job-commuting an issue to be addressed under this Solicitation RFP 200-0422-SE. It is the contractor's responsibility to provide the residents with free transportation for employment or program participation activities when there is an absence of public transportation within one mile of the facility. Bannum must provide a plan of action addressing how the residents will be provided free transportation for the purposes stated above. SOW, Chapter 3, Section A. This is a weakness."

4/24/98 Bannum responds:

"14. See attached letter of April 16, 1998. Should a different transportation plan be required, Bannum's Monday rates would increase based on the related costs thereof."

5/6/98 Addendum to Clarification and Discussion #2 - No mention of transportation issue.

5/27/98 Clarification and Discussion #3 - no mention of transportation issue

6/3/98 Request for Final Proposal Revision - no mention of transportation issue

6/17/98 Negotiations reopened - no mention of transportation issue

6/19/98 Negotiations reopened - no mention of transportation issue

6/25/98 Request for Final Proposal Revision - no mention of transportation issue

7/01/98 Notification of contract award - Obviously the transportation issue was negotiated to the satisfaction of the Contracting Officer, the evaluation committee and all other BOP officials involved in the procurement process.

10/1/98 New contract begins #J200c-397

2/1/99 CCM Spencer issues a finding in a monitoring report:

"Finding #2 - Facility (Transportation)

The City of Montgomery's public transportation system, Demand and Response Transit (DART) had proven to be an unreliable and ineffective means of transportation for the residents at the center."

2/16/99 Bannum's Operations Director responds

3/12/99 CCM Spencer states in a letter:

"However, there is strong evidence that the situation with the local bus service is not in accordance with the provisions of the Statement of Work."

3/26/99 Bannum's Executive Director responds:

" On March 24, 1999, I telephoned Ms. Perry, CCCOS (of the Montgomery office), and discussed the matter of bus service. Ms. Perry suggested I discuss the matter with the Contracting Officer, Leah Wilson. On March 25, 1999, I discussed the matter with Ms. Wilson and she said she would review the matter."

6/15/99 BOP Regional Transitional Drug Abuse Treatment Manager states in a letter:

"Upon conferring with the Management Center Administrator, Donna Zickefoose, the issue of transportation falls upon your agency based on the Statement of Work in which your agency agreed to provide transportation for the residents."

6/16/99 CCM Spencer issues a repeat finding in a monitoring report:

"Finding #2 - Facility - REPEAT FINDING

The City of Montgomery's public transportation system, Demand and Response Transit (DART) had proven to be an unreliable and ineffective means of transportation for the residents at the center (see attached news article)."

6/21/99 Bannum's Operations Director responds in a part to Regional Transitional Drug Abuse Manager's letter:
"Bannum is compliance with the Statement of Work due to public transportation being within one mile of the facility for the purpose of employment or program participation."

6/21/99 Bannum's Operations Director responds to the 6/16/99 repeat finding and appeals its issuance.

6/25/99 MCA Zickefoose states in a monitoring report:

"The only deficiency from the last monitoring not resolved was the transportation issue. This is currently being discussed with the Central Office Contracting Officer and the Contractor."

6/28/99 MCA Zickefoose states in a letter:

"Although the transportation issue has not been resolved, the problems regarding resident transportation are currently being discussed by the Contractor, Montgomery CCM Office, and the Central Office Contracting Office.

As a resolution is expected in the near future, I accept Ms. Bellew's response to the findings. Please consider the March 1999 monitoring closed. If the transportation issue is not resolved it will be readdressed in the future."

Prior to 9/8/99 - CCRA Dennings requests that Bannum submit to her proposal for the provision of transportation services in excess of contract terms.

9/8/00 Bannum submits a drafts cost proposal to the CCRA which discusses price, terms and other conditions.

9/23/99 CCM Spencer states in a letter:

"After numerous discussions regarding the transportation issue, we have decided to have the Contracting Officer negotiate this concern with your. For this reason, you may consider this monitoring officially closed. We appreciate all your efforts to provide quality services and programs to the residents."

| | |
|---|---|
| 11/24/99 | Contracting Officer sends Modification #3 for transportation services to Bannum for signature. Bannum signs modification believing that its draft proposal submitted to the CCRA on September 8, 1999 had been accepted. |
| 11/29/99 | The CCRA informs Bannum that its draft proposal was not forwarded to Contracting Officer; therefore, Bannum rescinds its agreement to Modification #3. |
| 12/17/99 | Bannum receives Modification #3 signed by the Contracting Officer |
| 12/20/99 | Bannum writes and reminds the Contracting Officer that it rescinded its agreement to Modification #3. |
| 1/4/00 | The Supervising Contracting Officer acknowledges the recission of Modification #3 and requests a cost proposal for the provision of transportation services in excess of contract requirements. Additionally, the Supervising Contracting Office states that the BOP Montgomery office may decide to not exercise the option period (THREAT) if Bannum does not satisfy their transportation concerns. |
| 1/7/00 | Bannum submit a formal cost proposal. |
| 1/11/00 | At the request of CCCOS Toston (new personnel in the Montgomery BOP office) Bannum's Executive Director responds to his concern about transportation as follows: |

"Please be advised that Bannum, Inc. Is currently negotiating with the contracting office for the provision of transportation services at our program I Tupelo, MS and Montgomery, AL."

| | |
|---|---|
| 2/2/00 | CCM Ramsdell (new personnel in the Montgomery BOP office) issues a finding in a monitoring report:<br><br>"The facility is not located withing one mile of public transportation." |
| 2/23/00 | Bannum's Executive Director responds: |

Finding #2

In your letter you stated that an agreement with Bannum and the Contracting Officer was reached on November 26,1999.....

"Attached is the documentation which shows that an agreement has not been reached. Therefore, we request that this finding be withdrawn."

3/2/00 CCM Ramsdell states in a letter:

"This finding resulted from the contractor's noncompliance with the Statement of Work by not providing transportation to residents for employment of program participation activities at no cost to the resident, due to the facility not being located within one mile of public transportation. In our monitoring report dated February 2, 2000, we requested that you comply with the recent negotiated agreement between you and the Contracting Officer."

3/7/00 Bannum's Executive Director writes:

"It is my understanding that, in response to my request, the CCRA was to have this finding rescinded. Further, Bannum is currently negotiating contract modification with Mr. Melvin Gardener, of the Contracting Branch. In fact, Mr. Gardener requested that Bannum provide additional information relating to the modification costs."

3/13/00 CCM Ramsdell writes in a letter:

"We are in receipt of your response to our clarification letter. Based on your responses, you may consider this monitoring officially closed."

3/24/00 In response to a request from the Contracting Officer to lower Bannum's cost, Bannum submits a second cost proposal.

4/25/00 Bannum management personnel meet in Atlanta with BOP Regional personnel to discuss the transportation issue, among other things.

6/13/00 Bannum submits a third cost proposal to the Supervising Contracting Officer.

10/5/00 In the absence of any discussion concerning Bannum's third cost proposal, the BOP notifies Bannum of its intent not to exercise the remaining option periods.

Therefore, it is difficult to understand why Ms. Zickefoose's December 4, 2000 response to Bannum only addresses the BOP's concern with the area of transportation. Specifically, Ms. Zickefoose stated:

> "As you are aware, the area of transportation has continually been cited as an area of concern throughout the life of this contract. The lack of transportation severely limits the residents' ability to seek employment outside walking distance of the facility. Additionally, residents that are unable to afford transportation must walk in all types of weather, and at all times of the day and night for purposes of employment and program participation regardless of the residents' age, health, and/or disabilities. Although the city has occasionally offered public transportation (bus) during the contract evaluation period, it was inadequate to meet the needs of the residents. . ."

No where in her December 4, 2000 comments does Ms. Zickefoose even suggest that Bannum is not in compliance with the terms of Contract Number J200c-397 -- I suspect because she knows that Bannum is, in fact, in full compliance with the contract term above. Therefore, it is both unreasonable and arbitrary for the BOP to justify Bannum's CEF score on concerns with the area of transportation.

The U.S. Court of Federal Claims has repeatedly overturned such determinations where the government has so blatantly been arbitrary, capricious, demonstrated an abuse of discretion, not in accordance with law, not in compliance with procedural requirements, or unsupported by substantial evidence. Aeron Marine Shipping Co. v. U.S., 26 Cl.Ct. 946 (1992); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823 (1971); Marathon Oil Co. v. United States, 17 Cl.Ct. 116, 120 (1989); Parks v. United States, 15 Cl.Ct. 183, 189 (1988); see 5 U.S.C. §§ 706(2). It is interesting to note that the court has also awarded attorneys fees, under the Equal Access to Justice Act, in such cases.

There is also concern that the use of the transportation issue in evaluating Bannum's CEF, may be the direct result of a personal bias leveled against Bannum, Inc., its Executive and middle management, as well as the Director and staff of Bannum Place of Montgomery. I do not need to remind you that government officials are presumed to act conscientiously and in good faith in the discharge of their duties (See Spezzaferro v. Federal Aviation Admin., 807 F.2d 169, 173 (Fed.Cir.1986); Kalvar Corp. v. United States, 211 Ct.Cl. 192, 543 F.2d 1298 (1976); Asco-Falcon II Shipping Co. v. United States, 32 Fed.Cl. 595, 604 (1994)), but specific acts of bad faith on the part of such officials can be imputed against the agency. Libertatia Associates, Inc. v. U.S., 46 Fed.Cl. 702 (May 23, 2000). In the case of Bannum Place of Montgomery, if it is proven that the aggregate of the actions of the government officials "would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard." Id.

At this point, Bannum is appealing the October 11, 2000 rating provided by Helen Ramsdell and the December 4, 2000 reaffirmation of those finding by Donna Zickefoose. In addition to revising Bannum's score for Contract Compliance, Customer Satisfaction and Business Relations, we request that the BOP add three points to the total score, in accordance with rating criteria outlined in the CEF.

PILIERO, MAZZA & PARGAMENT, PLLC



Thank you, Crystal, for your attention to this matter. Bannum looks forward to a fair, objective, and complete evaluation of its performance under Contract Number J200c-397 -- something we feel was not provided by your predecessors, as the record clearly reflects. If you have any questions, as always, please do not hesitate to contact me at (202) 857-1000.

Sincerely,

Joseph J. Summerill IV

cc: David Lowry
Jim Ropelewski, Esq.

# 15

PILIERO, MAZZA & PARGAMENT, PLLC
ATTORNEYS AT LAW

FARRAGUT SQUARE
888 17TH STREET, N.W., SUITE 1100
WASHINGTON, D.C. 20006

(202) 857-1000
FAX (202) 857-0200

writer's e-mail address:
jsummerill@pmplawfirm.com

DANIEL J. PILIERO II
(1942-1990)
PAMELA J. MAZZA
JEFFREY J. PARGAMENT
ANDREW P. HALLOWELL

ANTONIO R. FRANCO
PHILIP M. DEARBORN III
FRANK C. GULIN
STEPHEN C. DWYER
JUDITH M. BARGER
JOSEPH J. SUMMERILL, IV

NEW YORK OFFICE
292 MADISON AVENUE
NEW YORK, NY 10017

(212) 213-8200

February 27, 2001

**VIA FACSIMILE & U.S. MAIL**

Jackie Taylor
Acting, Management Center Administrator
Federal Bureau of Prisons
715 McDonough Blvd, S.E.
Atlanta, GA 30315

Re: Full Monitoring Report
Bannum Place of Montgomery
Contract Number J200c-397

Dear Mr. Taylor:

On behalf of Bannum, Inc. ("Bannum"), 1301 Seminole Boulevard, Suite 126, Largo, Florida 33770, telephone (727) 588-2594, facsimile (727) 588-2689, this constitutes an appeal to the February 21, 2001 Full Monitoring report conducted at Bannum Place of Montgomery. As indicated in Mr. Spencer's letter, since there were no findings identified in the report, no response is required and Bannum may consider the monitoring officially closed. While Bannum appreciates the several commendations issued by the Bureau of Prisons ("BOP") in the monitoring report, and Mr. Spencer's "congratulations for a job well done," Bannum feels compelled to appeal the Area of Concern addressed in the report.

The Full Monitoring Report on Bannum Place of Montgomery, states that "residents continue to suffer due to Bannum's failure to provide them with transportation for employment and program participation activities." See Full Monitoring Report, at 2. This statement is inaccurate, and Bannum requests that it be removed from the monitoring report. The BOP's repeated badgering of Bannum to provide the residents of Bannum Place of Montgomery with transportation is not only outside the scope of the contract, but may constitute "bad faith" administration of the contract.

Since February 1998, the BOP has repeatedly listed the decline of the public transportation system in Montgomery, AL as a "finding" or a "concern:"

PILIERO, MAZZA & PARGAMENT, PLLC

Jackie Taylor
February 27, 2001
Page 2

2/10/98 CCM Spencer (or the Montgomery BOP office) writes in a monitoring report:

"Recommendation #3 - Transportation has become an issue since the change in the public transportation system within the City of Montgomery. The transportation needs of the residents need to be addressed by Bannum immediately, before the problem becomes severe."

3/18/98 Bannum's Operations Director responds

4/9/98 The Contracting Officer writes:

"Bannum has not provided the BOP with an acceptable response. Bannum must present a corrective plan of action to the Contracting Officer by 2:00 PM on April 16, indicating how it will fully accommodate the transportation of federal residents, in accordance with the Statement of Work, Chapter 3, Section A.

4/16/98 Bannum's Executive Director responds to the Contracting Officer, Leah Wilson, in part:

"Since we are in compliance with contract requirements, should the Government wish to amend the contract, Bannum will accommodate the additional requirements after the Government's approval of the necessary cost adjustment."

However, the failure of the Montgomery public transportation system is more a reflection of the BOP's failure to draft a RFP and contract terms which meet the needs of the government. I do not have to remind you, that it is the responsibility of the government to draft an RFP which describes the minimum needs of the procuring activity accurately. Hero, Inc., B-213225, December 14, 1983, 83-2 CPD ¶ 687 at 3.

In fact, Chapter 3 (A) of Contract Number J200c-397 specifically requires that:

The facility shall be located within one mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident. (Emphasis Added)

In full compliance with the terms of this contract, Bannum Place of Montgomery is within one mile of public transportation. This fact is indisputable. Further, the BOP has not amended this portion of the contract:

3/10/98 Clarification and Discussion #1 - no mention of transportation issue

4/10/00 Clarification and Discussion #2 - The contracting officer states:

"14. Because the City of Montgomery has terminated much of its bus service, some residents are required to walk great distances to work under the current contract (J200c-181). This makes job searches and job-commuting an issue to be addressed under this Solicitation RFP 200-0422-SE. It is the contractor's responsibility to provide the residents with free transportation for employment or program participation activities when there is an absence of public transportation within one mile of the facility. Bannum must provide a plan of action addressing how the residents will be provided free transportation for the purposes stated above. SOW, Chapter 3, Section A. This is a weakness."

4/24/98 Bannum responds:

> "14. See attached letter of April 16, 1998. Should a different transportation plan be required, Bannum's Monday rates would increase based on the related costs thereof."

5/6/98 Addendum to Clarification and Discussion #2 - No mention of transportation issue.

5/27/98 Clarification and Discussion #3 - no mention of transportation issue

6/3/98 Request for Final Proposal Revision - no mention of transportation issue

6/17/98 Negotiations reopened - no mention of transportation issue

6/19/98 Negotiations reopened - no mention of transportation issue

6/25/98 Request for Final Proposal Revision - no mention of transportation issue

7/01/98 Notification of contract award - Obviously the transportation issue was negotiated to the satisfaction of the Contracting Officer, the evaluation committee and all other BOP officials involved in the procurement process.

10/1/98 New contract begins #J200c-397

2/1/99 CCM Spencer issues a finding in a monitoring report:

"Finding #2 - Facility (Transportation)

The City of Montgomery's public transportation system, Demand and Response Transit (DART) had proven to be an unreliable and ineffective means of transportation for the residents at the center."

2/16/99 Bannum's Operations Director responds

3/12/99 CCM Spencer states in a letter:

"However, there is strong evidence that the situation with the local bus service is not in accordance with the provisions of the Statement of Work."

3/26/99 Bannum's Executive Director responds:

" On March 24, 1999, I telephoned Ms. Perry, CCCOS (of the Montgomery office), and discussed the matter of bus service. Ms. Perry suggested I discuss the matter with the Contracting Officer, Leah Wilson. On March 25, 1999, I discussed the matter with Ms. Wilson and she said she would review the matter."

6/15/99 BOP Regional Transitional Drug Abuse Treatment Manager states in a letter:

"Upon conferring with the Management Center Administrator, Donna Zickefoose, the issue of transportation falls upon your agency based on the Statement of Work in which your agency agreed to provide transportation for the residents."

6/16/99 CCM Spencer issues a repeat finding in a monitoring report:

"Finding #2 - Facility - REPEAT FINDING

The City of Montgomery's public transportation system, Demand and Response Transit (DART) had proven to be an unreliable and ineffective means of transportation for the residents at the center (see attached news article)."

6/21/99 Bannum's Operations Director responds in a part to Regional Transitional Drug Abuse Manager's letter:
"Bannum is compliance with the Statement of Work due to public transportation being within one mile of the facility for the purpose of employment or program participation."

6/21/99 Bannum's Operations Director responds to the 6/16/99 repeat finding and appeals its issuance.

6/25/99 MCA Zickafoose states in a monitoring report:

"The only deficiency from the last monitoring not resolved was the transportation issue. This is currently being discussed with the Central Office Contracting Officer and the Contractor."

6/28/99 MCA Zickefoose states in a letter:

"Although the transportation issue has not been resolved, the problems regarding resident transportation are currently being discussed by the Contractor, Montgomery CCM Office, and the Central Office Contracting Office.

As a resolution is expected in the near future, I accept Ms. Bellew's response to the findings. Please consider the March 1999 monitoring closed. If the transportation issue is not resolved it will be readdressed in the future."

Prior to 9/8/99 - CCRA Dennings requests that Bannum submit to her proposal for the provision of transportation services in excess of contract terms.

9/8/00 Bannum submits a drafts cost proposal to the CCRA which discusses price, terms and other conditions.

9/23/99 CCM Spencer states in a letter:

"After numerous discussions regarding the transportation issue, we have decided to have the Contracting Officer negotiate this concern with your. For this reason, you may consider this monitoring officially closed. We appreciate all your efforts to provide quality services and programs to the residents."

11/24/99 Contracting Officer sends Modification #3 for transportation services to Bannum for signature. Bannum signs modification believing that its draft proposal submitted to the CCRA on September 8, 1999 had been accepted.

11/29/99 The CCRA informs Bannum that its draft proposal was not forwarded to Contracting Officer; therefore, Bannum rescinds its agreement to Modification #3.

12/17/99 Bannum receives Modification #3 signed by the Contracting Officer

PILIERO, MAZZA & PARGAMENT, PLLC



12/20/99 Bannum writes and reminds the Contracting Officer that it rescinded its agreement to Modification #3.

1/4/00 The Supervising Contracting Officer acknowledges the recision of Modification #3 and requests a cost proposal for the provision of transportation services in excess of contract requirements. Additionally, the Supervising Contracting Office states that the BOP Montgomery office may decide to not exercise the option period (THREAT) if Bannum does not satisfy their transportation concerns.

1/7/00 Bannum submit a formal cost proposal.

1/11/00 At the request of CCCOS Toston (new personnel in the Montgomery BOP office) Bannum's Executive Director responds to his concern about transportation as follows:

"Please be advised that Bannum, Inc. Is currently negotiating with the contracting office for the provision of transportation services at our program I Tupelo, MS and Montgomery, AL."

2/2/00 CCM Ramsdell (new personnel in the Montgomery BOP office) issues a finding in a monitoring report:

"The facility is not located withing one mile of public transportation."

2/23/00 Bannum's Executive Director responds:

Finding #2

In your letter you stated that an agreement with Bannum and the Contracting Officer was reached on November 26,1999.....
"Attached is the documentation which shows that an agreement has not been reached. Therefore, we request that this finding be withdrawn."

3/2/00 CCM Ramsdell states in a letter:

"This finding resulted from the contractor's noncompliance with the Statement of Work by not providing transportation to residents for employment of program participation activities at no cost to the resident, due to the facility not being located within one mile of public transportation. In our monitoring report dated

February 2, 2000, we requested that you comply with the recent negotiated agreement between you and the Contracting Officer."

3/7/00 Bannum's Executive Director writes:

"It is my understanding that, in response to my request, the CCRA was to have this finding rescinded. Further, Bannum is currently negotiating contract modification with Mr. Melvin Gardener, of the Contracting Branch. In fact, Mr. Gardener requested that Bannum provide additional information relating to the modification costs."

3/13/00 CCM Ramsdell writes in a letter:

"We are in receipt of your response to our clarification letter. Based on your responses, you may consider this monitoring officially closed."

3/24/00 In response to a request from the Contracting Officer to lower Bannum's cost, Bannum submits a second cost proposal.

4/25/00 Bannum management personnel meet in Atlanta with BOP Regional personnel to discuss the transportation issue, among other things.

6/13/00 Bannum submits a third cost proposal to the Supervising Contracting Officer.

10/5/00 In the absence of any discussion concerning Bannum's third cost proposal, the BOP notifies Bannum of its intent not to exercise the remaining option periods.

Therefore, it is difficult to understand why the February 21, 2001 Full Monitoring Report still addresses the BOP's concern with the area of transportation. No where in the report does the BOP acknowledge that Bannum is not in compliance with the terms of Contract Number J200c-397 -- I suspect because you know that Bannum is, in fact, in full compliance with the contract terms above. Therefore, it is both unreasonable and arbitrary for the BOP to continuously list the area of transportation as an area of concern.

