IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BANNUM, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) ) ) ) ) ) ) ) ) | No. 01-639C (Judge Lettow) |

**AFFIDAVIT OF DAVID LOWRY (Count 6)**

STATE OF FLORIDA )
)
PINELLAS COUNTY ) ss.

I, DAVID A. LOWRY, being of the age of majority and otherwise competent to make this affidavit, being duly sworn, deposes and says:

1. I am a resident of Pinellas County, State of Florida and I have personal knowledge of the facts contained in this affidavit. From 1984 until 2006, I was the Executive Director of Bannum, Inc. (hereinafter, "Bannum"), located at 8726 Old C.R. 54, Suite E, New Port Richey, Florida 34653. Bannum is a corporation with a principal place of business in New Port Richey. At the time of the filing of the Complaint in this action, Bannum operated approximately 16 Community Correction Centers, or halfway houses, throughout the United States, pursuant to contracts with the United States Department of Justice, Federal Bureau of Prisons (BOP). I was responsible for managing the day to day activities of Bannum and its contracts.

2. Several of these contracts were with the South Central Region of the BOP. During that time, Bannum was having significant difficulties with various BOP actions and inactions leading

to a multitude of contract disputes with this specific region. The Community Corrections Regional Administrator for this region was Gina Lane Mustain and the Community Corrections Contract Oversight Specialist ("CCCOS") was Charles W. Ala, who was the source and cause of a number of these contract disputes.

3. The Disputes in the South Central Region centered on the BOP's improper deductions, diversions of referrals, interference with personnel, refusal to pay for Contract mandated wage determinations, improper investigations, improper cure notice, improper home confinement issues, etc.

4. On or about December, 1996, the BOP issued Request for Proposal 200-0366-SC for a Community Correction Center in Beaumont, Texas. As a result, on or about January, 1997, a Bannum representative, Arnold R. Rich of Bannum then traveled to Beaumont, Texas, to search for property for a lease in connection with the proposal it intended to make in response to the RFP.

5. On or about February 5, 1997, a lease agreement was executed for the property located at 1310 Pennsylvania Avenue, Beaumont. (A42-44).

6. Pursuant to the RFP, the BOP required appropriate zoning and a use permit by the City of Beaumont. (A23).

7. Charles Foxworth, as an agent for both John McCray and Mr. Ken Webb who signed the lease, submitted an application to the City of Beaumont for amendment of the zoning ordinance. The names of the owners were listed as John McCray and Ken Webb. (A32).

8. The lease was submitted to the BOP by Bannum as part of its Proposal.

9. In part, based upon the lease, the BOP on July 17, 1997, entered into a contract with Bannum to provide a Community Corrections Center at 1310 Pennsylvania Avenue, Beaumont. (A1).

10. On February 10, 1999, Mrs. Webb sent a letter to Bannum directing it to forward all future rental payments directly to John McCray (A30).

11. I have reviewed the documentation produced by the BOP in response to Bannum's discovery request. I was surprised to find several memorandums that completely contradict the BOP's request for Summary Judgment. In a Memorandum dated November 7, 2000, Mr. Ala advised Ms. Mustain that during the monitoring of Bannum, it was discovered that the City Council in Beaumont had approved a Catholic school for troubled youths, and that the school would be placed in the building currently occupied by Bannum. Mr. Ala also represented that the City Council stated that it was agreed upon that Bannum would vacate the premises prior to the beginning of the school year 2001. Mr. Ala further stated that as of the date of the memorandum, Bannum had not notified the BOP of any future move. (Exhibit 1). No mention is made of any attempts by the BOP to communicate this information to Bannum. At that time Bannum had no knowledge of any discussion about Bannum vacating the building. **Nor was there any discussion about the previous zoning approval and use permit that had already been issued to Bannum. Bannum still remains at the leased facility under contract with the BOP.**

12. To the best of my knowledge, the BOP never disclosed this information to Bannum.

13. On December 15, 2000, Bannum received a letter dated December 8, 2000, from Foxworth Real Estate stating that "The Owner has elected to execute his option to terminate your tenancy". (A49 & A52). However, the owner had no option to terminate Bannum's tenancy

under the lease agreement and did not begin any kind of legal eviction proceeding. **Bannum still remains at the leased facility under contract with the BOP.**

14. It is important to note that Mr. McCray did not file any eviction proceeding in Court to legally effectuate an eviction proceeding.

