IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BANNUM, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 01-639C (Judge Lettow) |

**AFFIDAVIT OF DAVID LOWRY (Count 8)**

STATE OF FLORIDA }
}
COUNTY OF PINELLAS } ss:

I, DAVID A. LOWRY, being of the age of majority and otherwise competent to make this affidavit, being duly sworn, deposes and says:

1. I am a resident of Pinellas County, State of Florida and I have personal knowledge of the facts contained in this affidavit. From 1984 until 2006, I was the Executive Director of Bannum, Inc. (hereinafter, "Bannum"), located at 8726 Old C.R. 54, Suite E, New Port Richey, Florida 34653. Bannum is a corporation with a principal place of business in New Port Richey. At the time of the filing of the Complaint in this action, Bannum operated approximately 16 Community Correction Centers, or halfway houses, throughout the United States, pursuant to contracts with the United States Department of Justice, Federal Bureau of Prisons (BOP). I was responsible for managing the day to day activities of Bannum and its contracts.

2. I have reviewed the summary judgment motion filed by the government along with all the attachments, which attempt to represent to this Court that the government is not responsible for refusing to exercise the options and for refusing to pay for all of the time and effort that Bannum incurred in responding to the BOP's alleged transportation requirement. I have reviewed internal documents produced during discovery and as will be shown on March 26, 1999, the contracting officer acknowledged that Bannum was in compliance with the transportation requirement of the contract.

3. By letter dated March 6, 2001, Bannum filed with the Contracting Officer a detailed Request for Equitable Adjustment ("REA"). The basis of the REA was for all of the time and work effort expended by Bannum in attempting to accommodate the BOP alleged requirement for transportation in Montgomery, Alabama and responding to the BOP's demand for pricing proposals. The BOP has admitted that it was responsible for causing the transportation mistake. Despite the BOP's admissions, it systematically harassed and blamed Bannum in an attempt to force Bannum to provide extra contractual transportation services. The BOP went as far as to threaten Bannum that it would not exercise two option years on contract J200c-397 unless and until Bannum provided the transportation that it was mistakenly being forced to provide, no cost. **Attached to the REA was a detailed affidavit that I prepared detailing Bannum's position on this matter. A copy of the REA and my affidavit are attached to the government's motion for summary judgment (A320-A346).**

4. On or about August 6, 2004, The BOP audited Bannum's claim on the transportation issue and issued an audit report (A355-368). Bannum during discovery also obtained a copy of the Auditors working papers that were used to prepare the audit report. (Exhibit 18). Pursuant to

the requests of the auditor, **I prepared a detailed affidavit dated May 14, 2004 supporting the cost relating to the transportation issue that Bannum incurred at the behest and direction of the BOP. (Exhibit 17)**

5. Bannum was first awarded a contract for Montgomery in January, 1986. Then it was awarded a follow-on Contract No. J200c-181 on or about October 1, 1993. The contract called for Bannum to provide Community Corrections Center services for Federal offenders in the Montgomery, Alabama area. Pursuant to the terms of the contract, Bannum was to commence performance on October 1, 1993 for a base period of two years ending September 30, 1995. The contract also contained three 1-year options, all of which were exercised by the BOP. (A328)

6. Then, on or about July 1, 1998, Bannum was awarded a follow-on contract No. J200c-397 by the BOP. (A144-153) This Contract was awarded after several rounds of discussion during which the alleged transportation issue was raised only once in a C&D letter dated April 10, 1998, despite the BOP's alleged previous concerns. Bannum responded to that concern by attaching its April 16, 1998 letter which addressed the issue that was raised under its current contract. Bannum further stated that if a different transportation plan was required, Bannum's manday rates would increase based on related costs. (A330). The issue was not raised again during the six subsequent C&D negotiations and requests for Final Proposal Revisions. (A330).

7. The Statement of Work for Contract for J200c-397 required that "the facility shall be located within 1 mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost the resident". (A14) Bannum's facility was located in compliance with the contract requirement. (A328, ¶3).

