# 13

BANNUM, INC.
1301 SEMINOLE BOULEVARD
SUITE 126
LARGO, FLORIDA 33770

DAVID LOWRY
EXECUTIVE DIRECTOR

OFFICE: (727) 588-2594
FAX: (727) 588-2689

November 16, 2000

RECEIVED
NOV 20 2000
MCA, Atlanta, GA

Donna Zickefoose
U. S. Department of Justice
Federal Bureau of Prisons
Community Corrections Office
715 McDonough Boulevard S. E.
Atlanta, GA 30315

Re: Performance Evaluation
Contract #J200c-397
Bannum Place of Montgomery

Dear Ms. Zickefoose:

This is in response to the "Performance Evaluation" for Bannum Place of Montgomery dated October 11, 2000 which was received in our office on October 16, 2000. Based on the evaluation as forwarded to me, the BOP has, in absolute terms, determined that Director Juliette Davis lacks the leadership skills, professionalism and ability to maintain adequate staff; contract compliance; and an appropriate business relationship with the BOP. Using such a determination in Ms. Davis's job performance review would by itself dictate that Bannum must identify her replacement and seek her resignation. We do not believe that such an environment exists in Montgomery, and we continue to trust that our assessment of her abilities, skills and leadership are correct and that the information herein will succeed in removing this terminal career deficiency from her record. As such, the following represents Bannum's comments.

In previous discussions concerning contractor evaluations, we have been advised by high ranking BOP officials (including the CCRA and the MCA of the Southeast Region) that the evaluations are based primarily on monitoring reports <u>for the evaluation period</u>. Any consideration, other than the monitoring reports, is subjective as stated by the contract; therefore, the author of such evaluation reports can easily insert personal bias, emotional prejudices, negative attitudes and other subjective elements into the report.

Bannum has previously expressed its deep concerns about the bias, emotional prejudice, negative attitude and generally inappropriate approach of the CCM and CCCOS in the Montgomery CCM office. Such persons are responsible for the drafting and compilation of evaluation reports.

We have approached this response from the standpoint of the monitoring reports. Given the information hereinabove we do not see how a rating of poor in any of the three major categories can be substantiated. Therefore, it is our belief that the transportation issue has resulted in personal bias, emotional prejudices, negative attitudes and other subjective elements in this evaluation. Having included such elements in the evaluation violates the standard adopted and conveyed by the Assistant Administrator, Privatization and Special Projects Branch, and several other high ranking BOP officials.

We believe that such elements, by their very nature, have been leveled at Bannum, Inc. Executive and middle management to the exclusion of (by your own admission) the Director and staff of Bannum Place of Montgomery. If this belief is inaccurate, we are bewildered as to why the BOP has not removed or withdrawn approval for Ms. Davis to work with Federal offenders.

In addition to our request to revise the rating upward in each area discussed above, we are also requesting that you add three points to the total score. According to the evaluation form, up to three points can be added if performance is "over minimum requirements of the SOW" or "above minimum requirements of the SOW." Clearly, and considering the number of communications cited herein above, our performance has been exceptional.

Your review of this request is appreciated and if I can be of any further assistance, please let me know.

Sincerely,

David A. Lowry

During the two year base period for which this evaluation applies, there have been two full monitorings and three interim monitorings. In every monitoring report the BOP discusses their concern with the decline of the public transportation system in Montgomery, AL as a finding or concern.

With the implementation of the current contract and, in spite of the satisfactory negotiation of the transportation issue, the above referenced CCM and CCCOS continued their campaign maligning Bannum's contract compliance. Subsequently, a CCCOS (about whom Bannum has also stated grievous concerns) new to the region, but with the same prejudicial bent as his predecessors has become involved in the issue and in the drafting and compilation of the evaluation reports.

Obviously, this transportation issue was a significant factor in lowering the evaluation score. However, the BOP has now acknowledged that their concern with public transportation in Montgomery is not the fault of Bannum as more fully discussed in the attached Exhibit I below and therefore, Bannum's evaluation score should be raised significantly.

As stated above, we have been advised that monitoring reports are the basis for contractor evaluations. That standard was most recently confirmed and verified by the Assistant Administrator, Privatization and Special Projects Branch, a BOP official in Washington, DC. At the Western Regional Conference the Assistant Administrator assured all contractors present that all contractor evaluations are based solely on monitoring reports [emphasis added]. In applying that standard, we offer the following comments.

