# 14

PILIERO, MAZZA & PARGAMENT, PLLC
ATTORNEYS AT LAW

FARRAGUT SQUARE
888 17TH STREET, N.W., SUITE 1100
WASHINGTON, D.C. 20006

(202) 857-1000
FAX (202) 857-0200

writer's e-mail address:
jsummerill@pmplawfirm.com

DANIEL J. PILIERO II
(1942-1990)
PAMELA J. MAZZA
JEFFREY J. PARGAMENT
ANDREW P. HALLOWELL

ANTONIO R. FRANCO
PHILIP M. DEARBORN III
FRANK C. GULIN
STEPHEN C. DWYER
JUDITH M. BARGER
JOSEPH J. SUMMERILL, IV

NEW YORK OFFICE
292 MADISON AVENUE
NEW YORK, NY 10017

(212) 213-8200

February 9, 2001

**VIA FACSIMILE & U.S. MAIL**

Crystal D. Clayton
Contracting Officer
Federal Bureau of Prisons
Community Corrections Contracting
320 First Street, NW (5006)
Washington, DC 20534

Re: Contractor Evaluation Form ("CEF") Appeals
Bannum Place of Montgomery
Contract Number J200c-397 (4XA)

Dear Ms. Clayton:

On behalf of Bannum, Inc. ("Bannum"), 1301 Seminole Boulevard, Suite 126, Largo, Florida 33770, telephone (727) 588-2594, facsimile (727) 588-2689, this constitutes an appeal of the December 4, 2000 letter issued by Donna Zickefoose, Federal Bureau of Prisons ("BOP" or "Agency") Management Center Administrator with regard to the above referenced CEF. Kindly direct all communications concerning this issue to the undersigned.

During discussions with both Ms. Zickefoose and BOP officials concerning Helen Ramsdell's, Community Corrections Manager, October 11, 2000 CEF of Bannum Place of Montgomery, I was advised that the CEF was based on monitoring reports for the evaluation period. Therefore, I have painstakingly analyzed the past monitoring reports for the two year base period for which this evaluation applies, to determine whether such reports support Ms. Ramsdell's initial evaluation and Ms. Zickefoose's follow up evaluation. Needless to say, I am troubled by the inconsistency between the rating received by Bannum during these monitoring reports and Ms. Ramsdell's and Ms. Zickefoose's evaluation under the CEF.

During the two base year periods, there have been two full monitoring reports and three interim monitoring reports. The evaluation areas addressed in these reports are as follows:

I. Contract Compliance

A. Staffing - During the evaluation period, the monitoring reports contain only one finding concerning staff. That finding resulted from CCCOS Toston's misunderstanding of the Employment Specialist's performance of her duties in recognition of her job title and job description. This misunderstanding should never should have been a "finding" and clearly does not justify the score of "satisfied" given to Bannum on the CEF.

The monitoring report reflects as follows:

1/6/99 Full monitoring - CCM states:

"This contractor is fortunate to have highly skilled staff in the field of corrections. Key staff have advanced degrees in the fields of juvenile and adult corrections. This contractor is also fortunate in that the staff retention for key positions is very stable. This stability of leadership is the major factor to the consistent high standards displayed at this center."

3/30/99 Interim monitoring - CCRA signed on behalf of CCM.

Due to the upheaval in the CCM and CCCOS positions. A "reconstructed" monitoring report was submitted, and it contained no comments, discussions or commendations for staff.

6/22/99 Interim monitoring - CCM states:

"3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit."

1/3/00 Full monitoring -

Except as noted in I.A above, the CCCOS has no discussion comments or commendations for staff.

5/2/00 Interim monitoring - CCCOS Tosten provided no comments, commendations or discussion about staff except to acknowledge:

"Mr. Coleman, Counselor, is acknowledged for his hard work and dedication in keeping up with the resident case load after the departure of a fellow counselor."

I am sure that you would agree with me that these monitoring reports suggest that BOP was "extremely satisfied" with the staffing provided at Bannum Place of Montgomery. Clearly, Ms.

