# 17

# AFFIDAVIT

State of Florida )
)
County of Pinellas ) ss.

COUNT 8

I, DAVID A. LOWRY, being of the age of majority and otherwise competent to make this affidavit state to the best of my knowledge and belief that:

I am over the age of eighteen (18) and am a resident of Pinellas County, State of Florida.

I have personal knowledge of the facts contained in this affidavit as I am, and was at all times relevant hereto, the Executive Director of Bannum Inc.

The BOP improperly withheld the exercise of the remaining two option periods of Bannum's contract (J200c-397) in Montgomery, AL because the Montgomery CCM office improperly and wrongfully alleged that Bannum was not meeting the transportation needs of the program participants. Bannum, as later verified by BOP through the issuance of a modification to the contract, was, at all times adhering to all transportation requirements of the contract. Bannum filed an REA on March 6, 2001 and converted that REA to a Claim on April 9, 2001. The REA and Claim contained a discussion of the background and history of the claim, breach of contract, bad faith and abuse of discretion, a 17page affidavit of David Lowry, summary of claimed costs and a certification of the claim. Attached hereto is a copy of Bannum's Montgomery contract which supports the 28 and 29 residents per day respectively, and the $50.45 rate for Option Periods two and three of the contract.

LOST PROFIT AND OVERHEAD

Bannum's Montgomery contract provided for 28 residents per day during Option Year 2 and 29 residents per day during Option Year 3. Bannum was to be reimbursed $50.45 per day per resident during the two Option Years which is $1,049,612 in the aggregate. Bannum believes that it is entitled to a 28% lost profit and overhead dollars on that amount which is $293,891.

ESTIMATED ADDED ADMINISTRATIVE TIME

Attached is a copy of a 17page affidavit of David Lowry which details the amount of work effort involved in dealing with the transportation issue from the beginning of 1998 through 2000.

It is estimated that Bannum's Compliance Manager Jason Stough spent approximately 5 hours performing the various tasks detailed in the affidavit and Operations Director, Cathy Bellew spent approximately 400 hours performing the various tasks discussed in the affidavit. Further, it is estimated that facility staff spent 10 hours in assisting the Operations Director in the performance of the above discussed tasks. Facility directors are responsible for the day-to-day

management of a CCC program, its staff and inmates. They work the necessary hours to accomplish the job and in many situations work more than 40 hours per week but never less. Middle and executive management, given their level of responsibility and management of multiple contracts, almost always work far more than 40 hours per week. Bannum's middle management personnel keep time cards but do not account for each task which they addressed during work hours since they perform multiple tasks which within each addresses multiple issues during any given time period. Jason Stough was paid a salary of $22,000 with company portion FICA at 7.65% and Unemployment at 3.5 %. In addition, Worker's Compensation Insurance was .32 and Medical insurance was $224.00 per month. Cathy Bellew was paid a salary of $26,000 with company portion 7.65% FICA and Unemployment at 3.5%. In addition, Worker's Compensation Insurance was .71 and Medical Insurance was $224.00 per month.

Also during the applicable time period, Cathy Bellew and Jason Stough, Bannum middle management staff, researched the solicitation and contract, to include the statement of work, various city transportation issues and routes, numerous alternative methods of transportation and the cost associated thereto, and obtained estimates from various transportation providers. Further, Bellew and Stough responded, or were involved in responding, to the correspondence detailed in the affidavit to include correspondence of:

2-10-98, 3-10-98, 3-18-98, 4-9-98, 4-10-98, 4-16-98, 4-24-98, 2-1-99, 2-16-99, 3-12-99, 3-26-99, 6-15-99, 6-16-99, 6-21-99, 6-25-99, 6-28-99, 12-20-99, 1-11-00, 2-2-00, 2-23-00, 3-2-00, 3-7-00, 3-13-00, 10-11-00, 10-16-00, 11-2-00 and 11-16-00.

