IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BANNUM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01-639C |
| v. | ) | (Judge Lettow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS AND <u>PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS</u>**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims, plaintiff respectfully submits its responses to Defendant's Proposed Findings of Uncontroverted Facts and further submits Plaintiff's Proposed Findings of Uncontroverted Facts, and states as follows:

<u>Count 6: Contract J200c-336 - Beaumont, Texas</u>

1. Disagree that the contract was awarded on November 1, 1997, since the Contracting Officer signed the contract on July 17, 1997. Disagree that the contract had a general requirement. The contract required Bannum to provide residential community correction center services in accordance with the stated specifications. (A1-A5)

2. Agree.

3. Agree.

4. Agree only that the lessor identified on the lease was Ken Webb. Mr. Webb was identified as an owner along with John McCray by Mr. McCray's agent signing the application for amendment of the zoning ordinance. (A45). Mr. McCray accepted payments for rent from Bannum. (A30). In addition, Mr. McCray and Mr. Webb were partners in a business located in

the building. (A86-A88).

5. Disagree. See #4 above.

6. Agree only that the property manager for Mr. McCray stated to Mr. Ala that Bannum refused to sign a new lease with Mr. McCray. Bannum already had an existing lease and that Bannum made substantial payments under that lease.

7. Disagree. Mr. McCray did not send an eviction notice to Bannum. Lee Wheeler of Foxworth Real Estate sent a letter dated December 8, 2000, stating that the owner has elected to execute his option to terminate your tenancy. (A49). The lease contained no such option. (A42-44).

8. Disagree. This is a complete misrepresentation, which serves as one of the Defendant's main premises in support of the summary judgment motion. Mr. Ala was aware as far back as November, 2000, that a school had been approved by the City Council of Beaumont on condition that Bannum would be evicted. Mr. Ala and the BOP did not disclose this information to Bannum, which led to the attempted illegal eviction of Bannum. Furthermore, the BOP was aware that "county commissioner says unwritten agreement that if the schools go in Bannum will have to vacate." (Exhibit 1).

9. Disagree. See #8 above.

10. Bannum lacks information and belief as to what the BOP would have to do if Bannum was evicted from the Beaumont facility. Bannum further states that there was no eviction proceeding pending against Bannum, but only a vague notice that the owner was executing a nonexistent option terminating tenancy.

11. Agree only that on December 19, 2000, Bannum received a letter from Susan J. Oliver,

who reviewed the lease issue. (A30).

12. Agree only that during a telephone conversation between David Lowry of Bannum and Andrea Johnson (Deputy Community Corrections Regional Administrator for BOP) on December 20, 2000, Ms. Johnson stated that since Bannum was being evicted from the contract location, a Cure Notice would be issued the following week by the Contracting Office. (A53). At no time during the telephone conversation did Ms. Johnson impart any information to Bannum regarding the school agreement. (Lowry Affidavit ¶20)

13. Agree only that the petition was filed for a temporary restraining order, injunction, and declaratory judgment, and the petition speaks for itself. Bannum further states that the petition contained an application for zoning amendment filed by Foxworth, the firm that sent the letter to terminate Bannum, with the name of the owner stated as being John McCray and Ken Webb.

14. Agree.

15. Agree.

16. Agree.

17. Disagree. The claim states that the BOP refused to provide to Bannum the identity of its communications with respect to the alleged eviction and the cost entailed in responding to the improperly issued Cure Notice. (A27). The BOP either knew, or should have known, that the alleged eviction notice was a sham and that the real reason was the school agreement.

18. Agree only that Bannum's response was on Joseph A. Camardo, Jr. letterhead and that the letter was signed by Joseph A. Camardo, Jr.

19. Agree only that the letter speaks for itself and further states the Cure Notice did not disclose the secret school agreement.

20. Agree only that Bannum filed a complaint on November 13, 2001.

21. Agree.

22. Disagree. The document cited at A70 states that the Trial date of March 1, 2001, has been removed from the docket and a new date will be set some time in the future, and that the injunction remains in place. The document cited at A71 is similar to A70. The document cited at A76 states that a trial date is set as of May 25, 2001. The document cited at A77 states that the trial date has been changed to June 1, 2001. The document cited at A78 states that Bannum withdrew its complaint in State Court and will file a new complaint in Federal Court. Bannum dropped its complaint for the reasons stated in the complaint, because subpoenas for document production were violated by the Webbs, who were located in California, and the Texas Court insisted upon proceeding with a trial two days later in Texas. Bannum had no choice but to proceed to Federal Court. (A112-A113). Furthermore, at this point in time, McCray could have filed for an eviction for Bannum.

23. Agree only that the Federal Court issued the Decision at A131, and that the decision speaks for itself. Bannum further states that it completed its contract with the BOP and obtained the follow-on contract with the BOP based upon a new lease with Mr. McCray and continue to operate to this day.

24. Agrees only that in March 2001, Mr. Ala contacted the Director of the Richard Milburn Academy during which mention was made of one occasion of fraternizing taking place between a facility inmate and an Academy student and of his concern about federal inmates being housed in proximity to the school. Additionally, the Director further stated that "he thought Bannum Beaumont was to be moved out of the facility prior to them occupying the building."(A74-75).

**Count 8: Contract J200c-397- Montgomery, Alabama**

25. Disagree, the cited document A161 is only one page out of some BOP Statement of Work with no reference to any contract number.

26. Agree that the document speaks for itself.

27. Agrees only that quoted language is contained in the referenced document. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9)

28. Disagree with first sentence. Bannum responded in a letter dated March 18, 1998 that: "according to the attached DART operations manual, DART currently offers public transportation for Bannum residents which adhere to SOW requirements." Agrees with second sentence. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9)

29. Disagrees, the DART service is a call-ahead bus service and that persons wishing to use the service make advance reservations as to time and location. For persons needing the service on a regular schedule need only to make arrangements once.

