No. 01-639C
(Judge Lettow)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

BANNUM, INC.,

Plaintiff
v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT UPON COUNTS SIX AND EIGHT OF THE SECOND AMENDED COMPLAINT AND RESPONSE TO PLAINTIFF'S MOTION TO AMEND**

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DEBORAH A. BYNUM
Assistant Director

DEVIN A. WOLAK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel. (202) 616-0170
Fax. (202) 514-8624

October 29, 2007

Attorneys for Defendant

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . ii

ARGUMENT . . . . . . . . . . 2

I. Count Six: The Cure Notice . . . . . . . . . . 2

A. Bannum's Strategy Of Seeking Leave To Amend Its Complaint To Add New Allegations That, If Proven, Would Create A Material Issue Of Fact, Does Not Satisfy Bannum's Burden In Responding To This Motion . . . . . . . . . . 2

B. Assuming Bannum's New Allegations Concerning The "School Agreement" Conspiracy Have Some Merit, The Court Should Still Grant The Defendant's Motion Because These New Allegations Are The Subject Of An Unresolved Motion To Amend And Also Constitute A New Claim Over Which This Court Does Not Have Jurisdiction . . . . . . . . . . 4

C. Assuming Bannum's New Allegations May Be Considered Upon This Motion, They Do Not Constitute Superior Knowledge . . . . . . . . . . 6

D. The Government's Nondisclosure Of The Alleged School Agreement Is Not A Failure To Cooperate . . . . . . . . . . 8

E. Bannum Is Not Entitled To Any Of The Damages It Seeks . . . . . . . . . . 9

II. Count 8: Montgomery Transportation . . . . . . . . . . 11

A. Bannum Cannot Prove, By Clear And Convincing Evidence, That The Government Acted In Bad Faith In Refraining From Exercising The Final Two Options Upon The 1998 Montgomery Contract . . . . . . . . . . 11

B. Bannum Has Not Proven Its Costs Associated With Its Transportation Proposals . . . . . . . . . . 16

RESPONSE TO MOTION TO AMEND . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . 20

## TABLE OF AUTHORITIES

**CASES**

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) . . . . . 11, 12

Ferring B.V. v. Barr Labs., Inc.,
437 F.2d 1181 (Fed. Cir. 2006) . . . . . 2

GAF Corp. v. United States,
932 F.2d 947 (Fed. Cir. 1991) . . . . . 6

Ho v. U.S.,
49 Fed. Cl. 96 (2001) . . . . . 11

Kinetic Builders Inc. v. Peters,
226 F.3d 1307 (Fed. Cir. 2000) . . . . . 5, 18

McCormick Constr., Co. v. United States,
18 Cl. Ct. 259 (1989) . . . . . 7

Northrop Grumman Corp., Military Aircraft Div. v. United States,
63 Fed. Cl. 12 (2004) . . . . . 6

P.R. Contractors, Inc. v. United States,
76 Fed. Cl. 621 (2007) . . . . . 5, 18

Piasecki Aircraft Corp. Island Rd. v. United States,
229 Ct. Cl. 208 (1981) . . . . . 6

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . 8

Renda Marine, Inc. v. United States,
65 Fed. Cl. 152 (2005) . . . . . 18

Ryco Const., Inc. v. United States,
55 Fed. Cl. 184 (2002) . . . . . 8

Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States,
71 Fed. Cl. 172 (2006) . . . . . 17

Slovacek v. United States,
40 Fed. Cl. 828 (1998) . . . . . 17

United States v. Grumman Aerospace Corp.,
927 F.2d 575 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6, 18

**RULES**

RCFC 7.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RCFC 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BANNUM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-639C |
| | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT UPON COUNTS SIX AND EIGHT OF THE SECOND AMENDED COMPLAINT AND RESPONSE TO PLAINTIFF'S MOTION TO AMEND**

Pursuant to Rule 7.1(b) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this reply in support of its motion for summary judgment upon counts six and eight of the second amended complaint and response to the plaintiff's motion to amend, and in opposition to "Plaintiff's Response To Defendant's Motion For Summary Judgment And Cross-Motion For Leave To File Amended Complaint" (the "response").

In our motion, we established that there were no genuine issues of material fact and that the defendant was entitled to judgment as a matter of law upon counts six and eight of the plaintiff's second amended complaint. In its response, the plaintiff (a) seeks leave to amend its second amended complaint so that it can add allegations that would transform count six into an entirely new claim; (b) argues the allegations of this new claim as its only defense to our motion for summary judgment upon count six; and (c) fails to produce evidence sufficient to create a material issue of fact with respect to its entitlement to recover the amounts sought in count eight.

The plaintiff has not demonstrated that there are any issues of material fact or that the defendant is not entitled to judgment as a matter of law upon counts six and eight of the the

second amended complaint. The United States therefore respectfully renews its request that judgment be entered in its favor upon counts six and eight of the plaintiff's second amended complaint.

## ARGUMENT

I. Count Six: The Cure Notice

A. Bannum's Strategy Of Seeking Leave To Amend Its Complaint To Add New Allegations That, If Proven, Would Create A Material Issue Of Fact, Does Not Satisfy Bannum's Burden In Responding To This Motion

In its response to our motion upon count six, Bannum's only statements relating to the count as presently pled are as follows:

> Specifically, Bannum alleges that the BOP had conducted private conversations with the landlord and their agent, who imparted information that was improperly withheld from Bannum.
>
> Instead of imparting this vital information, the BOP issued a Cure Notice on December 22, 2000, demanding that Bannum provide a written plan of action and a copy of a valid lease. Again no mention was made of the school agreement. This failure to impart the information regarding the school agreement ***was in addition to the BOP's failure to give Bannum information regarding the identification and nature of the improper communications the BOP had with the property owner/agents***, despite Bannum's numerous requests.

