# In the United States Court of Federal Claims

No. 01-639C

(Filed January 23, 2008)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | ) | |
| | ) | Breach of contract; motion |
| **BANNUM, INC.,** | ) | for summary judgment; |
| | ) | contractual duty to cooperate; |
| Plaintiff, | ) | withholding of superior |
| v. | ) | knowledge; costs of responding |
| | ) | to negotiation requests; |
| **UNITED STATES,** | ) | amendment of complaint |
| | ) | |
| Defendant. | ) | |
| | ) | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

Joseph A. Camardo, Jr., Auburn, New York, for the plaintiff.

Devin A. Wolak, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

Bannum, Inc. ("Bannum") filed a ten-count complaint in this court seeking equitable adjustments and other remedies respecting contracts it has and has had with the Bureau of Prisons ("Bureau" or "BOP"). Bannum operates residential Community Correctional Centers ("Centers") for federal offenders, both male and female, at various locations for the Bureau.[1]

[1]In broad terms, the Centers are facilities where federal inmates spend the last months of their terms of incarcerations so that they can more effectively make the transition from life as an

The ten counts in Bannum's initial complaint related to sixteen contracts regarding fifteen different Centers operated for the Bureau. At this juncture in the case, nine of the ten counts are still in dispute. One count, related to wage determinations at all of the Centers, has been resolved by a final judgment. *See Bannum, Inc. v. United States*, 59 Fed. Cl. 241 (2003) (denying motion for reconsideration of final judgment entered under Rule 54(b) of the Rules of the Court of Federal Claims ("RCFC") respecting Count Seven), *aff'd*, 121 Fed. Appx. 849 (Fed. Cir. 2005) (addressing date on which interest began accruing on the amount of the judgment). Protracted discovery and an extended but failed mediation effort have delayed judicial action on the nine remaining counts, until now.

Pending before the court are a motion by the government for partial summary judgment on Counts Six and Eight of the Second Amended Complaint and a corresponding cross-motion by Bannum for leave to file a proposed Third Amended Complaint. Besides dealing with Counts Six and Eight, the proposed amended complaint would reintroduce an aspect of Count Seven and also address Count Ten. These motions have been fully briefed and a hearing was held on October 30, 2007. The competing motions accordingly are ready for disposition.

## BACKGROUND[2]

### A. Count Six: Bannum's Beaumont Facility

Bannum's Beaumont contract with the Bureau was awarded July 17, 1997, and required Bannum to operate a Center to house federal inmates assigned to the Beaumont, Texas area in the late stages of their incarceration. Appendix to Def.'s Mot. ("Def.'s App.") at 1-3 (Contract J200c-336 ("Beaumont Contract")). The Beaumont Contract required Bannum to "furnish the necessary facilities" for performance of the contract, *i.e.*, obtain a building in which to house the federal inmates. Def.'s App. at 10, 14-16 (Statement of Work; Community Corrections Center with Transitional Drug Treatment Services). To satisfy this requirement, on or about February 5, 1997, Bannum entered into a sublease agreement for a building located at 1310 Pennsylvania Avenue, Beaumont, Texas. Def.'s App. at 42-44 (Lease Agreement). The lessor on the lease agreement was Mr. Ken Webb, *id.* at 42; however his business partner, Mr. John McCray, was the actual owner of the building, and, according to Mr. McCray's agent, Mr. Webb's lease did not permit him to sublet the building. Def.'s App. at 20-21 (Memorandum from Charles Ala, Contract Oversight Specialist, BOP, to Kathy Campbell, Assistant Community Corrections

---

inmate to life as a member of free society. During their stay at a Center, the inmates are given a room, required to find gainful employment, and also are required to participate in a variety of transitional and rehabilitational activities. Under the terms of its contracts to operate Centers, Bannum was to provide services for and oversee all aspects of the inmates' custody.

[2]The recitations that follow do not constitute findings of fact by the court. Instead, the recitals are taken from the parties' filings and are undisputed or alleged and assumed to be true for purposes of the pending motions, except where a factual controversy is explicitly noted.

Administrator) (Dec. 18, 2000). At the request of Mrs. Webb, Bannum began to make its lease payments directly to Mr. McCray in February 1999. Def.'s App. at 92 (recital from a Second Amended Complaint filed in *Bannum, Inc. v. McCray*, No. 8:01-CV-1099-T-27MAP, ¶ 39 (M.D. Fla., filed Nov. 20, 2001)).

According to a memorandum prepared by Mr. Ala of the Bureau dated November 7, 2000, Fire Chief Jack Maddox of the Beaumont Fire Department told the Bureau that the Beaumont City Council had approved a Catholic school for troubled youths to operate in a vacant section of the building then occupied by Bannum in Beaumont. Pl.'s Resp. to Def.'s Mot. for Partial Summary Judgment and Cross-Mot. for Leave to File an Amended Compl. ("Pl.'s Resp.") at Ex. 1 (Mem. from Ala to Gina Lane Mustain, Community Corrections Regional Administrator (Nov. 7, 2000)). Reportedly, it had been agreed that Bannum would vacate the premises prior to the school's operation scheduled to begin in September 2001. *Id*. The persons who had reached such an agreement were not disclosed. As of the date of Mr. Ala's memorandum, Bannum had not informed the Bureau of any future move. *Id*. There is no evidence that the Bureau contemporaneously communicated the information obtained from the Fire Chief to Bannum, and Bannum claims no knowledge of any discussions about its vacating the Beaumont building. Pl.'s Resp. Attach. 1 (Aff. of David Lowry, former Executive Director of Bannum (Count 6) (Oct. 11, 2007) ("Lowry Count 6 Aff.")) at ¶ 11.

