IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BANNUM, INCORPORATED,

Plaintiff, No. 01-639C

vs. Judge Lettow

UNITED STATES,

Defendant.

**THIRD AMENDED COMPLAINT**

Parties

1. Plaintiff, Bannum, Inc., (hereinafter, "Bannum" or "Plaintiff") is a corporation organized and existing under the laws of the State of Kentucky, with its principal place of business being located in Largo, Florida.

2. Defendant is the United States Government, acting through the Department of Justice, Federal Bureau of Prisons, having a place of business addressed as 320 First St., N.W. Washington, DC 20534 (hereinafter, "Defendant" or "BOP").

Jurisdiction

3. This is an action for an equitable adjustment and for damages arising under various contracts resulting from certain government caused actions, inactions, and breaches thereof as more fully appears hereinafter. Bannum has filed various claims pursuant to the Contract Disputes Act of 1978 and the "Disputes" clause incorporated into the subject contracts, based on the increased costs of performance. The BOP has issued various Final Decisions with respect to Bannum's claims,

and/or has failed to issue a Final Decision, which is deemed to be a denial of its claims. As such, this Court has jurisdiction of this action under Section 10 of the Contract Disputes Act of 1978, 41 U.S.C. §609(a), and the Tucker Act, 28 U.S.C §1491(a).

## Introduction

4. Plaintiff has been awarded, by the BOP, various contracts for the provision of residential Community Correction Center services for male and female Federal offenders in various areas throughout the United States. The specific contracts, which are the subject of the present action are as follows:

a. Jackson, Mississippi - Contract No. J200c-325;

b. Corpus Christi, Texas - Contract No. J200c-361;

c. Beaumont, Texas - Contract No. J200c-336;

d. Laredo, Texas - Contract No. J200c-375;

e. Laredo, Texas - Contract No. J200c-433

f. Tupelo, Mississippi - Contract No. J200c-306;

g. Charleston, West Virginia - Contract No. J200c-343;

h. Clarksburg, West Virginia - Contract No. J200c-338;

i. Fayetteville, North Carolina - Contract No. J200c-332;

j. Florence, South Carolina - Contract No. J200c-370;

k. Greensboro, North Carolina - Contract No. J200c-377;

l. Montgomery, Alabama - Contract No. J200c-397;

m. Reno, Nevada - Contract No. J200c-365C;

n. Savannah, Georgia - Contract No. J200c-310;

o. Tallahassee, Florida - Contract No. J200c-376;

p. Wilmington, North Carolina - Contract No. J200c-373.

5. Throughout the course of performance of these contracts, Plaintiff was subjected to various improper actions and inactions of the BOP, which resulted in Bannum being forced to expend a significant amount of extra-contractual effort and cost, for which they have the right to be fully compensated. In addition, the BOP issued changes to various contracts, by Modification, for which Bannum has been improperly denied compensation. In addition, the ongoing and continuous improper actions of the BOP, have had a significant detrimental effect on Bannum's ability to secure additional contracts with the BOP. For all of the herein stated damages, Bannum has the right to be fully compensated.

COUNT 1

6. During the course of performance of several contracts, Bannum was assessed improper deductions for alleged performance deficiencies, which were contested by Plaintiff, as specifically delineated as follows:

Jackson, Mississippi - Contract No. J200c-325

7. On October 22, 1999, Bannum filed a Request for Equitable Adjustment ("REA") in the amount of $17,446 for wrongful deductions assessed by the BOP on Contract J200C-325. The REA included a detailed explanation as to its allegations that the deductions taken were improper. The REA also requested that ADR be conducted.

8. On March 24, 2000, the BOP rejected Bannum's REA, in its entirety.

9. On March 1, 2001, Bannum converted its REA into a Claim for Equitable Adjustment and demanded a Contracting Officer's Final Decision.

10. On April 30, 2001, the BOP issued a final decision awarding Bannum $13,940 and enclosed unilateral Modification 10 in the amount of $13,940.00.

11. On May 1, 2001, Bannum invoiced for the Modification No. 10 in the amount of $13,940. To date, Bannum has not been paid and, as such, Bannum is entitled to an equitable adjustment and damages, as a result of the Government's wrongful deduction and their failure to issue payment pursuant to the Modification.