The U.S. Court of Federal Claims has repeatedly overturned such determinations where the government has so blatantly been arbitrary, capricious, demonstrated an abuse of discretion, not in accordance with law, not in compliance with procedural requirements, or unsupported by substantial evidence. Aeron Marine Shipping Co. v. U.S., 26 Cl.Ct. 946 (1992); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823 (1971); Marathon Oil

PILIERO, MAZZA & PARGAMENT, PLLC



Co. v. United States, 17 Cl.Ct. 116, 120 (1989); Parks v. United States, 15 Cl.Ct. 183, 189 (1988); see 5 U.S.C. §§ 706(2).

I am also concern that the repeated use of the transportation issue in evaluating Bannum's performance, may rise to the level of "bad faith" administration of the contract. I do not need to remind you that specific acts of bad faith on the part of such officials can be imputed against the agency. Libertatia Associates, Inc. v. U.S., 46 Fed.Cl. 702 (May 23, 2000). In the case of Bannum Place of Montgomery, if it is proven that the aggregate of the actions of the government officials "would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard." Id.

At this point, Bannum is appealing the February 21, 2001 Full Monitoring Report, and requests that the report be amended to exclude the Area of Concern regarding transportation. Kindly direct all communications concerning this issue to the undersigned. If you have any questions, as always, please do not hesitate to contact me at (202) 857-1000.

Sincerely,

Joseph J. Summerill IV

cc: David Lowry
Jim Ropelewski, Esq.
Crystal D. Clayton, Contracting Officer

# 16

**RESERVED**

17

# AFFIDAVIT

State of Florida )
)
County of Pinellas ) ss.

COUNT 8

I, DAVID A. LOWRY, being of the age of majority and otherwise competent to make this affidavit state to the best of my knowledge and belief that:

I am over the age of eighteen (18) and am a resident of Pinellas County, State of Florida.

I have personal knowledge of the facts contained in this affidavit as I am, and was at all times relevant hereto, the Executive Director of Bannum Inc.

The BOP improperly withheld the exercise of the remaining two option periods of Bannum's contract (J200c-397) in Montgomery, AL because the Montgomery CCM office improperly and wrongfully alleged that Bannum was not meeting the transportation needs of the program participants. Bannum, as later verified by BOP through the issuance of a modification to the contract, was, at all times adhering to all transportation requirements of the contract. Bannum filed an REA on March 6, 2001 and converted that REA to a Claim on April 9, 2001. The REA and Claim contained a discussion of the background and history of the claim, breach of contract, bad faith and abuse of discretion, a 17page affidavit of David Lowry, summary of claimed costs and a certification of the claim. Attached hereto is a copy of Bannum's Montgomery contract which supports the 28 and 29 residents per day respectively, and the $50.45 rate for Option Periods two and three of the contract.

LOST PROFIT AND OVERHEAD

Bannum's Montgomery contract provided for 28 residents per day during Option Year 2 and 29 residents per day during Option Year 3. Bannum was to be reimbursed $50.45 per day per resident during the two Option Years which is $1,049,612 in the aggregate. Bannum believes that it is entitled to a 28% lost profit and overhead dollars on that amount which is $293,891.

ESTIMATED ADDED ADMINISTRATIVE TIME

Attached is a copy of a 17page affidavit of David Lowry which details the amount of work effort involved in dealing with the transportation issue from the beginning of 1998 through 2000.

It is estimated that Bannum's Compliance Manager Jason Stough spent approximately 5 hours performing the various tasks detailed in the affidavit and Operations Director, Cathy Bellew spent approximately 400 hours performing the various tasks discussed in the affidavit. Further, it is estimated that facility staff spent 10 hours in assisting the Operations Director in the performance of the above discussed tasks. Facility directors are responsible for the day-to-day

management of a CCC program, its staff and inmates. They work the necessary hours to accomplish the job and in many situations work more than 40 hours per week but never less. Middle and executive management, given their level of responsibility and management of multiple contracts, almost always work far more than 40 hours per week. Bannum's middle management personnel keep time cards but do not account for each task which they addressed during work hours since they perform multiple tasks which within each addresses multiple issues during any given time period. Jason Stough was paid a salary of $22,000 with company portion FICA at 7.65% and Unemployment at 3.5 %. In addition, Worker's Compensation Insurance was .32 and Medical insurance was $224.00 per month. Cathy Bellew was paid a salary of $26,000 with company portion 7.65% FICA and Unemployment at 3.5%. In addition, Worker's Compensation Insurance was .71 and Medical Insurance was $224.00 per month.

Also during the applicable time period, Cathy Bellew and Jason Stough, Bannum middle management staff, researched the solicitation and contract, to include the statement of work, various city transportation issues and routes, numerous alternative methods of transportation and the cost associated thereto, and obtained estimates from various transportation providers. Further, Bellew and Stough responded, or were involved in responding, to the correspondence detailed in the affidavit to include correspondence of:

2-10-98, 3-10-98, 3-18-98, 4-9-98, 4-10-98, 4-16-98, 4-24-98, 2-1-99, 2-16-99, 3-12-99, 3-26-99, 6-15-99, 6-16-99, 6-21-99, 6-25-99, 6-28-99, 12-20-99, 1-11-00, 2-2-00, 2-23-00, 3-2-00, 3-7-00, 3-13-00, 10-11-00, 10-16-00, 11-2-00 and 11-16-00.

In addition, they were involved in the various cost proposals of September 8, 1999, January 7, 2000, March 24, 2000 and June 13, 2000, as well as Modification No. 3. Bellew and Stough also made numerous telephone calls to the CCCOS, CCM, MCA and Life Safety Specialist. Further, Jason Stough traveled from Wilmington, NC to Atlanta, GA to meet with the CCCOS, CCM, MCA, Life Safety Specialist and the CCRA. Attached is documentation of Stough's travel costs. The REA, Claim and the discussions herein clearly documents the level of work required by Bannum personnel in dealing with the BOP. Each and every time that an alleged issue or concern arose with respect to a BOP allegation, the facility director would review, evaluate and report the issue to middle management personnel. Middle management personnel would consult with the facility director and review, evaluate and report the issue to executive management personnel. Executive management would then review and evaluate the matter and consult with middle management. A course of action would be formulated and executive management would provide direction to middle management regarding the work effort. Middle management would then provide direction of the work effort to the facility director. The facility director would then carry out the work effort and provide the results to middle management. Middle management would then review the work effort and report to executive management. Executive management would then either accept the work effort or request additional work. The same process would apply to responding to letters or monitoring reports from the BOP. The facility director would consult with middle management, draft a response and submit the draft to middle management. Middle management would review the draft and provide comments and forward the draft to executive management. Executive management would then consult with middle management and review the draft, provide comments and forward the draft back to middle management. Middle management would then consult with the facility director for finalization of the letter.

David Lowry, Executive Director, and Arnold Rich, Chairman, together comprised the Board of Directors of Bannum Inc., and its executive management. They were responsible for the daily administration and management of 15 contracts with the BOP. David Lowry and Arnold Rich were intimately involved in every facet of all the issues involved in this claim. They assisted in the research, preparation, compilation, review and editing of all the correspondence, monitoring reports and documents discussed above and attached hereto. Both provided direction to middle management personnel as well as to support staff. David Lowry made numerous telephone calls to the CCCOS, CCM, MCA, Life Safety Specialist, the CCRA, the Contracting Officer, Supervising Contracting Officers, Chief Contracting Officers, Assistant Community Corrections Administrator, Community Corrections Administrator, and various other high- ranking central office BOP officials. In addition, David Lowry traveled from Clearwater, FL to Atlanta, GA and Washington, DC on several occasions to meet with BOP officials regarding the transportation issue. Attached is documentation of Lowry's travel costs. David Lowry estimated that he spent approximately 80 hours performing the tasks discussed above to include travel. Arnold Rich estimated that he spent 40 hours performing the tasks discussed above. During this time, neither Lowry nor Rich kept time cards; however, both were full time executive management personnel.

David Lowry charged a professional rate of $110.00 per hour. At the time, Lowry had 25 years correctional executive management experience and possessed a BS, BSW and MSSW degrees. Arnold Rich charged a professional rate of $120.00 per hour. At the time, Arnold Rich had 16 years of correctional executive management experience, 10 years of executive financial management experience, was a licensed Certified Public Accountant and possessed a BA degree. Considering that the Office of Federal Procurement Policy allows compensation for senior executives under government contracts to be $186.00 per hour (see attached), Lowry and Rich's rates of $110.00 and $120.00 respectively are extremely reasonable.

The hours spent on the above discussed tasks and supported by the attached documentation were then applied against Bannum's internal hourly rate (includes hourly rate, labor burden, G/A and profit) to arrive at the estimated total amount, as this added/abnormal effort was truly a direct cost to the contract.

Finally, Bannium estimated that approximately 40 hours were spent for clerical support personnel, overnight mail, copying, telephone charges, etc. At the time, Bannum was paying its Office Manager approximately $11.00 per hour and two clerical personnel, approximately $9.00 per hour each. Approximately the same company portion FICA, unemployment, Worker's compensation and medical insurance amounts would apply to these staff as apply to the staff discussed above, along with labor burden, G/A and profit. Documentation of legal costs are attached.

UNAMORTIZED LEASE HOLD IMPROVEMENTS

Bannum estimated that it spent $192,000 in significant leasehold improvements that enhanced the facility from 1993 to 1998. In addition, significant leasehold improvements continue to have a residual value even after they are amortized.

INITIAL ESTIMATES

Based upon the best information developed at the time the claim was filed, Bannum estimated the following costs:

| | |
|---|---|
| Lost profit and Overhead | $293,891 |
| Estimated Added Administration Time | $19,615 |
| Estimated Added Phone, Travel, etc. | $1,400 |
| Unamortized Lease Hold Improvements | $22,588 |
| Proposal Preparation | $1,917 |
| | $339,411 |

At that time, we believed that these estimates were on the low side e.g., used more than one attorney, and we could not accurately determine certain costs given the best available information.

Obviously, the numerous hours spent by middle and executive management in responding to the issues in this claim prevented Bannum from expanding its business with the BOP and developing other business opportunities outside the BOP and therefore, should be considered as part of damages.

Dated: May 14, 2004

David A. Lowry

Sworn to before me under the penalty of perjury on this 14th day of May, 2004.

Sandra Allen
Notary Public

Sandra Allen
My Commission DD211868
Expires July 11, 2007

# 18

BANNUM INC.
~~New-Port-Richey, Fl.~~

2004D17200003/4/5 & 6

The following represents hard copy documents received by the auditor during the course of the audit which apply to all of the Bannum Counts. For simplicity, we have filed them under assignment number 2004D17200003 (folder 3 of 3).

1) Chronology of Significant Events
2) Contract Briefs
3) Contract Awards
4) BOP Funding Approvals for the Audits (Form 347's)
5) Request for Audit and copy of 2nd Complaint
6) Bannum's 4/5/04 Explanation of differences between amounts in the Counts vs. their "Prayer for Relief
7) Bannum 5/11/04 Response to Dennis's Questions
8) Bannum 6/7/04 Fax to Dennis regarding his questions
9) Bannum 6/8/04 Updated Counts
10) Bannum 6/15/04 Letter to Dennis re: support
11) Bannum 6/29/04 Letter from Mr. Rich and DCAA Response
12) Support for the 28% OH & Profit Rate
13) Cost or Pricing Data (Form B)
14) Bannum's CY2000 Income Statement
15) Camardo's Legal Fees – Allocation by Count.
16) Bannum's 6/21/04 Revision (all Counts)

Also filed in this folder are copies of documents obtained for Counts 1, 4 & 6 which we wound up not reviewing after all.

JS - 8/6/2004

2004D17200004:

These folders contain hard copies of:
w/p's 23, D-2a → D-8 (folder 1 of 2)
+ D-8a → D-9 (folder 2 of 2)
+ MISC unreferenced doc's ( " " " )

Remaining #'s below (6-21-04)

FOR SETTLEMENT PURPOSES ONLY

COUNT 8 – Revised Claim Information

| | | | |
|---|---|---|---|
| Lost Overhead & Profit | ✓ | $293,891.00 | |
| Est admin effort | ✓ | 23,425.35 | Mid mgt labor $9,614.61; Ex/mgt " 13,600.00; Facility " 210.74; 23,425.35 |
| Est phone, travel, etc | ✗ | ~~836.25~~ 1,534.93* | |
| Unamort Lease Hold Improvement | ✓ | 22,588.00 | |
| REA Preparation | ✓ ① | ~~10,350.97~~ 28,521.72 Revised 6-11-04 | |

~~*Additional legal fees for Joe Camardo will be forthcoming~~

~~Attached are labor costs for executive and middle management personnel which I are discussed in my affidavit~~

~~Additional travel cost will be submitted~~

LOWRY TRAVEL

Submitted 6-14-04 = 1,274.59
Submitted 6-15-04 = 681.42
1,956 (w/ D-v)

* 698.68 added on 6-25-04 ✓

Clerical Support $736.25 ✗
Tele, mail, copies 100.00
836.25 ✗
Parry +698.68
1534.93

① Camardo $1,925.25
Pilieri Ltd 8,425.72
10,350.97

J. [signature] 7/12/04



DCAA001241

6-21-04

FOR SETTLEMENT PURPOSES ONLY

COUNT 8 – Revised Claim Information

| | |
|---|---|
| Lost Overhead & Profit | $293,891.00 |
| Est admin effort | 23,425.35 |
| Est phone, travel, etc | ~~836.25~~ 1,534.73* |
| Unamort Lease Hold Improvement | 22,588.00 |
| REA Preparation | ~~10,350.97~~ 28,521.72 Revised 6-11-04 |

~~*Additional legal fees for Joe Camardo will be forthcoming~~

~~Attached are labor costs for executive and middle management personnel which are discussed in my affidavit~~

~~Additional travel cost will be submitted~~

LOWRY TRAVEL

Submitted 6-14-04 = 1,274.59
Submitted 6-15-04 = 681.42 } 1956 Travel

* 698.68 added on 6-21-04 - 798.00

RB

COUNT 8-BREAKDOWN OF COSTS

Lost Overhead & Profit-See chart

Est admin effort

| | |
|---|---|
| Mid/mang labor costs | 9,614.61 |
| Ex/mang labor costs | 13,600 |
| Facility labor costs | 210.74 |

+1300 to $1400

Est tele, travel, etc

| | |
|---|---|
| Clerical support | 736.25 |
| Tele, overnight mail, copies, etc | 100 |

| | |
|---|---|
| Unamort Lease Hold | 22,588 |

REA Preparation

| | |
|---|---|
| Camardo | 1,925.25 |
| Piliero et al | 8,425.72 |

TR 4

ut 6

5

Camardo 7

Piliero 6

23

COUNT 8

| AIRBORNE CHARGES | |
|---|---|
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 12.86 |
| | $ 11.29 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 12.86 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 8.40 |
| | $ 9.45 |
| | $ 8.40 |
| | $ 8.40 |
| | $ 8.40 |
| | $ 9.45 |
| | $ 12.86 |
| | $ 61.95 |
| | $ 12.86 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 56.18 |
| | $ 8.40 |
| | $ 21.92 |
| | $ 12.86 |
| | $ 9.45 |
| | $ 19.70 |
| | $ 19.70 |
| | $ 32.90 |
| | $ 9.45 |
| | $ 13.65 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 9.45 |
| | $ 14.06 |
| | $ 9.73 |
| | $ 9.73 |
| | $ 12.86 |
| | $ 22.66 |

* Additionally, we approximate $50 for copy charges

| TOTAL | $ 698.68 |
|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6051336222<br>PIE / DCA<br>1/20/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BUREAU OF PRISIONS<br>500 FIRST ST NW ROOM 5006<br>WASHINGTON<br>DC 20534<br>KATHERINE WASHING<br>S DIXON | DB<br>1<br>LX<br>52157 | EXP 9.45 | | $9.45 | 000 |
| 6051336325<br>PIE / DCA<br>1/20/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BUREAU OF PRISIONS<br>500 FIRST ST NW RM 5006<br>WASHINGTON<br>DC 20534<br>LEAH WILSON<br>S DIXON | DB<br>1<br>LX<br>52157 | EXP 9.45 | | $9.45 | 000 |
| 6051336421<br>PIE / BPT<br>1/20/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | PREMIUM PLUMBING<br>1575 SOUTH 23RD ST<br>BEAUMONT<br>TX 77707<br>409-842-1526<br>T BRIDGES | DB<br>1<br>LX<br>52157/AF | NAS 8.40 | | $8.40 | .004 |
| 6051336524<br>PIE / MGM<br>1/20/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BANNUM PL OF MONTGOMERY<br>540 SAYRE ST<br>MONTGOMERY<br>AL 36104<br>JULIETTE DAVIS 334-262-82<br>J DAVIS | DB<br>1<br>LX<br>52157/AF | NAS 8.40 | | $8.40 | 008 |
| 6397076760<br>PIE / DCA<br>1/21/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BUREAU OF PRISONS-CCC<br>CONTRACTING<br>500 FIRST ST NW ROOM 5006<br>WASHINGTON<br>DC 20534<br>CRYSTAL CLAYTON 202-307-3<br>S DIXON | DB<br>1<br>LX<br>52157 | EXP 9.45 | | $9.45 | .000 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
1/31/98

0000134 0000934

AIRBORNE EXPRESS
EXTVR REV. 11/97 DD

**AIRBORNE EXPRESS** — SENDER'S COPY

Preprint Format No. 6585036 | Origin PIE | Airbill Number 3397076760

FROM (Company): BANNUM
Street Address: STE 126, 1301 SEMINOLE BLVD
City: LARGO State: FL ZIP CODE: 33770
Phone Number: 813-588-2594

TO (Company): CCC Bureau of Prisons - Contracting
Street Address: 500 First St. N.W. Room 5006
City: Washington State: D.C. ZIP CODE: 20534
Attention: Crystal Clayton Phone Number: 202-307-
REF 200-0417-SF

Method of Payment: Bill Sender ☒ 39908860
No. of Pkgs: 1 Check if: Letter Express ☒
Date: 1-21-98

---

**AIRBORNE EXPRESS** — SENDER'S COPY

Preprint Format No. 6585036 | Origin PIE | Airbill Number 6051336325

FROM (Company): BANNUM
Street Address: STE 126, 1301 SEMINOLE BLVD
City: LARGO State: FL ZIP CODE: 33770
Phone Number: 813-588-2594

TO (Company): Bureau of Prisions
Street Address: 500 First Street, NW Rm 5006
City: Washington State: D.C. ZIP CODE: 20534
Attention: Leah Wilson
Description: Letter

Method of Payment: Bill Sender ☒ 39908860
No. of Pkgs: 1 Check if: Letter Express ☒
Date: 1-20-98

---

| FROM (Company) | Preprint Format No. | Origin | Airbill Number |
|---|---|---|---|
| BANNUM | 6585036 | PIE | 6051336222 |

Street Address: STE 126
1301 SEMINOLE BLVD
City: LARGO State: FL ZIP CODE (Required): 33770
Sent by (Name/Dept) Phone Number: 813-588-2594

Method of Payment: ☒ Bill Sender ▶ 39908860 (Airborne Sender account no.)
☐ Bill Receiver ▶ Airborne Receiver account no.
☐ Bill 3rd Party ▶ Airborne Customer account no.
☐ Paid in Advance Check No. Amount $
Billing Reference will appear on invoice

Service Type: X

TO (Company): Bureau of Prisions
Street Address: 500 First Street, NW Room 5006
City: Washington State: D.C. ZIP CODE (Required): 20534
Attention: (Name/Dept) Katherina Washington Phone Number (Important)
Description: Letter

No. of Pkgs: 1 Weight (lbs): 1 Check if: ☒ Letter Express ☐ Express Pack

Special Instructions: ☐ Saturday Delivery ☐ Hold at Airborne ☐ Lab Pack

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature ▶ Debra Kasse Date 1-20-98
Declared Value ☐ or Full Insurance ☐ $ Shipment Valuation
Received At ☐ Drop Box # ☐ Airborne Terminal

AIRBORNE EXPRESS

DCAA001252

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3397076843 PIE / LAS 1/21/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | JON LOWRY APT-1174 4650 WEST OAKEY BLVD LAS VEGAS NV 89102 702-258-3505 FD | DB 1 LX 52157 | EXP | 9.45 | | 1211.000 $9.45 |
| 3397076966 PIE / DCA 1/21/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | BUREAU OF PRISONS-CONTACTS CCC 500 FIRTS ST N W RM 5006 WASHINGTON DC 20534 LEAH WILSON 207-307-3070 S DIXON | DB 1 LX 52157 | EXP | 9.45 | | 000 $9.45 |
| 3397075662 PIE / DCA 1/22/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | BUREAU OF PRISONS RM 5006 500 FIRST ST N W WASHINGTON DC 20534 LEAH WILSON 201-307-3070 A COLES | DB 1 LX 52157 | EXP | 9.45 | | 000 $9.45 |
| 3397076664 PIE / DCA 1/22/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | BUREAU OF PRISONS RM 5006 6 500 FIRST ST N W WASHINGTON DC 20534 LENA WILSON 202-307-3070 A COLES | DB 1 LX 52157 | EXP | 9.45 | | 000 $9.45 |
| 5976007353 DVX / PIE 1/22/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | NINA FUCHS 1565 PEACEFUL LN CLEARWATER FL 34615 NINA 813-588-4457 LD-FD | SD 1 1 SR 52157 | EXP | 15.75 | | 000 $15.75 |

SUBTOTAL SENDER CUSTOMER NO.: 39908860 NO. SHIPMENTS: 16 179.85

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
HAS=HAT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
1/31/98

0000134 0000935

AIRBORNE EXPRESS
633TWR REV. 11/87 DD

**AIRBORNE EXPRESS** — Airbill Number 3397076966

Preprint Format No. 6585036 | Origin PIE

Method of Payment: [X] Bill Sender ▶ 39908860 (Airborne Sender account no.)