15. In a memorandum dated December 18, 2000, from Mr. Ala to Kathy Campbell, the Assistant Community Corrections Administrator in the BOP central office, Mr. Ala advised that he had a conversation with Mr. McCray, the owner of the building, who stated that Bannum never had a lease to occupy the building. Mr. Ala further represented that Mr. McCray leased the building to Mr. Webb and that Mr. Webb subleased the building to Bannum, and that Mr. Lowry was aware that he was subleasing the property. Purportedly Mr. McCray did not know that the building was being subleased until he received a letter from Bannum about a leaking roof. Mr. Ala further represented: "As an aside, should it become necessary, Cornell Corrections, Houston, Texas, can accommodate all Bannum Beaumont's population and can accommodate for all their programming needs, including home confinement in the Beaumont area." No mention is made of any attempts by the BOP to communicate these issues to Bannum. (Exhibit 2).

16. What is troubling is that on the bottom of the December 18, 2000 communication is a handwritten note stating **"County Commissioner says unwritten agreement that if the schools goes in Bannum will have to vacate."** (emphasis added) (Exhibit 2)

17. Bannum had no knowledge of any agreement with the County Commissioner regarding the institution of the school at the same premises as Bannum's facility and further Bannum was not aware that it would have to purportedly vacate the building because of the purported school agreement. Additionally, absolutely no attempt was made by the BOP to contact Bannum to

discuss this agreement regarding the school.

18. On December 19, 2000, I received a phone call from Ms. Mustain, who inquired of the purported eviction and represented that she already had in her possession a copy of the letter to vacate. As a matter of fact Mr. Ala had been in communication with Foxworth and Mr. McCray and had discussed the purported letter to vacate. (BOP26452). Ms. Mustain did not offer me any information about the "secret school" agreement.

19. On December 20, 1999 I had a telephone conversation with Andrea Johnson (Deputy Community Corrections Regional Administrator for BOP), during which Ms. Johnson stated that since Bannum was being evicted from the contract location, a Cure Notice would be issued the following week by the Contracting Office. At no time during the telephone conversation did Ms. Johnson impart any information to Bannum regarding the school agreement.

20. On December 19, 2000, Bannum had the lease agreement reviewed by an attorney Susan Oliver in Beaumont Texas, who indicated that the lease was valid. Ms. Oliver stated that the Zoning information showed both Mr. Webb and Mr. McCray were the owners of the property, and that Mr. McCray accepted Bannum's rent payments. Ms. Oliver further indicated that she would seek a restraining order. (A30-31). I then supplied a copy of Ms. Oliver's letter to the BOP. (A26).

21. On December 22, 2000, a Cure Notice was issued to Bannum demanding that Bannum provide a written plan of action and a copy of a valid lease for the duration of the contract. The Cure Notice did not advise Bannum of the existence of the secret unwritten agreement regarding the school. (A23).

22. On December 22, 2000, Bannum obtained a restraining order against any attempted legal eviction. (A59).

23. On January 3, 2001, Bannum filed a response to the Cure Notice and a claim for equitable adjustment. The claim stated that Bannum had a valid lease and Bannum alleged that the BOP improperly handled the lease matter by; failing to verify the validity of the letter to vacate, failing to review the terms of the lease previously submitted, or; failing to conduct meaningful discussions with Bannum before issuing the Cure Notice, which Bannum felt constituted a breach of the duties of cooperation and good faith and fair dealing. The response further alleged that the BOP's threat of default was especially egregious given the fact that Bannum had previously submitted numerous REAs under the subject contract, none of which had reached final resolution. At the time of the filing of the claim, Bannum was not aware of the BOP's "secret" memos about the purported removal of Bannum as a result of the school that was going into the facility. (A25-29).

24. Bannum obtained an extension of the restraining order on January 2, 2001 (A61) and a temporary injunction on January 11, 2001, which was extended a number of times (A66, A71, A76). **Bannum still remains at the leased facility under contract with the BOP.**

25. Bannum aggressively pursued litigation to preserve the lease (A33-62, A66-67, A71, A81-107).

26. On January 29, 2001, the BOP denied Bannum's claim stating that it did not have adequate assurances that Bannum would be able to perform the services required by the contract and was in danger of defaulting on its contract. No mention was made with respect to the communications regarding the secret agreement made regarding the placement of the Milburn Academy or that Bannum was advised accordingly. (A68).