8. Intermittently during Bannum's performance of the subject contract and the preceding

contract (No. J200c-181), BOP raised an issue regarding Bannum's compliance of the transportation requirements under the contract, which BOP claimed was deficient. The BOP issued numerous monitoring reports and letters insisting that Bannum had to come up with a solution for the BOP's mistaken transportation needs of the inmates. (A189, A334 ¶6, A196-197, A227, A230, A233-234, A237, A240, A242, A251, A334 ¶32, A263-265, A273-274, A287-292, A298, A300-304, A307, A308-310, A315-319, A350-354)

9. Bannum spent considerable extra-contractual time, effort and cost responding to BOP's allegations, continuously claiming that it met the transportation requirements of the contract. Discovery material shows that the BOP knew full well that Bannum had met, and was continuing to meet at all times, the contract transportation requirements. (A194, A198-199, A200-201, A229, A332 ¶s 21,22, A261-272, A275-276, A305-306).

10. The BOP then, after realizing that Bannum met the contract transportation requirements, directed Bannum to submit a proposal in excess of the contract terms and Bannum submitted, in response thereto, a proposal to the CCRA Cheryl Dennings on September 8, 1999 which discussed price, terms and other conditions. The price proposed by Bannum was $5,000.00 per month (A248-249)

11. Despite the submission of Bannum's proposal, the contracting officer sent to Bannum Modification No. 3, which included compensation for the additional transportation services in the amount of $45,000 per year, which was one-half of the BOP's estimate included in its Request for Contract Action. (A254-255)

12. However, on November 29, 1999 Bannum discovered that the CCRA had never forwarded its September 8, 1999 pricing proposal to the contracting officer. Bannum then

notified the contracting officer that it had mistakenly signed Modification No. 3, believing that its proposal to the CCRA of September 8, 1999 had been accepted and incorporated into the contract. Bannum therefore rescinded its agreement to the Modification. (A252)

13. On January 4, 2000 the supervising contracting officer acknowledged the rescission of modification three and requested yet another cost proposal for the provision of transportation services in excess of contract requirements. Additionally, the supervising contracting officer stated that the BOP Montgomery office (COTR) may decide to not exercise the option years, if Bannum did not satisfy their alleged transportation concerns. Bannum considered the contracting officer's statement an attempt to extort extra contractual performance from Bannum in exchange for the BOP exercising subsequent options under the contract. (A334)

14. In response to the BOP direction, Bannum submitted yet another formal cost proposal for the change in transportation requirement on January 7, 2000. (A257-259).

15. In January 2000, again, even though the BOP had directed Bannum to submit numerous cost proposals for extra-contractual transportation services, BOP personnel in the field office (COTR) continued to raise the alleged concerns regarding the transportation issue and Bannum rightly responded that the matter was presently being negotiated with the BOP central office. (A334 ¶32, A200).

16. Despite this fact, the BOP continued to issue findings against Bannum's contract in monitoring reports, including a "REPEAT" deficient finding. (A263-265) This forced Bannum to expend time and effort again in responding. (A269-276).

17. Pursuant to further requests from the BOP, Bannum submitted another cost proposal on March 24, 2000, in the amount of $55,200.00 per year. (A278-280) During a meeting with the

BOP regarding this cost proposal, the BOP stated that Bannum must provide transportation throughout the day and strongly encouraged Bannum to purchase a van for that purpose. (A-336).

18. Bannum then contacted the BOP seeking further clarification as to whether or not it should provide for taxicab services or to provide vans. The BOP responded that Bannum should just submit its best offer and did not provide Bannum with anymore direction or guidance. (Exhibit 11).

19. On June 13, 2000, Bannum submitted a detailed proposal for use of a taxicab service, and private vehicles in unusual situations. (A293-296).

20. No further negotiations were conducted between Bannum and the BOP with respect to the June cost proposal. (A336).

21. The BOP continued to blame Bannum in monitoring reports regarding the transportation issue forcing Bannum to incur additional costs. (A336).

22. On October 11, 2000, the BOP issued its performance evaluations (CEF) for the Montgomery program which ranked Bannum "fair" in the contract compliance and business relations category and "poor" in the customer satisfaction category. (Exhibit 12).