The evaluation areas are as follows:

I. Contract Compliance

A. Staffing – During the evaluation period, the monitoring reports contain only one finding concerning staff. That finding resulted from CCCOS Toston's misunderstanding of the Employment Specialist's performance of her duties in recognition of her job title and job description. This never should have been a finding and we asked that it be withdrawn.

The monitoring report reflects as follows:

1/6/99 Full monitoring – CCM states:
"This contractor is fortunate to have highly skilled staff in the field of corrections. Key staff have advanced degrees in the fields of juvenile and ad ult corrections. This contractor is also fortunate in that the staff retention for key positions is very stable.This stability of leadership is the major factor to the consistent high standards displayed at this center."

3/30/99 Interim monitoring – CCRA signed on behalf of CCM.

Due to the upheaval in the CCM and CCCOS positions. A "reconstructed" monitoring report was submitted, and it contained no comments, discussions or commendations for staff.

6/22/99 Interim monitoring – CCM states:

"3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit."

1/3/00 Full monitoring

Except as noted in I.A. above, the CCCOS has no discussion comments or commendations for staff.

5/2/00 Interim monitoring

CCCOS Toston provided no comments, commendations or discussion about staff except to acknowledge:

"Mr. Coleman, Counselor, is acknowledged for his hard work and dedication in keeping up with the resident case load after the departure of a fellow counselor."

With the exception of one erroneous finding which we requested to be withdrawn, the only comments concerning staff reflected skill, education, professionalism and stability. Therefore, we believe this rates an evaluation of Excellent.

c. Life Safety

Three monitoring reports reflected minor life safety issues, all of which are of a relatively routine nature, i.e. normal wear and tear. However, in all instances, Bannum took appropriate corrective measures. After consideration of the minor issues involved we believe our compliance is 100% with a rating good/excellent.

C. Financial Responsibility

The financial responsibility of Bannum, Inc. is beyond question. Our financial responsibility has been reviewed by the Small Business Administration and Office of the Inspector General and found to be above reproach. Therefore, we assume that financial responsibility relates to that of the residents of the program and our discussion relates thereto.

1. Employment (see Exhibit II) – Except for findings related to transportation, only one finding dealt with the issue of employment.

That issue involved CCCOS Toston's erroneous finding which we requested be withdrawn because it was based on his misunderstanding of the Employment Specialist's performance of her duties in recognition of her job title and job description. In fact, Bannum has achieved an excellent record of employment for the residents as evidenced by the information contained on the attached Exhibit II. Rating Excellent.

2. Subsistence – no findings related to this area. Bannum ensures that all residents pay the required subsistence, and we make the appropriate withholdings from the monthly billings. We believe our compliance rating to be Excellent.

3. Bank Accounts – Bannum encourages financial responsibility of residents by requiring or encouraging, as appropriate, the opening and maintenance of checking, savings accounts, etc. Financial counseling is provided when needed. We believe our rating is Excellent.

D. Discipline – No findings related to this area, therefore, we believe our rating is Excellent.

E. Food Service – One finding in this area which stated:

"During the monitoring, it was discovered that the approved food menu does not specify the K-CAL per day for males and females."

This is such a minor issue, with which we subsequently complied, that it should never have been considered a finding. In other monitoring reports the following comments were made:

"<u>COMMENDATIONS</u>

1. The food service operation was found to be in compliance with contract requirements. The meals followed the posted menu and appeared to provide ample portions."

and

2. "The center provides meals through Liz Home Cooking, a local caterer. The meals were prepared according to the posted menu and appeared nutritious. The caterer has a valid license issued by the City of Montgomery, Alabama. The caterer was last inspected by the Alabama Department of Health on December 8, 1998, obtaining a satisfactory rating."

We believe a rating of Excellent is appropriate.

F. Accountability – no findings in this area therefore, we believe our rating is Excellent.

G. Completeness and accuracy of reports - no findings related to submission of reports.

1. Invoices – no findings related to this area. The BOP states: "The contractor does an exceptional job of submitting accurate bills and collecting subsistence."

2. Urinalysis reports – one finding mentions urinalysis logs but our monthly urinalysis reports have not been questioned.

3. Incident reports – no findings related to this area.

4. Volunteer Participation Reports – no finding is this area.

In the area of completeness and accuracy of reports as discussed in 1. through 4. hereinabove, we believe our rating should be Excellent.