Ramsdell's score of "satisfied" is unjustified. Therefore, Bannum respectfully requests that you rectify the CEF score to reflect "extremely satisfied."

B. Life Safety

Three monitoring reports reflected minor life safety issues, all of which are of a relatively routine nature, i.e. normal wear and tear. However, in all instances, Bannum took immediate and appropriate corrective measures to the satisfaction of the BOP. Again, these efforts on the part of Bannum justify a score of "extremely satisfied," instead of the score of "satisfied" given by Ms. Ramsdell.

C. Financial Responsibility

The financial responsibility of Bannum, Inc. is beyond reproach. Our financial responsibility has been reviewed by the Small Business Administration and Office of the Inspector General and found to be excellent. With regard to the financial responsibility of the Bannum Place of Montgomery, again the monitoring reports speak for themselves:

1. Employment - During the two year period for which the CEF covers, there has only been one "finding" which dealt with the issue of employment. As discussed above, that issue involved CCCOS Toston's erroneous finding which was based on his misunderstanding of the Employment Specialist's performance of her duties in recognition of her job title and job description. In fact, Bannum has achieved an excellent record of employment for the residents:

2000

January — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 29, therefore, the employment rate was 93%.

1. Resident (HIV positive which inhibits employability), arrived 12/6/99; employed 2/24/00

2. Resident arrived 1/7/00; employed 1/26/00 (19 days instead of 15 days)

February — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 33, therefore, the employment rate was 94%

1. Resident arrived 2/9/00; employed 3.18/00

2. Resident arrived 1/25/00; released without job 3/16/00

March — One resident did not obtain employment within 15 days of arrival. The average population for the month was 30, therefore, the employment rate was 97%.

1. Resident arrived 3/14/00; illiterate which severely limits employability and could not find a job; released 4/25/00

2. Resident arrived 3/16/00; employed 5/25/00; BOP allowed Community Service and Mental Health and Rehabilitation training (not counted in the above figures)

April — 100% employment rate

May — 100% employment rate

1. Resident arrived 5/9/00; previous warrants issued against him were not cleared up; locked up by Bureau of Prisons on 5/15/00 (not counted in the above figures)

2. Resident arrived 5/2/00; sent to assessment center; OIC training (paid stipend) - 19 years old -10th grade education (not counted in the above figures)

June — Two residents did not obtain employment within 15 days of arrival. The average population for the month was 31, therefore, the employment rate was 94%.

1. Resident arrived 6/6/00; employed 7/11/00

2. Resident arrived 6/5/00; worked one day for Workforce; disabled/nerve cord damage/drug addiction; employed 7/10/00; terminated for drug use on 7/24/00

July — 100% employment rate

August — 100% employment rate

September — One resident did not obtain employment within 15 days of arrival. The average population for the month was 35, therefore, the employment rate was 97%.

1. Resident (HIV positive) arrived 6/12/00; worked several temporary jobs; walked off the job and was locked up by BOP on 10/13/00 for violations of Community Program; leaving job; accountability; disrespect to staff, etc.

As one can clearly see, Bannum Place of Montgomery has maintained a 97% rate of resident employment. Those who don't obtain employment within the specified time are clearly

recalcitrant and, unless specified circumstances exist, are program failed. Additionally, the employment rate at our Montgomery program is consistent with other Bannum programs. Again, I am sure that you would agree that such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

2. Subsistence - During the performance period covered by the CEF, there were no "findings" related to this area. Bannum ensures that all residents pay the required subsistence, and we make the appropriate withholdings from the monthly billings. Again, I am sure that you would agree that such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

3. Bank Accounts - The record reflects that Bannum encourages financial responsibility of residents by requiring or encouraging, as appropriate, the opening and maintenance of checking, savings accounts, etc. Financial counseling is provided when needed.

Again, I am sure that you would agree that such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

D. Discipline - During the performance period covered by the CEF, there were no "findings" related to this area. Again, I am sure that you would agree that such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

E. Food Service - During the performance period covered by the CEF, there was one minor "finding" in this area which stated:

> "During the monitoring, it was discovered that the approved food menu does not specify the K-CAL per day for males and females."