In addition, they were involved in the various cost proposals of September 8, 1999, January 7, 2000, March 24, 2000 and June 13, 2000, as well as Modification No. 3. Bellew and Stough also made numerous telephone calls to the CCCOS, CCM, MCA and Life Safety Specialist. Further, Jason Stough traveled from Wilmington, NC to Atlanta, GA to meet with the CCCOS, CCM, MCA, Life Safety Specialist and the CCRA. Attached is documentation of Stough's travel costs. The REA, Claim and the discussions herein clearly documents the level of work required by Bannum personnel in dealing with the BOP. Each and every time that an alleged issue or concern arose with respect to a BOP allegation, the facility director would review, evaluate and report the issue to middle management personnel. Middle management personnel would consult with the facility director and review, evaluate and report the issue to executive management personnel. Executive management would then review and evaluate the matter and consult with middle management. A course of action would be formulated and executive management would provide direction to middle management regarding the work effort. Middle management would then provide direction of the work effort to the facility director. The facility director would then carry out the work effort and provide the results to middle management. Middle management would then review the work effort and report to executive management. Executive management would then either accept the work effort or request additional work. The same process would apply to responding to letters or monitoring reports from the BOP. The facility director would consult with middle management, draft a response and submit the draft to middle management. Middle management would review the draft and provide comments and forward the draft to executive management. Executive management would then consult with middle management and review the draft, provide comments and forward the draft back to middle management. Middle management would then consult with the facility director for finalization of the letter.

David Lowry, Executive Director, and Arnold Rich, Chairman, together comprised the Board of Directors of Bannum Inc., and its executive management. They were responsible for the daily administration and management of 15 contracts with the BOP. David Lowry and Arnold Rich were intimately involved in every facet of all the issues involved in this claim. They assisted in the research, preparation, compilation, review and editing of all the correspondence, monitoring reports and documents discussed above and attached hereto. Both provided direction to middle management personnel as well as to support staff. David Lowry made numerous telephone calls to the CCCOS, CCM, MCA, Life Safety Specialist, the CCRA, the Contracting Officer, Supervising Contracting Officers, Chief Contracting Officers, Assistant Community Corrections Administrator, Community Corrections Administrator, and various other high- ranking central office BOP officials. In addition, David Lowry traveled from Clearwater, FL to Atlanta, GA and Washington, DC on several occasions to meet with BOP officials regarding the transportation issue. Attached is documentation of Lowry's travel costs. David Lowry estimated that he spent approximately 80 hours performing the tasks discussed above to include travel. Arnold Rich estimated that he spent 40 hours performing the tasks discussed above. During this time, neither Lowry nor Rich kept time cards; however, both were full time executive management personnel.

David Lowry charged a professional rate of $110.00 per hour. At the time, Lowry had 25 years correctional executive management experience and possessed a BS, BSW and MSSW degrees. Arnold Rich charged a professional rate of $120.00 per hour. At the time, Arnold Rich had 16 years of correctional executive management experience, 10 years of executive financial management experience, was a licensed Certified Public Accountant and possessed a BA degree. Considering that the Office of Federal Procurement Policy allows compensation for senior executives under government contracts to be $186.00 per hour (see attached), Lowry and Rich's rates of $110.00 and $120.00 respectively are extremely reasonable.

The hours spent on the above discussed tasks and supported by the attached documentation were then applied against Bannum's internal hourly rate (includes hourly rate, labor burden, G/A and profit) to arrive at the estimated total amount, as this added/abnormal effort was truly a direct cost to the contract.

Finally, Bannium estimated that approximately 40 hours were spent for clerical support personnel, overnight mail, copying, telephone charges, etc. At the time, Bannum was paying its Office Manager approximately $11.00 per hour and two clerical personnel, approximately $9.00 per hour each. Approximately the same company portion FICA, unemployment, Worker's compensation and medical insurance amounts would apply to these staff as apply to the staff discussed above, along with labor burden, G/A and profit. Documentation of legal costs are attached.

UNAMORTIZED LEASE HOLD IMPROVEMENTS

Bannum estimated that it spent $192,000 in significant leasehold improvements that enhanced the facility from 1993 to 1998. In addition, significant leasehold improvements continue to have a residual value even after they are amortized.

INITIAL ESTIMATES

Based upon the best information developed at the time the claim was filed, Bannum estimated the following costs:

| | |
|---|---|
| Lost profit and Overhead | $293,891 |
| Estimated Added Administration Time | $19,615 |
| Estimated Added Phone, Travel, etc. | $1,400 |
| Unamortized Lease Hold Improvements | $22,588 |
| Proposal Preparation | $1,917 |
| | $339,411 |

At that time, we believed that these estimates were on the low side e.g., used more than one attorney, and we could not accurately determine certain costs given the best available information.

Obviously, the numerous hours spent by middle and executive management in responding to the issues in this claim prevented Bannum from expanding its business with the BOP and developing other business opportunities outside the BOP and therefore, should be considered as part of damages.

Dated: May 14, 2004

David A. Lowry

Sworn to before me under the penalty of perjury on this 14th day of May, 2004.

Sandra Allen
Notary Public

Sandra Allen
My Commission DD211668
Expires July 11, 2007