30. Agrees and adds that Bannum was required to submit a corrective plan showing compliance with the contract requirements by April 16, 1998. (A329, ¶6). **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9)

31. Agrees only that Bannum forwarded a response dated April 16, 1998, which additionally stated the following:

a. "…the Statement of Work states: 'The contractor shall arrange for transportation for indigent residents while seeking employment, at no cost to the resident.' And that: 'the facility shall be located in the area where the commuting time to the general area of work is ordinarily no more than one and one half hours each way via public transit.' This is the extent to which the contract Statement of Work addresses transportation issues."

b. Attached documentation indicates that public transportation is available from 6:00 AM thru 6:00 PM within one mile of facility. During normal business hours inmates are allowed to leave the facility to find employment and indigent residents are provided with bus fare. Bannum is therefore in compliance with the SOW.

c. Given that 25 of 27 residents are employed, Bannum believes that transportation is not an issue.

d. Bannum further stated that with respect to transitional services, Bannum is advised that the government BOP budget provides for the costs of transportation. Bannum further stated that the arrangement should be addressed between the government and the transitional service provider and that due to the inflexibility of the current transitional service provider employment positions have been lost to Bannum residents.

e. The transitional service provider is not Bannum but a separate entity under contract with the GOP. (A198-199).

32. Agree only that during the third option year of Bannum's contract, the BOP solicited bids for a new solicitation. Agrees only that on March 10, 1998, Bannum was notified that its bid was within the competitive range for further discussions.

33. Agrees only that the quoted language was contained in the referenced letter, which is delineated as "Discussions #2. However, Bannum disagrees with the allegation contained therein that Bannum was responsible to provide the residents with free transportation for employment or program participation activities when there is an absence of public transportation within one mile of the facility. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

34. Agrees only that Bannum issued a response dated April 24, 1998, attaching its letter of April 16, 1998 (A198-199) and adds that the response further stated that: "Should a different transportation plan be required, Bannum's manday rate would increase based on the related costs thereof."

35. Agrees, but further adds that the BOP acknowledged the receipt of Bannum's response to Discussions #3. However, Defendant's Motion does not contain either BOP's Discussion #3 letter nor Bannum's response. Additionally, the referenced BOP request for Final Proposal Revision letter did not request any additional information regarding the transportation requirements. (A218-219).

36. Agree only that the referenced letter refers to the reopened discussions and response regarding the facility's handicapped accessibility, that discussion was closed and Bannum had the opportunity to submit a Final Proposal Revision. Adds that the referenced letter contains no

language regarding the transportation issue. (A222-223).

37. Agrees, but adds that the award was made based upon the Bannum proposals including its plan regarding the transportation requirements. (A144-153).

38. Agrees only that the quoted language was contained in the referenced February 1, 1999 document, and adds that the transportation plan submitted by Bannum in its proposal was accepted by Defendant by the awarding of the contract. Bannum continues to disagree with that somehow it has fault with respect to the transportation issue **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

39. Agrees.

40. Agrees only that the quoted language was contained in the referenced March 12, 1999 letter. Bannum continues to object to the insinuation that it is responsible for the BOP's transportation issue. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

41. Agrees only that the referenced copies of newspaper articles were attached to the letter but adds that the focus was on problems regarding the attempts to order same day services, and that the ridership for the public transportation had recently increased.

42. Agree. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

43. Agree only that in the June 15, 1999 letter, the BOP wanted to resolve the transportation

issue with Bannum. However, Plaintiff disagrees that the letter makes any statements that residents were having attendance problems with the Chemical Addiction Program that were directly attributable to a lack of readily available public transportation and that the Montgomery facility was not otherwise providing free transportation. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

44. Agree that the monitoring report speaks for itself but further disagrees with the contents therein. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

45. Agree. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

46. Agree that the monitoring report speaks for itself, but disagrees to any deficiency. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

47. Agree that the letter speaks for itself. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

48. Agree only that on September 8, 1999, Bannum submitted a cost proposal for providing transportation services in excess of contract terms, which stated the following:

a. The cost proposal was submitted in response to BOP request;

b. Yellow Cab Company of Montgomery will provide transportation to certain residents between the hours of 6 a.m. to 8 a.m. and 5 p.m. to 9 p.m. on as needed basis, Monday through Friday. "This transportation service is intended to supplement the existing public transportation system, not replace it."

c. Transportation is limited to those residents who have no other means of viable transportation including the use of personal vehicles and existing public transportation.

d. Transportation will not be provided beyond city limits.

e. "Transportation will be provided for transporting employed residents to and from their work site, residents seeking employment to specific interviews and residents participating in Transitional Services Counseling and for no other purpose."

f. "The cost of this service to the BOP is $5,00 per month…"

g. If the cab company discontinues its service to Bannum, then Bannum reserves the right to discontinue this transportation service. "In that event, Bannum will use its best efforts to locate other means of transportation service at the same cost. In the event Bannum locates other transportation service but at a higher cost, then Bannum's cost to the BOP will increase accordingly." (A248-249)

49. Agree only that on September 23, 1999, the BOP informed Bannum that the June 1999 monitoring was officially closed, but that it further states that "After numerous discussions regarding the transportation issue, we have decided to have the Contracting Officer negotiate this concern with you." (A251).

50. Agree only that in late November, 1999, the BOP issued Contract Modification No. 3 "to include an estimated annual transportation cost provided by Bannum, Inc. to and from the surrounding communities of Montgomery, Alabama" in the amount of $45,000.00. This figure was arrived at by a BOP prepared estimate of $90,720 to provide transportation which the BOP then cut by 50% to $45,000 (Exhibit 9) Bannum further takes exception to the inference that Bannum had to "correct" the ongoing transportation issue. Bannum was only going to correct the BOP's problem which is a change to the subject contract. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

51. Disagree, Bannum signed the Modification.

52. Agree only that on November 29, 1999 Bannum sent a letter to the BOP stating the following:

a) Prior to September 8, 1999, the CCRA for the Southeast Region requested that Bannum submit a proposal for the provision of transportation services, in excess of contract terms.

b) On September 8, 1999 Bannum submitted the requested cost proposal to the CCRA.

c) Having no further discussion, Bannum received Modification 3 on November 24, 1999. Believing that its proposal letter of September 8, 1999 had been accepted, Bannum signed the Modification.

d) Bannum was informed on November 29, 1999 that the CCRA office did not forward its September 8, 1999 proposal to the Contracting Officer. Obviously there has been a "mistake between the parties" and Bannum therefore rescinds its agreement to the

Modification.

e) Bannum would like the opportunity for further discussions. (A252).