Response at 7, 8 (emphasis added). These reiterations of its allegations do not satisfy Bannum's burden upon this motion. Bannum cannot rest upon the allegations of its complaint when facing a motion for summary judgment; it must produce evidence that either proves its allegations or creates a material issue of fact that must be sent to the factfinder. See Ferring B.V. v. Barr Labs., Inc., 437 F.2d 1181, 1193 (Fed. Cir. 2006) (stating that the non-moving party, "to prevail, must submit conflicting evidence in the form of an affidavit ro other admissible evidence . . . . Mere

denials or conclusory statements are insufficient.") (internal citations omitted). This rule is even more true where, as in this case, discovery has closed.

Rather than proffer evidence, Bannum makes its argument based upon new allegations of misconduct by the BOP that are the subject of its currently pending motion to amend. Specifically, Bannum now alleges that the Beaumont City Council, Bannum's Beaumont landlord, and the BOP engaged in a conspiracy to deprive Bannum of its right to occupy its Beaumont facility by leasing the extra space in the building to a Catholic school for troubled youths. Of course, asserting new allegations, without any proof, is the same insufficient response as reasserting old allegations.

These new allegations come without any proof, because the lone document Bannum proffers does not support its allegation the BOP conducted secret communications with Bannum's landlord with respect to the alleged school agreement. The document Bannum relies upon states:

> During the interim monitoring at Bannum Beaumont, it was discovered the City Council in Beaumont approved a Catholic school for troubled youths. The school will be in the unoccupied section of the building now occupied by Bannum Place Beaumont. The Beaumont City Council approved the school to begin operation at the beginning of the school year (September) 2001. The City Council stated that it was agreed upon that Bannum Place Beaumont would vacate the premises prior the beginning of the school year 2001. As of the writing of this memo Bannum Incorporated has not notified this office of any future move. This information was provided by Fire Chief Jack Maddox, Beaumont Fire Department.

Exhibit 1 to Response. Bannum's new allegation is that the "BOP had conducted private conversations with the landlord and their agent, who imparted information that was improperly withheld from Bannum." Response at 7. This document clearly states that the communication

Bannum complains of came from the Beaumont Fire Chief, not Bannum's landlord. It also states that the BOP learned of this agreement after the fact, i.e., the BOP was not involved in formulating this agreement. Bannum offers no other evidence in support of its new allegations, which means that this case would need to back into discovery so that Bannum might find evidence to prove its new allegations. This does not carry Bannum's burden upon this motion, and Bannum has essentially left count six, as presently pled, undefended. The Court should therefore grant the defendant's motion for summary judgment.

B. Assuming Bannum's New Allegations Concerning The "School Agreement" Conspiracy Have Some Merit, The Court Should Still Grant The Defendant's Motion Because These New Allegations Are The Subject Of An Unresolved Motion To Amend And Also Constitute A New Claim Over Which This Court Does Not Have Jurisdiction

As demonstrated immediately above, Bannum's allegations and argument concerning the alleged school agreement are entirely new to this case. Until now, under count six, Bannum has claimed the $4,500 cost of preparing its response to the December 2000 cure notice, based upon the allegation that the BOP communicated with Bannum's landlord after receiving the eviction notice in mid-December 2000. Now Bannum seeks $96,300 for the cost of responding to the cure notice, and the cost of its legal fees incurred with respect to the litigation Bannum initiated against its landlord, based upon the allegation that the BOP improperly communicated with Bannum's landlord at some time between November 7, 2000 and the issuance of the eviction letter. Bannum sums up its argument as: "the BOP attempted to disable Bannum's performance of the contract." Response at 13.

Bannum is not updating count six, it is making a new claim under the contract. Bannum is alleging a conspiracy among the BOP, the City Council, and Bannum's landlord to deprive

Bannum of its lease.[1] These allegations present an entirely new set of operative facts and new claimed damages (that happen to be 21 times higher than the original amount claimed). It is well settled that multiple claims may arise under a single contract, and that a contractor's claims are separate from one and other if they each present distinct sets of operative facts for the contracting officer to consider. See Kinetic Builders Inc. v. Peters, 226 F.3d 1307, 1312 (Fed. Cir. 2000). Furthermore, Bannum apparently agrees that its new allegations constitute a new claim, as it has requested that the Department of Justice forward its "amended" claim to the contracting officer for a final decision. See Exhibit A to this Reply.

Bannum's new school-agreement conspiracy claim clearly goes beyond Bannum's original claim submitted to the contracting officer, as well as what it has pled in count six of its second amended complaint. Because this is a new claim (and, notwithstanding the title Bannum has affixed to its submission to the contracting officer, Bannum agrees that it is a new claim), it is beyond this Court's jurisdiction. P.R. Contractors, Inc. v. United States, 76 Fed. Cl. 621, 637 (2007) ("It is well settled that the submission of a claim to the contracting officer by the contractor is a jurisdictional prerequisite to maintaining a suit under the CDA and that a contractor's failure to do so requires that its action be dismissed.") (citing United States v. Grumman Aerospace Corp., 927 F.2d 575, 579 (Fed. Cir. 1991)). Thus, these new allegations

---

[1] Aside from the fact that this constitutes a separate claim, it is also patently absurd. Bannum's argument assumes that the BOP knowingly engaged in a course of conduct that would result in the BOP having to incur the expense and hassle of relocating all of the Beaumont inmates once Bannum lost its facility. Bannum presents no evidence that would overcome the presumption that the BOP acts rationally -- i.e., there is absolutely no proof that the BOP would do something that is so plainly against its own interest. Furthermore, because discovery is closed (and even if it was not), Bannum cannot produce any such evidence. Bannum's theory here is a misguided attempt to rehabilitate its meritless claim, and it should be rejected.

present no impediment to the Court's ability to grant the defendant's motion upon count six, which, as demonstrated in section I.A., above, Bannum has failed to defend.