On December 8, 2000, Mr. McCray, acting through his property manager, sent Bannum a notice stating that Bannum's tenancy would terminate in 30 days. Def.'s App. at 49 (Letter from Lee Y. Wheeler, III, Property Manager, to Lowry (Dec. 8, 2000)). Ten days later, Mr. Ala sent a memorandum to the Bureau's Assistant Community Corrections Administrator relating his knowledge of the termination notice and recounting a phone call he had placed to Mr. McCray's property manager to determine what had led to the notice. Def.'s App. at 20 (Mem. from Ala to Campbell (Dec. 18, 2000)). On December 19, 2000, Ms. Mustain, the Bureau's Regional Administrator, informed Mr. Lowry that the Bureau had a copy of the notice of termination. Def.'s App. at 52 (Bannum's Response to BOP's Cure Notice, Ex. E (Aff. of Lowry (Dec. 21, 2000) ("Lowry 2000 Aff.")) at ¶ 10). On the same day, the Bureau obtained a legal opinion about its rights under the sublease which recommended that a cure notice be issued to Bannum. Def.'s App. at 22 (Letter from Benjamin R. Tousley, Community Corrections Manager to Katharina Washington, Community Corrections Contracting Officer (Dec. 19, 2000)). The next day, December 20, 2000, the Bureau informed Mr. Lowry that because the pending termination threatened performance of the contract, the Bureau planned to issue a cure notice the following week, which would give Bannum ten days to either remedy the problem or assure the Bureau that the problem would be remedied. Def.'s App. at 53 (Lowry 2000 Aff. at ¶¶ 13-14).[3]

---

[3]On December 21, 2000, Bannum initiated litigation in Texas state court to contest Mr. McCray's purported termination of the lease and filed an application for a temporary restraining order that would prevent Mr. McCray from evicting Bannum from the Beaumont facility. Def.'s App. at 33-60 (Petition for Temp. Restraining Order, Injunction and Declaratory Judgment) ("Bannum's TRO Petition"). In its application for a temporary restraining order,

The Cure Notice was issued to Bannum by the Bureau on December 22, 2000. Def.'s App. at 23-24 (Letter from Washington, Contracting Officer, to Lowry (Dec. 22, 2000) ("Cure Notice")). The Cure Notice stated that the Bureau had received a copy of the notice of termination and required Bannum to "provide a written plan of action and a copy of a valid lease for the duration of the contract." *Id.* at 23 (Cure Notice). Bannum was further notified that "[u]nless Bannum can cure the . . . apparent loss of right to use the facility or provide an acceptable plan of action . . . within ten . . . calendar days . . . , the [g]overnment may terminate the referenced contract for default." *Id.* at 24 (Cure Notice).

On January 3, 2001, Bannum filed a response to the Cure Notice and a claim for equitable adjustment. Def.'s App. at 25-63 (Bannum's Response to BOP's Cure Notice). In its response, Bannum asserted that there was no breach because Bannum had a valid lease and thus there was nothing to cure. *Id*. at 25-29. Bannum also took "strong exception to the manner in which the BOP has chosen to deal with this matter," complaining that the BOP's actions, such as failing to verify the validity of the termination notice or to review the terms of the lease previously submitted, constituted a breach of the duties of cooperation and good faith and fair dealing. *Id.* As damages for these breaches, Bannum demanded that the Bureau reimburse it for costs in preparing its response to the Cure Notice, totaling $4,500, and requested that its claim be submitted for a Contracting Officer's Final Decision. *Id.* at 27. As proof of these costs, Bannum attached a chart stating that it incurred $4,000 of costs for "added administrative time and effort in dealing with the show cause and its response," and $500 in costs for "[a]dded [c]lerical, copying, etc[.] cost." *Id.* at 63.

The Contracting Officer issued her final decision upon Bannum's claim on January 29, 2001, denying the request and stating her findings:

> Based on the information received, the BOP did not have adequate assurances that Bannum would be able to perform the services as required by the contract and was in danger of defaulting on the contract. In accordance with Federal Acquisition Regulation 52.249-8 Default (Fixed-Price Supply and Service), the BOP is required to issue a Cure Notice prior to making a decision to terminate a contractor for default. The BOP considers the contractor's response to a Cure Notice as part of the basic contract administration requirements of the contract and is not entitled to any costs associated with preparing the response.