<u>Corpus Christi, Texas - Contract J200C-361</u>

12. On October 26, 1999, Bannum filed a Request for Equitable Adjustment (REA) in the amount of $1,126.40 for wrongful deductions assessed in March 1999 on Contract No. J200c-361. In its REA, Bannum also requested that the matter be resolved through Alternate Dispute Resolution ("ADR")

13. On October 28, 1999, Bannum filed a Request for Equitable Adjustment ("REA") for wrongful deductions assessed in October 1999 on Contract No. J200c-361, in the amount of $950.00. In its REA, Bannum also requested that the matter be resolved through ADR. Documentation supporting its request was also provided.

14. On February 4, 2000, the Government responded to Bannum's REA(s) by denying Bannum's REA(s) as well as, Bannum's request to use ADR.

15. On February 22, 2000, Bannum submitted a REA to the Government for $1,120.00

for wrongful deductions assessed in January 2000 and again requested the use of ADR. Documentation supporting its request was also provided. Said REA was denied by letter dated March 24, 2000.

16. The Government refused to negotiate Bannum's REAs and by letters dated March 1, 2001, Bannum converted its REAs, for the wrongful deductions, into Claims for Equitable Adjustments, in the following amounts:

| | |
|---|---|
| October 26, 1999 | $1,126.40 |
| October 28, 1999 | $ 950.00 |
| February 22, 2000 | $1,120.00 |

The Claims further demanded a Contracting Officer's Final Decision.

17. The Contracting Officer failed to issue a Final Decision within the requisite sixty (60) days, and is deemed to be a denial of the Claims in their entirety. It is from this deemed denial that this appeal is taken.

<u>Beaumont, Texas - Contract J200C-336</u>

18. On October 27, 1999, Bannum submitted an REA for $700 for the wrongful deduction assessed on Contract No. J200c-375 during September 1999.

19. On February 23, 2000, Bannum filed an REA for wrongful deductions of $4,050.00 assessed on the above contract during January, 2000. In addition, Bannum provided documentation concerning the REA as well as requested the use of ADR.

20. BOP denied Bannum's REAs by letters dated February 24, 200 and March 24, 2000. Therefore, Bannum on January 3, 2001, converted its REA(s) into Claims for Equitable Adjustment.

21. The Contracting Officer failed to issue a Final Decision within the requisite sixty (60) days, and is deemed to be a denial of the Claims in their entirety. It is from this deemed denial that this appeal is taken.

Laredo, Texas - Contracts J200C-375 and J200C-433

22. On March 16, 2000, Bannum filed a REA for the wrongful deduction of $740 assessed in November 1999 under Contract J200c-375. In addition, Bannum requested the use of ADR to resolve this issue.

23. On April 10, 2000, Bannum filed an REA for $2,060 for wrongful deductions assessed in February 2000, under Contracts J200c-375 and J200c-433.

24. On April 26, 2000, Bannum provided additional information concerning its Requests for Equitable Adjustment. Furthermore, Bannum discussed in detail that the Government was making derogatory and disparaging remarks concerning Bannum. Again, Bannum requests the use of ADR as a means of resolving the difference.

25. By letters dated March 24, 2000 and April 13, 2000, the BOP denied Bannum's REAs, and as a result, on March 1, 2001, in two letters, Bannum converted the REA of March 16, 2000 totaling $740 and the REA of April 10, 2000, totaling $2,606, into Claims for Equitable Adjustment.

26. To date, the BOP has not responded to Bannum's claims and therefore Bannum has deemed the lack of response as a deemed denial of its Claim for Equitable Adjustment. It is from this deemed denial that this appeal is taken.

COUNT 2

27. Bannum, on June 14, 2000, filed a REA under the Tupelo, Mississippi contract (J200c-306) and the Jackson, Mississippi contract (J200c-325), in the amount of $16,620.86. The REA was for added cost incurred by Bannum for the purchase and installation of new doors, which was directed by the BOP.

28. On February 5, 2001, the BOP requested additional information concerning the breakdown of Bannum's added cost. By letter dated February 13, 2001, Bannum provided a breakdown of the cost as well as justification for this added cost.