FROM (Company): BANNUM
Street Address: STE 126, 1301 SEMINOLE BLVD
City: LARGO | State: FL | ZIP CODE (Required): 33770
Phone Number: 813-588-2594

TO (Company): BUREAU OF PRISONS-CONTACTS
Street Address: 500 FIRST ST. N.W. RM 5006
City: WASHINGTON, D.C. | ZIP CODE (Required): 20534
Attention: LEAH WILSON 202-307-3073
Description: RFP 200-0414-SE

No. of Pkgs: 1 | Check if: [X] Letter Express

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature | Date 1/21/98

SENDER'S COPY

http://www.airborne-express.com

---

**AIRBORNE EXPRESS** — Airbill Number 3397075662

Preprint Format No. 6585036 | Origin PIE

Method of Payment: [X] Bill Sender ▶ 39908860 (Airborne Sender account no.)

FROM (Company): BANNUM
Street Address: STE 126, 1301 SEMINOLE BLVD
City: LARGO | State: FL | ZIP CODE (Required): 33770
Phone Number: 813-588-2594

TO (Company): Bureau of Prisons
Street Address: 500 First Street
City: Washington, D.C. | ZIP CODE (Required): 20534
Attention: Leah Wilson 202-307-3070
Description: Letter

No. of Pkgs: 1 | Check if: [X] Letter Express

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature | Date 1/22/98

---

**AIRBORNE EXPRESS** — Airbill Number 3397076664

Preprint Format No. 6585036 | Origin PIE

Method of Payment: [X] Bill Sender ▶ 39908860 (Airborne Sender account no.)
[ ] Bill Receiver ▶ (Airborne Receiver account no.)
[ ] Bill 3rd Party ▶ (Airborne Customer account no.)
[ ] Paid in Advance — Check No. — Amount $
Billing Reference will appear on invoice

FROM (Company): BANNUM
Street Address: STE 126, 1301 SEMINOLE BLVD
City: LARGO | State: FL | ZIP CODE (Required): 33770
Sent by (Name/Dept) | Phone Number: 813-588-2594

TO (Company): Bureau of Prisons
Street Address: 500 First Street
City: Washington | State: D.C. | ZIP CODE (Required): 20534
Attention (Name/Dept): Leah Wilson | Phone Number (Important): 202-307-3070
Description: Letter

No. of Pkgs: 1 | Check if: [X] Letter Express [ ] Express Pack

Special Instructions: [ ] Saturday Delivery (Extra Charge, Express Only, Not available in all locations) [ ] Hold at Airborne [ ] Lab Pack

Declared Value [ ] or Full Insurance [ ] $ — Shipment Valuation

Service Type: One box must be checked with an "X". Assumed Express Service unless otherwise noted. Next Afternoon Shipments over 5 lbs will be charged at the Express rate. Next Afternoon delivery to Bold Red destinations only.

ABSENT A HIGHER SHIPMENT VALUATION, CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL.

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature ▶ | Date 1-22-98
Airborne Signature | Route No. | Date | Time

AIRBORNE EXPRESS

DCAA001254

AIRBORNE EXPRESS. ORIGINAL INVOICE

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN INQUIRING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 3/19/98 | 39908860 | | F4332322 | 4/03/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM M5E
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER ORIGIN / DEST SHIP DATE YOU OWE AS DESCRIPTION | CUSTOMER NUMBER SENDER SENT BY REFERENCE NUMBER ACCOUNTING CONTROL | CUSTOMER NUMBER RECEIVER ATTENTION RECEIVED BY ACCOUNTING CONTROL | REC AT # PCS WEIGHT CHG WGT SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 6292444443 PIE / DAL 3/10/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | COMMUNITY CORRECTIONS FED STE 306 4211 CEDAR SPRINGS RD DALLAS TX 75219 GINA MUSTAIN 214-767-... | DB 1 LX 52157/AF | NAS | 8.48 | 000 |
| ... P 3/12/98 SENDER | BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | BUREAU OF PRISONS- CONTRACTING CCC 320 FIRST ST NW ROOM 5006 WASHINGTON DC 20534 LEAH WILSON 202-307-3070 B LANCON | DB 1 LX 52157 | EXP | 9.45 | $18.40 000 $9.45 |

Preprint Format No. 6585036 Origin PIE Airbill Number 6292441746

FROM (Company) BANNUM
Street Address STE 126 1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594
CCC

TO (Company) BUREAU OF PRISONS - CONTRACTING
Street Address 320 FIRST ST. N.W. ROOM 5006
City WASHINGTON State D.C. ZIP CODE (Required) 20534
Attention (Name/Dept) LEAH WILSON Phone Number (important) 2023073070
Description

Method of Payment: [X] Bill Sender ▶ 39908860 Airborne Sender account no. / [ ] Bill Receiver ▶ Airborne Receiver account no. / [ ] Bill 3rd Party ▶ Airborne Customer account no. / [ ] Paid in Advance Check No. Amount $

Billing Reference will appear on invoice

Service Type: One box must be checked with an "X". Assumed Express Service unless otherwise noted. Next Afternoon: Shipments over 5 lbs will be charged at the Express rate. Next Afternoon delivery to Bus Reel destinations only.

No. of Pieces 1 Weight (lbs.) 1 CHECK IF [X] LETTER EXPRESS [ ] EXPRESS PACK

Special Instructions: [ ] Saturday Delivery Extra Charge Express Only Not available at all locations [ ] Hold at Airborne [ ] Lab Pack [ ]

Shipment Valuation: Declared Value [ ] or Full Insurance [ ] $

ABSENT A HIGHER SHIPMENT VALUATION, CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. SCAC-AIRB FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature [signature] Date 3-12-98
Airborne Signature Route No. Date Time
Received At [ ] Drop Box # [ ] Airborne Terminal

AIRBORNE EXPRESS. PO BOX 662, SEATTLE, WA 98111-0662 1-800-247-2676
www.airborne.com
SENDER'S COPY
WITHIN U.S. ONLY

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COP=COD FEE, SAT=SATURDAY DELIVERY
NAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
3/20/98
0000119 0000968

AIRBORNE EXPRESS. REV. 11/97 DD

DCAA001255

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 4/23/98 | 39908860 | | 62632873 | 5/08/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM M5E
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER ORIGIN / DEST SHIP DATE YOU OWE AS DESCRIPTION | CUSTOMER NUMBER SENDER SENT BY REFERENCE NUMBER ACCOUNTING CONTROL | CUSTOMER NUMBER RECEIVER ATTENTION RECEIVED BY ACCOUNTING CONTROL | REC AT # PCS WEIGHT CHG WGT SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 5614485624 PIE / CKB 4/17/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | BANNUM PLACE OF CLARKSBURG 260 MONTICELLO AVE CLARKSBURG WV 26301 BILL COBASKY 304-624-7634 A WELTY | DB 1 LX 52157/AF | NAS | 8.40 | 014 $8.40 |
| 5614485728 PIE / FLO 4/17/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | S C EMPLOYMENT SECURITY COMMISSION 1550 W EVANS ST FLORENCE SC 29501 803-669-4271 E MCKOY | DB 1 LX 52157/AF | NAS | 8.40 | 015 $8.40 |
| 5614413022 PIE / DCA 4/17/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | CCM CONTRACTING OFFICE BUREAU OF PRISIONS 320 FIRST ST N W WASHINGTON DC 20534 LEAH WILSON 202-307-3070 S DIXON | DB 1 LX 52157 | EXP | 9.45 | 000 $9.45 |

1 FROM (Company) BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594

2 TO (Company) CCM Contracting Office
Bureau of Prisons
Street Address 320 First Street N.W.
City Washington State D.C. ZIP CODE (Required) 20534
Attention: (Name/Dept) Leah Wilson Phone Number (Important) 202-307-3070
Description Letter

3 THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature [signature] Date 4-17-98
Airborne Signature Route No. Date Time

Preprint Format No. 65850360 Origin PIE Airbill Number 5614413022

4 Method of Payment — Assumed sender unless otherwise noted
[X] Bill Sender ▶ 39908860 Airborne Sender account no.
[ ] Bill Receiver ▶ Airborne Receiver account no.
[ ] Bill 3rd Party ▶ Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice

5 Service Type — One box must be checked with an "X". Assumed Express Service unless otherwise noted. [X]
Next Afternoon Shipments over 5 lbs will be charged at the Express rate. Next Afternoon delivery to Bold Red destinations only.

6 NO. OF PKGS 1 | 7 WEIGHT (LBS) 1 | 8 CHECK IF [X] LETTER EXPRESS [ ] EXPRESS PACK

Special Instructions
[ ] Saturday Delivery Extra Charge Express Only Not available in all locations
[ ] Hold at Airborne
[ ] Lab Pack
[ ]

Declared Value [ ] or Full Insurance [ ] Shipment Valuation $
Received At [ ] Drop Box # [ ] Airborne Terminal

ABSENT A HIGHER SHIPMENT VALUATION, CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. SCAC-ARB FED I.D. NO 91-0837469

AIRBORNE EXPRESS
PO BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

www.airborne.com
SENDER'S COPY

DCAA001256

AIRBORNE EXPRESS

# ORIGINAL INVOICE



| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 4/30/98 | 39908860 | | 64052624 | 5/15/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER / ORIGIN / DEST / SHIP DATE / YOU OWE AS / DESCRIPTION | CUSTOMER NUMBER SENDER / SENT BY / REFERENCE NUMBER / ACCOUNTING CONTROL | CUSTOMER NUMBER RECEIVER / ATTENTION / RECEIVED BY / ACCOUNTING CONTROL | REC AT / # PCS / WEIGHT / CHG WGT / SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 5614407422<br>PIE / DCA<br>4/24/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>DAVID A LOWRY 813-588-259<br>NONE | LEAH WILSON<br>CONTRACTING FED BUREAU PR<br>320 FIRST ST NW CCC<br>WASHINGTON<br>DC 20534<br>LEAH WILSON 202-307-3070<br>L PARKER | DB<br>1<br>LX<br>1R<br>52157 | EXP | 12.86 | 000<br>$12.86 |



| | | | | | | $8.40 |
|---|---|---|---|---|---|---|
| [redacted] | | | | | | |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
5/01/98

AIRBORNE EXPRESS
633TWR REV.11/97 DD

DCAA001257

AIRBORNE EXPRESS

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE |
|---|---|---|---|---|
| 5/07/98 | 39908860 | | 65534163 | 5/22/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM M5E
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER<br>ORIGIN / DEST<br>SHIP DATE<br>YOU OWE AS<br>DESCRIPTION | CUSTOMER NUMBER<br>SENDER<br>SENT BY<br>REFERENCE NUMBER<br>ACCOUNTING CONTROL | CUSTOMER NUMBER<br>RECEIVER<br>ATTENTION<br>RECEIVED BY<br>DELIVERY DATE/TIME<br>ACCOUNTING CONTROL | REC AT<br># PCS<br>WEIGHT<br>CHG WGT<br>SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 5614407621<br>PIE / CRW<br>4/27/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>DAVID A LOWRY 813-588-259<br>NONE | BANNUM INC<br>5904 MACCORKLE AVE S W<br>SAINT ALBANS<br>WV 25177<br>CATHY BELLEW 304-768-6625<br>C BELLEW RC<br>4/28/98 9:35 | DB<br>1<br>LX<br>52157 | EXP | 9.45 | $9.45 |
| 8580577633<br>MYR / ATL<br>4/28/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>BETSY WILLIAMS 845-676-80<br>NONE | FBOP<br>505 MCDONOUGH BLVD SE<br>ATLANTA<br>GA 30315<br>TANGIE PRICE<br>H LEDEZMA RC<br>4/29/98 10:13 | SD<br>1<br>2<br>52157/AF | NAS | 11.29 | $11.29 |
| 4421150882<br>PIE / LRD<br>4/29/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | ARMANDO LOPEZ<br>1905 HOUSTON ST<br>LAREDO<br>TX 78040<br>ARMANDO LOPEZ 956-726-072<br>A LOPEZ RC<br>4/30/98 11:20 | DB<br>1<br>LX<br>52157/AF | NAS | 8.40 | $8.40 |
| 4421150985<br>PIE / TUP<br>4/29/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BANNUM PLACE OF TUPELO<br>650 A&B CENTER<br>TUPELO<br>MS 38801<br>RAQUEK WELCH 601-411-7888<br>R WELCH RC<br>4/30/98 15:13 | DB<br>1<br>LX<br>52157/AF | NAS | 8.40 | $8.40 |
| 4421151081<br>PIE / JAN<br>4/29/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BANNUM PLACE OF JACKSON<br>1031 WHOLESALE ROW<br>JACKSON<br>MS 39201<br>CARROL BARBER 601-949-788<br>S MICHAEL RC<br>4/30/98 10:49 | DB<br>1<br>LX<br>52157/AF | NAS | 8.40 | $8.40 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKP=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NEXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS

AIRBORNE EXPRESS

DCAA001258

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT WAS DUE |
|---|---|---|---|---|
| 5/07/98 | 39908860 | | 65534163 | 5/22/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM M5E
STE 126
1301 SEMINOLE BLVD
LARGO

Prepaint Format No. 65850360 Origin PIE Airbill Number 4421151280

1 FROM (Company) BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594

2 Method of Payment
[X] Bill Sender ▶ 39908860 Airborne Sender account no. (Assumed sender unless otherwise noted)
[ ] Bill Receiver ▶ Airborne Receiver account no.
[ ] Bill 3rd Party ▶ Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice

3 Service Type — One box must be checked with an "X". Assumed Express Service unless otherwise noted.
[X] Express
[ ] Next Afternoon — Shipments over 5 lbs will be charged at the Express rate. Next Afternoon delivery to Bold Red destinations only.
[ ] Second Day Service

4 TO (Company) CCC Contracting
Street Address 320 First Street NW
City Washington State D.C. ZIP CODE (Required) 20534
Attention: (Name/Dept) Leah Wilson Phone Number (Important) 202-307-3070
Description

NO. OF PIECES 1 WEIGHT (LBS) 1
CHECK IF [X] LETTER EXPRESS [ ] EXPRESS PACK

Special Instructions
[ ] Saturday Delivery — Extra Charge, Express Only, Not available in all locations
[ ] Hold at Airborne
[ ] Lab Pack
[ ]

Shipment Valuation: Declared Value [ ] or Full Insurance [ ] $

ABSENT A HIGHER SHIPMENT VALUATION, CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. BCAC-AIRB FED I.D. NO. 91-0862490

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS

Sender's Signature ▶ Date
Airborne Signature Route No. Date Time
Received At [ ] Drop Box # [ ] Airborne Terminal

AIRBORNE EXPRESS. PO BOX 662, SEATTLE, WA 98111-0662 1-800-247-2676

SENDER'S COPY

http://www.airborne-express.com

| | | | | | |
|---|---|---|---|---|---|
| 4421... PIE / DCA 4/30/98 SENDER | ... M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | CCC CONTRACTING 320 FIRST ST NW WASHINGTON DC 20534 LEAH WILSON 202-307-3070 B LANCON MR 5/01/98 10:39 | DB 1 LX 52157 | EXP 9.45 | $11.29 $9.45 |
| 4421151383 PIE / TLH 4/30/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | DIVISION OF CO ANNUAL REPORTS FILING 409 EAST GAINES ST TALLAHASSEE FL 32399 NONE K WALKER RC 5/01/98 9:50 | DB 1 LX 52157 | EXP 9.45 | $9.45 |
| 4421151486 PIE / GSO 4/30/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | BRANNUM PL OF GREENSBORO 131 MANLEY AVE GREENSBORO NC 27404 DAVIS LINDEMAN 336-852-77 S LEWIS RC 5/01/98 7:49 | DB 1 LX 1R 52157 | EXP 12.86 | $12.86 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAD=NEXT AFTERNOON SRVC, SDD=2ND DAY SRVC
WGT CODES: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS

AIRBORNE EXPRESS.

DCAA001259

EXPRESS ORIGINAL INVOICE

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 5/14/98 | 39908860 | | G7026958 | 5/29/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM M5E
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER ORIGIN / DEST SHIP DATE YOU OWE AS DESCRIPTION | CUSTOMER NUMBER SENDER SENT BY REFERENCE NUMBER ACCOUNTING CONTROL | CUSTOMER NUMBER RECEIVER ATTENTION RECEIVED BY ACCOUNTING CONTROL | REC AT # PCS WEIGHT CHG WGT SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 9575104545 RDU / PIE 5/07/98 RECEIVER | 37274210 BANNUM PLACE 952 BRAGG BLVD FAYETTEVILLE NC 28301 DON CAUGHLIN 910-484-6442 NONE | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 ANNIE/DEBBIE 813-588-2594 V WOODRIDGE | SD 1 LX 52157/AF | NAS | 8.40 | 009 — $8.40 |
| SUBTOTAL SENDER CUSTOMER NO.: 37274210 | | NO. SHIPMENTS: 2 | | | 16.80 | |
| 4421152783 PIE / DCA 5/01/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | CCC CONTRACTING FEDERAL BUREAU OF PRISONS 320 FIRST ST WASHINGTON DC 20536 LEAH WILSON S DIXON | DB 1 LX 52157 | EXP | 9.45 | 000 $9.45 |
| 4421152982 PIE / JAN 5/01/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | BANNUM PLACE OF JACKSON 1031 WHOLESALE ROW JACKSON MS 39209 NONE L ALEXANDER | DB 1 LX 52157 | EXP | 9.45 | 014 — $9.45 |
| 4421153085 PIE / TUP 5/01/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | BANNUM PL OF TUPELO 630 A & D CENTER TUPELO MS 38801 NONE M FOX | DB 1 LX 52157 | EXP | 9.45 | 012 $9.45 |
| 4421153881 PIE / SDF 5/01/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | A G EDWARDS STE 110 101 BULLITT LN LOUISVILLE KY 40222 JOHN WINGFIELD 502-426-15 B COOPER | DB 1 LX 52157 | EXP | 9.45 | 000 — $9.45 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
5/15/98

0000536 0032768

AIRBORNE EXPRESS

DCAA001260

EXPRESS

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 5/14/98 | 39908860 | | G7026950 | 5/29/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER<br>ORIGIN / DEST<br>SHIP DATE<br>YOU OWE AS<br>DESCRIPTION | CUSTOMER NUMBER<br>SENDER<br>SENT BY<br>REFERENCE NUMBER<br>ACCOUNTING CONTROL | CUSTOMER NUMBER<br>RECEIVER<br>ATTENTION<br>RECEIVED BY<br>ACCOUNTING CONTROL | REC AT<br># PCS<br>WEIGHT<br>CHG WGT<br>SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 4421155082<br>PIE / ATL<br>5/04/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | ATLANTA MANAGEMENT CTR<br>FEDERAL BUREAU OF PRISONS<br>505 MCDONOUGH BLVB S E<br>ATLANTA<br>GA 30315<br>NONE<br>C STURDIVANT | DB<br>1<br>LX<br>52157 | EXP | 9.45 | $9.45 |
| 4421152282<br>PIE / FAY<br>5/05/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>DAVID LOWRY 813-588-2594<br>NONE | AD WINTERS<br>115 EAST RUSSELL STREET<br>FAYETTEVILLE<br>NC 28301<br>910-433-4433<br>J.CYRUS | DB<br>1<br>1<br>4R<br>52157 | EXP | 17.33 | $17.33 |
| 4421152584<br>PIE / MMR<br>5/05/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | ARMANDO MAURY<br>8855 COLLINS AVE APT 707<br>SURFSIDE<br>FL 33154<br>305-975-0318<br>LD FD | DB<br>1<br>LX<br>52157 | EXP | 9.45 | $9.45 |
| 4421152680<br>PIE / MGM<br>5/05/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | FEDERAL BUREAU OF PRISONE<br>15 LEE STREET ROOM B-18<br>MONTGOMERY<br>AL 36104<br>VIVIAN 334-223-7464<br>V WHITE | DB<br>1<br>LX<br>1R<br>52157 | EXP | 12.86 | $12.86 |
| 4421155185<br>PIE / RLE<br>5/05/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | FEDERAL BUREAU OF PRISONS<br>310 NEW BERN AVE ROOM 303<br>RALEIGH<br>NC 27601<br>KELLY MEYERS 910-856-4548<br>E BURKE | DB<br>1<br>LX<br>52157 | EXP | 9.45 | $9.45 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NXT AFTERNOON SRVC, SBS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
5/15/98

0008536 0032770

AIRBORNE EXPRESS

DCAA001261

FROM (Company) BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594

TO (Company) ATLANTA MANAGEMENT CENTER
Street Address FEDERAL BUREAU OF PRISONS
505 MCDONOUGH BLVD S.E.
City ATLAN State GA ZIP CODE (Required) 30315
Attention: (Name/Dept) Phone Number (Important)
Description

Preprint Format No. 65850360 Origin PIE Airbill Number 4421155082
Method of Payment: [X] Bill Sender — 39908860 Airborne Sender account no.
[ ] Bill Receiver — Airborne Receiver account no.
[ ] Bill 3rd Party — Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice

Service Type: XX

No. of Pkgs 1 Weight (LBS) 1 Check if [X] Letter Express [ ] Express Pack
Special Instructions: [ ] Saturday Delivery [ ] Hold at Airborne [ ] Lab Pack
Declared Value [ ] or [ ] Full Insurance Shipment Valuation $
Received At [ ] Drop Box # [ ] Airborne Terminal

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature Date
Airborne Signature Route No. Date Time