27. Several months passed and the Court issued stay remained in effect. (A61, A66, A71, A76).

28. On March 29, 2001, Charles Ala wrote another memorandum to the contracting officer that he had yet another conversation with Mr. Lee Wheeler of Foxworth Realty. Mr. Wheeler advised Mr. Ala of the status of the litigation and notified him that the Richard Milburn Academy, a school for troubled youths, was now occupying the back portion of the building as of January 31, 2001. Mr. Ala further stated that he phoned Herbert Johns, the director of the Academy and questioned whether or not he was experiencing any problem with the staff or inmates at Bannum's facility. Mr. Johns told Mr. Ala that there had been one occasion of fraternization between a student and a Bannum inmate. According to Mr. Ala, Mr. Johns also stated that he thought that Bannum was to be moved out of the facility prior to them occupying the building and that he had great concerns about adult federal inmates being housed in proximity to the school. (A74). At no time did Mr. Ala or the BOP communicate with Bannum regarding these concerns or the fact that there was a presumption that Bannum would be out of the facility prior to the school moving in. (A74-75). **Bannum still remains at the leased facility under contract with the BOP.**

29. Bannum continued to take aggressive legal steps to avoid any interference or interruption with its lease. In fact, Bannum pursued Mr. and Mrs. Webb in Bankruptcy Court in California, took depositions in California, and attempted to obtain all of the Webb's records pertaining to its operation of the property at 1310 Pennsylvania Avenue. When Bannum's motion for continuance in the Texas Court was denied, it pulled its action in the Texas Court and then proceeded to pursue both Mr. McCray and Mr. Webb, and all other parties in Federal Court. (A81& A87).

30. As a matter of fact on June 4, 2001, Bannum advised the Contracting Officer that it withdrew its complaint in the Texas State Court and proceeded in Federal Court.

31. Bannum incurred substantial litigation expenses while the BOP remained silent with critical information that could have exposed the reason why Bannum was being asked to leave. As a matter of fact, in my opinion, the BOP actually consorted with and encouraged Mr. McCray by openly communicating with him.

32. At no time did the BOP retract or rescind its Cure Notice. **Bannum still remains at the leased facility under contract with the BOP.**

33. However, as a result of this litigation, Bannum was able to complete its contract. Bannum then bid on the follow-on contract with the BOP utilizing the same premises pursuant to a new lease agreement with Mr. McCray. **Bannum still remains at the leased facility under contract with the BOP.**

34. I was contacted by the Defense Contract Audit Agency (DCAA) and told that it had been requested by the DOJ to do an Audit of Bannum's Claims. However the Auditor advised me that he was not directed to Audit Count 6.

35. I have reviewed Bannum's time and effort including all the legal bills incurred by Bannum as a result of the defective Cure Notice. Bannum has incurred approximately, $115,836.64 as a result of the ongoing litigation resulting from the lease. The BOP and Bannum were under contract and pursuant to partnering agreements; both parties were to act in good faith with each other. If the BOP had disclosed the real reason behind the alleged eviction notice, Bannum could have confronted the City, the BOP, and Mr. McCray, and gotten to the bottom of this madness. The BOP knew about the school agreement approximately one month before the letter to vacate, but yet stood silent and then forced Bannum to incur tremendous legal costs to preserve the contract.

36. Even though the Auditor did not audit Count 6, he reviewed some of the legal bills that

Bannum incurred. (Exhibit 6)

37. Bannum has been supplied by the DOJ with the Audit working papers that the Auditor utilized to prepare his Audit Report that included some of the legal bills incurred in the McCray litigation.

- Bannum had to chase down the Webb's, who were located in San Diego, to obtain documents to show the real estate connection between Mr. Webb and Mr. McCray.
- When the Webb's refused to produce documents at a deposition, and the Texas Court insisted on proceeding with the case, Bannum was forced to non-suit its Texas case and proceed in Federal Court to further protect the lease, incurring additional legal cost.
- Subsequently, because the Federal Court dismissed the case on jurisdictional grounds only, Bannum had to continue with the Texas State Court action, which included additional discovery.
- Bannum finally obtained discovery from the Webb's, which included boxes of files that had to be reviewed.

(Exhibit 6).

38. __Bannum still remains at the leased facility under contract with the BOP.__

Sworn to before this
11th day of October, 2007

David Lowry

Sandra Allen
Notary Public

Notary Public State of Florida
Sandra Allen
My Commission DD671757
Expires 07/11/2011