23. Bannum had to spend a significant amount of time responding to this blatantly false performance evaluation. On November 16, 2000 Bannum submitted a detailed rebuttal to what it considered to be the erroneous CEF (Exhibit 13)

24. On November 29, 2000, Bannum received a copy of solicitation 200-0637-SE which was a request for proposals for a follow-on contract in Montgomery. When Bannum inquired as to the reason for this solicitation, the BOP responded that unless the transportation issue was

resolved, the procurement was going back out on the street and that the BOP would further contact Bannum to discuss the transportation issue. (A343)

25. On or about January 11, 2001 Bannum contacted the chief contracting officer and was advised again that unless it negotiated the transportation issue, the option years would not be exercised and a new contract would be awarded under the new solicitation (A343-344)

26. On January 24, 2001, Bannum submitted yet another cost proposal pursuant to a telephone conversation between Bannum representatives and BOP personnel and significantly reduced its cost proposal. (A311-313)

27. On February 9, 2001 the Piliero law firm, at a great deal of time and expense, contested the erroneous CEF. (Exhibit 14) and further appealed the February 21, 2001 full monitoring report wherein again the transportation issue was raised. (Exhibit 15).

28. As I indicated above, on March 6, 2001 Bannum file a detailed REA. The basis of the REA was to contest the wrongful refusal by the BOP to exercise the option and for all the time and expenses in dealing with the transportation issue with the BOP and the requested cost proposals.

29. Bannum was awarded the follow-on contract J200c-562 on September 25, 2001 for the base period of 2 years and 3 one-year options which were all exercised by the government. (A154-157). It is important to note that the government exercised all of the options years and the contract recently expired. Bannum was unsuccessful in obtaining the follow on contract after having been in Montgomery since 1986.

30. The BOP did not negotiate the REA and on April 9, 2001 the REA was converted into a certified claim for equitable adjustment in the amount of $339,411.57. (A347)

31. As I indicated above, the BOP then, through the Defense Contract Audit Agency ("DCAA"), performed an audit. I was Bannum's representative during the audit. (A355-368)

32. The claim was revised during the audit from $339,412 to $371,918 (A358).

33. The claim amount included the lost overhead and profits for the wrongful refusal to exercise the option, proposal preparation expenses which included Bannum labor costs for the BOP requested proposals, associated expenses such as UPS and overnight charges, fees associated with compiling the REA, legal cost and travel expenses. (A358)

34. The auditor questioned certain costs during the audit, based on certain opinions, which Bannum submits are in the error. (A358)

35. The auditor questioned the lost overhead and profits in its entirety based on the premise that Bannum would have replaced the income or revenue that it would have derived from the exercise of the options with the 2001 contract. (A356)

36. Bannum was still shorted two years. As indicated above the BOP exercised all the option years of the 1993 contract, did not exercise option years 2 & 3 on the 1998 contract, and exercised all of the option years on the 2001 follow-on contract. The auditor erred in not taking this issue into account.

37. The auditor then reviewed Bannum's labor costs. (A360-361). This labor was incurred in responding to the BOP's wrongful attempts to continuously blame Bannum for the transportation nightmare and then to the BOP's request for numerous pricing proposals.

38. The auditor questioned all of Bannum's labor cost because Bannum did not have time sheets and further that the work was performed by Bannum salary personnel. (A359)

39. However, buried in the auditor's working papers was my affidavit explaining and

detailing the basis behind Bannum's request. (Exhibit 17). My affidavit is very detailed, citing to the work effort expended by specific Bannum personnel and a detailed estimate of their time and also identifies the labor rates. My affidavit is hereby incorporated herein.

40. The auditor then reviewed the expenses incurred by Bannum associated with the extra work. He questioned the cost claiming that he could not tie them in to the Montgomery claim. (A361-362) However, I did provide the auditor with invoices and receipt of certain mailing and postage expenses which show the date and time of the bill that can be matched to Bannum's correspondence. (Exhibit 18)

41. The auditor then looked at the Camardo and the Piliero legal bills. The auditor incorrectly explains that these bills were for the Montgomery protest. (A362-363). However the vast majority of the Camardo billing was for the time and effort incurred in the protest of the defective transportation language and the detailed REA. (Exhibit 6). The Piliero bills were for the time and effort incurred contesting the improper and erroneous CEF's that also included contesting the transportation issue (Exhibit 6).

42. The auditor then reviewed the travel cost. (A363-364) The auditor claimed that Bannum did not support these charges by tying them into the Montgomery matter. However, pursuant to my May 14, 2004 affidavit, on page 3, I identified that I traveled to meet with the BOP officials on several occasions to deal with the transportation issue (Exhibit 17).

Sworn to before this
11th day of October, 2007

[signature]
David Lowry

[signature] Sandra Allen
Notary Public

Notary Public State of Florida
Sandra Allen
My Commission DD671757
Expires 07/11/2011