II. Customer Satisfaction

A. Overall quality of programs that provide:

1. Accountability – see discussion under Contract Compliance above – no findings. We believe our rating should be Excellent.

2. Work - see discussion under Contract Compliance above and incorporate Exhibit II herein. We believe our rating should be Excellent.

3. Other self improvement opportunities for offenders. The monitoring reports reflect no findings in this area. Also, see discussion under contract compliance hereinabove. We believe our rating should be Excellent.

B. Overall approach to communication and correctional management. Bannum has operated a program in Montgomery, AL for the Federal Bureau of Prisons since 1986.

1. Communication – no findings in the monitoring reports indicate any failure in the areas of communication either at the center staff level or at the middle and executive management levels. See discussion under Business Relations A. Flexibility.

2. Correctional management – no findings in the monitoring reports indicate any failure in the areas of correctional management either at the center staff level or at the middle or executive management levels. In fact, at the center staff level commendations include:

"We were pleased with the results of the monitoring and believe Bannum operates a very efficient program in Montgomery. The staff at the center work as a team and this is apparent after one spends only a short time in the facility. Key staff have excellent skills in their specific duties. Director, Mrs. Juliette Davis, is considered a master in the field of community corrections. She has put together a group of individuals who work well together. We are pleased to have her in charge of the facility."

and

"This contractor is fortunate to have highly skilled staff in the field of corrections. Key staff have advanced degrees in the field of juvenile and adult corrections. This contractor is also fortunate in that the staff retention for key positions is very stable. This stability of leadership is the major contributing factor to the consistent high standards displayed at this center."

and

"3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit attitude."

As to correctional management at Bannum's Executive and middle management levels, Bannum has been performing these services since early 1985 and in Montgomery since early 1986. I have had 25 years experience of correctional management experience, Mr. Rich has 16 years experience in this area, Ms. Bellew has 15 plus years and Mr. Stough has 5 plus years. We remain committed to excellence of service in correctional management, provision of quality programs and absolute compliance, <u>all of which is consistent with the mission of the BOP.</u> Accordingly, we believe we rate Excellent in this area.

III. Business Relations:

A. Flexibility - As relates to the issue of transportation which obviously has skewed this evaluation, Bannum has considered every viable alternative to meeting BOP demands. When our insurance carrier advised us that they would not provide coverage for the proposed service. We contacted other agencies with access to all carriers and were able to obtain coverage for the transportation activities desired by the BOP. We have submitted three proposals regarding transportation in an effort to accommodate the BOP.

Additionally, there is not one finding or recommendation that we did not implement or attempt to implement. As an example, if we are told to revise a form, we revised the form and so on.

Prior to initiating action concerning potentially disputable matters, Bannum consistently initiates face to face or telephonic communication for in-depth discussions of the issues involved in an attempt to resolve these issues without controversy. In that regard, Bannum's Executive Director and middle management personnel have traveled to Atlanta on four occasions for such purpose.

B. Proactiveness – During contract negotiation, Bannum proposed and BOP accepted, creation of an Employment Specialist position and promotion of a senior staff member. Although this action was misunderstood by CCCOS Toston, that action has provided the excellent resident employment record as indicated by Exhibit II hereto, in spite of the BOP's transportation concerns.

Understanding the BOP comments about the age of the building, we continually try to locate an alternative site for the program, subject of course to BOP approval.

The BOP confirms proactiveness when it states:

"COMMENDATIONS

1) Staff are in the process of attempting to implement a program that gives employers a tax break for hiring ex-felons."

and

"This contractor does an excellent job of obtaining community support through the use of local volunteers, student interns and community activists in many of their programs."

C. Professionalism – you will recall discussions which we have had in which you and the CCRA expressed the utmost respect for the professionalism, integrity and skills of Director Juliette Davis and her staff. Of course such

professionalism involves the areas of flexibility and proactiveness as discussed herein above, as well as the area of cooperation which will be discussed herein below. With these considerations, it is absolutely impossible to rate Bannum Place of Montgomery's business relations as anything but excellent. The BOP confirms this when it states:

"We believe Bannum operates a very efficient program in Montgomery. Staff of the center work as a team and this is apparent after one spends only a short time in the facility. Key staff have excellent skills in their specific duties. Director, Mrs. Juliette Davis, is considered a master in the field of community corrections. She has put together a group of individuals who work well together. We are very pleased to have her in charge of this facility."

and

"3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit attitude."