As soon as this finding was brought to the attention of Bannum, we immediately sought compliance with the contract requirements. Obviously, the minuteness of this should never have resulted in a "finding," and should not now result in Bannum being deprived of an "extremely satisfied" score with regard to contract compliance under the CEF. In fact, the monitoring reports for the period covered reflect Bannum's continued efforts in this area. Bannum Place of Montgomery has received "commendations" because:

1. The food service operation was found to be in compliance with contract requirements. The meals followed the posted menu and appeared to provide ample portions.

and

2. The center provides meals through Liz Home Cooking, a local caterer. The

meals were prepared according to the posted menu and appeared nutritious. The caterer has a valid license issued by the City of Montgomery, Alabama. The caterer was last inspected by the Department of Health on December 8, 1998, obtaining a satisfactory rating."

Again, such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

F. Accountability - During the performance period covered by the CEF, there were no "findings" related to this area. I am sure that you would agree that such a record deserves a rating of "extremely satisfied," instead of the "satisfied" rating given by Ms. Ramsdell.

G. Completeness and accuracy of reports -

1. Invoices - During the performance period covered by the CEF, there were no "findings" related to this area. In fact, the BOP stated that " The contractor does an exceptional job of submitting accurate bills and collecting subsistence."

2. Urinalysis reports - While there was one minor finding mentioning uranalysis logs, our monthly urinalysis reports have not been questioned.

3. Incident reports - During the performance period covered by the CEF, there were no "findings" related to this area.

4. Volunteer Participation Reports - During the performance period covered by the CEF, there were no "findings" related to this area.

I think that you would be hard pressed to find that such an outstanding record deserves the rating of "satisfied" given by Ms. Ramsdell. Instead, Bannum's efforts in this area deserve an "extremely satisfied."

II. Customer Satisfaction

As you can imagine, we were most disappointed with Ms. Ramsdell's rating of Bannum Place of Montgomery's Customer Satisfaction rating. Not only was Ms. Ramsdell's rating of "dissatisfied" unfair, but as our following review demonstrates, it was unjustified.

A. Overall quality of programs that provide:

1. Accountability - As our discussion under Contract Compliance above details, during the CEF monitoring period, there were no "findings" related to this area. Logic would suggest that the result would be a score of "extremely satisfied."

2. Work - As our discussion under Contract Compliance above details, the monitoring reports strongly favor a CEF score of "extremely satisfied."

3. Other self improvement opportunities for offenders - The monitoring reports reflect no findings in this area. Again, as our discussion under Contract Compliance above details, the monitoring reports strongly favor a CEF score of "extremely satisfied."

B. Overall approach to communication and correctional management. Bannum has operated a program in Montgomery, AL for the BOP since 1986. The following suggests that Bannum deserves a CEF score of "extremely satisfied."

1. Communication - no findings in the monitoring reports indicate any failure in the areas of communication either at the center staff level or at the middle and executive management levels.

2. Correctional management - no findings in the monitoring reports indicate any failure in the areas of correctional management either at the center staff level or at the middle or executive management levels. In fact, the center staff level commendations include:

> "We were pleased with the results of the monitoring and believe Bannum operates a very efficient program in Montgomery. The staff at the center work as a team and this is apparent after one spends only a short time in the facility. Key staff have excellent skills in their specific duties. Director, Mrs. Juliette Davis, is considered a master in the field of community corrections. She has put together a group of individuals who work well together. We are pleased to have her in charge of the facility."

and

> "This contractor is fortunate to have highly skilled staff in the field of corrections. Key staff have advanced degrees in the field of juvenile and adult corrections. This contractor is also fortunate in that the staff retention for key positions is very stable. This stability of leadership is the major contributing factor to the consistent high standards displayed at this center."

and

> "3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit attitude."

As to correctional management at Bannum's executive and middle management levels, Bannum has been performing these services since early 1985 and in Montgomery since early 1986.

Mr. Lowry has had 25 years experience of correctional management experience, Mr. Rich has 16 years. Together, they remain committed to excellence of service in correctional management, provision of quality programs and absolute compliance, all of which is consistent with the mission of the BOP. As a result, a score of anything less than "extremely satisfied" is unjustified.