53. Disagree, the subject letter stated "On December 17, 1999, our office received the above referenced modification which was signed by you on November 26, 1999 (see attached). However, on November 29, 1999, Bannum rescinded those modifications due to a "mistake" between the parties (see attached) and I subsequently discussed the "mistake" with you by telephone." (A256).

54. Agree, but states that the letter further stated the following:

a) The proposal was submitted in response to BOP's request.

b) In the September 8, 1999 proposal, Bannum submitted its cost based on an anticipated $30 per hour agreement with the cab company. Bannum received a letter from the cab company indicating a cost of $35 per hour, which Bannum negotiated down to $33 per hour.

c) Based upon the $33 per hour rate for 6 hours per day, 5 days per week, 52 weeks per year, the total cost is $51,480 per year. With administrative, insurance and profit costs added the total cost to the BOP would be $73,000 annually, or $6,000 per month, which Bannum requested that they be paid in advance. (A257-259).

55. Agree only that Mr. Totson raised an alleged concern to Bannum regarding the transportation issue. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

56. Agree

57. Agree that the document speaks for itself but totally disagrees with the contents alleging that Bannum is responsible for the transportation issue. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9). Furthermore, due to a mistake between the parties the modification had not been agreed to.

58. Agree only that on February 24, 2000, Bannum responded to the monitoring report, which stated the following:

a) "In a supplemental letter of February 4, 2000 you state: 'the contractor shall provide all residents seeking employment with free transportation.' It is our understanding that the SOW only requires that we provide "free" transportation to "indigent residents"; it does not require that we provide free transportation to "all residents." In an attached letter at A271 from Bannum's Facility Director, she states that all indigent residents will be provided with bus passes.

b) "In your letter you state that "an agreement with Bannum in the contracting officer was reached on November 26, 1999……". Attached is the documentation which shows that an agreement has not been reached. Therefore, we request that this finding be withdrawn." (A269-272).

59. Agreed that the letter speaks for itself, but disagree with the contents. The modification had been rescinded.

60. Disagrees. Bannum's response letter dated March 7, 2000 states:

a) "Bannum Place of Montgomery will provide transportation for indigent residents while seeking employment at no cost to the resident. Bus passed will be purchased

from DART and given to unemployed indigent residents."

b) Finding #2: "it is my understanding that, in response to my request, the CCRA was to have this finding rescinded. Further, Bannum is currently negotiating a contract modification with Mr. Melvin Gardener, of the Contracting Branch. In fact, On March 2, 2000, Mr. Gardener requested that Bannum provide additional information relating to the modification costs." (A275-276).

61. Agree.

62. Agree only that on March 24, 2000, Bannum submitted a revised cost proposal regarding the transportation issues, which stated the following:

a) On January 7, 2000 Bannum submitted costs to the BOP associated with its proposal for the provision of transportation services in excess of the contract terms. The BOP stated that the costs were excessive and requested that Bannum lower the cost.

b) In order to accommodate the BOP, Bannum successfully negotiated agreements with independent taxis, which lower the costs.

c) New Deal Cab will provide transportation to certain residents from 6:30 a.m. to 8:00 a.m. and 5:30 p.m. to 9:00 p.m. on and as needed basis Monday through Friday. "This transportation service is intended to supplement the existing public transportation system, not replace it. Transportation is limited to those residents who have no other means of viable transportation, to include the use of personal vehicles or use of the existing public transportation system, and will not be provided beyond city limits."

d) The total cost proposed is $55,000 per year, which includes per hour rate, insurance

and administrative costs and reasonable profit.

e) "Accordingly, transportation will be provided for transporting employed residents to and from their work site, residents seeking employment to specific interviews and residents participating in Transitional Services Counseling and for no other purpose.

f) Bannum requested payment for this service be made in advance on a monthly basis.

g) If the cab company discontinues its service, Bannum reserves the right to discontinue the service, but will use its best efforts to locate other transportation service at the same cost. If another service is found at a higher cost, Bannum's cost to the BOP will increase accordingly.

63. Disagree. Based upon information and belief, Bannum's letter of May 10, 2000 relates to interim discussions between Bannum and BOP regarding the possible use of a Bannum-owned and operated van (A281-282) and the revised Statement of Work dealing with the transportation requirements (A283-285), which Defendant failed to reference in its Statement of Facts. Bannum's May 10, 2000 letter stated:

a) Bannum is expeditiously re-constructing its previously submitted proposals, which would address all the issues expressed by the Regional BOP and will be forwarded within a couple of days;

b) Bannum is anxious to conclude the negotiations since the matter has dragged on for some time.

64. Agree that the report speaks for itself, but disagrees that Bannum was responsible for any transportation problems. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract**

**was necessary.** (Exhibits 7-9).

65. Agree only that Bannum submitted a revised cost proposal on June 13, 2000, which stated the following:

a) Cab company will provide transportation between hours of 6:30 a.m. and 10:00 a.m. and 4:00 p.m. and 9:00 p.m., Monday through Friday, on an as needed basis.

b) Transportation will be limited to those residents who have no other means of viable transportation and will no be provided within one linear mile of the facility, as discussed in the SOW.

c) Cab company will be on call to serve transportation needs between the hours of 10:00 a.m. and 4:00 p.m., with a response time of 30 minutes.

d) Bannum staff will transport residents in unusual situations. Residents will be required to schedule known program activities in advance.

e) The total proposed price is $100, 477, which includes the cab service cost, insurance, administrative costs and reasonable profit.

f) If the cab company discontinues its service, Bannum reserves the right to discontinue the service, but will use its best efforts to locate other transportation service at the same cost. If another service is found at a higher cost, Bannum's cost to the BOP will increase accordingly

66. Agree only that the letter speaks for itself.

67. Agree only that the referenced letter speaks for itself, but disagree with the content.

68. Agree only that the letter speaks for itself.

69. Agree that the referenced document states as represented, but disagrees with the content.

**The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

70. Agrees only that Bannum issued a response on November 2, 2000, which stated the following:

a) The transportation concern was first raised by the BOP on February 10, 1998, Bannum addressed the concern, and without any further discussions, seven months later Bannum was awarded the present contract. Obviously Bannum had satisfied the BOP's concern prior to the award.

b) The February 1, 1999 monitoring issued a finding for transportation, which resulted in a 10-month negotiation. In November, 1999 the Contracting Officer initiated the contract modification process, which absolutely exonerates Bannum for any liability associated with the transportation issue, since a modification is an admission that the transportation issue is outside contract terms.

c) Bannum has maintained a 97% rate of resident employment, which obviously indicates that BOP's concerns regarding public transportation is not affecting resident's ability to obtain employment. Those who do not obtain employment are clearly recalcitrant.