C. Assuming Bannum's New Allegations May Be Considered Upon This Motion, <u>They Do Not Constitute Superior Knowledge</u>

Assuming that there is some truth to Bannum's new allegations, this is not the type of vital information that the Government is required to disclose. To be liable for failing to disclose superior knowledge, the allegedly non-disclosed information must be vital to the contractor's ability to perform; the contractor is not entitled to disclosure of "each and every bit of information" the Government possesses. <u>Piasecki Aircraft Corp. Island Rd. v. United States</u>, 229 Ct. Cl. 208 (1981). The communication about the school agreement is simply not vital to Bannum's ability to perform.[2] As the recently submitted affidavit of David Lowery repeatedly states, Bannum is still operating its Beaumont facility, and has been doing so without interruption since before the cure notice issue arose. Bannum's ability to perform in light of this allegedly improper nondisclosure has not been interrupted or impeded.

Bannum argues that, had it known about the school agreement in November 2000, it could have done a better job of protecting its leasehold interests, and thereby avoided the issuance of the cure notice and the cost of its litigation with the landlord. Bannum does not, however, explain precisely how it would have accomplished these things. And an explanation is necessary, as it is not obvious that the Government's disclosure of a conversation between its

[2] The law also requires that the information be known or knowable prior to the time when the contractor begins performance. <u>See</u> <u>Northrop Grumman Corp., Military Aircraft Div. v. United States</u>, 63 Fed. Cl. 12, 15-16 (2004) (citing <u>GAF Corp. v. United States</u>, 932 F.2d at 949 (Fed. Cir. 1991). Here, Bannum had been performing upon the contract for years before either party knew that the landlord wanted to evict Bannum.

monitoring inspector and the Beaumont Fire Chief about a plan by the City Council to put a school in the same building as the Bannum facility would accomplish these goals. Bannum has not cited to, and we are not aware of, any provision of law stating that a tenant's knowledge of a potential reason for a landlord's eviction notice, other than the one stated upon the notice, is an automatic and complete defense to the eviction proceedings. Bannum has produced no evidence demonstrating that, if confronted by Bannum with the allegation that the landlord's eviction attempt was motivated by the school agreement, the landlord would have refrained from issuing the eviction letter. Bannum has produced no evidence demonstrating that, if the Government knew that Bannum knew about the school agreement, it would not have issued the cure notice in response to the eviction letter. Discovery is closed, and there is absolutely no evidence in the record supporting Bannum's claim that, but for the disclosure of the school agreement, it would not have incurred any of the costs it seeks to recover. This information was not vital to Bannum's ability to perform the contract.

This information is also information Bannum could have discovered independently. Indeed, information about the alleged school agreement did not originate with the Government; it originated with the Beaumont Fire Chief. The fact that this information was not something exclusively known to the Government strongly suggests that Bannum could have learned it on its own. As such, the Government cannot be held liable for nondisclosure. See McCormick Constr., Co. v. United States, 18 Cl. Ct. 259, 266 (1989) (the Government need not disclose information if it may reasonably be obtained by the contractor from other sources).

Furthermore, this information is something Bannum should have discovered on its own. Obtaining and maintaining the premises for the operation of the CCC was a task that the contract

required Bannum to perform. A 10 ("the contractor shall furnish the necessary facilities"). A necessary corollary of this contractual duty includes maintaining communication with the landlord – something other evidence in the case reveals Bannum was not doing for months prior to the issuance of the eviction notice, and Bannum has not denied. A 20, A22 (landlord was attempting to communicate with Bannum for six months prior to issuance of eviction letter, but Bannum would not respond). If Bannum had not been ignoring its landlord, it could have asked the landlord about this agreement.

Bannum had ample opportunity to discover this allegedly real motivation for its landlord's actions during the discovery stage of the litigation Bannum initiated in response to the eviction notice. If knowing the landlord's true motivations are actually a complete defense to an eviction action, then Bannum should have at least asked its landlord what his true motivations were during discovery.

Finally, Bannum should have known about the impact of the school's occupation of the building as early as January 2001, which is when the school in question opened in the empty space in the building housing the Bannum facility, and it is also when the school began registering complaints about improper contact between Bannum inmates and students at the school. A 74.

D. The Government's Nondisclosure Of The Alleged School Agreement Is Not A Failure To Cooperate

The duty to cooperate is only implicated where the Government actively and unjustifiably interferes with the contractor's performance. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 58-59 (2001); Ryco Const., Inc. v. United States, 55 Fed. Cl. 184, 192 (2002). Bannum argues that this duty requires the Government to also actively assist its

contractors in litigation that the contractor elects to pursue, and that the Government must fully support any position the contractor takes in that litigation, no matter how unreasonable. Response at 14. Specifically, Bannum argues that the existence of the alleged school agreement should have been so obviously relevant to the lease dispute that the BOP's failure to disclose its communication with the Fire Chief constituted a failure to cooperate. This position is incorrect.

First, Bannum offers no evidence or argument as to why it should have been obvious to the BOP that this information was critically important to its ability to continue performance upon the contract. It is also unable to produce any evidence that Bannum (or any other litigant) has ever used this or similar evidence to avoid an eviction in Texas. Also, as early as January 2001, when the school began operations and shortly after when Bannum and the BOP began receiving complaints about improper contacts between Bannum inmates and school students, it would have been obvious to any rational person that the existence of this school had no material impact upon Bannum's ability to occupy the building – because Bannum was still occupying the building.

Bannum chose to litigate with its landlord, and it never asked the BOP or the landlord what the "real" motivation behind the eviction notice was. The Government cannot be held liable for its failure to be clairvoyant, or to correct the errors and omissions of its contractors' attorneys.