Def.'s App. at 68-69 (Letter from Washington to Lowry). Bannum contested this decision when

---

Bannum argued that it must be allowed to continue its tenancy or it would suffer great harm by losing its contract with the Bureau, and this was best evidenced by the fact that the Bureau had indicated its intent to issue a cure notice with respect to the Beaumont facility – a necessary prerequisite to terminating Bannum's Beaumont contract for default. *Id*. at 35-37 (Bannum's TRO Petition). The Texas court granted Bannum's application on December 21, 2000. Def.'s App. at 59-60 (Temporary Restraining Order).

it filed its complaint in this case on November 13, 2001.[4]

Mr. McCray never initiated eviction proceedings, Lowry Count Six Aff. at ¶ 14, and Bannum was able to complete its contract and follow-on contracts with the Bureau using the same premises pursuant to a new lease agreement with Mr. McCray. *Id.* ¶ 33.[5] As of October 30, 2007, Bannum remained at the leased facility using the premises to perform a contract with the Bureau. *Id.*; Hr'g Tr. 33:22-25 (Oct. 30, 2007).

**B. Count Eight: Bannum's Montgomery Facility**

Bannum's Montgomery contract with the Bureau was awarded October 1, 1993, and required Bannum to operate a Center for federal inmates in the Montgomery, Alabama area. Def.'s App. at 161 (1992 Montgomery Statement of Work excerpts); Def.'s Proposed Findings of Uncontroverted Fact ("Def.'s PFUF") at ¶ 25.[6] The Statement of Work for the contract required that the Center "be located within one mile of public transportation, or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident[s]." Def.'s App. at 162 (1992 Montgomery Statement of Work excerpts) ("transportation clause").[7]

---

[4]Bannum's Texas state court litigation continued until June 4, 2000, when Bannum voluntarily withdrew its complaint and filed a new case against the owner of the Beaumont building in the United States District Court for the Middle District of Florida. Def.'s App. at 78 (Letter from Lowry to Washington (June 4, 2001)). That federal case was eventually dismissed for a lack of personal jurisdiction. Def.'s App. at 131-38 (*Bannum, Inc. v. McCray*, No. 8:01-CV-1099-T-27MAP (M.D. Fla) (Order of Mar. 28, 2002)).

[5]Bannum and the school for troubled youth co-occupied the building beginning on January 31, 2001. Def.'s App. at 74 (Letter from Ala to Washington (Mar. 29, 2001)).

[6]The terms of the contract called upon Bannum to commence performance on October 1, 1993 for a base period of two years ending September 30, 1995. Pl.'s Resp. at 15. The Montgomery contract also contained three one-year options, all of which were exercised by the Bureau. Def.'s App. at 328 (Aff. of Lowry) (Mar. 6, 2001) ("Lowry 2001 Aff.")) at ¶ 2.

On July 1, 1998, Bannum was awarded follow-on contract J200c-397 by the Bureau, which encompassed a base period of two years and had three one-year options. Def.'s App. at 144-153 (Contract J200c-397). In pertinent respects, the 1998 contract contained the same provisions as appeared in the original 1993 contract.

[7]The 1998 follow-on contract contained the same transportation clause as the original 1993 contract. *See* Def.'s App. at 162 (1992 Montgomery Statement of Work with 1997 revisions).

In September 1997, the City of Montgomery switched from conventional bus service to a Demand and Response Transit ("DART") public bus service, which is a call-ahead, limited bus service. Def.'s App. at 209-211 (Questions & Answers about DART); 231 (news article about "new bus service"). Unlike a regular bus route, the DART buses did not operate on a regular schedule. Def.'s App. at 209 (Questions & Answers about DART). People wishing to use the DART system needed to call the dispatch center and then wait for the bus to arrive. *Id.* The system only operated from 6:00 a.m. to 6:00 p.m. in limited areas, "creat[ing] problems for residents [of the Montgomery Center] by restricting their employment opportunities and participation in off[-]site program related activities." Def.'s App. at 235-37 (Interim Monitoring Report by the Bureau (June 16, 1999)), 238-40 (Interim Monitoring Report by the Bureau (June 21, 1999)). As a result, conflicts arose between the Bureau and Bannum over Bannum's compliance with the transportation clause of the contract.

In early 1998, the Bureau concluded that Montgomery's public transportation system had become inadequate to meet the needs of the Montgomery Center. Def.'s App. at 189 (Monitoring Report (Feb. 10, 1998)). Beginning in February 1998, and continuing until October 2001, when Bannum was awarded a replacement contract with a new transportation clause, the Bureau repeatedly cited Bannum for failing to provide its inmates with free transportation, as the Montgomery contract required, when Montgomery's public service had proven inadequate. *See* Def.'s Mot. at 8; Pl.'s Resp. at 15.[8] Bannum consistently responded that Montgomery's public