29. On February 26, 2001, the BOP responded to Bannum's REA and issued two bilateral modifications as follows:

| Modification | Contract | Amount |
|---|---|---|
| 13 | J200C-306 | $ 918.00 |
| 9 | J200C-325 | $3,248.40 |

The Modifications also contained language which released the Government from any other claims being asserted. Also attached to the Modifications, was a letter from the Contracting Officer, which stated that the Modifications constituted a Final Decision of the Contracting Officer.

30. In a letter dated March 9, 2001 Bannum disputed the amounts contained in the Modification, and further stated that it would not execute the Modifications, due to the release language contained therein. Therefore, Bannum requested that the Modifications be re-issued as unilaterals and that payments be issued in the amounts stated.

31. Pursuant to Bannum's request, on April 9, 2001, BOP issued the following unilateral modifications:

| Modification | Contract | Amount |
|---|---|---|
| 13 | J200c-306 | $ 918.00 |
| 9 | J200c-325 | $3,248.40 |

32. By letters dated July 30th and 31st, 2001, the BOP rescinded both unilateral Modifications. The BOP stated, that upon further review it was determined that the modification should have been issued as a bilateral modification with a contractor's release of claims, to be signed by Bannum. If Bannum was to reconsider its position and agree to sign a modification with the release language, BOP was to be notified.

33. On October 18, 2001, the BOP issued a Final Decision, withdrawing the previous Final Decision, dated February 26, 2001, and further denied Bannum's REA in their entirety. From this October 18, 2001 Final Decision, Bannum hereby takes an appeal of said denial of its claim, in the amount of $16,620.86.

COUNT 3

34. All of the contracts awarded to Bannum by the BOP are of a requirements nature. Therefore, any BOP need for residential services, within the area covered by a particular contract, must be assigned to Bannum's facilities. However, in regard to; the Beaumont, Texas Contract (J200c-336), the Laredo, Texas Contract (200c-375), and the Corpus Christi, Texas Contract (J200c-361), the BOP began to improperly divert newly-assigned residents to facilities other than Plaintiffs. This diversion of residents constituted a breach of the contracts.

35. On July 12, 2000, Bannum filed a certified Claim for Equitable Adjustment in the amount of $428,201.40, for breach of the above -referenced requirement contracts.

36. On November 15, 2000, the BOP responded to Bannum's Claim for Equitable Adjustment by three separate letters:

a. regarding Contract No. J200C-336, the BOP issued a Final Decision granting Bannum $50,000 for its claims.

b. regarding Contract No. J200C-375, the BOP issued a Final Decision denying Bannum's claim in its entirety; and

c. regarding Contract No. J200C-361, the BOP issued a Final Decision denying Bannum's claim in its entirety.

37. On January 3, 2001 and February 27, 2001, Bannum through its counsel forwarded letters requesting that ADR be used to resolve this matter.

38. On or about May 4, 2001, the BOP issued unilateral Modification 12 to Contract No. J200c-336, which reflected the additional $50,000 granted by the Contracting Officer's Final Decision.

39. On May 7, 2001, Bannum, under Contract No. J200C-336 billed the BOP for the $50,000 granted in unilateral Modification 12. Bannum in this letter reserved its request to pursue this matter further.

40. On June 12, 2001, the BOP forwarded a letter to Bannum along with bilateral Modification 13. The letter states that "after further review by the BOP, it has been determined that the modification should have been issued as a bi-lateral modification." Modification 13 included language whereby Bannum would release all rights to additional claims on this matter for all three contracts. In addition, Modification 13, also improperly rescinded unilateral Modification 12.

41. To date, Modification 13 has not been executed by Bannum and no payment has been made.

42. On October 18, 2001, the Contracting Officer issued another Final Decision in regard to the diversion claim on the Beaumont contract (J200c-336). In its Final Decision, the Contracting Officer stated that the letter of November 15, 2000 was mistakenly categorized as a Final Decision and was, in fact, a settlement offer of $50,000. Since Bannum did not accept the offer, as demonstrated by their failure to sign the Modification granting the $50,000, the offer is withdrawn. In addition, the Final Decision stated that upon further consideration of the claim, it was determined that the BOP did not breach the contract, and therefore, Bannum's Claim was denied in its entirety.