AIRBORNE EXPRESS
PO BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

http://www.airborne-express.com SENDER'S COPY

| | | | | | |
|---|---|---|---|---|---|
| 9575104545<br>RDU / PIE<br>5/07/98<br>RECEIVER | 37274210<br>BANNUM PLACE<br>952 BRAGG BLVD<br>FAYETTEVILLE<br>NC 28301<br>DON CAUGHLIN 910-484-6442<br>NONE | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>ANNIE/DEBBIE 813-588-2594<br>V WOODRIDGE RC<br>5/08/98 9:33 | SD<br>1<br>LX<br>52157/AF | NAS 8.40 | $8.40 |

TOTAL SENDER CUSTOMER NO.: 37274210 NO. SHIPMENTS: 2 16.80

| | | | | | |
|---|---|---|---|---|---|
| 4421152783<br>PIE / DCA<br>5/01/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | CCC CONTRACTING<br>FEDERAL BUREAU OF PRISONS<br>320 FIRST ST<br>WASHINGTON<br>DC 20536<br>LEAH WILSON<br>S DIXON MR<br>5/04/98 10:50 | DB<br>1<br>LX<br>52157 | EXP 9.45 | $9.45 |

FROM (Company) BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-586-2594

TO (Company) Federal Bureau Of Prisons
Street Address Community Programs Office
15 Lee Street, Room B-18
City Montgomery, AL ZIP CODE (Required) 36104
Attention: (Name/Dept) Vivian Phone Number (Important) 334-223-7464
Description

Preprint Format No. 65850360 Origin PIE Airbill Number 4421152680
Method of Payment: [X] Bill Sender — 39908860 Airborne Sender account no.
[ ] Bill Receiver — Airborne Receiver account no.
[ ] Bill 3rd Party — Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice

No. of Pkgs 1 Weight (LBS) 1 Check if [X] Letter Express [ ] Express Pack
Special Instructions: [ ] Saturday Delivery [ ] Hold at Airborne [ ] Lab Pack
Declared Value [ ] or [ ] Full Insurance Shipment Valuation $
Received At [ ] Drop Box # [ ] Airborne Terminal

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature V Woodridge Date 5-5-98
Airborne Signature Route No. Date Time

AIRBORNE EXPRESS
PO BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

SENDER'S COPY

DCAA001262

Case 1:01-cv-00639-CFL Document 189-21 Filed 10/12/2007 Page 19 of 49

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING ---> | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 5/14/98 | 39908860 | | 67026950 | 5/29/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER<br>ORIGIN / DEST<br>SHIP DATE<br>YOU OWE AS<br>DESCRIPTION | CUSTOMER NUMBER<br>SENDER<br>SENT BY<br>REFERENCE NUMBER<br>ACCOUNTING CONTROL | CUSTOMER NUMBER<br>RECEIVER<br>ATTENTION<br>RECEIVED BY<br>ACCOUNTING CONTROL | REC AT<br># PCS<br>WEIGHT<br>CHG WGT<br>SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 4421174785<br>PIE / MGM<br>5/06/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | FEDERAL BUREAU OF PRISONS<br>COMMUNITY PROGRAMS OFFICE<br>15 LEE ST RM B-18<br>MONTGOMERY<br>AL 36104<br>LARRY SPENCER | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 000<br>$9.45 |
| 4421175080<br>PIE / HOT<br>5/06/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | FEDERAL BUREAU OF PRISONS<br>COMMUNITY CORRECTIONS OFF<br>515 RUSK ROOM 12024<br>HOUSTON<br>TX 77002<br>CYNTHIA RICHARDS 713-718-<br>C RICHARD | DB<br>1<br>LX<br>52157/AF | NAS | 8.40 | 000<br>$8.40 |
| 4421175286<br>PIE / DCA<br>5/06/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>DAVID LOWRY 813-588-2594<br>NONE | US DEPT OF JUSTICE<br>FEDERAL BUREAU OF PRISONS<br>320 FIRST ST NW<br>WASHINGTON<br>DC 20534<br>LEAH WILSON<br>L PARKER | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 000<br>$9.45 |
| 4421175382<br>PIE / JAN<br>5/06/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>DAVID LOWRY 813-588-2594<br>NONE | BANNUM PLACE OF JACKSON<br>1031 WHOLESALE ROW<br>JACKSON<br>MS 39209<br>CAROL BARBER 601-960-1901<br>C BARBER | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 014<br>$9.45 |
| 4421175485<br>PIE / ATL<br>5/06/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | ATLANTA MANAGEMENT CTR<br>FEDERAL BUREAU FO PRISONS<br>505 MCDONOUGH BLVD S E<br>ATLANTA<br>GA 30315<br>KAREN JAMES 404-624-8141<br>K JAMES | DB<br>1<br>LX<br>52157/AF | NAS | 8.40 | 000<br>$8.40 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
5/15/98

0000536 0032773

AIRBORNE EXPRESS

DCAA001263

FROM
BANNUM
Street Address STE 125
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594
TO (Company) Federal Bureau of Prisons Community Programs office
Street Address 15 Lee Street Rm B-18
City Montgomery State AL ZIP CODE (Required) 36104
Attention: (Name/Dept) Larry Spencer Phone Number (Important)
Description Letter
THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature Y Wooldridge Date 5-6-98
Airborne Signature Route No. Date Time
http://www.airborne-express.com

Preprint Format No. 65850360 Origin PIE Airbill Number 442[illegible]74785
Method of Payment: [X] Bill Sender ▶ 39908860 (Assumed sender unless otherwise noted; Airborne Sender account no.)
[ ] Bill Receiver ▶ Airborne Receiver account no.
[ ] Bill 3rd Party ▶ Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice
No. of PKGS 1 Weight (LBS.) 1 Check if [X] Letter Express [ ] Express Pack
Special Instructions: [ ] Saturday Delivery Extra Charge Express Only Not available in all locations [ ] Hold at Airborne [ ] Lab Pack [ ]
Declared Value [ ] or Full Insurance [ ] Shipment Valuation $
Received At [ ] Drop Box # [ ] Airborne Terminal
SENDER'S COPY
Service Type: One box must be checked with an "X". Assumed Express Service unless otherwise noted. Next Afternoon Shipments over 5 lbs will be charged at the Express rate. Next Afternoon delivery to Gold Rod destinations only.
ABSENT A HIGHER SHIPMENT VALUATION, CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. SCAC-AIRB FED I.D. NO. 91-0837469
AIRBORNE EXPRESS
PO BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

---

FROM (Company)
BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
(Name/Dept) DAVID LOWRY Phone Number 813-588-2594
TO (Company) US Department of Justice Federal Bureau of Prisons
Street Address 320 First Street, NW
City Washington State DC ZIP CODE (Required) 20534
Attention: (Name/Dept) Sarah Wilson Phone Number (Important)
Description Letter
THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature [signature] Date 5-6-98
Airborne Signature Route No. Date Time
www.airborne-express.com

Preprint Format No. 65850360 Origin PIE Airbill Number 4421175286
Method of Payment: [X] Bill Sender ▶ 39908860 (Assumed sender unless otherwise noted; Airborne Sender account no.)
[ ] Bill Receiver ▶ Airborne Receiver account no.
[ ] Bill 3rd Party ▶ Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice
No. of PKGS 1 Weight (LBS.) 1 Check if [X] Letter Express [ ] Express Pack
Special Instructions: [ ] Saturday Delivery Extra Charge Express Only Not available in all locations [ ] Hold at Airborne [ ] Lab Pack [ ]
Declared Value [ ] or Full Insurance [ ] Shipment Valuation $
Received At [ ] Drop Box # [ ] Airborne Terminal
SENDER'S COPY
Service Type: [X]
ABSENT A HIGHER SHIPMENT VALUATION, CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. SCAC-AIRB FED I.D. NO. 91-0837469
AIRBORNE EXPRESS
PO BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

---

FROM (Company) BANNUM
Street Address STE 125
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594
TO (Company) Atlanta Management Center Federal Bureau of Prisons
Street Address 505 McDonough Blvd. S.E.
City Atlanta State Ga ZIP CODE (Required) 30315
Attention: (Name/Dept) Karen James Phone Number (Important) 404-624-8141
Description 1034- Bannum Place of 'Florence
Date 5/6/98
Preprint Format No. 65850360 Origin PIE Airbill Number 4421175485
Method of Payment: [X] Bill Sender ▶ 39908860
No. of PKGS 1 Weight 1 Check if [X] Letter Express
Service Type: [X]
FOR SHIPMENTS WITHIN U.S. ONLY
PLEASE TYPE OR PRINT
AIRBORNE EXPRESS

DCAA001264

AIRBORNE EXPRESS

# CORRECTED INVOICE



| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT WAS DUE |
|---|---|---|---|---|
| 5/21/98 | 39908860 | | G8512906 | 6/05/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUN MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER<br>ORIGIN / DEST<br>SHIP DATE<br>YOU OWE AS<br>DESCRIPTION | CUSTOMER NUMBER<br>SENDER<br><br>SENT BY<br>REFERENCE NUMBER<br><br>ACCOUNTING CONTROL | CUSTOMER NUMBER<br>RECEIVER<br><br>ATTENTION<br>RECEIVED BY<br>DELIVERY DATE/TIME<br>ACCOUNTING CONTROL | REC AT<br># PCS<br>WEIGHT<br>CHG WGT<br>SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 4421173481<br>PIE / HOT<br>5/07/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE<br>600 | FEDERAL BUREAU OF PRISONS<br>COMMUNITY CORRECTIONS OFF<br>515 RUSK ROOM 12024<br>HOUSTON<br>TX 77002<br>CYNTHISA RICHARDS 713-718<br>C RICHARD RC<br>5/08/98 11:25 | DB<br>1<br>LX<br>1R<br>52157 | EXP | 12.86 | |
| | | ADJUSTMENT | 6/11/98 | | 3.41CR | $9.45 |
| 4421173584<br>PIE / MGM<br>5/07/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE<br>600 | COMMUNITY PROGRAMS OFICE<br>FED BUREAU OF PRISIONS<br>15 LEE ST ROOM B-18<br>MONTGOMERY<br>AL 36104<br>VIVIAN 334-223-7464<br>Y WHITE RC<br>5/08/98 10:47 | DB<br>1<br>LX<br>1R<br>52157 | EXP | 12.86 | |
| | | ADJUSTMENT | 6/11/98 | | 3.41CR | $9.45 |
| 8580575835<br>MYR / ATL<br>5/08/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>BETSY WILLIAMS 843-676-00<br>NONE<br>600 | COMMUNITY CORRECTIONS<br>MANAGEMENT CTR<br>585 MCDONOUGH BLVD SE<br>ATLANTA<br>GA 30315<br>JERRY PEARSON CCM<br>C STURDVANT DR<br>5/11/98 10:59 | SD<br>1<br>LX<br><br>52157 | EXP<br>SAT | 9.45<br>10.00 | |
| | | ADJUSTMENT | 6/11/98 | | 10.00CR | $9.45 |
| 4421155583<br>PIE / LAS<br>5/11/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE<br>018 | JON LOWRY<br>APT-2030<br>8101 W FLAMINGO<br>LAS VEGAS<br>NV 89117<br>JON LOWRY<br>FB RD<br>5/12/98 11:44 | DB<br>1<br>LX<br><br>52157/AF | NAS | 8.40 | $8.40 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NOT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS

4/25/98 YJNM

0000076 0002996

AIRBORNE EXPRESS

DCAA001265

AIRBORNE EXPRESS

# ORIGINAL INVOICE



| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING ---> | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 5/28/98 | 39908860 | | G9927072 | 6/12/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM M5E
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER ORIGIN / DEST SHIP DATE | CUSTOMER NUMBER SENDER | CUSTOMER NUMBER RECEIVER | REC AT # PCS | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|

FROM (Company) BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) David Lowry Phone Number 813-588-2594
TO (Company) U.S. Department of Justice
Street Address 320 First Street NW
City Washington State DC ZIP CODE (Required) 20534
Attention (Name/Dept) Leah Wilson Phone Number (Important)
Description letter

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature Vara Wooldridge Date 5-20-98
Airborne Signature Route No. Date Time

Preprint Format No. 65850360 Origin PIE Airbill Number 4421157381

Method of Payment — Assumed sender unless otherwise noted
[X] Bill Sender ▶ 39908860 Airborne Sender account no.
[ ] Bill Receiver ▶ Airborne Receiver account no.
[ ] Bill 3rd Party ▶ Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice

Service Type — One box must be checked with an "X". Assumed Express Service unless otherwise noted. [X]
Next Afternoon Shipments over 5 lbs will be charged at the Express rate.
Next Afternoon delivery to Gold Pool destinations only.
Second Day Service

NO. OF PKGS 1 WEIGHT (LBS) 1 CHECK IF [X] LETTER EXPRESS [ ] EXPRESS PACK

Special Instructions
[ ] Saturday Delivery Extra Charge Express Only Not available in all locations
[ ] Hold at Airborne
[ ] Lab Pack
[ ]

ABSENT A HIGHER SHIPMENT VALUATION, CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. SCAC-AIRB FED I.D. NO. 91-0837469

Declared Value [ ] or Full Insurance [ ] Shipment Valuation $
Received At [ ] Drop Box # [ ] Airborne Terminal

AIRBORNE EXPRESS
PO BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

http://www.airborne-express.com SENDER'S COPY

$9.45

| AIRBILL NUMBER ORIGIN / DEST SHIP DATE | CUSTOMER NUMBER SENDER | CUSTOMER NUMBER RECEIVER | REC AT # PCS | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 4421157381<br>PIE / DCA<br>5/20/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>DAVID LOWRY 813-588-2594<br>NONE | U S DEPARTMENT OF JUSTICE<br>320 FIRST STREET N W<br>WASHINGTON<br>DC 20534<br>LEAH WILSON<br>B LANCON | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 0.00<br>$9.45 |
| 4421157404<br>PIE / CRW<br>5/20/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BANNUM PLACE OF<br>CHARLESTON<br>5904 MACCORKLE AVE S W<br>SAINT ALBANS<br>WV 25177<br>CATHY BELLEW<br>M ASHFORD | DB<br>1<br>LX<br>52157/AF | NAS | 8.40 | 0.11<br>$8.40 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NEXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
5/29/98

AIRBORNE EXPRESS

DCAA001266

EXPRESS

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING ---> | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 6/04/98 | 39908860 | | H2342572 | 6/19/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM M5E
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER<br>ORIGIN / DEST<br>SHIP DATE<br>YOU OWE AS<br>DESCRIPTION | CUSTOMER NUMBER<br>SENDER<br>SENT BY<br>REFERENCE NUMBER<br>ACCOUNTING CONTROL | CUSTOMER NUMBER<br>RECEIVER<br>ATTENTION<br>RECEIVED BY<br>ACCOUNTING CONTROL | REC AT<br># PCS<br>WEIGHT<br>CHG WGT<br>SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 8580576130<br>MYR / ATL<br>5/22/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>BETSY WILLIAMS -676-0037<br>NONE | COMMUNITY CORRECTIONS<br>OFFICE<br>505 MCDONOUGH BLVD SE<br>ATLANTA<br>GA 30315<br>JERRY PEARSON 404-624-814<br>W BRONSON | SD<br>1<br>LX<br>52157/AF | NAS | 8.40 | 000<br>$8.40 X |
| 4421170983<br>CRP / LAS<br>5/26/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | WALKER FURNITURE<br>LUTHER KING BLVD<br>301 SOUTH MARTIN<br>LAS VEGAS<br>NV 89106<br>TODD BINDER<br>T HALL | SD<br>1<br>LX<br>52157 | EXP | 9.45 | 000<br>$9.45 |
| 4421158383<br>PIE / BPT<br>5/27/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | V & M CATERING<br>ROUTE 1 BOX 526<br>SILSBEE<br>TX 77656<br>409-386-0211<br>LD-BD | DB<br>1<br>LX<br>52157/AF | NAS | 8.40 | 000<br>$8.40 |
| 4421170482<br>PIE / RNO<br>5/27/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | DAVID KEEVER/BANNUM OF<br>RENO<br>245 GENTRY WAY<br>RENO<br>NV 89502<br>WAYNE MCMERAK 702-829-758<br>M WILLIAMS | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 018<br>$9.45 |
| 4421170283<br>PIE / LAS<br>5/28/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | JONATHAN LOWRY APT-2030<br>8101 WEST FLAMIGO<br>LAS VEGAS<br>NV 89117<br>702-220-7738<br>FD | DB<br>1<br>LX<br>52157/AF | NAS | 8.40 | 000<br>$8.40 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COD=COD FEE, SAT=SATURDAY DELIVERY
NAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
6/05/98
0000093 0000738

AIRBORNE EXPRESS
ESSTWR REV. 11/97 CD

EXPRESS

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | DUE DATE |
|---|---|---|---|---|
| 6/04/98 | 39908860 | | H2342572 | 6/19/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER / ORIGIN / DEST / SHIP DATE / YOU OWE AS / DESCRIPTION | CUSTOMER NUMBER / SENDER / SENT BY / REFERENCE NUMBER / ACCOUNTING CONTROL | CUSTOMER NUMBER / RECEIVER / ATTENTION / RECEIVED BY / ACCOUNTING CONTROL | REC AT / # PCS / WEIGHT / CHG WGT / SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 4421170386<br>PIE / BWG<br>5/28/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | PATTI SCHULTZ<br>388 YELLOW BUCKEYE LANE<br>GLASGOW<br>KY 42142<br>502-646-3720<br>LD FD | DB<br>1<br>LX<br>52157/AF | MAS | 8.40 | 000<br>$8.40 |
| 4421170804<br>PIE / DCA<br>5/29/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BUREAU OF PRISONS-DOS<br>CCC CONTRACTING<br>320 FIRST ST NW<br>WASHINGTON<br>DC 20534<br>LEAN WILSON 202-307-3070<br>L PARKER | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 000<br>$9.45 |
| 4421171886<br>PIE / TLH<br>5/29/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | HILAR SKAGFIELD<br>270 CROSSWAY RD<br>TALLAHASSEE<br>FL 32310<br>850-878-1144<br>V CARROLL | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 000<br>$9.45 |
| SUBTOTAL SENDER CUSTOMER NO.: 39908860 | | NO. SHIPMENTS: 8 | | | 71.40 | |
| 6656692324<br>MGM / PIE<br>5/22/98<br>3RD PARTY | 42159326<br>BANNUM PLACE<br>540 SAYRE ST<br>MONTGOMERY<br>AL 36104<br>JACQUELYN B 334-262-0227<br>NONE | BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>ANN 813-588-2594<br>A HAMBSCH | SD<br>1<br>LX<br>52157/AF | MAS | 8.40 | 008<br>$8.40 |
| SUBTOTAL SENDER CUSTOMER NO.: 42159326 | | NO. SHIPMENTS: 1 | | | 8.40 | |
| 2679681130<br>CRW / PIE<br>5/26/98<br>3RD PARTY | 44534208<br>BANNUM CHARLESTON<br>5904 MACCORKLE AVE<br>SAINT ALBANS<br>WV 25177<br>CATHY BELLEW 304-768-6625<br>NONE | BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>M LOWRY 813-588-2594<br>S WOOLDRIDGE | SD<br>1<br>2<br>1R<br>52157/AF | MAS | 9.98 | 011<br>$9.98 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
MAS=NEXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
6/05/98
0000093 0000739

AIRBORNE EXPRESS

CUSTOM REV. 11/97 DD

DCAA001268

AIRBORNE EXPRESS

ORIGINAL INVOICE

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 6/11/98 | 39908860 | | H3719874 | 6/26/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER<br>ORIGIN / DEST<br>SHIP DATE<br>YOU OWE AS<br>DESCRIPTION | CUSTOMER NUMBER<br>SENDER<br>SENT BY<br>REFERENCE NUMBER<br>ACCOUNTING CONTROL | CUSTOMER NUMBER<br>RECEIVER<br>ATTENTION<br>RECEIVED BY<br>ACCOUNTING CONTROL | REC AT<br># PCS<br>WEIGHT<br>CHG WGT<br>SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 4421169885<br>PIE / FLO<br>6/01/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BANNUM PL OF FLORENCE<br>1219 WEST EVANS ST<br>FLORENCE<br>SC 29503<br>BETH WILLIAMS 803-676-803<br>D MCELVEEN | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 015<br>$9.45 |
| 4421169981<br>PIE / GSO<br>6/01/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BANNUM PLACE OF<br>GREENSBORO<br>131 MANLEY AVE<br>GREENSBORO<br>NC 27404<br>DAVID LINDEMAN 336-852-77<br>D COFER<br>ADDITIONAL SHIPMENT INFORMATION:<br>OTH-LAB PACK HANDLING CHARGE | DB<br>1<br>LX<br>52157 | EXP<br>OTH | 9.45<br>.75 | 013<br>$10.20 |
| 4421170585<br>PIE / BPT<br>6/01/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BANNUM PLACE OF BEAUMONT<br>STE A<br>1310 PENNSYLVANIA AVE<br>BEAUMONT<br>TX 77701<br>MICHAEL CHLOSTA 409-835-7<br>L BERNARD | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 004<br>$9.45 |
| 4421170681<br>PIE / CRW<br>6/01/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | BANNUM PL OF CHARLESTON<br>5904 MAC CORKLE AVE SW<br>SAINT ALBANS<br>WV 25177<br>MICHAEL HATFIELD 304-768-<br>S HATFIELD | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 011<br>$9.45 |
| 8580575334<br>MYR / ATL<br>6/01/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>DEMETRIA 846-676-0037<br>NONE | COMMUNITY CORRECTIONS<br>OFFICE<br>505 MCDONOUGH BLVD S<br>ATLANTA<br>GA 30315<br>DIANE EASTER 404-624-8144<br>K JAMES | SB<br>1<br>LX<br>52157/AF | NAS | 8.40 | 000<br>$8.40 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
6/12/98