D. Cooperation with the BOP, USPO, U. S. Marshall, local law enforcement and the community.

The transportation issue as discussed throughout this missive can in no way be considered a fault of Director Juliette Davis and her staff. Such personnel continue to cooperate in developing and providing information related to that area in an effort to understand and resolve the issues. When one eliminates the transportation issue from the evaluation, Bannum's cooperation and especially that of Ms. Juliette Davis and her staff, is not subject to even a minimal question.

The BOP confirms that when it states:

"COMMENDATIONS

Director Davis and her staff continue to have an excellent relationship with the United States Probation Office. USPO Sandra Woods relayed the center provides a valuable resource to her agency.
This contractor does an excellent job of obtaining community support through the use of local volunteers, student interns and community activists in many of their programs."

We believe a rating of Excellent is appropriate in Business Relations.

CONCLUSION:

# Exhibit I

2/10/98 CCM Spencer (of the Montgomery BOP office) writes in a monitoring report:

"Recommendation #3 – Transportation has become an issue since the change in the public transportation system within the City of Montgomery. The transportation needs of the residents need to be addressed by Bannum immediately, before the problem becomes severe."

3/18/98 Bannum's Operations Director responds

4/9/98 The Contracting Officer writes:

"Bannum has not provided the BOP with an acceptable response. Bannum must present a corrective plan of action to the Contracting Officer by 2:00 PM on April 16, indicating how it will fully accommodate the transportation of federal residents, in accordance with the Statement of Work, Chapter 3, Section A."

4/16/98 Bannum's Executive Director responds to the Contracting Officer, Leah Wilson, in part:

"Since we are in compliance with contract requirements, should the Government wish to amend the contract, Bannum will accommodate the additional requirements after the Government's approval of the necessary cost adjustment."

CONTRACT NEGOTIATIONS FOR THE EXISTING CONTRACT INCLUDED:

3/10/98 Clarification and Discussion #1 – no mention of transportation issue

4/10/00 Clarification and Discussion #2 – The contracting officer states:

"14. Because the City of Montgomery has terminated much of its bus service, some residents are required to walk great distances to work under the current contract (J200c-181). <u>This makes job searches and job-commuting an issue to be addressed under this Solicitation RFP 200-0422-SE.</u> It is the contractor's responsibility to provide the residents with free transportation for employment or program participation activities when there is an absence of public transportation within one mile of the facility. Bannum must provide a plan of action addressing how the residents will be provided free

transportation for the purposes stated above. SOW, Chapter 3, Section A. This is a weakness."

4/24/98 Bannum responds:

"14. See attached letter of April 16, 1998. Should a different transportation plan be required, Bannum's manday rates would increase based on the related costs thereof."

5/6/98 Addendum to Clarification and Discussion #2 – No mention of transportation issue

5/27/98 Clarification and Discussion #3 – no mention of transportation issue

6/3/98 Request for Final Proposal Revision – no mention of transportation issue

6/17/98 Negotiations reopened – no mention of transportation issue

6/19/98 Negotiations reopened – no mention of transportation issue

6/25/98 Request for Final Proposal Revision – no mention of transportation issue

7/01/98 Notification of contract award - Obviously the transportation issue was negotiated to the satisfaction of the Contracting Officer, the evaluation committee and all other BOP officials involved in the procurement process.

10/1/98 <u>New contract begins</u> #J200c-397

2/ 1/99 CCM Spencer issues a finding in a monitoring report:

"Finding #2 – Facility (Transportation)

The City of Montgomery's public transportation system, Demand and Response Transit (DART) has proven to be an unreliable and ineffective means of transportation for the residents at the center."

2/16/99 Bannum's Operations Director responds

3/12/99 CCM Spencer states in a letter:

"However, there is strong evidence that the situation with the local bus service is not in accordance with the provisions of the Statement of Work."

3/26/99 Bannum's Executive Director responds:

"On March 24, 1999, I telephoned Ms. Perry, CCCOS (of the Montgomery office), and discussed the matter of bus service. Ms. Perry suggested I discuss the matter with the Contracting Officer, Leah Wilson. On March 25, 1999, I discussed the matter with Ms. Wilson. Ms. Wilson said she would review the matter."

6/15/99 BOP Regional Transitional Drug Abuse Treatment Manager states in a letter:

"Upon conferring with the Management Center Administrator, Donna Zickefoose, the issue of transportation falls upon your agency based on the Statement of Work in which your agency agreed to provide transportation for the residents."