III. Business Relations:

Finally, with regard to "Business Relations," I believe that the record demonstrates an impeccable effort on the part of Bannum and contradicts the score of "satisfied" given by Ms. Ramsdell on the CEF.

A. Flexibility - The record demonstrates that Bannum continuously implemented or attempted to implement every request made by the BOP. As an example, if Bannum was told to revise a form, it revised the form and so on. Prior to initiating action concerning potentially disputable matters, Bannum consistently initiates face to face or telephonic communication for in-depth discussions of the issues involved in an attempt to resolve these issues without controversy. In that regard, Bannum's Executive Director and middle management personnel have traveled to Atlanta on at least four occasions to meet with the BOP for the purpose of resolving an issue.

B. Proactiveness - During contract negotiation, Bannum proposed and BOP accepted, creation of an Employment Specialist position and promotion of a senior staff member. Although this action was misunderstood by CCCOS Toston, that action has provided the excellent resident employment record as indicated above. In addition, understanding the BOP's comments about the age of the building, we continually try to locate an alternative site for the program, subject of course to BOP approval. The BOP even confirmed Bannum's proactiveness in numerous commendations:

> "1) Staff are in the process of attempting to implement a program that gives employers a tax break for hiring ex-felons."

and

> " This contractor does an excellent job of obtaining community support through the use of local volunteers student interns and community activists in many of their programs."

C. Professionalism - On numerous occasions, Ms. Zickefoose and the CCRA expressed the utmost respect for the professionalism, integrity and skills of Bannum Place of Montgomery Director Juliette Davis and her staff. Such professionalism involved the areas of flexibility and proactiveness as discussed above, as well as the area of cooperation which will be discussed below. With such praise, it is difficult to understand why Ms. Ramsdell only rated Bannum as "satisfactory," while the record suggests that BOP was "extremely satisfied" with Bannum in the area "business relations." The BOP even admits this when it states:

> "We believe Bannum operates a very efficient program in Montgomery. Staff of the center work as a team and this is apparent after one spends only a short time in the facility. Key staff have excellent skills in their specific duties. Director, Mrs. Juliette Davis, is considered a master in the field of community corrections. She has put together a group of individuals who work well together. We are very pleased to have her in charge of this facility."

and

> "3. Staff were very knowledgeable about their duties, security, and programs. The staff were professional, helpful, and displayed a team spirit attitude."

D. Cooperation with the BOP, USPO, U.S. Marshall, local law enforcement and the community.

Again, it is inconceivable that Bannum would receive nothing less that "extremely satisfied" in this area, especially when you take into consideration the commendations bestowed upon Bannum by the BOP.

> "Director Davis and her staff continue to have an excellent relationship with the United States Probation Office. USPO Sandra Woods relayed the center provides a valuable resource to her agency. This contractor does an excellent job of obtaining community support through the use of local volunteers, student interns and community activists in many of their programs."

Therefore, when Bannum's performance is approached from the standpoint of the monitoring reports, the evidence overwhelmingly suggests an error on the part of both Ms. Ramsdell and Ms. Zickefoose with regard to the October 11, 2000 CEF. In fact, many of the above arguments were made to Ms. Zickefoose in Bannum's November 16, 2000 response to Ms. Ramsdell's October 11, 2000 evaluation. To my surprise, however, Ms. Zickefoose failed to address any of these points in her December 4, 2000 response to Bannum. This amazed me, because from my experience with the Bureau, it is usually responsive to contractor's concerns. However, Ms. Zickefoose seemed to ignore the factors listed on the CEF, and instead, focused on a unlisted factor -- transportation. This unreasonable and arbitrary decision, on the part of

Ms. Zickefoose, not only violates the terms of Contract Number J200c-397, but may border on the level of "bad faith."