71. Agree only that the letter speaks for itself.

72. Agrees only that on January 24, 2001, Bannum sent a letter to the BOP stating the following:

a) The BOP had demanded that Bannum provide transportation services from 6:00 a.m.

to 9:00 p.m.

b) Bannum strongly believes that it meets or exceeds all the contract requirements dealing with public transportation.

c) However to continue to try to accommodate BOP, Bannum has agreed to submit another cost proposal. Bannum had previously supplied four cost proposals during the past 16 months, which is believed that BOP had refused to accept because of the 97% employment rate at the facility. Residents who have not obtained employment are recalcitrant and is not a reflection on Bannum's ability to perform the contract.

d) Bannum proposed a price to fix the transportation problem.

74. Agree only that the letter speaks for itself.

75. Agree that the quoted language states as represented, but notes that the SOW cited does not refer to any specific solicitation nor identifies its applicability to any solicitation/contract.

76. Agree only that on February 21, 2001, BOP conveyed the findings of the Full Monitoring, and that the cover letter stated: "There were no findings identified during the monitoring." Strongly disagrees that the monitoring findings state anywhere that Bannum had failed to comply with the transportation clause. **The BOP admits in several internal documents that Bannum was in compliance with the transportation requirements and that a modification to the contract was necessary.** (Exhibits 7-9).

77. Disagrees. The cited February, 2001 monitoring report states only that the transportation issue remained a concern and is not considered a finding, and that is was currently being handled by the Contracting Officer and Bannum.

78. Agree.

79. Agree.

## PLAINTIFFS PROPOSED FINDINGS OF UNCONTROVERTED FACTS

(For the purpose of convenience and continuity, Plaintiff's Proposed Findings of Uncontroverted Facts are numbered starting with the last number of Defendant's Proposed Findings of Uncontroverted Facts.)

### Count 6: Contract J200c-336 - Beaumont, Texas

PFUF 80. At the time of the filing of the subject claim for equitable adjustment, Bannum operated approximately 16 community correction centers, or halfway houses, throughout the United States, pursuant to contracts with the United States Department of Justice, Federal Bureau of Prisons (BOP). (A83) (Lowry Affidavit-Count 6, ¶1)

PFUF 81. Many of these contracts were with the South Central Region of the BOP. During this time, Bannum was having a multitude of contract disputes with this specific region. The Community Corrections Regional Administrator for this region was Gina Lane Mustain and the Community Corrections Manager was Charles W. Ala. Many of the disputes were centered around the actions and inactions of Mr. Ala. (Lowry Affidavit-Count 6, ¶ 2). The Disputes in the South Central Region centered on the BOP improper deductions (See Count 1), Diversions of referrals (Count 3,) interference with personnel (Count 4), refusal to pay for Contract mandated wage determinations (Count 7 of the Complaint which has since been resolved), Improper Investigations, (Count 5), Improper Cure Notice (Count 6), Improper Home Confinement Issues (Count 9).

PFUF 82. In or about January, 1997, Bannum traveled to Beaumont, Texas, to search for property for a lease in connection with a competitive bid it intended to make for a BOP Request for Proposal 200-0366-SC, for a Community Corrections Center in Beaumont. (A85-86) (Lowry

Affidavit-Count 6, ¶4).

PFUF 83. Mr. Charles Foxworth, a broker, assured Bannum that he was a property owners' agent for a property located at 1310 Pennsylvania Avenue in Beaumont, and introduced Mr. Ken Webb, who based upon information and belief, had authority from the owner, John McCray, to lease the premises, or any portion thereof. (A86).

PFUF 84. Mr. McCray had purchased the property for the operation of the Delta Career Institute in December, 1987, and purportedly sold DCI to Mr. Webb and his wife in 1998. (A86). As part of the sale, a consulting agreement was entered into, wherein Mr. McCray would allegedly perform work for DCI. (A86-87)

PFUF 85. Bannum then selected the premises for use in its bid with the BOP. As required, Bannum then negotiated a lease agreement through Mr. Foxworth for use should a contract be awarded to Bannum. (A89).

PFUF 86. On or about February 5, 1997, a lease agreement was executed. (A42-44) (Lowry Affidavit-Count 6, ¶5).

PFUF 87. Pursuant to the RFP, the BOP required appropriate zoning and use permits from the City of Beaumont. (A23) (Lowry Affidavit-Count 6, ¶6).

PFUF 88. Charles Foxworth, as an agent for both Mr. McCray and Mr. Webb, submitted an application for amendment of the zoning ordinance. Both Mr. McCray and Mr. Webb were listed as owners. (A32) (Lowry Affidavit-Count 6, ¶7).

PFUF 89. The lease was submitted to the BOP by Bannum as part of it proposal in response to the RFP. (Lowry Affidavit-Count 6, ¶8).

PFUF 90. On July 17, 1997, Bannum entered into a contract to provide a community

corrections center at the 1310 Pennsylvania Avenue property with the BOP. (A1-4) Contract was issued by the BOP in part based upon Bannum's lease. (Lowry Affidavit-Count 6, ¶9).

PFUF 91. Bannum made and continued to make its lease payments to Mr. Webb and to Mr. McCray. (A30).

PFUF 92. On February 10, 1999, Mrs. Webb sent a letter to Bannum directing them to forward all future rental payments directly to the owner of the building, John McCray. (A47) (Lowry Affidavit-Count 6, ¶10).

PFUF 93. On November 7, 2000, Mr. Ala advised Ms. Mustain that during the monitoring of Bannum, it was discovered that the City Council in Beaumont had approved a Catholic school for troubled youths, and that the school would be in the section of the building occupied by Bannum. Mr. Ala also represented that the City Council stated that it was agreed upon that Bannum would vacate the premises prior to the beginning of the school year 2001. Mr. Ala further stated that as of the date of the memorandum, Bannum had not notified the BOP of any future move. No mention is made of any attempts by the BOP to communicate this information to Bannum. (Exhibit 1) (Lowry Affidavit-Count 6, ¶11).