E. Bannum Is Not Entitled To Any Of The Damages It Seeks

In response to our argument that Bannum is not entitled to recover the cost of responding to the cure notice, Bannum argues that "[t]hese costs went beyond normal contract administration, and constituted abnormal work effort beyond the scope of the contract." Response at 13. Bannum then cites three board of contract appeals cases that generally stand for

the proposition that the contractor's method of billing costs (indirect versus direct) should not be an impediment to its ability to recover those costs.

Bannum misapprehends our argument. We do not argue that Bannum's failure to separately list these costs on its books is an absolute defense to its claim (though we do maintain Bannum would have to prove that its claim of indirectly billed costs satisfy the requirements of the FAR). Our argument is that Bannum is simply not entitled to recover its cost of responding to the cure notice, no matter how it accounted for those costs. Bannum's claim essentially asks the Government to pay the cost of Bannum's partial failure to perform. In this case, it was Bannum's conduct that necessitated the issuance of the cure notice. If Bannum had not mismanaged its relations with its landlord, it would never have been in danger of losing its lease, the landlord would not have issued an eviction notice, the BOP would not have had to issue the cure notice, and Bannum would not have had to respond. Bannum caused extra work for everyone involved; it should not be paid for that.

Assuming Bannum's new claim of $96,000 in legal fees for the litigation it initiated with its landlord are fairly before the Court upon this motion (and we contend they are not, as further explained in our response to the motion to amend), Bannum should not recover these costs either. The contract assigns the task of obtaining and retaining possession of the premises to Bannum. A 10 ("the contractor shall furnish the necessary facilities"). The Government did not have any input into Bannum's choice of the premises or landlord. Bannum chose its landlord, and the fact that Bannum's chosen landlord had a change of heart mid-lease that, according to

Bannum, required litigation,[3] does not create a contract cost that the Government must now pay. The Government did not choose Bannum's landlord, it did not force its landlord to issue the eviction letter, and it did not choose to initiate litigation over the lease issue. The Government is not responsible for legal costs that Bannum undertook voluntarily as a part of its contractual obligation to provide a facility in which to operate the Beaumont facility.

II. Count 8: Montgomery Transportation

A. Bannum Cannot Prove, By Clear And Convincing Evidence, That The Government Acted In Bad Faith In Refraining From Exercising The Final Two Options Upon The 1998 Montgomery Contract

To prove that the Government should be liable for refraining from exercising the final two option years on Bannum's Montgomery contract, it must show, by clear and convincing evidence, that the Government acted in bad faith when it did not exercise the option. Ho v. U.S., 49 Fed. Cl. 96, 107 (2001). aff'd, 30 Fed. Appx. 964 (Fed. Cir. 2002) (not finding bad faith and collecting cases addressing the bad-faith exception to the option rule). Bannum bears the high burden of producing "well-nigh irrefragable" proof of the BOP's bad faith, by clear and convincing evidence that "produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is highly probable." Am-Pro Protective Agency, Inc. v. United

[3] There is some question as to whether the litigation was necessary in the first place. The pre-eviction notice memoranda reveal that the landlord's agent had been trying to contact Bannum in an attempt to negotiate, without litigation, a new lease, and that Bannum had not been responsive to these overtures for approximately six months. When the eviction letter was issued, Bannum's first and only response was to file a lawsuit, which, as we outlined in our motion, proved unsuccessful (although it apparently did not result in Bannum's eviction from the Beaumont facility). David Lowery testifies repeatedly in his affidavit that Bannum is still the BOP contractor in Beaumont, at the same facility, and operating under a new lease that it recently negotiated with its landlord – the exact same resolution that the landlord had been proposing since before this escapade began.

States, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (internal quotation marks omitted). To do this, Bannum must demonstrate that the Government "had a specific intent to injure" it, was "motivated alone by malice," was engaged in a "conspiracy . . . to get rid of" Bannum, or was engaging in conduct that was designedly oppressive. Id. at 1241 (internal citations omitted).

Bannum has not produced sufficient evidence to send this issue to trial. In response to our motion, Bannum does two things. First, it recharacterizes the Government's actions with respect to the transportation issue as harassment, and bases that characterization solely upon internal BOP documents that contained the opinions of individual BOP employees suggesting that Bannum was complying with the transportation specification. In matters of contract interpretation, the opinions of Government employees do not bind the United States, and we maintain that the contract required Bannum to do more than simply locate its facility within one mile of a bus stop. It required that the facility "be located within one mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident." A 162; PFUF ¶ 26. Bannum may have been in compliance with the first part of this specification, but it never complied with the second. Thus, any citations by the BOP for deficient performance in this area were entirely justified.

Furthermore, Bannum ignores the evidence that the inadequacies of the Montgomery public transportation system were well documented and were causing problems for the residents, and the evidence it proffers in its response further supports this conclusion. The BOP's actions were made in response to the transportation problem -- a problem brought about by neither Bannum nor the BOP, but a problem nonetheless that needed to be addressed. Because the BOP

initially thought Bannum should be providing transportation when the public bus service failed, it began addressing the problem by reminding Bannum of its contractual duty. When Bannum responded by asserting that it did not have a contractual duty to do anything beyond maintain a facility within one mile of public transportation, the BOP tried another approach by attempting to negotiate a modification with Bannum. See Exhibit 7 to response (internal BOP e-mail that immediately followed Bannum's objection to the transportation findings, directing BOP employees to further investigate the transportation issue to determine if it really is a problem, and, if it is, directing them to begin negotiating a solution with Bannum); Exhibit 8 to response (BOP document opining that Bannum was meeting the contract's transportation requirements, but also stating that the public bus service was, in fact, inadequate, and was having a negative impact upon residents' ability to travel to employment and programs); Exhibit 9 to response (request for contract action to approve a modification that will address the transportation issue).