---

[8]*See also* Def.'s App. at 189 (Monitoring Report (Feb. 10, 1998)), 194 (Letter from Bannum regarding DART (Mar. 18, 1998)), 329 (Lowry Aff.) at ¶ 6, 198-99 (Letter from Bannum regarding transportation clause compliance (Apr. 16, 1998)), 195-97 (Letter from Bureau regarding a request for proposals (Apr. 10, 1998)), 200-01 (Letter from Bannum clarifying a proposal submitted in response to the Bureau's request (Apr. 24, 1998)), 227 (Monitoring Report (Feb. 1, 1999)), 229 (Letter from Bannum responding to Monitoring Report (Feb. 16, 1999)), 230 (Letter from Bureau regarding public transportation concerns (Mar. 12, 1999)), 332 (Lowry 2001 Aff.) ¶ 18, 233-34 (Letter from Bureau regarding public transportation concerns (June 15, 1999)), 237 (Interim Monitoring Report (June 16, 1999)), 332 (Lowry 2001Aff.) at ¶¶ 21, 22, 242 (Interim Monitoring Report (June 25, 1999)), 247 (Letter from Bureau regarding the close of a monitoring period (June 28, 1999)), 251 (Letter from Bureau regarding the close of a monitoring period (Sept. 23, 1999)), 334 (Bureau complaint regarding transportation (Jan. 2000)) at ¶ 32, 260 (Letter from Bannum regarding negotiation of transportation issue (Jan. 11, 2000)), 263-65 (Interim Monitoring Report (Feb. 2, 2000)), 269-72 (Letter from Bannum requesting withdrawal of Interim Monitoring Report finding (Feb. 24, 2000)), 273-74 (Letter from Bureau regarding Interim Monitoring Report (Mar. 2, 2000)), 275-76 (Letter from Bannum regarding finding (Mar. 7, 2000)), 277 (Letter from Bureau closing monitoring period (Mar. 13, 2000)), 287-92 (Interim Monitoring Report (May 19, 2000)), 298 (Letter from Bureau regarding the close of a monitoring period (June 26, 2000)), 300-04 (Interim Monitoring Report (Oct. 16, 2000)), 305-06 (Letter from Bannum regarding public transportation issue (Nov. 2, 2000)), 307 (Letter from Bureau regarding the close of a monitoring period (Nov. 13, 2000)), 308-10 (Bureau memo regarding transportation issue (Jan. 1, 2001)), 315-19 (Interim

transportation system worked as advertised, and any transportation problems were caused by other contractors or the inmates themselves and were therefore not Bannum's responsibility. *See* Pl.'s Resp. at 15; Def.'s Mot. at 8. The government maintains that "[d]uring this time, Bannum never provided the free transportation that was required under the contract," Def.'s Mot. at 8, while Bannum argues that it "met the transportation requirements of the contract." Pl.'s Resp. at 15.

Beginning in September 1999, the parties began negotiating a resolution to the transportation issue. Bannum submitted five cost proposals between September 1999 and February 2001, each being a slight variation on a general plan to hire a taxi cab company to provide service to some inmates during limited hours of the day. Def.'s App. at 248-49 (Bannum cost proposal (Sept. 8, 1999)), 257-59 (Bannum cost proposal (Jan. 7, 2000)), 278-80 (Bannum cost proposal (Mar. 24, 2000)), 286 (Letter from Bannum regarding public transportation issue (May 10, 2000)), 293-95 (Bannum cost proposal (June 13, 2000)), 311-13 (Bannum cost proposal (Jan. 24, 2001)). The Bureau found all of the proposals to be unacceptable because they did not provide transportation to all inmates when needed. Def.'s App. at 308-10 (Bureau memo (Jan. 1, 2001)), 314 (Letter from Bureau (Feb. 12, 2001)). In October 2000, the Bureau notified Bannum that it was not going to exercise any more option periods under the 1998 Montgomery contract and, instead, it would resolicit the contract with a new transportation clause. Def.'s App. at 299 (Letter from Bureau (Oct. 5, 2000)), 314 (Letter from Bureau (Feb. 12, 2001)).

Bannum was awarded the replacement contract, effective November 1, 2001. Def.'s App. at 154 (Contract J200c-562).[9] The replacement contract pays Bannum at a higher rate than would have been paid under the option periods for the 1998 contract. *Compare* Def.'s App. at

---

Monitoring Report (Feb. 21, 2001)), 350-54 (Interim Monitoring Report (Aug. 1, 2001)).

[9]The revised transportation clause stated:

> The facility will be located within one mile of public transportation, or the contractor will provide transportation for offenders to seek employment, work, and participate in program activities and necessary medical treatment[,] i.e. physicals, at no cost to the offender. The contractor will ensure the proper insurance policy is in effect to cover the transportation, if applicable. If at anytime during the cont[r]act the [Community Corrections Manager] determines the public transportation system to be inadequate or ineffective, the contractor will provide offenders with transportation for work, program participation activities[,] and necessary medical appointments at no cost to the offender. Additionally, staff will not use their personal automobile[s] to transport offenders unless it is an emergency.

Def.'s App. at 175.

144 (Contract J200c-397), *with* Def.'s App. at 154 (Contract J200c-562).[10] As of October 30, 2007, Bannum continues to perform at the Montgomery facility. Hr'g Tr. 9:15-18, 13:4-5.[11]

On March 6, 2001, Bannum filed a Request for Equitable Adjustment seeking to recover the costs for responding to the Bureau's citations regarding the transportation issue and contesting the Bureau's alleged "wrongful refusal" to exercise the remaining options. Def.'s App. at 320-49 (Bannum's Request for Equitable Adjustment). On April 9, 2001, Bannum's Request for Equitable Adjustment was converted into a certified claim for equitable adjustment in the amount of $339,411.57. Def.'s App. at 347 (Bannum's Request for Equitable Adjustment; Letter from Kevin Cox for Bannum to Crystal Clayton, Contracting Officer). The claim was revised upward to $371,918 as the result of an audit, and this higher claim is reflected in Bannum's Proposed Third Amended Complaint, for which a Motion to Amend is currently pending. *See* Proposed Third Am. Compl. at 22. The Contracting Officer failed to issue a final decision within the requisite 60 days, which is deemed a denial of the claim in its entirety, *see* 41 U.S.C. § 605(c)(2)-(5), and Bannum contests this deemed denial.