43. Therefore, as a result of the Contracting Officer's Final Decision, dated October 18, 2001, denying Bannum's claim for Contract J200c-336, and the Final Decision , dated November 15, 2000, denying Bannum's claims for Contracts J200c-361, and J200c-375, this appeal is made for compensation in the amount of $428,201.40.

COUNT 4

44. On July 5, 2000, the BOP notified Bannum that, as a result of an investigation conducted by the Office of Internal Affairs, Pamela Simpson, a Counselor Aide under the Beaumont, Texas contract (J200c-336), would not be allowed to work with BOP inmates. The letter contained no details of the investigation nor explanation of the of its findings.

45. On July 5, 2000, Bannum issued a letter to the BOP requesting a full accounting of the alleged charges and findings of the investigation. BOP issued no response to this request.

46. On July 17, 2000, Bannum filed a Request for Equitable Adjustment in the amount of

$4,293.45, which reflected costs expended in replacing Ms. Simpson and in preparing the REA. Bannum, in this REA, also demanded that ADR be used. The REA further stated that the BOP had blatantly ignored Bannum's request for information regarding the charges and investigation against Ms. Simpson, and that they have been forced to bar her from employment without reason or rationale. Bannum further stated that this matter was a continuation of problems that Bannum has experienced with the BOP's South Central Region, including but not limited to; improper investigations, diversions of referrals, and interference of personnel management and that such improper actions by the BOP will affect Bannum's ability to receive future contracts.

47. By letter dated November 15, 2000, the BOP denied Bannum's Request for Equitable Adjustment in its entirety. Despite the clear categorization of its submittal as a "Request for Equitable Adjustment," the BOP's letter of November 15, 2000 was improperly issued as a Final Decision, denying a Claim for Equitable Adjustment. On January 31, 2001, Bannum converted its REA into a Claim for Equitable Adjustment.

48. The Contracting Officer failed to issue a Final Decision on Bannum's Claim within the requisite 60 days, which is deemed to be a denial. From this deemed denial of Bannum's Claim, this appeal is taken, and compensation is requested in the amount of $4,293.45

COUNT 5

49. In regard to the Beaumont, Texas Contract (J200c-336), during July, 1999, the BOP Office of Internal Affairs began investigating Bannum personnel for alleged sexual misconduct, specifically in regard to an allegation that a Bannum employee may have been involved in a sexual relationship with another Bannum employee.

50. Based upon information and belief, the BOP's justification for conducting the investigation was internal BOP guidelines and restrictions, which dealt only with BOP personnel, which were not incorporated into Bannum's contracts. In addition, the basis of this investigation was utilized as a pretext to further improperly expand the investigation in an effort to find any possible wrongdoing by Bannum.

51. In addition to improperly conducting the investigation, the method used by the BOP during the investigation, resulted in a disruption of Bannum's contract management and resulted in pitting employee against employee and employees against management, which resulted in Bannum incurring increased costs and effort. In addition, throughout this investigation, investigators continually and improperly threatened that Bannum's contracts would be in danger of being terminated.

52. In addition, pursuant to the terms of the contract, Bannum was required to report to BOP of any alleged violation. However, because of the BOP's refusal to notify Bannum as to the allegations made, and the nature and extent of the investigation being conducted, the BOP was putting Bannum at risk of violating its contractual obligation to immediately report alleged misconduct.

53. The Government impliedly acknowledged that its investigation was based upon standards and restrictions not incorporated into Bannum's contract, by the issuance of Modification 10, on or about September 19, 2000, which incorporated BOP's Internal Standards of Conduct into the option years of the contract.

54. As a result of the improper investigation, on January 2, 2001, Bannum filed a detailed

Request for Equitable Adjustment for various constructive changes to its contract, including the costs incurred in dealing with the improper investigation. In addition, Bannum also stated that the REA would be revised to include the costs entailed with the incorporation of Modification 10.

55. On January 25, 2001 the BOP requested additional information concerning Bannum's REA.

56. On April 10, 2001, Bannum converted its REA into a Claim for Equitable Adjustment and demanded a Contracting Officer's final decision. To date, no final decision has been issued. Bannum deems the lack of a response as a deemed denial of its claim. From this deemed denial this appeal is taken and compensation is requested in the amount of $41,200.00.