0008515 0030686

AIRBORNE EXPRESS

DCAA001269

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
| --- | --- | --- | --- | --- |
| 6/11/98 | 39908860 | | H3719074 | 6/26/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER / ORIGIN / DEST / SHIP DATE / YOU OWE AS / DESCRIPTION | CUSTOMER NUMBER / SENDER / SENT BY / REFERENCE NUMBER / ACCOUNTING CONTROL | CUSTOMER NUMBER / RECEIVER / ATTENTION / RECEIVED BY / ACCOUNTING CONTROL | REC AT / # PCS / WEIGHT / CHG WGT / SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
| --- | --- | --- | --- | --- | --- | --- |
| 4421168604 PIE / SAV 6/02/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 DAVID A LOWRY 813-588-259 NONE | BANNUM PLACE OF SAVANNAH 804 L P OWENS DR BLVD1010 GARDEN CITY GA 31408 KAREN BELL 912-963-0121 T FORCINE | DB 1 LX 52157 | EXP | 9.45 | 010 $9.45 |
| 8580575430 MYR / ATL 6/02/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 BETSY WILLIAMS 843-676-60 NONE | COMMUNITY CORRECTIONS OFFICE 305 MCDONOUGH BLVD SE ATLANTA GA 30315 DIANE EASTER 404-624-8144 T PRICE | SD 1 LX 52157/AF | NAS | 8.40 | 000 $8.40 |
| 4421158980 PIE / CKB 6/03/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 CARRIE CLOPTON 813-588-25 NONE | BANNUM PLACE OF CLARKSBURG 260 MONTICELLO AVE CLARKSBURG WV 26301 BILL 304-624-7634 B COBOSKY | DB 1 LX 52157/AF | NAS | 8.40 | 016 $8.40 |
| 4421159186 PIE / GSO 6/03/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 CATHY BELLER 813-588-2594 NONE | BANNUM PLACE OF GREENSBORO 131 MANLEY AVE GREENSBORO NC 27404 LINDEMAN 336-852-7700 B COFER | DB 1 LX 52157/AF | NAS | 8.40 | 013 $8.40 |
| 4421159282 PIE / TLH 6/03/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 CARRIE CLOPTON 813-588-25 NONE | CREATIVE RESIDENTIAL 203 N GADSDEN ST STE 2-B TALLAHASSEE FL 32301 904-204-7526 J WYNN | DB 1 LX 52157 | EXP | 9.45 | 000 $9.45 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COD=COD FEE, SAT=SATURDAY DELIVERY
NAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SEAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
6/12/98
0000515 0030688

AIRBORNE EXPRESS

EXPRESS

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 6/11/98 | 39908860 | | H3719074 | 6/26/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER ORIGIN / DEST SHIP DATE YOU ONE AS DESCRIPTION | CUSTOMER NUMBER SENDER SENT BY REFERENCE NUMBER ACCOUNTING CONTROL | CUSTOMER NUMBER RECEIVER ATTENTION RECEIVED BY ACCOUNTING CONTROL | REC AT # PCS WEIGHT CHG WGT SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 4421160380 PIE / MGM 6/04/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 CATHY BELLEW 813-588-2594 NONE | BAN PLACE OF MONTGOMERY 540 SAYRE ST MONTGOMERY AL 36101 DAVIS 334-262-0227 J BELL | DB 1 LX 52157/AF | NAS | 8.40 | 008 $8.40 |
| 4421160483 PIE / MGM 6/04/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 CATHY BELLEW 813-588-2594 NONE | COMMUNITY PROGRAMS OFFICE PROGRAMS OFFICE 15 LEE ST ROOM B-18 MONTGOMERY AL 36104 SPENCER CLM 334-223-7464 V WHITE | DB 1 LX 52157/AF | NAS | 8.40 | 000 $8.40 |
| 4421160586 PIE / SAV 6/04/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 CATHY BELLEW 813-588-2594 NONE | KAREN BELL DIRECTOR BLDG #1010 804 L F OWENS DR GARDEN CITY GA 31408 KAREN BELL 912-563-0032 K BELL | DB 1 LX 52157 | EXP | 9.45 | 010 $9.45 |
| 8262884781 PIE / ACT 6/04/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 PATTI 813-588-2594 NONE | PATSY MERCER 708 CRAIG HILLSBORO TX 76645 PATSY 254-582-9920 LB FD | DB 1 1 52157/AF | NAS | 9.98 | 000 $9.98 |
| 4421160682 PIE / DCA 6/05/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 CARRIE CLOPTON 813-588-25 NONE | CCC CONTRACTING FEDERAL BUREAU OF PRISONS 320 FIRST ST NW WASHINGTON DC 20534 LEATT WILSON L PARKER | DB 1 LX 52157 | EXP | 9.45 | 000 $9.45 |

SUBTOTAL SENDER CUSTOMER NO.: 39908860 NO. SHIPMENTS: 40 340.13

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NEXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
6/12/98
0000515 0030691

AIRBORNE EXPRESS

DCAA001271

AIRBORNE EXPRESS

ORIGINAL INVOICE

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 6/18/98 | 39908860 | | H5222906 | 7/03/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER ORIGIN / DEST SHIP DATE YOU ONE AS DESCRIPTION | CUSTOMER NUMBER SENDER SENT BY REFERENCE NUMBER ACCOUNTING CONTROL | CUSTOMER NUMBER RECEIVER ATTENTION RECEIVED BY ACCOUNTING CONTROL | REC AT # PCS WEIGHT CHG WGT SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 4421165582<br>PIE / MGM<br>6/09/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | FEDERAL BUREAU OF<br>PRISONS COMMUNITY PROGRAM<br>15 LEE ST RM B-18<br>MONTGOMERY<br>AL 36104<br>VIVIAN 334-223-7464<br>V WHITE | DB<br>1<br>LX<br>1R<br>52157 | EXP | 12.86 | 000<br>$12.86 |
| 4421165781<br>PIE / ATL<br>6/09/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | ATLANTA MANAGEMENT<br>CENTERS FEDERAL BUREAU OF<br>585 MC DONOUGH BLVD S E<br>ATLANTA<br>GA 30315<br>KAREN JAMES 404-624-8141<br>KK JAMES | DB<br>1<br>LX<br>1R<br>52157 | EXP | 12.86 | 000<br>$12.86 |
| 4421167380<br>PIE / RLE<br>6/09/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | COMMUNITY CORRECTIONS<br>OFFICE FEDERAL BUREAD OF<br>310 NEW BERN AVE ROOM 303<br>RALEIGH<br>NC 27601<br>LARRY JONES 910-856-4548<br>E BURKE | DB<br>1<br>LX<br>1R<br>52157 | EXP | 12.86 | 000<br>$12.86 |
| 4421165804<br>PIE / HOT<br>6/10/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | COMMUNITY CORRECTIONS<br>OFFICE FEDERAL BUREAU OF<br>515 RUSK ROOM 12024<br>HOUSTON<br>TX 77002<br>CYNTHIA RICHARDS 713-718-<br>C RICHARD | DB<br>1<br>LX<br>52157 | EXP | 9.45 | 000<br>$9.45 |
| 4421166186<br>PIE / DCA<br>6/10/98<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | CCC CONTRACTING<br>FEDERAL BUREAU OF PRISONS<br>320 FIRST ST NW<br>WASHINGTON<br>DC 20534<br>LEAH WILSON 202-307-3070<br>B LANCON<br>ADDITIONAL SHIPMENT INFORMATION:<br>DIMENSION: 1 24X 18X 18 | SD<br>1<br>1<br>41 D<br>52157 | EXP | 61.95 | 000<br>$61.95 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
HAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
6/19/98

AIRBORNE EXPRESS

DCAA001272

AIRBORNE EXPRESS — ORIGINAL INVOICE

| INVOICE DATE | CUSTOMER NUMBER |
|---|---|
| 7/09/98 | 39908860 |

REFER TO THIS NUMBER WHEN REMITTING

| INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|
| H9572253 | 7/24/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM M5E
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER ORIGIN / DEST SHIP DATE YOU OWE AS DESCRIPTION | CUSTOMER NUMBER SENDER SENT BY REFERENCE NUMBER ACCOUNTING CONTROL | CUSTOMER NUMBER RECEIVER ATTENTION RECEIVED BY ACCOUNTING CONTROL | REC AT # PCS WEIGHT CHG WGT SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 4421163983 BNA / PIE 6/29/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 ARNIE 813-588-2594 NONE (006 ✓) | BANRIUM 1301 SEMINSLE BLVD # 126 LARGO FL 34640 ARNIE 813-588-2594 O VEBEEDING | SD 1 LX 52157 | EXP | 9.45 | $9.45 |
| 6901000175 PIE / DCA 6/30/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE (006 ✓) | U S DEPARTMENT OF JUSTICE FEDERAL BUREAU OF PRISONS 320 FIRST ST NW WASHINGTON DC 20534 LEAH WILSON 202-307-3070 A COLES | SD 1 LX 1R 52157 | EXP | 12.86 | $12.86 |

FOR SHIPMENTS WITHIN U.S. ONLY — PLEASE TYPE OR PRINT

FROM (Company) BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594

TO (Company) U.S. Department of Justice
Federal Bureau of Prisons
Street Address 320 First Street, NW
City Washington State DC ZIP CODE (Required) 20534
Attention: (Name/Dept) Leah Wilson Phone Number (Important) (202) 307-3070
Description letter

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature Olivia Hebeeling Date 6/30/98
Airborne Signature Route No. Date Time

Preprint Format No. 65850360 Origin PIE Airbill Number 6901000175

Method of Payment — Assumed sender unless otherwise noted
[X] Bill Sender ▸ 39908860 Airborne Sender account no.
[ ] Bill Receiver ▸ Airborne Receiver account no.
[ ] Bill 3rd Party ▸ Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice

Service Type — One box must be checked with an "X". Overnight Express Service unless otherwise noted.
[X]
[ ]
Next Afternoon Shipments over 5 lbs will be charged at the Express rate. Next Afternoon delivery to Bold Red destinations only.

NO. OF PIECES 1 WEIGHT (LBS.) 1 CHECK IF [X] LETTER EXPRESS [ ] EXPRESS PACK

Special Instructions
[ ] Saturday Delivery Extra Charge Express Only Not available to all locations
[ ] Hold at Airborne
[ ] Lab Pack
[ ]

ABSENT A HIGHER SHIPMENT VALUATION CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THE NONNEGOTIABLE AIRBILL. SCAC-AIRB FED I.D. NO. 91-0837469

Declared Value [ ] or Full Insurance [ ] Shipment Valuation $

Received At [ ] Drop Box # [ ] Airborne Terminal

AIRBORNE EXPRESS
PO BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

http://www.airborne-express.com

SENDER'S COPY

005 = 115.66
006 = 19.43
008 = 32.55
012 = 42.80
013 = 30.19
014 = 104.47
010 = 10--

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
HAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
7/10/98

0000449 0027202

AIRBORNE EXPRESS
REV. 11/97

AIRBORNE EXPRESS

ORIGINAL INVOICE



| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 7/09/98 | 39908860 | | H9572253 | 7/24/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM M5E
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER / ORIGIN / DEST / SHIP DATE / YOU OWE AS / DESCRIPTION | CUSTOMER NUMBER / SENDER / SENT BY / REFERENCE NUMBER / ACCOUNTING CONTROL | CUSTOMER NUMBER / RECEIVER / ATTENTION / RECEIVED BY / ACCOUNTING CONTROL | REC AT / # PCS / WEIGHT / CHG WGT / SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 6901016872<br>PIE / DCA<br>7/02/98<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE 000 | FEDERAL BUREAU OF PRISONS<br>CCC CONTRACTING<br>320 FIRST STREET N W<br>WASHINGTON<br>DC 20534<br>LEAH WILSON 202-307-3069<br>S DIXON | DB<br>1<br>LX<br>52157 | EXP | 9.45 | $9.45 |
| ... | 39908860 M5E | | DB | EXP | 12.86 | |

FROM (Company) BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594
TO (Company) Federal Bureau of Prisons
CCC Contracting
Street Address 320 First Street, NW
City Washington, State DC ZIP CODE (Required) 20534
Attention: (Name/Dept) Leah Wilson Phone Number (Important) (202) 307-3069
Description letter
THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature Oliver Heberling Date 7/2/98
Airborne Signature Route No. Date Time

Preprint Format No. 65850360 Origin PIE Airbill Number 6901016872
Method of Payment: [X] Bill Sender 39908860 Airborne Sender account no. / [ ] Bill Receiver / [ ] Bill 3rd Party / [ ] Paid in Advance
Billing Reference will appear on invoice
No. of Pieces 1 — Check if [X] Letter Express
Special Instructions: Saturday Delivery, Hold at Airborne, Lab Pack
Declared Value / Full Insurance / Shipment Valuation $
Received At: Drop Box / Airborne Terminal

AIRBORNE EXPRESS PO BOX 662, SEATTLE, WA 98111-0662 1-800-247-2676
http://www.airborne-express.com
SENDER'S COPY

| | | | | | | |
|---|---|---|---|---|---|---|
| CRW / PIE<br>7/01/98<br>SENDER | 5904 MACCORKLE AVE<br>SAINT ALBANS<br>WV 25177<br>MELVIN ASHFORD 304-768-48<br>NONE OK | STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>ANNIE HUMBSCHJ 813-588-25<br>O HEBERLING | 52157/AF | | | |
| | | ADDITIONAL SHIPMENT INFORMATION:<br>OTH-ID SERVICE FEE | | | | $16.29 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NBT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469
THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
7/10/98
0000449 0027206

AIRBORNE EXPRESS

DCAA001274

AIRBORNE EXPRESS

ORIGINAL INVOICE



| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 7/16/98 | 39908860 | | J1912562 | 7/31/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER / ORIGIN / DEST / SHIP DATE / YOU OWE AS / DESCRIPTION | CUSTOMER NUMBER / SENDER / SENT BY / REFERENCE NUMBER / ACCOUNTING CONTROL | CUSTOMER NUMBER / RECEIVER / ATTENTION / RECEIVED BY / ACCOUNTING CONTROL | REC AT / # PCS / WEIGHT / CHG WGT / SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 6901014875 PIE / SDF 7/09/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 000 NONE | JANE LOWRY 1900 JAN LYN JEFFERSONTOWN KY 40299 LETTER 502-267-1424 FD | DB 1 LX 52157/AF | NAS | 8.40 | $8.40 |
| 6901014971 PIE / MGM 7/09/98 SENDER | 39908860 MSE BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 000 NONE | BUREAU OF PRISONS COMM CORRECTIONS OFFICE 15 LEE STREET ROOM B-18 MONTGOMERY AL 36101 LARRY SPENCER V WHITE | DB 1 LX 52157 | EXP | 9.45 | $9.45 |

FROM (Company) BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594
TO (Company) Federal Bureau of Prisons Community Corrections office
Street Address 15 Lee Street, Room B-18
City Montgomery State AL ZIP CODE (Required) 36101
Attention: (Name/Dept) Phone Number (Important) Larry Spencer
Description Documents

Preprint Format No. 65850360 Origin PIE Airbill Number 6901014971
Method of Payment (Assumed sender unless otherwise noted)
[X] Bill Sender ▶ 39908860 Airborne Sender account no.
[ ] Bill Receiver ▶ Airborne Receiver account no.
[ ] Bill 3rd Party ▶ Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice
Service Type: One box must be checked with an "X". Assumed Express Service unless otherwise noted. [X] Express
NO. OF PKGS 1 WEIGHT 3 CHECK IF [X] LETTER EXPRESS [ ] EXPRESS PAK
Special Instructions: [ ] Saturday Delivery Extra Charge Express Only Not available to all locations [ ] Hold at Airborne [ ] Lab Pack [ ]
Shipment Valuation: Declared Value [ ] or Full Insurance [ ] $
ABSENT A HIGHER SHIPMENT VALUATION, CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. SCAC-AIRB FED I.D. NO. 91-0837469
THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature ▶ Brian Bannum Date 7/9/98
Airborne Signature Route No. Date Time
Received At [ ] Drop Box # [ ] Airborne Terminal
AIRBORNE EXPRESS PO BOX 662, SEATTLE, WA 98111-0662 1-800-247-2676
http://www.airborne-express.com SENDER'S COPY

$9

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NEXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
7/17/98

AIRBORNE EXPRESS

FROM (Company) BANNUM
Street Address STE 125
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594

TO (Company) Federal Bureau of Prisons
Community Corrections Office
Street Address 15 Lee Street. Room B-18
City Montgomery State AL ZIP CODE (Required) 36101
Attention: (Name/Dept) Phone Number (important)
Spencer
Description Med Bl Service

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS

Sender's Signature Olivia Hebeling Date 7/6/98 Time
Airborne Signature Route No. Date

Preprint Format No. 65850360 Origin PIE Airbill Number 6901015472

Method of Payment (Assumed sender unless otherwise noted)
[X] Bill Sender ▶ 39908860 Airborne Sender account no.
[ ] Bill Receiver ▶ Airborne Receiver account no.
[ ] Bill 3rd Party ▶ Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice

Service Type: One box must be checked with an "X". Assumed Express Service unless otherwise noted. [X]

NO. OF PKGS 1 | WEIGHT (LBS.) | CHECK IF [X] LETTER EXPRESS [ ] EXPRESS PACK

Special Instructions
[ ] Saturday Delivery Extra Charge Express Only Not available in all locations
[ ] Hold at Airborne
[ ] Lab Pack

Declared Value [ ] or Full Insurance [ ] Shipment Valuation $

Received At [ ] Drop Box # [ ] Airborne Terminal

ABSENT A HIGHER SHIPMENT VALUATION, CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. SCAC:ARB FED I.D. NO. 91-0837480

AIRBORNE EXPRESS
PO BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

SENDER'S COPY

http://www.airborne-express.com

---

FROM (Company) BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594

TO (Company) Federal Bureau of Prisons
Community Corrections Office
Street Address 15 Lee Street, Room B-18
City Montgomery State AL ZIP CODE (Required) 36101
Attention: (Name/Dept) Phone Number (important)
Larry Spencer
Description Documents

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS

Sender's Signature Date 7/9/98
Airborne Signature Route No. Date Time

Preprint Format No. 65850360 Origin PIE Airbill Number 6901014971

Method of Payment (Assumed sender unless otherwise noted)
[X] Bill Sender ▶ 39908860 Airborne Sender account no.
[ ] Bill Receiver ▶ Airborne Receiver account no.
[ ] Bill 3rd Party ▶ Airborne Customer account no.
[ ] Paid in Advance Check No. Amount $
Billing Reference will appear on invoice

Service Type: One box must be checked with an "X". Assumed Express Service unless otherwise noted. [X]

NO. OF PKGS 1 | WEIGHT (LBS.) 3 | CHECK IF [X] LETTER EXPRESS [ ] EXPRESS PACK

Special Instructions
[ ] Saturday Delivery Extra Charge Express Only Not available in all locations
[ ] Hold at Airborne
[ ] Lab Pack

Declared Value [ ] or Full Insurance [ ] Shipment Valuation $

Received At [ ] Drop Box # [ ] Airborne Terminal

ABSENT A HIGHER SHIPMENT VALUATION, CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. SCAC:ARB FED I.D. NO. 91-0837480

AIRBORNE EXPRESS
PO BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

SENDER'S COPY

http://www.airborne-express.com

| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 7/16/98 | 39908860 | | J1912562 | 7/31/98 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM M5E
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

AIRBILL NUMBER

FROM (Company) BANNUM
Street Address STE 126
1301 SEMINOLE BLVD
City LARGO State FL ZIP CODE (Required) 33770
Sent by (Name/Dept) Phone Number 813-588-2594
TO (Company) Bureau of Prisons
C C Contracting
Street Address 320 First Street, N.W.
City Washington, D.C. ZIP CODE (Required) 20534
Attention (Name/Dept) Phone Number (Important) Leah Wilson
Description letter
THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
Sender's Signature Olivia Heberling Date 7/10/98
Airborne Signature Route No. Date Time

Preprint Format No. 65850360 Origin PIE Airbill Number 6901014573
Method of Payment: [X] Bill Sender 39908860 Airborne Sender account no.
[ ] Bill Receiver Airborne Receiver account no.
[ ] Bill 3rd Party Airborne Customer account no.
[ ] Paid in Advance Cash No. Amount $
Billing Reference will appear on invoice
Service Type: [X]
No. of Pkgs 1 | Weight | Check if [X] Letter Express [ ] Express Pack
Special Instructions: [ ] Saturday Delivery [ ] Hold at Airborne [ ] Lab Pack
Declared Value [ ] or Full Insurance [ ] $ Shipment Valuation
Received At [ ] Drop Box # [ ] Airborne Terminal
AIRBORNE EXPRESS PO BOX 662, SEATTLE, WA 98111-0662 1-800-247-2676
SENDER'S COPY
http://www.airborne-express.com

| | | | | | | |
|---|---|---|---|---|---|---|
| | 813-588-2594 NONE | TX 78405 512-879-0047 M DIAZ | | | | $9.45 |
| 6901014573 PIE / DCA 7/10/98 SENDER | 39908860 M5E BANNUM STE 126 1301 SEMINOLE BLVD LARGO FL 33770 813-588-2594 NONE | C C C ACCOUNTING BUREAU OF PRISONS 320 FIRST ST N W WASHINGTON DC 20534 LEAH WILSON A DIXON | DB 1 LX 52157 | EXP | 9.45 | $9.45 |