6/16/99 CCM Spencer issues a repeat finding in a monitoring report:

"Finding #2 – Facility – REPEAT FINDING

The City of Montgomery's public transportation system, Demand and Response Transit (DART) had proven to be an unreliable and ineffective means of transportation for the residents at the center (see attached news article)."

6/21/99 Bannum's Operations Director responds in part to Regional Transitional Drug Abuse Manager's letter:
"Bannum is in compliance with the Statement of Work due to public transportation being within one mile of the facility for the purpose of employment or program participation."

6/21/99 Bannum's Operations Director responds to the 6/16/99 repeat finding and appeals its issuance

6/25/99 MCA Zickefoose states in a monitoring report:

"The only deficiency from the last monitoring not resolved was the transportation issue. This is currently being discussed with the Central Office Contracting Officer and the Contractor."

6/28/99 MCA Zickefoose states in a letter:

"Although the transportation issue has not been resolved, the problems regarding resident transportation are currently being discussed by the Contractor, Montgomery CCM Office, and the Central Office Contracting Office.

As a resolution is expected in the near future, I accept Ms. Bellew's response to the findings. Please consider the March 1999 monitoring closed. If the transportation issue is not resolved it will be re-addressed in the future."

Prior to 9/8/99 – CCRA Dennings requests that Bannum submit to her a proposal for the provision of transportation services in excess of contract terms.

9/8/00 Bannum submits a draft cost proposal to the CCRA which discusses price, terms and other conditions.

9/23/99 CCM Spencer states in a letter:

"After numerous discussions regarding the transportation issue, we have decided to have the Contracting Officer negotiate this concern with you. For this reason, you may consider this monitoring officially closed. We appreciate all your efforts to provide quality services and programs to the residents."

11/24/99 Contracting Officer sends Modification #3 for transportation services to Bannum for signature. Bannum signs modification believing that its draft proposal submitted to the CCRA on September 8, 1999 had been accepted.

11/29/99 The CCRA informs Bannum that its draft proposal was not forwarded to the Contracting Officer; therefore, Bannum rescinds its agreement to Modification #3.

12/17/99 Bannum receives Modification #3 signed by the Contracting Officer

12/20/99 Bannum writes and reminds the Contracting Officer that it rescinded its agreement to Modification #3.

1/4/00 The Supervising Contracting Officer aknowledges the recision of Modification #3 and requests a cost proposal for the provision of transportation services in excess of contract requirements. Additionally, the Supervising Contracting Officer states that the BOP

Montgomery office may decide to not exercise the option period (THREAT) if Bannum does not satisfy their transportation concerns.

1/7/00 Bannum submits a formal cost proposal.

1/11/00 At the request of CCCOS Toston (new personnel in the Montgomery BOP office) Bannum's Executive Director responds to his concern about transportation as follows:

"Please be advised that Bannum, Inc. is currently negotiating with the contracting office for the provision of transportation services at our program in Tupelo, MS and Montgomery, AL."

2/2/00 CCM Ramsdell (new personnel in the Montgomery BOP office) issues a finding in a monitoring report:

"The facility is not located within one mile of public transportation."

2/23/00 Bannum's Executive Director responds:

"Finding #2

In your letter you stated that 'an agreement with Bannum and the Contracting Officer was reached on November 26, 1999 . . ..' Attached is the documentation which shows that an agreement has not been reached. Therefore, we request that this finding be withdrawn."

3/2/00 CCM Ramsdell states in a letter:

"This finding resulted from the contractor's noncompliance with the Statement of Work by not providing transportation to residents for employment or program participation activities at no cost to the resident, due to the facility not being located within one mile of public transportation. In our monitoring report dated February 2, 2000, we requested that you comply with the recent negotiated agreement between you and the Contracting Officer."

3/7/00 Bannum's Executive Director writes:

"It is my understanding that, in response to my request, the CCRA was to have this finding rescinded. Further, Bannum is currently negotiating a contract modification with Mr. Melvin Gardener, of the

Contracting Branch. In fact, Mr. Gardener requested that Bannum provide additional information relating to the modification costs."

3/13/00 CCM Ramsdell writes in a letter:

"We are in receipt of your response to our clarification letter. Based on your responses, you may consider this monitoring officially closed."

3/24/00 In response to a request from the Contracting Officer to lower Bannum's cost, Bannum submits a second cost proposal.

4/25/00 Bannum management personnel meet in Atlanta with BOP Regional personnel to discuss the transportation issue, among other things.