Before addressing Ms. Zickefoose's actions, I believe that it is necessary to first address the issue of transportation. In every monitoring report the BOP lists the decline of the public transportation system in Montgomery, AL as a "finding" or "concern:"

2/10/98 CCM Spencer (or the Montgomery BOP office) writes in a monitoring report:

> "Recommendation #3 - Transportation has become an issue since the change in the public transportation system within the City of Montgomery. The transportation needs of the residents need to be addressed by Bannum immediately, before the problem becomes severe."

3/18/98 Bannum's Operations Director responds

4/9/98 The Contracting Officer writes:

> "Bannum has not provided the BOP with an acceptable response. Bannum must present a corrective plan of action to the Contracting Officer by 2:00 PM on April 16, indicating how it will fully accommodate the transportation of federal residents, in accordance with the Statement of Work, Chapter 3, Section A.

4/16/98 Bannum's Executive Director responds to the Contracting Officer, Leah Wilson, in part:

> "Since we are in compliance with contract requirements, should the Government wish to amend the contract, Bannum will accommodate the additional requirements after the Government's approval of the necessary cost adjustment."

However, the failure of the Montgomery public transportation system is more a reflection of the BOP's failure to draft a RFP and contract terms which meet the needs of the government. I do not have to remind you, that it is the responsibility of the government to draft an RFP which describes the minimum needs of the procuring activity accurately. Hero, Inc., B-213225, December 14, 1983, 83-2 CPD ¶ 687 at 3.

In fact, Chapter 3 (A) of Contract Number J200c-397 specifically requires that:

The facility shall be located within one mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident. (Emphasis Added)

In full compliance with the terms of this contract, Bannum Place of Montgomery is within one mile of public transportation. This fact is indisputable. Further, the BOP has not amended this portion of the contract:

3/10/98 Clarification and Discussion #1 - no mention of transportation issue

4/10/00 Clarification and Discussion #2 - The contracting officer states:

"14. Because the City of Montgomery has terminated much of its bus service, some residents are required to walk great distances to work under the current contract (J200c-181). This makes job searches and job-commuting an issue to be addressed under this Solicitation RFP 200-0422-SE. It is the contractor's responsibility to provide the residents with free transportation for employment or program participation activities when there is an absence of public transportation within one mile of the facility. Bannum must provide a plan of action addressing how the residents will be provided free transportation for the purposes stated above. SOW, Chapter 3, Section A. This is a weakness."

4/24/98 Bannum responds:

"14. See attached letter of April 16, 1998. Should a different transportation plan be required, Bannum's Monday rates would increase based on the related costs thereof."

5/6/98 Addendum to Clarification and Discussion #2 - No mention of transportation issue.

5/27/98 Clarification and Discussion #3 - no mention of transportation issue

6/3/98 Request for Final Proposal Revision - no mention of transportation issue

6/17/98 Negotiations reopened - no mention of transportation issue

6/19/98 Negotiations reopened - no mention of transportation issue

6/25/98 Request for Final Proposal Revision - no mention of transportation issue

7/01/98 Notification of contract award - Obviously the transportation issue was negotiated to the satisfaction of the Contracting Officer, the evaluation committee and all other BOP officials involved in the procurement process.

10/1/98 New contract begins #J200c-397

2/1/99 CCM Spencer issues a finding in a monitoring report:

"Finding #2 - Facility (Transportation)

The City of Montgomery's public transportation system, Demand and Response Transit (DART) had proven to be an unreliable and ineffective means of transportation for the residents at the center."

2/16/99 Bannum's Operations Director responds

3/12/99 CCM Spencer states in a letter:

"However, there is strong evidence that the situation with the local bus service is not in accordance with the provisions of the Statement of Work."

3/26/99 Bannum's Executive Director responds:

" On March 24, 1999, I telephoned Ms. Perry, CCCOS (of the Montgomery office), and discussed the matter of bus service. Ms. Perry suggested I discuss the matter with the Contracting Officer, Leah Wilson. On March 25, 1999, I discussed the matter with Ms. Wilson and she said she would review the matter."

6/15/99 BOP Regional Transitional Drug Abuse Treatment Manager states in a letter:

"Upon conferring with the Management Center Administrator, Donna Zickefoose, the issue of transportation falls upon your agency based on the Statement of Work in which your agency agreed to provide transportation for the residents."