PFUF 94. The BOP never disclosed this information to Bannum. (Lowry Affidavit-Count 6, ¶12).

PFUF 95. On December 15, 2000, Bannum received a notice dated December 8, 2000, from Mr. Lee Y. Wheeler III of Foxworth Real Estate stating that "the owner has elected to execute his option to terminate your tenancy. Please consider this your 30-day notice." (A49, A52) (Lowry Affidavit-Count 6, ¶13).

PFUF 96. Mr. McCray did not file any formal eviction proceeding against Bannum. (Lowry

Affidavit-Count 6, ¶14).

PFUF 97. In a memorandum dated December 18, 2000, from Mr. Ala to Kathy Campbell, the Assistant Community Corrections Administrator, he advised that he had a conversation with Mr. McCray, the owner of the building, who stated that Bannum never had a lease to occupy the building. Mr. Ala further represented that Mr. McCray leased the building to Mr. Webb and that Mr. Webb subleased the building to Bannum, and that Mr. Lowry was aware that he was subleasing the property. Purportedly Mr. McCray did not know that the building was being subleased until he received a letter from Bannum about a leaking roof. Mr. Ala further represented: "As an aside, should it become necessary, Cornell Corrections, Houston, Texas, can accommodate all Bannum Beaumont's population and can accommodate for all their programming needs, including home confinement in the Beaumont area." No mention is made of any attempts by the BOP to communicate with Bannum. (Exhibit 2) (Lowry Affidavit-Count 6, ¶15)

PFUF 98. The December 18, 2000, memorandum also contained a handwritten note stating **"County Commissioner says unwritten agreement that if the schools goes in Bannum will have to vacate."** (emphasis added) (Exhibit 2) (Lowry Affidavit-Count 6, ¶16).

PFUF 99. Bannum had no knowledge of any agreement with the County Commissioner regarding the institution of the school at the same premises as Bannum's facility. (Lowry Affidavit-Count 6, ¶17).

PFUF 100. On December 19, 2000, Bannum received a telephone call from Gina Mustain (BOP Regional Administrator) inquiring about the purported eviction and stating that she was in possession of a copy of the eviction letter. Based upon information and belief, no Bannum

employee gave the BOP any notice of the eviction notice. (A52-53) Additionally, at no time during the conversation did Ms. Mustain raise the issue of the school agreement. (Lowry Affidavit-Count 6, ¶18).

PFUF 101. On December 19, 2000, a memorandum was issued by Benjamin R. Tousley, Community Corrections Manager to Katharina Washington, Contracting Officer, (A22), stating that he recommended that a Cure Notice be issued to Bannum based on a conversation with the owner of the building located at 1310 Pennsylvania Avenue, who stated that the building was erroneously subleased to Bannum, and that Bannum never had a valid lease agreement. No mention was made of the school agreement. (Exhibit 3).

PFUF 102. On December 19, 2000, Bannum had the lease agreement reviewed by an attorney Susan Oliver who indicated that the lease was valid. (A30-31). Ms. Oliver stated that the Zoning information showed both Mr. Webb and Mr. McCray as owners of the property (A32), and that Mr. McCray accepted Bannum's rent payments (A47). Ms. Oliver further indicated that she would seek a restraining order. (Lowry Affidavit-Count 6, ¶20).

PFUF 103. On December 20, 1999 David Lowry of Bannum had a telephone conversation with Andrea Johnson (Deputy Community Corrections Regional Administrator for BOP), during which Ms. Johnson stated that since Bannum was being evicted from the contract location, a Cure Notice would be issued the following week by the Contracting Office. At no time during the telephone conversation did Ms. Johnson impart any information to Bannum regarding the school agreement. (Lowry Affidavit-Count 6, ¶19).

PFUF 104. Bannum supplied a copy of Ms. Oliver's letter to the BOP. (A26) (Lowry Affidavit-Count 6, ¶20).

PFUF 105. Despite being supplied with a copy of Ms. Oliver's opinion letter clearly establishing lease-hold rights, on December 22, 2000, a Cure Notice was issued to Bannum citing to the purported eviction notice and demanding that Bannum provide a written plan of action and a copy of a valid lease for the duration of the contract. No mention was made of the school agreement. (A23-24) (Lowry Affidavit-Count 6, ¶21).

PFUF 106. On December 22, 2000, Bannum obtained a restraining order against any unlawful eviction. (A59-60) (Lowry Affidavit-Count 6, ¶22).

PFUF 107. On January 3, 2001, Bannum filed a response to the Cure Notice and a claim for equitable adjustment. The claim stated that Bannum had a valid lease and that Bannum alleged that the BOP improperly handled the lease matter by; failing to verify the validity of the eviction notice, failing to review the terms of the lease previously submitted, or; failing to conduct meaningful discussions with Bannum before issuing the Cure Notice, which Bannum felt constituted a breach of the duties of cooperation and good faith and fair dealing. The response further alleged that the BOP's threat of default was especially egregious given the fact that Bannum had previously submitted numerous REAs under the subject contract, none of which had reached final resolution. (A25-64) (Lowry Affidavit-Count 6, ¶23).

PFUF 108. Bannum obtained an extension of the restraining order on January 2, 2001, (A61) and a temporary injunction on January 11, 2001, which was extended a number of times (A66, A71, A76) (Lowry Affidavit-Count 6, ¶25).

PFUF 109. Bannum aggressively pursued litigation to preserve the lease (A33-A62, A66-67, A71, A81-A107) (Lowry Affidavit ¶26-27).

PFUF 110. On January 12, 2001, the Contracting Officer sent a note to Gina Mustain stating

that: "Please note Bannum, Inc. has an Injunction for the facility in Beaumont which is good until 3/1/01. Therefore, there is nothing to cure at this time." (Exhibit 4).

PFUF 111. On January 29, 2001, the BOP denied Bannum's claim stating that it did not have adequate assurances that Bannum would be able to perform the services required by the contract and was in danger of defaulting on its contract. No mention was made with respect to the communications regarding the school agreement made regarding the placement of the Milburn Academy or that Bannum was advised accordingly. (A68-69) (Lowry Affidavit-Count 6, ¶26).