Bannum also argues that the Government's initial estimate of the cost of the proposed modification far exceeded any of its four proposals, and therefore the Government acted in bad faith by not accepting Bannum's proposed modifications. In making this argument, Bannum misrepresents the amount of the Government's estimate and the reasons that its proposals were rejected.

First, the Government's estimate was $45,000, not $90,000 as Bannum contends. The $90,000 figure that Bannum relies upon is the Government's estimate of what a reasonable modification would be to transport each inmate, in his own car, approximately 35 miles from the CCC to the place of employment. However, because the inmates do not need what would essentially be a private car service to travel to and from their jobs, the Government reduced that

number by half with the following explanation:

> However, not every inmate would require an individual trip. It is assumed that many inmates would be going to the same area or in the same general direction. Thus, several inmates would most likely be serviced on one trip by making deviations or side trips off the main route. Therefore, it is recommended that the total figure be cut by at least 50%. This would provide a high end estimate of approximately $45,000.

Exhibit 9 to Response. Thus, Bannum's statement that this number was "slashed down," presumably without cause and in bad faith, is contradicted by the document itself.

Second, the Government did not reject Bannum's four transportation proposals because they were too expensive. The Government rejected them because Bannum was offering an inadequate solution to the transportation problem. Bannum's proposals were too rigid and did not accommodate inmates who were working jobs that required attendance at times other than the standard nine-to-five shifts. The BOP did not want to curtail residents' ability to obtain employment by eliminating the scope of jobs that worked on odd schedules. See A 308-310.

Only after a year of unsuccessful attempts to resolve this problem did the BOP elect to take a new approach by not exercising the final two option years and resoliciting the contract with a new transportation clause. This is not bad faith, and Bannum has failed to produce any evidence that suggests it can prove at trial, by clear and convincing evidence, that the Government's decision not to exercise the options was the result of a designedly oppressive scheme, or was motivated by malice, or was based upon a specific intent to injure or get rid of Bannum.

Bannum also makes the misleading argument that the Government's estimate of the replacement cost for the Montgomery Contract (Exhibit 10 to the Response) vastly exceeds all of

the proposals Bannum submitted to resolve the transportation issue, and is therefore proof of bad faith. Response at 26. Bannum's argument assumes that, because the replacement Montgomery contract added a new transportation clause, the increase in price between Bannum's old Montgomery contract and the new one is wholly attributable to the cost of complying with the new transportation specification. In other words, under the option periods for the 1998 contract, Bannum would have been paid $50.45 for an estimated 10,220 man-days in 2001, and $50.45 for an estimated 10,585 man-days in 2002. A 144. Thus, under the option periods for the 1998 contract, Bannum would have received an estimated gross income of $1,049,612.25. Under the Government's reprocurement estimate, those same years would be paid at a rate of $60.00 per man-day for an estimated 21,900 man-days, resulting in a total contract price of $1,314,000.00. The difference is $264,387.75, which is $132,193.88 per year that Bannum assumes represents the cost of the complying with the new transportation requirement. Bannum argues that because this amount is so much higher than Bannum's four pre-reprocurement transportation proposals, the Government acted in bad faith by rejecting those proposals and not exercising the options on the 1998 contract (Bannum's proposals were: $66,000/year (A 248), $73,000/year (A 258); $55,200/year (A 279); $100,477/year (A 295)).

What Bannum omits from its argument is the fact that its assumption about the difference in the contract prices is false. The cost of reprocuring the contract is not as simple as adding the estimated cost of the new transportation specification (if it was, the Government estimate would have been $45,000 higher per year than Bannum's 1998 contract). This is best evidenced by Bannum's own award for the 2001 Montgomery contract, for which Bannum was paid $60.45 for an estimated 21,900 man-days in the two-year base period, giving Bannum $137,121.38 more

per year than it would have received under the final two option periods of the 1998 contract. Applying Bannum's assumption, it therefore must have cost Bannum $30,000 more than its highest transportation proposal to comply with the new transportation requirement. This demonstrates one of two things: either Bannum was not offering an adequate transportation solution in its pre-reprocurement proposals (as the BOP steadfastly maintained), or Bannum's assumption is false. Either way, this is not evidence of bad faith on the part of the Government.

Bannum also argues that, because it failed to successfully obtain the most recent Montgomery contract, it is entitled to its lost profits under the unexercised option periods from the 1998 contract. Response at 27-28. However, the fact that Bannum was unsuccessful in extending its operation in 2007 has nothing to do with its entitlement to performance in 2001 and 2002. These service contracts are tied to actual calendar dates; just because Bannum failed to competitively bid on a contract in 2007 does not mean it is automatically entitled to retroactive and hypothetical performance upon the final two option periods in the 1998 contract. The issue here is whether Bannum was wrongfully denied the right to perform in 2001 and 2002. The reason it is not performing in 2007 is because it failed to successfully compete for a new contract. Bannum cannot assume that all options would be exercised under its old contracts because they are options, and Bannum had no absolute right to performance in those years; concomitantly, Bannum cannot assume that its most recent Montgomery contract, which just expired, would have been awarded in the same fashion had the competition occurred two years later.

B. <u>Bannum Has Not Proven Its Costs Associated With Its Transportation Proposals</u>

Bannum's response to our assertion that it has failed to prove its costs of complying with

the BOP's requests for transportation proposals is to resubmit all the inadequate documentation that it already submitted to the DCAA auditors. As evidenced by their report, the DCAA auditors did a thorough and detailed analysis of the documentation, and concluded that the entire amount claimed was questionable because (1) the lost-profits for the two unexercised option years plainly appear to be an amount that Bannum is not entitled to recovery, especially since Bannum operated under a new, more favorable contract in the allegedly affected years; (2) the documentation submitted for the other claimed amounts was insufficient, or (3) certain claimed amounts were not allowable under the FAR.