**Jurisdiction**

Jurisdiction must be established as a threshold matter before the court may proceed with the merits of any action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). The Tucker Act provides jurisdiction for this court to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). In this vein, the Tucker Act also provides that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978 [, as amended, 41 U.S.C. § 609(a)(1)]." 28 U.S.C. § 1491(a)(2). This court has jurisdiction over Bannum's claims under these provisions.

---

[10]Under the option periods for the 1998 contract, Bannum would have been paid $50.45 for an estimated 10,220 man-days in 2001, and $50.45 for an estimated 10,585 man-days in 2002. Def.'s App. at 144 (Contract J200c-397). Thus, under the option periods for the 1998 contract, Bannum would have received an estimated gross income of $1,049,612.35. Under the replacement contract, the two-year base period paid $60.45 for an estimated 21,900 man-days, thus giving Bannum an estimated gross income of $1,323,855, an estimated $274,242.75 more than under the 1998 contract's option years. Def.'s App. at 154 (Contract J200c-562), 155, 158 (2001 Montgomery Contract Award Document).

[11]Although not selected for the new contract after the 2001 contract's expiration, Bannum protested the award to another contractor and the protest is pending. Hr'g Tr. 13:6-11. Accordingly, Bannum's performance continues.

**Summary Judgment Principles**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The moving party carries the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. In considering the existence of a genuine issue of material fact, a court must draw all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If no rational trier of fact could find for the non-moving party, a genuine issue of material fact does not exist and the motion for summary judgment may be granted. *Id*.

## ANALYSIS

### A. Count Six: Beaumont Center

1. *Alleged breach of contractual covenants*.

Count Six of the Second Amended Complaint seeks to recover $4,500 in costs allegedly incurred by Bannum in responding to the Cure Notice issued by the Bureau respecting the Beaumont contract after Bannum received the termination notice from the landlord's property manager for the Beaumont Center. Second Am. Compl. ¶¶ 57-59. This claim is based upon the contention that the Bureau violated two components of the implied covenant of good faith and fair dealing. *See id*. Specifically, Bannum alleges an improper and prejudicial withholding of superior knowledge and a breach of the Bureau's duty to cooperate, both of which were allegedly caused by "[the Bureau staff]'s direct communication with the owner of the property, their failure to verify the accuracy of information received, their failure to notify Bannum of their receipt of the communication[,] and their failure to identify person(s) and nature of the communications conducted." *Id*.

"[I]n every contract there exists an implied covenant of good faith and fair dealing." 13 Richard A. Lord, *Williston on Contracts* § 38:15 at 437 (4th ed. 2000); *Temple-Inland, Inc. v. United States*, 59 Fed. Cl. 550, 559 (2004) (quoting *Centex Corp. v. United States*, 49 Fed. Cl. 691, 708 (2001)). "In a government contract, the implied covenant of good faith and fair dealing requires that the [g]overnment not use its unique position as sovereign to target the legitimate expectations of its contracting partners." *Centex*, 49 Fed. Cl. at 708 (citing *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997)). Because of the presumption that a governmental employee performs his or her duties in good faith, it is often difficult to prove a breach of this covenant. *See Southern Cal. Edison v. United States*, 58 Fed. Cl. 313, 325 (2003) (citing John W. Whelan, *Understanding Federal Government Contracts* 68-70 (1993)). For a plaintiff to successfully assert a claim for breach of the implied covenant of good faith and fair

dealing respecting a contract with the government, he or she "must allege and prove facts constituting a specific intent to injure [the] plaintiff on the part of the government[al] official." *Pratt v. United States*, 50 Fed. Cl. 469, 479 (2001) (citing *Texas Instruments, Inc. v. United States*, 991 F.2d 760, 768 (Fed. Cir. 1993)). The intended injury may be as simple and straightforward as elimination of tax benefits previously granted. *See First Nationwide Bank v. United States*, 431 F.3d 1342, 1350-51 (Fed. Cir. 2005).[12]

Closely related to the implied covenant of good faith and fair dealing is the government's implied affirmative duty to disclose superior knowledge that is required for the performance of a contract to which it is a party. *Southern Cal. Edison*, 58 Fed. Cl. at 325 (citing *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 674-75 (1994)). The government is only liable for a breach of this duty when the following four prerequisites are met: "'(1) [the contractor] undertook to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.'" *AT&T Communications, Inc. v. Perry*, 296 F.3d 1307, 1312 (Fed. Cir. 2002) (quoting *GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991)); *see also Petrochem Servs., Inc. v. United States*, 837 F.2d 1076, 1079 (Fed. Cir. 1988); *Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 777-78 (Ct. Cl. 1963); *Miller Elevator*, 30 Fed. Cl. at 675. This inquiry, unlike that associated with the covenant of good faith and fair dealing, has no intent-to-injure component and instead "focuses on the government's knowledge vis-a-vis the contractor's lack of knowledge." *Southern Cal. Edison*, 58 Fed. Cl. at 325 (citing *Max Jordan Bauunternehmung v. United States*, 10 Cl. Ct. 672, 679 (1986) ("The government's liability for failure to provide information arises from a conscious omission to share superior knowledge it possesses in circumstances where it permits a contractor to pursue a course of action known to be defective."), *aff'd*, 820 F.2d 1208 (Fed. Cir. 1987)).