COUNT 8

57. Pursuant to the terms of the Montgomery Contract (Contract No. J200c-397), the only transportation requirement was that public transportation was to be available within one mile of the facility. At all times, during its performance of this present and the past contract (No. J200c-181), Bannum was in full compliance with the requirements, as evidenced by the extremely high employment rate of the facility residents.

58. Despite the fact that Bannum was in full compliance with the transportation requirements contained in the contract, intermittently during Bannum's performance of this contract and its performance of the preceding contract (No. J200c-181), BOP raised an issue in regard to Bannum's compliance of the transportation requirements under the contract, specifically in regard to the adequacy of the public transportation in Montgomery.

59. However, despite raising these concerns, the BOP failed to delineate how exactly

Bannum was failing to comply, resorting instead to general, vague allegations of non-compliance, which were impossible address with any specificity; In addition, the BOP failed to definitize the changes to the transportation requirements that it wanted made.

60. As a result, Bannum was forced to supply numerous cost proposals in an attempt to respond to these undefinitized extra-contractual changes, on which the BOP failed to conduct any meaningful discussions.

61. Despite the fact that the BOP had failed to properly definitize the transportation requirement changes and despite the fact that they failed to negotiate the costs proposals submitted by Bannum, the BOP improperly withheld the exercise of the remaining options under the contract, stating that they would not be exercised until after the transportation issue was resolved. This attempt to leverage Bannum was an abuse of discretion, was done to harm Bannum, and was done in bad faith.

62. Additionally, despite the fact that Bannum had always complied with the transportation requirements, the BOP, in bad faith, utilized this extra-contractual issue as a pretext to improperly issue a Performance Evaluation in October, 2000, which ranked Bannum "fair/poor", as a result of the transportation issue. This issuance of the improper and erroneous Performance Evaluation has had, and continues to have, a long-range effect on Bannum's ability to be awarded other contracts.

63. As a result of the BOP's bad faith actions on this matter, on March 6, 2001, Bannum submitted an REA to the BOP, requesting compensation for all costs expended as a result of this issue and for lost profits as a result of the BOP's breach in not exercising the options because of the

transportation issue. The BOP failed to respond to the REA, which was converted into a Claim, by letter dated April 9, 2001, demanding compensation in the amount of $339,411.67.

64. The Contracting Officer failed to issue a Final Decision within the requisite sixty (60) days, which is deemed to be a denial of the claim in its entirety. Therefore, from this deemed denial, this appeal is made and compensation is requested in the amount of $339,411.67.

65. As a result of the instant action, during discovery, the BOP produced internal documents admitting that all along Bannum was in compliance with the transportation requirements of the contact. The BOP in bad faith still continued to abuse and leverage Bannum into providing extra transportation by causing false monitoring reports to be issued, which it used to make false performance evaluations. These performance evaluations then affected Bannum's ability to obtain additional contracts from the BOP.

66. The BOP also produced internal documents allegedly justifying the failure to exercise option years by claiming that Bannum's proposals were excessive and that it could get the services cheaper if the contract was put back out on the street. Upon information and belief, the BOP either knew or should have known that this information was false, and this was a deliberate attempt to punish Bannum for exercising its rights under the changes clause of the contract. The cost that the BOP estimated for putting the contract back out on the street was more expensive than the cost that Bannum was proposing to correct the BOP's transportation problems. This is bad faith and an abuse of discretion.

67. Bannum was unsuccessful in obtaining the replacement contract with the BOP exercising all of the option years. The BOP also exercised all of the option years on the preceding

contract. The BOP has a history of exercising all its options once a contract is in place because the expense, time, and effort of obtaining a facility in light of the zoning requirements. As a result, Bannum lost an additional two years of contract revenues. Bannum further spent an enormous amount of time and effort on attempting to resolve the transportation issue which the BOP admitted was a change to the contract requirements. Not only should Bannum be paid the additional contract revenues but it should be paid all of its time and effort in attempting to resolve the transportation issue at the behest of the BOP.