SUBTOTAL SENDER CUSTOMER NO.: 39908860 NO. SHIPMENTS: 29 271.95

| | | | | | | |
|---|---|---|---|---|---|---|
| 6656692722 MGM / PIE 7/07/98 3RD PARTY | 42159326 BANNUM PLACE 540 SAYRE ST MONTGOMERY AL 36104 JAC BER 334-262-0227 NONE | BANNUM INC STE 126 1301 SEMINOLE BLVD LARGO FL 33770 ANNIE 813-588-2594 O HEBERLING | SD 1 LX 52157 | EXP | 9.45 | $9.45 |

SUBTOTAL SENDER CUSTOMER NO.: 42159326 NO. SHIPMENTS: 1 9.45

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
HAS=NXT AFTERNOON SRVC, SDE=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
7/17/98
0000461 00027191

AIRBORNE EXPRESS

| CUSTOMER NUMBER | [illegible] | INVOICE NUMBER | INVOICE DATE |
|---|---|---|---|
| 39908860 | | N6051216 | 2/12/99 |

PORTION

BANNUM · M5E
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER<br>ORIGIN / DEST<br>SHIP DATE<br>YOU OWE AS<br>DESCRIPTION | CUSTOMER NUMBER<br>SENDER<br><br>SENT BY<br>REFERENCE NUMBER<br><br>ACCOUNTING CONTROL | CUSTOMER NUMBER<br>RECEIVER<br><br>ATTENTION<br>RECEIVED BY<br>ACCOUNTING CONTROL | REC AT<br># PCS<br>WEIGHT<br>CHG WGT<br>SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 4712575243<br>PIE / CRW<br>1/20/99<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>727-588-2594<br>NONE | CATHY BELLEW OPERATION<br>DIRECTOR<br>5904 MACCORKLE AVE SW<br>SAINT ALBANS<br>WV 25177<br>304-768-6625<br>A DARBY | DB<br>1<br>5<br>52157 | EXP | 19.70 | $19.70 |
| 4712575346<br>PIE / CRW<br>1/20/99<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>727-588-2594<br>NONE | CATHY BELLOW OPERATION<br>DIRECTOR<br>5904 MACCROKLE AVE SW<br>SAINT ALBANS<br>WV 25177<br>306-768-6625<br>A DARBY | DB<br>1<br>LX<br>1R<br>52157 | EXP | 12.86 | $12.86 |
| 6901083475<br>PIE / TUP<br>1/20/99<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | DIRECTOR<br>BANNUM PLACE OF TUPELO<br>630 A D CENTER<br>TUPELO<br>MS 38801<br>RAQUEL WELCH 601-841-7888<br>C MAISHALL | DB<br>1<br>LX<br>52157 | EXP | 9.45 | $9.45 |
| 1316710474<br>PIE / MGM<br>1/21/99<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>727-588-2594<br>NONE | LIZ HOME COOKING<br>1677 OAK ST<br>MONTGOMERY<br>AL 36108<br>ELIZABETH MCNEIL 334-281-<br>L MCNEIL | DB<br>1<br>LX<br>52157 | EXP | 9.45 | $9.45 |
| 6901082974<br>PIE / DCA<br>1/21/99<br>SENDER | 39908860 M5E<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>813-588-2594<br>NONE | ELAINE PEEBLES FEDERAK BU<br>CCC CONTRACTING<br>320 FIRST ST NW<br>WASHINGTON<br>DC 20534<br>ELAINE PEEBLES<br>L HALL | SB<br>1<br>1<br>36R<br>52157 | EXP | 56.18 | $56.18 |

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NEXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS

1/21/99

0000075 0000670

AIRBORNE EXPRESS
REV. 11/97

DCAA001278

AIRBORNE EXPRESS

# ORIGINAL INVOICE



| INVOICE DATE | CUSTOMER NUMBER | REFER TO THIS NUMBER WHEN REMITTING | INVOICE NUMBER | PAYMENT DUE DATE |
|---|---|---|---|---|
| 4/01/99 | 39908860 | | Q1229325 | 4/16/99 |

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

BILL TO: BANNUM MSE
STE 126
1301 SEMINOLE BLVD
LARGO FL 33770

| AIRBILL NUMBER<br>ORIGIN / DEST<br>SHIP DATE<br>YOU OWE AS<br>DESCRIPTION | CUSTOMER NUMBER<br>SENDER<br>SENT BY<br>REFERENCE NUMBER<br>ACCOUNTING CONTROL | CUSTOMER NUMBER<br>RECEIVER<br>ATTENTION<br>RECEIVED BY<br>ACCOUNTING CONTROL | REC AT<br># PCS<br>WEIGHT<br>CHG WGT<br>SCALE # | CHG TYPE | CHARGES | TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| 6707691056<br>PIE / CRW<br>3/26/99<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>727-588-2594<br>NONE | CATHY BELLEW OPERATIONS DIRECTORS<br>5904 MACCORKLE AVE S W<br>SAINT ALBANS<br>WV 25177<br>304-768-6625<br>B MORRISON | DB<br>1<br>LX<br>52157/AF | NAS | 8.40 | $8.40 |
| 6707691550<br>PIE / MGM<br>3/26/99<br>SENDER | 39908860 MSE<br>BANNUM<br>STE 126<br>1301 SEMINOLE BLVD<br>LARGO<br>FL 33770<br>727-588-2594<br>NONE | FEDERAL BURAU OF PRISONS<br>U S COURTHOUSE ROOM B-18<br>15 LEE ST<br>MONTGOMERY<br>AL 36101<br>LARRY SPENCER<br>V WHITE | DB<br>1<br>LX<br>52157/AF | NAS | 8.40 | $8.40 |

| | | |
|---|---|---|
| FROM (Company) BANNUM<br>Street Address STE 126 1301 SEMINOLE BLVD<br>City LARGO State FL ZIP CODE (Required) 33770<br>Sent by (Name/Dept) Phone Number 727-588-2594 | Preprint Format No. 56302401<br>Origin PIE Airbill Number 6707691550<br>Method of Payment (Assumed sender unless otherwise noted)<br>[X] Bill Sender ▶ 39908860 Airborne Sender account no.<br>[ ] Bill Receiver ▶ Airborne Receiver account no.<br>[ ] Bill 3rd Party ▶ Airborne Customer account no.<br>[ ] Paid in Advance Check No. Amount $<br>Billing Reference will appear on invoice | Service Type<br>Must Alternate ... |
| TO (Company) Larry Spencer, CCM<br>Federal Bureau of Prisons<br>Street Address U.S.Courthouse Room B-18<br>15 Lee Street<br>City Montgomery State AL ZIP CODE (Required) 36101<br>Attention (Name/Dept) Phone Number (important) Larry Spencer<br>Description | # of Pkgs Weight Letter Express Pack Other Packaging<br>Special Instructions<br>[ ] Saturday Delivery Extra Charge Express Only<br>[ ] Hold at Airborne<br>[ ] Lab Pack | ABSENT A HIGHER SHIPMENT VALUATION, CARRIERS LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. SCAC-AIRB FED I.D. NO. 91-0837469 |
| THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS<br>Sender's Signature Date 3/26/99<br>Airborne Signature Route No. Date Time | Declared Value [ ] or Full Insurance [ ] Shipment Valuation $ .00<br>Received At [ ] Drop Box # [ ] Airborne Terminal | AIRBORNE EXPRESS<br>PO BOX 662, SEATTLE, WA 98111-0662<br>1-800-247-2676 |

USE THE INTERNATIONAL AIR WAYBILL FOR SHIPMENTS TO PUERTO RICO

www.airborne.com SENDER'S COPY

12.86

11.29

16.28

CHG TYPE: EXP=FREIGHT CHARGE, DLV=DELIVERY, PKU=PICKUP, INS=INSURANCE, DCV=DECLARED VALUE, COF=COD FEE, SAT=SATURDAY DELIVERY
NAS=NXT AFTERNOON SRVC, SDS=2ND DAY SRVC
WGT CODE: D=DIMENSIONAL WEIGHT, R=REWEIGHED, LX=LETTER
SCAC - AIRB
FED I.D. NO. 91-0837469

THANK YOU FOR SHIPPING WITH AIRBORNE EXPRESS
4/02/99
0000718 0000940

AIRBORNE EXPRESS

DCAA001279

JOSEPH A. CAMARDO, JR.
ATTORNEY AT LAW
127 GENESEE STREET
AUBURN, NEW YORK 13021
WWW.CAMARDO.COM

JOSEPH A. CAMARDO, JR.
NANCY M. CAMARDO*
*admitted to Georgia Bar only
KEVIN M. COX
BRIAN J. SMITH
KEVIN P. RYAN

MANAGER-GOVERNMENT COST/PRICE ANALYST
JOSEPH W. NORRIS, M.B.A.

PHONE (315) 252-3846
FAX (315) 252-3508
E-MAIL: JCAM123@AOL.COM

**Via Overnight Courier**

May 6, 2004

David Lowry
Bannum, Inc.
9180 Oakhurst Road
Suite 4
Seminole, FL 33776

***RE: Bannum, Inc.***
***Proposal Fees***

Dear Dave:

Dave attached is supporting documentation concerning the fees that were part of the REA(s)

The auditor asked for the breakdown of fees for the following counts:

Count 5 Beaumont Standards of Conduct
Count 8 Montgomery
Count 9 Beaumont, Laredo and Corpus Christi

Exhibit 1 contains the fees associated with the standards of conduct REA. The estimated legal fees for administration and proposal preparation were based on the approximate time frame of July 16, 1999 through May 15, 2000 when the investigations problems were causing Bannum to incur extra time and effort. During this period of July 16, 1999 through approximately December 31, 1999 all of the legal fees charged to Bannum for the Beaumont issue dealt with the standard of conduct charges. After that time from January 2000 – May 15, 2000, Bannum allocated only 25% of the time to the REA/claim for legal fees concerning the standard of conduct. In addition Bannum expended additional time in responding to the contract officer's question and compiling its February 1, 2001 response to the Contracting Officer.

D-4

Count 8 – The relevant portion of the fees for the Montgomery REA(s) fees are contained in Exhibit 2. The fees that are for the REA have been highlighted and are:

| | |
|---|---|
| 2/28/01 | $1,106.25 |
| 3/15/01 | $ 317.00 |
| 3/28/01 | $ 502.00 |
| | $1,925.25 |

Count 9 – The relevant portion of the relating to the Beaumont, Laredo and Corpus Christi REA(s) can be found as follows:

In the original Beaumont REA, the fees we estimated at $1800.00, the following are the actual fees incurred with to compiling the REA were (Exhibit 3):

| | |
|---|---|
| 4/30/01 | $ 500.00 |
| 5/15/01 | $ 964.00 |
| | $1,464.00 |

In the Laredo and Corpus Christi REA(s) proposal fees were estimated at $1,000 for each of the contracts. The actual fees incurred for Laredo and Corpus matters are as follows (Exhibit 4):

| Date | Corpus/Laredo |
|---|---|
| 3/31/01 | $ 268.00 |
| 3/31/01 | $ 358.00 |
| 4/15/01 | $ 442.00 + $355.00 |
| 5/15/01 | $ 677.00 |
| | $2,100.00 |

Dave, I have only included the relevant portion of the bills for the above matters. Also, on Count 2, the auditor in his email never asked for any documentation on the fees. If you have any further questions or comments, please do not hesitate to contact the undersigned.

Sincerely,

Joseph W. Norris

Enclosure

2

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| | SUBTOTAL: | | [redacted] | |
| [redacted] | | | | |
| | SUBTOTAL: | | [redacted] | |
| | Montgomery | | | |
| 2/16/01 | General | K. Cox: Discussion with N. Camardo, review of file Montgomery | 1.50 100.00/hr | 150.00 |
| 2/17/01 | General | K. Cox: Review of file and REA Montgomery | 1.50 100.00/hr | 150.00 |
| 2/19/01 | General | K. Cox: Telecon with client, discussion with J. Norris, review correspondence from client Montgomery | 1.75 100.00/hr | 175.00 |
| 2/20/01 | General | K. Cox: Review new documents received from client Montgomery | 2.50 100.00/hr | 250.00 |
| 2/21/01 | General | K. Cox: Review of file Montgomery | 1.25 100.00/hr | 125.00 |

David Lowry



| | Hrs/Rate | Amount |
|---|---|---|
| 2/26/01 General<br>J. Camardo: Review faxes, telecon with client<br>Montgomery | 1.00<br>125.00/hr | NO CHARGE |
| General<br>K. Cox: Discussion with J. Camardo and N. Camardo, telecon with D. Lowry, review of file<br>Montgomery | 1.25<br>100.00/hr | 125.00 |
| General<br>N. Camardo: Conference with J. Camardo and K. Cox, telecon with D. Lowry, review of file, legal research<br>Montgomery | 2.25<br>125.00/hr | 281.25 |
| 2/27/01 General<br>N. Camardo: Conference with J. Camardo and K. Cox, review of file, legal research, draft protest to court<br>Montgomery | 4.75<br>125.00/hr | 593.75 |
| General<br>K. Cox: Review and edit REA<br>Montgomery | 0.17<br>100.00/hr | 17.00 |
| 2/28/01 General<br>K. Cox: Review and edit REA<br>Montgomery | 1.08<br>100.00/hr | 108.00 |
| General<br>N. Camardo: Conference with K. Cox and J. Camardo, legal research, drafting and editing protest<br>Montgomery | 2.50<br>125.00/hr | 312.50 |
| SUBTOTAL: | [ 21.50 | 2,287.50] |

[redacted]

[redacted] telecon with N. Ca[redacted]

David Lowry



| | | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | | [redacted] | |
| SUBTOTAL: | | [ 1.15 | 0.00] |
| | Montgomery | | |
| 3/1/01 | General<br>K. Cox: Edit and draft REA, review complaint, discussion with N. Camardo<br>Montgomery | 2.42<br>100.00/hr | 242.00 |
| | General<br>N. Camardo: Draft protest to claim court, conference with K. Cox, legal research, telecon with D. Lowry<br>Montgomery | 3.25<br>125.00/hr | 406.25 |
| 3/2/01 | General<br>K. Cox: Review complaint, discussion with N. Camardo, review and edit REA<br>Montgomery | 3.00<br>100.00/hr | 300.00 |
| | General<br>N. Camardo: Finalize and edit protest, prepare for filing, discussion with K. Cox<br>Montgomery | 2.00<br>125.00/hr | 250.00 |
| 3/5/01 | General<br>K. Cox: Telecon with D. Lowry, edit and revise REA<br>Montgomery | 0.75<br>100.00/hr | 75.00 |
| 3/6/01 | General<br>J. Camardo: Preparation for Court of Claims conference, conference with Court, telecon with client<br>Montgomery | 2.00<br>125.00/hr | 250.00 |

| | | Hrs/Rate | Amount |
|---|---|---|---|
| [redacted] | | [redacted] | |
| | SUBTOTAL: | [ 10.21 | 1,021.00] |
| | Montgomery | | |
| 3/27/01 | General<br>J. Norris: Discussion with K. Cox, review of file<br>Montgomery | 0.28<br>100.00/hr | NO CHARGE |
| | General<br>J. Camardo: Preparation for conference call<br>Montgomery | 1.25<br>125.00/hr | 156.25 |
| | General<br>✓ K. Cox: Review of file, prepare for telecon with Judge, telecon with Judge, discussion with J. Camardo and N. Camardo, telecon with D. Lowry, letter to C. Clayton regarding claim<br>Montgomery | 2.25<br>100.00/hr | 225.00 |
| | General<br>N. Camardo: Conference with J. Camardo and K. Cox, telecon with Court of Claim, telecon with Lowry<br>Montgomery | 1.33<br>125.00/hr | NO CHARGE |
| 3/28/01 | General<br>✓ J. Norris: Work on REA/Claim, edit letter, faxes to Bannum<br>Montgomery | 1.70<br>100.00/hr | 170.00 |
| 3/30/01 | General<br>J. Camardo: Telecon on items to add to the claim<br>Montgomery | 0.08<br>125.00/hr | NO CHARGE |
| | General<br>✓ J. Norris: Call with D. Lowry, discussion with J. Camardo, review of file and fax from Lowry<br>Montgomery | 1.07<br>100.00/hr | 107.00 |
| | SUBTOTAL: | [ 7.96 | 658.25] |

[redacted]

Produced on 6-14-04

5-12-02 atlanta

| | |
|---|---|
| Taxi | 14.00 |
| Food | 9.00 |
| Parking | 10.00 |

Count 8

14.00
9.00
10.00
188.00
28.74

249.74

D-5

**Above and Beyond Travel, Inc.**
12533 ULMERTON ROAD • LARGO, FLORIDA 33774
(727) 595-5443 • (800) 881-5702 • FAX (727) 595-6775

AGENT LJ/JR BOOKING REF ZL0J05
77965
LOWRY/DAVID

BANNUM
9180 OAKHURST ROAD
UNIT 5
SEMINOLE FL 33776

DATE: SEP 05 2002 BANNUM

| SERVICES | DATE | FROM | TO | LV | AR | ST |
|---|---|---|---|---|---|---|
| DELTA AIR LINES<br>DL 1036 T | 12SEP<br>THU | TAMPA FL<br>TAMPA INTL<br>AIRCRAFT:<br>SEAT 48E CONFIRMED | ATLANTA GA<br>W B HARTSFIELD<br>BOEING 767-400 | 700A | 833A | |
| DELTA AIR LINES<br>DL 432 T | 12SEP<br>THU | ATLANTA GA<br>W B HARTSFIELD<br>AIRCRAFT:<br>SEAT 35C CONFIRMED | TAMPA FL<br>TAMPA INTL<br>BOEING 767-300/300ER | 230P | 355P | |

AIR FARE 128.38 TAX 29.62 TOTAL USD 158.00
ADMINISTRATIVE FEE USD 30.00
ADDITIONAL FEES USD 0.00

INVOICE TOTAL USD 188.00

TICKET PAYMENT CREDIT CARD
MCO PAYMENT: CREDIT

RESERVATION NUMBER(S) DL/XLU44N

TICKET: DL/ETKT 006 7258206998
MCO: 890 1962962471

DL FREQUENT FLYER DL2003064892

PASSENGER TICKET AND BAGGAGE CHECK
SCN-S892411971766 INF0000077965 AN-BANNUM
ETKT PASSENGER RECEIPT
XXXXXXXXX BOARDING PASS 2
DELTA AIR LINES ARC XXXXX
64201 LOWRY/DAVID
ABOVE AND BEYOND TRAVE/ LARGO FL 02 DTPAATLDL1036 T12SEP
LOWRY/DAVID ZL0J05/1A TA7TN08 7708/ UATLTPADL0432 T12SEP
**NOT VALID FOR** THIS IS YOUR RECEIPT 12SEP12SEP
**TRANSPORTATION*
NONREFUNDABLE CHANGE FEE MAY APPLY
FP AX3737931516Z3006/EXP0706 000032 FC TPA DL ATL64.19TA7TN08 DL TPA64.19TA7TN08 US
D128.38END ZP TPAS ATL SXT6.00ZP9.00XF TPA4.5ATL4.5

USD 15.00XT
USD 128.38
USD 9.62US
USD 5.00AY 24118717685 0 006 7258206998 3
USD 158.00

NOT VALID FOR TRAVEL
0 006 7258206998 3

DCAA001327

**Atlanta, Ga.**
**Receipt for Taxi Service**

Date 9-12-02

From Atlanta airport

To BWI

Cab No.

Driver's Name

Fare $ 14.00

Thank You

Tax $

Tips $

TOTAL $

REPUBLIC PARKING SYSTEM
TAMPA INTERNATIONAL AIRPORT
TOLLBOOTH PLAZA
TAMPA, FL. 33622
(813)870-8790

| | | |
|---|---|---|
| DATE: | | TERM |
| 09/12/02 | | 01 |
| ACCOUNT NUMBER-AMEX | EXP | TIME |
| 372264094245002: | 0411 | 16:19 |

SALE $10.00

AUTH: 554762 ROC # 5216 ID # 1501

TOP COPY-MERCHANT BOTTOM COPY-CUSTOMER

Houlihan's
Hartsfield Airport Atrium
Atlanta GA

Date: Sep17'02 12:13PM
Card Type: Visa/M.C.
Acct #: XXXXXXXXXXXX
Exp Date: 03-04
Auth Code: 01709S
Check: 3120
Table: 68/1
Server: 1034 Terree
VSCA: Auto Driver
DAVID A LONNY

Subtotal: 24.74

Tip 4.00

Total 28.74

Signature

I agree to pay above total amount according to my card issuer agreement

*** Customer Copy ***

7-13-00 Atlanta

Taxis 30.00
Parking 8.00
Food 6.50
Misc 5.00

Count 8

30.00
8.00
6.50
5.00
219.00

269.50

| | | | | | | |
|---|---|---|---|---|---|---|
| 501179-0 | 06/26 | 06/27 | RPS* AIRPORT PARKINGTAMPA<br>260067001 PARKING FEES | FL<br>06/26/00 | 40.00 | |
| 667181-0 | 06/20 | 06/29 | AMERICA WEST AIRLINESLARGO<br>TKT# 40170T0322217 | FL<br>06/20 | 75.00 | |
| 659188-0 | 07/05 | 07/06 | TRAVEL AGENCY SERVICELARGO<br>TKT# 8908106965005 | FL<br>07/05 | 15.00 | |
| 600188-0 | 07/05 | 07/06 | AIRTRAN COLLEGE PARK GA<br>TKT# 9990007363872 | 188<br>07/05 | 219.00 | |
| | | | PAGE TOTAL | | 559.26 | .00 |
| | | | ACCOUNT TOTAL | | 833.63 | 1,034.16 |

YOUR CASH ADVANCE LIMIT IS $2000
AVAILABLE BALANCE FOR NEW CASH ADVANCE
TRANSACTION IS $2000.