6/13/00 Bannum submits a third cost proposal to the Supervising Contracting Officer.

10/5/00 In the absence of any discussion concerning Bannum's third cost proposal, the BOP notifies Bannum of its intent not to exercise the remaining option periods.

# Exhibit II

After reviewing the BOP billings for the first nine months of 2000 and discussions with our Montgomery staff, the following employment information (excluding those residents who have received a waiver from BOP) is provided:

<u>2000</u>

January — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 29, therefore, the employment rate was 93%.

1. Resident (HIV positive which <u>inhibits</u> employability) arrived 12/6/99; employed 2/24/00
2. Resident arrived 1/7/00; employed 1/26/00 (19 days instead of 15 days)

February — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 33, therefore, the employment rate was 94%.

1. Resident arrived 2/9/00; employed 3/18/00
2. Resident arrived 1/25/00; released without job 3/16/00

March — One resident did not obtain employment within 15 days of arrival. The average population for the month was 30, therefore, the employment rate was 97%.

1. Resident arrived 3/14/00; illiterate which <u>severely</u> <u>limits</u> employability and could not find a job; released 4/25/00
2. Resident arrived 3/16/00; employed 5/25/00; BOP allowed Community Service and Mental Health and Rehabilitation training (not counted in the above figures)

April — 100% employment rate

May — 100 % employment rate

1. Resident arrived 5/9/00; previous warrants issued against him were not cleared up; locked up by Bureau of Prisons on 5/15/00 (not counted in the above figures)

2. Resident arrived 5/2/00; sent to assessment center; OIC training (paid stipend)– 19 years old – 10th grade education (not counted in the above figures)

June — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 31, therefore, the employment rate was 94%.

1. Resident arrived 6/6/00; employed 7/11/00

2. Resident arrived 6/5/00; worked one day for Workforce; disabled/nerve cord damage/drug addiction; employed 7/10/00; terminated for drug use on 7/24/00

July — 100% employment rate

August — 100% employment rate

September — One resident did not obtain employment within 15 days of arrival. The average population for the month was 35, therefore, the employment rate was 97%.

1. Resident (HIV positive) arrived 6/12/00; worked several temporary jobs; walked off the job and was locked up by BOP on 10/13/00 for violations of Community Program; leaving job; accountability; disrespect to staff, etc.

As one can clearly see, Bannum Place of Montgomery has maintained a 97% rate of resident employment. Obviously, the BOP concerns expressed about public transportation is not affecting our residents' ability to obtain employment. Those who don't obtain employment within the specified time are clearly recalcitrant and, unless specified circumstances exist, are program failed. Additionally, the employment rate at our Montgomery program is consistent with other Bannum programs.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## PROBATION OFFICE

ROBERT P. LONGSHORE
CHIEF PROBATION OFFICER

JUDITH CROSBY
DEPUTY CHIEF PROBATION OFFICER

136 Catoma St.
P.O. Box 39
Montgomery, AL 36101-0039

LESLIE P. CRAFT
SUPERVISING PROBATION OFFICER
INVESTIGATIVE UNIT

SCOTT WRIGHT
SUPERVISING PROBATION OFFICER
SUPERVISION UNIT

Voice 334/223-7301
FAX 334/223-7473

March 3, 2000

Mr. Stan Robinson
Federal Bureau of Prisons
Community Corrections Office
P.O. Box 230727
Montgomery, AL 36123-0727

Re: **Transportation Problems at Bannum**

Dear Mr. Robinson:

This letter is in regards to the transportation problems occurring at Bannum and our conversation with your staff in regards to this issue. The purpose of this letter is to advise the problems the U. S. Probation Office is having with indigent offenders that are placed in Bannum Place of Montgomery.

Within the last two months, our officers have had to provide transportation for residents of Bannum Place. These have included an immediate response to pick up an offender and take him to mental health to see a psychiatrist, transport offender to a doctor in regards to his chronic and life threatening illness, and picking up medication for the offenders.

These instances have removed our officers from their assigned duties, increased paperwork, and communication with our federal judges.

Our office has had a long and satisfactory relationship with Bannum Place and their staff, so if we could in any way assist in alleviating this problem, we will do so. In addition, would you provide our office with a contract and conditions of the duties of Bannum Place of Montgomery.

RECEIVED
MAR -6 2000
CCM, Montgomery, AL

Sincerely,

Robert P. Longshore
Chief U. S. Probation Officer

RPL/djk