6/16/99 CCM Spencer issues a repeat finding in a monitoring report:

"Finding #2 - Facility - REPEAT FINDING

The City of Montgomery's public transportation system, Demand and Response Transit (DART) had proven to be an unreliable and ineffective means of transportation for the residents at the center (see attached news article)."

6/21/99 Bannum's Operations Director responds in a part to Regional Transitional Drug Abuse Manager's letter:
"Bannum is compliance with the Statement of Work due to public transportation being within one mile of the facility for the purpose of employment or program participation."

6/21/99 Bannum's Operations Director responds to the 6/16/99 repeat finding and appeals its issuance.

6/25/99 MCA Zickefoose states in a monitoring report:

"The only deficiency from the last monitoring not resolved was the transportation issue. This is currently being discussed with the Central Office Contracting Officer and the Contractor."

6/28/99 MCA Zickefoose states in a letter:

"Although the transportation issue has not been resolved, the problems regarding resident transportation are currently being discussed by the Contractor, Montgomery CCM Office, and the Central Office Contracting Office.

As a resolution is expected in the near future, I accept Ms. Bellew's response to the findings. Please consider the March 1999 monitoring closed. If the transportation issue is not resolved it will be readdressed in the future."

Prior to 9/8/99 - CCRA Dennings requests that Bannum submit to her proposal for the provision of transportation services in excess of contract terms.

9/8/00 Bannum submits a drafts cost proposal to the CCRA which discusses price, terms and other conditions.

9/23/99 CCM Spencer states in a letter:

"After numerous discussions regarding the transportation issue, we have decided to have the Contracting Officer negotiate this concern with your. For this reason, you may consider this monitoring officially closed. We appreciate all your efforts to provide quality services and programs to the residents."

11/24/99 Contracting Officer sends Modification #3 for transportation services to Bannum for signature. Bannum signs modification believing that its draft proposal submitted to the CCRA on September 8, 1999 had been accepted.

11/29/99 The CCRA informs Bannum that its draft proposal was not forwarded to Contracting Officer; therefore, Bannum rescinds its agreement to Modification #3.

12/17/99 Bannum receives Modification #3 signed by the Contracting Officer

12/20/99 Bannum writes and reminds the Contracting Officer that it rescinded its agreement to Modification #3.

1/4/00 The Supervising Contracting Officer acknowledges the recission of Modification #3 and requests a cost proposal for the provision of transportation services in excess of contract requirements. Additionally, the Supervising Contracting Office states that the BOP Montgomery office may decide to not exercise the option period (THREAT) if Bannum does not satisfy their transportation concerns.

1/7/00 Bannum submit a formal cost proposal.

1/11/00 At the request of CCCOS Toston (new personnel in the Montgomery BOP office) Bannum's Executive Director responds to his concern about transportation as follows:

"Please be advised that Bannum, Inc. Is currently negotiating with the contracting office for the provision of transportation services at our program I Tupelo, MS and Montgomery, AL."

2/2/00 CCM Ramsdell (new personnel in the Montgomery BOP office) issues a finding in a monitoring report:

"The facility is not located withing one mile of public transportation."

2/23/00 Bannum's Executive Director responds:

Finding #2

In your letter you stated that an agreement with Bannum and the Contracting Officer was reached on November 26,1999.....

"Attached is the documentation which shows that an agreement has not been reached. Therefore, we request that this finding be withdrawn."

3/2/00 CCM Ramsdell states in a letter:

"This finding resulted from the contractor's noncompliance with the Statement of Work by not providing transportation to residents for employment of program participation activities at no cost to the resident, due to the facility not being located within one mile of public transportation. In our monitoring report dated February 2, 2000, we requested that you comply with the recent negotiated agreement between you and the Contracting Officer."

3/7/00 Bannum's Executive Director writes:

"It is my understanding that, in response to my request, the CCRA was to have this finding rescinded. Further, Bannum is currently negotiating contract modification with Mr. Melvin Gardener, of the Contracting Branch. In fact, Mr. Gardener requested that Bannum provide additional information relating to the modification costs."