PFUF 112. Several months passed and the Court-issued stay remained in effect. (A61, A66, A71, A76) (Lowry Affidavit-Count 6, ¶27).

PFUF 113. On March 29, 2001, Charles Ala wrote another memorandum stating that he had yet another conversation with Mr. Lee Wheeler of Foxworth. Mr. Wheeler advised Mr. Ala of the status of the litigation and notified him that the Richard Milburn Academy, a school for troubled youths, was now occupying the back portion of the building as of January 31, 2001. Mr. Ala further stated that he phoned Herbert Johns, the director of the Academy and questioned whether or not he was experiencing any problem with the staff or inmates at Bannum's facility. Mr. Johns told Mr. Ala that there had been one occasion of fraternization between a student and a Bannum inmate. Mr. Johns also stated that he thought that Bannum Beaumont was to be moved out of the facility prior to them occupying the building and that he had great concerns about adult federal inmates being housed in proximity to the school. (A74) (Lowry Affidavit-Count 6, ¶28).

PFUF 114. At no time did Mr. Ala or the BOP communicate with Bannum regarding these concerns or the fact that there was a presumption that Bannum would be out of the facility prior

to the school moving in. (A74-75) (Lowry Affidavit-Count 6, ¶28).

PFUF 115. Bannum continued to take aggressive legal steps to avoid any interference or interruption with its lease. Bannum pursued Mr. and Mrs. Webb in Bankruptcy Court in California, took depositions in California, and attempted to obtain all of the Webb's records pertaining to its operation of 1310 Pennsylvania Avenue. When Bannum's motion for continuance in the Texas Court was denied, it then proceeded to pursue both Mr. McCray and the Webbs, and all other parties in Federal Court. (A81) On June 4, 2001, Bannum advised the Contracting Officer that it withdrew its complaint in the Texas State Court and proceeded in Federal Court. (Lowry Affidavit-Count 6, ¶29).

PFUF 116. As a result of this litigation, Bannum was able to complete its contract. Bannum then bid on the follow-on contract with the BOP utilizing the same premises pursuant to a new lease agreement with Mr. McCray. (Lowry Affidavit-Count 6, ¶34).

PFUF 117. Bannum incurred substantial litigation expenses while the BOP remained silent with critical information that could have exposed the reason why Bannum was being forced out. (Lowry Affidavit-Count 6, ¶31).

PFUF 118. At no time did the BOP retract or rescind its Cure Notice. (Lowry Affidavit ¶32).

PFUF 119. Bannum was contacted by the Defense Contract Audit Agency (DCAA) Auditor and was told that it had been requested by the DOJ to do an Audit of Bannum's Claims. However the Auditor advised that he was not directed to Audit Count 6. (Lowry Affidavit-Count 6, ¶34).

PFUF 120. Mr. Lowry reviewed Bannum's time and effort including all the legal bills incurred by Bannum as a result of the Cure Notice. Bannum has incurred approximately,

$115,836.64 as a result of the ongoing litigation resulting from the lease. The BOP and Bannum were under contract and pursuant to partnering agreements; both parties were to act in good faith with each other. If the BOP had disclosed the real reason behind the alleged eviction notice, Bannum could have confronted the City, the BOP, and Mr. McCray, and gotten to the bottom of this madness. The BOP knew about the school agreement approximately one month before the alleged eviction notice, but yet stood silent and then forced Bannum to incur tremendous legal costs to preserve the contract. (Lowry Affidavit-Count 6, ¶35).

PFUF 121. Even though the Auditor did not audit Count 6, he reviewed some of the legal bills that Bannum incurred. (Exhibit 6) (Lowry Affidavit ¶36).

PFUF 122. Bannum has been supplied by the DOJ with the Audit working papers that the Auditor utilized to prepare his Audit Report that included some of the legal bills incurred in the McCray litigation, which included the following costs.

- Bannum had to chase down the Webb's, who were located in San Diego, to obtain documents to show the connection between the Webb's and Mr. McCray.
- When the Webb's refused to produce documents at a deposition, and the Texas Court insisted on proceeding with the case, Bannum was forced to non-suit its Texas case and proceed in Federal Court to further protect the lease, incurring additional legal cost.
- Subsequently, because the Federal Court dismissed the case on jurisdictional grounds only, Bannum had to continue with the Texas State Court action, which included additional discovery.

- Bannum finally obtained discovery from the Webb's, which included boxes of files that had to be reviewed.

(Exhibit 6) (Lowry Affidavit-Count 6, ¶37).

**Count 8: Contract J200c-397- Montgomery, Alabama**

PFUF 123. Bannum was awarded Contract No. J200c-181 on or about October 1, 1993. The contract called for Bannum to provide Community Corrections Center services for Federal offenders in the Montgomery, Alabama area. Pursuant to the terms of the contract, Bannum was to commence performance on October 1, 1993 for a base period of two years ending September 30, 1995. The contract also contained three 1-year options, all of which were exercised by the BOP. (A328) (Lowry Affidavit-Count 8, ¶5).

PFUF 124. Then, or about July 1, 1998, Bannum was awarded a follow-on contract No. J200c-397 by the BOP, which encompassed a base period of two years, and three 1-year options. (A144-153) This Contract was awarded after several rounds of discussion during which there were no questions raised regarding the transportation requirement, except for BOP's C&D letter dated April 10, 1998 (A195-197), which Bannum responded to (A200-201) by attaching its April 16, 1998 (A198-199) letter which addressed the issue that was raised under the present contract. Bannum further stated that if a different transportation plan was required, Bannum's manday rates would increase based on related costs. (A330). The issue was not raised again during subsequent negotiations and requests for Final Proposal Revisions. (A330) (Lowry Affidavit-Count 8, ¶6).

PFUF 125. The Statement of Work required that "the facility shall be located within 1 mile of public transportation, or the contractors shall provide for transportation residents for

employment or program participation activities at no cost the resident". (A14). Bannum's facility was in compliance with the contract requirement. (A328) (Lowry Affidavit-Count 8, ¶7).