Bannum does not rebut any of these conclusions, except to flatly state that the DCAA auditor must be wrong. Bannum does not explain why its documentation is sufficient, and presumably requests that the parties proceed to trial upon this issue even though it could be adequately dealt with upon paper. It has been six years since this issue arose and Bannum has repeatedly failed to provide an adequate basis for its claimed costs.

## RESPONSE TO MOTION TO AMEND

Rule 15 governs the amendment of pleadings, and states that "leave [to amend] shall be freely given when justice so requires." RCFC 15(a). However, leave to amend may be denied when the amendment sought would be futile. Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States, 71 Fed. Cl. 172, 176 (2006). "A motion to amend may be deemed futile if a claim added by the amendment would not withstand a motion to dismiss." Id. (citing Slovacek v. United States, 40 Fed. Cl. 828, 834 (1998)).

"It is well settled that the submission of a claim to the contracting officer by the contractor is a jurisdictional prerequisite to maintaining a suit under the CDA and that a

contractor's failure to do so requires that its action be dismissed." P.R. Contractors, Inc. v. United States, 76 Fed. Cl. 621, 637 (2007) (citing United States v. Grumman Aerospace Corp., 927 F.2d 575, 579 (Fed. Cir. 1991)). A contractor presents a new claim if the operative facts of the claim are different than any of the claims it has submitted beforehand. See Kinetic Builders Inc. v. Peters, 226 F.3d 1307, 1312 (Fed. Cir. 2000). If the allegations the plaintiff seeks to add to the complaint by amendment actually constitute a new claim, and that claim has not been presented to the contracting officer for a final decision, then the court should deny leave to amend the complaint on the grounds of futility. See Renda Marine, Inc. v. United States, 65 Fed. Cl. 152, 162 (2005).

Here, Bannum argues that its proposed amendment seeks to make only "minor revisions" to the second amended complaint. Response at 29. With respect to Count 6 (the cure-notice claim), Bannum seeks to add allegations concerning the allegedly improper non-disclosure of the "school agreement" and a conspiracy by the BOP and Bannum's landlord (and possibly the Beaumont City Council) to evict Bannum from its Beaumont facility. Bannum also seeks to increase its claim from $4,500 to more than $96,000. These allegations and this new monetary demand go far beyond the original scope of the claim that was presented to the contracting officer, and therefore constitute a new claim. Bannum apparently shares this view as well, as it has requested that the DOJ present its new "amended"[4] claim to the contracting officer for a final decision. This Court will not acquire jurisdiction to review this claim until the contracting officer issues a final decision upon it. Thus, Bannum's new claim regarding the Beaumont

[4] Bannum's chosen title for its filing cannot change the true nature of its new claim, which arises from a separate and broader set of facts.

school-agreement conspiracy would not survive a motion to dismiss. Therefore, leave should not be granted to amend this portion of its second amended complaint.

Regarding the amendment to Count 7, Bannum states that it has added language that reserves its right to seek attorney fees pursuant to the Equal Access to Justice Act ("EAJA"). This amendment is unnecessary; EAJA awards are not contingent upon the plaintiff's inclusion of a statement in its complaint that it has reserved the right to seek fees under the Act. Leave to amend should not be granted to amend this portion of the plaintiff's second amended complaint.

With respect to Count 8, Bannum states that its amendment makes allegations relating to documents it recently discovered (in a production that was made over two years ago) that "supplement and augment" its claim. These allegations all relate to Bannum's new allegation of bad faith upon the part of the Government (see Motion at 18 n.4, noting that Bannum had failed to allege that the Government's decision to refrain from exercising the final two option years on the Montgomery contract were made in bad faith), and will cure a deficiency in Bannum's pleading. Therefore, to the extent this amendment will allow this simple fix, we have no objection. If, however, the second amended complaint adequately pled bad faith, and this amendment is made to place Bannum's factual arguments into its pleading, then it is completely unnecessary and leave to amend should be denied.

The proposed amendment either (a) introduce a claim to this case that is currently beyond this Court's jurisdiction, or (b) are entirely unnecessary. Accordingly, the plaintiff's request for leave to amend its complaint for a third time should be denied.

**CONCLUSION**

For these reasons, as well as those stated in our motion, we respectfully request the Court to grant the defendant summary judgment upon counts six and eight of the plaintiff's second amended complaint. We also respectfully request that the Court deny the plaintiff's motion to amend its second amended complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Deborah A. Bynum (by Todd Hughes)
DEBORAH A. BYNUM
Assistant Director

/s/ Devin A. Wolak
DEVIN A. WOLAK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel. (202) 616-0170
Fax. (202) 514-8624

October 29, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on October 29, 2007, a copy of the foregoing "DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT UPON COUNTS SIX AND EIGHT OF THE SECOND AMENDED COMPLAINT AND RESPONSE TO PLAINTIFF'S MOTION TO AMEND" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Devin A. Wolak
DEVIN A. WOLAK

# EXHIBIT A

CAMARDO LAW FIRM, P.C.
127 GENESEE STREET
AUBURN, NEW YORK 13021
WWW.CAMARDO.COM

JOSEPH A. CAMARDO, JR.
NANCY M. CAMARDO*
*admitted to Georgia Bar only
KEVIN M. COX
JEFFREY D. WALKER
ADAM H. VAN BUSKIRK

MANAGER-GOVERNMENT COST/PRICE ANALYST
JOSEPH W. NORRIS, M.B.A.