The bare allegations of Bannum's Second Amended Complaint relating to alleged breaches of the implied covenant of good faith and fair dealing and the duty to cooperate are not supported by sufficient facts to present a genuine issue of material fact. First, there is no evidence that the government incited the landlord's termination notice or participated in any way in causing the landlord to issue the notice. There is also no evidence that the government

---

[12]Courts have used varying terms to describe the allegations and proofs necessary to rebut the presumption that governmental officials act in good faith. *See Am-Pro Protective Agency v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002). In *Am-Pro*, the Federal Circuit contrasted *Schaefer v. United States*, 633 F.2d 945, 948-49 (Ct. Cl. 1980) (requiring "well-nigh irrefragible proof"), with *George v. United States*, 166 Ct. Cl. 527, 531 (1964) (referring to "clear evidence"). *Am-Pro* reconciled these lines of precedent by holding that the traditional clear and convincing standard "most appropriately describes the burden of proof applicable to the presumption of the government[']s good faith." *Am-Pro*, 281 F.3d at 1239; *see also Galen Medical Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

breached an obligation to Bannum by failing to inform Bannum of any information that the Bureau may have had regarding the attempted termination. Bannum attempts to draw an inference of collusion or conspiracy from the Bureau's internal memorandum regarding a conversation between the Bureau's representative and the Beaumont Fire Chief, *see* Pl.'s Resp. at Ex. 1 (Mem. from Ala to Mustain, Community Corrections Regional Administrator (Nov. 7, 2000)), but this memorandum does not support collusion. The memorandum simply stated that during the Bureau's Interim Monitoring of Bannum's Beaumont Center, it discovered that the City Council had given its approval of a school for troubled youths to be located in the building that housed Bannum. The memorandum reported hearsay, *i.e.*, that "[t]he City Council stated that it was agreed upon that Bannum Place Beaumont would vacate the premises prior to the beginning of the school year 2001," without naming the persons who had so agreed. *Id*. The Bureau's representative implicitly faulted Bannum for not informing the Bureau of this development: "As of the writing of this memo[, Bannum] has not notified this office of any future move." *Id*. Bannum allegedly did not know of the City Council's action. In the circumstances, the fact that Bannum supposedly had no such knowledge may ultimately have led both the Bureau and Bannum to be suspicious of the reaction of each to the landlord's attempted termination notice, but no intent to injure or lack of cooperation can be inferred.

Second, Bannum's bare allegations regarding the Bureau's superior knowledge also lack factual support sufficient to raise a genuine issue of material fact. A superior knowledge claim ordinarily relates to knowledge regarding contractual specifications that the government failed to impart to a contractor prior to the contractor's agreement to undertake performance of a contract. *See Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1357 (Fed. Cir. 2007) (discussing the "pre-award period" and "vital knowledge or the opportunity to obtain that knowledge *before* contract entry" (emphasis added)). The matter here, however, relates to knowledge that was allegedly withheld years after performance was begun. Furthermore, this claim only adheres if "the government was aware the contractor had no knowledge of and had no reason to obtain such information," *id*. (quoting *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000)), and there is no such evidence in the case at hand. Bannum had every reason to obtain information relating to its ability to occupy the Beaumont premises, as it was key to its ability to perform. Accordingly, Bannum's allegations respecting the duty of good faith and fair dealing and the duty to impart superior knowledge fail.

2. *A proposed restated claim.*

To shore up its claim for damages respecting the Beaumont Center, Bannum filed a proposed Third Amended Complaint on October 12, 2007, and, among other things, increased its claimed damages from $4,500 to $96,390. Proposed Third Am. Compl. ¶ 59, 62. The increase stems from the costs allegedly incurred by Bannum in the litigation over its landlord's termination notice. *Id.* ¶ 61. Bannum's Third Amended Complaint also would add allegations of bad faith by the Bureau and attempt to tie these allegations to the termination notice. *Id.* ¶ 60. "[L]eave [to amend] shall be freely given when justice so requires," RCFC 15(a), but such leave may be denied when the amendment sought would be futile. *See Shoshone Indian Tribe of the*

*Wind River Reservation, Wyo. v. United States*, 71 Fed. Cl. 172, 176 (2006). "A motion to amend may be deemed futile if a claim added by the amendment would not withstand a motion to dismiss." *Id.* (citing *Slovacek v. United States*, 40 Fed. Cl. 828, 834 (1998)).