68. During the audit Bannum revised its claim from $339,411.67 to $371,918.00

COUNT 9

69. Pursuant to the terms of the Beaumont, Texas contract (J200c-336), the Laredo, Texas contract (J200c-375) and the Corpus Christi, Texas contract (J200-361), in addition to services for full-time resident mandays, "a percentage of total estimated mandays may be used for live-out programs." The contracts further contained the following estimates in regard to categorization of these services:

Fixed price per Regular Manday - 80%;

Home Confinement Mandays - 19%; and

Furloughed Mandays - 1%.

The Statement of Work for these contracts also contained a detailed description of the requirements to be filled before a resident in assigned to Home Confinement.

70. Bannum bid the contracts based upon these estimates, with the Home Confinement Manday Rate being approximately one-half of the rate for the Full-Time Resident Manday. It was

clearly understood that the Home Confinement percentage estimates reflected the maximum number of residents which could be assigned to Home Confinement.

71. On February 27, 2001 the BOP issued a letter to the Directors of Bannum's facilities, stating that the South Central Region home confinement utilization is below the mandated 20% and that this mandated target is a minimum and that all eligible inmates should be referred to and placed on home confinement.

72. On February 27 and 28, 2001 the BOP issued letters to the particular Bannum Facilities Directors, directing them to move the following number of residents from the in-house program to home confinement:

Beaumont, Texas - 5 Inmates;

Laredo, Texas - 4 inmates; and

Corpus Christi, Texas - 7 inmates.

73. As a result of complying with the BOP's direction, Bannum had the following number of residents assigned to home confinement:

Beaumont, Texas - 9 inmates;

Laredo, Texas - 10 inmates; and

Corpus Christi, Texas - 8 inmates.

74. In each of these locations, the number of inmates required to be assigned to home confinement greatly exceeded the 19% maximum estimate included in the contracts, which constitutes a breach of the contract.

75. In addition, the directed removal of a specific number of inmates to home

confinement, violated the terms of the Statement of Work, which requires that home confinement can be granted to inmates, only upon a prior determination that various specified standards have been met.

76. As a result of this improper diversion of inmates to home confinement, Bannum was forced to reduce its staff accordingly, as allowed under the Contract. As a result Bannum suffered damages, including, but not limited to: lost G&A and Profit, increased unemployment costs and the costs incurred in the interviewing and rehiring resulting from the changing populations. In the matter of the Beaumont, Texas contract, the damages were exacerbated by the fact that Bannum had already been damaged by the BOP's improper diversion of residents to other facilities, as previously discussed.

77. As a result of the improper diversion, and the damages caused thereby, Bannum submitted the following REAs:

Beaumont, Texas - March 15, 2001;

Laredo, Texas - April 9, 2001; and

Corpus Christi, Texas - April 9, 2001.

78. Subsequent to the filings of the REAs, the BOP requested a cost breakdown for each of the submittals, which were supplied by Bannum. These breakdowns included revised figures, which reflected the most recent shifts in inmate categorization. The total revised pricing for each of the REAs, was as follows:

Beaumont, Texas - $52,943.65;

Laredo, Texas - $56,416.66; and

Corpus Christi, Texas - $43, 520.87.

79. Due to the BOP's failure to negotiate these REAs, the three REAs were converted into Claims for Equitable Adjustment on September 12, 2001. By letter dated November 8, 2001, the Contracting Officer issued a Final Decision, denying Bannum's Claims in their entirety. From this November 8, 2001 Final Decision, Bannum hereby takes an appeal from said denial of its claims, in the amount of $152,881.18

COUNT 10

A. BEAUMONT, TEXAS (CONTRACT NO. J200c-336)

80. On December 15, 1999 the BOP issued a letter to Bannum regarding the Beaumont, Texas contract (J200c-336), which stated that pursuant to their records, Bannum was to reimburse a past resident a sum of $980.00, which represented an overpayment made for the required weekly subsistence payments.

81. In response, on December 23, 1999, Bannum issued a letter to BOP, stating that the required reimbursement was made and that a voucher was enclosed, in which Bannum requested payment for the reimbursement, as allowed per the contract.

82. On March 9, 2000 Bannum issued a memo to the BOP, regarding the Beaumont contract, requesting reimbursement in the amount of $81.00 for a resident release advance, which should not have been included as a credit on Bannum's billing.