ACCOUNT GRACE PERIOD=STANDARD GRACE
(SEE STATEMENT BACK FOR DETAILS).

Account Number 3728-931516-72008

Bill Closing Date 07-21-00

Account Charges

Page 3

DCAA001330

TAMPA AIRPORT PARKING
(813) 870-8790

07/13/00 14:26 L# 1 A# 8 Txn#128050
07/13/00 06:25 In 07/13/00 14:28 Out
Tkt# 852855

| | |
|---|---|
| SHORT TERM | $ 8.43 |
| Total Tax | $ 0.57 |
| Total Fee | $ 9.00 |
| CASH PAID | $ 9.00- |
| Cash Tender | $ 100.00 |
| Change Due | $ 91.00 |

THANK YOU AND DRIVE SAFELY

**Atlanta, Ga.**
**Receipt for Taxi Service**

**Date** 7-13-00
**From** 3800 Camp Creek
**To** Airport
**Cab No.** ______
**Driver's Signature** ______
**Fare** $ ______
**Tax** $ ______
**Tips** $ ______
**TOTAL** $ 15—

**Atlanta, Ga.**
**Receipt for Taxi Service**

**Date** 7-13-00
**From** Airport
**To** 3800 Camp Creek
**Cab No.** ______
**Driver's Signature** ______
**Fare** $ ______
**Tax** $ ______
**Tips** $ ______
**TOTAL** $ 65—

PASSENGER TICKET AND BAGGAGE CHECK

SCN-8696742831552 AN-BANNUM

ETKT PASSENGER RECEIPT XXXXXXXX 1

ARC XXXXX

DELTA AIR LINES XXXXX A10564201 LOWRY/DAVID

ABOVE AND BEYOND TRAVEL LARGO FL 33774US16FEB01 01TPAATLDL0301 H22FEB

LOWRY/DAVID ZHNSKL/1A MULTI 6 72064 0ATLTPADL0457 M23FEB

**NOT VALID FOR** THIS IS YOUR RECEIPT ********************

**TRANSPORTATION* LD-LD ********************

NONREFUNDABLE CHANGE FEE MAY APPLY ********************

FP AX373993151672008/EXP0702 M 000032 EF CCAX EX 0067015654252 OR 0067015654252PIE130 ********************

CT0010564201 FC TPA DL ATL Q1.86 145.12HR3TN DL TPA213.95HROTN USD360.93END ZP TPA2.7 ********************

5ATL2.75XF TPA3ATL3 A/C USD159.50 ********************

********************

USD 6.00XF ********************

USD 360.93 XXXXXXXXXXX NOT VALID FOR TRAVEL

USD 27.07US 67428315522 0 006 7022057110 1 0 006 7022057110 1

USD 5.50ZP

USD 399.50

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BANNUM, INCORPORATED,

Plaintiff,

vs.

UNITED STATES,

Defendant.

No. 01-639C

Judge Lettow

# THIRD AMENDED COMPLAINT

## Parties

1. Plaintiff, Bannum, Inc., (hereinafter, "Bannum" or "Plaintiff") is a corporation organized and existing under the laws of the State of Kentucky, with its principal place of business being located in Largo, Florida.

2. Defendant is the United States Government, acting through the Department of Justice, Federal Bureau of Prisons, having a place of business addressed as 320 First St., N.W. Washington, DC 20534 (hereinafter, "Defendant" or "BOP").

## Jurisdiction

3. This is an action for an equitable adjustment and for damages arising under various contracts resulting from certain government caused actions, inactions, and breaches thereof as more fully appears hereinafter. Bannum has filed various claims pursuant to the Contract Disputes Act of 1978 and the "Disputes" clause incorporated into the subject contracts, based on the increased costs of performance. The BOP has issued various Final Decisions with respect to Bannum's claims,

and/or has failed to issue a Final Decision, which is deemed to be a denial of its claims. As such, this Court has jurisdiction of this action under Section 10 of the Contract Disputes Act of 1978, 41 U.S.C. §609(a), and the Tucker Act, 28 U.S.C §1491(a).

Introduction

4. Plaintiff has been awarded, by the BOP, various contracts for the provision of residential Community Correction Center services for male and female Federal offenders in various areas throughout the United States. The specific contracts, which are the subject of the present action are as follows:

a. Jackson, Mississippi - Contract No. J200c-325;

b. Corpus Christi, Texas - Contract No. J200c-361;

c. Beaumont, Texas - Contract No. J200c-336;

d. Laredo, Texas - Contract No. J200c-375;

e. Laredo, Texas - Contract No. J200c-433

f. Tupelo, Mississippi - Contract No. J200c-306;

g. Charleston, West Virginia - Contract No. J200c-343;

h. Clarksburg, West Virginia - Contract No. J200c-338;

i. Fayetteville, North Carolina - Contract No. J200c-332;

j. Florence, South Carolina - Contract No. J200c-370;

k. Greensboro, North Carolina - Contract No. J200c-377;

l. Montgomery, Alabama - Contract No. J200c-397;

m. Reno, Nevada - Contract No. J200c-365C;

n. Savannah, Georgia - Contract No. J200c-310;

o. Tallahassee, Florida - Contract No. J200c-376;

p. Wilmington, North Carolina - Contract No. J200c-373.

5. Throughout the course of performance of these contracts, Plaintiff was subjected to various improper actions and inactions of the BOP, which resulted in Bannum being forced to expend a significant amount of extra-contractual effort and cost, for which they have the right to be fully compensated. In addition, the BOP issued changes to various contracts, by Modification, for which Bannum has been improperly denied compensation. In addition, the ongoing and continuous improper actions of the BOP, have had a significant detrimental effect on Bannum's ability to secure additional contracts with the BOP. For all of the herein stated damages, Bannum has the right to be fully compensated.

COUNT 1

6. During the course of performance of several contracts, Bannum was assessed improper deductions for alleged performance deficiencies, which were contested by Plaintiff, as specifically delineated as follows:

Jackson, Mississippi - Contract No. J200c-325

7. On October 22, 1999, Bannum filed a Request for Equitable Adjustment ("REA") in the amount of $17,446 for wrongful deductions assessed by the BOP on Contract J200C-325. The REA included a detailed explanation as to its allegations that the deductions taken were improper. The REA also requested that ADR be conducted.

8. On March 24, 2000, the BOP rejected Bannum's REA, in its entirety.

9. On March 1, 2001, Bannum converted its REA into a Claim for Equitable Adjustment and demanded a Contracting Officer's Final Decision.

10. On April 30, 2001, the BOP issued a final decision awarding Bannum $13,940 and enclosed unilateral Modification 10 in the amount of $13,940.00.

11. On May 1, 2001, Bannum invoiced for the Modification No. 10 in the amount of $13,940. To date, Bannum has not been paid and, as such, Bannum is entitled to an equitable adjustment and damages, as a result of the Government's wrongful deduction and their failure to issue payment pursuant to the Modification.

<u>Corpus Christi, Texas - Contract J200C-361</u>

12. On October 26, 1999, Bannum filed a Request for Equitable Adjustment (REA) in the amount of $1,126.40 for wrongful deductions assessed in March 1999 on Contract No. J200c-361. In its REA, Bannum also requested that the matter be resolved through Alternate Dispute Resolution ("ADR")

13. On October 28, 1999, Bannum filed a Request for Equitable Adjustment ("REA") for wrongful deductions assessed in October 1999 on Contract No. J200c-361, in the amount of $950.00. In its REA, Bannum also requested that the matter be resolved through ADR. Documentation supporting its request was also provided.

14. On February 4, 2000, the Government responded to Bannum's REA(s) by denying Bannum's REA(s) as well as, Bannum's request to use ADR.

15. On February 22, 2000, Bannum submitted a REA to the Government for $1,120.00 for wrongful deductions assessed in January 2000 and again requested the use of ADR. Documentation supporting its request was also provided. Said REA was denied by letter dated March 24, 2000.

16. The Government refused to negotiate Bannum's REAs and by letters dated March 1, 2001, Bannum converted its REAs, for the wrongful deductions, into Claims for Equitable Adjustments, in the following amounts:

| | |
|---|---|
| October 26, 1999 | $1,126.40 |
| October 28, 1999 | $ 950.00 |
| February 22, 2000 | $1,120.00 |

The Claims further demanded a Contracting Officer's Final Decision.

17. The Contracting Officer failed to issue a Final Decision within the requisite sixty (60) days, and is deemed to be a denial of the Claims in their entirety. It is from this deemed denial that this appeal is taken.

Beaumont, Texas - Contract J200C-336

18. On October 27, 1999, Bannum submitted an REA for $700 for the wrongful deduction assessed on Contract No. J200c-375 during September 1999.

19. On February 23, 2000, Bannum filed an REA for wrongful deductions of $4,050.00 assessed on the above contract during January, 2000. In addition, Bannum provided documentation concerning the REA as well as requested the use of ADR.

20. BOP denied Bannum's REAs by letters dated February 24, 200 and March 24, 2000. Therefore, Bannum on January 3, 2001, converted its REA(s) into Claims for Equitable Adjustment.

21. The Contracting Officer failed to issue a Final Decision within the requisite sixty (60) days, and is deemed to be a denial of the Claims in their entirety. It is from this deemed denial that this appeal is taken.

Laredo, Texas - Contracts J200C-375 and J200C-433

22. On March 16, 2000, Bannum filed a REA for the wrongful deduction of $740 assessed in November 1999 under Contract J200c-375. In addition, Bannum requested the use of ADR to resolve this issue.

23. On April 10, 2000, Bannum filed an REA for $2,060 for wrongful deductions assessed in February 2000, under Contracts J200c-375 and J200c-433.

24. On April 26, 2000, Bannum provided additional information concerning its Requests for Equitable Adjustment. Furthermore, Bannum discussed in detail that the Government was making derogatory and disparaging remarks concerning Bannum. Again, Bannum requests the use of ADR as a means of resolving the difference.

25. By letters dated March 24, 2000 and April 13, 2000, the BOP denied Bannum's REAs, and as a result, on March 1, 2001, in two letters, Bannum converted the REA of March 16, 2000 totaling $740 and the REA of April 10, 2000, totaling $2,606, into Claims for Equitable Adjustment.

26. To date, the BOP has not responded to Bannum's claims and therefore Bannum has deemed the lack of response as a deemed denial of its Claim for Equitable Adjustment. It is from this deemed denial that this appeal is taken.

COUNT 2

27. Bannum, on June 14, 2000, filed a REA under the Tupelo, Mississippi contract (J200c-306) and the Jackson, Mississippi contract (J200c-325), in the amount of $16,620.86. The REA was for added cost incurred by Bannum for the purchase and installation of new doors, which was directed by the BOP.

28. On February 5, 2001, the BOP requested additional information concerning the breakdown of Bannum's added cost. By letter dated February 13, 2001, Bannum provided a breakdown of the cost as well as justification for this added cost.

29. On February 26, 2001, the BOP responded to Bannum's REA and issued two bilateral modifications as follows:

| Modification | Contract | Amount |
|---|---|---|
| 13 | J200C-306 | $ 918.00 |
| 9 | J200C-325 | $3,248.40 |

The Modifications also contained language which released the Government from any other claims being asserted. Also attached to the Modifications, was a letter from the Contracting Officer, which stated that the Modifications constituted a Final Decision of the Contracting Officer.

30. In a letter dated March 9, 2001 Bannum disputed the amounts contained in the Modification, and further stated that it would not execute the Modifications, due to the release

language contained therein. Therefore, Bannum requested that the Modifications be re-issued as unilaterals and that payments be issued in the amounts stated.

31. Pursuant to Bannum's request, on April 9, 2001, BOP issued the following unilateral modifications:

| Modification | Contract | Amount |
|---|---|---|
| 13 | J200c-306 | $ 918.00 |
| 9 | J200c-325 | $3,248.40 |

32. By letters dated July 30th and 31st, 2001, the BOP rescinded both unilateral Modifications. The BOP stated, that upon further review it was determined that the modification should have been issued as a bilateral modification with a contractor's release of claims, to be signed by Bannum. If Bannum was to reconsider its position and agree to sign a modification with the release language, BOP was to be notified.

33. On October 18, 2001, the BOP issued a Final Decision, withdrawing the previous Final Decision, dated February 26, 2001, and further denied Bannum's REA in their entirety. From this October 18, 2001 Final Decision, Bannum hereby takes an appeal of said denial of its claim, in the amount of $16,620.86.

COUNT 3

34. All of the contracts awarded to Bannum by the BOP are of a requirements nature. Therefore, any BOP need for residential services, within the area covered by a particular contract, must be assigned to Bannum's facilities. However, in regard to; the Beaumont, Texas Contract (J200c-336), the Laredo, Texas Contract (200c-375), and the Corpus Christi, Texas Contract (J200c-

361), the BOP began to improperly divert newly-assigned residents to facilities other than Plaintiffs. This diversion of residents constituted a breach of the contracts.

35. On July 12, 2000, Bannum filed a certified Claim for Equitable Adjustment in the amount of $428,201.40, for breach of the above -referenced requirement contracts.

36. On November 15, 2000, the BOP responded to Bannum's Claim for Equitable Adjustment by three separate letters:

a. regarding Contract No. J200C-336, the BOP issued a Final Decision granting Bannum $50,000 for its claims.

b. regarding Contract No. J200C-375, the BOP issued a Final Decision denying Bannum's claim in its entirety; and

c. regarding Contract No. J200C-361, the BOP issued a Final Decision denying Bannum's claim in its entirety.

37. On January 3, 2001 and February 27, 2001, Bannum through its counsel forwarded letters requesting that ADR be used to resolve this matter.

38. On or about May 4, 2001, the BOP issued unilateral Modification 12 to Contract No. J200c-336, which reflected the additional $50,000 granted by the Contracting Officer's Final Decision.

39. On May 7, 2001, Bannum, under Contract No. J200C-336 billed the BOP for the $50,000 granted in unilateral Modification 12. Bannum in this letter reserved its request to pursue this matter further.

40. On June 12, 2001, the BOP forwarded a letter to Bannum along with bilateral

Modification 13. The letter states that "after further review by the BOP, it has been determined that the modification should have been issued as a bi-lateral modification." Modification 13 included language whereby Bannum would release all rights to additional claims on this matter for all three contracts. In addition, Modification 13, also improperly rescinded unilateral Modification 12.

41. To date, Modification 13 has not been executed by Bannum and no payment has been made.

42. On October 18, 2001, the Contracting Officer issued another Final Decision in regard to the diversion claim on the Beaumont contract (J200c-336). In its Final Decision, the Contracting Officer stated that the letter of November 15, 2000 was mistakenly categorized as a Final Decision and was, in fact, a settlement offer of $50,000. Since Bannum did not accept the offer, as demonstrated by their failure to sign the Modification granting the $50,000, the offer is withdrawn. In addition, the Final Decision stated that upon further consideration of the claim, it was determined that the BOP did not breach the contract, and therefore, Bannum's Claim was denied in its entirety.

43. Therefore, as a result of the Contracting Officer's Final Decision, dated October 18, 2001, denying Bannum's claim for Contract J200c-336, and the Final Decision , dated November 15, 2000, denying Bannum's claims for Contracts J200c-361, and J200c-375, this appeal is made for compensation in the amount of $428,201.40.

COUNT 4

44. On July 5, 2000, the BOP notified Bannum, that as a result of an investigation conducted by the Office of Internal Affairs, Pamela Simpson, a Counselor Aide under the Beaumont, Texas contract (J200c-336), would not be allowed to work with BOP inmates. The letter contained

no details of the investigation nor explanation of the of its findings.

45. On July 5, 2000, Bannum issued a letter to the BOP requesting a full accounting of the alleged charges and findings of the investigation. BOP issued no response to this request.

46. On July 17, 2000, Bannum filed a Request for Equitable Adjustment in the amount of $4,293.45, which reflected costs expended in replacing Ms. Simpson and in preparing the REA. Bannum, in this REA, also demanded that ADR be used. The REA further stated that the BOP had blatantly ignored Bannum's request for information regarding the charges and investigation against Ms. Simpson, and that they have been forced to bar her from employment without reason or rationale. Bannum further stated that this matter was a continuation of problems that Bannum has experienced with the BOP's South Central Region, including but not limited to; improper investigations, diversions of referrals, and interference of personnel management and that such improper actions by the BOP will affect Bannum's ability to receive future contracts.

47. By letter dated November 15, 2000, the BOP denied Bannum's Request for Equitable Adjustment in its entirety. Despite the clear categorization of its submittal as a "Request for Equitable Adjustment," the BOP's letter of November 15, 2000 was improperly issued as a Final Decision, denying a Claim for Equitable Adjustment. On January 31, 2001, Bannum converted its REA into a Claim for Equitable Adjustment.

48. The Contracting Officer failed to issue a Final Decision on Bannum's Claim within the requisite 60 days, which is deemed to be a denial. From this deemed denial of Bannum's Claim, this appeal is taken, and compensation is requested in the amount of $4,293.45

COUNT 5

49. In regard to the Beaumont, Texas Contract (J200c-336), during July, 1999, the BOP Office of Internal Affairs began investigating Bannum personnel for alleged sexual misconduct, specifically in regard to an allegation that a Bannum employee may have been involved in a sexual relationship with another Bannum employee.

50. Based upon information and belief, the BOP's justification for conducting the investigation was internal BOP guidelines and restrictions, which dealt only with BOP personnel, which were not incorporated into Bannum's contracts. In addition, the basis of this investigation was utilized as a pretext to further improperly expand the investigation in an effort to find any possible wrongdoing by Bannum.

51. In addition to improperly conducting the investigation, the method used by the BOP during the investigation, resulted in a disruption of Bannum's contract management and resulted in pitting employee against employee and employees against management, which resulted in Bannum incurring increased costs and effort. In addition, throughout this investigation, investigators continually and improperly threatened that Bannum's contracts would be in danger of being terminated.

52. In addition, pursuant to the terms of the contract, Bannum was required to report to BOP of any alleged violation. However, because of the BOP's refusal to notify Bannum as to the allegations made, and the nature and extent of the investigation being conducted, the BOP was putting Bannum at risk of violating its contractual obligation to immediately report alleged misconduct.

53. The Government impliedly acknowledged that its investigation was based upon

standards and restrictions not incorporated into Bannum's contract, by the issuance of Modification 10, on or about September 19, 2000, which incorporated BOP's Internal Standards of Conduct into the option years of the contract.

54. As a result of the improper investigation, on January 2, 2001, Bannum filed a detailed Request for Equitable Adjustment for various constructive changes to its contract, including the costs incurred in dealing with the improper investigation. In addition, Bannum also stated that the REA would be revised to include the costs entailed with the incorporation of Modification 10.

55. On January 25, 2001 the BOP requested additional information concerning Bannum's REA.

56. On April 10, 2001, Bannum converted its REA into a Claim for Equitable Adjustment and demanded a Contracting Officer's final decision. To date, no final decision has been issued. Bannum deems the lack of a response as a deemed denial of its claim. From this deemed denial this appeal is taken and compensation is requested in the amount of $41,200.00.

COUNT 6

57. On December 22, 2000, a Cure Notice was issued to Bannum under Contract J200C-336 (Beaumont, Texas). The Cure Notice stated that the BOP had received notice that the owner of the property, housing Bannum's facility, was intending to exercise his option to terminate Bannum's tenancy.

58. In response by letter dated January 2, 2001, Bannum through its attorney, responded to the Cure Notice. Bannum, as part of this response, filed a Claim for Equitable Adjustment in the amount of $4,500, which constitutes all costs entailed in responding to this improper cure notice. In

its Claim, Bannum claimed that the BOP's direct communication with the owner of the property, their failure to verify the accuracy of information received, their failure to notify Bannum of their receipt of the communication and their failure to identify the person(s) and nature of the communications conducted, constituted an improper and prejudicial withholding of Superior Knowledge and further constituted a breach of the BOP's contractual duty to cooperate with Bannum.

59. On January 29, 2001, the Contracting Officer issued a Final Decision, denying Bannum's Claim in its entirety. From this January 29, 2001 Final Decision, Bannum hereby takes an appeal of said denial of its claim, in the amount of $4,500.00.

60. During discovery, the BOP produced various internal documents stating that there was an unwritten agreement with the City (County) government in Beaumont, Texas that a school for troubled youths was going to be occupying the Bannum facility and that Bannum would be forced to vacate. The BOP had knowledge of this agreement a full month before receiving the letter from the landlord indicating that it was exercising its option to terminate Bannum's tenancy and yet failed to impart this information to Bannum or to further aid Bannum by providing the information.

61. Instead the BOP issued a shame cure notice based upon some alleged conversation and letter that it obtained from landlord who claimed that it was exercising its option to terminate Bannum's tenancy. As a result Bannum was forced to litigate this matter in Court to protect its contract without all of the pertinent facts.

62. On or about October 12 , 2007, Bannum filed a revised claim with the contracting officer based upon the new information the amount of $96,390.00.

COUNT 7

63. During the course of performance of various contracts, the BOP issued various unilateral modifications, which incorporated revised Wage Determinations under the Service Contract Act (SCA) of 1965, and which required Bannum to pay higher wage rates and fringe benefit rates under its contract. Pursuant to the terms of the contracts, Bannum had the right to be compensated for the increase of wages.