3/13/00 CCM Ramsdell writes in a letter:

"We are in receipt of your response to our clarification letter. Based on your responses, you may consider this monitoring officially closed."

3/24/00 In response to a request from the Contracting Officer to lower Bannum's cost, Bannum submits a second cost proposal.

4/25/00 Bannum management personnel meet in Atlanta with BOP Regional personnel to discuss the transportation issue, among other things.

6/13/00 Bannum submits a third cost proposal to the Supervising Contracting Officer.

10/5/00 In the absence of any discussion concerning Bannum's third cost proposal, the BOP notifies Bannum of its intent not to exercise the remaining option periods.

Therefore, it is difficult to understand why Ms. Zickefoose's December 4, 2000 response to Bannum only addresses the BOP's concern with the area of transportation. Specifically, Ms. Zickefoose stated:

> "As you are aware, the area of transportation has continually been cited as an area of concern throughout the life of this contract. The lack of transportation severely limits the residents' ability to seek employment outside walking distance of the facility. Additionally, residents that are unable to afford transportation must walk in all types of weather, and at all times of the day and night for purposes of employment and program participation regardless of the residents' age, health, and/or disabilities. Although the city has occasionally offered public transportation (bus) during the contract evaluation period, it was inadequate to meet the needs of the residents. . ."

No where in her December 4, 2000 comments does Ms. Zickefoose even suggest that Bannum is not in compliance with the terms of Contract Number J200c-397 -- I suspect because she knows that Bannum is, in fact, in full compliance with the contract term above. Therefore, it is both unreasonable and arbitrary for the BOP to justify Bannum's CEF score on concerns with the area of transportation.

The U.S. Court of Federal Claims has repeatedly overturned such determinations where the government has so blatantly been arbitrary, capricious, demonstrated an abuse of discretion, not in accordance with law, not in compliance with procedural requirements, or unsupported by substantial evidence. Aeron Marine Shipping Co. v. U.S., 26 Cl.Ct. 946 (1992); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823 (1971); Marathon Oil Co. v. United States, 17 Cl.Ct. 116, 120 (1989); Parks v. United States, 15 Cl.Ct. 183, 189 (1988); see 5 U.S.C. §§ 706(2). It is interesting to note that the court has also awarded attorneys fees, under the Equal Access to Justice Act, in such cases.

There is also concern that the use of the transportation issue in evaluating Bannum's CEF, may be the direct result of a personal bias leveled against Bannum, Inc., its Executive and middle management, as well as the Director and staff of Bannum Place of Montgomery. I do not need to remind you that government officials are presumed to act conscientiously and in good faith in the discharge of their duties (See Spezzaferro v. Federal Aviation Admin., 807 F.2d 169, 173 (Fed.Cir.1986); Kalvar Corp. v. United States, 211 Ct.Cl. 192, 543 F.2d 1298 (1976); Asco-Falcon II Shipping Co. v. United States, 32 Fed.Cl. 595, 604 (1994)), but specific acts of bad faith on the part of such officials can be imputed against the agency. Libertatia Associates, Inc. v. U.S., 46 Fed.Cl. 702 (May 23, 2000). In the case of Bannum Place of Montgomery, if it is proven that the aggregate of the actions of the government officials "would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard." Id.

At this point, Bannum is appealing the October 11, 2000 rating provided by Helen Ramsdell and the December 4, 2000 reaffirmation of those finding by Donna Zickefoose. In addition to revising Bannum's score for Contract Compliance, Customer Satisfaction and Business Relations, we request that the BOP add three points to the total score, in accordance with rating criteria outlined in the CEF.

PILIERO, MAZZA & PARGAMENT, PLLC



Thank you, Crystal, for your attention to this matter. Bannum looks forward to a fair, objective, and complete evaluation of its performance under Contract Number J200c-397 -- something we feel was not provided by your predecessors, as the record clearly reflects. If you have any questions, as always, please do not hesitate to contact me at (202) 857-1000.

Sincerely,

Joseph J. Summerill IV

cc: David Lowry
Jim Ropelewski, Esq.