PFUF 126. Intermittently during Bannum's performance of the subject contract and the preceding contract (No. J200c-181), BOP raised an issue regarding Bannum's compliance of the transportation requirements under the contract, which BOP claimed was deficient. The BOP issued numerous monitoring reports and letters insisting that Bannum had to come up with a solution for the transportation needs of the inmates. (A189, A334 ¶6, A196-197, A227, A230, A233-234, A237, A240, A242, A251, A334 ¶32, A263-265, A273-274, A287-292, A298, A300-304, A307, A308-310, A315-319, A350-354) (Lowry Affidavit-Count 8, ¶8).

PFUF 127. Bannum spent considerable extra-contractual time, effort and cost responding to BOP's allegations, continuously claiming that it met the transportation requirements of the contract. (A194, A198-199, A200-201, A229, A332 ¶s 21,22, A261-272, A275-276, A305-306) (Lowry Affidavit-Count 8, ¶9).

PFUF 128. Meanwhile in an internal BOP e-mail, dated March 26, 1999 from the contracting officer to Larry Spencer (BOP Manager), the Contracting Officer stated: " we need to determine if this city's transportation system is a significant issue, impairing the inmates ability to get to/from work on a regular basis. If it is, will have to work out a solution with Bannum, and that solution could possibly mean we'd have to pay Bannum something additional **since there is in fact 'transportation' provided by the City, within a mile of the facility-regardless of how regular/consistent it is" (emphasis added).** (Exhibit 7)

PFUF 129. Then on September 24, 1999, the BOP once again admitted that it was responsible

for the transportation issue. In an internal letter, the BOP stated “the contractor is presently meeting both requirements set forth in the statement work. Public transportation (bus system) is provided by the city of Montgomery, Alabama buses run from 6 a.m. to 6 p.m. however, CCM staff in Montgomery, Alabama, as well as Atlanta, Georgia, had determined that the city's transportation system is inadequate. The transportation system impairs residents’ ability to get to, and/or from work, as well and as required program activities” (Exhibit 8).

PFUF 130. In or about October, 1999, the BOP issued a Request for Contract Action citing a need for a modification on Bannum’s contract for additional transportation services, and which further provided a cost estimate of $90,000 which was then slashed down by 50% to $45,000. The Request further stated that “It should be noted that the contractor is presently meeting the requirements set for in the Statement of Work, regarding this concern.” (Exhibit 9).

PFUF 131. The BOP then, after realizing that Bannum met the contract transportation requirements, required Bannum to submit a proposal in excess of the contract terms and Bannum submitted a proposal to the CCRA Cheryl Dennings on September 8, 1999 which discuss price, terms and other conditions. The price proposed by Bannum was $5,000.00 per month (A248-249) (Lowry Affidavit-Count 8, ¶10).

PFUF 132. Despite the submission of Bannum’s proposal, the contracting officer sent to Bannum Modification No. 3, which included compensation for the additional transportation services in the amount of $45,000 per year, which was the BOP’s estimate included in its Request for Contract Action. (A254-255) (Lowry Affidavit-Count 8, ¶11).

PFUF 133. However on November 29, 1999 Bannum found out that the CCRA had never forwarded its September 8, 1999 pricing proposal to the contracting officer. Bannum then

notified the contracting officer that there had been a mistake with Bannum believing that its proposal had been accepted and incorporated into the contract. Bannum rescinded its agreement to the Modification. (A252) (Lowry Affidavit-Count 8, ¶12).

PFUF 134. On January 4, 2000 the supervising contracting officer acknowledged the rescission of modification three and requested a cost proposal for the provision of transportation services in excess of contract requirements. Additionally the supervising contracting officer stated that the BOP Montgomery office may decide to not exercise the option, if Bannum did not satisfy their alleged transportation concerns. Bannum considered the contracting officers statement an attempt to extort extra contractual performance from Bannum in exchange for the BOP exercising subsequent options under the contract. (A334) (Lowry Affidavit-Count 8, ¶13).

PFUF 135. In response to the BOP direction Bannum submitted a formal cost proposal for the change in transportation requirement on January 7, 2000. (A257-259) (Lowry Affidavit-Count 8, ¶14).

PFUF 136. In January 2000, again, even though the BOP had directed Bannum to submit a proposal for additional transportation services, BOP personnel in the field office continued to raise the alleged concerns regarding the transportation issue and Bannum responded that the matter was presently being negotiated with the BOP. (A334 ¶32, A200) (Lowry Affidavit-Count 8, ¶15).

PFUF 137. Despite this fact, the BOP continued to make findings against Bannum in monitoring reports. (A263-265) This forced Bannum to expend time and effort again in responding. (A269-276) (Lowry Affidavit-Count 8, ¶16).

PFUF 138. Pursuant to further requests from the BOP, Bannum submitted another cost

proposal on March 24, 2000, in the amount of $55,200 per year (A27-280). During a meeting with the BOP regarding this cost proposal, the BOP stated that Bannum must provide transportation throughout the day and strongly encouraged Bannum to purchased a van for that purpose. (A336) (Lowry Affidavit-Count 8, ¶17).

PFUF 139. Bannum then contacted the BOP and sought further clarification as to whether or not it should provide for taxicab services or to provide vans. The BOP responded that Bannum just submit its best offer and would not provide Bannum anymore information. (Exhibit 11) (Lowry Affidavit-Count 8, ¶18).

PFUF 140. On June 13, 2000, Bannum submitted a detailed proposal for use of a taxicab service, and private cars in unusual situations. (A293-296) (Lowry Affidavit-Count 8, ¶19). The total cost proposed was $100,477 per year. Based upon a estimated inmate population of 30, as used in the Government's subsequent estimate, Bannum's proposal would equate to a revised manday rate of $59.63 ($50.45/day contract amount + $9.18/day proposed change), for the remaining option years.

PFUF 141. No further negotiations were conducted between Bannum and the BOP with respect to the June cost proposal. (A336) (Lowry Affidavit-Count 8, ¶20).

PFUF 142. The BOP continued to attack Bannum in monitoring reports regarding the transportation issue forcing Bannum to incur additional costs. (A336) (Lowry Affidavit-Count 8, ¶21).