PHONE: (315) 252-3846
FAX: (315) 252-3508
E-MAIL: lawfirm@camardo.com

# FAX TRANSMISSION

| | | | |
|---|---|---|---|
| **To:** | Devin A. Wolak, Esq. | **Date:** | October 12, 2007 |
| **Fax #:** | 202-514-8624 | **Pages:** | **2 , including this cover sheet.** |
| **From:** | Joseph A. Camardo Jr. | | |
| **Subject:** | Bannum, Inc. v. United States<br>Case No. 01-639C (Judge Lettow) | | |

***ATTORNEY / CLIENT PRIVILEGED AND CONFIDENTIAL INFORMATION***

**IF YOU DO NOT RECEIVE ALL OF THE PAGES, OR THERE WAS A PROBLEM WITH TRANSMISSION, PLEASE CALL (315) 252-3846.**

**COMMENTS:**

Please see attached.

CAMARDO LAW FIRM, P.C.

127 GENESEE STREET
AUBURN, NEW YORK 13021
WWW.CAMARDO.COM

JOSEPH A. CAMARDO, JR.
NANCY M. CAMARDO*
*admitted to Georgia Bar only
KEVIN M. COX
JEFFREY D. WALKER
ADAM H. VAN BUSKIRK

MANAGER-GOVERNMENT COST/PRICE ANALYST
JOSEPH W. NORRIS, M.B.A.

PHONE: (315) 252-3846
FAX: (315) 252-3508
E-MAIL: LAWFIRM@CAMARDO.COM

**Via Fax, & First Class Mail**

October 5, 2007

Devin Wolak, Esq.
U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, N.W. 8th Floor
Washington, DC 20530

**Re: <u>Bannum v. United States</u>**
**No. 01-639 (Lettow)**

Dear Devin:

Reference is hereby made to the above matter: With respect thereto, the following should be noted:

1. As you should be aware, I filed detailed papers opposing the government's motion for summary judgment. Unfortunately, the BOP is seeking dismissal without disclosing certain key internal documents to the Court. Most notably is the Beaumont situation. The BOP one month before the alleged termination notice, was involved in, or at the very least was aware of the "unwritten school agreement". As such the cure notice was a sham, causing Bannum to incur significant legal cost in protecting its contract.

2. I discovered this information, in plowing through the BOP's documentation obtained through discovery. As such, the claim is being amended to $96,390.00 and I have enclosed a revised claim that needs to be filed with the contracting officer. I am reluctant to send this document directly since the BOP is represented by counsel. I am requesting that you provided the revised claim to the requisite contracting officer. If you cannot do so, please let me know if I can send it directly to the contracting officer. If not, Bannum can forward it on to the contracting officer.

It is a shame that, we cannot sit down and resolve these issues ourselves, without Court intervention.

Sincerely yours,

Joseph A. Camardo, Jr.

cc: John Rich, Esq.

**Additional Revision To Claim for Equitable Adjustment dated January 3, 2001 Pursuant To Contract No.J200c-336 (Beaumont, TX)**

By letter dated January 3, 2001, Bannum filed a claim for equitable adjustment resulting from a BOP issued cure notice that was false and improper causing Bannum substantial extra cost. That claim was denied by the contracting officer, and Bannum filed a complaint before the United States Federal Claims Court with the matter being docketed as No. 01-639C. This document supplements that claim with additional support, based upon newly discovered information hidden from Bannum by the BOP. Thus, the Cure Notice was a sham and was intended to harm Bannum, by causing Bannum to incur substantial additional cost.

During discovery it was also uncovered pursuant to a BOP memorandum dated November 7, 2000 that the Beaumont City Council in Texas had approved a Catholic School for troubled youths and that the School would be located in the section of the building occupied at the time by Bannum. As a result Bannum had to be evicted or vacate the premises prior to the school year 2001. Then in another BOP memorandum dated December 18, 2000, it was noted that there was an unwritten municipal agreement that if the school moved in, Bannum would have to vacate. This information was never supplied to Bannum by the BOP.

Instead, the BOP sent Bannum a cure notice stating that the BOP had been in communication with the landlord and that the landlord was exercising his option to terminate Bannum's tenancy. As a result, in order to protect its contract with the BOP, Bannum was forced to incur significant amounts of legal fees because of the sham cure notice and the sham letter from the landlord. This is a situation where Bannum is under contract with the BOP, and both parties are to be acting honestly and in good faith. The BOP had exculpatory information and intentionally withheld it from Bannum. The unwritten agreement was the main reason why Bannum was being forced out and not because of the alleged validity of the lease. The cure

notice was a sham and cost Bannum a tremendous amount of time and effort in trying to protect its contract with the BOP. In addition, if Bannum had been provided this information by the BOP, it could have been provided to the Texas Court further supporting Bannum's case that the purported lease termination was a sham. Furthermore, Bannum would have known where to focus its discovery during the Texas State Court Proceeding. The BOP sat idly by and at times was present in the Texas Court while the landlord would make false representations and further exacerbated the situation by intentionally withholding the school agreement from Bannum. Thus, the cure notice was false because the BOP knew that it was based on a false premise and never mentioned anything about the unwritten school agreement to Bannum.