To bring a claim that is subject to the Contract Disputes Act before this court, Section 6 of that Act, 41 U.S.C. § 605, requires that a contractor must first submit its claim to a contracting officer, and the contracting officer must issue a final decision regarding that claim or fail to issue a decision in timely fashion. *See ACE Constructors, Inc. v. United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007) (citing *England v. Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004); *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1578 (Fed. Cir. 1994)). The claim presented to this court must be the same as that which was decided by the Contracting Officer, but the statute "does not require rigid adherence to the exact language or structure of the original administrative . . . claim [when] they arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." *ACE Constructors*, 499 F.3d at 1361 (quoting *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003)); *see also Kinetic Builders, Inc. v. Peters*, 226 F.3d 1307, 1312 (Fed. Cir. 2000) (holding that a contractor presents a new claim if the operative facts of the claim are different than any of the claims it has submitted beforehand). Leave to amend a complaint in this court should be denied if the allegations sought to be added by plaintiff factually constitute a new claim that has not been presented to the Contracting Officer. *See Renda Marine, Inc. v. United States*, 65 Fed. Cl. 152, 162 (2005).

Bannum initially contended that it was due the costs of responding to the Cure Notice, Second Am. Compl. ¶ 58; however, Bannum now seeks the costs of litigating the termination notice. Proposed Third Am. Compl. ¶ 61. The revised claim differs substantially because the termination notice was issued by Bannum's landlord, not the Bureau, and resulted from Bannum's sublease and the landlord's preferences, not any action of the Bureau. Even though some basic facts bear on both claims, the new claim has a significantly different scope and thus must be presented to the Bureau's Contracting Officer and receive a final decision before this court can exercise jurisdiction to consider it.[13] Bannum's Motion to Amend accordingly is denied as to Count Six.

---

[13]Bannum itself seemed to acknowledge that its claim for costs of litigating the termination notice was different from the claim for responding to the Bureau's Cure Notice respecting the Beaumont Center. On October 5, 2007, a week prior to filing its motion to file the proposed Third Amended Complaint, Bannum's counsel wrote the counsel for the government, sending "a revised claim that needs to be filed with the contracting officer." Def.'s Reply, Ex. A (Letter from Joseph Camardo to Devin Wolak (Oct. 5, 2007)). Bannum's counsel sent the claim to the government's counsel because the Bureau was represented by him, and requested that the claim be forwarded to the Bureau's contracting officer. *Id.*

### B. Count Eight: Montgomery Center

The dispute between Bannum and the Bureau over the meaning of the transportation clause in Bannum's original contract for the Montgomery Center has led to two claims by Bannum. First, Bannum contests the Bureau's decision not to exercise any additional options under the 1998 contract and instead to resolicit the contract with a new transportation clause, allegedly resulting in Bannum's "los[s of] an additional two years of contract revenues." Proposed Third Am. Compl., ¶ 88. Second, Bannum seeks compensation for the "enormous amount of time and effort [spent] . . . attempting to resolve the transportation issue." *Id.*[14]

1. *Option-years claim.*

Bannum alleges that it is owed the value of the option years in its original 1998 contract with the Bureau. Proposed Third Am. Compl., ¶ 88. "An option contract generally binds the option giver, not the option holder." *Hi-Shear Tech. Corp. v. United States*, 53 Fed. Cl. 420, 435 (2002); *see also Optimal Data Corp. v. United States*, 17 Cl. Ct. 723, 731 (1989), *aff'd*, 904 F.2d 45 (Fed. Cir. 1990) (table); 1A Corbin, Contracts § 259 at 464 (1963 ed.). Consequently, Bannum ordinarily would be bound by the option in the original Montgomery contract, but the government would not. However, "[a] contractor can recover for the government's failure to exercise an option if the government's failure was in bad faith." *Hi-Shear*, 53 Fed. Cl. at 436; *Dangfeng Shen Ho v. United States*, 49 Fed. Cl. 96, 107 (2001). Because governmental officials are presumed to act conscientiously and in good faith in the discharge of their duties, *see, e.g.*, *Spezzaferro v. Fed. Aviation Admin.*, 807 F.2d 169, 173 (Fed. Cir. 1986); *Kalvar Corp. v United States*, 543 F.2d 1298, 1301 (Ct. Cl. 1976), a plaintiff must present "clear and convincing" evidence of bad faith to overcome this presumption. *Am-Pro*, 281 F.3d at 1238-39.

Bannum argues that there is evidence of bad faith because the Bureau "forc[ed] Bannum to respond to allegations that [the Bureau] internally admitted were not true for the purpose of extorting additional services at no cost" and "threaten[ed] Bannum that it would not exercise the option years unless Bannum lowered its proposal costs." Pl.'s Resp. at 25-26. The government responds that the Bureau's actions were not in bad faith, but rather were "an attempt . . . to make sure the inmates who rel[ied] upon the contractor receive[d] the services they need" and that the Bureau made a "good faith effort to appease Bannum and entertain its demands for more money." Def.'s Mot. at 19.