83. The BOP failed to submit the required payments, despite Bannum's repeated requests on September 5, 2000 and May 16, 2001.

84. On October 3, 2001, Bannum's requests for payment was converted into a Claim for

Equitable Adjustment, in the amount of $1,061.00, from which no Decision or payment has been issued.

85. The Contractor Officer issued a Final Decision on November 30, 2001, wherein she denied $980 of the Claim, and advised Bannum to provide further documentation in support of the remaining $81 of the Claim. Since Bannum had already provided the Contracting Officer with the documentation needed to make a decision on the $81, that portion of the Claim is deemed denied. It is from the Contracting Officer's November 30, 2001 that this appeal has been taken.

B. TUPELO, MISSISSIPPI (CONTRACT NO. J200c-306), JACKSON, MISSISSIPPI (CONTRACT NO. J200c-325), TALLAHASSEE, FLORIDA (CONTRACT NO. J200c-376), MONTGOMERY, ALABAMA (CONTRACT NO. J200c-397)

86. Pursuant to the terms of the Statement of Work contained in each contract, certain medical bills incurred by the inmates are paid by Bannum, who then invoices the BOP for reimbursement.

87. In complying with the terms of the SOW, Bannum paid various medical bills and then invoiced the BOP for reimbursement. However, in regard to thirteen of these billings relating to the Tupelo, Mississippi Contract (J200c-306), Jackson, Mississippi Contract (J200c-325), Tallahassee, Florida Contract (J200c-376) and Montgomery, Alabama Contract (J200c-397), the BOP has failed to reimburse Bannum. Twelve of the billings are for the year 1999 and one is for 1998.

88. At the request of the BOP, Bannum, on numerous occasions, has supplied the BOP CCM office and the BOP Southeast Regional Office with the documentation supporting these requests.

89. Due to the failure of the BOP to issue the reimbursement, as contractually required,

on May 16, 2001, Bannum issued a demand letter for reimbursement in the amount of $2,856.00 plus additional administrative costs, plus applicable interest. The letter further requested that the BOP engage in ADR procedures to resolve the matter.

90. On October 3, 2001, these demands for payment were converted into Claims for Equitable Adjustment. To date, the BOP has failed to either reimburse Bannum, per the contract requirements, or to engage in ADR, as demanded.

91. The Contracting Officer issued a Final Decision on November 30, 2001, wherein she denied Bannum's Claim in its entirety. It is from this Contracting Officer's Final Decision that the instant appeal is taken.

C. <u>LAREDO, TEXAS (CONTRACT NO. J200c-375)</u>

92. In November, 1999, the BOP issued Modification No. 8 to the Laredo, Texas Contract (Contract No. J200c-375). The purpose of the Modification was to compensate Bannum, in an amount not exceed $4,710.40, for wages paid pursuant to the revised Wage Determinations. Bannum executed the Modification on November 12, 1999, and on or about November 17, 2000, Bannum issued a voucher requesting payment of the agreed-to $4,710.40.

93. Pursuant to the pertinent regulations, payment was to be made on or before December 23, 1999. However, payment was not received until August 30, 2001, two-hundred fifty-one (251) days after the voucher was submitted. Since the payment was not made within the requisite time, included in this payment was interest costs in the amount of only $56.90.

94. On October 4, 2001 Bannum's counsel forwarded a claim letter to the Contracting Officer questioning the interest figure contained in the payment. The letter also included detailed

calculations which showed that Bannum was entitled to interest in the amount of $156.74. In addition, since the proper interest penalty was not paid within 10 days of receipt of payment, pursuant to FAR 32.907-1 Bannum was entitled to a double interest penalty, thereby raising the total interest due to $313.47. The request for the interest payment was reiterated by letter dated October 23, 2001.

95. The Contracting Officer issued a Final Decision on November 30, 2001, wherein she denied Bannum's Claim in its entirety. It is from this Final Decision that this appeal is taken.

D. GREENSBORO, NORTH CAROLINA (CONTRACT NO. J200c-377)

96. Pursuant to the terms of the Greensboro Contract (J200c-377), Bannum was to supply doors leading to the sleeping areas, which complied with NFPA codes. Bannum installed doors which met these requirements, which resulted in the issuance of a Notice to Proceed by the BOP, after their pre-occupancy inspections, and the issuance of a Certificate of Occupancy by the State Fire Marshall and Building Inspector. As a result of the issuance of the Notice to Proceed and the Certificate of Occupancy, Bannum began performance of the contract on or about March 1, 1998.