64. In response to these modifications, Bannum submitted the appropriate payment vouchers for the increased costs incurred under the various contracts, at various intervals from approximately 1998 to the early months of 2001. These vouchers were subsequently audited by the DCAA, which confirmed a total amount due of $258,891.00, which was divided as follows:

| Location | Contract Number | Date of Voucher | Audited Values |
|---|---|---|---|
| Beaumont, Texas | J200c-336 | 3/22/01 | $26,655.00 |
| Charleston, North Carolina | J200c-343 | 3/12/01 | $29,021.00 |
| Clarksburg | J200c-338 | 2/16/01 | $15,694.00 |
| Corpus Christi, Texas | J200c-362 | 4/12/01 | $17,230.00 |
| Fayetteville | J200c-332 | 3/2/01 | $21,951.00 |
| Florence, South Carolina. | J200c-370 | 2/01 | $14,305.00 |
| Greensboro, North Carolina | J200c-377 | 3/21/01 | $16,771.00 |
| Jackson, Mississippi | J200c-325 | 3/14/01 | $15,426.00 |
| Jackson, Mississippi | | 3/19/01 | $ 3,465.00 |

| | | | |
|---|---|---|---|
| Laredo, Texas | J220c-375 | 4/11/01 | $30,437.00 |
| Montgomery, Alabama | J200c-397 | 3/20/01 | $ 2,509.00 |
| Reno, Nevada | J200c-355c | 3/20/01 | $14,205.00 |
| Savannah, Georgia | J200c-310 | 2/23/01 | $17,770.00 |
| Tallahassee, Florida | J200c-376 | 3/2/01 | $ 6,165.00 |
| Tupelo, Mississippi | J200c-306 | 4/18/01 | $16,036.00 |
| Wilmington, North Carolina | J200c-373 | 4/18/01 | $11,251.00 |
| **Subtotal** | | | $258,891.00 |

65. On April 6, 2001, the BOP issued a letter alleging that Bannum failed to provide the Contracting Officer with proper notice or the required documentation in support of the wage rate it is claiming.

66. On April 16, 2001, Bannum, through its counsel, issued a letter responding to the BOP's allegation regarding the alleged lack of notice, which clearly established that Bannum had provided the proper notice and in a format directed by the Contracting Officer. In addition, it must be noted that the inclusion of the revised wage rates by Modification is not subject to negotiation. Bannum was required to pay these rates, and therefore, the BOP could in no way be prejudiced by any alleged lack of notice.

67. On or about September 5, 2001, Bannum filed an additional REA requesting compensation for G&A, Profit and financing costs, in the amount of $57,072.28, resulting from the revised Wage Determinations incorporated during the base periods of the contracts. The

Government failed to respond to the Request, and therefore, on October 3, 2001, the REA was converted into a Claim for Equitable Adjustment.

68. On October 18, 2001, the Contracting Officer issued a Final Decision stating that Bannum is entitled to $146,060.00, for the past wage determination. Bannum contends that the $146,060 allowed for in the Final Decision is based upon erroneous calculations and that it is entitled to the full $258,891.00 as confirmed by the referenced Government audit. In addition, the Final Decision denied, in its entirety, Bannum's Claim for the G&A, Profit and financing costs in the amount of $57,072.28.

69. Accompanying the Final Decision was bilateral Modification 8, which reflected the Final Decision, thereby increasing the contract amount by $146,060.00. The Modification also contained language whereby Bannum released the Government from any and all liability under these contracts regarding the Past Wage Determination. Bannum has not executed the Modification.

70. From this October 18, 2001 Final Decision, Bannum hereby takes an appeal and requests compensation in the amount of $258,891.00 for the past Wage Determinations and $57,072.28 for the claim dealing with G&A, Profit and Financing Costs.

71. In addition to the submission of the REAs in regard to past Wage Determinations, additional REAs/Vouchers were submitted for current Wage Determinations, which affected present and future billings. The BOP has failed to conduct any meaningful discussions as to these current rates, which has resulted in the failure of the BOP to issue a contract modification which would allow Bannum to invoice based upon these current rates. Therefore, Bannum is forced, per contract

Modification, to pay the higher rates, but at the same time, it has been deprived of the right to properly bill based upon these higher rates.

72. Due to the BOP's failure to negotiate and modify the contracts to reflect these higher rates, on August 21, 2001 Bannum converted the various REAs/Vouchers for the current and projected wages into a Claim for Equitable Adjustment, in the amount of $430,219.00. Subsequent to the filing of these Claims, the amount has been revised to $402,753.06 ($54,226.76 - actual paid wages, $348,526.32 - projected wage increase), to reflect the actual costs and rates.

73. By letter dated October 18, 2001, the BOP requested additional supporting information in regard to its Claim. The letter further stated that it wanted until March 22, 2002 to issue a Final Decision.

74. Bannum alleges that it has already supplied BOP with all the information necessary to arrive at a Final Decision in this matter. In addition, a significant portion of these costs, which were projected at the time of submission are now actual costs, which have been paid by Bannum, and are therefore clear-cut, indisputable amounts that should be granted. Therefore, based upon the foregoing, Bannum alleges that the request of BOP to wait until March 22, 2001 to issue the Final Decision is patently unreasonable. As a result, Bannum hereby considers the BOP's letter of October 18, 2001 to be a deemed denial of its Claim, from which this appeal is made.

75. Due to the passage of time, the character and amount of Bannum's Claim for current and future revised wage determinations has changed from $402,753.06 to $394,112.23, $382,966.93 of which is actual paid wages, and $11,145.40 is projected wage increase.

76. Notably, on August 9, 2002, Bannum submitted additional wage determination REAs to the BOP for current and future billings. If the BOP refuses to pay these REAs, Bannum intends to convert them into Claims as well.

77. On March 18, 2004, the BOP consented to the entry of a judgment in the amount of $258,891.00 plus interest. On April 6, 2004, the Court entered judgment in the amount of $258, 891.00 plus interest. The issue of EAJA fees have not been determined as of yet.

COUNT 8

78. Pursuant to the terms of the Montgomery Contract (Contract No. J200c-397), the only transportation requirement was that public transportation was to be available within one mile of the facility. At all times, during its performance of this present and the past contract (No. J200c-181), Bannum was in full compliance with the requirements, as evidenced by the extremely high employment rate of the facility residents.

79. Despite the fact that Bannum was in full compliance with the transportation requirements contained in the contract, intermittently during Bannum's performance of this contract and its performance of the preceding contract (No. J200c-181), BOP raised an issue in regard to Bannum's compliance of the transportation requirements under the contract, specifically in regard to the adequacy of the public transportation in Montgomery.

80. However, despite raising these concerns, the BOP failed to delineate how exactly Bannum was failing to comply, resorting instead to general, vague allegations of non-compliance, which were impossible address with any specificity; In addition, the BOP failed to definitize the changes to the transportation requirements that it wanted made.

81. As a result, Bannum was forced to supply numerous cost proposals in an attempt to respond to these undefinitized extra-contractual changes, on which the BOP failed to conduct any meaningful discussions.

82. Despite the fact that the BOP had failed to properly definitize the transportation requirement changes and despite the fact that they failed to negotiate the costs proposals submitted by Bannum, the BOP improperly withheld the exercise of the remaining options under the contract, stating that they would not be exercised until after the transportation issue was resolved. This attempt to leverage Bannum was an abuse of discretion, was done to harm Bannum, and was done in bad faith.

83. Additionally, despite the fact that Bannum had always complied with the transportation requirements, the BOP, in bad faith, utilized this extra-contractual issue as a pretext to improperly issue a Performance Evaluation in October, 2000, which ranked Bannum "fair/poor", as a result of the transportation issue. This issuance of the improper and erroneous Performance Evaluation has had, and continues to have, a long-range effect on Bannum's ability to be awarded other contracts.

84. As a result of the BOP's bad faith actions on this matter, on March 6, 2001, Bannum submitted an REA to the BOP, requesting compensation for all costs expended as a result of this issue and for lost profits as a result of the BOP's breach in not exercising the options because of the transportation issue. The BOP failed to respond to the REA, which was converted into a Claim, by letter dated April 9, 2001, demanding compensation in the amount of $339,411.67.

85. The Contracting Officer failed to issue a Final Decision within the requisite sixty (60) days, which is deemed to be a denial of the claim in its entirety. Therefore, from this deemed denial, this appeal is made and compensation is requested in the amount of $339,411.67.

86. As a result of the instant action, during discovery, the BOP produced internal documents admitting that all along Bannum was in compliance with the transportation requirements of the contact. The BOP in bad faith still continued to abuse and leverage Bannum into providing extra transportation by causing false monitoring reports to be issued, which it used to make false performance evaluations. These performance evaluations then affected Bannum's ability to obtain additional contracts from the BOP.

87. The BOP also produced internal documents allegedly justifying the failure to exercise option years by claiming that Bannum's proposals were excessive and that it could get the services cheaper if the contract was put back out on the street. Upon information and belief, the BOP either knew or should have known that this information was false, and this was a deliberate attempt to punish Bannum for exercising its rights under the changes clause of the contract. The cost that the BOP estimated for putting the contract back out on the street was more expensive than the cost that Bannum was proposing to correct the BOP's transportation problems. This is bad faith and an abuse of discretion.

88. Bannum was unsuccessful in obtaining the replacement contract with the BOP exercising all of the option years. The BOP also exercised all of the option years on the preceding contract. The BOP has a history of exercising all its options once a contract is in place because the expense, time, and effort of obtaining a facility in light of the zoning requirements. As a result,

Bannum lost an additional two years of contract revenues. Bannum further spent an enormous amount of time and effort on attempting to resolve the transportation issue which the BOP admitted was a change to the contract requirements. Not only should Bannum be paid the additional contract revenues but it should be paid all of its time and effort in attempting to resolve the transportation issue at the behest of the BOP.

89. During the audit Bannum revised its claim from $339,411.67 to $371,918.00

COUNT 9

90. Pursuant to the terms of the Beaumont, Texas contract (J200c-336), the Laredo, Texas contract (J200c-375) and the Corpus Christi, Texas contract (J200-361), in addition to services for full-time resident mandays, "a percentage of total estimated mandays may be used for live-out programs." The contracts further contained the following estimates in regard to categorization of these services:

Fixed price per Regular Manday - 80%;

Home Confinement Mandays - 19%; and

Furloughed Mandays - 1%.

The Statement of Work for these contracts also contained a detailed description of the requirements to be filled before a resident in assigned to Home Confinement.

91. Bannum bid the contracts based upon these estimates, with the Home Confinement Manday Rate being approximately one-half of the rate for the Full-Time Resident Manday. It was clearly understood that the Home Confinement percentage estimates reflected the maximum number of residents which could be assigned to Home Confinement.

92. On February 27, 2001 the BOP issued a letter to the Directors of Bannum's facilities, stating that the South Central Region home confinement utilization is below the mandated 20% and that this mandated target is a minimum and that all eligible inmates should be referred to and placed on home confinement.

93. On February 27 and 28, 2001 the BOP issued letters to the particular Bannum Facilities Directors, directing them to move the following number of residents from the in-house program to home confinement:

Beaumont, Texas - 5 Inmates;

Laredo, Texas - 4 inmates; and

Corpus Christi, Texas - 7 inmates.

94. As a result of complying with the BOP's direction, Bannum had the following number of residents assigned to home confinement:

Beaumont, Texas - 9 inmates;

Laredo, Texas - 10 inmates; and

Corpus Christi, Texas - 8 inmates.

95. In each of these locations, the number of inmates required to be assigned to home confinement greatly exceeded the 19% maximum estimate included in the contracts, which constitutes a breach of the contract.

96. In addition, the directed removal of a specific number of inmates to home confinement, violated the terms of the Statement of Work, which requires that home confinement

can be granted to inmates, only upon a prior determination that various specified standards have been met.

97. As a result of this improper diversion of inmates to home confinement, Bannum was forced to reduce its staff accordingly, as allowed under the Contract. As a result Bannum suffered damages, including, but not limited to: lost G&A and Profit, increased unemployment costs and the costs incurred in the interviewing and rehiring resulting from the changing populations. In the matter of the Beaumont, Texas contract, the damages were exacerbated by the fact that Bannum had already been damaged by the BOP's improper diversion of residents to other facilities, as previously discussed.

98. As a result of the improper diversion, and the damages caused thereby, Bannum submitted the following REAs:

Beaumont, Texas - March 15, 2001;

Laredo, Texas - April 9, 2001; and

Corpus Christi, Texas - April 9, 2001.

99. Subsequent to the filings of the REAs, the BOP requested a cost breakdown for each of the submittals, which were supplied by Bannum. These breakdowns included revised figures, which reflected the most recent shifts in inmate categorization. The total revised pricing for each of the REAs, was as follows:

Beaumont, Texas - $52,943.65;

Laredo, Texas - $56,416.66; and

Corpus Christi, Texas - $43, 520.87.

100. Due to the BOP's failure to negotiate these REAs, the three REAs were converted into Claims for Equitable Adjustment on September 12, 2001. By letter dated November 8, 2001, the Contracting Officer issued a Final Decision, denying Bannum's Claims in their entirety. From this November 8, 2001 Final Decision, Bannum hereby takes an appeal from said denial of its claims, in the amount of $152,881.18

COUNT 10

BEAUMONT, TEXAS (CONTRACT NO. J200c-336)

101. On December 15, 1999 the BOP issued a letter to Bannum regarding the Beaumont, Texas contract (J200c-336), which stated that pursuant to their records, Bannum was to reimburse a past resident a sum of $980.00, which represented an overpayment made for the required weekly subsistence payments.

102. In response, on December 23, 1999, Bannum issued a letter to BOP, stating that the required reimbursement was made and that a voucher was enclosed, in which Bannum requested payment for the reimbursement, as allowed per the contract.

103. On March 9, 2000 Bannum issued a memo to the BOP, regarding the Beaumont contract, requesting reimbursement in the amount of $81.00 for a resident release advance, which should not have been included as a credit on Bannum's billing.

104. The BOP failed to submit the required payments, despite Bannum's repeated requests on September 5, 2000 and May 16, 2001.

105. On October 3, 2001, Bannum's requests for payment was converted into a Claim for Equitable Adjustment, in the amount of $1,061.00, from which no Decision or payment has been issued.

106. The Contractor Officer issued a Final Decision on November 30, 2001, wherein she denied $980 of the Claim, and advised Bannum to provide further documentation in support of the remaining $81 of the Claim. Since Bannum had already provided the Contracting Officer with the documentation needed to make a decision on the $81, that portion of the Claim is deemed denied. It is from the Contracting Officer's November 30, 2001 that this appeal has been taken.

TUPELO, MISSISSIPPI (CONTRACT NO. J200c-306),
JACKSON, MISSISSIPPI (CONTRACT NO. J200c-325), TALLAHASSEE, FLORIDA
(CONTRACT NO. J200c-376), MONTGOMERY, ALABAMA (CONTRACT NO. J200c-397)

107. Pursuant to the terms of the Statement of Work contained in each contract, certain medical bills incurred by the inmates are paid by Bannum, who then invoices the BOP for reimbursement.

108. In complying with the terms of the SOW, Bannum paid various medical bills and then invoiced the BOP for reimbursement. However, in regard to thirteen of these billings relating to the Tupelo, Mississippi Contract (J200c-306), Jackson, Mississippi Contract (J200c-325), Tallahassee, Florida Contract (J200c-376) and Montgomery, Alabama Contract (J200c-397), the BOP has failed to reimburse Bannum. Twelve of the billings are for the year 1999 and one is for 1998.

109. At the request of the BOP, Bannum, on numerous occasions, has supplied the BOP CCM office and the BOP Southeast Regional Office with the documentation supporting these requests.

110. Due to the failure of the BOP to issue the reimbursement, as contractually required, on May 16, 2001, Bannum issued a demand letter for reimbursement in the amount of $2,856.00 plus additional administrative costs, plus applicable interest. The letter further requested that the BOP engage in ADR procedures to resolve the matter.

111. On October 3, 2001, these demands for payment were converted into Claims for Equitable Adjustment. To date, the BOP has failed to either reimburse Bannum, per the contract requirements, or to engage in ADR, as demanded.

112. The Contracting Officer issued a Final Decision on November 30, 2001, wherein she denied Bannum's Claim in its entirety. It is from this Contracting Officer's Final Decision that the instant appeal is taken.

LAREDO, TEXAS (CONTRACT NO. J200c-375)

113. In November, 1999, the BOP issued Modification No. 8 to the Laredo, Texas Contract (Contract No. J200c-375). The purpose of the Modification was to compensate Bannum, in an amount not exceed $4,710.40, for wages paid pursuant to the revised Wage Determinations. Bannum executed the Modification on November 12, 1999, and on or about November 17, 2000, Bannum issued a voucher requesting payment of the agreed-to $4,710.40.

114. Pursuant to the pertinent regulations, payment was to be made on or before December 23, 1999. However, payment was not received until August 30, 2001, two-hundred fifty-one (251) days after the voucher was submitted. Since the payment was not made within the requisite time, included in this payment was interest costs in the amount of only $56.90.

115. On October 4, 2001 Bannum's counsel forwarded a claim letter to the Contracting Officer questioning the interest figure contained in the payment. The letter also included detailed calculations which showed that Bannum was entitled to interest in the amount of $156.74. In addition, since the proper interest penalty was not paid within 10 days of receipt of payment, pursuant to FAR 32.907-1 Bannum was entitled to a double interest penalty, thereby raising the total interest due to $313.47. The request for the interest payment was reiterated by letter dated October 23, 2001.

116. The Contracting Officer issued a Final Decision on November 30, 2001, wherein she denied Bannum's Claim in its entirety. It is from this Final Decision that this appeal is taken.

GREENSBORO, NORTH CAROLINA (CONTRACT NO. J200c-377)

117. Pursuant to the terms of the Greensboro Contract (J200c-377), Bannum was to supply doors leading to the sleeping areas, which complied with NFPA codes. Bannum installed doors which met these requirements, which resulted in the issuance of a Notice to Proceed by the BOP, after their pre-occupancy inspections, and the issuance of a Certificate of Occupancy by the State Fire Marshall and Building Inspector. As a result of the issuance of the Notice to Proceed and the Certificate of Occupancy, Bannum began performance of the contract on or about March 1, 1998.

118. Despite the issuance of the referenced documents and Bannum's successful performance during the base period and the first option period, inexplicably, in a monitoring report, dated April 17-18, 2001, the BOP issued a finding stating that the doors leading to the sleeping areas were not fire rated, and that Bannum was to ensure compliance and provide documentation within 10 days of receipt of the report.

119. This issue gave rise to numerous communications between Bannum and the BOP, regarding the actual requirements of the contract, and the continuing issuance of detrimental and erroneous monitoring report findings.

120. In the spirit of cooperation, Bannum offered to apply a Flame Control, fire retardant paint, which would result in the doors meeting the BOP's extra-contractual requirement. However, despite the cost and function effectiveness of this proposed resolution, BOP improperly refused to accept Bannum's accommodation.

121. As a result of the BOP's continual issuance of the improper and unfavorable monitoring reports and their refusal to accept Bannum's proposed resolution, Bannum was forced to purchase and install new doors, which met the BOP's changed requirements.

122. On September 12, 2001 Bannum filed an REA in the amount of $9,663.55, which reflected the costs of purchasing and installing the new doors and the administrative incurred in dealing with this issue. The BOP failed to negotiate this REA, and as a result the REA was converted into a Claim by letter dated October 3, 2001.

123. The Contracting Officer has failed to issue a Final Decision on this Claim. To the extent that the Contractor Officer was divested of authority to make a Final Decision by the filing of Bannum's Complaint on November 9, 2001, Bannum respectfully requests that the Court stay this portion of the instant Complaint and remand it back to the Contract Officer for a Final Decision in accordance with 41 U.S.C. §605(c)(5).

WHEREFORE, Bannum hereby requests that this Court grant Bannum the following relief:

COUNT 1: Enter a judgment against the United States and in favor of Bannum in the amount of $29,673.08, plus interest, for improper deductions taken as a result of alleged performance deficiencies;

COUNT 2: Enter a judgment against the United States and in favor of Bannum in the amount of $19,090.04, plus interest, for the costs incurred as a result of the purchase and installation of new doors, directed by the BOP;

COUNT 3: Enter a judgment against the United States and in favor of Bannum in the amount of $450,722.74, plus interest, as a result of the BOP's breach of the requirements contracts and the improper diversion of residents;

COUNT 4: Enter a judgment against the United States and in favor of Bannum in the amount of $4,519.26, plus interest, for costs incurred as a result of the improper termination of Pamela Simpson from the Beaumont facility;

COUNT 5: Enter a judgment against the United States and in favor of Bannum in the amount of $51,073.10, plus interest, for costs incurred as a result of the BOP investigation based upon standards of conduct not included in Bannum's contract;

COUNT 6: Enter a judgment against the United States and in favor of Bannum in the amount of $96,390.00, plus interest, for costs incurred as a result of the BOP's improper issuance of a Cure Notice in regard to the Beaumont, Texas contract, and as a result of the BOP's breach of their duty of cooperation;

COUNT 7: As a result of a consent judgment Bannum is entitled to all of attorney fees and expense under the Equal Access to Justice Act ("EAJA").

COUNT 8: Enter a judgment against the United States and in favor of Bannum in the amount of $371,918.00 plus interest, for damages suffered as a result of Bannum's dealing with the Montgomery transportation issue and the improper non-exercise of options.

COUNT 9: Enter a judgment against the United States and in favor of Bannum in the amount of $165,749.37, plus interest, for damages suffered as a result of the excessive BOP-directed home confinement.

COUNT 10: Enter a judgment against the United States and in favor of Bannum in the amount of $4,702.97, plus interest, for Claims A-C described hereinabove in the narrative for Count 10, to be later amended to include additional costs, if any, resulting from the Contracting Officer's Final Decision on Claim D (Greensboro) of Count 10.

Date: October 12, 2007

/s/ Joseph A. Camardo, Jr.
Joseph A. Camardo, Jr.
Camardo Law Firm, P.C.
*Attorneys for Plaintiff*
127 Genesee Street
Auburn, NY 13021
Tel: (315) 252-3846
Fax: (315) 252-3508