PFUF 143. On or about September 5, 2000, the BOP prepared a request for contract action (RCA) and stated that Bannum and the BOP were unable to reach a mutual agreement to resolve the ongoing transportation issue and therefore, Option year 2 would not be exercised. Included

in the RCA was an estimate of what the BOP expected a new contract to cost in the amount of $60 per manday, based upon a inmate population of 30 inmates, for the base 2-year period first year, $61.80 per manday for Option Year 1, $63.65 per manday for Option Year 2, and $65.56 per manday for Option Year 3. (Exhibit 10). However the record is devoid of any comparison between the alleged mandate rate for the new contract and Bannum's transportation proposal, as evidenced by the fact that Bannum's June 13, 2000 cost proposal equates to a significantly lower price than the BOP's estimate.

PFUF 144. The BOP eventually awarded Bannum a contract for $60.45 per man day for the base period and all option years (A154). This price was significantly less than the BOP estimate.

PFUF 145. On October 11, 2000, the BOP issued its Performance Rating for Bannum's Montgomery program ("CEF"), which ranked Bannum fair in the contract compliance and business relations category and poor in the customer satisfaction category. (Exhibit 12) (Lowry Affidavit-Count 8, ¶22).

PFUF 146. Bannum had to spend a significant amount of time responding to this performance evaluation. On November 16, 2000, Bannum submitted a detailed rebuttal to what it considered to be the erroneous CEF. (Exhibit 13) (Lowry Affidavit-Count 8, ¶23).

PFUF 147. On November 29, 2000, Bannum received a copy of solicitation 200-0637-SE which was a request for proposals for a follow-on contract in Montgomery. When Bannum inquired as to the reason for this solicitation the BOP responded that unless the transportation issue was resolved, procurement was going back out on the street and that the BOP would further contact Bannum to discuss the transportation issue. (A343) (Lowry Affidavit-Count 8,

¶24).

PFUF 148. On or about January 11, 2001 Bannum contacted the chief contracting officer and was advised again that unless it negotiated the transportation issue, a new contract would be issued. (A343-344) (Lowry Affidavit-Count 8, ¶25).

PFUF 149. On January 24, 2001, Bannum submitted yet another cost proposal pursuant to a telephone conversation between Bannum representatives and BOP you personnel and significantly reduced its cost proposal. (A311-313) (Lowry Affidavit-Count 8, ¶26). The total proposed price was $87,035 per year. Based upon a estimated inmate population of 30, as used in the Government's estimate, Bannum's proposal would equate to a revised manday rate of $58.40 ($50.45/day contract amount + $7.95/day proposed change), for the remaining option years.

PFUF 150. On February 9, 2001 the Piliero law firm spent a great deal of time and expense contesting the CEF (Exhibit 14) and further appealed the February 21, 2001 full monitoring report. (Exhibit 15) (Lowry Affidavit-Count 8, ¶27).

PFUF 151. On or about March 2, 2001, Bannum filed a Protest of Solicitation No. 200-0637-SE.

PFUF 152. On March 6, 2001 Bannum file a detailed Request for Equitable Adjustment (REA). The basis behind the REA was to contest the wrongful refusal by the BOP to exercise the option and for all the time and expense in dealing with the transportation issue which includes the BOP requested cost proposals. (A320-A346) (Lowry Affidavit-Count 8, ¶28).

PFUF 153. The BOP did not negotiate the REA and on April 9, 2001 the REA was converted into a certified claim for equitable adjustment in the amount of $339,411.57. (A347) (Lowry

Affidavit-Count 8, ¶30).

PFUF 154. The claim was revised during the audit from $339,412 to $371,918 (A 358). This was a revision to ongoing costs. The claim amount included the lost overhead and profits for the wrongful refusal to exercise the option, proposal preparation expenses which included Bannum labor costs for the BOP requested proposals, associated expenses such as UPS and overnight charges, fees associated with the requests for equitable (REA), and travel expenses. (Lowry Affidavit-Count 8, ¶s 32,33).

PFUF 155. While the auditor attempted to write off the lost overhead and profits with the excuse that Bannum would have replaced the income or revenue that it would have derived from the exercise of the options with the replacement contract (A356), Bannum was still shorted two years. As indicated above the BOP exercised all the option years on the replacement contract and Bannum was not successful in obtaining a follow-on contract. (Lowry Affidavit-Count 8, ¶s 35-36).

PFUF 156. The auditor then reviewed Bannum's labor costs. (A360-361). The auditor did not disclose the basis behind Bannum's request nor did the auditor disclose the support that Bannum provided for these fees. All that the auditor did was to discount these fees with a general conclusion that Bannum did not have timesheets. (A359) However, buried in the auditor's working papers was a detailed affidavit from David Lowry explaining and detailing the basis behind Bannum's request. (Exhibit 17). Mr. Lowry's affidavit is very detailed, citing to the work effort expended by specific Bannum personnel and a detailed estimate of their time. Mr. Lowry also identifies the labor rates. (Lowry Affidavit-Count 8, ¶s 37-39).

PFUF 157. The auditor then reviewed the expenses incurred by Bannum associated with the

extra work explained above in paragraph 19, discounting these expenses claiming that he could not tie them in to the Montgomery claim. (A361-362). However, all of the bills were provided to the auditor and pursuant to those bills he could see the address of the recipient which was the BOP and the date and time of the bill which could be matched to Bannum's correspondence. (Exhibit 18) (Lowry Affidavit-Count 8, ¶40)

PFUF 158. The auditor then looked at the Camardo and the Piliero bills. The auditor explains that these bills were for the Montgomery protest. (Exhibit 6). However the vast majority of the Camardo bills were for the time and effort incurred in the protest of the defective transportation language and the detailed REA. The REA was included in the government's motion at A320. The Piliero bills were for the time and effort incurred contesting the improper CEF's. (Exhibit 6) (Lowry Affidavit-Count 8, ¶41).

PFUF 159. The auditor then reviewed the travel cost. (A363-3640). The auditor claimed that Bannum did not support these charges by tying them into the Montgomery matter. However, pursuant to Lowry's affidavit, on page 3 (Exhibit 17), he identifies that he traveled to meet with the BOP officials on several occasions to deal with the transportation issue. The government would have a record of these meetings that would support the cost. (Lowry Affidavit-Count 8, ¶42).

Dated: October 12, 2007

Respectfully submitted,

/s/ Joseph A. Camardo, Jr.
Joseph A. Camardo, Jr.
Camardo Law Firm, P. C.
*Attorneys for Plaintiff*
127 Genesee Street
Auburn, NY 13021
Tel: (315) 252-3846
Fax: (315) 252-3508