The BOP acting in concert with the landlord caused false statements to be made to Bannum in the cure notice which caused Bannum to incur significant expenses. Not only did Bannum incur the $4500 claimed earlier dealing with the cure notice but Bannum incurred substantial litigation cost. As a result Bannum hereby revises its claim from $4,500.00 to $96,390.00

Bannum has further filed a detailed opposition papers to the governments motion for summary judgment in the United States Court of Federal Claims Case No. 01-639C. Those opposition papers including a detailed affidavit from David Lowry are incorporated herein by reference. Attached hereto is a chart of the legal fees incurred as a result of the litigation with the landlord and Bannum. The claim is hereby revised to $96,390.00.

| Bannum, Inc<br>Summary of fees associated with count 6 in Bannum's Complaint | | | |
|---|---|---|---|
| Bill Date Ending | *Beaumont (arising out of Lease litigation)* | *Lease (arising out of lease litigation)* | *Subtotal* |
| 5/31/2001 | $10,534.00 | $1,125.00 | $11,659.00 |
| 6/15/2001 | $0.00 | $6,417.00 | $6,417.00 |
| 6/30/2001 | $0.00 | $721.00 | $721.00 |
| 7/15/2001 | $117.00 | $0.00 | $117.00 |
| 7/31/2001 | $0.00 | $0.00 | $0.00 |
| 8/15/2001 | $0.00 | $3,409.00 | $3,409.00 |
| 8/31/2001 | $0.00 | $5,233.00 | $5,233.00 |
| 9/15/2001 | $0.00 | $1,591.00 | $1,591.00 |
| 9/30/2001 | $0.00 | $3,966.00 | $3,966.00 |
| 10/15/2001 | $0.00 | $3,271.50 | $3,271.50 |
| 10/31/2001 | $0.00 | $3,983.00 | $3,983.00 |
| 11/15/2001 | $0.00 | $5,357.25 | $5,357.25 |
| 11/30/2001 | $0.00 | $5,716.00 | $5,716.00 |
| 12/15/2001 | $0.00 | $2,846.50 | $2,846.50 |
| 12/31/2001 | $0.00 | $1,660.00 | $1,660.00 |
| 1/15/2002 | $0.00 | $1,525.00 | $1,525.00 |
| 1/31/2002 | $0.00 | $3,124.00 | $3,124.00 |
| 2/15/2002 | $0.00 | $3,691.00 | $3,691.00 |
| 2/28/2002 | $0.00 | $5,284.00 | $5,284.00 |
| 3/15/2002 | $0.00 | $100.00 | $100.00 |
| 3/31/2002 | $0.00 | $275.00 | $275.00 |
| 4/15/2002 | $0.00 | $559.00 | $559.00 |
| 4/30/2002 | $0.00 | $1,271.50 | $1,271.50 |
| 5/15/2002 | $0.00 | $2,687.50 | $2,687.50 |
| 5/31/2002 | $0.00 | $125.00 | $125.00 |
| 6/15/2002 | $0.00 | $275.00 | $275.00 |
| 6/30/2002 | $0.00 | $92.00 | $92.00 |
| 7/15/2002 | $0.00 | $0.00 | $0.00 |
| 7/31/2002 | $67.00 | $0.00 | $67.00 |
| 8/15/2002 | $191.00 | $0.00 | $191.00 |
| 8/31/2002 | $2,083.00 | $33.00 | $2,116.00 |
| 9/15/2002 | $875.00 | $0.00 | $875.00 |
| 9/30/2002 | $375.00 | $0.00 | $375.00 |
| 10/15/2002 | $0.00 | $0.00 | $0.00 |

| Bannum, Inc<br>Summary of fees associated with count 6 in Bannum's Complaint | | | |
|---|---|---|---|
| | *Beaumont (arising out of Lease litigation)* | *Lease (arising out of lease litigation)* | *Subtotal* |
| Bill Date Ending | | | |
| 10/31/2002 | $116.25 | $0.00 | $116.25 |
| 11/15/2002 | $0.00 | $0.00 | $0.00 |
| 11/30/2002 | $0.00 | $0.00 | $0.00 |
| 12/15/2002 | $0.00 | $0.00 | $0.00 |
| 12/31/2002 | $0.00 | $0.00 | $0.00 |
| 1/15/2003 | $0.00 | $0.00 | $0.00 |
| 1/31/2003 | $0.00 | $0.00 | $0.00 |
| 2/15/2003 | $0.00 | $0.00 | $0.00 |
| 2/28/2003 | $0.00 | $0.00 | $0.00 |
| 3/15/2003 | $0.00 | $0.00 | $0.00 |
| 3/31/2003 | $125.00 | $0.00 | $125.00 |
| 4/15/2003 | $167.00 | $0.00 | $167.00 |
| 4/30/2003 | $5,296.50 | $0.00 | $5,296.50 |
| 5/15/2003 | $254.25 | $1.00 | $255.25 |
| 5/31/2003 | $0.00 | $0.00 | $0.00 |
| 6/15/2003 | $800.00 | $0.00 | $800.00 |
| 6/30/2003 | $0.00 | $0.00 | $0.00 |
| 7/15/2003 | $1,220.50 | $0.00 | $1,220.50 |
| 7/31/2003 | $917.00 | $0.00 | $917.00 |
| 8/15/2003 | $467.00 | $0.00 | $467.00 |
| 8/31/2003 | $1,905.25 | $0.00 | $1,905.25 |
| 9/15/2003 | $249.00 | $0.00 | $249.00 |
| 9/30/2003 | $650.00 | $0.00 | $650.00 |
| 10/15/2003 | $691.00 | $0.00 | $691.00 |
| 10/31/2003 | $350.00 | $0.00 | $350.00 |
| 11/15/2003 | $0.00 | $0.00 | $0.00 |
| 11/30/2003 | $0.00 | $0.00 | $0.00 |
| 12/15/2003 | $100.00 | $0.00 | $100.00 |
| 12/31/2003 | $0.00 | $0.00 | $0.00 |
| 1/15/2004 | $0.00 | $0.00 | $0.00 |
| 1/31/2004 | $0.00 | $0.00 | $0.00 |
| 2/15/2004 | $0.00 | $0.00 | $0.00 |
| 2/29/2004 | $0.00 | $0.00 | $0.00 |
| 3/15/2004 | $0.00 | $0.00 | $0.00 |
| 3/31/2004 | $0.00 | $0.00 | $0.00 |
| | | | |
| | | | |
| Subtotal | **$27,550.75** | **$64,339.25** | **$91,890.00** |