---

[14]Bannum's Motion to Amend is granted as to Count Eight, because the material sought to be added to this count simply revises the amount of damages sought based on an audit and elaborates on the bad faith claims made in the initial claim to the Contracting Officer, the original Complaint, and the Second Amended Complaint. *See* Proposed Third Am. Compl., ¶¶ 82, 86-89. The government stated at the court's hearing that it does not oppose this amendment. Hr'g Tr. 47:6-17 (error in transcript misattributing statement to court rather than government's counsel).

A genuine dispute of material fact prevents the court from granting summary judgment respecting Bannum's option-year claim. *See Celotex*, 477 U.S. at 324-25. On the current record, it is not possible for the court to decide whether the Bureau pursued its contentions about the transportation clause of the original Montgomery contract in an effort to force Bannum to provide services that were not required under the contractual language. The transportation clause of the contract specified that the Center "be located within one mile of public transportation," Def.'s App. at 162, and the parties concede that the Center was so located. Notwithstanding this location, the government's insistence on invoking the alternative provided by the contract – "or the contractor shall provide for transportation of residents for employment or program participation activities at no cost to the resident[s]," *id.* – arguably reflects a reaction to the ineffectiveness of the DART service instituted by the City of Montgomery in the middle of the contractual term for the Montgomery Center rather than a reasonable interpretation of the contractual language. *See supra*, at 6-7. The transportation clause seems to be the key to the government's refusal to exercise the option years, but that triggering cause cannot be determined with certainty. In the circumstances, the option-year dispute arising with the original contract cannot be resolved on the paper record attendant to the government's motion for summary judgment.

Notably also, the current record does not enable the court to determine whether Bannum's replacement, follow-on contract for the Montgomery Center was a substituted contract. "A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty." *Restatement (Second) of Contracts* § 279(1). Such a contract "discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty." *Id.* § 279(2); *see also* 29 Richard A. Lord, *Williston on Contracts* § 73:36, at 116 (4th ed. 2003). "A common type of substituted contract is one that contains a term that is inconsistent with a term of an earlier contract between the parties." *Restatement (Second) of Contracts* § 279 cmt. a.

To enter into a substituted contract that discharges a prior contract, the same elements of mutual assent and consideration that are required for contract formation must be present. *See* 29 *Williston on Contracts* § 73:15, at 48. Nonetheless, "[a]n agreement to rescind or modify need not be express. Mutual assent to abandon a contract, like mutual assent to form one, may be implied from the attendant circumstances and conduct of the parties." *Id.* § 73:16, at 50. A genuine issue of material fact exists as to whether the parties entered into such a contract, thus discharging their mutual obligations under the original Montgomery Contract. For this reason also, summary judgment cannot be granted on the claims arising from the initial Montgomery Contract.

2. *Costs of responding to the deficiency notices.*

Bannum seeks the costs of responding to the Bureau's deficiency notices and negotiation requests to resolve the transportation issue. At the court's hearing held on October 30, 2007, the government conceded that Bannum is entitled to some of these costs. *See* Hr'g Tr. 15:24 to 16:1.

The pertinent question thus becomes the amount to which Bannum is entitled, and this is a triable issue for which summary judgment is not appropriate.

### C. Count Seven: Wage Determination

Bannum further seeks to amend its complaint as to Count Seven, related to wage determinations at all of its Centers. Bannum would add a claim for attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d). Proposed Third Am. Compl. ¶¶ 63-77. As noted earlier, however, this count has been resolved by a final judgment, *see Bannum*, 59 Fed. Cl. 241, *aff'd*, 121 Fed. Appx. 849, and the time for seeking fees under the Equal Access to Justice Act has long passed. *See* 28 U.S.C. § 2412(d)(1)(B) ("A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses . . . ."). Accordingly, Bannum's motion for leave to file its Proposed Third Amended Complaint is denied insofar as Count Seven is concerned.

### D. Count Ten: Reimbursements

Bannum's proposed Third Amended Complaint would reinstitute Count Ten, seeking various reimbursements relating to the Beaumont facility. *See* Proposed Third Am. Compl., ¶¶ 101-106. This claim is virtually identical to that alleged as Count Ten in Bannum's Second Amended Complaint, which the court dismissed without prejudice on April 23, 2003 in response to Bannum's April 8, 2003 Motion for Partial Voluntary Dismissal. *See* Order of April 28, 2003. Bannum offers no reason for resuscitating Count Ten, but the government puts forward no objection. As a result, Bannum's proposed amendment embodied in its Proposed Third Amended Complaint will be allowed as to Count Ten.

## CONCLUSION

For the reasons stated, the government's Motion for Summary Judgment is GRANTED as to Count Six, and Bannum's cross-motion to amend its complaint is DENIED as to that count. The government's Motion for Summary Judgment is DENIED as to Count Eight, and Bannum's cross-motion to amend its complaint is GRANTED as to that count. Bannum's Motion to Amend is DENIED as to Count Seven and GRANTED as to Count Ten.

On or before February 4, 2008, Bannum shall file a Third Amended Complaint that comports with this decision, and the government shall file its answer to that amended complaint by February 22, 2008. Thereafter, on or before March 21, 2008, the parties shall file a joint status report that sets out a proposed schedule for final preparations for trial of this case, to include proposed trial dates.

It is so ORDERED.

s/ Charles F. Lettow
Judge