97. Despite the issuance of the referenced documents and Bannum's successful performance during the base period and the first option period, inexplicably, in a monitoring report, dated April 17-18, 2001, the BOP issued a finding stating that the doors leading to the sleeping areas were not fire rated, and that Bannum was to ensure compliance and provide documentation within 10 days of receipt of the report.

98. This issue gave rise to numerous communications between Bannum and the BOP, regarding the actual requirements of the contract, and the continuing issuance of detrimental and

erroneous monitoring report findings.

99. In the spirit of cooperation, Bannum offered to apply a Flame Control, fire retardant paint, which would result in the doors meeting the BOP's extra-contractual requirement. However, despite the cost and function effectiveness of this proposed resolution, BOP improperly refused to accept Bannum's accommodation.

100. As a result of the BOP's continual issuance of the improper and unfavorable monitoring reports and their refusal to accept Bannum's proposed resolution, Bannum was forced to purchase and install new doors, which met the BOP's changed requirements.

101. On September 12, 2001 Bannum filed an REA in the amount of $9,663.55, which reflected the costs of purchasing and installing the new doors and the administrative incurred in dealing with this issue. The BOP failed to negotiate this REA, and as a result the REA was converted into a Claim by letter dated October 3, 2001.

102. The Contracting Officer has failed to issue a Final Decision on this Claim. To the extent that the Contractor Officer was divested of authority to make a Final Decision by the filing of Bannum's Complaint on November 9, 2001, Bannum respectfully requests that the Court stay this portion of the instant Complaint and remand it back to the Contract Officer for a Final Decision in accordance with 41 U.S.C. §605(c)(5).

WHEREFORE, Bannum hereby requests that this Court grant Bannum the following relief:

COUNT 1: Enter a judgment against the United States and in favor of Bannum in the amount of $29,673.08, plus interest, for improper deductions taken as a result of alleged performance deficiencies;

COUNT 2: Enter a judgment against the United States and in favor of Bannum in the amount of $19,090.04, plus interest, for the costs incurred as a result of the purchase and installation of new doors, directed by the BOP;

COUNT 3: Enter a judgment against the United States and in favor of Bannum in the amount of $450,722.74, plus interest, as a result of the BOP's breach of the requirements contracts and the improper diversion of residents;

COUNT 4: Enter a judgment against the United States and in favor of Bannum in the amount of $4,519.26, plus interest, for costs incurred as a result of the improper termination of Pamela Simpson from the Beaumont facility;

COUNT 5: Enter a judgment against the United States and in favor of Bannum in the amount of $51,073.10, plus interest, for costs incurred as a result of the BOP investigation based upon standards of conduct not included in Bannum's contract;

COUNT 8: Enter a judgment against the United States and in favor of Bannum in the amount of $371,918.00 plus interest, for damages suffered as a result of Bannum's dealing with the Montgomery transportation issue and the improper non-exercise of options.

COUNT 9: Enter a judgment against the United States and in favor of Bannum in the amount of $165,749.37, plus interest, for damages suffered as a result of the excessive BOP-directed home confinement.

COUNT 10: Enter a judgment against the United States and in favor of Bannum in the amount of $4,702.97, plus interest, for Claims A-C described hereinabove in the narrative for Count 10, to be later amended to include additional costs, if any, resulting from the Contracting Officer's

Final Decision on Claim D (Greensboro) of Count 10.

Date: January 28, 2008

/s/ Joseph A. Camardo, Jr.
Joseph A. Camardo, Jr.
Camardo Law Firm, P.C.
*Attorneys for Plaintiff*
127 Genesee Street
Auburn, NY 13021
Tel: (315) 252-3846
Fax: (315) 252-3508

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BANNUM, INCORPORATED,

Plaintiff,

v. No. 01-639C

UNITED STATES, Judge Lettow

Defendant.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of January 2008, a copy of the foregoing Plaintiff's Third Amended Complaint was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing though the Court's system.

s/Joseph A. Camardo, Jr.